Jonathan F. Mitchell *
jonathan@mitchell.law
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940

* admitted *pro hac vice*

William J. Brown Jr.
California Bar No. 192950
bill@brownwegner.com
Brown Wegner LLP
2010 Main Street, Suite 1260
Irvine, California 92614
(949) 705-0081

*Counsel for Plaintiff*
[Additional counsel for Plaintiff on following page]

Deleted: next

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| **Students Against Racial Discrimination,**<br><br>Plaintiff,<br><br>v.<br><br>**The Regents of the University of California; Maria Anguiano, Elaine E. Batchlor, Sonya Brooks, Carmen Chu, Michael Cohen, Gareth Elliott, Brian Komoto, Jose M. Hernandez, Nancy Lee,** | Case No. 8:25-cv-00192<br><br>**Second Amended Complaint** |

Deleted: First

Deleted: Josiah Beharry

Deleted: Howard “Peter” Guber

Deleted: FIRST

Deleted: ¶

FREEDOM FOUNDATION
Legal@myFreedomFoundation.com
360.956.3482 | myFreedomFoundation.com
WA | PO Box 552, Olympia, WA 98507
OR | 736 Hawthorne Ave NE, Salem OR 97301

**Richard Leib**, **Hadi Makarechian**, **Ana Matosantos**, **Robert Myers**, **Lark Park**, **Janet Reilly**, **Mark Robinson**, **Gregory Sarris**, **Jonathan "Jay" Sures**, **Ann Wang**, **Gavin Newsom**, **Eleni Kounalakis**, **Robert Rivas**, **Tony Thurmond**, and James B. Milliken, each in their official capacities as regents of the University of California System; **Rich Lyons**, in his official capacity as chancellor of the University of California at Berkeley; **Julio J. Frenk Mora**, in his official capacity as chancellor of the University of California at Los Angeles; **Howard Gillman**, in his official capacity as chancellor of the University of California at Irvine; **David Faigman**, in his official capacity as chancellor and dean of the University of California College of the Law, San Francisco; **Pradeep K. Khosla**, in his official capacity as chancellor of the University of California at San Diego; **Cynthia K. Larive**, in her official capacity as chancellor of the University of California at Santa Cruz; **Gary S. May**, in his official capacity as chancellor of the University of California at Davis; **Juan Sánchez Muñoz**, in his official capacity as chancellor of the University of California at Merced; **S. Jack Hu**, in his official capacity as chancellor of the University of California at Riverside; **Dennis Assanis**, in his official capacity as chancellor of the University of California at Santa Barbara,

Defendants.

Formatted: Font: Not Bold

Deleted: Michael V. Drake M.D., Geoffrey Pack, Alfonso Salazar

Formatted: Default Paragraph Font, Font: Not Bold, Font color: Text 1

Deleted: Sam Hawgood

Formatted: Font color: Text 1

Formatted: Font color: Text 1

Deleted: at

Deleted: Kim A. Wilcox

Deleted: er

Deleted: Henry T. Yang

Deleted: FIRST

Deleted: ¶

[Additional counsel for Plaintiff]

RYAN GIANNETTI*
ryan.giannetti@aflegal.org
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721

* admitted *pro hac vice*

Deleted: FIRST
Deleted: ¶

Federal law prohibits universities that accept federal funds from discriminating on account of race. *See* 42 U.S.C. § 2000d (Title VI); 42 U.S.C. § 1981. The University of California System is flouting these requirements by using racial preferences in student admissions—a practice that violates the clear and unequivocal text of Title VI and 42 U.S.C. § 1981, as well as the Equal Protection Clause of the Fourteenth Amendment. The plaintiff brings suit to enjoin these discriminatory practices, and to ensure that the defendants comply with their obligations under federal anti-discrimination laws.

## Jurisdiction and Venue

1.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.  Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district and division. *See* 28 U.S.C. § 1391(b)(2). Venue is additionally proper because at least one of the defendants resides in this judicial district and division and all defendants reside in California. *See* 28 U.S.C. § 1391(b)(1).

## Parties

3.  Plaintiff Students Against Racial Discrimination (SARD) is a voluntary, non-profit membership organization incorporated under the laws of California. SARD was formed and exists for the purpose of restoring meritocracy in academia and fighting illegal race and sex preferences that subordinate academic merit to so-called diversity considerations. SARD has members who intend to apply and will apply for admission to each of the University of California's nine undergraduate campuses. SARD also has members who intend to apply and will apply for admission to each of the University of California's five law schools. SARD's website is at https://www.sard.law. Its of-

Deleted: and each of its six medical schools

Deleted: FIRST

Deleted: ¶

fice and mailing address are located in Santa Ana, California.

4. Defendant The Regents of the University of California is a non-profit educational institution organized under the laws of the state of California. It can be served at its Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. Defendant the Regents of the University of California operates the UC System. Under Article IX, §9 of the California Constitution, the regents have the "full powers of organization and government" over the UC System, including each of its nine undergraduate campuses and each of its five law schools. *See* Cal. Const. art. IX, § 9(a).

5. Defendants Maria Anguiano, Elaine E. Batchlor, Sonya Brooks, Carmen Chu, Michael Cohen, Gareth Elliott, Brian Komoto, Jose M. Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Mark Robinson, Gregory Sarris, Jonathan "Jay" Sures, and Ann Wang are appointed regents of the University of California system. They can be served at the Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. The appointed regents are sued in their official capacities.

6. Defendants Gavin Newsom, Eleni Kounalakis, Robert Rivas, Tony Thurmond, and James B. Milliken are ex officio regents of the University of California system. They can be served at the Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. The ex officio regents are sued in their official capacities.

7. Defendants Rich Lyons, Julio J. Frenk Mora, Howard Gillman, David Faigman, Pradeep K. Khosla, Cynthia K. Larive, Gary S. May, Juan Sánchez Muñoz, S. Jack Hu, and Dennis Assanis are chancellors of the University of California at Berkeley; the University of California at Los Angeles; the Uni-

**Formatted:** Font: Italic

**Deleted:** Josiah Beharry

**Deleted:** Howard "Peter" Guber

**Formatted:** Default Paragraph Font, Font: Not Bold, Font color: Text 1

**Deleted:** and

**Formatted:** Default Paragraph Font, Font color: Text 1

**Deleted:** Michael V. Drake M.D., Geoffrey Pack,

**Deleted:** Alfonso Salazar

**Formatted:** Default Paragraph Font, Font color: Text 1

**Formatted:** Default Paragraph Font, Font color: Text 1

**Deleted:** Sam Hawgood

**Deleted:** Kim A. Wilcox

**Deleted:** Henry T. Yang

**Formatted:** Default Paragraph Font, Font color: Text 1

**Deleted:** FIRST

**Deleted:** ¶

Formatted: Font color: Text 1

Deleted: at

versity of California at Irvine; the University of California College of the Law, San Francisco; the University of California at San Diego; the University of California at Santa Cruz; the University of California at Davis; the University of California at Merced; the University of California at Riverside; and the University of California at Santa Barbara. They can be served at the Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. Each of the chancellors is sued in his or her official capacity.

8. The Regents' bylaws describe the chancellors' responsibilities and prerogatives as follows:

> The Chancellors serve as the executive heads of their respective campuses, implementing the policies and objectives of the Board and of the President of the University, and apprising the Board and the President of the University of significant developments affecting their campuses and the University. The Chancellors set the policies, goals and strategic direction for their campuses, consistent with those of the University. The Chancellors are responsible for the organization, internal administration, operation, financial management, and discipline of their campuses within the budget and policies approved by the Board and/or the President of the University. They oversee all faculty personnel and other staff at their locations, and appoint all members of the instructional staff, and may fix their remuneration in accordance with the provisions of the budget established by the Board and the salary scales of the University.

Bylaw 31, University of California Board of Regents, available at http://bit.ly/4pp4uii [https://perma.cc/NF8G-5HAC]. The chancellors are appropriate defendants under *Ex parte Young*, 209 U.S. 123 (1908), because: (1) The chancellors serve as the "executive heads" of their campuses; (2) The chancellors hold the power to change the "policies" of their campuses,

Deleted: FIRST

Deleted: ¶

including their campuses' admissions policies for their undergraduate and law-school programs; (3) The chancellors are "responsible for the organization, internal administration, operation, financial management, and discipline of their campuses," which includes the conduct of admissions and ensuring compliance with federal and state laws banning the use of race in admissions; and (4) The chancellors "oversee all faculty personnel and other staff at their locations," including every employee invovlved with admissions at their campuses. The chancellors therefore have "some connection" with the enforcement of the challenged admissions policies, making them proper defendants. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act").

## BACKGROUND

9. The University of California system discriminates on account of race when admitting students by giving discriminatory preferences to non-Asian racial minorities. This practice allows applicants with inferior academic credentials to obtain admission at the expense of rejected candidates with better academic credentials. This discriminates against large numbers of Asian-American and white applicants, who are denied admission to UC schools based on their race. And it also harms Hispanic and black students who are often placed at a significant academic disadvantage, and thus experience worse outcomes, because of the university's use of racial preferences. Students of all races are harmed by the University of California's discriminatory behavior.

10. These racial preferences are illegal under the clear and unambiguous

Deleted: FIRST

Deleted: ¶

text of Title VI, which prohibits all forms of racial discrimination at universities that receive federal funds and make no exception for diversity-based affirmative-action programs.

11. They also violate 42 U.S.C. § 1981, which prohibits racial discrimination in contracting and makes no exception for diversity-based affirmative-action programs.

12. And they violate Proposition 209, a state constitutional amendment approved by California voters in 1996 (and reaffirmed by California voters in 2020) providing that "the State shall not discriminate against, nor grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

13. After the voters approved Proposition 209 in 1996, the University of California (UC) began to institute new admissions policies compliant with the law, and applied "race-neutrality" to admissions for graduate students matriculating in 1997 and for undergraduate students matriculating in 1998.

14. The effects of Proposition 209 upon UC and its students were complex and are still debated by academics. But several major effects are undisputed. First, race-blind admissions produced a sharp drop in black freshman matriculants at UC's most competitive schools (UC Berkeley and UCLA), but higher enrollment rates of these students at less-elite UC schools (*e.g.*, UC Davis and UC Irvine), in part because black students who would have attended UC Berkeley or UCLA with a preference were admissible at UC Davis or UC Irvine without a preference.

15. Second, black students at UC campuses post-209 were generally closer to their peers in levels of academic preparation, grades, persistence in

Deleted: FIRST

Deleted: ¶

STEM fields, and graduation rates—especially rates of graduation in four years.

16. Third, all the patterns described above for black students also affected Hispanic students, though both the reductions in admissions and the improvements in academic outcomes were less pronounced for Hispanics, presumably because Hispanics had received smaller ethnically based preferences than blacks before Proposition 209.

17. Fourth, UC launched a variety of initiatives post-209 aimed at improving the high-school-to-UC pipeline for young Californians, especially for those from economically disadvantaged backgrounds. Over the years, according to UC documents, hundreds of millions of dollars were invested in these programs. These measures had a disproportionate and beneficial effect upon black and Hispanic high school students, and led to large increases in black and Hispanic applications to UC schools. For example, the total number of black, in-state applications for freshman-year admission to UC was stagnant in the years before these initiatives (2,191 in 1989, and 2,151 in 1998), but rose rapidly once the initiative began in 1999 (black applicants rose from 2,151 in 1998 to 3,307 in 2006, a greater than 50% increase.).

18. For all of these reasons, the actual number of blacks and Hispanics graduating from UC with bachelor's degrees was far higher for 2006 matriculants than for pre-209 matriculants, and there was no campus for which the number was materially lower.

19. Nonetheless, UC administrators, who had uniformly opposed Proposition 209 when it was proposed, continued to heavily criticize the restrictions it placed on their ability to increase racial diversity at UC campuses. In 2003, the UC Regents repealed their own internal measures forbidding

Deleted: FIRST
Deleted: ¶

the use of race in admissions and hiring.

20. In 2006, UCLA announced that the number of blacks matriculating as freshmen at the school would fall below one hundred for the first time in many years. Although this was largely a stochastic drop, and was largely offset by a large increase in black transfers to UCLA that year, the UCLA announcement generated a large amount of critical media coverage and protests from UCLA students and faculty. UCLA's then chancellor, Norm Abrams, met with the admissions committee and urged them to overhaul the admissions, and in particular to move to a more subjective "holistic" policy, to address concerns about low black admissions numbers. One of the members of that admissions committee, political scientist Timothy Groseclose, has written an entire book documenting how this new policy became a subterfuge for reactivating racial preferences in admissions. See Tim Groseclose, *Cheating: An Insider's Report on the Use of Race in Admissions at UCLA* (2014). The number of blacks admitted as freshmen to UCLA roughly doubled in the next admissions cycle.

21. Groseclose also documented that a majority of UCLA's undergraduate admissions committee were unwilling to allow Groseclose—a member of the committee—access to the admissions files or to detailed (anonymized) data on applicant characteristics. As a compromise, the university agreed to appoint Robert Mare, a distinguished sociologist who was sympathetic to the use of racial preferences, to examine the question of whether UCLA's post-2006 "holistic" policy was, in fact, making decisions partly on the basis of applicant race.

22. Mare completed two exhaustive studies—one completed in 2012, a second completed in 2014—on UCLA's undergraduate admissions. The sec-

Deleted: a

Deleted: FIRST

Deleted: ¶

ond, larger report was not made public until disclosed in response to a Public Records Act ("PRA") request in 2018. Both reports showed unambiguously that UCLA had awarded many more undergraduate admissions to blacks and Hispanics, and many fewer admissions to Asian-Americans, than could be explained by considering all of the non-racial factors used in admissions. Mare even provided numerical estimates of exactly how many student offers (by race) resulted from the consideration of race. Over five years, over two thousand offers were thus affected, by Mare's estimate.

23. Meanwhile, UC administrators began to encourage other UC campuses to adopt the same "holistic" approach that UCLA had implemented. In 2011, the Regents mandated that all UC campuses utilize either "holistic" or "comprehensive" review in undergraduate admissions—in other words, that they move away from objective criteria towards more subjective assessments of the overall appeal of individual candidates. Trends in racial admissions patterns consistently show that the adoption of the holistic process favored black and Hispanic admissions and disfavored Asian-Americans and, to a lesser extent, whites.

24. For example, in 2010, UC Berkeley's admission rate for black, in-state freshman applicants was 13%, compared to an overall admissions rate of 21%. This disparity reflected the lower average academic preparation of black applicants. By 2023, the black admissions rate at Berkeley was 10%, compared to an overall admission rate of 12%. Over this period, in other words, Berkeley moved towards a practice of aiming for a similar admissions rate for all ethnic groups, regardless of qualifications.

25. At UC Irvine, the 2010 admissions rate for black, in-state freshmen was 24%, compared to an overall admissions rate of 45%. By 2023, the rates

Deleted: FIRST

Deleted: ¶

were, respectively, 21% and 26%. At UCLA, the 2010 admissions rate for black, in-state freshmen was 14%, compared to an overall admissions rate of 23%. By 2023, the rates were, respectively, 10% and 9%. Note that, based on the Mare report, we know that black applicants were already receiving a large admissions preference at UCLA in 2010. At UC Santa Barbara, the 2010 admissions rate for black, in-state freshmen was 28%, compared to an overall admissions rate of 45%. By 2023, the rates were, respectively, 25% and 28%.

26. Similar trends exist at each of the remaining UC undergraduate colleges. At UC San Diego, the overall in-state admissions rate was 38% in 2010, with a 19% admissions rate for blacks; by 2023, those numbers are 25% and 18%. At UC Santa Cruz, the overall in-state admissions rate was 64% in 2010, with a 41% admissions rate for blacks; by 2023, those numbers are 63% and 52%. At UC Davis, the overall in-state admissions rate was 48% in 2010, with a 31% admissions rate for blacks; by 2023, those numbers are 42% and 30%. At UC Riverside, the overall in-state admissions rate was 76% in 2010, with a 56% admissions rate for blacks; by 2023, those numbers are 70% and 57%. At UC Merced, the overall in-state admissions rate was 89% in 2010, with a 76% admissions rate for Blacks; by 2023, those numbers are 88% and 80%

27. The degree of convergence in between the overall admissions rates and the admissions rates for blacks is highly correlated with the prestige of the school, with a bigger effect at the most elite schools, and a progressively smaller, though still detectable, effect as the eliteness of the school goes down.

28. During this same period, UC also became notably more opaque in matters relating to race. It shut down websites that had made it possible for researchers to study the relationship between student credentials, race, and

Deleted: s

Deleted: FIRST

Deleted: ¶

admissions, or to study aggregated changes in GPA, attrition from STEM fields, or graduation rates by race. In 2018, it refused to provide anonymized, individual-level data on student admissions and outcomes, although in 2008 it had willingly disclosed identical data covering student admissions up to 2006.

29. One of the few types of data that the University of California does make publicly available is a website that shows, for individual California high schools, the number of freshman applicants to each UC school, the number of admitted students, and the number of enrolled students. *See* http://bit.ly/4mXH83h [https://perma.cc/4K9Q-CMBG]. This data is broken down by race, though numbers are only reported if the "cell" size is at least three. (In other words, if a given high school has ten Hispanic applicants to Berkeley, of whom four are admitted and two enroll, the website will report the "ten" and the "four" but will show no data for Hispanic enrollment.) These data provide further evidence that UC schools pursue proportional racial representation despite substantial differences in academic preparation across racial groups. For example, the website reports that at Long Beach Polytechnic, 237 students applied for admission to UCLA in 2023, of whom 23 were admitted (just under 10%). Forty-one of the applicants were black, of whom 4 were admitted (again, just under 10%). Yet the average achievement level of black students at Long Beach Polytechnic on state exams was substantially lower than the achievement level for students overall (roughly one-half standard deviation). At Woodrow Wilson High School, also in Long Beach, 186 students applied for admission to UCLA, and 20 were admitted (11%). Of the 186 applicants, 33 were black, and 4 of these applicants were admitted (12%). Yet the average achievement level of black students at Woodrow Wilson High

Deleted: FIRST

Deleted: ¶

School on state exams was substantially lower than the achievement level for students overall. Similar patterns can be demonstrated for many other high schools. In other words, the tendency of UC schools to approximate racial parity in overall admissions rates cannot be explained by differences in the high schools attended by students of different races.

30. University of California law schools have been even more overt in their violation of state and federal laws prohibiting racial preferences. In 2014, the National Bureau of Economic Research published a working paper by Danny Yagan, an associate professor of economics at UC Berkeley. Yagan found that racial preferences at UC Berkeley's Law School declined after Proposition 209 became law, but still remained quite large. The black admissions rate of 31%, Yagan found, would have fallen to 8% had the school applied the same criteria that it applied to whites. Holding credentials of individual applicants constant, Yagan found that black applicants received an admissions preference as large as 61 percentage points.

31. This pattern of discrimination continues and operates to varying degrees across UC law schools. Just as the University of California was unwilling to provide anonymized, individual-level data on undergraduate applicants after 2010, so it was unresponsive to a public records request filed by UCLA law professor Richard Sander for law school data in 2011. In 2014, Sander brought suit to enforce his request, and UC subsequently provided him admissions data for UC Berkeley Law School, UCLA Law School, and UC Davis Law School, covering many admissions cycles up through 2011. These data show significant racial preferences at all three law schools throughout this period, and confirm the general pattern documented by Yagan. The publicly-available data on UC Hastings and UC Irvine's law schools is less granular,

Deleted: FIRST
Deleted: ¶

but strongly implies the same pattern.

32. More recently, Professor Sander has obtained data from Law School Data (www.lsd.law), a website that law school applicants use to report and compare their admissions outcomes at law schools. The site contains (anonymized) data on tens of thousands of law school applications over the past five years, including information on LSAT scores, undergraduate grades, ethnicity, the schools to which the student applied, and the admissions outcome. Analysis of the data shows that the implicit weights on various admissions factors in the data, such as academic credentials, are very similar to the weights revealed by analysis of publicly disclosed data from law schools, suggesting that the data are highly reliable. Regression analysis of this data (see attached Table 1) and tabular presentation of the data (see attached Table 2) show a very pronounced pattern of racial preferences across all the UC law schools. In these analyses, "relative credential" is a measure of the academic Index of each applicant (LSAT and undergraduate grade point average combined) relative to the estimated median credential of students at a given law school, based on data reported by the law schools to the American Bar Association. Thus, if a law applicant has an academic index of 750, and applies to a law school with a median academic index of 800, then the applicant has a "relative credential" of –50. As Table 2 suggests, black students with low relative credentials have, at the five UC law schools analyzed collectively, about ten times the chance to be admitted as does a "non-URM" (*i.e.*, white or Asian-American) student with similar credentials.

33. The shift to race-neutral admissions brought about by Proposition 209 benefitted black and Hispanic students both in terms of placement and outcomes. Yet the university's decision to pursue racial preferences in the

**Deleted:** nts

**Deleted:** our

**Deleted:** <#>The University of California's medical schools have also been giving illegal race and sex preferences to black and Hispanic applicants, and they have dramatically increased the discriminatory preferences awarded to black medical-school applicants in response to the death of George Floyd in 2020. In 2015–2016, blacks made up 7.1% of the entering medical-school class at the University of California at San Francisco. In each of the last three academic years, however, the University of California at San Francisco has boosted racial preferences for black medical-school applicants to the point that blacks make up at least 14% of the entering medical-school class, so that the black student-body percentage at UCSF equals or exceeds the percentage of blacks in the overall U.S. population. At the same time, the University of California at San Francisco has drastically cut the number of white students attending UCSF. Before the death of George Floyd in 2020, whites consistently represented at least 33% of the entering medical-school class as UCSF. By 2024–25, however, that number had fallen to 15.3%. The number of white and black students in UCSF's entering medical-school class for the 2024–25 school year were nearly equal (105 vs. 100), even though whites far exceed blacks in the applicant pool and significantly outperform blacks on the MCAT. The following chart illustrates this trend:
**UCSF School of Medicine Matriculants**

**UCSF School of Medicine Matriculants** ... [1]

**Deleted:** FIRST

**Deleted:**

teeth of Proposition 209 has willfully disregarded the interests of black and Hispanic candidates and harmed their educational outcomes.

## Facts Related To Standing

34. Plaintiff SARD is a voluntary membership organization founded in 2024. SARD seeks to restore meritocracy in academia and eliminate the corrupt and unlawful race and sex preferences that subordinate academic merit to so-called diversity considerations.

35. SARD has student members who are ready and able to apply for admission to the University of California.

36. Individual A is a member of SARD. He is an Asian-American male. Individual A has completed his junior year of high school and began his senior year this fall.

Deleted: recently
Deleted: will
Deleted: i

37. Individual A stands able and ready to apply for admission as an undergraduate freshman to each of the University of California's nine campuses that have undergraduate colleges. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual A from competing with other applicants for admission on an equal basis. Specifically, Individual A is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

38. Individual A has applied for admission to each of the University of California's nine campuses that has an undergraduate college. Individual A submitted each of these applications in the fall of 2025. Individual A meets all of the requirements for admission as an undergraduate freshman to the

Deleted: intends to apply and will
Deleted: y
Deleted: will
Deleted: FIRST
Deleted: ¶

University of California campuses, which are listed at http://bit.ly/4mLLR8k [https://perma.cc/H95Z-VHTW]. Specifically, Individual A has completed all 15 of the "A–G courses" listed on the UC website. Individual A also has a grade point average (GPA) of 3.0 or better in those courses with no grade lower than a C, using the GPA calculation described on the UC website. *See* http://bit.ly/4kw8Imw [https://perma.cc/SQX8-4YZS]. Individual A will maintain the required minimum grade-point average during the application process and until he graduates from high school.

39. Individual D is a member of SARD. He is a white male.

40. Individual D stands able and ready to apply for admission as a law student to each of the University of California's five campuses that have a law school: Berkeley, UCLA, Davis, Irvine, and UC Law San Francisco (formerly known as UC Hastings). *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual D from competing with other applicants for admission on an equal basis. Specifically, Individual D is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

41. Individual D intends to apply and will apply for admission to each of the University of California's five campuses that has a law school. Individual D will submit each of these applications in the fall of 2025. Individual D meets all of the requirements for admission as a law student to these University of California campuses. Specifically, Individual D has already earned a bachelor's degree from an accredited college and has taken the LSAT and re-

**Deleted:** already

**Deleted:** 14 of the

**Deleted:** , and he will complete the 15th course over the summer

**Deleted:** <#>Individual B is a member of SARD. She is an Asian-American female. Individual B is a college undergraduate.¶
<#>Individual B stands able and ready to apply for admission to UCSD for a master's degree in electrical engineering. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual B from competing with other applicants for admission on an equal basis. Specifically, Individual B is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.¶
<#>Individual B has already submitted her application to UCSD for a master's degree in electrical engineering. Individual B meets all of the requirements for admission to this program, including the minimum required undergraduate GPA of 3.0.¶
<#>Individual C is a member of SARD. He is a white male. Individual C attends a community college and wishes to transfer to one of the University of California campuses.¶
<#>Individual C stands able and ready to apply for admission as an undergraduate transfer to all nine the University of California's campuses that have undergraduate colleges, and he has already submitted his transfer applications. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual C from competing with other applicants for admission on an equal basis. Specifically, Individual C is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.¶
<#>Individual C meets all of the requirements for admission as an undergraduate transfer student to these University of California campuses, which are listed at http://bit.ly/3ZS04Xe [https://perma.cc/DB32-3BKR] and http://bit.ly/4ks7xVf [https://perma.cc/FZJ5-LSTQ]. Specifically, Individual C has taken all of the course work required to make him eligible for consideration as an undergraduate transfer student from a community college. ¶

**Deleted:** FIRST

**Deleted:** ¶

ceived his LSAT score.

42. Individual F is a member of SARD. He is an Asian-American male.

43. Individual F stands able and ready to apply for admission as a law student to each of the University of California's five campuses that have a law school: Berkeley, UCLA, Davis, Irvine, and UC Law San Francisco (formerly known as UC Hastings). *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual F from competing with other applicants for admission on an equal basis. Specifically, Individual F is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

44. Individual F intends to apply and will apply for admission to each of the University of California's five campuses that has a law school. Individual F will submit each of these applications in the fall of 2025. Individual F meets all of the requirements for admission as a law student to these University of California campuses. Specifically, Individual F has already earned a bachelor's degree from an accredited college and has taken the LSAT and received his LSAT score.

45. Individual G is a member of SARD. He is a white male.

46. Individual G stands able and ready to apply for admission as a law student to each of the University of California's five campuses that have a law school: Berkeley, UCLA, Davis, Irvine, and UC Law San Francisco (formerly known as UC Hastings). *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chap-*

**Deleted:** <#>Individual E is a member of SARD. He is an Asian-American male.¶
<#>Individual E stands able and ready to apply for admission as a medical student to each of the University of California's six campuses that have a medical school: UCSF, UCLA, Davis, Irvine, San Diego, and Riverside. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual E from competing with other applicants for admission on an equal basis. Specifically, Individual E is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.¶
<#>Individual E intends to apply and will apply for admission to each of the University of California's six campuses that has a medical school. Individual E will submit each of these applications in the summer of 2026. Individual E meets all of the requirements for admission as a medical student to these University of California campuses. Specifically, Individual E has already earned a bachelor's degree from an accredited college and will take the MCAT before applying to medical school next year. Individual E has also taken all of the undergraduate courses and lab work required for admission to medical school, including one year of biology, one year of chemistry, one year of physics, and one year of organic chemistry. ¶

**Deleted:** FIRST

**Deleted:** ¶

*ter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual G from competing with other applicants for admission on an equal basis. Specifically, Individual G is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

47. Individual G intends to apply and will apply for admission to each of the University of California's five campuses that has a law school. Individual G will submit each of these applications in the fall of 2026. Individual G will meet all of the requirements for admission as a law student to these University of California campuses. Specifically, Individual G will earn his bachelor's degree from an accredited college in the spring of 2026, and he has already taken the LSAT and received his LSAT score.

48. Individual H is a member of SARD. He is a white male.

49. Individual H stands able and ready to apply for admission as a law student to each of the University of California's five campuses that have a law school: Berkeley, UCLA, Davis, Irvine, and UC Law San Francisco (formerly known as UC Hastings). *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual H from competing with other applicants for admission on an equal basis. Specifically, Individual H is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

50. Individual H intends to apply and will apply for admission to each of

Deleted: FIRST

Deleted: ¶

the University of California's five campuses that has a law school. Individual H will submit each of these applications in the fall of 2026. Individual H will meet all of the requirements for admission as a law student to these University of California campuses. Specifically, Individual H will earn his bachelor's degree from an accredited college in the spring of 2027, and he will take the LSAT in the fall of 2026.

Formatted: Font color: Auto

51. Individual J is a member of SARD. He is an Asian-American male. Individual J has completed his sophomore year of high school and began his junior year this fall. He will graduate from high school in 2027.

52. Individual J stands able and ready to apply for admission as an undergraduate freshman to each of the University of California's nine campuses that have undergraduate colleges. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual J from competing with other applicants for admission on an equal basis. Specifically, Individual J is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

53. Individual J intends to apply and will apply for admission to each of the University of California's nine campuses that has an undergraduate college. Individual J will submit each of these applications in the fall of 2026. Individual J will meet all of the requirements for admission as an undergraduate freshman to the University of California campuses, which are listed at http://bit.ly/4mLLR8k [https://perma.cc/H95Z-VHTW]. Specifically, Individual J will complete all 15 of the "A–G courses" listed on the UC website.

Deleted: FIRST

Deleted: ¶

Individual J will also maintain a grade point average (GPA) of 3.0 or better in those courses with no grade lower than a C, using the GPA calculation described on the UC website. *See* http://bit.ly/4kw8Imw [https://perma.cc/SQX8-4YZS]. Individual J will maintain the required minimum grade-point average during the application process and until he graduates from high school.

54.  Individual K is a member of SARD. He is an Asian-American male. Individual K has completed eighth grade and began his freshman year of high school this fall. He will graduate from high school in 2029.

55.  Individual K stands able and ready to apply for admission as an undergraduate freshman to each of the University of California's nine campuses that have undergraduate colleges. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual K from competing with other applicants for admission on an equal basis. Specifically, Individual K is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

56.  Individual K intends to apply and will apply for admission to each of the University of California's nine campuses that has an undergraduate college. Individual K will submit each of these applications in the fall of 2028. Individual K will meet all of the requirements for admission as an undergraduate freshman to the University of California campuses, which are listed at http://bit.ly/4mLLR8k [https://perma.cc/H95Z-VHTW]. Specifically, Individual K will complete all 15 of the "A–G courses" listed on the UC website.

Deleted: FIRST

Deleted: ¶

Individual K will also maintain a grade point average (GPA) of 3.0 or better in those courses with no grade lower than a C, using the GPA calculation described on the UC website. *See* http://bit.ly/4kw8Imw [https://perma.cc/SQX8-4YZS]. Individual K will maintain the required minimum grade-point average during the application process and until he graduates from high school.

57. All of these Article III injuries are fairly traceable to the allegedly unlawful conduct of the defendants discriminating on account of race in violation of 42 U.S.C. § 1981, Title VI, and Proposition 209. And all of these injuries will be redressed by the requested relief, which will enjoin the defendants from continuing these discriminatory policies and require them to adopt colorblind student-admission policies.

58. SARD is challenging the admissions policies and practices at the University of California's undergraduate programs and its law schools. SARD is not challenging the University of California's transfer or graduate or medical-school admissions in this lawsuit.

Deleted: ,

Deleted: , and its medical schools

**FIRST CLAIM FOR RELIEF—VIOLATIONS OF TITLE VI**

59. Each of the defendants is violating Title VI by discriminating in favor of black, and Hispanic applicants for admission and against whites and Asians.

60. Each of the nine UC undergraduate campuses and the five UC law schools to which the members of SARD intend to apply is a "program or activity" that "receives Federal financial assistance" within the meaning of Title VI.

Deleted: ,

Deleted: , and the six UC medical schools

61. SARD therefore seeks declaratory and injunctive relief that prohibits the defendants from considering or discriminating on account of race in any

Deleted: FIRST

Deleted: ¶

way in student admissions, and that compels the defendants to select applicants for admission in a color-blind manner.

62. SARD seeks this relief under Title VI, 42 U.S.C. § 1983, and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

63. SARD seeks this relief only against the institutional defendants and not the individual defendants.

64. SARD also seeks nominal damages from the institutional defendants on its Title VI claims.

65. The text of Title VI makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits *all* forms of racial discrimination at institutions that receive federal funds—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**SECOND CLAIM FOR RELIEF—VIOLATIONS OF 42 U.S.C. § 1981**

66. 42 U.S.C. § 1981(a) guarantees individuals the same right to make and enforce contracts without regard to race. *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens").

67. 42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

Deleted: FIRST
Deleted: ¶

68.  The individual defendants are violating 42 U.S.C. § 1981(a) by discriminating in favor of blacks and Hispanics in student admissions, and against whites and Asians.

69.  SARD therefore seeks declaratory and injunctive relief that prohibits the individual defendants from considering or discriminating on account of race in any way in student admissions, and that compels the defendants to select applicants for admission in a color-blind and race-neutral manner.

70.  SARD seeks this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975).

71.  SARD seeks this relief only against the individual defendants, and not against the institutional defendants, as 42 U.S.C. § 1981 neither abrogates nor waives a state institution's sovereign immunity from suit. *See Sessions v. Rusk State Hospital*, 648 F.2d 1066 (5th Cir. 1981) ("Section 1981 contains no congressional waiver of the state's eleventh amendment immunity.").

72.  The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits *all* forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**THIRD CLAIM FOR RELIEF—EQUAL PROTECTION CLAUSE**

73.  As public institutions, the University of California is subject to the

Deleted:

Deleted: FIRST

Deleted: ¶

commands of the Equal Protection Clause, which prohibits state universities or their components from denying to any person the equal protection of the laws.

74. The Supreme Court has held that the Equal Protection Clause prohibits race and sex discrimination by state universities in student admissions. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 206 (2023).

75. The University of California's use of racial preferences is incompatible with the Supreme Court's interpretation of the Equal Protection Clause.

76. SARD therefore seeks declaratory and injunctive relief that prohibits the defendants from considering or discriminating on account of race in any way in student admissions, and that compels the defendants to select applicants for admission in a color-blind and race-neutral manner.

77. SARD seeks this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

78. SARD seeks this relief only against the individual defendants, and not against the institutional defendants, as 42 U.S.C. § 1983 authorizes lawsuits only against "persons" and not states or state institutions. *See Will v. Michigan Dep't of Police*, 491 U.S. 58, 64–71 (1989) (a state is not a "person" under 42 U.S.C. § 1983).

**DEMAND FOR RELIEF**

79. SARD respectfully requests that the court:

a. declare that each of the defendants is violating Title VI by discriminating in favor of non-Asian racial minorities in student

Deleted: FIRST

Deleted: ¶

admissions;

b. declare that the individual defendants are violating 42 U.S.C. § 1981(a) and the Equal Protection Clause by discriminating in favor of non-Asian racial minorities in student admissions;

c. permanently enjoin the defendants from considering race in student admissions;

d. permanently enjoin the defendants from asking or allowing an applicant for admission to reveal their race;

e. appoint a court monitor to oversee all decisions relating to the defendants' admission of students to ensure that these decisions are free from racial discrimination of any sort;

f. award the plaintiff nominal damages on its Title VI claim;

g. award costs and attorneys' fees under 42 U.S.C. § 1988;

h. grant all other relief that the Court may deem just, proper, or equitable.

Deleted: and punitive damages

Respectfully submitted.

/s/ William J. Brown Jr.
WILLIAM J. BROWN JR.
California Bar No. 192950
Brown Wegner LLP
2010 Main Street, Suite 1260
Irvine, California 92614
(949) 705-0081 (phone)
bill@brownwegner.com

JONATHAN F. MITCHELL*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Deleted: ¶

(additional counsel listed on following page)

Deleted: FIRST

Deleted: ¶



Ryan Giannetti*
D.C. Bar No. 400153
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721 (phone)
ryan.giannetti@aflegal.org

* admitted *pro hac vice*

Dated: January 7, 2026

*Counsel for Plaintiff*

Deleted: June 10, 2025

Deleted: FIRST

Deleted: ¶

## Certificate of Service

I certify that on January 7, 2026, I served this document by CM/ECF upon:

Debo Adegbile
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 295-8800
debo.adegbile@wilmerhale.com

Felicia H. Ellsworth
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
felicia.ellsworth@wilmerhale.com

Joshua A. Vittor
Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue Suite 2400
Los Angeles, California 90071
(213) 443-5300
joshua.vittor@wilmerhale.com

*Counsel for the Defendants*

/s/ William J. Brown Jr.
William J. Brown Jr.
*Counsel for Plaintiff*

Dated: January 7, 2026

Deleted: June 10, 2025,

Deleted: December 31, 2025

Deleted: first

Deleted: ¶

**Page 15: [1] Deleted** **Jonathan F Mitchell** **1/4/26 4:32:00 PM**