AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| Students Against Racial Discrimination (SARD) | ) |
| _Plaintiff_ | ) |
| v. | ) |
| The Regents of the University of California, et al. | ) |
| _Defendant_ | ) |

Civil Action No.  8:25-cv-00192-JWH-JDE

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                          Dr. Roger Edward Bolus
                   2862 Avenida Cereza, Carlsbad, California 92009

_(Name of person to whom this subpoena is directed)_

☛ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached to this subpoena.

| Place: Please e-mail responsive documents to: jonathan@mitchell.law | Date and Time: March 2, 2026, at 5:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     1/20/2026

CLERK OF COURT

_____          OR      _Jonathan F. Mitchell_
Signature of Clerk or Deputy Clerk                    _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_     SARD
_____ , who issues or requests this subpoena, are:

Jonathan F. Mitchell, 111 Congress Avenue, Suite 400, Austin, Texas, 78701; (512) 686-3940; jonathan@mitchell.law

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.    8:25-cv-00192-JWH-JDE

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $       0      .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                              *Server's signature*

                                                  _____
                                                              *Printed name and title*

                                                  _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

## Documents to Be Produced by Dr. Roger Bolus

I.    **DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION**

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 1997, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message, and any electronic data or computer file.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or

last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms **"implement"** and **"implementation"** refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term **"information"** refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms **"person"** and **"persons"** mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term **"record"** means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)    handwriting;
  (B)    typewriting;
  (C)    printing;
  (D)    photostat;
  (E)    photograph;
  (F)    magnetic impulse;
  (G)    mechanical or electronic recording;
  (H)    digitized optical image; or
  (I)    another form of data compilation.

- The term **"record"** also includes any communication, including an e-mail or text-message communication.

- The term **"reproduction"** means an accurate and complete counterpart of an original document or record produced by:

  (A)    production from the same impression or the same matrix as the original;
  (B)    photograph, including an enlargement or miniature;
  (C)    mechanical or electronic re-recording;
  (D)    chemical reproduction;

(E)    digitized optical image; or

(F)    another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

- The term "**you**" means the State Bar of California.

## II.    DOCUMENTS OR TANGIBLE THINGS REQUESTED

**Request No. 1**: All data, documents, and communications in your possession, custody, or control pertaining to studies that you led, conducted, or participated in for the State Bar of California, including but not limited to: (1) The 2017 study that analyzed data from 2008, 2012, and 2016; (2) The study completed in 2018 that examined changes in the characteristics of students taking the California Bar Exam to provide a better understanding of the declining trend of the bar passage rates; and (3) Each and all of the studies attached to this document.

The studies mentioned in (1) and (2) are described on the State Bar of California's website at: https://www.calbar.ca.gov/admissions/examinations/california-bar-examination/california-bar-examination-studies-fact-sheet

# AN INVESTIGATION OF POSSIBLE ITEM AND GRADER BIASES
# IN A STATE BAR EXAMINATION.[1]

Stephen P. Klein[2]
The Rand Corporation
University of California, Los Angeles

## Purpose

Black and Mexican-American candidates generally score substantially lower on state bar examinations than do Anglo candidates. The purpose of the research presented in this report was to determine whether this differential in performance was a function of the relative abilities of the examinees versus biases in the examination's questions and/or the scoring of the answers to these questions.

## State Bar Examination

The state bar examination used in this research had two major sections. One section, called the "Multistate Bar Examination" (MBE), was composed of 200 multiple choice items. These items were divided equally among five content areas corresponding to basic fields of law, such as torts and contracts. The multistate examination is used throughout the United States and is published and scored by the Educational Testing Service.

The other section of the bar examination was developed by the state's own committee of bar examiners and contained a set of 20 essay questions. Each examinee was required to answer 15 of these 20 questions at the average rate of 52 minutes per question.

## Candidates

A sample of 343 Anglos, 128 Blacks, and 83 Chicanos was drawn from among those candidates who in July of 1974 were taking the examination for the first time. Information regarding ethnicity of these candidates was obtained from them via a mailed questionnaire. Data on the candidates' performance in law school and on the Law Schools Admissions Test (LSAT) was obtained from their law school records.

1. Paper presented at the meetings of the Western Psychological Association, Los Angeles, California; April 9, 1976.

2. This study was conducted and prepared while Dr. Klein was a private consultant to the State Bar Association of California. The views expressed in this report are his own and do not necessarily represent those of the State Bar Association, The Rand Corporation, or the University of California.

## Analysis of Bias Across MBE Subtests

The first analysis of the bar examination investigated whether the relative differences between ethnic groups was essentially the same across the five content areas in the Multistate section of the test. In other words, were certain subtests unusually more or less difficult for certain groups? This question was examined by means of a repeated measures analysis of variance. In this context, "bias" was defined as a significant interaction between ethnic group and subtests. The results of this analysis appear in Tables 1 and 2. An inspection of these data indicates a highly statistically significant but practically small percentage of systematic variance accounted for by the interaction effect.

## Analysis of Bias Within MBE Subtests

The second analysis examined whether the relative difference between ethnic groups was essentially the same across all 40 items within each subtest of the Multistate examination. This issue was investigated by a series of repeated measures analyses of variance; i.e., one analysis for each of the five subtests. The results of these analyses appear in Table 3. Inspection of these data indicates a few interactions between ethnic group and items that achieve statistical significance, however, none of these effects account for any substantial portion of the variance in candidates' performance.

## Analysis of Bias Across Essay Questions

The third analysis investigated whether the differences in performance on the essay section between ethnic groups remained relatively constant or whether certain questions were atypically hard or easy for a given group. A repeated measures analysis of variance was employed with the candidates' scores on the 18 questions that were answered most frequently. The results of this analysis appear in Table 4. These results were consistent with those noted previously in that a very small but statistically significant interaction was obtained.

The foregoing set of studies indicated that a total of less than five percent of the variation in a candidate's score could be attributable to any biases in the kinds of questions asked on the multistate and essay portion of the bar examination. For the reader's information, Tables 5 and 6 contain summary information regarding the candidates' performance on this examination for those individuals for whom complete data were available.

## Analysis of Grading Practices

The present research also investigated one more possible source of bias in the examination process; namely, whether there was any bias in the scoring of the answers to the essay questions as a result of the state generally using Anglo graders for this function.    In other words, would the difference in performance between groups on this portion of the test diminish if there were greater use of Black and Chicano graders?  For reasons that have to do more with the politics rather than the science of research, it was not possible to obtain the essay answers written by the candidates employed in the analyses described previously.  Thus, in order to investigate the issue of grader bias, it was necessary to obtain answers written by Anglo, Black, and Chicano candidates on the 1975 examination.

The answers to two questions were selected for this study.  Each candidate's answer was then scored independently by three Anglo, three Black, and two Chicano graders.  Except for ethnicity, these graders were comparable to those used by the state in terms of both demonstrated satisfactory performance on the bar and training in how to score the written answers.  The score assigned to each answer by the state bar's grader also was available as were data on the candidates' performance on relevant predictor measures.

The median intraclass correlation among graders within each group of graders was .77 for question #1 and .76 for question #2.  In general, Anglo graders tended to agree with one another slightly more than did the graders within the other two groups.

The results of a repeated measures analysis of variance appear in Table 7. An inspection of these data indicate that no statistically significant interaction was obtained between types of candidates and graders.  In other words, the ethnicity of the grader did not <u>differentially</u> influence the scores that grader assigned to answers written by candidates in the various ethnic groups. In fact, the only significant difference between types of graders was that minority group graders tended to be somewhat more lenient than Anglo graders. This finding is illustrated in the column means in Tables 8 and 9.  Table 10 presents the correlations between the average score assigned by each group of graders with other variables of interest, such as the number of words written on each answer.

Summary and Conclusions

The analyses presented in this report indicate that there is little evidence of ethnic bias in either the questions asked or in who scores them. Thus, the observed differences in average performance between ethnic groups appears to be primarily a function of their respective abilities to take the bar examination rather than any inherent bias in the test itself. Possible reasons for this difference are beyond the scope of this paper but are likely to involve factors that influence a candidate even before he or she ever enters law school.  Finally, it should be noted that this study only examined certain sources of bias within the test itself.  It did not examine whether performance on the test was in any way related to being an effective lawyer.  While we are waiting for the jury to give us a verdict on that issue, it seems reasonable to continue with the present examination process in that it does not appear to be unduly biased for or against any ethnic group.

TABLE 1

Summary of repeated measures ANOVA across MBE subtests.

| Source | df | MS | F | p |
|---|---|---|---|---|
| Ethnic Group | 2 | 2237.02 | 35.22 | .001 |
| Error | 551 | 46.77 | | |
| Subtests | 4 | 4351.16 | 492.64 | .001 |
| Group X Subtests | 8 | 39.05 | 4.42 | .001 |
| Error | 2204 | 8.83 | | |

TABLE 2

Mean MultiState subtest scores.

| | Anglos (N=342) | Blacks (N=128) | Chicanos (N=82) | Subtest Average |
|---|---|---|---|---|
| Real Property | 22.19 | 18.34 | 18.49 | 20.74 |
| Contracts | 28.38 | 26.60 | 26.72 | 27.72 |
| Torts | 29.34 | 26.57 | 27.24 | 28.39 |
| Criminal | 27.12 | 24.59 | 25.18 | 26.24 |
| Evidence | 28.72 | 25.79 | 26.40 | 27.70 |
| Group Average | 27.15 | 24.38 | 24.81 | 26.16 |

TABLE 3

Summary of repeated measures ANOVA for each MBE subtest.

| Source | df | Real Property MS | F | Contracts MS | F | Torts MS | F | Criminal MS | F | Evidence MS | F |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ethnic Group | 2 | 23.45 | 43.58** | 4.88 | 14.22** | 10.54 | 31.96** | 8.87 | 21.84** | 12.09 | 27.77** |
| Error | 551 | .53 | | .34 | | .33 | | .41 | | .44 | |
| Items | 39 | 114415.56 | 33.84** | 266965.31 | 101.58** | 134343.38 | 85.94** | 87614.31 | 34.55** | 846584.19 | 405.54** |
| Group X Items | 78 | 6348.92 | 1.87** | 1619.28 | .62 | 960.62 | .61 | 5371.28 | 2.12** | 5488.82 | 2.63** |
| Error | 21489 | 3380.20 | | 2628.06 | | 1563.21 | | 2536.24 | | 2087.55 | |

** $\alpha \leq .01$

TABLE 4

Summary of ANOVA for Essay Questions

| Source | df | MS | F | p |
|---|---|---|---|---|
| Ethnic Group | 2 | 24605.91 | 35.22 | .001 |
| Error | 551 | 698.64 | | |
| Items | 17 | 1371.04 | 20.03 | .001 |
| Ethnic Group X Items | 34 | 139.70 | 2.04 | .001 |
| Error | 9367 | 68.44 | | |

TABLE 5

Mean score on each measure for each group.

| Measure | Anglos (N=248) | Blacks (N=82) | Chicanos (N=52) |
|---------|----------------|---------------|-----------------|
| UGPA    | 2.94           | 2.70          | 2.67            |
| LSAT    | 567.39         | 443.08        | 461.94          |
| LGPA    | 2.74           | 2.22          | 2.25            |
| MBE     | 478.45         | 428.02        | 432.50          |
| Essay   | 1135.94        | 1041.03       | 1039.90         |
| Total   | 1614.40        | 1469.05       | 1472.40         |

TABLE 6

Correlations between predictors and criterion variables for each group.

| Predictor(s) | Criterion | Anglos | Blacks | Chicanos |
|--------------|-----------|--------|--------|----------|
| LSAT         | MBE       | .51    | .59    | .22      |
|              | Essay     | .36    | .37    | .24      |
|              | Total     | .46    | .51    | .24      |
| UGPA         | MBE       | .12    | .04    | .01      |
|              | Essay     | .17    | **.03**  | .14    |
|              | Total     | .16    | .04    | .09      |
| LGPA         | MBE       | .39    | .31    | .47      |
|              | Essay     | .40    | .29    | .51      |
|              | Total     | .44    | .33    | .53      |
| LSAT & LGPA  | MBE       | .62    | .59    | .48      |
|              | Essay     | .55    | .42    | .55      |
|              | Total     | .56    | .54    | .55      |

TABLE 7

Summary of results for repeated measures ANOVA

for Questions #1 and #2

| Source | df | Question #1 | | | Question #2 | | |
|---|---|---|---|---|---|---|---|
| | | MS | F | p | MS | F | p |
| Candidates | 2 | 2210.94 | 11.02 | .001 | 937.70 | 5.34 | .007 |
| Error | 76 | 200.62 | | | 175.50 | | |
| Graders | 3 | 1055.06 | 37.40 | .001 | 596.91 | 23.19 | .001 |
| Candidates X Graders | 6 | 41.67 | 1.47 | .187 | 42.14 | 1.64 | .138 |
| Error | 228 | 28.21 | | | 25.79 | | |

TABLE 8

Cell and marginal means for Question #1.

| Type of Candidate | State Bar | Type of Grader | | | Row Mean |
|---|---|---|---|---|---|
| | | Anglos | Blacks | Chicanos | |
| Anglo (N = 28) | 70.71 | 70.65 | 72.69 | 77.66 | 72.93 |
| Black (N = 25) | 60.40 | 59.67 | 66.87 | 68.90 | 63.96 |
| Chicano (N = 26) | 65.58 | 63.53 | 68.21 | 71.25 | 67.14 |
| Column Mean | 65.76 | 64.83 | 69.37 | 72.78 | 68.18 |

TABLE 9

Cell and marginal means for Question #2

| Type of Candidate | State Bar | Type of Grader | | | Row Mean |
|---|---|---|---|---|---|
| | | Anglos | Blacks | Chicanos | |
| Angio (N = 28) | 74.29 | 71.90 | 72.98 | 76.77 | 73.98 |
| Black (N = 24) | 70.63 | 64.58 | 70.35 | 71.77 | 69.33 |
| Chicano (N = 27) | 68.33 | 64.06 | 70.49 | 71.85 | 68.57 |
| Column Mean | 71.14 | 67.00 | 71.18 | 73.57 | 70.72 |

TABLE 10

Correlations between the average scores assigned by each type of grader and related factors. [1,2]

| | Anglo Graders | Black Graders | Chicano Graders | State Bar Grader | LSAT Score | LGPA | Total Bar Score | No. words written on question #1 |
|---|---|---|---|---|---|---|---|---|
| Anglo Graders | (.43)** | .79** | .75** | .69** | .42** | .55** | .58** | .55** |
| Black Graders | .60** | (.32)** | .67** | .53** | .39** | .59** | .44** | .51** |
| Chicano Graders | .67** | .61** | (.16) | .69** | .32** | .49** | .47** | .60** |
| State Bar Grader | .67** | .59** | .66** | (.24)* | .28** | .42** | .44** | .48** |
| LSAT Score | .30** | .30** | .29** | .32** | --- | .52** | .59** | .22* |
| LGPA | .42** | .37** | .24* | .38** | .52** | --- | .72** | .34** |
| Total Bar Score | .57** | .56** | .47** | .62** | .59** | .72** | --- | .34** |
| No. words written on question #2 | .44** | .31** | .26* | .22* | -.03 | .14 | .22* | (.29)** |

\* α ≤ .05    \*\* α ≤ .01

1. Correlations for Questions #1 and #2 appear above and below the main diagonal, respectively.

2. Correlations between Questions #1 and #2 appear along the main diagonal in parenthesis and are based on those candidates (N = 69) who answered both questions.

AN ANALYSIS OF THE RELATIONSHIP BETWEEN
TRIAL PRACTICE SKILLS AND BAR EXAMINATION RESULTS

A Report Prepared for the
Committee of Bar Examiners of the State Bar of California
and the National Conference of Bar Examiners

Prepared by

Stephen P. Klein
GANSK & Associates

January 10, 1983

PREFACE

In 1979, the Committee of Bar Examiners (CBE) of the State Bar of California held a series of conferences with experts in legal education and testing. These meetings focused on identifying the kinds of skills that should and could be measured by a bar examination, especially those that were important in actual legal practice. It was apparent from these discussions that many of the skills and new assessment techniques that were considered warranted further investigation.

The National Conference of Bar Examiners (NCBE) concurred with this view and with their financial assistance, the CBE undertook the development and field testing of several new measures of lawyering skills (e.g., the ability to conduct legal research and to make timely and appropriate decisions during a trial). These tests were given in conjunction with the July 1980 administration of California's general bar examination (GBX).

The results of these studies are being presented in a series of reports. The first report (Klein, 1981a) discussed the findings with the Research Test. As its name implies, the Research Test assessed some of the skills that are required for carrying out legal research (such as the ability to determine whether existing case law can be used to support a client's case). One unique feature of this test is that examinees are given copies of the cases and statutes on which they are to base their answers; i.e., it is analogous to an open book examination.

The second report presented the results of an Assessment Center (AC) that was conducted with 485 applicants who also took the July 1980 GBX (Klein and Bolus, 1982). The AC was conducted over a two-week period in August of 1980. Each AC participant attended for two days. On one day, the participant served as counsel for the plaintiff in a simulated case and on the other day, as counsel for the defendant in a different simulated case. On both days, the participant took several oral and written tasks. Analyses of the data examined the relationships among the different types of AC scores and their relationships with scores on the GBX and other measures. Special attention was given to investigating whether the inclusion of AC type tasks on the GBX would affect minority passing rates.

This report describes the procedures that were used and the results obtained with two tests that were designed to assess certain trial practice skills. In each of these 90 minute tests, applicants were given background information about a case that was in trial or arbitration. They were then shown a videotape of a brief segment of the proceedings. This was followed by one to three questions about the segment, such as whether a certain objection was valid. These questions appeared on the TV monitor and the applicants had 5 to 10 minutes to write their answers before the next segment appeared on the screen. There were 11 segments per test.

Several other NCBE/CBE supported studies also were conducted in conjunction with the July 1980 administration of the California examination. These studies focused on a variety of issues associated with the current form of the examination, such as the degree to which scores on the multiple choice and essay portions of it are affected by the amount of time applicants are given to complete them. The results of these studies are presented in another report (Klein, 1981b).

SUMMARY

Two forms of a Trial Practices Test (TPT), designated A and B, were developed to provide measures of certain important lawyering skills that were not tested (at least not directly) by California's General Bar Examination (GBX).  One unique feature of the TPT was that applicants had to answer 1 to 3 specific questions about a simulated arbitration (Form A) or trial (Form B) immediately after viewing a short segment of the proceedings on a television monitor.  Each form took about 90 minutes to complete and contained 11 segments (19 scorable questions).

Two types of questions, Content and Strategy, were usually asked after each segment.  Content questions generally inquired about the validity of objections, such as "discuss how the judge should rule on the objection."  Strategy questions focused on the appropriateness of trial tactics, such as "should the plaintiff have attempted to elicit the information on direct examination?"

The 323 applicants at the San Francisco test center took the forms in the sequence A then B whereas the 538 applicants at the Long Beach center took them in the sequence B then A.

The results of analyses with TPT scores indicated:

o TPT answers were scored just as reliably as Essay answers on the GBX.  The scores on one half day of TPT tests were just as reliable as the scores on one full day of the GBX Essay.

o How well an applicant performed on one form of the TPT was a good predictor of how well the applicant performed on the other form (observed and corrected correlations were .58 and .90, respectively).

o The sequence in which the forms were taken had no practical impact on scores.

o Although the TPT included both Content and Strategy questions, there was no distinction between these types in terms of applicant performance.  An applicant's score on one type of question was just as highly correlated with scores on other questions of the same type as with scores on questions of a different type.

o The TPT was just as highly correlated with the Essay and MBE as the Essay and MBE were correlated with each other.  Thus, the TPT was measuring skills that were similar to but not exactly the same as those assessed by the GBX.

o TPT and GBX scores had very similar correlations with various applicant background characteristics, such as race, sex, age, repeater status, and law school type.  Thus, it did not widen or narrow the gap in average scores that currently exists among groups on the GBX.

o Applicants who had some clinical experience did better on the TPT than those who had no experience. This differences was not attributable to differences in average GBX scores among experience groups. There also was a strong underlying relationship between TPT and Assessment Center scores.

o Although applicants thought the GBX was a better test of their legal knowledge than the TPT, they had the opposite opinion regarding the relative efficacy of the measures as tests of an applicant's ability to perform as an attorney. They also felt the TPT presented more realistic case situations than the GBX.

o Average scores on TPT answers were related to presentation mode (video versus scripted), but the nature of this relationship suggested that it may have been produced by factors that were related to the experimental procedures rather than to the mode per se. Nevertheless, it appears that the two modes are likely to yield similar results.

The foregoing findings suggest that including a TPT in the GBX would increase the GBX's reliability, make a small but noticeable change in who passed, and increase the validity of the examination by measuring skills that are relevant to practice but which are not assessed now.

ACKNOWLEDGMENTS

The Committee of Bar Examiners of the State Bar of California provided the advice and cooperation that were necessary for carrying out the studies described in this report. Two members of this committee, Armando M. Menocal, III and Martin R. Glick, made especially important contributions in the design, implementation, analysis, and report preparation phases of this research. John O'Hara provided valuable advice and assistance throughout the project. He was also instrumental in making it a jointly supported effort of the Committee of Bar Examiners and the National Conference of Bar Examiners.

Professor Leo O'Brien of Hastings Law School was primarily responsible for developing the test materials used in this research. Allison Hoffman and and Terry Lamb supervised the production of the videotapes and their presentation during the examination.

The Committee's staff reviewed, pilot tested, edited, printed, and administered the test materials. This staff, along with the Committee's Board of Reappraisers, also selected, trained, and calibrated the cadre of lawyers who graded the answers. Kenneth D. McCloskey, the Committee's former Director of Testing, was in charge of and participated actively in all of these activities. The efficiency with which these tasks were completed, the quality of the data obtained, and the fact the research activities were carried out concurrently with testing and processing over 7,500 applicants on the regular bar examination testify to the skills, energies, and unstinting dedication that Ken provided. Ken was ably assisted in these activities by James B. Tippin, Jr., Suzanne M. Obermeier, and Philip Schoner. Phil also provided invaluable help in coordinating readers, data cleaning, and records management.

John Bianchini and Andrew York of the Educational Testing Service developed and implemented the computer systems that were used in assigning applicants to groups and in cleaning and linking diverse data files. Randy Onishi and Roger Bolus of GANSK & Associates also participated in the computer data cleaning and file management activities. Roger was further responsible for conducting the statistical analyses presented in this report.

Finally, the project could not have been carried out without the excellent cooperation of the applicants who participated in it. Their tolerance and good nature in putting up with the many unique demands of the research at a time when they were under great emotional strain were most appreciated by all who were involved in this project.

CONTENTS

PREFACE.................................................................  i

SUMMARY................................................................  ii

ACKNOWLEDGMENTS........................................................  iv

Chapter
  1. INTRODUCTION......................................................  1
       Background......................................................  1
       Purpose.........................................................  1
       General Procedures..............................................  2
       Special Session.................................................  3
       Background Characteristics......................................  3
       Preexamination Questionnaire....................................  4
       Post Special Session Questionnaire..............................  4

  2. TEST DESCRIPTION AND PRELIMINARY ANALYSES.........................  5
       Overview........................................................  5
       Trial Practices Test............................................  5
       Test Administration.............................................  6
       Sample Characteristics..........................................  7
       Scoring.........................................................  7
       Interreader Reliability.........................................  8
       Sequence Effects................................................  9
       Item Analyses and Test Reliability..............................  9
       Factor Analyses.................................................  10
       Subscore Analyses...............................................  10

  3. RESULTS...........................................................  12
       Overview........................................................  12
       Relationship with GBX Scores...................................  12
       Relationship with Background Characteristics...................  12
       Relationship with Clinical Experience and Skills..............  13
       Applicant Evaluations of TPT...................................  13
       Presentation Mode Study........................................  14
       Summary of Results and Conclusions.............................  16

Appendixes
  A. Excerpts From Notice to Applicants...............................  17
  B. Preexamination Questionnaire.....................................  18
  C. Post Special Session Questionnaire...............................  20

REFERENCES.............................................................  22

Chapter 1

INTRODUCTION

## BACKGROUND

The general goal of a bar examination is to assess the degree to which examinees have some of the important skills and knowledge that are necessary for legal practice. Most bar examinations are therefore designed to emphasize understanding of basic legal principles and legal analysis. One skill that is not measured, but which is important for many lawyers' practices, is the ability to represent a client's interests effectively during a trial or hearing.

We do not know whether the scores on present bar examinations provide a good indicator of trial practice skills. We also do not know whether applicants to the bar who have had trial experience, such as through a clinical education program, would be more proficient in performing actual trial tasks than those who have not had such training.

One important reason we do not know more about the relationship between bar examination scores and trial practice skills is that there are a paucity adequate measures of these skills. Although trial practice exercises have been used in educational programs for both law students and attorneys, these tasks are not truly appropriate for a bar examination. They cannot be given simultaneously to large groups of applicants under standardized and secure testing conditions. There is also a question about whether performance on many of these exercises can be evaluated reliably.

## PURPOSE

The foregoing considerations led the National Conference of Bar Examiners (NCBE) and the Committee of Bar Examiners (CBE) of the State Bar of California to develop a group administered test that was designed to assess certain trial practice skills. The studies presented in this report investigated whether responses on this test:

   o could be scored reliably;

   o were more a function of applicant skills than the unique characteristics of a particular version of the test;

   o were affected by how much practice applicants had in taking such tests (e.g., possible warm up or sequence effects);

   o were related to the applicants' bar examination scores, prior legal training and experience, performance on other clinical skills tasks, and various background characteristics; and

   o were influenced by whether the test materials were presented in written form or via a videotape of a hearing.

We also investigated applicant attitudes towards the test, such as whether they felt it was a good measure of their legal skills and abilities.

GENERAL PROCEDURES

All the applicants who participated in this research took the July 1980 version of California's General Bar Examination (GBX). This version of the GBX had two sections, the multistate bar examination (MBE) and the Essay.

The MBE consisted of 200 multiple choice questions (or items) that were drawn from six content areas, such as torts and contracts. Applicants were given 3 hours to answer the first 100 items and another 3 hours to answer the remaining 100 items. Raw scores on the MBE (i.e., the number of items answered correctly) were adjusted by the Educational Testing Service for possible differences in average item difficulty across administrations. California multiplied the adjusted scores by 3.0 so that the maximum possible MBE score was 600.

The Essay portion of the July 1980 GBX was divided into three sessions. In each session, applicants were given 3 hours to answer 3 questions. An applicant's answer to a question was graded on a scale of 0 to 100.

All the applicants did not have all of their essay answers graded. Instead, applicants were divided into two groups on the basis of their score on the combination of three essay questions and the MBE (hereafter referred to as the Phase I score). If the Phase I score was greater than 665, the applicant passed. If the score was not greater than 665, all of the applicant's answers were read at least once and as many as three times. Applicants needed a total score (MBE + 9 question Essay) of 1050 in order to pass if all of their answers were graded (see Klein, 1980a for a more complete description the pass/fail rules).

Table 1 presents summary statistical data on the July 1980 GBX for the 7379 applicants who took both the MBE and Essay portions of this test. The reliability of the MBE was computed by Dorans and Wright (1980). The reliability of the Essay portion was computed by using the Spearman-Brown formula to step up the average inter-question correlation within sessions ($r = .32$). It was not possible to compute the average correlation across all questions because the multiphased grading process resulted in some of the applicants not having all of their essay answers read and those who did have all of them read were not representative of all the applicants who took the examination. The reliability of the total GBX score was estimated using the procedures described by Gulliksen (1950) for a linear composite. There was a .68 correlation between the MBE and Essay sections.

Table 1

SUMMARY STATISTICAL DATA ON THE JULY 1980 GBX

| Statistic | MBE | Essay | Total |
|---|---|---|---|
| Average Score | 424.5 | 617.5 | 1042.0 |
| Standard Deviation | 46.0 | 54.4 | 92.2 |
| Reliability | .88 | .81 | .91 |

Total Score = MBE + (9)(average essay question score)

Some of the other characteristics of the applicant pool were: 49 percent passed the GBX, 69 percent took the GBX for the first time, and 62 percent were graduates of American Bar Association approved law schools. Within this latter group, 81 percent took the GBX for the first time. The passing rate among these ABA first timers was 73 percent. These results are very consistent with those obtained with past administrations of the examination (Klein, 1981c).


SPECIAL SESSION (SS)

Prior to the administration of the examination, applicants were advised that there would be a Special Session (SS). They were further advised that (1) their scores in the SS would not be counted if they passed the regular examination (i.e., based on the total of their Essay and MBE scores) and (2) their scores in the SS would be counted as one-sixth of their total grade if they failed the regular examination (see Appendix A). Thus, participating in the SS could increase but not decrease their chances of passing. Applicants also were informed that they had to take the MBE and Essay portions of the GBX in order to derive any benefit from taking the SS and that they would be assigned randomly to one of its four sections. In other words, a given applicant was assigned to one of four concurrently administered sections.

The SS was administered on the morning of the second day of examination. Of the 7379 applicants who took the complete GBX, 98.5 percent elected to participate in the SS. A stratified random sampling plan was used to assign applicants to sections. The stratification variables included race, type of law school from which an applicant graduated, and repeater status. The number of applicants assigned to a section was based on how many would be needed for statistical analyses of the data as well as each section's administration and scoring costs. The subsequent chapters of this report discuss the data obtained in two sections of the SS.


BACKGROUND CHARACTERISTICS

All persons applying to take California's bar examination are required to provide a transcript of their law school grades. These transcripts made it possible to determine the type of law school from which an applicant graduated; i.e., American Bar Association (ABA) approved, California Accredited (but not ABA approved), and Unaccredited. State bar records also were used to determine whether an applicant had taken and failed the GBX previously; i.e., whether or not the applicant was a repeater.

All applicants taking the bar examination in California are requested to complete a form on which they indicate their sex and racial/ethnic (R/E) group affiliations. This information, which is used solely for research purposes, was provided by 99.6 percent of those taking the July 1980 examination. The distribution of sex and racial/ethnic groups on this examination was as follows: males (71%) and females (29%); Anglos (82%), Asians (4%), Blacks (6%), and Hispanics (6%). The Asian group is composed mainly of Chinese and Japanese Americans, but it also includes those with Philippino and Pacific Islander backgrounds. The Hispanic group is largely Mexican-American, although it contains small percentages of applicants with Central American, South American, and Puerto Rican backgrounds.

PREEXAMINATION QUESTIONNAIRE

Applicants were advised that in order to derive any benefit from their participation in the Special Session (i.e., in terms of passing the GBX), they had to complete and return the questionnaire that appears in Appendix B. This questionnaire requested information about certain potentially relevant background characteristics, such as the extent to which English was spoken in the home, and data about an applicant's legal training and experience.

All applicants who applied to take the July 1980 examination were mailed a copy of the questionnaire prior to the examination. Applicants who did not return the questionnaire by early July were sent another copy of it. They also were advised again that it had to be completed in order for them to derive any benefit from the Special Session and that they could turn it in at the examination site. Of the 7379 applicants taking the complete GBX (and thereby eligible to benefit from the Special Session), 96 percent returned questionnaires. And, almost all of those who completed both the full GBX and the Special Session returned questionnaires.


POST SPECIAL SESSION QUESTIONNAIRE

A questionnaire also was administered between the morning and afternoon sessions on the third day of the examination. This questionnaire inquired about the applicants' preparation for the examination; assessment of the adequacy of the time limits for the MBE, Essay, and Special Session; and opinions about how well each of these sections measured their legal skills and knowledge. A copy of this questionnaire appears in Appendix C. About 95 percent of the applicants who participated in the SS and took the complete GBX turned in this questionnaire.

Chapter 2

TEST DESCRIPTION AND PRELIMINARY ANALYSES

OVERVIEW

Two versions (forms) of a Trial Practices Test were developed.  Each form was designed to measure the degree to which applicants had some (but certainly not all) the skills that are necessary for representing a client during a hearing.  One unique feature of this test was that the applicants had to answer specific questions about a simulated trial or arbitration, such as whether a particular objection was valid, immediately after viewing a short segment of the proceedings on a TV monitor.

Both versions of the test were given to two groups of applicants.  In addition, a portion of the script for one of the forms and some its questions were given to two of the four groups that participated in the MBE Time Limits Study (Klein, 1981b).  The other two groups in the MBE Time Limits Study received a portion of the script for the other form and some its questions.  The answers written by applicants who received the scripted materials were merged with those who viewed the videotapes prior to the grading process.  Graders were not informed whether a given answer was written by an applicant who had viewed a segment or read the script for it.

The remainder of this chapter discusses the characteristics of each form of the test and the results of preliminary analyses that were run on the data collected with them.

TRIAL PRACTICES TEST

Two forms of the Trial Practices Test (TPT) were developed.  Form A involved an arbitration of a life insurance claim in which the beneficiary claimed the death of a spouse was accidental and the insurer asserted it was suicide.  Form B involved an automobile accident in which the issue of liability was being tried before a jury.  Both forms had the following features:

o Applicants were instructed that the Federal Rules of Evidence applied.  Objections of "immateriality" and "irrelevance" were to be treated as exact equivalents.  They were not to discuss common law distinctions between them; but to assume that either objection sufficed to raise either point.

o Prior to playing the tape, applicants were given background documents related to the case, such as a police report, a witness' statement, and a portion of the application for an insurance policy.  Applicants were given about 10 minutes to review these materials.

o Applicants also were provided with an answer book that contained one page for each question and an excerpt from the Federal Rules of Evidence.

o In the first segment of each tape, the announcer introduced the judge and the parties for each side. This segment also contained a portion of the direct examination of one witness. Following this segment, two questions appeared on the screen. The announcer then advised the applicants that the segment would be played again and that the same set of questions would appear. However, he further advised them that this was the only segment that would be repeated.

o The pattern of a brief (3 to 7 minute) segment followed by 1 to 3 questions was repeated for 10 more segments. Some of these segments involved direct examination of a witness whereas others involved cross-examination. The announcer read the questions aloud once when they first appeared on the screen.

o Two types of questions were usually asked after each segment.

Content questions generally inquired about the validity of objections, such as "discuss how the judge should rule on the objection."

Strategy questions focused on the appropriateness of trial tactics, such as "should the plaintiff have attempted to elicit the information on direct examination?"

o Applicants were given 5 to 10 minutes to write their answers. The amount of time allowed on a segments' questions was based on the number of questions asked and test developers' judgments regarding their difficulty. The questions appeared on the screen throughout this writing period along with the amount of time that remained before the next segment began. Thus, time limits were maintained by the videotape rather than by a test administrator.

o Applicants were not given feedback about the adequacy of their answers to the questions on one segment by the events that took place in subsequent segments.


TEST ADMINISTRATION

It took about 90 minutes to administer each video form. Applicants were given a 15 minute break between forms. The applicants at the San Francisco test center took the forms in the sequence A then B whereas Long Beach applicants took them in the sequence B then A.

There were hardly any complaints about the ability to see the TV monitors or read the questions that followed each segment. However, several minor administrative and technical problems were encountered at both test centers. For instance, there was a partial loss of sound on one segment of Form A at Long Beach, there was a significant error in the wording of one question (that ultimately led to it not being scored), the noise from the shuffling of papers made it difficult to hear the voices on the tape on the first segment (this was quickly corrected by turning up the sound), and many applicants wrote the answers to all of the first segment's questions on the answer sheet reserved for just question #1.

SAMPLE CHARACTERISTICS

Table 2 presents summary statistical information on the applicants who took the test. These data indicate that the San Francisco applicants generally had higher scores on the GBX than the Long Beach applicants. Minority group applicants also made up a larger proportion of the Long Beach group. A comparison of the means in Table 2 with those in Table 1 indicate that the total sample taking the test had only slightly lower GBX scores than the entire population of July 1980 applicants.

Table 2

AVERAGE GBX SCORES AND PERCENTAGE OF
MINORITY APPLICANTS AT EACH TEST CENTER

| Variable | San Francisco | Long Beach | Total sample |
|---|---|---|---|
| MBE | 434 | 412 | 420 |
| Essay | 633 | 601 | 613 |
| Total | 1067 | 1013 | 1033 |
| Number of applicants | 323 | 538 | 861 |
| % minority | 15 | 25 | 21 |

SCORING

A total of 19 questions were scored on each form (i.e., not counting the question that was dropped from Form A).

Two to three readers were assigned to each question. A reader usually graded answers to all the questions on a segment because an applicant's answer to one of these questions often alluded to information contained in his/her answer to another question on that segment. However, most readers graded the answers to questions on only two or three segments.

The readers assigned to a question reviewed the segment and background materials on which the question was based and discussed the appropriate answer(s) to the question. Each reader then independently evaluated a small sample of answers that also had been graded by the other reader(s) assigned to the question. Scoring discrepancies were discussed and additional answers read until the readers appeared to be calibrated.

A five point relative grading scale was used for each question (ranging from 1 = very poor response to 5 = very good response).

INTERREADER RELIABILITY

Interreader reliability refers to the degree to which different graders
independently assign the same score to a given answer. The data for the
interreader reliability analyses were obtained by embedding a common set of
30 answers into the entire batch of answers assigned to each reader.
Although the readers were advised that their grading would be checked in
this way, they did not know which answers would be evaluated by other
readers (i.e., as distinct from the calibration session where the readers
knew that all the answers they were grading would be scored by others).

Analyses of the scores on the embedded answers that were evaluated by more
than one reader indicated:

    o  With few exceptions, readers spread their scores out around their
       average score in about the same way (on both forms, the mean
       standard deviation on a question was about 1.0 and the average
       range of standard deviations on a question was 0.3).

    o  One reader was usually not much more lenient than another reader.
       The average difference in mean score between the most and least
       lenient reader on a question was 0.3 on Form A and 0.6 on Form B.
       A few questions on Form B exhibited differences in mean scores
       between readers that were greater than one standard deviation.

    o  The average correlation between two readers was .58 on a Form A
       question and .44 on a Form B question. These values are typical
       of those obtained between two readers of a regular GBX essay
       question (Klein, 1977 and 1980). For instance, on the July 1979
       GBX, the average correlation between two readers was .48.

An in depth analysis of some of the unusually large differences among
readers on Form B revealed there was one reader who had a negative
correlation with the other readers assigned to question #7 and near zero
correlations with the readers on another question. These data along with
anecdotal reports suggested this reader may have reversed the grading scale
for all or many of the answers on question #7 and reversed it for some (but
not all) of the answers on another question (in other words, he may have
assigned 1's to the best answers and 5's to the worst answers on at least
one of the questions).

The problem of potential score reversals was investigated further by
examining the correlation between the scores a reader assigned to all the
answers he/she graded on a question and these applicants' GBX scores. This
analysis did not provide conclusive evidence of score reversals (because
the variation among readers in the correlations between TPT question and
GBX scores could easily have occurred by chance).

Various techniques were used in an attempt to adjust the readers' scores
for some of the problems noted above. The results with these procedures
suggested the adjustments would have little or no affect on correlations
between TPT scores and other variables. The major reasons for this finding
were: a given question counted as only 1/19th of a form's total score, a
particular reader graded only 33% to 50% of a question's answers, and an
applicant had the same reader for only two to four questions.

SEQUENCE EFFECTS

The two Trial Practices Tests were very different than any other test most applicants had taken in law school and totally different from previous bar examinations. Thus, it was quite possible that scores on the first form taken might be influenced by the applicants becoming accustomed to the testing format. In other words, scores might be affected by possible sequence or "warm-up" effects.

A sophisticated statistical procedure was needed to investigate this issue because the applicants who took the forms in the A-B sequence had higher average GBX scores than those who took the forms in the opposite order (see Table 2). The first step in this procedure involved using the total sample of 861 applicants to compute an equation that would predict an applicant's score on a form on the basis of that applicant's Phase I GBX score. The percentage of variance predicted by these equations was 37% for Form A and 32% for Form B (as compared to the 41% of the variance in Essay scores that is predicted by MBE scores).

The next steps consisted of computing each applicant's predicted score on each form, subtracting his/her actual score on a form from the predicted score, and then determining (by means of an analysis of variance) whether the average of these difference scores was higher or lower on the first form taken than on the second form taken. The results of this analysis indicated that there were no practically significant relationship between an applicant's total score on a form and whether that applicant took the form first or second (the form by test center interaction accounted for only 2% of the variance in difference scores).

Because there were no practically important sequence effects, all the remaining analyses in this report were conducted on the total sample of applicants (rather than separately by test center).


ITEM ANALYSES AND TEST RELIABILITY

An analysis was conducted on each form to determine (1) the degree to which scores on one question on a form correlated with the sum of the scores on the other 18 questions on that form (called corrected item-total r's or correlations), (2) the reliability (internal consistency) of each form, and (3) the reliability of a form's Content and Strategy subscores. The data in Table 3 indicate there was generally a low positive correlation among the questions; i.e., applicants who received high scores on one question also tended to receive high scores on another question. Only 2 items on Form A and 7 on B had corrected item total r's below .20 (and only 1 item, #3 on Form B, had a corrected r below .10). Despite the previously noted problems with Item #7 on Form B, this item's corrected correlations were only slightly lower than the corrected r's on the other items.

The average reliability of the total score on a single, 90-minute form was .64. This is much higher than the reliability of the total score on two, 60-minute GBX essay questions. The reliability of the 3 hour total test (i.e., Form A + B) was .73 (as determined by the .58 correlation between forms). This is the same level of reliability that is obtained by 6 hours of GBX essay questions! The much higher reliability per hour of testing time with the Trial Practices Test than with the Essay was probably due to the TPT having 38 questions and all of them were in the same subject area.

Table 3

SUMMARY OF ITEM ANALYSIS RESULTS

| Statistic | Form A | | | Form B | | |
|---|---|---|---|---|---|---|
| | Content | Strategy | Total | Content | Strategy | Total |
| Number of items | 12 | 8 | 19* | 12 | 7 | 19 |
| Mean inter-item correlation | .11 | .10 | .10 | .08 | .10 | .08 |
| Mean corrected item-total correlation | .25 | .23 | .25 | .21 | .21 | .22 |
| Reliability (alpha) | .60 | .51 | .66 | .53 | .45 | .63 |

* The score on Item #12 on Form A was used in computing both subscores
  on this form.

FACTOR ANALYSES

Preliminary analyses indicated that the scores on a Content question did
not generally correlate more highly with the scores on other Content
questions than they did with the scores on the Strategy questions.  And,
the scores on a Strategy question did not generally correlate more highly
with the scores on other Strategy questions than they did with the scores
on the Content questions.  These findings suggest that the two types of
questions were not really measuring different skills or abilities.

This issue was investigated further by subjecting the data to a statistical
procedure called factor analysis.  This procedure examined each question's
correlation with every other question to determine whether there were
questions that generally correlated more highly with each other than they
did with other questions on the test.  This analysis revealed there were
several clusters of questions on each form.  These clusters were closely
associated with the segments.  Specifically, how well an applicant
performed on one question was generally more highly correlated with how
well he/she performed on the other questions on that segment than with
questions associated with the preceding or subsequent segments.  This
pattern was probably due at least in part to one reader evaluating all the
answers an applicant wrote to one segment before grading the next
applicant's answers.

SUBSCORE ANALYSIS

The two forms of the Trial Practices Test yielded nine scores:  Total
scores on Form A and B, Content subscores on Forms A and B, Strategy
subscores on Forms A and B, Content and Strategy subscores across forms,
and the combined Total Score across forms.

The correlation between the Content subscore on Form A and the Content subscore on Form B (.44), and between the forms' two Strategy subscores (.41) were essentially the same as the correlation between the Content subscore on one form and the Strategy subscore on the other form (.39 and .43).  Moreover, the correlation of the total Content score across the two forms with the total Strategy score across forms (.59) was almost identical to the correlation between the total scores on the two forms (.58).

The foregoing results confirmed the factor analysis finding that there was no meaningful distinction (in terms of applicant performance) between the Content and Strategy subscores.  Total scores on the forms as well as total subscores across forms also had similar patterns of correlations with other variables.  In other words, all the different scores on the Trial Practices Test appeared to be measuring the same common set of skills.  Thus, only the combined total score across forms is discussed in the analyses presented in the next chapter.

Chapter 3

RESULTS

OVERVIEW

This chapter discusses the relationship between an applicant's score on the Trial Practices Test (TPT) and that applicant's GBX scores and background characteristics. There also is a discussion of applicant attitudes about the TPT and whether scores on it are affected by presenting the case and questions via a video versus a scripted mode. The chapter ends with a summary of the major findings and a discussion of their implications for the use of a TPT type test on a bar examination.

RELATIONSHIP WITH GBX SCORES

The correlation between TPT and individual GBX essay question scores ranged from .35 to .49 (the correlation with the GBX evidence question was .39).

Table 4 contains the observed and corrected correlations between GBX and TPT scores. The latter coefficients show the strength of the underlying relationship among the abilities assessed by each test. These data indicate the correlation between TPT and GBX scores is about as strong as the correlation between the essay and MBE (.66 observed and .81 corrected). In short, the abilities needed to earn a high score on the TPT are similar to but not exactly the same as those measured by the GBX.

Table 4

OBSERVED AND CORRECTED CORRELATIONS BETWEEN TPT AND GBX SCORES

| Type | Essay | MBE | Total |
|------|-------|-----|-------|
| Observed | .63 | .61 | .68 |
| Corrected | .82 | .76 | .83 |

RELATIONSHIP WITH BACKGROUND CHARACTERISTICS

An analysis of the relationship between TPT scores and applicant background characteristics indicated these relationships paralleled those obtained with GBX scores. For instance, the correlation of TPT scores with applicant age, sex, and repeater status were: -.40, -.03, and -.41. The corresponding values for Total GBX score were: -.41, -.03, and -.52. The TPT did not widen or narrow the gap in performance level between racial groups that is already present on the bar examination (and in law school). There was was a .33 correlation between "being Anglo" and scores on both measures. And, applicants who graduated from ABA approved schools also had higher scores on both the TPT and GBX than did applicants from California accredited or non-accredited schools.

RELATIONSHIP WITH CLINICAL EXPERIENCE AND SKILLS

As noted in Chapter 1, the applicants participating in this research completed a questionnaire that inquired about their clinical training and experience prior to July 1980.  An analysis of these data indicated that applicants who had some clinical experience had statistically significantly higher TPT scores than those who did not have such experience.  For example, applicants who had some paid or volunteer experience on actual cases had an 8 point higher average total TPT score (.61 standard deviation units) than applicants who did not have such experience.  This difference appeared to be due to the experience factor rather than general academic ability because there was almost no difference between the two groups in average GBX scores.  However, the experience factor explained only 7% of the variance in TPT scores (compared to the 46% explained by Total GBX) and the number of hours of experience was not related to TPT scores.  In other words, a small portion of the difference between two applicants' TPT scores could be accounted for by differences among their respective amounts of clinical training and experience.  It was not possible with the data available for this study to determine whether the quality (as distinct from just the amount) of clinical experience would have accounted for some of unexplained differences in TPT scores among applicants.

A group of 59 applicants who took the TPT also participated two weeks later in an Assessment Center (Klein, 1982).  This participation involved two full days of testing on simulated cases under standardized conditions.  On one day, an applicant served as counsel for the plaintiff in one case and on the other day, as counsel for the defendant in a different case.  On both days, the participant took several oral and written tasks.  There was a .61 correlation between total Assessment Center and TPT scores.  This correlation rose to .87 after correcting for the unreliability in both measures.  Thus, the underlying relationship between them was about the same as the underlying relationship between TPT and GBX scores.


APPLICANT EVALUATIONS OF TPT

About 97% of the applicants who participated in the TPT also completed a questionnaire that inquired about their attitudes toward the test.  An analysis of these data revealed that most applicants rated the TPT as:

  o A less adequate measure of their "legal knowledge" than the GBX
    (ratings were on a 5 point scale from 1 = very poor to 5 = very
    good; means were 2.84, 3.43, and 3.21 for TPT, Essay, and MBE).

  o A better measure than the GBX of their "ability to perform as an
    attorney" (means on 5 point scale were 3.02, 2.76, and 2.39 for
    TPT, Essay, and MBE).

  o Having more realistic case situations than the GBX (means on 5
    point scale were 3.54, 2.96, and 2.76 for TPT, Essay, and MBE).

In terms of the adequacy of time limits, the TPT, Essay, and MBE all received a rating of 1.7 (on a scale from 1 = less than enough to 3 = more than enough).  There were no consistent relationship between ratings and performance.  The 79% of the applicants who attended a commercial bar review course of at least 5 weeks duration had higher TPT and GBX scores than the 21% who did not attend (r's were .20 and .30, respectively).

PRESENTATION MODE STUDY

An investigation was conducted to explore whether TPT scores would be affected if the TPT were presented in a scripted rather than in a video mode. This study involved the 2940 applicants who participated in another experiment that was conducted in conjunction with the July 1980 examination (Klein, 1981b). These applicants were randomly assigned to four groups. A given group received the background materials for either Form A or B, the script for three or four segments on their assigned form, and the 6 to 7 questions that were associated with these segments. They were then given 35 minutes to write their answers. Thus, unlike the video mode, the scripted mode permitted an applicant to read and review a segment's dialogue, but not to see or hear what transpired.

Before the grading process began, the answers to the questions written under the scripted mode were merged with those written under the video mode. Further, the same type of answer books were used for the two modes. Thus, the readers did not know under which mode a given answer was written.

Table 5 shows the average score on each question that was presented in both modes as well as the difference between modes. These data indicate that applicants who answered the questions under the video mode generally had higher scores than those who answered the same questions under the scripted mode. This finding was quite unexpected because all four groups taking the scripted mode had higher average GBX scores than the video group (by about 0.1 standard deviation units) and they could review the dialogue for a segment.

The relative advantage of the video mode tended to be greater on the higher numbered questions than on the lower numbered ones. This trend, which was most apparent in Groups 1 and 3, suggests the differences between modes may have been due to warm up effects (i.e., applicants taking the video had more opportunity to become accustomed to the novel question types). Other explanations for this pattern are that the scripted version allowed less time to answer per question than the video mode and/or that applicants in the scripted mode did not budget their time evenly across questions. It also is possible that knowledge of what transpired in the initial segments of a form helped the applicants in the video mode answer the questions on the subsequent segments on that form.

There was a .42 correlation between Total GBX scores and a scaled version of the scripted score (the scaling was done to control for some scripted groups having more questions than others and the average difficulty of the questions not being equal across groups). There was a .78 correlation between these measures after their scores were corrected for unreliability (where the correction involved estimating the reliability of a 6.5 item scripted test on the basis of the reliability of the 38 item total score).

The relatively strong corrected correlation between Total GBX and TPT scores regardless of presentation mode suggests there probably would be a fairly high correlation between scores on the two modes. However, because a given applicant only participated in one mode, there is no way of computing the actual correlation between modes.

Table 5

AVERAGE SCORE ON EACH QUESTION BY PRESENTATION MODE

| Script Group | Test form | Question number | Video mode | Script mode | Difference |
|---|---|---|---|---|---|
| 1 | A | 9 | 2.66 | 2.86 | -.20 |
| | | 10 | 2.01 | 2.18 | -.17 |
| | | 11 | 2.86 | 2.92 | -.06 |
| | | 12 | 2.66 | 2.48 | .18 |
| | | 13 | 2.57 | 2.17 | .40 |
| | | 17 | 2.70 | 1.91 | .79 |
| | | Average | 2.58 | 2.42 | .16 |
| 2 | A | 7 | 2.66 | 2.85 | -.19 |
| | | 8 | 3.13 | 2.74 | .39 |
| | | 14 | 2.37 | 2.20 | .17 |
| | | 15 | 2.30 | 1.89 | .41 |
| | | 18 | 2.76 | 2.39 | .37 |
| | | 19 | 2.73 | 2.26 | .47 |
| | | 20 | 3.39 | 2.02 | 1.37 |
| | | Average | 2.76 | 2.33 | .43 |
| 3 | B | 5 | 3.15 | 3.46 | -.31 |
| | | 6 | 2.94 | 3.06 | -.12 |
| | | 7 | 2.86 | 2.70 | .16 |
| | | 8 | 3.10 | 2.93 | .17 |
| | | 11 | 2.87 | 2.42 | .45 |
| | | 12 | 2.56 | 1.92 | .64 |
| | | Average | 2.91 | 2.75 | .16 |
| 4 | B | 4 | 1.87 | 1.84 | .03 |
| | | 9 | 2.58 | 2.66 | -.08 |
| | | 10 | 2.59 | 2.51 | .08 |
| | | 14 | 2.54 | 2.20 | .34 |
| | | 15 | 2.20 | 1.84 | .36 |
| | | 18 | 3.01 | 2.46 | .55 |
| | | 19 | 2.57 | 2.18 | .39 |
| | | Average | 2.48 | 2.24 | .24 |
| All | A+B | Average | 2.68 | 2.44 | .24 |

The standard deviation of a question under both modes was generally close to 1.00.  There were about 735 applicants in each scripted group.

SUMMARY OF RESULTS AND CONCLUSIONS

Two forms of a Trial Practices Test (TPT) were developed in order to provide measures of certain important lawyering skills that were not tested (at least not directly) by California's General Bar Examination (GBX).  The results of this research indicated:

o TPT answers were scored just as reliably as Essay answers on the GBX.  The scores on one half day of TPT tests were just as reliable as the scores on one full day of the GBX Essay.

o How well an applicant performed on one form of the TPT was a good predictor of how well the applicant performed on the other form (observed and corrected correlations were .58 and .90).  There were no practially important sequence effects.

o Although the TPT included both Content and Strategy questions, there was no distinction between these question types in terms of applicant performance.  An applicant's score on one type of question was just as highly correlated with scores on other questions of the same type as with scores on questions of a different type.

o The TPT was just as highly correlated with the Essay and MBE as the Essay and MBE were correlated with each other.  Thus, the TPT was measuring skills that were similar to but not exactly the same as those assessed by the GBX.

o TPT and GBX scores had very similar correlations with various applicant background characteristics, such as race, sex, age, repeater status, and law school type.  Thus, it did not widen or narrow the gap in average scores that currently exists among groups on the GBX.

o Applicants who had some clinical experience did better on the TPT than those who had no experience.  This differences was not attributable to differences in average GBX scores among experience groups.  There also was a strong underlying relationship between TPT and Assessment Center scores.

o Although applicants thought the GBX was a better test of their legal knowledge than the TPT, they had the opposite opinion regarding the relative efficacy of the measures as tests of an applicant's ability to perform as an attorney.  They also felt the TPT presented more realistic case situations than the GBX.

o Average scores on TPT answers were related to presentation mode (video versus scripted), but the nature of this relationship suggested it may have been produced by factors that were related to the experimental procedures rather than to the mode per se.  Nevertheless, it appears the two modes are likely to yield similar results.

The foregoing findings suggest that including a TPT in the GBX would increase the GBX's reliability, make a small but noticeable change in who passed, and increase the validity of the examination by measuring skills that are relevant to practice but which are not now assessed.

APPENDIX A

EXCERPTS FROM NOTICE TO APPLICANTS

In addition to the usual examination sessions, each applicant for the Fall 1980 Examination will be expected to participate in a one-half day Special Session to be administered either on Monday, July 28, 1980, or Tuesday, July 29, 1980.

The Special Session is designed to give applicants an opportunity to improve their scores by demonstrating their capabilities in other than the standard methods or procedures and to test alternative means of examining for the future.

To derive any benefit from the Special Session, applicants must complete and return designated questionnaires by specified deadlines and complete all other portions of the examination which they are taking.

There will be four types of problems given during the Special Session. Individual applicants will be assigned to the various types of problems by the Committee based on a statistical analysis of the composition of the entire examinee population.  General description (of the video problem):

> Applicants in this session will take two problems.  In each problem, applicants will be provided some written materials containing some relevant and some irrelevant factual and legal information about a case and will be allowed an appropriate period of time to review those materials.  Thereafter, short segments of the examination of a witness or witnesses in a trial or arbitration proceedings will be shown on television monitors.  After each segment, applicants will be asked one or more questions concerning such matters as objections and other procedures which may or may not have been utilized by counsel at that point or might be utilized later in the case and to justify their answers.  Applicants also will be asked to evaluate the effectiveness of some of the devices and arguments employed by counsel depicted on the tape.  Each problem will take one and one-half hours to complete (including the time to view the videotape).

The scoring for the Special Session for the various groups of applicants will be scaled so that the Special Session would be equivalent to one session of a six-session examination.  An applicant's score on the Special Session will then be utilized if and only if (a) the applicant did not pass the regular part of the examination based upon the usual scoring procedures and (b) the applicant's score on the Special Session is above passing. Thus, an applicant's performance on the Special Session can increase but cannot decrease the likelihood that the applicant will pass the examination. Since the score on the Special Session can count for one-sixth of an applicant's total grade, it can have a substantial beneficial impact for an applicant who scores well on it.

APPENDIX B

PREEXAMINATION QUESTIONNAIRE

Your answers to the questions below will assist the Committee of Bar Examiners in its efforts to improve the bar examination.  Your responses will be kept strictly confidential and used solely for research purposes. We are most appreciative of your cooperation.

1. Birthdate (   /   /   )

2. Which of the following jobs, if any, have you held for one or more months? Check all that apply:

   [ ] Attorney                    [ ] Legal Investigator
   [ ] Court Reporter              [ ] Legal Secretary
   [ ] Law Clerk                   [ ] Paralegal assistant
   [ ] Law Enforcement Officer     [ ] Other Law Related Employment

3. About what percentage of the time was English spoken in your home during your childhood?  Please put your answer in the box below.

       [   ] Percent of time English spoken.

4. Circle the box corresponding to the language other than English that was spoken most often.

   [1] Chinese      [3] Spanish               [5] None of these or no
   [2] Japanese     [4] Taglog/Phillipino          language besides English

5. Circle the box corresponding to the highest grade in school completed by your MOTHER or female guardian.  Leave blank if you do not know.

   [1] 1st to 5th     [4] High School Graduate
   [2] 6th to 8th     [5] College Graduate
   [3] 9th to 11th    [6] Graduate/Professional School Degree

6. Circle the box corresponding to the highest grade in school completed by your FATHER or male guardian.  Leave blank if you do not know.

   [1] 1st to 5th     [4] High School Graduate
   [2] 6th to 8th     [5] College Graduate
   [3] 9th to 11th    [6] Graduate/Professional School Degree

7. Circle the box below that best describes your undergraduate major:

   [1] Economics, Business, Accounting
   [2] Physical Science, Engineering, Mathematics, Biology
   [3] Social Science (Anthropology, Psychology, Sociology)
   [4] History, Government, Political Science
   [5] English, Journalism, Classical Studies, Philosophy
   [6] Fine Arts
   [7] Education
   [8] Other

8. For each of the activities below, indicate the number of hours, if any, you have spent doing them for: SIMULATED cases, ACTUAL cases associated with supervised law school programs, and ACTUAL cases as part of paid and/or volunteer employment. Insert the number 99 in a box if you spent more than 100 hours doing the activity.

| | SIMULATED CASES | ACTUAL CASES Supervised Law School Programs | ACTUAL CASES Paid or Volunteer Employment |
|---|---|---|---|
| a. Conduct legal research | [ ] | [ ] | [ ] |
| b. Prepare briefs, petitions, or motions | [ ] | [ ] | [ ] |
| c. Conduct direct examinations | [ ] | [ ] | [ ] |
| d. Conduct cross examinations | [ ] | [ ] | [ ] |
| e. Interview a client or witness for a hearing | [ ] | [ ] | [ ] |
| f. Interview a client on general legal matters; e.g., landlord-tenant dispute | [ ] | [ ] | [ ] |
| g. Present an oral argument in a legal proceeding | [ ] | [ ] | [ ] |

9. In the box next to each choice below, indicate the number of courses, if any, you have taken in:

[ ] Evidence
[ ] Clinical or Trial Practice involving your participation in simulated or actual hearings
[ ] Trial Practice NOT involving your participation in simulated or actual hearings; i.e., lecture only

10. If you have secured employment in California in a law related job commencing by September 15, please circle the box corresponding to how you will be employed.

[1] Attorney General's Office
[2] Public office, criminal prosecution (e.g., District Attorney)
[3] Public office, criminal defense (e.g., Public Defender)
[4] Legal aid office (e.g., neighborhood legal assistance)
[5] Public interest law firm
[6] Law clerk for a judge
[7] Private law firm, criminal defense
[8] Private law firm, general practice
[9] Law department of a corporation
[0] Other

11. Do you hereby apply to participate in the two day Assessment Center?

(1) No    (2) Yes

If selected as a participant in the Assessment Center, I will be available to participate in the location circled below on any date between August 4 and 24 (inclusive) except for the dates circled below.

| Circle one | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---|---|---|---|---|---|---|---|
| in (1) Los Angeles only | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| in (2) San Francisco only | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| in (3) either LA or SF | 18 | 19 | 20 | 21 | 22 | 23 | 24 |

APPENDIX C

POST EXAMINATION QUESTIONNAIRE

APPLICANTS MUST COMPLETE AND FILE THIS QUESTIONNAIRE BEFORE THE FINAL SESSION OF THE GENERAL BAR EXAMINATION ON WEDNESDAY, JULY 30, 1980 IN ORDER TO DERIVE ANY BENEFIT FROM THE SPECIAL SESSION OF THE JULY 1980 EXAMINATION OR TO PARTICIPATE IN THE AUGUST 1980 ASSESSMENT CENTER.

Your answers to the questions below will assist the Committee of Bar Examiners in its efforts to improve the bar examination. Your responses will be kept strictly confidential and used solely for statistical purposes. A completed questionnaire is required of all applicants who participated in any one of the special sessions and/or will be participating in the Assessment Center. We are most appreciative of your cooperation in answering the questions below.

Application # [    ]    Center Number [    ]    Birthdate [ / / ]

1. Which of the following methods, if any, did you use to prepare for the examination? Check all that apply:

   [ ] Commercial bar review course of at least 5 weeks duration which met 4 or more times per week; e.g., BAR or BRC.
   [ ] Commercial bar review course of less than 5 weeks duration.
   [ ] Intensified commercial writing course; e.g., Beverly Rubens.
   [ ] Law school sponsored or administered bar review course.

2. About how many hours per week were you engaged in paid employment during the last five weeks? Please put your answer in the box below.

        [    ] Hours per week Employed

3. About how many hours per week did you spend studying for the examination during the last five weeks? Please put your answer in the box below.

        [    ] Hours per week Studied

4. Circle the number corresponding to the special session you took:

        1 Videotape of Arbitration and Court Room cases
        2 Case of Barelas v. Brown (Research Task)
        3 Case of State v. Dolan (Research Task)
        4 60 multiple choice questions and script with questions
        5 Two essay questions and 20 multiple choice questions
        9 Did not participate in a special session

5. In your opinion, how good a measure of your LEGAL KNOWLEDGE was each part of the examination? Please circle one number for each part.

| | Very Poor | Poor | Fair | Good | Very Good | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

6. In your opinion, how good a measure of your ABILITY TO PERFORM AS AN ATTORNEY was each part of the examination? Please circle one number for each part.

| | Very Poor | Poor | Fair | Good | Very Good | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

7. In your opinion, was the time allowed for each part the examination appropriate? Please circle one number for each part.

| | Less Than Enough | About Right | More Than Enough | Did Not Take |
|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 9 |

8. Please circle one number below for each part of the examination to indicate how much you agree or disagree with the statement: "The case situations were realistic."

| | Strongly Disagree | Disagree | Neutral | Agree | Strongly Agree | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

9. In general, were the directions and questions in your special sessions clear or ambiguous? Please circle one choice below.

1-Clear    2-Mixed    3-Ambiguous    9-Did Not Take

10. What were your general reactions to the special session? How could it be improved? Should it be included in future examinations?

_____

_____

_____

_____

REFERENCES

Dorans, N. and Wright, R.  Test Analysis: Multistate Bar Examination, Forms 3CEB2 and S-3CEB2.  Unpublished Statistical Report, SR-80-117. Princeton, N.J.: Educational Testing Service, October, 1980.

Gulliksen, Harold  Theory of Mental Tests.  New York: Wiley, 1950.

Klein, S.  An analysis of grading practices on the California Bar Examination.  Report prepared for the Committee of Bar Examiners of the State Bar of California, 1977.

Klein, S.  A comparison of the effectiveness of a single versus multiphased grading system.  Report prepared for the Committee of Bar Examiners of the State Bar of California, 1980a.

Klein, S. P.  Intra- and inter-reader agreement on the essay section of the California State Bar Examination.  Report prepared for the Committee of Bar Examiners of the State Bar of California, 1980b.

Klein, S. P.  Testing research skills on the California Bar Examination. Report prepared for the Committee of Bar Examiners of the State Bar of California and the National Conference of Bar Examiners, 1981a.

Klein, S. P.  The effect of time limits, item sequence, and question format on applicant performance on the California Bar Examination.  Report prepared for the Committee of Bar Examiners of the State Bar of California and the National Conference of Bar Examiners, 1981b.

Klein, S. P.  An analysis of possible variations in pass/fail standards on the California State Bar Examination.  Report prepared for the Committee of Bar Examiners of the State Bar of California, 1981c.

Klein, S. P. and R. Bolus.  An analysis of the relationship between clinical legal skills and bar examination results.  Report prepared for the Committee of Bar Examiners of the State Bar of California and the National Conference of Bar Examiners, 1982.

Report #81-9PR

AN ANALYSIS OF THE RELATIONSHIP BETWEEN INITIAL SCORE AND
EVENTUAL PASS/FAIL STATUS ON THE CALIFORNIA BAR EXAMINATION

A Report Prepared for the
Committee of Bar Examiners of the State Bar of California

Prepared by

Stephen P. Klein
GANSK & ASSOCIATES

April 1, 1982

SUMMARY

Previous analyses of California General Bar Examination (GBX) data have provided information about the passing rate among applicants who took this examination for the first time and the passing rate among those who had made one or more prior attempts to pass. However, there has not been a longitudinal study of the eventual (as distinct from initial) pass rate among first timers. This report fills that gap by presenting data on the relationship between an applicant's score the first time he/she took the examination and that applicant's ultimate pass/fail status. This report also discusses the relationship between this status and: the type of law school from which an applicant graduated, an applicant's sex and race, and an applicant's score on the First Year Law Students' Examination (FLYSX).

The sample for this study consisted of all the applicants who in July 1977 took the GBX for the first time (N = 5419). Since it was possible to track the applicants who failed this examination over as many as seven subsequent administrations of the GBX, the study was able to identify essentially all the July 1977 first timers who eventually passed. Results indicated that:

o About 68% of the applicants passed on their first attempt. The passing rate dropped sharply on succeeding attempts. For instance, 43% of the applicants that took the GBX two or more times passed on their second attempt while only 25% of those that took it three or more times passed on their third attempt.

o About 88% of the applicants eventually passed. Three fourths of these successful applicants passed on their first attempt. Over 60% of the repeaters who eventually passed achieved their passing status on their second attempt.

o There was a strong, but far from perfect, relationship between initial GBX score and eventual pass/fail status. Applicants who passed on their first attempt tended to have much higher scores than those who passed after one or more subsequent attempts who in turn had higher scores than those who did not eventually pass. And, most of the applicants who came close to passing on their first attempt eventually passed while most of the applicants who did not come close to passing on their first attempt did not eventually pass. However, there was no initial score that clearly distinguished between those who did and did not eventually pass.

o Female applicants had slightly higher initial and eventual pass rates than male applicants.

o Graduates from ABA approved law schools had a much higher initial pass rate (75%) than graduates from California accredited schools (53%) who in turn had a higher initial pass rate than graduates from unaccredited schools (44%). However, the eventual pass rate of graduates from the California accredited schools (84%) came close to the eventual pass rate of the ABA graduates (92%).

o About 71% of the Anglo but only 41% of the minority applicants passed on their first attempt. About 90% of the Anglo applicants eventually passed, about 80% the Asian and Hispanic applicants eventually passed, but only 64% of the Black applicants eventually passed.

o The disparity in passing rates among racial groups was not related to the type of law school from which the applicants in these groups graduated. In fact, 79% of the minority applicants but only 67% of the Anglo applicants graduated from ABA approved schools. And, with the exception of Hispanic applicants, the percentage of females among minority applicants was actually slightly higher than it was among Anglo applicants.

The sample of 5419 first timers contained 682 applicants who had taken the First Year Law Students' Examination (FYLSX). Most, but not all, of these 682 applicants were unaccredited law school graduates. Analyses indicated that:

o An applicant's score on the FYLSX was a good predictor of that applicant's GBX scores, especially the score on the MBE, even though: the FYLSX was usually taken three years before the GBX, it only contained three of the content areas covered by the GBX, and scores on the FYLSX were necessarily restricted to just those who had passed this examination.

o An applicant who earned the minimum passing score on the FYLSX, 560 points, had substantially less than a 50% chance of passing the GBX on the first attempt but a slightly better than 50% chance of eventually passing the GBX.

o The passing rate for unaccredited law school graduates on the GBX overestimates the percent that would pass this examination among the group of students that begin and complete their legal studies at an unaccredited law school. The reason for this is that most students who begin their legal studies at an unaccredited school do not pass the FYLSX (and thereby become ineligible to take the GBX) while some of those who do pass the FYLSX transfer to and eventually graduate from an accredited school.

AN ANALYSIS OF THE RELATIONSHIP BETWEEN INITIAL SCORE AND
EVENTUAL PASS/FAIL STATUS ON THE CALIFORNIA BAR EXAMINATION

PURPOSE

This report describes the relationship between an applicant's initial score on the California Bar Examination and that applicant's eventual pass/fail status. The report also discusses the relationship between this status and the type of law school from which the applicant graduated, the applicant's sex and race, and the applicant's score on the First Year Law Students' Examination (FYLSX).

EXAMINATION SCORES

The July 1977 version of the California's General Bar Examination (GBX) had two parts, namely; the Multistate Bar Examination and the Essay test.

The Multistate Bar Examination (MBE) consisted of 200 multiple choice questions from six content areas. MBE raw scores (i.e., the number of questions answered correctly) were scaled so that the maximum possible MBE score was 514 points.

The Essay test was administered in three sessions. Applicants were given 3.5 hours to answer any four of the five questions that were asked in each session. A team of readers was assigned to grade all the answers to a particular question; i.e., there were a total of 15 teams. Each answer was graded by a single reader on a scale of 0 to 100 points. Thus, an applicant could earn up to 1200 points on the Essay test.

An applicant's total GBX score was the sum of that applicant's Essay and MBE scores. Applicants with GBX scores over 1199 passed the examination while those with scores below 1140 failed. Applicants in the 1140 to 1199 range had all 12 of their essay answers evaluated as a set by at least two and sometimes three members of the Committee of Bar Examiner's Board of Reappraisers. The purpose of this reread process was to determine whether an applicant's answers (when evaluated as a set) warranted giving that applicant enough additional points to allow that applicant to pass the examination. If enough points could be found, the applicant was assigned a passing status. If not, the applicant was assigned a failing status. However, no change was made in the applicant's initial score as a result of the reappraisal process. One consequence of this policy was that 5.6% of the July 1977 first time takers (N = 305) passed the examination even though their initial Total GBX scores were less than 1200 points.

Several changes were made in the examination procedures after the July 1977 administration. These changes included reducing the number of questions an applicant was instructed to answer, implementing a multiphased grading process which resulted in passing many applicants after reading only a few of their essay answers, and bifurcating the examination (i.e., allowing applicants to pass the whole examination if they passed the MBE on one administration and the Essay on another administration). Although these changes did not affect subsequent pass/fail standards (Klein, 1981), they did preclude direct comparisons between July 1977 and subsequent GBX scores. Thus, for the purposes of this report, an applicant's performance on any administration after July 1977 is reported solely in terms of that applicant's pass/fail status (i.e., rather than the score achieved).

SAMPLE

The sample for this study consisted of the 5419 applicants who in July 1977 took the MBE and Essay portions of the GBX for the first time. Table 1 contains summary statistical data on this group. A comparison of these data with that obtained on other examinations indicates that the July 1977 first timers performed about as well on the examination as first timers who took other July administrations of the GBX (Klein, 1981). For example, on the five July administrations given between 1976 and 1980, the average MBE score among first timers ranged from 374 to 382 (these scores were computed using the 1977 procedures).

Table 1

STATISTICAL DATA ON JULY 1977 FIRST TIMERS

|                    | Essay  | MBE    | Total   |
|--------------------|--------|--------|---------|
| Average Score      | 840.65 | 378.03 | 1218.68 |
| Standard Deviation | 62.77  | 34.89  | 88.98   |
| Reliability        | .77    | .90    | .88     |

Correlation between Essay and MBE scores = .63

The use of the July 1977 administration for this study permitted tracking all initially failing applicants across as many as seven subsequent examinations. Cross-sectional data suggested that seven administrations would capture almost all the initially failing applicants that would eventually pass. For example, less than 4% passed within the group of 254 July 1977 examinees who had made more than five previous attempts to pass. And, less than 4% of the total sample of July 1977 applicants (N = 7191) had taken the examination more than five times.

STATUS GROUPS

The sample was divided into four status groups; namely: (1) applicants who passed on their first attempt, (2) applicants who failed on their first attempt but who passed subsequently, (3) applicants who failed on their first attempt and who also failed on all subsequent attempts, and (4) applicants who failed on their first attempt and did not take the test again.

DEFINITIONS

The term "repeaters" refers to applicants in groups 2 and 3 because these applicants made more than one attempt to pass (29% of the July 1977 first timers became repeaters). The term "attempts" refers to the number of administrations of the GBX on which an applicant took the MBE and/or Essay portions of the examination.

An applicant's law school was placed in the California Accredited category if that law school received provisional accreditation prior to July 1977.

RELATIONSHIP OF STATUS GROUP TO INITIAL GBX SCORES

Table 2 presents the average GBX scores and the percentage of applicants in each of the four status groups on the July 1977 examination.  Table 3 presents the average scores for the repeaters who eventually passed the examination relative to the number of attempts they made in order to pass.  Table 4 presents the average scores relative to the number of attempts for the repeaters who did not eventually pass.  These data indicate:

o About 68% of the 5419 first time takers passed on their first attempt.  The passing rate dropped sharply on succeeding attempts.  For instance, of the 1563 applicants that took the GBX two or more times, 675 (43%) passed on their second attempt.  Only 25% of the 778 applicants that took the GBX three or more times passed on their third attempt.

o Almost 9 out 10 of the first time takers eventually passed.  Over 75% of these successful applicants passed on their first attempt.

o There were large differences in average GBX scores among the four status groups.  Those who passed on their first attempt had an average GBX Total score that was 126 points higher than the applicants who initially failed but eventually passed and 188 points higher than the repeaters who did not eventually pass.

o Slightly over 60% of the repeaters who eventually passed did so the second time they took the examination.  About 70% of all the repeaters eventually passed.

o Among the repeaters who eventually passed, there was an inverse relationship between the number of attempts and initial GBX scores.  For example, applicants who passed on their second attempt had a 44 point higher initial average Total GBX score than applicants who needed more than four attempts to pass.

o Repeaters who eventually passed had higher average GBX scores than repeaters who failed regardless of the number of attempts made.  For example, the average Total GBX score of the repeaters who passed after making over four attempts was 28 points higher than the average score of the repeaters who did not eventually pass.

o Applicants who failed the July 1977 examination and who made no further attempt to pass had slightly higher average GBX scores than applicants who made one or more additional but unsuccessful attempts to pass.  For example, the former group had a 16 point higher average Total GBX score than the latter group.

o There was a weak inverse relationship between initial score and the number of subsequent attempts among the applicants who did not eventually pass.  For example, the average initial Total score of the applicants who made as many as four attempts to pass (i.e., including those who made only one attempt) was 1088 while the average of those who made more than four attempts was 1072.

Table 2

AVERAGE GBX SCORES AND PERCENTAGE OF APPLICANTS IN EACH STATUS GROUP

| Status Group | Number | Percent | Average GBX Score Essay | MBE | Total | Average Number of Attempts |
|---|---|---|---|---|---|---|
| Initial Pass | 3669 | 68 | 871 | 395 | 1267 | 1.0 |
| Subsequent Pass | 1106 | 20 | 791 | 350 | 1141 | 2.7 |
| Subsequent Fail | 457 | 8 | 752 | 327 | 1079 | 4.1 |
| No Subsequent Attempt | 187 | 4 | 759 | 336 | 1095 | 1.0 |
| All First Timers | 5419 | 100% | 841 | 378 | 1219 | 1.6 |

Table 3

INITIAL AVERAGE SCORES OF REPEATERS WHO EVENTUALLY PASSED
RELATIVE TO THE NUMBER OF ATTEMPTS THEY MADE TO PASS

| Number of Attempts | Number of Repeaters Passing | Percent of all Passing Repeaters | Percent of all Repeaters | Average GBX Score Essay | MBE | Total |
|---|---|---|---|---|---|---|
| 2 | 675 | 61 | 43 | 797 | 354 | 1151 |
| 3 | 191 | 17 | 12 | 785 | 349 | 1134 |
| 4 | 159 | 14 | 10 | 783 | 342 | 1125 |
| 5-7 | 81 | 7 | 5 | 770 | 337 | 1107 |
| Total | 1106 | 100% | 70% | 791 | 350 | 1141 |

Table 4

INITIAL AVERAGE SCORES OF REPEATERS WHO DID NOT EVENTUALLY PASS
RELATIVE TO THE NUMBER OF ATTEMPTS THEY MADE TO PASS

| Number of Attempts | Number of Repeaters Failing | Average GBX Score Essay | MBE | Total |
|---|---|---|---|---|
| 2 | 110 | 748 | 333 | 1081 |
| 3 | 88 | 756 | 330 | 1086 |
| 4 | 80 | 753 | 332 | 1085 |
| 5 | 65 | 751 | 319 | 1070 |
| 6 | 53 | 761 | 320 | 1081 |
| 7 | 61 | 747 | 318 | 1065 |

RELATIONSHIP OF INITIAL TOTAL GBX SCORE TO FINAL STATUS

Table 5 shows the number of applicants at various initial Total GBX score levels and the percentage of these applicants who passed (where passing could stem from an initial score over 1199, the reappraisal process, or repeated attempts to pass). These data indicate that there is a strong relationship between initial score and final pass/fail status; e.g., less than 25% of the applicants with scores below 1080 eventually passed while more than 90% of the applicants with scores in the 1160 to 1199 range eventually passed.

Table 5

RELATIONSHIP OF INITIAL TOTAL GBX SCORE TO EVENTUAL PASS/FAIL STATUS

|  | Less Than 1080 | 1080 to 1099 | 1100 to 1119 | 1120 to 1139 | 1140 to 1159 | 1160 to 1179 | 1180 to 1199 | More Than 1199 |
|---|---|---|---|---|---|---|---|---|
| Number of Applicants | 343 | 123 | 203 | 232 | 331 | 378 | 445 | 3364 |
| Percent Passing | 22 | 47 | 62 | 65 | 73 | 86 | 97 | 100 |

Table 6 shows the percentage of applicants within each status group at various initial Total GBX score levels. These data indicate that while the relationship between an applicant's initial score and eventual pass/fail status was quite strong, it was not perfect. In other words, while most of the applicants who came within a few points of passing on their first attempt eventually passed, there were several that did not. Similarly, some applicants with scores below 1100 on their first attempt were never-the-less eventually able to achieve a passing status (such as through extra diligent studying for a subsequent administration).

Because the relationship between initial score and final status was not perfect, lowering the pass/fail line to a point that would include most of the applicants who eventually passed would result in passing a large percentage of applicants who were not able to achieve a passing status even after as many as seven attempts. For example, 63% of the repeaters who eventually passed came within 60 points of passing on their first attempt. However, 20% of the repeaters who did not eventually pass and 33% of those who failed initially and did not try again also came within 60 points of passing on their first attempt (see Table 6).

Several repeaters who did not eventually pass had scores below 1140 on their initial attempt, but between 1140 and 1200 on a subsequent attempt. Lowering the pass/fail line to 1140 would therefore result in eventually passing applicants who scored below 1140 on their first attempt and who never scored above 1200. These applicants also would be far less qualified than those with initial scores above 1140 (see Table 5). In short, lowering the pass/fail line so as to initially pass a large portion of the repeaters who would eventually pass would in effect lower standards because there was no initial score that clearly distinguished between those who did and those who did not eventually pass.

Table 6

PERCENTAGE OF APPLICANTS WITHIN EACH STATUS GROUP
AT VARIOUS INITIAL TOTAL GBX SCORE LEVELS

| Status Group | Less Than 1100 | 1100 to 1119 | 1120 to 1139 | 1140 to 1159 | 1160 to 1179 | 1180 to 1199 | More Than 1199 |
|---|---|---|---|---|---|---|---|
| Initial Pass | 0 | 0 | 0 | 0 | 0 | 8 | 92 |
| Subsequent Pass | 12 | 11 | 14 | 22 | 28 | 13 | 0 |
| Subsequent Fail | 56 | 13 | 12 | 12 | 6 | 2 | 0 |
| No Subsequent Attempt | 41 | 10 | 16 | 17 | 13 | 3 | 0 |

RELATIONSHIP OF STATUS GROUP TO BACKGROUND CHARACTERISTICS

Tables 7 - 9 show the percentage of applicants in each status group
relative to their sex, race, and type of law school.  These data indicate:

o Female applicants had a slightly higher initial pass rate than
  male applicants (70% to 67%).  Female applicants also had a
  higher subsequent pass rate.  For example, 76% of the female
  repeaters but only 69% of the male repeaters eventually passed.

o Anglo applicants had a much higher initial pass rate (71%) than
  any other racial group.  This finding is consistent with previous
  research which has shown that differences among racial groups on
  the MBE and Essay parallels differences among them in law school
  grades and admission test scores (see Klein, 1979).

o About 90% the Anglos eventually passed and about 80% of the Asian
  and Hispanic applicants eventually passed, but only 64% of the
  Blacks eventually passed.  The eventual pass rate among Hispanics
  was slightly higher than that of Asians even though the Asians'
  initial pass rate was 5% higher than the Hispanics' initial rate.

o About 75% of the graduates from ABA accredited law schools passed
  the examination on their first try and 92% of the graduates from
  these schools eventually passed.

o Graduates of ABA accredited law schools had a much higher initial
  pass rate than applicants from California accredited schools who
  in turn had a higher initial pass rate than graduates from non-
  accredited law schools.

o The eventual pass rate for graduates from California accredited
  schools (84%) was almost as high as the eventual pass rate for
  graduates from ABA accredited schools (92%) as a result of the
  former group's repeated efforts to pass the examination.

o Differences in the subsequent pass rates among repeaters from the
  various types of schools paralleled the differences in their
  initial pass rates; i.e., the higher the initial pass rate, the
  larger the percentage of repeaters who eventually passed.

Table 7

PERCENTAGE OF APPLICANTS IN EACH STATUS GROUP WITHIN EACH SEX GROUP

| Status Group | Male | Female | Total |
|---|---|---|---|
| Initial Pass | 67 | 70 | 68 |
| Subsequent Pass | 20 | 21 | 20 |
| Subsequent Fail | 9 | 6 | 8 |
| No Subsequent Attempt | 4 | 2 | 4 |
| | | | |
| Percent of Applicants | 74 | 26 | 100 |

Table 8

PERCENTAGE OF APPLICANTS IN EACH STATUS GROUP WITHIN EACH RACE GROUP

| Status Group | Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|
| Initial Pass | 71 | 48 | 30 | 43 |
| Subsequent Pass | 19 | 30 | 34 | 37 |
| Subsequent Fail | 7 | 16 | 27 | 15 |
| No Subsequent Attempt | 3 | 7 | 8 | 5 |
| | | | | |
| Percent of Applicants | 90 | 3 | 3 | 4 |

Table 9

PERCENTAGE OF APPLICANTS IN EACH STATUS GROUP
WITHIN EACH TYPE OF LAW SCHOOL

| Status Group | Calif ABA | Other ABA | Calif Accred | Un-accred | Other |
|---|---|---|---|---|---|
| Initial Pass | 76 | 74 | 53 | 44 | 48 |
| Subsequent Pass | 17 | 16 | 31 | 31 | 19 |
| Subsequent Fail | 5 | 6 | 14 | 22 | 16 |
| No Subsequent Attempt | 2 | 4 | 2 | 4 | 17 |
| | | | | | |
| Percent of Applicants | 58 | 11 | 17 | 9 | 5 |

The Other category includes applicants who did not take the GBX within one year of graduation from law school.

RELATIONSHIP OF INITIAL SCORE TO BACKGROUND CHARACTERISTICS

Table 10 presents the average Total GBX score within each school type,
race, and sex group as well as the percentage of applicants within each
group at various initial Total GBX score levels (i.e., the percentages in
each row sum to 100%). These data again indicate that the differences in
passing rates among groups correspond to differences in their initial Total
GBX scores.

Table 10 shows that lowering the pass/fail line by several points would not
improve the minority pass rate appreciably more than it would improve the
Anglo pass rate. For example, if the line were dropped 40 points, 18% more
minority applicants would have passed on their first attempt. However, 15%
more Anglo applicants also would have passed. And, because of the large
number of Anglo applicants taking the examination, about eight times as
many Anglo as minority applicants would benefit from a lowered pass/fail
standard. If the line was dropped to 1100, almost all the Anglos would
pass on their first attempt but over 20% of the minority applicants would
fail on their first attempt. In short, there is no score within a zone of
potential pass/fail standards that would produce essentially equivalent
initial passing rates among racial groups.

Table 10

PERCENTAGE OF APPLICANTS WITHIN EACH SEX, RACE, AND LAW SCHOOL TYPE AT
VARIOUS INITIAL TOTAL GBX SCORE LEVELS AND THE AVERAGE SCORE IN EACH GROUP

| Group | Less Than 1100 | 1100 to 1119 | 1120 to 1139 | 1140 to 1159 | 1160' to 1179 | 1180 to 1199 | More Than 1199 | Average Total Score |
|---|---|---|---|---|---|---|---|---|
| Male | 9 | 4 | 5 | 6 | 7 | 8 | 61 | 1217 |
| Female | 8 | 4 | 4 | 6 | 6 | 8 | 64 | 1222 |
| Anglo | 6 | 4 | 4 | 6 | 7 | 8 | 65 | 1225 |
| Asian | 20 | 5 | 6 | 11 | 9 | 10 | 41 | 1172 |
| Black | 28 | 7 | 14 | 7 | 7 | 8 | 28 | 1144 |
| Hispanic | 19 | 5 | 7 | 9 | 11 | 9 | 38 | 1166 |
| Calif ABA | 6 | 2 | 4 | 5 | 6 | 8 | 71 | 1237 |
| Other ABA | 8 | 4 | 3 | 3 | 6 | 7 | 70 | 1233 |
| Calif Accred | 12 | 6 | 5 | 10 | 10 | 12 | 45 | 1190 |
| Unaccredited | 18 | 6 | 9 | 10 | 10 | 10 | 37 | 1168 |
| Other | 23 | 7 | 5 | 9 | 8 | 8 | 41 | 1167 |

The differences in average scores among racial groups were not due to
differences in the types of law schools they attended. In fact, 79% of the
minority applicants but only 68% of the Anglo applicants graduated from ABA
approved schools (see Table 11). These differences were statistically
significantly different than would be obtained by chance and they also are
consistent with the findings of previous research (Klein, 1979).

Table 11

PERCENTAGE OF FIRST TIMERS WITHIN EACH RACIAL GROUP
THAT GRADUATED FROM EACH TYPE OF LAW SCHOOL

|  | Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|
| Calif ABA | 57 | 67 | 56 | 68 |
| Other ABA | 11 | 13 | 19 | 13 |
| Calif Accred | 18 | 5 | 6 | 9 |
| Unaccredited | 9 | 6 | 7 | 6 |
| Other | 5 | 10 | 12 | 4 |

The percentage of females among minority applicants (29%) was generally slightly higher than it was among Anglo applicants (25%). However, there was a disproportionately large percentage of Hispanic males (see Table 12).

Table 12

PERCENTAGE OF FIRST TIMERS WITHIN EACH RACIAL GROUP
THAT WERE IN EACH SEX GROUP

|  | Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|
| Male | 75 | 70 | 62 | 79 |
| Female | 25 | 30 | 38 | 21 |

RELATIONSHIP BETWEEN GBX AND FYLSX SCORES

Students attending unaccredited law schools (and all students who have not successfully completed two years of undergraduate education) must pass the First Year Law Students' Examination (FYLSX) in order to receive State Bar of California credit for completing one year of law studies. And, these students cannot receive credit for any law studies until they pass the FYLSX. Thus, these students must pass the FYLSX (as well as meet other requirements) in order to be eligible to take the GBX.

The FYLSX is administered in June and again in October. The test is given in two 3.5 hour sessions. In the morning session, examinees answer four essay questions drawn from three areas: contracts, torts, and criminal law. An examinee can earn up to 100 points per question. The afternoon session consists of 100 multiple choice questions drawn from the same three areas that are covered on the essay portion of the examination. Raw scores on the multiple choice section (i.e., the number of questions answered correctly) are converted to scale scores so as to control for possible differences in question difficulty across administrations of the test. The maximum possible scale score on the multiple choice section is 400 points. The total score on the FYLSX is the sum of the four essay scores plus the multiple choice scale score. A total score of 560 or higher is required for passing the FYLSX.

The sample of 5419 applicants who took the GBX for the first time in July 1977 contained 682 applicants who had taken the FYLSX. Most of these applicants took the June 1974 FYLSX (because those attending unaccredited schools would need three more years of law school training after passing the FYLSX in order to be eligible to take the July 1977 GBX).

Table 13 shows the number of applicants within each school type who had FYLSX scores. It can be seen from this table that several applicants who did not graduate from an unaccredited school nevertheless took the FYLSX. Most of these applicants transferred to an accredited or ABA school after taking the FYLSX or took the FYLSX because they did not complete two years of undergraduate education prior to enrolling in law school.

Table 13 further indicates that 16 unaccredited school graduates did not take the FYLSX. Almost all of these applicants successfully completed their first year of law studies at an ABA or California accredited school (i.e., prior to their transferring to an unaccredited school) or passed the FYLSX prior to June 1974.

Table 13

NUMBER OF APPLICANTS WITHIN EACH SCHOOL TYPE THAT TOOK THE FYLSX

| Exams Taken | Calif ABA | Other ABA | Calif Accred | Unaccred | Other | Total |
|---|---|---|---|---|---|---|
| GBX + FLYSX | 36 | 10 | 146 | 474 | 16 | 682 |
| GBX Only | 3082 | 613 | 750 | 16 | 276 | 4737 |
| Total | 3118 | 623 | 896 | 490 | 292 | 5419 |

Table 14 presents the average FYLSX and GBX scores for the applicants in each status group that took the FYLSX and the average number of attempts the applicants in each group made to pass the GBX and FYLSX. These data indicate that there was a strong relationship between FYLSX and status group. For example, there was a 48 point difference in average FYLSX scores between applicants who passed the GBX on their first attempt and repeaters who did not eventually pass. FYLSX scores also provided a good prediction of GBX scores and the average number of attempts an applicant made to pass the GBX. The small number of applicants in the "No Subsequent Attempt" category requires interpreting their data with extreme caution.

Table 15 contains observed and corrected correlations between GBX and FYLSX scores. The corrected correlations in this table estimate the strength of the relationship between the measures if there was no restriction in the range of FYLSX scores; i.e., if all the students who took the FYLSX also took the GBX. These estimates were made using the procedures described by Thorndike (1949; Case 2, page 173) and a statistical analysis that showed that the standard deviation of the total FYLSX scores was 68 in the population of 2209 students who took the June 1974 examination as distinct from the standard deviation of 49 in the restricted sample of 682 students who went on to take the July 1977 GBX.

Table 14

AVERAGE GBX AND FYLSX SCORES FOR APPLICANTS IN EACH STATUS GROUP AND
THE AVERAGE NUMBER OF ATTEMPTS THEY MADE TO PASS THE GBX AND FYLSX

| GBX Status Group | N | Per-cent | Average GBX Score Essay | MBE | Total | FYLSX Score | Average Number of Attempts on GBX | FYLSX |
|---|---|---|---|---|---|---|---|---|
| Initial Pass | 338 | 50 | 857 | 387 | 1244 | 602 | 1.0 | 1.1 |
| Subsequent Pass | 208 | 31 | 789 | 350 | 1139 | 574 | 3.1 | 1.3 |
| Subsequent Fail | 118 | 17 | 746 | 327 | 1073 | 554 | 4.6 | 1.4 |
| No Subsequent Attempt | 18 | 3 | 773 | 340 | 1113 | 574 | 1.0 | 1.1 |
| All FYLSX Takers | 682 | 100% | 815 | 364 | 1179 | 585 | 2.3 | 1.2 |

The last FYLSX score was used if an applicant took the FYLSX more than once.
94 of the 682 students took the FYLSX more than once and 74 of these FYLSX
repeaters were unaccredited law school graduates.

Table 15

OBSERVED AND CORRECTED CORRELATIONS
BETWEEN FYLSX AND GBX SCORES (N=682)

| FYLSX with: | Observed Correlation | Correlation Corrected for Restriction in Range |
|---|---|---|
| MBE | .53 | .66 |
| Essay | .33 | .44 |
| Total GBX | .45 | .57 |

In the unrestricted population of all June 1974
takers (N = 2209), the FYLSX total score had a
reliability of .87 (based on reliabilities of .71 for
its Essay and .82 for its Multiple Choice sections;
and a .65 correlation between these two sections).

The data in Table 15 further substantiates that the FYLSX is a good
predictor of GBX scores; especially considering that the FYLSX is usually
taken three or more years before the GBX, it covers only three of the
content areas included in the GBX, there is a much smaller range of FYLSX
scores among those who pass the FYLSX than among the entire group that take
it (which biases the observed correlations downwards), and the GBX and
FLYSX scores are less than perfectly reliable (which also tends to limit
the observed correlations).

FYLSX's higher correlation with MBE than with Essay scores is probably due mainly to two factors: (1) the higher reliability of the MBE than the Essay section of the GBX and (2) the Multiple Choice section of the FYLSX carries more weight in determining the relative standings of the examinees on this test than does the score on the four essay questions. In other words, even though a student can earn up to 400 points on each section, the standard deviation of the Multiple Choice section (45) was much larger than the standard deviation of the Essay section (30) in the population of 2209 students who took the June 1974 FYLSK which in turn resulted in the Multiple Choice section having a greater influence on relative standings on this examination.

The data in Table 15 were used to construct an equation for predicting GBX scores from FYLSX scores. This equation indicated that an applicant with a FLYSX score of 613 is likely to earn about 1200 points on the GBX (i.e., the minimum score required for passing). An applicant would need a FLYSX score of 534 in order to have a predicted Total GBX score of 1140; i.e., about the average initial GBX score of the applicants who failed on their first attempt but eventually passed (see Tables 2 and 14). An applicant who just passes the FYLSX with a score of 560 therefore has substantially less than a 50/50 chance of passing the GBX on the first attempt but slightly better than a 50/50 chance of eventually passing the GBX.

Table 16 presents the average predicted Total GBX score on the first attempt for various FYLSX scores. As in all the other tables involving FYLSX scores, these predictions are based on the last and thereby the highest FYLSX score earned by an applicant (i.e., in the event the applicant took the FYLSX more than once).

## Table 16

### PREDICTED INITIAL TOTAL GBX SCORES
### FOR APPLICANTS WITH VARIOUS FYLSX SCORES

| FYLSX Score | 480 | 500 | 520 | 540 | 560 | 580 | 600 | 620 |
|---|---|---|---|---|---|---|---|---|
| Predicted GBX | 1099 | 1114 | 1129 | 1145 | 1160 | 1175 | 1190 | 1205 |

Predicted Total GBX Score = 733.67 + (.761)(FLYSX Score)

The passing rate on the FYLSX is generally below 40% and often below 30% (see Table 17). While this rate might seem quite low, it is evident from the data above that the pass/fail line on the FYLSX (560 points) is not unduly restrictive. Applicants who just make it over this line have substantially less than a 50% chance of passing the GBX on their first attempt and only slightly better than a 50% chance of eventually passing. Standard statistical formulas further indicate that if the FYLSX's reliability were increased, predictive accuracy also would be increased. This would have the effect of lowering the predicted GBX scores for applicants with FYLSX scores below 585 (and increasing the predicted scores for applicants with FYLSX scores above 585).

Table 17

NUMBER OF EXAMINEES TAKING AND THE PERCENT PASSING THE FYLSX

| Year | Number of Examinees | | Percent Passing | |
|------|------|---------|------|---------|
|      | June | October | June | October |
| 1971 | 1187 |     | 42 |    |
| 1972 | 2411 |     | 38 |    |
| 1973 | 2217 |     | 46 |    |
| 1974 | 2209 | 866 | 34 | 12 |
| 1975 | 1807 | 770 | 40 | 13 |
| 1976 | 1717 | 769 | 35 | 20 |
| 1977 | 1366 | 602 | 37 | 26 |
| 1978 | 1168 | 553 | 27 | 18 |
| 1979 |  833 | 395 | 29 | 22 |
| 1980 |  603 | 352 | 24 | 23 |
| 1981 |  627 | 361 | 24 | 26 |

The FYLSX was given only once per year from
1971 through 1973.

Table 17 also indicates that the percent passing the FYLSX has been
declining.  This drop is most likely attributable to a change in the
general ability level of the students who take the FYLSX.  Specifically,
some formerly unaccredited schools received California accreditation after
1973 (which also partially accounts for the marked drop in the number
taking the test).  Since the students at these newly accredited schools
tended to do better on the FYLSX than students at the schools that were
still unaccredited and since the students at the newly accredited schools
no longer have to take the FYLSX, there probably has been a decline in the
general ability level of those who take the FYLSX.

The relatively low pass rate on the FYLSX is a very significant factor when
comparing the pass rates of school types on the GBX.  The reason for this
is that many if not most of the students attending unaccredited schools are
unlikely to ever be eligible to take the GBX.  The initial and eventual
pass rates on the GBX of applicants from unaccredited schools are therefore
not indicative of what the GBX pass rates would be if all the students at
the unaccredited schools were allowed to take the GBX.  In other words,
even though the initial and eventual pass rates of applicants from
unaccredited schools are relatively low (see table 9), these rates would be
far lower if the FYLSX did not remove a substantial portion of the
unaccredited students from the GBX's potential applicant pool.


DISCUSSION

About 55% of the applicants who took the July 1977 GBX passed.  This is
about the same percent that passed the five July examinations given between
1976 and 1980 (Klein, 1981).  However, it is evident from this report and
other studies that the overall pass rate is very misleading.  The overall
rate does not consider that about 25% of those taking the examination are
repeaters.  And, a large number of these repeaters had initial GBX scores
so low as to make it highly unlikely that they would eventually pass.

There also are large differences in passing rate among types of schools. Applicants from unaccredited schools have much lower initial and eventual pass rates than do applicants from ABA schools. This is not surprising given the large differences in admissions standards between these two types of schools (Klein, 1979) and the fact that the pass/fail line on the FYLSX is set at a level that is well below the score that would be needed to have even a 50/50 chance of passing the GBX on the first attempt.

The misleading nature of the overall pass rate is most evident when applicants are disaggregated on the basis of number of attempts and law school type (see Table 9). And, since almost all states except California limit eligibility to take the bar examination to applicants from ABA approved law schools, any comparisons between California's passing rate and the passing rate in other states must be restricted to ABA graduates. This is a significant consideration because the results presented in this report show that a high percentage of ABA graduates eventually pass the GBX.

The foregoing considerations and the other data presented in this report suggest that there are four qualitatively different groups taking the California examination. One group consists mainly of ABA graduates. About 90% of these applicants pass on their first or second attempt. A second group is composed mainly of applicants from accredited and unaccredited schools. About 84% of these applicants eventually pass, often as a result of several repeated attempts to pass (and the additional studying and preparation that is associated with such repeated efforts). The third group consists of applicants who take the California examination but are not really committed to practicing law in California. Thus, if they fail, they are unlikely to take the test again and therefore wind up in the No Subsequent Attempt category. Group 4 consists of applicants who take the examination over and over again even though their initial GBX scores indicate that they have a very slight chance of ever passing. Several of these applicants have taken the GBX over 20 times!

The number of applicants in Group 4 appears to be growing. The basis for this conclusion is that the pass rate among ABA first timers has not been declining as rapidly over the past several years as has the overall pass rate. For example, between 1976 and 1980, the overall pass rate on the July GBX declined 11% while the pass rate for ABA first timers on these examinations declined by only 7% (Klein, 1981). It may be inferred from these data that attrition in Group 4 during this period (due to eventually passing the examination or not making any further attempts) did not keep pace with the number of applicants being added to it. These additions were most likely to have come from the unaccredited schools because the graduates of these schools tended to have much lower GBX scores than graduates of ABA or California accredited schools (see Table 10). This line of reasoning further suggests that even though the passing rate on the FYLSX is quite low, the FYLSX still lets into the GBX applicant pool a significant number of unaccredited school graduates who have relatively little chance of ever passing the GBX.

The slight decline in the pass rate on the GBX among first timers during the past several years suggests that the eventual pass rate also may be dropping. For example, in July 1977, about 76% of the ABA first timers passed while on the July 1980 GBX, only 73% of the ABA first timers passed. Previous research has indicated that this decline has been due to a decrease in the general ability level of the applicants taking the GBX rather than to any change in pass/fail standards (Klein, 1981).

REFERENCES

Klein, S.  An analysis of the relationships between bar examination scores
        and an applicant's law school, admissions test scores, grades, sex,
        and racial/ethnic group.  Paper presented at the American Bar
        Association meetings, Dallas, Texas; August 14, 1979.  A summary of
        this paper appears in The Bar Examiner, 1980, 49, 14-18.

Klein, S.  An analysis of possible variations in pass/fail standards on the
        California State Bar Examination.  Report prepared for the Committee
        of Bar Examiners of the State Bar of California, 1981.

Thorndike, R. L.  Personnel Selection. New York: John Wiley & Sons, 1949.

PR-03-05

# ANALYSIS OF CHANGES IN TEST SCORES AND PASSING RATES ON THE CALIFORNIA BAR EXAM FROM 1997 TO 2002

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.
GANSK & Associates

June 17, 2003

During the past decade, there has been a fairly steady decline in the percentage of first timers passing California's General Bar Exam (GBX).  For example, the first-timer passing rate on the July 1994 and July 2002 exams were 78 and 65 percent, respectively.  This report examines some of the factors that were related to this decline.  As background for what follows, the next section of this report summarizes the GBX's structure and scoring practices. We then describe the samples of applicants used in this study and the results of our analyses.  We conclude with a discussion of our findings.

## Exam Structure

California's GBX has two parts—the Multistate Bar Examination (MBE) and a written section.  The MBE contains 200 multiple-choice items.  MBE raw scores (i.e., the number of questions answered correctly) are adjusted ("equated") for possible differences in average question difficulty across administrations of the exam.  As a result of this process, a given MBE scale score indicates about the same level of proficiency regardless of the particular version of the test taken.

The written section consists of six 1-hour essay questions and two 3-hour performance test (PT) questions.  Answers are graded in 5-point intervals on a 40 to 100-point scale.  Readers are instructed to assign a score of "65" to an answer that they consider to be a "marginal fail" and a "70" to an answer that is a "marginal pass."  An applicant's total written raw score equals the sum of the six essay scores plus two times the sum of the two PT scores.  Hence, the maximum possible written raw score is 1,000 points.

Total written raw scores are normally converted to a score distribution that has the same mean and standard deviation as the distribution of the applicants' MBE scale scores.  The resulting written scale scores are then combined with the MBE scores to compute the total scores that are used to make pass/fail decisions. However, this report presents the results with the written raw scores on the 1,000-point scale because these scores reflect the readers' assessment of the absolute quality of the applicants' answers.

**Analysis Sample**

To provide a consistent basis for comparisons, the analyses below used all the first timers who took the full General Bar Examination (i.e., both the MBE and Written sections) and who also had a Law School Admission Test (LSAT) score. Preliminary analyses indicated that about 94 percent of the first timers had an LSAT score, that this percentage was fairly stable across the nine July exams studied, and that the small differences that did occur were not systematically increasing or decreasing over time.

**Trends in Scores and Passing Rates**

Table 1 contrasts the mean scores and passing rates on the nine July exams studied. This table shows LSAT, MBE, and Written raw scores were generally dropping over these nine years, as were passing rates. This relationship was not perfectly consistent, but the general trend on all four indicators was clearly downwards. For example, almost all of the values in the 1994 to 1997 period were higher than almost all the values in the 1998 to 2002 period. Indeed, only 4 of the 36 values in Table 1 deviated from this pattern. These are in bold italics.

Table 1
Number of Applicants in Analysis Sample, Means, and Passing Rates by Exam

| Exam | Number of Applicants | LSAT Score | MBE Score | Written Raw Score | Percent Passing |
|------|---------------------|------------|-----------|-------------------|-----------------|
| 1994 | 4694 | 158.1 | 152.7 | 689.4 | 77.7 |
| 1995 | 5118 | 158.0 | 150.9 | 675.1 | 73.0 |
| 1996 | 5374 | 157.9 | *149.6* | 683.9 | 68.6 |
| 1997 | 5571 | 158.3 | 151.3 | *669.7* | 74.4 |
| 1998 | 5373 | 157.4 | 148.2 | *670.0* | 64.3 |
| 1999 | 5188 | 157.5 | 148.5 | 658.5 | 63.5 |
| 2000 | 4996 | 157.2 | 149.7 | 657.4 | 66.7 |
| 2001 | 4969 | 157.5 | *150.8* | 652.3 | 70.0 |
| 2002 | 4882 | 157.2 | 148.7 | 648.4 | 64.6 |

The three test scores studied (LSAT, MBE, and Written raw) had different means and standard deviations. Hence, to assess whether they exhibited the same sized decrease over time, it was first necessary to convert the differences between the 1994 and 2002 values to an "effect" size. In the context of this analysis, the effect size is the difference between the 1994 and 2002 values divided by the standard deviation.

2

Table 2 shows that the decline in mean MBE scores and passing rates between 1994 and 2002 was about 2.5 times larger than the decline in average LSAT scores during this period. The decline in mean Written raw scores was three times larger than the change in MBE scores and passing rates. The comparability of the declines in mean MBE scores and passing rates stems in part from the scaling of written scores to the MBE for the purposes of computing the total scores that are used to make pass/fail decisions.

Table 2
Differences in Mean Scores and Passing Rates Between 1994 and 2002

|  | LSAT Score | MBE Score | Written Score | Percent Passing |
|---|---|---|---|---|
| 1994 minus 2002 | 0.93 | 3.91 | 41.0 | 13.1 |
| Standard Deviation | 8.10 | 14.1 | 45.5 | 46.2 |
| Effect Size | 0.11 | 0.28 | 0.90 | 0.28 |

The standard deviation for a test score was the mean of its standard deviations over the nine exams. The standard deviation for the percent passing was equal to 100 times the square root of pq where p = the average proportion passing across the nine exams and q = average proportion failing. Standard deviations on a measure were fairly constant across exams.

**Demographic Trends**

Table 3 shows that over the nine exams studied, there was a general increase in the percentage of minority (defined as anyone who was not a non-Hispanic white) and female applicants as well as the percentage that were graduates of American Bar Association (ABA) approved law schools. Between 1994 and 2002, there was a 10 percentage point increase in the percentage of minority applicants, an 8 point increase in the percentage who were women, and a 6-point increase in the percentage who graduated from ABA law schools within the past year.

Table 4 shows the change in mean scores and passing rates between 1994 and 2002 for various groups. These data indicate that most groups experienced similar declines in scores and passing rates over the nine-year period, but a few had a larger decrease than others on one or more measures. For example, graduates of California accredited schools had an especially large drop in mean LSAT and MBE scores between these two exams.

Table 3
Demographic Characteristics of the Analysis Sample by Exam

| Exam | Percent Minority | Percent Female | Percent ABA |
|------|------------------|----------------|-------------|
| 1994 | 20 | 44 | 80 |
| 1995 | 23 | 43 | 79 |
| 1996 | 26 | 47 | 80 |
| 1997 | 28 | 47 | 82 |
| 1998 | 28 | 46 | 82 |
| 1999 | 29 | 46 | 84 |
| 2000 | 27 | 47 | 84 |
| 2001 | 30 | 48 | 86 |
| 2002 | 30 | 52 | 86 |

Table 4
Differences in Mean Scores and Passing Rates Between 1994 and 2002
By Gender, Racial/Ethnic Group, and School Type*

| Group | LSAT Score | MBE Score | Written Raw Score | Percent Passing |
|-------|-----------|-----------|-------------------|-----------------|
| Female | 0.48 | 3.45 | 36.2 | 9 |
| Male | 1.10 | 3.65 | 46.5 | 16 |
| White | 0.87 | 3.09 | 40.0 | 11 |
| Asian | 0.06 | 2.36 | 30.6 | 8 |
| Hispanic | 1.37 | 3.46 | 37.4 | 11 |
| Black | 0.73 | 4.96 | 42.3 | 15 |
| Other | -0.26 | 5.64 | 50.6 | 22 |
| ABA | 1.82 | 4.56 | 42.5 | 15 |
| CA Accredited | 2.70 | 7.01 | 48.4 | 20 |
| Unaccredited | 1.90 | 1.37 | 52.3 | 22 |
| All Others | 0.53 | 3.22 | 48.2 | 18 |

* Difference = 1994 value – 2002 value

## Summary and Discussion

The average bar exam scores of July first timers on the GBX (and their passing rates) have been gradually sliding downwards during the last nine years. For example, the passing rate was about 13 percentage points higher in 1994 than it was in 2002. One factor that may have contributed to this decline is the decrease in LSAT scores that occurred during this period because these scores provide a consistent measure of the overall academic ability of the students coming into law school. However, the drop in bar scores was larger than the drop in LSAT, so this does not appear to be the sole reason for the decrease in bar scores. Another factor that may have contributed to the decline was the increase during this period in the percentage of minority applicants taking the test; i.e., because they tend to earn lower bar scores (and law school grades) than their non-minority classmates (Table 5).

The decline in bar scores and passing rates is directly opposite to what would be expected on the basis of other changes over time in the composition of the applicant pool. Specifically, women and ABA graduates generally earn higher total bar scores than other applicants and the percentage of woman taking the exam increased by 8 percentage points whereas the ABA percentage increased by 6 points (see Table 3). Thus, these changes would normally be expected to increase essay scores and the passing rate. One explanation for why these changes did not coincide with an increase in bar scores is that some California accredited schools became ABA accredited during the study period and this may have diluted the pool of highly qualified applicants. The gender effect may be related to schools taking female students who were as a group somewhat less qualified than their predecessors. Other factors may relate to changes in law school admission standards, grading and educational practices, and retention policies.

Table 5
Mean LSAT, MBE, and Written Scores and Percent Passing
By Gender, Racial/Ethnic Group, and Law School Type*

| Group | Number of Applicants | Mean LSAT | Mean MBE | Mean Written | Percent Passing |
|---|---|---|---|---|---|
| Female | 20,950 | 157.1 | 148.0 | 670.8 | 69 |
| Male | 23,871 | 158.3 | 151.9 | 64.4 | 69 |
| White | 30,723 | 158.6 | 151.9 | 672.7 | 74 |
| Asian | 5,769 | 157.3 | 147.2 | 663.8 | 66 |
| Hispanic | 3,404 | 153.9 | 144.7 | 652.8 | 55 |
| Black | 2,054 | 151.9 | 141.4 | 640.4 | 44 |
| All Others | 4,215 | 157.7 | 148.5 | 657.6 | 54 |
| ABA | 38,164 | 158.9 | 151.3 | 672.3 | 74 |
| CA Accredited | 4,221 | 148.3 | 141.5 | 640.8 | 40 |
| Unaccredited | 475 | 145.4 | 137.0 | 619.7 | 26 |
| All Others | 3,305 | 157.7 | 147.7 | 650.5 | 57 |

* A small percentage of applicants were missing gender, racial/ethnic group, and/or a school code.

AN ANALYSIS OF THE RELATIONSHIPS BETWEEN
BAR EXAMINATION SCORES AND AN APPLICANT'S
LAW SCHOOL, ADMISSIONS TEST SCORES, GRADES,
SEX, AND RACIAL/ETHNIC GROUP


Stephen P. Klein
The Rand Corporation


Paper presented to
The National Conference of Bar Examiners,
American Bar Association
Dallas, Texas
August 1979

## INTRODUCTION

The percent of racial/ethnic minority group members who pass
California's State Bar Examination has consistently been below the
percent of Anglo applicants who pass.  Previous research efforts
have indicated that this differential was not a function of certain
questions being particularly more difficult for one group than for
another group relative to these groups' respective performance levels
on other questions (Klein, 1976).  This research also found that the
differences in passing rates between groups were not related to the
racial/ethnic background of the persons who graded the essay portion
of the examination.  Moreover, controlling for various characteristics
of the applicants (such as their use of bar review courses) did not
diminish the disparities between the performance levels of each group.
    The foregoing situation led to the hypothesis that the
differential in passing rates may have been due to differences
between the groups in their respective levels of legal skills
and knowledge and/or some general characteristic of the
examination that may have differentially affected their
performance on it.  A pilot study was mounted to explore this
issue with the July, 1976 examination.  The results of this
investigation indicated that controlling for an applicant's
grades in law school removed some but not all of the observed
differences between groups.  The pilot study results also
suggested that the multiple-choice portion of the examination
was giving women applicants somewhat lower scores than would
have been expected on the basis of their law school grades.
    One major shortcoming of the pilot study stemmed from its
obtaining information about an applicant's racial/ethnic and sex
group from a questionnaire that was mailed shortly after the
examination was administered.  Since only about two-thirds of
the applicants completed the questionnaire, it was not known whether
the pilot study's findings were due to general trends or to the
unique characteristics of those who chose to respond.  A second
consequence of the return-rate problem was that the number of minority
applicants identified by the questionnaire was so low as to raise
concern about the reliability of the results obtained.  Finally,
the outcomes of the statistical procedures used in the pilot study
may have been biased, directly or indirectly, by marked differences
in enrollment patterns between groups; e.g., minority applicants

were more likely to attend American Bar Association (ABA) approved law schools than were Anglo applicants.*

## PURPOSE

The present study was designed to replicate the research done on the 1976 examination, but with a larger and more representative sample of applicants. Thus, like the pilot study, its goal was to assess whether the discrepancies in passing rates between various sex and racial/ethnic groups were solely a function of differences in the relative academic achievement levels of the applicants in these groups.

The present research also expanded upon the pilot study by examining whether any differences between applicants that still remained after controlling for their academic achievement levels were related to the law schools the applicants attended. The reason for investigating this issue was that if some law schools did a better job than others in preparing their students to take the bar examination, and if certain groups had an unusually high or low enrollment at these schools, then any differences between groups in their passing rates may have been due to the schools they attended rather than to some characteristic of the group itself.

## OUTCOME MEASURES

The California State Bar Examination consists of two subtests, Multistate Bar Examination and Essay. An applicant can pass the examination by passing each of these subtests separately (with a score of 70 percent or greater of the maximum score on each subtest) or by receiving a combined total score of 70 percent or more of the maximum total score.

Multistate Bar Examination (MBE)
The MBE is developed by the National Conference of Bar Examiners and is administered and scored by the Educational Testing Service (ETS). The test is composed of 200 multiple choice questions from the following six content areas: Constitutional Law, Contracts, Criminal Law, Evidence, Real Property, and Torts. Scores on the MBE are scaled by ETS across administrations of the test so that the maximum possible score in California equals 514 points. A score of 360 points is considered passing on the MBE.

Essay
The Essay portion of the 1977 examination was administered in three test sessions. In each session, applicants were instructed to answer any four of the five questions presented; i.e., each applicant was supposed to answer 12 questions. An applicant could earn up to 100 points per question, so that the maximum Essay score was 1200 points. A score of 840 was considered passing on this subtest.

------------

*A copy of the pilot study and a more detailed discussion of its limitations are on file at the offices of The Committee of Bar Examiners in San Francisco, California.

Total Score and Final Pass/Fail Status

An applicant could pass the 1977 examination by receiving a Total Score, i.e., Essay plus MBE, of 1200 or more points. Applicants with Total Scores in the 1170 to 1199 range had their Essay answers reappraised. On the basis of this reevaluation, a final pass/fail decision was made. Previous research (Klein, 1977) indicated that the net effect of this reread process was to essentially move the pass/fail cutoff score from 1200 to 1190 points.

## PREDICTORS OF SUCCESS ON THE BAR EXAMINATION

Law School Grade Point Average (LGPA)

Of the 38 schools represented in this research, 15 used a four-point grading system and 22 used a 100-point system. The remaining school used a letter category system which was converted to a 4.0 system in a way that reflected the number of credits earned within each letter grade. The grades assigned by this conversion and Total bar scores correlated with one another at this school to about the same degree (r = .61) as they correlated with each other at the other schools in this study.

If a school did not provide an LGPA for a student, then it was estimated on the basis of that student's LSAT score and the relationship between LSAT scores and LGPA's at that student's school. A total of 68 applicants had LGPA's assigned by this method. All of these applicants graduated from ABA schools (see Appendix A).

Since a common scoring system across law schools was needed for the planned analyses, the grades within each school were rescaled to a mean (average) of 50 points and a standard deviation of 10 points. This scaling preserved the relative standings of the students within each school, as well as the shape of the distribution of these grades (i.e., whether the students tended to bunch or spread out in some fashion across the possible score range).

Law School Admissions Test (LSAT)

The Law School Admissions Test (LSAT) is a multiple choice test that is developed, administered, and scored by the Educational Testing Service of Princeton, New Jersey. The Law School Admissions Test Council, which is an independent organization, oversees these activities.

LSAT scores are used in the admissions process at most accredited law schools across the country because of the generally moderate correlation (r = .33) between these scores and first year LGPA (Pitcher, Schrader, and Winterbottom, 1973). In a seven-state study, Carlson and Werts (1976) also found that performance on the LSAT correlated with bar examination scores (median r's were .36, .51, and .51 with Essay, MBE, and Total, respectively).

If a law school did not provide an LSAT score for an applicant, one of two procedures was used to estimate that score. The first procedure involved predicting the LSAT score from the applicant's LGPA and the relationship between LSAT scores and LGPA's at the applicant's law school. This method was used with applicants who graduated from the 32 law schools which reported LSAT scores for most of their students. A total of 230 applicants had their LSAT scores estimated in this fashion.

The second procedure that was used to estimate missing LSAT
scores was limited to one California (but not ABA) accredited
and five unaccredited law schools that did not report these scores
for their graduates.   The steps involved in this estimation process
were as follows:

   o   The equation for predicting a school's average LSAT score
       from the percent passing at that school was computed for
       the 32 schools which did report LSAT scores for the majority
       of their students.*

   o   This equation and the percent passing at each of the six
       remaining schools was used to estimate their respective
       average LSAT scores.

   o   All the students at these six schools were assigned their
       school's average LSAT score.

   A total of 136 applicants had their LSAT scores estimated by
this second method.

                    APPLICANTS AND SCHOOLS

Sampling
   In order to control for a variety of extraneous factors, the
present study was limited to applicants with the following
characteristics:

   o   In the fall of 1977, they took the examination for the first
       time.

   o   They took the complete examination; i.e., they answered
       12 essay questions and had a score on the multiple choice
       portion of the test.

   o   They graduated from a California law school which had 10
       or more of its recent graduates taking the examination.

   o   Their law school provided the author with their grade point
       average and/or their score on the Law School Admission Test.

   The foregoing procedures resulted in a total sample of 4,414
applicants.   The 38 schools represented by these applicants were
distributed across school type categories as follows:   ABA approved
(16), other California accredited (8), and unaccredited (14).   This
sample also represented 95 percent of the 4,637 applicants who were
taking the test for the first time and who were graduates of a
California law school.

Sex and Racial/Ethnic Group Affiliations
   Self-reported sex and racial/ethnic group affiliation data
were obtained from a form the students completed at the time they
applied to take the examination.   An analysis of these data indicated
that there were four racial/ethnic groups with enough applicants

─────────
   *A correlation of .74 was obtained between percent passing and
average LSAT score at these 32 schools.

Table 1

SUMMARY DESCRIPTIVE STATISTICS FOR EACH
SCHOOL TYPE AND FOR ALL SCHOOLS COMBINED

| Descriptive Statistic | Variable | ABA Approved | Other Calif. Accredited | Unaccredited | All Schools Combined |
|---|---|---|---|---|---|
| Average Score | Total | 1237.3 | 1187.6 | 1176.2 | 1222.3 |
| | Essay | 853.0 | 825.9 | 811.7 | 844.1 |
| | MBE | 384.3 | 361.7 | 364.5 | 378.2 |
| | LGPA | 50.0 | 50.0 | 50.0 | 50.0 |
| | LSAT | 607.3 | 513.9 | 516.8 | 581.1 |
| Standard Deviation | Total | 78.0 | 75.4 | 77.2 | 81.1 |
| | Essay | 53.3 | 50.7 | 52.9 | 54.7 |
| | MBE | 32.7 | 32.3 | 31.9 | 34.0 |
| | LGPA | 10.0 | 10.0 | 9.9 | 10.0 |
| | LSAT | 77.5 | 70.9 | 62.0 | 85.8 |
| Percent Passing | Total[*] | 76.1 | 51.2 | 46.7 | 68.7 |
| | Essay | 63.5 | 40.0 | 33.2 | 56.2 |
| | MBE | 78.8 | 54.0 | 58.2 | 72.2 |
| Number of Applicants | | 3163 | 868 | 383 | 4414 |

[*]Percent passing after reappraisal.

Table 2

SUMMARY DESCRIPTIVE STATISTICS FOR
EACH RACIAL/ETHNIC AND SEX GROUP

| Descriptive Statistic | Variable | Racial/Ethnic Group | | | | Sex Group | |
|---|---|---|---|---|---|---|---|
| | | Anglo | Asian | Black | Hispanic | Male | Female |
| Average Score | Total | 1228.5 | 1188.7 | 1140.1 | 1170.0 | 1221.5 | 1224.2 |
| | Essay | 847.8 | 828.2 | 792.1 | 812.7 | 841.6 | 850.9 |
| | MBE | 380.7 | 360.5 | 348.0 | 357.3 | 379.9 | 373.2 |
| | LGPA | 50.9 | 44.4 | 37.6 | 42.0 | 49.5 | 51.3 |
| | LSAT | 588.2 | 559.5 | 481.2 | 513.6 | 579.6 | 585.1 |
| Standard Deviation | Total | 78.6 | 85.7 | 73.1 | 81.2 | 80.8 | 81.9 |
| | Essay | 53.3 | 58.9 | 51.0 | 53.9 | 54.3 | 55.3 |
| | MBE | 33.0 | 34.5 | 33.2 | 35.5 | 34.0 | 33.8 |
| | LGPA | 9.6 | 8.8 | 7.4 | 9.6 | 9.7 | 10.6 |
| | LSAT | 83.1 | 83.2 | 73.9 | 75.0 | 87.3 | 81.6 |
| Percent Passing | Total* | 71.9 | 53.2 | 26.6 | 40.5 | 67.8 | 71.0 |
| | Essay | 58.9 | 42.9 | 18.6 | 34.6 | 54.4 | 61.2 |
| | MBE | 75.1 | 54.8 | 38.1 | 47.0 | 73.5 | 68.5 |
| Number of Applicants** | | 3957 | 126 | 113 | 185 | 3253 | 1157 |

 *Percent passing after reappraisal.
 **Some of the applicants did not indicate their sex and/or racial/ethnic group on the form provided for this purpose.  Moreover, some of the applicants who took the examination did not belong to any of the four racial/ethnic groups included in this table.  Thus, the total number of applicants across the four racial/ethnic groups or across the two sex groups does not equal the total number of applicants in Table 1.

Table 3

CORRELATIONS BETWEEN VARIABLES*

| Variables | School Type | | | Sex | | Racial/Ethnic Group | | | | |
| | ABA Approved | Other Cal. Accredited | Unaccredited | Males | Females | Anglo | Asian | Black | Hispanic | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| LGPA & Essay | .62 | .59 | .47 | .57 | .61 | .56 | .53 | .51 | .54 | .58 |
| LSAT & Essay | .34 | .24 | .37 | .39 | .44 | .37 | .42 | .27 | .32 | .40 |
| LGPA & MBE | .59 | .53 | .38 | .54 | .57 | .50 | .40 | .52 | .52 | .54 |
| LSAT & MBE | .52 | .41 | .37 | .55 | .58 | .53 | .53 | .51 | .47 | .55 |
| LGPA & Total | .67 | .62 | .48 | .61 | .64 | .59 | .53 | .59 | .59 | .62 |
| LSAT & Total | .45 | .33 | .41 | .49 | .53 | .47 | .50 | .42 | .42 | .50 |
| LSAT & LGPA | .34 | .28 | .27 | .27 | .30 | .21 | .15 | .28 | .31 | .28 |
| Essay & MBE | .62 | .63 | .63 | .66 | .67 | .64 | .66 | .48 | .63 | .65 |

*Internal consistency reliability estimates for the variables and the sources for these estimates were as follows: MBE = .91 (Faggen, 1977); Essay = .78 and Total = .88 (Klein, 1978); LSAT = .90 and LGPA = .85+ (Carlson and Werts, 1976).

to permit their being included in comparisons between groups. The
four groups were identified as follows: Anglo, Asian, Black, and
Hispanic.

Sample Characteristics

     Table 1 provides summary descriptive statistics for each of the
three categories of schools and the total sample.  Table 2 contains
the corresponding data for each of the sex and racial/ethnic groups.
The correlations between the measures within each school type, sex,
and racial/ethnic group are presented in Table 3.


DATA ANALYSIS PLAN

     The data analysis procedures focused on assessing the extent
to which differences in bar scores between applicants could be
explained by factors that were independent of how well these applicants
performed in law school.  In other words, the procedures were designed
to answer the question:  "Why do two applicants with comparable grades
in law school get different scores on the bar examination?"  The
first step in answering this question involved determining how much
of the variation in bar scores between applicants was related to
their law school grades.  This was done by constructing an equation
to predict bar scores from knowledge of an applicant's LGPA.  How
well this equation worked was indicated by the degree to which
differences in the applicants' LGPA's corresponded with differences
in their bar scores; i.e., the higher the degree of correspondence,
the better the prediction.

     The next analytic step involved adding to this equation one
or more of the variables under investigation, such as the applicant's
sex, and then measuring whether this expanded equation increased
the level of predictive accuracy achieved.  If the addition of a
variable improved prediction over LGPA alone, then it is evident
that this variable helped to explain why one applicant received
a different bar score than another applicant even though they had
comparable LGPA's.  Thus, a variable's unique contribution to
prediction provides an index of the degree to which bar scores are
related to this variable after the bar scores have been adjusted
for differences between applicants in how well they performed in
law school.  This index can be expressed in terms of the percent
of variation in bar scores that the variable explains that has not
already been explained by LGPA.

     When a variable is able to explain bar score variation, it does
not mean that this variable in and of itself caused the scores to
differ.  Other factors which are closely associated with both the
variable and bar scores may be producing the observed relationship.
For example, if differences in the applicants' socioeconomic status
(SES) were related to differences in their bar scores, and if
the racial/ethnic groups differed substantially in their average
SES levels, then the variable "racial/ethnic group" would appear
to explain some of the variation in bar scores.  The role of a
variable such as "sex" or "racial/ethnic group" is therefore primarily
that of a proxy for one or more other variables with which it is
closely associated.  If the proxy variable makes a contribution to
prediction, we do not know which of a host of variables (like SES)
are the underlying causes of this contribution.  On the other hand,
if a variable like "sex" fails to explain any of the variation in
bar scores, then it is apparent that it and the factors closely related
to it are not influencing an applicant's bar scores.

The total percent of variance explained by a team of predictors, such as LGPA and LSAT, may be less than the sum of their individual contributions to prediction. The reason for this is that there may be some overlap between the predictors in the amount of variation they explain; i.e., the predictors are explaining a certain percentage of the same variation in bar scores. The importance of this consideration is that the statistical procedures used in this study credit all of this shared (or common) variance to the first predictor that enters the equation; i.e., LGPA. The unique contribution of the second predictor is therefore just that part of the variance in bar scores that has not already been explained by the first predictor. Similarly, the potential unique contribution of a third predictor is limited to just that part of the bar score variation that has not already been explained by the first two predictors that were allowed to enter the equation. In general, the greater the correlation between the predictors, the greater the likelihood that they will share explanatory power.

The total percent of variance in bar scores that can be explained by one or more predictors is also influenced by the reliability of all the measures involved; i.e., both bar scores and predictors. The reason for this is that any chance variation in a variable, such as might stem from inconsistencies in the Essay grading process, reduces the degree to which Essay scores will correlate with some other variable. Thus, the higher the reliability of each measure, the greater the likelihood that the predictors will be able to explain differences in bar scores.

In summary, the factors that determine the extent to which variation in bar scores between applicants can be explained are: (1) the underlying relationships between bar scores and the variables for which the predictors used in this research served as proxies; (2) the degree to which the predictors are correlated with each other (i.e., the amount of shared versus unique variance they explain); and (3) the reliabilities of both bar scores and the measures used to predict them. Although there are no clear guidelines as to what should be considered a "high" versus a "low" percentage of explained variation, one potentially relevant benchmark is that the combination of LSAT and undergraduate grade point average is able to predict about 20 percent of the variance in LGPA (Carlson and Werts, 1976; pg. 34).

RESULTS

School Effects

The data in Table 4 indicate that an applicant's law school explained 17 percent more of the variance in Total bar scores than was explained by LGPA alone (equation #5 versus #8). When LSAT is added to the prediction system, the overall level of prediction did not change (equation #8 versus #12), but the unique contribution due to School was reduced to 8 percent (equation #9 versus #12).

These findings suggest that the School effect is made up of at least two components. One component may be differences in grading standards between schools that are related to differences in the average academic ability of the students they enroll. In other words, a certain level of academic performance might receive a relatively high grade at one school but only a medium or even a low grade at another school.

Table 4

PERCENT OF VARIATION IN BAR SCORES
THAT WAS EXPLAINED BY EACH PREDICTOR
WHEN USED SINGLY AND IN
COMBINATION WITH OTHER VARIABLES*

| Equation Number | Variables Included in the Equation | Percent of Explained Variation | | |
|---|---|---|---|---|
| | | Essay | MBE | Total |
| 1 | Racial/Ethnic Group | 4 | 5 | 6 |
| 2 | Sex Group | 0 | 2 | 0 |
| 3 | School | 15 | 16 | 17 |
| 4 | Law School Admissions Test (LSAT) | 16 | 30 | 25 |
| 5 | Law School Grade Point Average (LGPA) | 34 | 29 | 38 |
| 6 | LGPA + Racial/Ethnic | 34 | 29 | 38 |
| 7 | LGPA + Sex | 34 | 30 | 38 |
| 8 | LGPA + School | 49 | 51 | 55 |
| 9 | LGPA + LSAT | 40 | 46 | 50 |
| 10 | LGPA + LSAT + Racial/Ethnic | 40 | 46 | 50 |
| 11 | LGPA + LSAT + Sex | 40 | 48 | 50 |
| 12 | LGPA + LSAT + School | 49 | 51 | 58 |
| 13 | LGPA + LSAT + School + Sex + Racial/Ethnic | 49 | 53 | 58 |

*Group membership was included in the equations by constructing a separate predictor for each group.  This was done by assigning a score of 1 versus 0 to an applicant corresponding to whether or not that applicant was a member of the group.  Thus, there were two variables for sex, four for racial/ethnic group, and 38 for school.

Adding LSAT to the prediction system apparently served to adjust the LGPA's between schools for these differences in performance standards.

The second School effect component appears to be a function of how well the law schools prepared their graduates to take the bar examination and/or systematic differences between schools with respect to certain characteristics of the students they enroll. For example, if going to night school versus day classes was related to bar scores even after the effects of LGPA and LSAT were controlled, then part of the School effect could be due to differences between schools in the proportions of their graduates who attended night versus day classes.

Additional analyses indicated that the schools which tended to have a positive effect on the Essay portion of the examination also tended to have a positive effect on the MBE section.*  This finding suggests that whatever effect a particular school had on an applicant's chances of passing, it did not result in improving performance on one section of the examination at the expense of scores on the other section.  It was noted, however, that the size of the school effect was slightly larger on the Essay than on the MBE portions of the examination and that this differential was apparently related to LSAT's relative ability to predict these two types of scores (see equations #5 versus #8 and #9 versus #12).

Table 5 presents a cross-tabulation of type of school by whether the school tended to have a positive versus negative effect on Total Score.  The data in this table indicate that the ABA approved schools tended to have positive effects, while the unaccredited schools tended to have negative effects.  This same trend was observed with both the MBE and Essay portions of the examination.  The individual effect of each school with respect to Total Score is presented in the "School with Total" column of Appendix A.  An inspection of these data indicates that school #8 had the largest positive effect, and School #9 had the largest negative effect.

Racial/Ethnic Group Effects

The data in Table 4 indicate that knowledge of an applicant's racial/ethnic group did not contribute to the prediction of bar scores.  This result was obtained when racial/ethnic group was teamed with just LGPA (equation #5 versus #6) and when it was combined with both LGPA and LSAT (equation #9 versus #10).  Even by itself, racial/ethnic group explained only one-sixth as much variance in Total bar scores as was explained by LGPA (equation #1 versus #5) and only one-eighth as much as the team of LGPA and LSAT (equation #1 versus #9).  These findings indicate that what little systematic relationship exists between bar scores and racial/ethnic group could be explained fully by differences between groups in their average LGPA's.

---

*The point biserial correlation coefficient between attendance versus non-attendance at a school and MBE scores was computed for each school with the effect of LSAT partialed out of both measures. Corresponding coefficients were computed for the Essay scores.  A correlation of .81 was obtained between these two sets of coefficients across the 38 schools.

Table 5

NUMBER OF SCHOOLS WITHIN EACH SCHOOL TYPE
THAT HAD A POSITIVE VERSUS NEGATIVE RELATIONSHIP
WITH TOTAL BAR SCORES AFTER CONTROLLING FOR
DIFFERENCES BETWEEN SCHOOLS IN THEIR AVERAGE LSAT SCORES

| Direction of School Effect | Type of School | | | |
| --- | --- | --- | --- | --- |
| | ABA Approved | Other California Accredited | Unaccredited | Total |
| Positive or Neutral | 11 | 3 | 4 | 18 |
| Negative | 5 | 5 | 10 | 20 |

Table 6

PERCENT OF APPLICANTS WITHIN
EACH SEX AND RACIAL/ETHNIC GROUP
WHO GRADUATED FROM EACH TYPE OF LAW SCHOOL

| Type of Law School | Sex Group | | Racial/Ethnic Group | | | | Number of Schools |
|---|---|---|---|---|---|---|---|
| | Male | Female | Anglo | Asian | Black | Hispanic | |
| Unaccredited | 9 | 7 | 9 | 6 | 8 | 4 | 14 |
| California but not ABA Accredited | 22 | 14 | 21 | 7 | 8 | 14 | 8 |
| ABA Accredited: | | | | | | | |
|   Low Average LSAT | 19 | 17 | 19 | 22 | 13 | 11 | 5 |
|   Medium Average LSAT | 27 | 30 | 28 | 21 | 23 | 32 | 6 |
|   High Average LSAT | 22 | 33 | 23 | 44 | 48 | 38 | 5 |

14

A comparison of Anglo and minority group enrollment patterns revealed that a disproportionately large number of minority applicants graduated from ABA approved schools (see Table 6).  Nevertheless, within these schools, Anglo and minority applicants had about the same proportion of graduates (31 and 28 percent, respectively) from schools which had a positive effect on bar scores (when this effect was measured by the point biserial correlation coefficients in Appendix A).  Thus, relative to Anglos, minority passing rates were not hurt or helped by the particular ABA approved schools from which minority applicants tended to graduate.  It was noticed, however, that within the ABA approved category, minority applicants were far more likely than Anglo applicants to graduate from the five schools with the highest average LSAT scores.  This finding suggests that the results presented in Table 4 regarding racial/ethnic group effects may have been unduly influenced by the trends at a few schools.

In order to investigate this issue, the average LSAT, LGPA, and Total bar score were computed for each racial/ethnic group within each of the three categories of ABA approved schools (see Appendix B).*
The mean and standard deviation of these measures (in conjunction with standard statistical tables) were then used to convert the averages to percentile scores (see Table 7).  These percentile scores indicate the relative standing of each group on each measure.  For example, it may be seen from Table 7 that the average Anglo applicant who graduated from a low-average-LSAT school had a Total bar score that was as good or better than 46 percent of all the applicants who took the examination.

The differences between the percentile scores of Anglos and each of the minority groups are presented in Table 8.  These data indicate that the percentile score differences between Anglo and minority group applicants on LGPA were quite similar to their respective score differences on the total examination.
For example, in high average LSAT schools (i.e., the schools in which most of the minority group members were located), the Anglo-Black gap between percentile scores was 46 points on LGPA and 52 points on Total score, or a disparity of only six percentile points.  For Hispanic applicants at these five schools, the gap between their average LGPA and that of the Anglos' LGPA was identical to that of the gap between their respective percentile scores on the Total examination; i.e., it was 47 points on both measures.  The differences between Asian and Anglo applicants on LGPA was 11 points larger than it was on Total score.  This trend suggests that the bar examination tended to reduce rather than exacerbate the differences between Asian and Anglo applicants in their relative performance levels in law school.  It is apparent, therefore, that even when differences in enrollment patterns between groups were controlled, the parallelism between performance in law school and scores on the bar examination remained.  In short, whatever caused minority group applicants to get lower grades in law school probably also caused them to get lower scores on the bar examination; i.e., regardless of whether they attended a school with a high, medium, or low average LSAT score.

_____

*There were too few minority group applicants in other California accredited and non-accredited law schools to conduct the corresponding analyses with their graduates.

Table 7

LSAT, LGPA, AND TOTAL EXAMINATION PERCENTILE SCORES
FOR EACH RACIAL/ETHNIC GROUP WITHIN EACH OF
THREE CATEGORIES OF ABA APPROVED LAW SCHOOLS

| Score | Low Average LSAT | | | | Medium Average LSAT | | | | High Average LSAT | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Anglo | Asian | Black | Hispanic | Anglo | Asian | Black | Hispanic | Anglo | Asian | Black | Hispanic |
| LSAT | 47 | 29 | 5 | 21 | 64 | 43 | 10 | 17 | 84 | 53 | 18 | 31 |
| LGPA | 52 | 22 | 16 | 40 | 54 | 33 | 9 | 19 | 59 | 22 | 13 | 12 |
| Total | 46 | 14 | 18 | 27 | 64 | 39 | 14 | 29 | 71 | 45 | 19 | 24 |
| Number of Applicants | 760 | 28 | 15 | 21 | 1113 | 27 | 26 | 60 | 911 | 55 | 54 | 71 |

Table 8

DIFFERENCE BETWEEN ANGLO AND MINORITY GROUP PERCENTILE SCORES
WITHIN EACH OF THREE CATEGORIES OF ABA APPROVED LAW SCHOOLS

| Score | Low Average LSAT | | | Medium Average LSAT | | | High Average LSAT | | | Average Difference | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Asian | Black | Hispanic | Asian | Black | Hispanic | Asian | Black | Hispanic | Asian | Black | Hispanic |
| LSAT | 18 | 42 | 26 | 21 | 54 | 47 | 31 | 66 | 53 | 23 | 54 | 42 |
| LGPA | 30 | 36 | 12 | 21 | 45 | 35 | 37 | 46 | 47 | 29 | 42 | 31 |
| Total | 32 | 28 | 19 | 25 | 50 | 35 | 26 | 52 | 47 | 28 | 43 | 34 |

The corresponding set of comparisons between LSAT and Total score indicated that, on the average, there was a greater gap between Anglo and minority percentile scores on the LSAT than there was on Total bar score. For example, the difference between Anglo and Black applicants' average percentile scores on LSAT and the total examination was 54 and 43 points, respectively. Moreover, with both Black and Hispanic applicants, this disparity was in the direction of greater Anglo-minority differences on LSAT than on Total score; i.e., there was a smaller difference between the groups on Total score than would have been expected on the basis of the disparity between their respective average LSAT scores. Thus, the bar examination reduced rather than increased the differences between racial/ethnic groups that were observed in their LSAT scores at the time these groups entered law school.

A comparable set of findings were obtained with the MBE and Essay portions of the examination. In the high average LSAT schools, for example, there was a 44 point percentile difference between Anglo and Hispanic applicants on the MBE portion of the examination and a 43 point percentile difference on the Essay portion. The gap in percentile points between these two groups on LGPA was 47 points; i.e., there was a very close correspondence between the size of the gap on LGPA and both portions of the examination. Black applicants at the high average LSAT schools differed from their Anglo classmates by 50 and 48 percentile points on the MBE and Essay portions of the examination, respectively. These gaps corresponded closely with the 46 percentile spread between them on LGPA. Similar trends were observed at the medium and low average LSAT schools and with Asian applicants.

In summary, the differences in performance level between racial/ethnic groups in law school and on the LSAT paralleled quite closely the differences between these groups on the bar examination. This was true for the MBE and Essay sections as well as for the examination as a whole. The slight deviations from this trend tended to be in the direction of smaller differences between groups on the bar examination than were observed in law school. It was apparent, therefore, that the bar examination did not systematically widen the gap between groups.

Sex Group

The results obtained with equation #5 versus #7 in Table 4 indicated that an applicant's sex was generally unrelated to that applicant's bar scores whether or not LGPA was already in the prediction system. The only exception to this general trend was the very slight improvement in the prediction of MBE scores by the inclusion of the Sex variable. Adding LSAT to the prediction system did not change these relationships (equation #9 versus #11).

An inspection of the Sex group data in Table 2 indicated that the small Sex effect on the MBE was due to female applicants performing less well on this portion of the examination than would have been expected on the basis of their LGPA and/or LSAT scores. In other words, the female applicants had higher average scores on these predictors but lower MBE scores than did male applicants. Nevertheless, the absolute size of the Sex effect was so small (2 percent) that it had an almost negligible impact on an applicant's chances of passing the MBE portion of the test and essentially no unique influence on Total score.

18

All Factors Combined

Figures 1, 2, and 3 indicate the relative contribution to prediction of Essay, MBE, and Total scores by each of the variables under investigation. These calculations were made by entering the variables into the prediction equation in the following order: LGPA, LSAT, School, Sex, and Racial/Ethnic group (see equation #13). Entering Sex and/or Racial/Ethnic group into the equation sooner would not have changed the estimate of their explanatory power because these variables did not increase the level of prediction achieved by the use of LGPA alone (see Table 4). One major constraint on explaining the observed variance in bar scores was the reliability of both the predictor variables and the bar scores to be predicted. When an estimate of the effect of such unreliability was made (via a standard statistical procedure called "correction for attenuation"), it was found that the unreliability would have explained 21 percent of the variance in Essay scores, 12 percent of the variance in MBE scores, and 15 percent of the Total score variance.

It was noted, however, that even when the variables were corrected for unreliability, there was still a substantial amount of unexplained variance (e.g., 27 percent on Total score). Some of the factors that may have contributed to the unexplained variance are described briefly below:

o  Lack of sensitivity in LGPA to reflect true performance level differences within each school. For example, the grades may have been artificially constrained at the top and/ or bottom end of the scale, such as if a large number of students were given the same low (but passing) grade even though there were marked differences in their performance levels.

o  Applicants may have varied in the type of post-law school preparation they had for the examination and/or in how much they were able to profit from this preparation, such as if applicants differed in ability to "cram" for the test.

o  Individual differences in potentially relevant personality characteristics that were not directly related to an applicant's LGPA, LSAT score, school, sex, or racial/ethnic group. Such characteristics might include variables related to how much the extreme pressure of a bar examination affected their ability to perform well on it.

o  Complex interactions among the predictors used in this research and/or other factors. For example, it is possible that certain students may have done better on the examination if they had attended a law school whose curriculum and teaching philosophy were more compatible with their particular study habits, interests, skills, etc.

o  Chance events. In this category there are a variety of factors, such as: the applicant's physiological and psychological state at the time of the examination and the period immediately preceding it; whether the applicant happened to be lucky enough to be asked a question involving an issue with which he or she was especially familiar; whether the applicant happened to draw Essay graders who tended to be slightly more or less lenient than other graders, etc.



Figure 1.   RELATIVE CONTRIBUTIONS TO THE PREDICTION OF
ESSAY SCORES



Figure 2.  RELATIVE CONTRIBUTIONS TO THE PREDICTION OF MBE SCORES

21



Figure 3.  RELATIVE CONTRIBUTIONS TO THE PREDICTION OF
TOTAL BAR EXAMINATION SCORES.

Despite the presence of the unexplained variance in bar scores, it was evident that the overall level of prediction achieved was quite high. For example, the combination of LGPA, LSAT, and School was able to explain 58 percent of the Total score variance (see equation #12). This is almost three times more variance than the combination of LSAT and undergraduate grade point average is able to explain in law school grades. Even when LGPA was used by itself, it explained 34 percent of the variance in Essay scores and 29 percent of the variance in MBE scores. These relationships of LGPA to Essay and MBE scores are identical with those obtained by Carlson and Werts (1976) in their seven-state study. The percentages of explained variance that Carlson and Werts reported for the LSAT are also quite similar to those listed in Table 4, equation #4. Thus, the results obtained in the present study are probably typical of those that would be found with bar examinations administered in other states.

## SUMMARY AND CONCLUSIONS

This study investigated the extent to which disparities in bar examination scores between applicants were related to factors that were uniquely and systematically associated with an applicant's law school, racial/ethnic group, and sex. The study was conducted with almost all of the applicants who in the fall of 1977 were taking the examination for the first time and who had also just graduated from a California law school. The major results of this research were as follows:

o   Applicants from ABA approved schools generally had higher bar scores than did applicants from other California accredited or unaccredited law schools.

o   The average bar scores at ABA approved schools tended to be slightly higher than would be expected on the basis of their average LSAT scores while unaccredited schools tended to have slightly lower average bar scores than expected.

o   Within all three types of schools, certain ones had higher bar scores than expected while others had lower scores than expected. In general, the magnitude of these school effects were relatively small, especially in comparison to the relationship between bar scores and LGPA.

o   It could not be determined from the data available for this research whether the observed School effects were a function of differences in educational programs between schools and/or in the general characteristics of the students they enrolled. It was evident, however, that the factors which produced the School effects were not related to differences between the schools in their average LSAT scores and/or in their proportional representations of each sex and racial/ethnic group.

o   Schools which had average Essay scores that were higher than expected (on the basis of their average LSAT scores) also tended to have higher than expected MBE scores.

o   About the same percentage of racial/ethnic minority applicants
    as Anglo applicants attended the ABA approved schools which
    had positive School effects.  Thus, the performance
    differentials between groups on the bar examination were
    not affected by school effects.

o   Knowledge of an applicant's racial/ethnic group did not
    contribute to the prediction of that applicant's bar scores
    once these scores had been adjusted for differences between
    applicants in their relative performance levels in law
    school.  Even before this adjustment was made, racial/
    ethnic group explained only 6 percent of the variance in
    Total scores as compared to the 25 percent and 38 percent
    that were explained by LSAT and LGPA, respectively.

o   A disproportionately large number of minority group applicants
    graduated from ABA approved schools, and even within this
    category of schools, proportionately more minority applicants
    than Anglo applicants graduated from the five schools with
    the highest average LSAT scores.  When these differences
    in Anglo and minority enrollment patterns were controlled,
    the differences between the groups in their law school
    grades still paralleled quite closely their differences
    in their Essay, MBE, and Total scores.

o   The size of the gap between Anglo and minority groups on
    the Essay portion of the examination paralled the size of
    the gap between them on the MBE.  In other words, the Essay
    section of the test was not relatively more or less
    difficult for racial/ethnic minority groups than was the
    MBE section.  For example, the difference in passing rates
    between Anglo and Hispanic applicants on the MBE and Essay
    portions of the test were 25% and 28%, respectively.  Thus,
    giving more or less weight to either section of the test
    would not have any affect on the relative passing rates
    of the groups.

o   The foregoing findings led to the hypothesis that whatever
    was producing the performance differentials between racial/
    ethnic groups in law school was probably also at work on
    the bar examination.  In other words, the observed
    differences in average bar scores between groups were
    probably not a function of certain features of the
    examination (such as its time limits or the length, wording,
    or complexity of its questions), but rather they were due
    to differences between the groups in the degree to which
    they possessed the general skills and knowledge that are
    required to get high grades in law school.  Whether these
    same characteristics are also required for legal practice
    is an issue that was not addressed by this research.

o   Female applicants did slightly less well on the MBE portion
    of the examination than would have been expected on the
    basis of their LGPA's and LSAT scores.  For example, 7%
    more females than males passed the Essay, but 5% more males
    than females passed the MBE.  While it is not known what
    produced this trend, it was evident that it had only a very
    minor effect on MBE scores and essentially no effect on an
    applicant's Total score.

o   The overall percent of variance explained in bar scores
by LGPA and LSAT (or by LGPA and School) was quite high and
consistent with what is usually found in similar types
of research.  Nevertheless, there was still a substantial
amount of variation in bar scores that was not explained
by the predictors, even after controlling for the less
than perfect reliability of the measures involved in the
analyses.

o   It was hypothesized that some of the factors that may have
contributed to this unexplained variance were:  lack of
sensitivity of the LGPA's to reflect fully the true performance
differentials within schools; post-law school preparation
for the examination; individual differences in potentially
relevant ability and personality characteristics that
were independent of an applicant's LGPA, LSAT score, school,
sex, and racial/ethnic group; complex interactions between
these and other variables; and chance events.

Finally, it should be noted that the foregoing findings and
hypotheses are based on the analyses conducted on a single examination.
Replications of this investigation are therefore recommended so as
to check on the stability of the results obtained, especially with
respect to the effects of individual schools on their graduates'
chances of passing the examination.  If it were found that the size
and direction of these school effects remained relatively constant
across examinations, then subsequent research might be undertaken
to determine the source of these effects.

REFERENCES

Carlson, A. B. and C. E. Werts, Relationships among law school predictors, law school performance, and bar examination results. Princeton, N.J.: Educational Testing Service, 1976.

Faggen, J., Test Analysis: Multistate Bar Examination (Forms ZEB2, S-ZEB2). Princeton, N.J.: Educational Testing Service, October, 1977.

Klein, S. P., An investigation of possible item and grader biases in a state bar examination. Paper presented at the meetings of the Western Psychological Association, Los Angeles, California; April 9, 1976.

Klein, S. P., An analysis of grading practices on the California Bar Examination. Report submitted to the Committee of Bar Examiners of the State Bar of California; December 15, 1977.

Klein, S. P., Summary of studies conducted for the Committee of Bar Examiners and the statistical rationale underlying proposed changes. San Francisco, California: Committee of Bar Examiners, 1978.

Pitcher, B., W. B. Schrader, and J. A. Winterbottom, Law school validity study service. Princeton, N.J.: Educational Testing Service, 1973.

This study was conducted by Dr. Klein while he was serving as a private consultant to The Committee of Bar Examiners of The State Bar of California. The views expressed in this report are his own and do not necessarily represent those of The Committee of Bar Examiners or The Rand Corporation.

APPENDIX A

## SUMMARY DESCRIPTIVE STATISTICS BY SCHOOL

| School Number | School Type | Number of Applicants | Percent Passing | Percent Minority | Average LSAT Score | Percent Missing LSAT | Correlations LSAT with LGPA | LGPA with Total | School with Total** |
|---|---|---|---|---|---|---|---|---|---|
| 01 | UnAcr | 27 | 37 | 15 | 519 | 0 | .26 | .35 | −.05 |
| 02 | ABA | 125 | 49 | 6 | 550 | 1 | .40 | .70 | −.08 |
| 03 | ABA | 144 | 71 | 7 | 594 | 1 | .19 | .65 | −.02 |
| 04 | ABA | 396 | 78 | 13 | 621 | 2 | .44 | .78 | +.03 |
| 05 | UnAcr | 10 | 10 | 0 | 480 | 30 | .01 | .64 | −.05 |
| 06 | UnAcr | 70 | 50 | 8 | 511 | 33 | .31 | .57 | −.07 |
| 07 | ABA | 278 | 85 | 8 | 612 | 1 | .23 | .63 | +.10 |
| 08 | ABA | 262 | 92 | 6 | 598 | 0 | .24 | .61 | +.18 |
| 09 | ABA | 334 | 59 | 9 | 573 | 0 | .19 | .66 | −.10 |
| 10 | ABA | 78 | 78 | 17 | 682 | 0 | .60 | .77 | .00 |
| 11 | CalAcr | 45 | 78 | 2 | 531 | 0 | .08 | .60 | +.05 |
| 12 | ABA | 216 | 87 | 21 | 675 | 6 | .40 | .61 | +.10 |
| 13 | ABA | 146 | 78 | 23 | 631 | 0 | .41 | .79 | +.04 |
| 14 | ABA | 264 | 78 | 17 | 638 | 0 | .44 | .75 | +.01 |
| 15 | ABA | 198 | 77 | 8 | 601 | 0 | .22 | .77 | +.02 |
| 16 | ABA | 156 | 65 | 13 | 587 | 3 | .41 | .76 | −.04 |
| 17 | ABA | 215 | 74 | 17 | 601 | 0 | .48 | .76 | −.02 |
| 18 | ABA | 138 | 82 | 17 | 603 | 1 | .48 | .81 | +.04 |
| 19 | CalAcr | 207 | 46 | 3 | 491 | 33 | .26 | .65 | −.04 |
| 20 | ABA | 138 | 72 | 4 | 556 | 0 | .11 | .66 | +.04 |
| 21 | CalAcr | 81 | 62 | 9 | 540 | 51 | .19 | .70 | −.01 |
| 22 | ABA | 75 | 88 | 5 | 574 | 1 | .23 | .63 | +.06 |
| 23 | CalAcr | 287 | 46 | 8 | 513 | 5 | .36 | .62 | −.09 |
| 24 | UnAcr | 17 | 53 | 0 | 554 | 18 | .48 | .49 | .00 |
| 25 | UnAcr | 39 | 54 | 10 | 543* | 100 | -- | .51 | −.03 |
| 26 | CalAcr | 16 | 81 | 0 | 598* | 100 | -- | .80 | +.01 |
| 27 | CalAcr | 49 | 39 | 6 | 507 | 0 | .15 | .72 | −.06 |
| 28 | CalAcr | 18 | 83 | 0 | 529 | 0 | .05 | .82 | +.07 |
| 29 | UnAcr | 41 | 34 | 7 | 501 | 66 | .28 | .62 | −.06 |
| 30 | UnAcr | 24 | 25 | 4 | 483* | 100 | -- | .69 | −.05 |
| 31 | CalAcr | 165 | 52 | 5 | 515 | 1 | .33 | .62 | −.07 |
| 32 | UnAcr | 19 | 21 | 5 | 475* | 100 | -- | .49 | −.07 |
| 33 | UnAcr | 17 | 71 | 0 | 571 | 0 | .25 | .60 | .00 |
| 34 | UnAcr | 12 | 83 | 8 | 607 | 8 | .01 | .42 | +.01 |
| 35 | UnAcr | 11 | 27 | 9 | 487* | 100 | -- | .81 | −.02 |
| 36 | UnAcr | 39 | 74 | 5 | 523 | 28 | .43 | .54 | +.03 |
| 37 | UnAcr | 30 | 60 | 10 | 512 | 20 | .31 | .39 | −.01 |
| 38 | UnAcr | 27 | 26 | 7 | 485* | 85 | -- | .42 | −.09 |

*
Average LSAT score estimated for all applicants.
**
This column contains the point biserial correlation coefficients between Total score
and enrollment versus non-enrollment at the school with the effect of LSAT partialed out
of Total score.

B

APPENDIX B

AVERAGE SCORES AND NUMBER OF APPLICANTS WITHIN EACH
RACIAL/ETHNIC AND SEX GROUP AT ABA APPROVED SCHOOLS

| School's Average LSAT Score | Variable | Anglo | | Asian | | Black | | Hispanic | |
|---|---|---|---|---|---|---|---|---|---|
| | | Male | Female | Male | Female | Male | Female | Male | Female |
| Low | N | 578 | 182 | 22 | 6 | 9 | 6 | 19 | 2 |
| | LSAT | 577.6 | 566.9 | 530.4 | 548.8 | 458.2 | 420.0 | 517.8 | 439.5 |
| | LGPA | 50.1 | 52.1 | 42.0 | 43.5 | 39.1 | 41.3 | 48.5 | 37.9 |
| | Total | 1214.1 | 1214.5 | 1132.9 | 1142.5 | 1152.0 | 1139.5 | 1184.4 | 1053.0 |
| Medium | N | 798 | 312 | 21 | 6 | 14 | 12 | 50 | 10 |
| | LSAT | 614.8 | 605.9 | 564.1 | 573.0 | 446.0 | 503.8 | 503.1 | 476.7 |
| | LGPA | 50.3 | 52.5 | 45.8 | 45.2 | 36.4 | 37.3 | 41.1 | 41.3 |
| | Total | 1254.9 | 1241.6 | 1193.5 | 1200.0 | 1130.1 | 1142.8 | 1179.5 | 1166.4 |
| High | N | 606 | 305 | 29 | 26 | 32 | 22 | 46 | 25 |
| | LSAT | 666.8 | 651.8 | 597.0 | 577.0 | 509.2 | 490.6 | 548.5 | 521.8 |
| | LGPA | 52.1 | 52.7 | 42.4 | 42.3 | 36.7 | 35.1 | 39.0 | 37.2 |
| | Total | 1267.4 | 1265.7 | 1227.6 | 1193.6 | 1148.1 | 1154.0 | 1184.4 | 1129.4 |

Appendix C

GLOSSARY OF STATISTICAL TERMS

Correction for
Attenuation

The correction for attenuation is used to determine what the
correlation between two variables would be if both variables
were perfectly reliable; i.e., it provides an estimate of the
underlying relationship between the variables.

Correlation
Coefficient
(r)

The correlation coefficient (symbolized by the letter "r") is
an index of the degree to which the relative performance of
the applicants on one measure corresponds to their relative
scores on another measure.  The correlation may be positive
(which means that high scores on one measure correspond to
high scores on the other) or negative.  The coefficients them-
selves may range between $\pm$ 1.00; the higher the coefficient,
the stronger the relationship between the two measures
(regardless of its algebraic sign).  A zero correlation means
that there is no linear relationship between the measures.

Internal
Consistency
Coefficient
(Reliability)

An internal consistency coefficient is a type of correlation
coefficient.  It indicates the extent to which an applicant's
performance level is consistent throughout the test relative
to the other applicants who took that test.  If the content
of the test is relatively homogeneous (e.g., all of the questions
measure the applicants' general legal knowledge and skills),
then its internal consistency coefficient provides an estimate
of what the correlation would be between that measure and a
parallel form of it.  For example, the internal consistency
of a 12-question Essay test is about .78.  This means that if
the applicants answered another 12 questions, their scores on
this second set would correlate about .78 (all other factors
being equal) with their scores on the first set.

Mean Score

The mean score is the arithmetic average score.  It is computed
by adding all the scores and then dividing by the number of
scores added.

Percent of
Explained
Variance
($r^2$ x 100)

The square of the correlation coefficient is called the
"coefficient of determination."  When multiplied by 100, this
statistic indicates the percent of variance in one variable
(such as Total Bar scores) that is associated with, determined
by, or accounted for by the variance in another variable (such
as LGPA).  For example, if one applicant's Total score is 20
points higher than another applicant's Total score and if
$r^2$ = .60, then about 12 of the 20 points can be explained by
the differences between these two applicants in their respective
LGPA's.

Standard
Deviation

The standard deviation of a test is an index of the degree to which the scores on that test spread out on either side of the mean (average) score.  The larger the standard deviation, the greater the spread.  Approximately 68 percent of the applicants fall within plus or minus one standard deviation of the mean, and about 95 percent fall within plus or minus two standard deviations.  For example, the July 1977 examination had an average total score of 1222 points and a standard deviation of 81 points.  This means that applicants with scores between 1141 and 1303 comprised about 68 percent of those taking the test.

Standard Error
of Measurement

The standard error of measurement is an index of the range within which an individual applicant's score is likely to fall on a parallel form of the test.  For example, if the standard error on a test was 30 points and if an applicant had a score of 1170 on this test, the chances are two out of three that this applicant would have received a score between 1140 and 1200 had that applicant taken a different form of this test.  The more reliable the test, the smaller the standard error of measurement.

# AN ANALYSIS OF THE JULY 1983 CALIFORNIA BAR EXAMINATION

Prepared by:
Stephen P. Klein, Ph.D.

March 17, 1984

## PURPOSE

The July 1983 version of the California bar exam had three sections: an Essay test, the Multistate Bar Examination, and two Performance Tests. The analyses described in this report were conducted to answer the following questions about this exam:

- o Was the scoring of the exam's essay and Performance Test written answers as reliable as the scoring of essay answers on prior exams; i.e., did different readers tend to assign the same score to a given answer?

- o Was the total score across all three sections sufficiently reliable for making pass/fail decisions about individual applicants?

- o Was any section more difficult than any other section?

- o Was the total exam as difficult as previous California exams?

- o Were the exam's phased grading decision rules as accurate as the rules used on past exams?

## SCORING PROCEDURES

The theoretical possible score range on each section was 0 to 600 points. This portion of the report discusses the general procedures that were used to administer and score each section, including the scaling of the multiple choice parts of the exam.

### Essay Test

The Essay portion was given in two, 3-hour sessions on the first day. There were three questions per session. Some questions dealt with a single content area whereas others covered more than one area. There was a separate team of 12 Essay answer readers per question. The scores on a question were assigned in 5-point intervals up to a maximum of 100 points. Applicants were assigned a score of at least 40 if they appeared to make a serious attempt to answer a question.

Multistate Bar Examination (MBE)

The MBE was given in two, 3-hour sessions on the second day.  The MBE contains 200 multiple choice items (questions) from six content areas, with four choices per question.  It is given as part of the bar exam in almost every jurisdiction in the country.  MBE raw scores (the number of items answered correctly) are scaled by the Educational Testing Service to control for the possibility that the items asked on one exam may, on the average, be more or less difficult than those asked on another exam.

The scaling of MBE scores is accomplished by including in the group of 200 items, a subset that had been used previously but are still secure. These repeated items are called "equators" in order to distinguish them from items that had not been asked previously.  Standard statistical formulas are used to compare the performance of past and current applicants on the equators.  The results of this comparison are then used to determine how total raw scores on the July 1983 exam should be adjusted so that they could be compared fairly with scale scores earned on prior MBEs.  The formula for converting July 1983 MBE total raw scores to scale scores is:

California MBE Scale Score = 2.6460(total raw score) + 83.9841

All applicants benefited from the scaling.  For instance, an applicant who answered 130 items correctly (65 percent of those asked) received an MBE scale score of 428 (which is 71 percent of the theoretical maximum score of 600) rather than the 390 that applicant would have earned if the scaling had not been done.


Performance Test (PT)

Two PTs were given on the third day.  Applicants were allowed 3.5 hours per PT.  Each PT had a "library" of fictitious cases and statutes in one booklet and a "file" of memoranda, interview notes, documents, and transcripts in another booklet.  The morning PT dealt with a torts case and the afternoon PT with a civil procedures case.

Each PT had two parts, a written test and a multiple choice test.  The theoretical maximum score on the written and multiple choice portions of a PT were 200 and 100 points, respectively.

The written portion of the morning PT asked the applicant to use the library and file to prepare a memo that presented an objective analysis of the strengths and weaknesses of their client's case as well as a brief description of the additional information that should be gathered.  In the afternoon, applicants were instructed to use the library and file for the second problem to write a persuasive argument in favor of their client's case in the form of a Memorandum of Points and Authorities.

Each written portion was graded in 5-point intervals up to a maximum of 100 points.  Applicants were assigned a score of at least 40 if they made a serious attempt to answer to this portion of the PT.  An applicant's raw score on the written portion was multiplied by 2.0 so that the theoretical maximum score on a written answer was 200 points.  There was a separate team of 16 readers for each PT.

The multiple choice portion of a PT contained 15 questions.  A
question typically asked applicants to evaluate various cases in the
library with respect to how much they would support a legal principle that
was relevant to their client's case.

Raw scores on the multiple choice part of each PT were scaled so that
the mean and standard deviation of the scale scores would be one sixth as
large as the corresponding statistics on the MBE.  The formulas for
converting raw PT multiple choice scores to scale scores appear below.
Note that these formulas do not adjust a given applicant's PT score in
terms of that applicant's MBE score and they are based on parameters that
were derived from all the applicants who took the MBE and PT.

PT-AM Scale Score = (4.5088 x AM raw score) + 20.9988

PT-PM Scale Score = (3.4692 x PM raw score) + 32.4314

The decision was made to adjust scores on the PT's multiple choice
sections to a score distribution that was based on the distribution of MBE
scale scores because:

(1) There was no way of knowing in advance of the exam whether the
    PT multiple choice items were unduly easy or difficult and with
    only a total of 30 items, a few of them could have a large
    adverse affect on the passing rate.

(2) The distribution of MBE scale scores provided an objective and
    independent basis for determining the difficulty of the PT
    items because its scale scores were already adjusted for
    possible variations in average question difficulty from one
    exam to the next.

(3) The procedures for scoring the multiple choice sections could
    be announced in advance of the administration of the exam and
    thereby avoid any suspicion that the Committee adversely
    influenced the percent passing.

(4) A previous study (Klein, 1981a) indicated that applicants who
    had high scores on the machine scorable portion of the PT's
    prototype also tended to have high MBE scores (the correlation
    was .38).  On the July 1983 exam, there was a .55 correlation
    between the MBE and the average PT multiple choice score.

(5) Scaling to the MBE rather than to the Essay was expected to
    increase the percent passing the whole exam because studies of
    past exams (Klein, 1983) indicated that about 21 percent more
    applicants passed the MBE than passed the Essay and the mean
    written scores on prototype versions of the PT were no higher
    than mean essay scores (Klein, 1981a).

## PASS/FAIL DECISION RULES

The basic pass/fail rule on the July 1983 exam was that an applicant had to have a total score (Essay + MBE + PT) of 1260 or higher in order to pass. Previous research (Klein, 1980 and 1982) had indicated, however, that it was possible to identify with an extremely high degree of accuracy a large portion of the passing applicants without grading all of their essay answers. The resources saved by reading only some of the answers could then be devoted to additional readings of the answers of applicants whose initial scores placed them near the pass/fail line. The decision rules in this multiphased grading process were:

1) If the sum of an applicant's MBE score, score on two randomly selected essay questions, and scale scores on the multiple choice sections of the PT was greater than 739, then the applicant passed. If this sum was not greater than 739, the applicant went to Phase 2. About 67 percent the applicants who took all three sections of the exam and passed, passed in this phase (see Appendix A).

2) If the sum of an applicant's MBE score, score on the first reading of all six essay questions, and scores on both PTs was less than 1213, then the applicant failed. If this sum was greater than 1278, the applicant passed. If it was between 1213 and 1278, the applicant went to Phase 3.

3) Applicants in Phase 3 had all of their essay answers and written parts of their PTs graded again by readers who had not seen them before. The average of the first and second readings was then used to compute a Phase 3 total score. If this total was less than 1236, the applicant failed; if it was greater than 1259, the applicant passed; and if it was between 1236 and 1259, the applicant went to Phase 4.

4) An applicant in Phase 4 had all of his/her answers and scores reviewed by a member of California's Board of Reappraisers. As a result of this review, the overall passing rate was increased by about 3 percent (see Appendix A).

Prior to the July 1983 exam, applicants were allowed to pass in two ways: by having a total score (MBE + Essay) over the pass/fail line and/or by passing the MBE on one administration of the exam and the Essay on another administration. Contrary to the Committee's expectations when this policy was first adopted, it had the effect of lowering rather than increasing the percent passing. Moreover, it was impractical to extend the rule to the July 1983 exam because it would require a "trifurcation" policy. However, because some July 1983 examinees were repeaters, they were allowed to grandfather a previous pass.

The grandfathering rules were: A repeater who earned a passing score on the MBE between February 1982 and February 1983 was deemed to have passed the exam if that applicant earned a score of 840 or higher on the balance of the test. An applicant who passed the Essay during this same period only needed to earn an MBE score of 420 or higher in order to pass. Applicants did not jeopardize a previous pass by retaking a section they had passed previously. Applicants also could transfer an MBE score from another jurisdiction if that score was earned before the July 1983 exam.

## POPULATION AND ANALYSIS SAMPLE CHARACTERISTICS

There were 7,277 July 1983 applicants who had scores on all three sections of the exam.  A random sample of 865 of these applicants had all of their Essay and PT written answers read twice as part of the regular grading process regardless of their scores in Phases 1 or 2.  Applicants in this sample did not have their actual pass/fail status affected by the additional readings required for this research.

Table 1 presents data on the characteristics of the applicants in the analysis sample and the population.  These data indicate that the sample is very representative of the population of examinees who took all three sections of the exam.  For instance, average MBE scores differed by less than one point and the percent passing by only 1.2 percent.  Except as otherwise noted, the remainder of this report is based on analyses with the sample of 865 applicants.

## READER RELIABILITY

Because all 865 applicants in the analysis sample had their Essay and PT answers independently read twice, it was possible to assess whether the PT readers were any more or less consistent with each other than were Essay readers.  This analysis focused on the degree to which two readers were likely to assign the same score to a given answer and the degree to which they were likely to rank order the answers in the same way (correlation).

Table 2 presents the cumulative percentage distribution of absolute difference scores between the first and second reading of an answer.  For instance, if the first reader assigned a score of 70 to an answer, the absolute difference would be 5 regardless of whether the second reader assigned it a score of 65 or 75.  These data indicate that more than 90 percent of the answers had a difference of less than 15 points between readers.

The next to the last row of Table 2 indicates that the score assigned by one reader to an answer usually differed by about 5 points from the score assigned by another reader to that same answer.  The last row contains the correlation between the first and second reading of an answer.  These data show that the Essay and PT readers were equally reliable.

The means and correlations in Table 2 are consistent with those obtained in interreader studies of past exams (Klein,1981c and 1982).  For instance, the average correlation between the first and second readings of the answers on an essay question was .77 on both the February 1982 and the July 1983 exams.

Finally, the average score on the first reading of an Essay or PT written answer did not differ substantially from the average score on the second reading of that answer.  Table 3 shows that the small differences that did occur were balanced out by summing across questions.  The total scores on the first and second reading of the Essay section were 403 and 401, respectively.  The corresponding averages on the PT written sections (after multiplying each score by 2.0) were 270.4 and 270.7.

- 6 -

Table 1

SAMPLE AND POPULATION CHARACTERISTICS

| Variable | Sample | Population | Difference |
|----------|--------|------------|------------|
| Number of Applicants | 865 | 7,277 | --- |
| Average Essay score[a] | 402.1 | 400.8 | 1.3 |
| Average MBE score | 431.1 | 430.6 | 0.5 |
| Average PT MC score[b] | 71.8 | 71.9 | 0.1 |
| Percent Passing | 51.2 | 50.0 | 1.2 |
| Percent Male | 65.9 | 64.1 | 1.8 |
| Percent Anglo | 80.3 | 80.7 | 0.4 |
| Percent First Timers | 75.8 | 72.9 | 2.9 |
| Percent ABA Graduates | 63.5 | 64.8 | 1.3 |

[a] The population's average essay score was estimated
    using the essay scores assigned in Phase 1. It was
    not possible to use this procedure to estimate the
    average score on the written portion of the PT in
    the population because all applicants did not have
    at least one of their PT written answers graded.

[b] This is the average of the two scaled scores on the
    multiple choice portion of the PT.

- 7 -

Table 2

CUMULATIVE PERCENTAGE OF ANSWERS WITH DIFFERENT SIZED DIFFERENCE SCORES
AND CORRELATIONS BETWEEN FIRST AND SECOND READINGS OF THE ESSAY ANSWERS

| Size of Absolute Difference | Essay Questions | | | | | | PT | | Average Cumul. % | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | AM | PM | Essay | PT |
| 0 | 36 | 29 | 39 | 37 | 36 | 45 | 28 | 37 | 36.8 | 32.6 |
| 5 | 79 | 71 | 85 | 78 | 79 | 89 | 69 | 82 | 80.2 | 75.2 |
| 10 | 95 | 91 | 97 | 93 | 95 | 98 | 90 | 95 | 94.9 | 92.2 |
| 15 | 99 | 98 | 99 | 98 | 98 | 100 | 97 | 99 | 98.8 | 97.8 |
| 20 | 100 | 100 | 100 | 99 | 100 | ☆ | 99 | 100 | 99.8 | 99.5 |
| >20 | ☆ | ☆ | ☆ | 100 | ☆ | | 100 | ☆ | 100.0 | 100.0 |
| Average difference | 4.6 | 5.6 | 4.0 | 4.7 | 4.6 | 3.4 | 5.9 | 4.4 | 4.5 | 5.2 |
| Correlation | .79 | .66 | .78 | .74 | .80 | .84 | .76 | .83 | .77 | .80 |

☆Less than one percent of the answers had a difference of this size.

Table 3

AVERAGE SCORES ON FIRST AND SECOND READINGS
OF ESSAY AND PT WRITTEN ANSWERS

| Section | Question | First | Second | Difference |
|---|---|---|---|---|
| Essay | 1 | 70.01 | 69.06 | 0.95 |
| Essay | 2 | 65.98 | 65.43 | 0.53 |
| Essay | 3 | 68.40 | 67.84 | -0.56 |
| Essay | 4 | 65.24 | 64.60 | 0.64 |
| Essay | 5 | 67.25 | 67.69 | -0.44 |
| Essay | 6 | 66.20 | 66.43 | -0.23 |
| Essay | Average | 67.18 | 66.84 | 0.34 |
| PT | 1 | 66.22 | 67.69 | -1.47 |
| PT | 2 | 69.00 | 67.64 | 1.36 |
| PT | Average | 67.61 | 67.67 | -0.06 |

It may be concluded from these data that there was no appreciable difference between the Essay and the PT in scorer reliability (consistency of grading). And, the reader agreement rates on both the Essay and the PT were just as high as those obtained in studies of prior California exams.

## INTERNAL CONSISTENCY

Internal consistency reliability refers to the degree to which applicants who do well on some questions in a test also tend to do well on the other questions in that test. Reliability is an important test characteristic because it can indicate the degree to which chance may have affected applicant scores. Examples of chance factors are guessing on multiple choice items and studying a case just before the exam that is especially relevant to one of the exam's questions. A test or a combination of tests should have a reliability of about .90 if scores on it are used for making pass/fail decisions about individuals.

The internal consistency of the July 1983 MBE was .885 in a random sample of applicants from across the country. This is typical of the reliability coefficients obtained on previous versions of the MBE.

The internal consistency of the Essay section in the sample of 865 applicants was .774 when all six of their Essay answers were read twice. This degree of consistency is almost as high as that obtained on previous exams when each of nine essay answers was read only once. For example, estimates of the internal consistency coefficients of the total essay score on the July 1980 and 1982 exams were .81 and .79, respectively.

The reliability of the total PT score was .698 when both of its written portions were read twice and combined with the multiple choice scores. This coefficient was estimated from the .525 correlation between the morning and afternoon total scores. The reliability of the written portion of the PT was .671 (based on the .505 correlation between the average AM and average PM written scores).

Item analyses conducted by the Educational Testing Service with a random sample of 950 applicants from the population of applicants who took the PT indicated that the internal consistency of its AM and PM multiple choice sections was .28 and .57, respectively. The lower reliability of the AM section was due to two items that were answered correctly by over 95 percent of the applicants and two items that had much lower than average correlations with other 13 items in the test.

The reliability of the total score when all the Essay and PT written answers were read twice was .919 (as determined by standard formulas for computing the reliability of a linear composite). Thus, total exam scores exceeded the minimum standards for reliability.

## RELATIONSHIPS AMONG SECTIONS

Table 4 presents the correlations among the various sections and PT subsections of the exam. These data indicate that MBE and Essay scores correlated slightly higher with each other than they did with PT scores and

that the relative standings of the applicants on the written portion of the PT was by far the major determiner of their relative standings on the PT (the part-whole correlation between the PT written score and PT total was .96 whereas the part-whole correlation between the PT multiple choice and PT total was only .66). The right hand column of Table 4 shows that all three sections correlated to about the same degree with total bar scores.

## RELATIVE DIFFICULTY OF SECTIONS

Table 5 shows the average score and standard deviation on each section. These data indicate that the MBE was easier than the PT which in turn was easier than the Essay. For instance, the percentage of applicants with scores of 420 or higher on the MBE, PT, and Essay were: 61.3, 46.0, and 30.6, respectively. Figure 1 shows the distribution of MBE, Essay, and PT scores. The horizontal lines in each bar represent, from top to bottom, the 90th, 75th, 25th, and 10th percentile points. The asterisk (*) shows the median (50th percentile). For example, about 50 percent of the applicants had MBE scores at or below 433 whereas 50 percent had Essay scores at or below 402.

The difference in relative difficulty between the MBE and Essay (30.7 percent with "passing" scores) was larger than the usual 20 to 22 percent differences between these two sections on previous exams. Because the PT's difficulty level fell about midway between the MBE and the Essay, its inclusion in the exam did not appreciably affect the overall percent passing.

As noted previously, scaling the MBE raw scores had the effect of increasing an applicant's score on this section. Adjusting the PT multiple choice scores in terms of the distribution of MBE scale scores generally had the opposite effect because, on the average, the PT multiple choice items were easier than those asked on the MBE. These differences in average item difficulty were eliminated by adjusting PT multiple choice scores in terms of the distribution of MBE scale scores. If no scaling had been done on either the MBE or the PT, then the percent passing the exam would have been substantially lower because: (1) the MBE carried three times more weight in determining an applicant's total score than did the sum of the two PT multiple choice sections and (2) the average per item size of the correction on the MBE was larger than it was on the PT multiple choice sections.

## RELATIVE DIFFICULTY OF THE EXAM

About 46.9 percent of the applicants in the analysis sample had total scores of 1260 or higher before reappraisal (Phase 4). The reappraisal process and in the case of one applicant, the transferring of an MBE score from another jurisdiction, increased the total percent passing to 51.2 percent. None of the applicants in the analysis sample passed as a result of the grandfathering of the bifurcation rule.

The total percent passing in the analysis sample and the population was higher than it had been on the two prior July exams.

- 10 -

Table 4

CORRELATIONS AMONG SECTIONS, PT SUBSECTIONS,
AND TOTAL BAR EXAMINATION SCORES

|  | MBE | Essay | Performance Test | | | Total GBX |
|  |  |  | Multiple choice | Written | Total |  |
| MBE | --- | .73 | .55 | .57 | .64 | .91 |
| Essay |  | --- | .46 | .61 | .65 | .90 |
| PT-MC |  |  | --- | .42 | .66 | .63 |
| PT-Written |  |  |  | --- | .96 | .81 |
| PT-Total |  |  |  |  |  | .86 |

Total GBX = MBE + Essay + Total PT

Table 5

SUMMARY TEST STATISTICS IN SAMPLE OF 865
APPLICANTS WHO HAD ALL OF THEIR ESSAY
AND PT WRITTEN ANSWERS READ TWICE

|  | Average | Standard Deviation | Internal Consistency |
|  | --- | --- | --- |
| MBE | 431.07 | 48.75 | .885 |
| PT | 414.14 | 42.73 | .689 |
| Essay | 402.08 | 35.81 | .774 |
| Total | 1247.29 | 112.68 | .919 |

Internal consistency coefficient for PT and
Essay are based on two readings per answer.



Figure 1.  The 10th, 25th, 50th, 75th, and 90th Percentile
Points on Each Section.

A difficulty index was computed for the July 1983 exam in order to to assess whether its grading standards were more or less lenient than those employed on prior exams. The procedures used to compute this index were slightly different from those used in the past (Klein, 1983) because the July 1983 exam contained three rather than just two sections. And, the index had to be computed on just the analysis sample rather than the full population who took all three sections because as a result of the phased grading process, all the applicants in the population did not have at least one of their two PT written answers read. However, considering how representative the analysis sample was of the population (see Table 1), it is very unlikely that these factors biased the computed value of the index.

The steps involved in computing the difficulty index were: scale the Essay and PT scores to a distribution that had the same mean and standard deviation as the MBE scale scores, compute the sum of each applicant's three scale scores, divide this sum by 9 (to put it on the same 200 point scale that had been used in the past), tabulate the distribution of these average scores, and then find the score in this distribution that would result in 51.2 percent of the applicants passing.

The results of this analysis yielded a difficulty index of 143.6 for the July 1983 exam. The average index on the seven prior July exams was 142.3 (Klein, 1983). It may be inferred from these data (and the 14.4 standard deviation of the average scale scores) that the July 1983 exam was not significantly more difficult than prior California bar exams.

## ACCURACY OF PHASED GRADING RULES

The bar exam only has to classify applicants into two categories, pass and fail. There is no need to know by how much an applicant passed or failed. This situation led California to adopt a multiphased grading system that concentrates reader resources on the applicants whose pass/fail status is truly in doubt rather than spreading these resources equally among all applicants taking the exam. For instance, all applicants do not have all of their essay answers read at least once whereas others may have all their answers read as many as three times.

The decision to read all of an applicant's Essay and PT written answers once is based on that applicant's scores on two randomly selected essay answers, the MBE, and the multiple choice sections of the PT. The decision to read them all again is based on the sum of all the scores after the first reading. The decision to read them all a third time is based on the sum of the scores after the second reading.

Data on the sample of 865 applicants who had all their Essay and PT written answers read twice (regardless of their initial scores) provided an opportunity to check the appropriateness of the cutoff scores for each phase of the grading process. The general question addressed by the analyses described below was: Would the phased grading system make the same pass/fail decisions as would have been made if all the applicants had gone through all of the first three phases of it?

Phase 1

The Phase 1 decision rule was: pass all applicants who have a total score of 740 or higher on two randomly selected essay answers, the MBE, and the scaled multiple choice sections of the PT. About 34 percent of the 865 applicants in the analysis sample had Phase 1 scores of 740 or higher.

The appropriateness of the Phase 1 cutoff score was tested by counting the number of applicants who would have been passed in Phase 1, but who nevertheless did not pass after all their answers had been read at least twice. Because there were 6 essay questions, there were 15 possible combinations of two of them. For example, a Phase 1 score might involve essay questions 1 and 2, 1 and 3, 2 and 3, etc.

A test of the efficacy of the Phase 1 cutoff score with each of the 15 possible pairs of essay questions indicated that on the average, it would classify 1.5 applicants out of 865 as having passed when in fact they did not pass after at least two readings of all of their answers. This is an error rate of .0017 (which is well below the .0050 rate that the Committee of Bar Examiners considered to be tolerable). The Phase 1 rule precludes failing an applicant in this phase. Thus, no errors were made in this direction.

In a related analysis, it was discovered that 1,877 applicants (25.8 percent of the 7,277 who had scores on all three sections) had MBE scores of 465 or higher and that only 16 of the applicants in this group failed the exam. Thus, California may want to consider revising the Phase 1 rule so that it focuses on just the MBE portion of the exam.

The use of the PT multiple choice score in Phase 1 contributed to the accuracy of the Phase 1 cutoff score. This conclusion is supported by the .66 correlation between the PT multiple choice score and the total PT score and by the .63 correlation between the PT multiple choice and the total score on the examination.


Phase 2

A Phase 2 error would occur if an applicant's pass/fail status at the end of this phase would have been reversed in Phase 3 as a result of the second reading of all of that applicant's essay and PT written answers. Thus, two types of Phase 2 errors could be made: passing an applicant who should have failed and failing an applicant who should have passed. The likelihood of making each type of error was investigated by counting the number of applicants who had a Phase 2 score:

   o greater than 1278, but whose total scores were less than 1260
     after a second reading of all of their answers

   o less than 1213, but whose total scores were greater than 1259
     after a second reading of all of their answers

The results of this analysis indicated that there was no one in either group. All the applicants with Phase 2 scores over 1276 had Phase 3 scores over 1260. Thus, the upper bound of the Phase 2 cutoff (1278) was set at about the right spot.

The lowest Phase 2 score that when averaged with the scores from the second reading resulted in the applicant having a Phase 3 score of 1260 or higher was a 1242. The sample of 865 applicants contained 81 examinees with Phase 2 scores between 1213 and 1242. Only 3 of these applicants eventually passed...they earned a Phase 3 score that was high enough to put them into reappraisal and they eventually passed as a result of Phase 4. The Phase 2 scores of these three applicants were 1223, 1234, and 1240.

In summary, the upper bound of the Phase 2 band identified all the applicants who would have passed if all of their answers were read twice. The lower bound did not not exclude anyone from Phase 3 (and thereby from Phase 4 as well) who would have earned a passing score if all of their answers were read twice. Moreover, the lower bound erred on the side of sending more applicants to Phase 3 than were likely to benefit from the double reading. For instance, if the lower bound was raised from 1213 to 1221, it would eliminate the replicate readings of all the answers written by about 3 percent of the total applicant pool. It also would reduce the number of applicants going on to reappraisal.


Phase 3

Phase 3 placed applicants into three categories: pass, reappraise, and fail. The accuracy of the pass/reappraise decision was tested by seeing if there was any applicant with a Phase 3 score over 1260 who did not pass the exam. This analysis indicated that there was not a single applicant that the complete phased grading procedure classified as a fail who would have passed if it was required for all applicants to have all of their essay and PT written answers read twice.

The accuracy of the fail/reappraise decision was tested by determining how many applicants with Phase 3 scores just above 1235 eventually passed. If several applicants with scores in this zone passed, it would suggest that the reappraisal cutoff was too high; i.e., more applicants should have gone to Phase 4. Conversely, if there was no one in this zone, it would suggest the cutoff was too low; i.e., fewer applicants should have gone to Phase 4.

Table 6 shows the number of applicants with Phase 3 scores between 1235 and 1259 relative to their final pass/fail decision. These data indicate that five applicants with Phase 3 scores between 1235.0 and 1244.5 passed. However, the table also shows that only one of these applicants passed because of reappraisal. The other four passed in Phase 1. Given the reappraisal decisions on all 26 applicants in the 1235.0 to 1244.5 zone, these four applicants are probably best categorized as Phase 1 errors rather than as indicators that the bottom of the Phase 3 band was set too high. The one applicant in the 1235-1244.5 zone who did pass as a result of Phase 4 had a Phase 3 score of 1242.

The foregoing findings suggest that all the applicants who might have benefited from having their answers read twice did indeed have them read twice and the Phase 3 cutoff score was too liberal in the sense that it sent more applicants to reappraisal than was really necessary.

- 15 -

Table 6

NUMBER OF APPLICANTS WITH PHASE 3 SCORES BETWEEN 1235.0 AND 1259.5
WHO PASSED AND FAILED THE EXAM IN PHASES 1 AND 4

| Phase | Decision | 1235.0 to 1239.5 | 1240.0 to 1244.5 | 1245.0 to 1249.5 | 1250.0 to 1254.5 | 1255.0 to 1259.5 | Total |
|-------|----------|------|------|------|------|------|-------|
| 1 | Pass | 1 | 3 | 1 | 4 | 3 | 12 |
| 4 | Pass | 0 | 1 | 2 | 6 | 9 | 18 |
| 4 | Fail | 11 | 10 | 10 | 7 | 2 | 40 |
| | Total | 12 | 14 | 13 | 17 | 14 | 70 |

Eight of the 39 applicants with Phase 3 scores between 135 and
145 passed the exam, however, 5 of these 8 applicants passed
as a result of Phase 1.  In other words, only 3 of the 34
applicants in Phase 4 who had Phase 3 scores below 1250 passed
as a result of reappraisal.  All but 2 of the 11 applicants in
Phase 4 who had Phase 3 scores above 1254.5 passed as a result
of reappraisal.  Thus, the Phase 3 score is a very good, but
not a perfect predictor of reappraisal decisions.

## SUMMARY AND CONCLUSIONS

The July 1983 California bar exam had three sections: a six question Essay test, the Multistate Bar Examination (MBE), and two Performance Tests (PTs). The theoretical score range on each section was 0 to 600 points.

MBE raw scores (the number of questions answered correctly) were scaled in order to adjust for possible differences in average question difficulty from one exam to the next. This scaling benefited all applicants; i.e., raw scores were consistently lower than scaled scores.

Raw scores on the multiple choice portions of the PT were scaled to the MBE because among other reasons, there was no way of determining in advance of the exam whether the PT's items would be unduly easy or difficult. Scaling to the MBE rather than the Essay or the PT's written score also increased the percent passing the examination.

There were 7,277 applicants who had a score on all three sections of the exam. A random sample of 865 of these applicants had all of their Essay and PT written answers read twice during the regular grading process. Analyses of their data indicated the following:

o Readers agreed with each other on the score that should be assigned to a PT written answer to the same degree that they agreed with each other on the score that should be assigned to an essay answer. The average difference between two readers on an answer was about 5 points.

o The degree of interreader agreement on the July 1983 exam was the same as that obtained on prior California exams.

o The total score on the exam (MBE + Essay + PT) was sufficiently reliable for making pass/fail decisions.

o The MBE was the easiest part of the test and the Essay was the hardest. For example, the percentage of applicants with scores of 420 or higher on the MBE, PT, and Essay were: 61.3, 46.0, and 30.6, respectively. The tendency for the MBE to be easier than the Essay is consistent with the findings on past exams, but the size of the difference was larger than usual.

o The net effect of scaling the raw MBE and PT multiple choice scores was to increase the percent passing the exam because all applicants benefited from the MBE's scaling and the MBE carried three times as much weight as the sum of the two PT multiple choice sections in determining an applicant's total score.

o The percent passing the July 1983 exam was slightly higher than the percent passing the two previous July exams. This increase was probably due to a slight increase in the legal abilities of those taking the exam because the July 1983 test was not more or less difficult than previous exams.

o The .0017 misclassification rate in Phase 1 was below the .0050 rate set by the Committee. In other words, fewer applicants were misclassified as passes in Phase 1 than was anticipated. Equally accurate Phase 1 decisions could be made for 26 percent of all the applicants solely on the basis of their MBE scores.

o The parameters for Phases 2 and 3 did not fail any applicant who would have passed if all of his/her essay and PT written answers were read twice. However, the Phase 2 and 3 cutoff scores did lead to more replicate readings than was minimally necessary to make accurate phased grading decisions. Thus, the phased system erred slightly on the side of being too liberal.

## REFERENCES

Klein, S. A comparison of the effectiveness of a single versus multiphased grading system. Report prepared for the Committee of Bar Examiners of the State Bar of California, 1980.

Klein, S. Testing research skills on the California Bar Examination. Report prepared for the Committee of Bar Examiners of the State Bar of California and the National Conference of Bar Examiners, 1981a.

Klein, S. An analysis of possible variations in pass/fail standards on the California bar examination. Report prepared for the Committee of Bar Examiners of the State Bar of California, 1981b.

Klein, S. The effect of time limits, item sequence, and question format on applicant performance on the California bar exam. Report prepared for the Committee of Bar Examiners of the State Bar of California and the National Conference of Bar Examiners, 1981c.

Klein, S. Analysis of the February 1982 bar examination. Report prepared for the Committee of Bar Examiners of the State Bar of California, 1982.

Klein, S. Sources of variation in passing rates on California bar exams. Report prepared for the Committee of Bar Examiners of the State Bar of California, 1983.

- 18 -

APPENDIX A

NUMBER OF APPLICANTS IN EACH PASS/FAIL CATEGORY RELATIVE TO THEIR
SCHOOL TYPE IN THE POPULATION OF APPLICANTS WHO TOOK ALL THREE
SECTIONS OF THE JULY 1983 EXAMINATION

| Pass/fail Category | ABA Approved | California Accredited | Not Accredited | All Others | Total |
|---|---|---|---|---|---|
| Fail - Phase 2 | 879 | 762 | 197 | 358 | 2,196 |
| Fail - Phase 3 | 597 | 273 | 49 | 104 | 1,023 |
| Fail - Phase 4 | 251 | 63 | 11 | 33 | 358 |
| Fail - but passed Essay in Phase 4 | 44 | 10 | 2 | 5 | 61 |
| Pass - Phase 1 | 2,027 | 155 | 20 | 227 | 2,429 |
| Pass - Phase 2 | 532 | 73 | 9 | 61 | 675 |
| Pass - Phase 3 | 229 | 44 | 4 | 14 | 291 |
| Pass - Phase 4 | 131 | 31 | 6 | 14 | 182 |
| Pass because of prior MBE pass | 27 | 19 | 3 | 13 | 62 |
| Total | 4,717 | 1,430 | 301 | 829 | 7,277 |

None of the applicants who took all three sections passed as a
result of combining a previous essay pass with a current MBE pass.

PR-98-01

# ANALYSIS OF THE FEBRUARY 1998 EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

**GANSK & ASSOCIATES**

October 9, 1998

# SUMMARY

The February 1998 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written Examination composed of six essay questions and two Performance Test (PT) problems. There were 3871 applicants who completed both sections, 61% of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the exam to the next. Essay and PT answers were graded on a 40 to 100 point scale. Scores on this scale were assigned in 5-point intervals. Each PT score was then multiplied by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE. This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded. An applicant's total score was computed using the formula below:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Essay Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, the applicant was failed if the total scale score was less than 1390, passed if it was 1466 or higher, and placed in reread if it was at least 1390 but below 1466.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time. At the end of this phase, applicants were: failed if their Total scores were below 1412, passed if their scores were 1440 or higher, and placed in reappraisal if their scores were in the 1412 - 1439.9999 range. Applicants also were placed in reappraisal if their Total score after the first reading was 1440 or higher (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant came to the pass/fail line of 1440.

The major findings with the applicants who had all of their answers read at least once and the group of 917 applicants who had them read at least twice were as follows:

- After the first reading of all answers, 45% of the applicants failed and 31% passed. The total percent passing after the second reading and the reappraisal process were 37% and 40%, respectively.

- California applicants scored higher than the national average on all of the six MBE subjects.

i

- The reliability of the Written and Total scores (.70 and .87, respectively) was comparable to that of previous exams.

- The correlation between MBE and Written scores (.60) was in the normal range for a February exam.

- The phased grading cutoff scores led to rereading and reappraising the answers of the applicants who were most likely to benefit from these additional reviews.

- Males tended to earn higher scale scores on the MBE than on the Written section. The reverse was true for females. Racial and ethnic minority applicants tended to earn the same scale scores on the MBE as they did on the Written section.

# ANALYSIS OF THE FEBRUARY 1998 EXAM

## TEST SECTIONS

The February 1998 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six (1-hour) essay questions and two (3-hour) Performance Test (PT) problems. The exam was administered over three consecutive days, with two 3-hour sessions per day. Day 1 consisted of essay questions 1 - 3 and PT problem A. Day 2 was devoted to the MBE. Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES, FORMULAS, AND PHASED GRADING

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores and then multiplied by 10 using the formula below. This procedure adjusts raw scores for possible differences in mean question difficulty from one administration of the MBE to another.

$$\text{MBE Scale} = (8.8772)(\text{MBE Raw}) + 301.8086$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale. The same procedure was used to grade each PT answer. PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200 points each). Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores. This scaling was done using the MBE and Written scores of the random sample of about 1,000 applicants who had their Written answers graded first. The formula used to convert written raw scores to scale scores was:

$$\text{Written Scale} = [145.564][(\text{Written Raw} - 654.538)/50.451] + 1414.836$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores. The formula for computing Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants failed if their total scale score was less than 1390, passed if it was 1466 or higher, and placed in reread if it was at least 1390 but below 1466.0. In Phase 2, the applicants in reread had all of their essay and PT answers read a second time. The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader. The scores assigned on the first and second readings were averaged and a new total computed using the formulas above. At the end of Phase 2, applicants failed if the new total was below 1412, passed if it was 1440 or higher, and placed in reappraisal if it was above 1411.9999 but below 1440.

1

Applicants also were placed in reappraisal if their total scale score on the first reading was 1440 or higher even if their mean total after two readings was below 1412. An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.

## SAMPLE

Analyses were conducted with the 3871 applicants who had both an MBE and a Written score. This sample contained 1517 applicants who were taking the exam for the first time and 2354 repeaters. The percentage of applicants from ABA approved, California Accredited, and Nonaccredited schools were 49, 25, and 6, respectively. The remaining 20% were not assigned to a school.

## MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows California applicants scored higher than the national average on all six MBE subtests. California's mean total raw score (the average number of questions answered correctly) was about 3 points higher than the national average (which included California scores).

Table 1 - NATIONAL AND CALIFORNIA MEAN MBE SCORES
AND THE DIFFERENCE BETWEEN THESE MEANS

| Test Score | Number of Items | National Mean | California Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 33 | 22.26 | 22.88 | 0.62 |
| Contracts | 34 | 18.25 | 19.06 | 0.81 |
| Criminal Law | 33 | 18.19 | 18.61 | 0.42 |
| Evidence | 33 | 20.24 | 20.81 | 0.57 |
| Real Property | 33 | 19.75 | 20.39 | 0.64 |
| Torts | 34 | 22.50 | 23.35 | 0.85 |
| Total Raw | 200 | 121.19 | 125.10 | 3.91 |
| NCBE/ACT Scale | 200 | 137.75 | 141.22 | 4.47 |

2

## WRITTEN SECTION

There were 917 applicants who had their answers read at least twice. On the average, an applicant's total written raw score on the first reading was 6.7 points higher than it was on the second reading. The correlation between these scores was .50. This value underestimates the true degree of agreement between readers because reread was limited to applicants near the pass/fail line. Table 2 shows the means and standard deviations on each question after all readings.

### Table 2 - SUMMARY STATISTICAL DATA ON THE WRITTEN SECTION AFTER ALL READINGS

| Question Number | Essay Content Area(s) and PT Tasks | Mean Score | Standard Deviation |
|---|---|---|---|
| 1 | Contracts/Torts | 65.94 | 8.47 |
| 2 | Constitutional Law | 63.17 | 7.41 |
| 3 | Evidence | 63.82 | 10.33 |
| 4 | Real Property/Professional Responsibility | 66.53 | 7.75 |
| 5 | Remedies | 64.75 | 7.43 |
| 6 | Wills | 62.67 | 7.70 |
| PT-1 | Draft objective memos re law and options | 130.25 | 15.90 |
| PT-2 | Draft objective memo and letter | 132.68 | 14.40 |

## SUMMARY STATISTICS

Table 3 presents summary statistical data on each section after all readings. There was a .60 correlation between MBE and Written scores. Law School Admission Test (LSAT) scores correlated .52, .45, and .53 with MBE, Written, and Total Scale scores, respectively. There were 3429 applicants with useable LSAT scores.

### Table 3 - SUMMARY TEST STATISTICS AFTER ALL READINGS

| Test Statistic | MBE Scale | Written Raw | Total Scale |
|---|---|---|---|
| Mean Score | 1412.15 | 649.87 | 1405.11 |
| Standard Deviation | 144.73 | 49.15 | 129.16 |
| Reliability | .87 | .70 | .87 |

The MBE's reliability was computed by ACT using national data.

3

## SUBGROUP ANALYSES

On the average, women scored 27 points higher on the Written section than on the MBE whereas there was a 41 point average differential in the opposite direction for male applicants (Table 4). On the average, racial and ethnic minority groups scored about as highly on the Written section as they did on the MBE.

### Table 4 - MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND GENDER GROUPS AND THE NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
|---|---|---|---|---|---|---|
| | Anglo | Asian | Black | Hispanic | Female | Male |
| Written | 1419 | 1395 | 1340 | 1383 | 1429 | 1381 |
| MBE | 1435 | 1396 | 1343 | 1389 | 1402 | 1422 |
| Total | 1424 | 1395 | 1341 | 1385 | 1419 | 1395 |
| N | 2278 | 507 | 354 | 367 | 1612 | 2029 |
| % Male | 60% | 55% | 54% | 62% | 0% | 100% |

\* There were 135 applicants who did not fall in one of the four largest racial/ethnic groups and 95 applicants who did not indicate their racial/ethnic group or gender.

## PHASED GRADING

A three-phased grading process was used to focus reader time on the applicants who were near the pass/fail line. Table 5 presents the number and percentage of applicants in each of the exam's pass/fail categories. Overall, 1558 (40.2%) of the applicants passed.

### Table 5 - NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Phase | Fail | | Pass | | Total | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| 1 | 1737 | 44.9 | 1217 | 31.4 | 2954 | 76.3 |
| 2 | 347 | 9.0 | 236 | 6.1 | 583 | 15.1 |
| 3 | 229 | 5.9 | 105 | 2.7 | 334 | 8.6 |
| Total | 2313 | 59.8 | 1558 | 40.2 | 3871 | 100.0 |

Table 6 shows the number of Phase 2 applicants who passed and failed relative to their Phase 1 scores. This table illustrates the strong relationship between Phase 1 scores and final pass/fail status. These data also indicate that the width of the Phase 2 reread band (1390 - 1466) was about right in that almost all the applicants with relatively high scores on the first reading passed and almost all with low initial scores failed.

Table 6 - NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED
RELATIVE TO THEIR TOTAL SCORES AFTER THE FIRST READING

| Score After the First Reading | Number of Applicants | | | Percent Passing |
| --- | --- | --- | --- | --- |
| | Fail | Pass | Total | |
| 1450 - 1466 | 34 | 143 | 177 | 81 |
| 1435 - 1449 | 79 | 105 | 184 | 57 |
| 1420 - 1434 | 125 | 61 | 186 | 33 |
| 1405 - 1419 | 182 | 25 | 207 | 12 |
| 1390 - 1404 | 156 | 7 | 163 | 4 |
| Total | 576 | 341 | 917 | 37 |

The higher an applicant's score at the end of Phase 2, the greater the likelihood that applicant passed as a result of reappraisal (Table 7). The lower limit of the reappraisal band (1412) appears to be appropriate because only one of the 35 applicants with Phase 2 Total scores below 1415 passed as a result of reappraisal.

Table 7 - NUMBER OF APPLICANTS IN REAPPRAISAL WHO PASSED
AND FAILED RELATIVE TO THEIR TOTAL SCORES AFTER REREAD

| Total Score After Reread | Number of Applicants | | | Percent Passing |
| --- | --- | --- | --- | --- |
| | Fail | Pass | Total | |
| 1435 - 1439 | 15 | 43 | 58 | 74 |
| 1430 - 1434 | 23 | 31 | 54 | 57 |
| 1425 - 1429 | 43 | 14 | 57 | 25 |
| 1420 - 1424 | 60 | 8 | 68 | 12 |
| 1415 - 1419 | 54 | 8 | 62 | 13 |
| < 1415 | 34 | 1 | 35 | 3 |
| Total | 229 | 105 | 334 | 31 |

## APPENDIX A: SUMMARY TEST STATISTICS ON FEBRUARY EXAMS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|---|-----------------|----------------------|-------|-------------|-------------------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1991 | 3685 | 51 | 1430 | 667 | .68 | .58 |
| 1992 | 3907 | 51 | 1432 | 663 | .69 | .60 |
| 1993 | 3682 | 45 | 1418 | 666 | .73 | .59 |
| 1994 | 3638 | 44 | 1421 | 657 | .68 | .59 |
| 1995 | 3488 | 42 | 1412 | 653 | .74 | .60 |
| 1996 | 3834 | 44 | 1417 | 646 | .67 | .58 |
| 1997 | 4103 | 49 | 1434 | 651 | .66 | .59 |
| 1998 | 3871 | 40 | 1412 | 650 | .70 | .60 |

## APPENDIX B: SUMMARY TEST STATISTICS ON JULY EXAMS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|---|-----------------|----------------------|-------|-------------|-------------------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1990 | 6963 | 58 | 1451 | 684 | .76 | .67 |
| 1991 | 7219 | 55 | 1454 | 674 | .75 | .67 |
| 1992 | 7108 | 60 | 1464 | 674 | .71 | .64 |
| 1993 | 7018 | 59 | 1465 | 671 | .77 | .68 |
| 1994 | 7027 | 64 | 1482 | 672 | .76 | .70 |
| 1995 | 7109 | 60 | 1471 | 660 | .75 | .68 |
| 1996 | 7445 | 56 | 1458 | 667 | .76 | .70 |
| 1997 | 7678 | 62 | 1478 | 655 | .75 | .68 |

# AN ANALYSIS OF THE PERFORMANCE TEST
## ON THE JULY 1983 CALIFORNIA BAR EXAMINATION

Prepared by:
Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

May 14, 1984

## BACKGROUND

Several studies conducted in conjunction with the July 1980 version of California's General Bar Examination suggested it would be possible to assess some important legal practice skills that were not measured by the regular Essay and multiple choice portions of the exam.  Applicants who had clinical legal experience scored slightly higher on these "performance" tests than applicants who did not have such experience and most applicants felt the new tests were more realistic and better measures of their ability to practice law than the traditional parts of the exam.  These findings and other factors, such as the increased emphasis on clinical skills in law school, led California's Committee of Bar Examiners to include two of the new measures on the July 1983 exam.

## PURPOSE

The analyses described in this report were designed to provide answers to the questions below about the Performance Test (PT) portions of the July 1983 exam:

o Did the inclusion of the PT significantly affect who passed the exam as a result of the PT measuring skills and abilities that were not already tested by the essay and multiple choice sections of the exam?

o Did the PT significantly affect the percentage of applicants passing the exam?  In other words, was the PT more or less difficult than the essay and multiple choice sections?

o Was the effect of including the PT on the exam the same for ABA and non-ABA graduates, for different sex and racial/ethnic groups, and for repeaters and first timers?

o What were the measurement characteristics of the PT?  For instance, were readers as consistent with each other in assigning PT scores as they were in assigning essay scores?

o Did applicants like the idea of including the PT in the exam?

o After controlling for general legal ability, did applicants with prior legal practice experience score higher on the PT than applicants who did not have such experience?

The written portion of the morning PT asked the applicant to use the library and file to prepare a memo that presented an objective analysis of the strengths and weaknesses of their client's case as well as a brief description of the additional information that should be gathered. In the afternoon, applicants were instructed to use the library and file for the second problem to write a persuasive argument in favor of their client's case in the form of a Memorandum of Points and Authorities. Each written portion was graded in 5-point intervals up to a maximum of 100 points. This score was then multiplied by two. There was a separate team of 16 readers for each PT, most of whom had graded answers on a prototype of the PT that was given in conjunction with the July 1980 exam.

Pass/fail Policy

An applicant could theoretically earn 1800 points on the whole exam; 600 on the essay (6 questions with 100 points per question), 600 on the MBE, and 600 on the PT sections (2 PT's worth 300 points each, 100 for a multiple choice part and 200 for a written part). California's basic pass/fail rule was that an applicant had to earn a total score of 1260 or higher in order to pass the exam. A description of how California operationalized this policy by means of a multiphased grading and reappraisal process is presented in another report (Klein, 1984).

Sample

There were 7,277 July 1983 applicants who took all three parts of the exam. A random sample of 865 of these applicants had all of their Essay and PT written answers read twice by reinserting their answers into the regular grading process. The second reader was different than the first one and did not know the score assigned by the first one. Applicants in this sample did not have their actual pass/fail status affected by the additional readings required for this study.

Table 1 presents data on the characteristics of the applicants in the analysis sample and the population. These data indicate that the sample is very representative of the population of examinees who took all three parts of the exam. For instance, average MBE scores differed by less than one point and the percent passing by less than one percent. Except as otherwise noted, the remainder of this report is based on analyses with this sample of 865 applicants.

PRELIMINARY ANALYSES

Preliminary analyses were conducted with the sample of 865 applicants to assess certain measurement characteristics of the MBE, Essay, and PT parts of the exam that might affect their relationships with each other and their impact on pass/fail decisions. These analyses investigated: reader reliability (i.e., whether the PT readers were more or less consistent in their grading practices than Essay readers), internal consistency (e.g., whether applicants who had high scores on the morning PT also tended to have high scores on the afternoon PT); and the relative difficulty of each part of the exam.

The next portion of this report describes: the three sections of the July 1983 exam, the general procedures used to score each section, and the characteristics of the sample used in the analyses discussed in the remaining portions of this report. A technical analysis of the 1983 exam is presented in another report (Klein, 1984).

## PROCEDURES

Tests and Scoring

The July 1983 version of California's bar exam had three parts: an Essay test, the Multistate Bar Examination (MBE), and two PTs. Six hundred points were assigned to each part.

The Essay portion was given in two 3-hour sessions on the first day. There were three questions per session. Some questions dealt with a single content area whereas others covered more than one area. There was a separate team of 12 Essay answer readers per question. The scores on a question were assigned in 5-point intervals up to a maximum of 100 points. Applicants were assigned a score of at least 40 if they appeared to make a serious effort to answer a question.

The MBE was given in two 3-hour sessions on the second day. It contained 200 multiple choice items with four choices per item. The test covered six content areas, such as torts and contracts. The MBE is given as part of the bar exam in almost every jurisdiction in the country. MBE raw scores (the number of items answered correctly) are scaled to control for possible variations in average item difficulty across administrations of the exam. California multiplies the values in the scaling formula by 3.0 so that the theoretical maximum California MBE score is 600 points. The conversion formula for the July 1983 exam was:

California MBE Scale score = 2.6460(MBE raw score) + 83.9841

Two PTs were given on the third day. Applicants were allowed 3.5 hours per PT. Each PT had a "library" of fictitious cases and statutes in one booklet and a "file" of memoranda, interview notes, documents, and transcripts in another booklet. The morning (AM) PT dealt with a torts case and the afternoon (PM) PT with a civil procedures case. Each PT had a 15-item multiple choice test and a written test.

A PT multiple choice question typically asked applicants to evaluate various cases in the library with respect to how much they would support a legal principle that was relevant to their client's case. Raw scores on each PT multiple choice test were converted to a score distribution whose mean and standard deviation were one sixth as large as the California MBE's mean and standard deviation. This procedure gave a PT multiple choice score one sixth the weight as the MBE in determining an applicant's total score. The formulas for making this conversion were:

PT-AM Scale Score = (4.5088 x AM raw score) + 20.9988

PT-PM Scale Score = (3.4692 x PM raw score) + 32.4314

- 4 -

Table 1

SAMPLE AND POPULATION CHARACTERISTICS

| Variable | Sample | Population | Difference |
|---|---|---|---|
| Number of applicants | 865 | 7,277 | --- |
| Average Essay score | 402.1 | 400.8 | 1.3 |
| Average MBE score | 431.1 | 430.6 | 0.5 |
| Average PT MC score* | 71.8 | 71.9 | 0.1 |
| Percent passing before reappraisal | 46.9 | 47.5 | 0.6 |
| Percent Male | 65.9 | 64.1 | 1.8 |
| Percent Anglo | 80.3 | 80.7 | 0.4 |
| Percent First Timers | 75.8 | 72.9 | 2.9 |
| Percent ABA graduates | 63.5 | 64.8 | 1.3 |

* This is the average scale score on the multiple choice
  portion of the PT.  It was not possible to estimate the
  average score on the written portion of the PT in the
  population because all applicants did not have at least
  one of their PT written answers graded.

- 6 -

Table 2

AVERAGE ABSOLUTE DIFFERENCE SCORES AND CORRELATIONS BETWEEN
READERS, AVERAGE SCORES ON FIRST AND SECOND READINGS, AND
THE DIFFERENCE IN AVERAGE SCORES BETWEEN READINGS

| Section | Question | Between Readings | | Average Scores | | |
|---------|----------|------------------|-----------|-------|--------|------------|
| | | Average Absolute Difference | Corre-lation | First | Second | Difference |
| Essay | 1 | 4.6 | .79 | 70.01 | 69.06 | 0.95 |
| Essay | 2 | 5.6 | .66 | 65.98 | 65.43 | 0.53 |
| Essay | 3 | 4.0 | .78 | 68.40 | 67.84 | 0.56 |
| Essay | 4 | 4.7 | .74 | 65.24 | 64.60 | 0.64 |
| Essay | 5 | 4.6 | .80 | 67.25 | 67.69 | -0.44 |
| Essay | 6 | 3.4 | .84 | 66.20 | 66.43 | -0.23 |
| Essay | Average | 4.5 | .77 | 67.18 | 66.84 | 0.34 |
| PT | 1 | 5.9 | .76 | 66.22 | 67.69 | -1.47 |
| PT | 2 | 4.4 | .83 | 69.00 | 67.64 | 1.36 |
| PT | Average | 5.2 | .80 | 67.61 | 67.67 | -0.06 |

Average absolute difference = difference between two readings of
an answer without regard to the algebraic sign of that difference

Reader Reliability

Because all 865 applicants in the analysis sample had their Essay and
PT answers independently read twice, it was possible to assess whether the
PT readers were any more or less consistent with each other than were Essay
readers.  This analysis focused on the degree to which two readers were
likely to assign the same score to a given answer and the degree to which
they were likely to rank order the answers in the same way (correlation).

The third column in Table 2 shows the average absolute difference in
scores between the first and second reading of an answer.  For instance, if
the first reader assigned a score of 70 to an answer, the absolute
difference would be 5 regardless of whether the second reader assigned it a
score of 65 or 75.  These data indicate that the score assigned by one
reader to an answer usually differed by about 5 points from the score
assigned by another reader to that same answer.  The next column contains
the correlation between the first and second reading of an answer.

The remaining columns in Table 2 show that the average score on the
first reading of an Essay or PT written answer did not differ substantially
from the average score on the second reading of that answer.  The small
differences that did occur were balanced out by summing across questions:
the total score on the first and second reading of the Essay section were
403 and 401, respectively; and, the corresponding averages on the PT
written sections were 270 and 271.

Taken together, the data in Table 2 indicate that the Essay and PT
readers were equally consistent in their grading practices and that the
scores assigned on the second reading were not systematically higher or
lower than those assigned on the first reading.


Internal Consistency

Internal consistency reliability refers to the degree to which
applicants who do well on some of the questions in a test also tend to do
well on the other questions in that test.  Reliability is an important test
characteristic because it can affect the degree to which scores on one test
correlate with scores on another test.  For instance, if a test has a low
internal consistency as a result of many applicants guessing which answer
was correct, then scores on this test would not correlate well with scores
on some other measure.  A test (or a combination of tests) should have a
reliability of about .90 if scores on it are used for making important
decisions about individuals.

The internal consistency of the July 1983 MBE was .885 in a random
sample of applicants from across the country.  This is typical of the
reliability coefficients obtained on previous versions of the MBE.

The internal consistency of the Essay section in the sample of 865
applicants was .774 when all six of their Essay answers were read twice.
This degree of consistency is almost as high as that obtained on previous
exams when each of nine Essay answers was read only once.  There was a .65
correlation between the average total Essay score in the morning and
afternoon sessions.  The average correlation between any two Essay
questions was .37.

The reliability of the total PT score (when both of its written portions were read twice) was .689 (as estimated from the .525 correlation between the morning and afternoon total scores).  The reliability of the written portion of the PT was .671 (based on the .505 correlation between the average AM and average PM written scores).

The correlation between the AM and PM multiple choice sections in the analysis sample was .30.  It was .28 in the population of 7,277 applicants. Item analyses of the PT multiple choice sections with a random sample of 950 cases from the population indicated that the internal consistency of the AM and PM sections was .28 and .57, respectively.  The lower reliability of the AM section was due to two items that were answered correctly by over 95 percent of the applicants (which effectively reduced the length of the test to 13 items) and to two items that had much lower than average correlations with other items in the test.

The reliability of the total exam score was estimated to be .919 when all the Essay and PT written answers were read twice and when each section of the exam was weighted equally in determining an applicant's total score.


Relative Difficulty

Table 3 shows the average score and standard deviation on each section of the exam.  These data indicate the MBE was much easier than the Essay. For instance, the percentage of applicants with scores of 420 or higher on the MBE, PT, and Essay were: 61.3, 46.0, and 30.6, respectively.  Because the PT's difficulty level fell about midway between the MBE and the Essay, its inclusion in the exam did not appreciably affect the overall percent passing.


RESULTS


Relationships Among PT Scores

Table 4 shows the correlation between PT multiple choice and written scores by problem and across problems.  These data indicate that the AM multiple choice scores correlated just as highly with the AM written scores (r = .24) as they did with the PM written scores (r = .23).  This finding suggests that the relationship between PT multiple choice and written scores is not affected by the unique characteristics of each problem. However, the reliability of the AM PT score was quite low (.28).

The reliability of the multiple choice score was much higher on the PM problem than on the AM problem.  And, the PM multiple choice scores correlated higher with the PM written scores (r = .43) than they correlated with the AM written scores.  This finding suggests that there may be a unique effect due to problems and that this effect becomes more detectable as the reliability of the multiple choice scores increases.

The correlations in the last column of Table 4 indicate the written scores carried substantially more weight than the multiple choice scores in determining an applicant's relative standing on the PT.  In fact, an

- 8 -

Table 3

SUMMARY TEST STATISTICS IN SAMPLE OF 865

|  | Average | Standard Deviation | Internal Consistency |
|---|---|---|---|
| MBE | 431.07 | 48.75 | .885 |
| PT | 414.14 | 42.73 | .689 |
| Essay | 402.08 | 35.81 | .774 |
| Total | 1247.29 | 112.68 | .919 |

Internal consistency coefficient for PT and Essay are based on two readings per answer.

Table 4

CORRELATIONS AMONG PT SUBSECTIONS

|  | Multiple Choice | | | Written | | | PT Total |
|---|---|---|---|---|---|---|---|
|  | AM | PM | Total | AM | PM | Total | |
| Multiple Choice | | | | | | | |
| Morning | --- | .30 | .79 | .24 | .23 | .27 | .47 |
| Afternoon | | --- | .82 | .28 | .43 | .41 | .59 |
| Total | | | --- | .79 | .82 | .42 | .66 |
| Written | | | | | | | |
| Morning | | | | --- | .50 | .96 | .93 |
| Afternoon | | | | | --- | .96 | .92 |
| Total | | | | | | --- | .96 |

applicant's PT written score was almost a perfect predictor of that applicant's total PT score. These findings along with the only slightly greater reliability of the total PT score over the written score suggest that it may not be necessary to continue to have a PT multiple choice section (although it did prove useful for California's phased grading process).


Relationships Among Sections

The most important issue addressed by this research was whether including the PT on the exam affected who passed the exam. This issue was investigated by assigning a pass/fail status to an applicant solely on the basis of that applicant's combined MBE and Essay score and then computing the percentage of applicants whose status changed as a result basing the pass/fail decision on the combination of the MBE, Essay, and PT scores.

Because the large differences in difficulty among the sections would have biased results; scores on each section were scaled so that the Essay and PT had the same mean and standard deviation as the MBE (prior to its being multiplied by 3.0). A pass/fail line of 145.2 was used for the analysis because it resulted in about the same percent passing a section as actually passed the exam prior to California's reappraisal process.

Table 5 presents the results of this analysis. These data indicate that basing the pass/fail decision on the MBE+Essay+PT score versus just the MBE+Essay score changed the pass/fail status of 8.4% of the applicants. Specifically, including the PT resulted in 4.3% passing who would not have passed if the exam had just contained the MBE and Essay whereas 4.1% failed because the exam contained the PT. These changes are about the same as would have occurred if the pass/fail decision had been been based on just the Essay+PT score or the MBE+PT score rather than the combination of all three scores. This pattern suggests that <u>the difference in the abilities measured by the MBE and Essay is comparable in size to the difference between the MBE and the PT, and between the Essay and the PT</u>.

The same conclusion may be drawn from a cross-tabulation of pass/fail decisions when these decisions are based on the PT versus the MBE or the Essay (see Table 6). For instance, about 77 percent of the applicants had the same pass/fail status on the MBE as they had on the Essay (13 percent passed the MBE only and 10 percent passed the Essay only). This agreement rate is only slightly higher than that obtained between the MBE and PT (72 percent), and between the Essay and the PT (73 percent).

The fact that the PT had a lower internal consistency than either of the other two parts of the exam raised the question of whether this characteristic may have contributed to its having a lower agreement rate than that observed between the MBE and the Essay. This possibility was explored by computing the correlation among the three parts of the exam both before and after the scores on these parts were corrected for their lack of perfect reliability.

Table 7 shows that there would have been a substantial increase in the correlation between sections if their scores were perfectly reliable, but that (1) the correlations with the PT never went over .90 and (2) the MBE and Essay still correlated higher with each other than they did with the

- 10 -

Table 5

PERCENTAGE OF APPLICANTS WHOSE PASS/FAIL STATUS WAS AND WAS NOT
CLASSIFIED IN THE SAME WAY BY DIFFERENT COMBINATIONS OF SCORES
WHEN THE SECTIONS WERE MADE EQUALLY DIFFICULT TO PASS

|  | MBE+Essay vs MBE+Essay+PT | MBE+PT vs MBE+Essay+PT | Essay+PT vs MBE+Essay+PT |
|---|---|---|---|
| Both scores agree pass | 43.0 | 42.9 | 43.5 |
| Both scores agree fail | 48.7 | 48.8 | 49.6 |
| Total Agreements | 91.7 | 91.7 | 93.1 |
| Pass by total score only | 4.3 | 4.4 | 3.8 |
| Pass by subscore only | 4.1 | 3.9 | 3.1 |
| Total Disagreements | 8.4 | 8.3 | 6.9 |

Column percentages may not sum to 100.0% due to rounding.

Table 6

PERCENTAGE OF APPLICANTS WHOSE PASS/FAIL STATUS WAS AND WAS NOT
CLASSIFIED IN THE SAME WAY BY DIFFERENT SECTIONS OF THE GBX
WHEN THE SECTIONS WERE MADE EQUALLY DIFFICULT TO PASS

| First test | Second test | Pass both | Fail both | Total agreed | Pass first only | Fail first only | Total disagreed |
|---|---|---|---|---|---|---|---|
| MBE | Essay | 36.9 | 40.1 | 77.0 | 12.8 | 10.2 | 23.0 |
| MBE | PT | 34.3 | 37.6 | 71.9 | 15.4 | 12.7 | 28.1 |
| Essay | PT | 33.6 | 39.5 | 73.1 | 13.4 | 13.4 | 26.8 |

Row percentages may not sum to 100% due to rounding.

PT.  This means that if the three parts the exam were equally difficult,
including the PT would have a slightly larger impact on who passed than
would adding either another day of essay or MBE type testing.  However, the
substantial increase in the correlations among the measures when they are
corrected for reliability suggests that the 8.4% difference in pass/fail
decisions that occurred when the PT was added to the MBE and Essay slightly
overestimates the PT's unique contribution to those decisions.

Table 7

OBSERVED AND CORRECTED CORRELATIONS AMONG SECTIONS

|       | MBE  | Essay | PT   |
|-------|------|-------|------|
| MBE   | ---  | .733  | .640 |
| Essay | .939 | ---   | .651 |
| PT    | .773 | .891  | ---  |

Observed and corrected
coefficients appear above
and below the main diagonal,
respectively.

The combination of MBE and
essay scores accounted for
.473 percent of the
variance in PT scores.

The .94 corrected correlation between MBE and Essay scores suggests
that if it was possible to make both tests (and particularly the Essay)
much more reliable, then the relative standings of the applicants on the
two measures would be almost identical.  Moreover, if the MBE and Essay
also were equally difficult, then they would make almost exactly the same
pass/fail decisions.  One implication of these findings is that observed
differences in how the MBE and essay rank order applicants are probably far
more a function of unreliability in the measures than any real differences
in the underlying abilities assessed by these tests.

Effect of PT on Subgroups

Although the data in the total sample of 865 applicants indicates that
the PT had virtually no influence on the percent passing the exam and only
a small influence on who passed, it still may have had a large effect in
certain subgroups.  This issue was explored by examining the extent to
which the PT would have made the same pass/fail decisions as the
combination of MBE and Essay scores after controlling for differences in
the relative difficulties of these sections.

The results of this analysis are presented in Table 8.  These data indicate the following:

o In all the groups, the PT made the same pass/fail decision as the combination of the MBE and Essay for about 75 percent of the applicants.  The highest degree of agreement occurred with applicants from unaccredited schools and the lowest with women.

o Women benefited slightly more than men from the inclusion of the PT (18.4% of them passed the PT but failed the combination of MBE and Essay whereas the reverse trend was true for 11.4%).  The opposite pattern occurred for men: 9.8% passed the PT only and 13.5% failed the PT only.

o There was a tendency for the PT to benefit Asian applicants more than Hispanic or Black applicants, however, there were too few applicants in any one group on which to base any firm conclusions regarding this matter.  With only about 50 applicants per group, 5 applicants account for a 10% shift in passing rate!  The same caveat holds for the results with graduates from unaccredited schools and attorney applicants.

The tendency for women to do better then men on the PT was most likely a by-product of a combination of two extraneous factors: (1) the total PT score is primarily dependent on the scores assigned to its written sections and (2) women tend to score higher then men on the written portions of the bar exam.  This sex difference is shown in Table 9 where it can be seen that when the MBE and Essay were made equally difficult, 17.2 percent of the women passed the essay but failed the MBE whereas the reverse was true for only 6.2 percent.  The opposite pattern occurred for men where 6.7 percent passed the essay but failed the MBE and 16.0 percent passed the MBE but failed the essay.

Differences in the relative effects of the PT among racial ethnic groups also may be explained by this "testing method" effect (i.e., some groups may do relatively better on essay type tests whereas other groups may do relatively better on multiple choice type tests).  The presence of an interaction between group and testing method argues for the inclusion of both multiple choice and essay questions on a bar exam in order to help insure its fairness to all groups.

Attitudes Toward the PT

A questionnaire was mailed to all of the 865 applicants in the analysis sample shortly after the exam was administered.  Applicants who did not respond to the first mailing were sent a reminder and another copy of the questionnaire.  The results discussed below are based on the 664 applicants (77 percent of the analysis sample) who returned completed questionnaires prior to the announcement of who passed the exam.

There were no apparent major differences in the characteristics of the applicants who did and did not return questionnaires.  For example, 51 percent of the applicants in both groups passed (after reappraisal) and their respective average exam scores were:  MBE - 433 and 427; Essay - 403 and 399; and PT - 415 and 411.

Table 8

PERCENTAGE OF APPLICANTS WHOSE PASS/FAIL STATUS WAS AND WAS NOT
CLASSIFIED IN THE SAME WAY BY THE PT AND THE COMBINATION OF MBE AND
ESSAY SCORES WHEN THE SECTIONS WERE MADE EQUALLY DIFFICULT TO PASS

| Group | Number of Applicants | Pass both | Fail both | Total agreed | Pass PT only | Fail PT only | Total disagreed |
|---|---|---|---|---|---|---|---|
| Total Sample | 865 | 34.3 | 40.2 | 74.5 | 12.7 | 12.7 | 25.4 |
| Males | 570 | 32.5 | 44.2 | 76.7 | 9.8 | 13.5 | 23.3 |
| Females | 290 | 38.3 | 32.1 | 70.4 | 18.3 | 11.4 | 29.7 |
| Asian | 44 | 22.7 | 59.1 | 81.8 | 11.4 | 6.8 | 18.2 |
| Hispanic | 58 | 12.1 | 69.0 | 81.1 | 6.9 | 12.1 | 19.0 |
| Black | 54 | 5.6 | 66.7 | 72.3 | 9.3 | 18.5 | 27.8 |
| Anglo | 695 | 39.7 | 33.7 | 73.4 | 13.8 | 12.8 | 26.6 |
| First Timers | 656 | 42.8 | 30.0 | 72.8 | 13.6 | 13.6 | 27.2 |
| Repeaters | 209 | 7.7 | 72.3 | 80.0 | 10.0 | 10.0 | 20.0 |
| ABA | 549 | 45.7 | 27.5 | 73.2 | 14.4 | 12.4 | 16.8 |
| Cal Accredited | 180 | 11.1 | 63.9 | 75.0 | 10.6 | 14.4 | 25.0 |
| Unaccredited | 42 | 7.1 | 81.0 | 88.1 | 0.0 | 11.9 | 11.9 |
| Attorney | 34 | 17.7 | 61.8 | 79.5 | 2.9 | 17.7 | 20.6 |

Row percentages may not sum to 100.0% due to rounding and the number of
applicants in each cluster may not sum to 865 because of missing data
and some subgroups not having enough applicants to provide reliable data
regarding overall agreement rates.

Table 9

PERCENTAGE OF APPLICANTS WHOSE PASS/FAIL STATUS WAS AND WAS NOT
CLASSIFIED IN THE SAME WAY BY THE MBE AND ESSAY WHEN THESE SECTIONS
WERE MADE EQUALLY DIFFICULT TO PASS

| Group | Pass both | Fail both | Total agreed | Pass Essay only | Pass MBE only | Total disagreed |
|---|---|---|---|---|---|---|
| Males | 36.7 | 40.7 | 77.4 | 6.7 | 16.0 | 22.7 |
| Females | 37.6 | 39.0 | 76.6 | 17.2 | 6.2 | 23.4 |
| Total Sample | 36.9 | 40.1 | 77.0 | 10.2 | 12.8 | 23.0 |

Row percentages may not sum to 100% due to rounding.

A copy of the questionnaire appears in Appendix A.  A review of the questionnaire responses indicated the following:

o Applicants felt actual legal practice helped them the most in preparing for the PT.  Average scores on the five point scale from 1 = almost no help to 5 = a great deal of help were:

General law school courses = 2.4
Clinical courses          = 3.0
Bar review courses        = 3.1
Actual legal practice     = 3.8

o Applicants were slightly more apt to say the multiple choice portion of the PT helped than hurt them in answering the PT's written portion.

o There was no consensus as to which part of the exam was the most difficult.  Average scores on the scale from 1 = very easy to 5 = very hard were 3.5, 4.1, 3.6, and 4.5. for the Essay, MBE, and the AM and PM portions of the PT, respectively.

o Most applicants felt the time limits were about right for the Essay and MBE, but too short for the PT.  Average scores on the scale which asked about whether enough time was allowed (from 1 = far less than enough to 5 = far more than enough) were 2.8, 2.6, 2.1, and 1.6. for the Essay, MBE, and the AM and PM PT.

o The especially low rating for the PM PT is consistent with it being rated the hardest part of the exam.  Concern about the PT's time limits also was reflected by 42 percent of the respondents mentioning this problem in their written comments.

o An equally high percentage wrote in favorable comments about the PT.  Perhaps as a result of these different views, the overall reaction to continuing to include the PT as a regular part of the exam was essentially neutral (average rating of 3.2 on the scale from 1 = strongly opposed to 5 = strongly favor).

o Applicants who earned high PT scores favored continuing the PT more often than applicants who earned low PT scores even though none of the respondents knew their scores or pass/fail status at the time they completed the questionnaire.  This relationship was stronger than the one between an applicant's attitude towards continuing the PT and that applicant's MBE or Essay scores.

Applicants were asked to evaluate the realism of the case situations on each part of the exam and how well each part measured an applicant's legal knowledge and ability to perform as an attorney.  Table 10 presents the average score on each of these dimensions.  These data indicate the AM but not the PM PT received relatively high ratings for the realism of the case situations and how well they measured the ability to perform as an attorney.  The low ratings of the PM PT probably stemmed from the previously noted feelings that not enough time was allowed to complete it.  However, there was no difference between the AM and PM problems in average written scores (67.6 and 67.7) or in average multiple choice raw scores (11.271 and 11.275).

Table 10

AVERAGE RATINGS OF TEST CHARACTERISTICS

|  | Realism of case situations | Ability to perform as an attorney | Legal knowledge |
|---|---|---|---|
| Essay | 3.1 | 2.8 | 3.4 |
| MBE | 2.5 | 2.1 | 3.1 |
| AM PT | 3.5 | 2.9 | 2.7 |
| PM PT | 3.0 | 2.5 | 2.2 |

All ratings were on a five point scale from
1 = very poor to 5 = very good

The questionnaire also asked applicants to evaluate the adequacy of various aspects of the PT's materials on a five point scale from 1 = not adequate to 5 = adequate. The respective average ratings for the AM and PM sections were: 3.4 and 2.8 for the file materials, 3.3 and 2.7 for the library materials, and 3.6 and 3.2 for the instructions. The higher ratings for the AM section are consistent with the ratings of the adequacy of the time limits on these sections.

Effect of Clinical Experience

The questionnaire asked applicants several questions about their prior legal experience, such as the number of credits they earned in clinical courses and whether they had ever been licensed to practice law. Table 11 shows that there was only a small relationship between such experience and PT scores that could not be explained by the skills already measured by the MBE and Essay. For instance, having ever held a job in a law office or clerked for a judge during the summer (item 4b) was positively correlated with PT scores, but it was also correlated to the same degree with MBE and Essay scores.

The one exception to this pattern was that applicants who felt that actual legal practice helped them prepare for the PT did better on it than applicants who either did not have such experience or felt it was not useful (item 8c). This finding suggests that some types of experience may indeed be helpful and others not; and, the questions we asked about practice experiences did not distinguish between these types.

The fact that attorneys who had been licensed in other states (or countries) did not do especially better on the PT than other applicants is an issue that deserves further study. It was noted that in general, attorney applicants do not do as well on either the Essay or the MBE as

- 16 -

Table 11

CORRELATIONS BETWEEN BAR EXAM SCORES AND QUESTIONNAIRE VARIABLES

| Item number | Questionnaire Variable | MBE | Essay | PT |
|---|---|---|---|---|
| 2 | Number of credits earned in PT related courses in law school | .03 | .03 | .09 |
| 4a | Worked in a law office or clerked for a judge (versus marked no) | .17 | .19 | .25 |
| 4b | Worked in a law office or clerked for a judge during the summer | .30 | .32 | .34 |
| 4c | Worked in a law office or clerked for a judge during the school year | .10 | .10 | .15 |
| 6b | Had been licensed to practice law in the U.S prior to July 1983 | .11 | .02 | .09 |
| 8c | Felt that actual legal practice helped in preparing to take the PT | .02 | -.01 | .16 |
| 13c | Adequate time to answer AM PT | .03 | .00 | .10 |
| 13d | Adequate time to answer PM PT | .09 | .01 | .08 |
| 18 | Would favor continuing the PT on future bar exams | .10 | .05 | .20 |
| 19 | Wrote a favorable comment about the PT | .04 | .10 | .18 |

first time takers from ABA schools (see Table 8).  However, the passing rate (47%) among all of the 126 attorney applicants who took the July 1983 exam was 21% higher than it was for this group on the July 1982 exam.  It is not known whether this increase was due in part to the PT.

Correlates of Bar Exam Scores

Table 12 contains the correlations of bar exam scores with several background characteristics, including both school reported and self reported Law School Admissions Test (LSAT) scores.  These data indicate that self reported class standing correlated slightly higher with Essay scores than with PT scores.  There was a .63 correlation between school reported LSAT scores and total bar exam scores.

There was a very high correlation (.90) between self reported and school reported LSAT scores.  In other words, the self reported LSAT scores rank ordered applicants in much the same way as the LSAT scores reported for them by their law schools.  However, a self reported score was, on the average, 18.5 points higher than a school reported score.  Self reported class standing had a relatively low correlation with both self and school reported LSAT scores (.23 and .17, respectively).

## SUMMARY AND CONCLUSIONS

The July 1983 version of California's bar exam contained a six question Essay test, the Multistate Bar Examination (MBE), and for the first time, two Performance Tests (PTs).  The morning PT involved a torts case and the afternoon PT a civil procedures case.  Unlike the typical essay question, each PT contained a file of statutes, case law, memos, and other materials regarding a hypothetical client's case.  Applicants were asked 15 multiple choice questions about these materials.  They also were instructed to use them in preparing a memorandum that would be used in handling an important step in the case.

An analysis of the effect of adding the PT to the bar exam was conducted with a random sample of 865 of the 7,277 applicants who took all three parts of the exam.  For the purposes of this research, all 865 of these applicants had all of their essay and PT written answers read twice during the regular grading process.  About 77 percent of the applicants in this sample completed a questionnaire (prior to the release of exam scores) that inquired about their clinical legal experience and their attitudes towards the various sections of the exam.

The major findings of this research were as follows:

o PT readers agreed with each other in the score that should be
  assigned to an answer to about the same degree that essay
  readers agreed with each other in the scores they assigned.

- 18 -

Table 12

CORRELATIONS BETWEEN BAR EXAM SCORES
AND BACKGROUND CHARACTERISTICS

|  | MBE | Essay | PT | Total score |
|---|---|---|---|---|
| Class standing* | .38 | .47 | .34 | .44 |
| LSAT score* | .47 | .38 | .46 | .51 |
| School reported LSAT score | .60 | .47 | .55 | .63 |
| Racial/ethnic group = Anglo* | .27 | .27 | .28 | .31 |
| Sex = Female* | -.06 | .12 | .15 | .07 |
| ABA graduate | .36 | .33 | .41 | .42 |
| First Timer | .33 | .32 | .39 | .39 |

* Self reported

o The total PT score (morning plus afternoon sessions) was almost as reliable (.69) as the Essay score (.77). The PT's written score was almost as reliable (.67) as its total score (.77). Thus, the multiple choice portion of the PT did not substantially increase the reliability of the total PT score. Moreover, the written score correlated .96 with the PT total score. These findings suggest that a substantial amount of testing time could be saved without losing a significant amount of reliability if the multiple choice portions of the PT were eliminated.

o Applicants tended to earn much higher MBE than Essay scores. Because the difficulty of the PT fell in between the MBE and the Essay and because all three sections of the exam carried about equal weight in determining an applicant's total score, the inclusion of the PT did not influence the percent passing.

o The inclusion of the PT affected the pass/fail status of about 8 percent of the applicants. However, some of this effect may be due to the less than perfect reliability of the scores on all three sections of the exam.

o The passing rate in different racial/ethnic groups was not appreciably affected by the inclusion of the PT on the exam.

o Women applicants tended to do slightly better on the PT than would have been expected given their total scores on the other two sections, however, this trend appeared to be due to the fact that women tend to score relatively higher on essay than on multiple choice questions and two-thirds of the PT total score involved a written response.

o Self reported and school reported LSAT scores as well as self reported class standings correlated about as well with PT scores as they did with MBE and Essay scores. The correlations of school reported LSAT scores with bar exam scores was quite strong considering the LSAT scores were earned almost four years before the applicants took the bar exam.

o The major complaint about the PT was that not enough time was allowed to complete it. This was particularly true for the afternoon session. However, afternoon PT scores were just as highly correlated with other variables as were the morning PT scores.

o The realism of the PT's case situations was judged to be much higher than that of the MBE's or Essay's situations. The PT was rated about the same as the Essay but better than the MBE in terms of how well it tested an applicant's ability to perform as an attorney.

o There was substantial variation among applicants in their opinions about whether the PT should be included on future examinations. Applicants who favored continuing it on the exam tended to earn higher PT scores than those who were opposed to its continued use.

o Applicants felt that actual legal practice helped them the most
  in preparing for the PT. And, applicants who said that such
  practice helped, actually did better on the PT than would have
  been expected given their scores on the other sections of the
  exam. There did not appear to be any other significant
  relationship between PT scores and prior experience that could
  not be explained by the combination of the applicants MBE and
  Essay scores.

Several factors may have influenced the findings reported above. Some
of these factors are: (1) all the comparisons among sections in the results
portion of this report were conducted after making the three sections
equally difficult to pass rather than reflecting the observed differences
in their difficulties; (2) applicants (and bar review courses) were informed
the July 1983 exam would include the PT (and provided with a prototype copy
of it) about seven months before it was administered (thereby reducing the
possible effect of special preparation for it); (3) the two PTs were very
similar in some respects but very different in others; (4) future PTs may
differ in a number of ways from those given in July 1983; and (5) the size
of the effect of including the PT on who passes the exam is affected by the
amount of weight assigned to it in computing an applicant's total score,
the specific pass/fail rules employed, the scoring standards employed on
it, and the overall percent passing. For example, if the passing rate on
the California exam was 80 percent or higher and if all three sections
carried equal weight and were equally difficult, it is highly unlikely that
as many as 8 percent of the applicants would have had their status changed
by the inclusion of the PT.

In light of these considerations, the reader is cautioned that the
effect of the PT on the July 1983 results may not be indicative of the PT's
impact on subsequent California exams or on the exams given by other states
should they decide to include a PT on their bar exam.


REFERENCES

Klein, S.  Testing research skills on the California Bar Examination.
     Report prepared for the Committee of Bar Examiners of the State Bar
     of California and the National Conference of Bar Examiners, 1981.

Klein, S.  An analysis of the July 1983 California Bar Examination.
     Report prepared for the Committee of Bar Examiners of the State
     Bar of California, 1984.

APPENDIX A

APPLICANT QUESTIONNAIRE AND PERCENTAGE SELECTING EACH CHOICE

Dear Candidate:

    The Committee of Bar Examiners of the State Bar of California and the National Conference of Bar Examiners are conducting an in depth analysis of the performance test that was administered as part of the July 1983 California State Bar Examination.  This analysis is being conducted on a small percentage of the applicants who took this exam.  Your name was selected randomly to participate in this study.

    The purposes of this study are to identify ways of improving the bar examination and to explore what background factors, if any, are related to performance on it.  Your responses will therefore have a significant impact on decisions about the nature of future examinations.

    Your answers to the following questionnaire will be treated in the strictest confidence and will not in any way affect the grading of your answers.  The data will be used solely for research purposes.

    In return for your cooperation in this research, you will receive a copy of the summary report of our findings.

    Thank you for taking the time to consider this request and I hope you will be willing to participate in this important research.  If you have any questions about the questionnaire or the study, please write to me at the address above.

    If you did not take the Performance Tests, please check this box []
and return this form.  If you did take it, please answer the following questions and return your questionnaire by September 30.  A return envelope is enclosed for your convenience.  Thank you.

                                Sincerely,



                                Stephen P. Klein, Ph.D.

- 22 -

1) To the best of your recollection, what was your LSAT score?  If
   you took the LSAT more than once, please indicate your highest
   score.  If you did not take the LSAT or have no recollection of
   your approximate score, mark an X ...(Mean = 601, SD = 83.5, N = 522)

2) While you were in law school, how many credits did you earn in
   courses that required performing practice oriented tasks, such as
   conducting legal research, preparing motions or briefs, examining
   witnesses, and interviewing clients?  If you did not take any
   courses that involved these activities, skip to Question 4 .....
   ....(Mean = 7.8, SD = 4.4, N = 612)

3) About what percentage of the time spent in these courses was
   devoted to SIMULATED cases and what percentage to REAL cases?

   a) SIMULATED CASES, such as moot court or an on-campus clinical
      program..........(Mean = 25.7% among 564 respondents)

   b) REAL CASES where you had contact with the client or the client's
      attorney, such as part of a on-campus or off-campus clinic run
      by your law school....(Mean = 41.7% among 307 respondents)

4) Have you ever worked in a law office (or clerked for a judge) where
   you had to use your legal knowledge and skills in handling actual
   cases, such as conducting legal research, preparing motions or
   briefs, and interviewing clients?  Circle each period of employment
   that lasted at least 4 weeks and was not part of a law school program.

20%  a) No
48%  b) Yes, during the summer
57%  c) Yes, during the school year: average number of hours/week (Mdn = 20) ...
33%  d) Yes, after graduation: average number of hours/week  (Mdn = 40)

   If you answered "yes" to question 4, please circle whether you:
66%  a) were paid for your services
8%   b) did the work as a volunteer       (N = 523 said Yes)
26%  c) both a and b

5) About where did you rank in your graduating law school class?

   7%   a) bottom 20%
   0%   b) next 20%
   33%  c) middle 20%
   32%  d) next 20%
   28%  e) top 20%

6) Have you ever been licensed to practice law?

   90%  a) No
   8%   b) Yes; number of years practiced in the U.S. prior to July 1983
   3%   b) Yes; number of years practiced outside the U.S. prior to July 1983

            Range of years licensed to practiced = 1 to 33, Mdn = 3

7) Which one of the following schedules would you recommend for future examinations?

54%  a) Give the 6 essay questions on day 1 and the 2 performance test problems on day 3...plan used for July 1983 examination.

4%  b) Give the 6 essay questions on day 3 and the 2 performance test problems on day 1

25%  c) Give 3 essay questions and 1 performance test problem on day 1; give the remaining 3 essay questions and performance test problem on day 3.

16%  d) Lengthen the time allowed to answer each performance test problem by adding a fourth day to the examination.

8) Circle one choice for each of the activities below to indicate how much it helped you to prepare for the Performance Test:

|  | Almost no help at all 1 | 2 | Some help 3 | 4 | A great deal of help 5 |
|---|---|---|---|---|---|
| a. general law school courses | 30 | 19 | 33 | 12 | 6% |
| b. clinical courses | 17 | 16 | 31 | 23 | 13% |
| c. actual legal practice | 8 | 8 | 21 | 22 | 21% |
| d. bar review course(s) | 18 | 15 | 29 | 19 | 19% |
| e. other _____ | | | | | |

9) In your opinion, how difficult was each part of the exam?  Please circle one number for each part.  The AM performance test, Carelton v. Mid-Central Shipping, was a Torts case involving a boy who was injured while jumping off a plank.  The PM performance test, Lee v. Western Steel, was a Civil Procedure case involving a class action suit dealing with acid fog.

|  | Very easy 1 | Easy 2 | Average 3 | Hard 4 | Very hard 5 |
|---|---|---|---|---|---|
| a. Essay | 1 | 4 | 49 | 38 | 8% |
| b. Multistate (MBE) | 0 | 2 | 23 | 39 | 36% |
| c. AM Performance Test - Carelton | 1 | 6 | 35 | 41 | 17% |
| d. PM Performance Test - Lee | 0 | 2 | 10 | 26 | 62% |

10) In your opinion, how good a measure of your LEGAL KNOWLEDGE was each part of the examination?  Please circle one number for each part.

|  | Very poor 1 | Poor 2 | Fair 3 | Good 4 | Very good 5 |
|---|---|---|---|---|---|
| a. Essay | 5 | 12 | 31 | 40 | 11% |
| b. Multistate (MBE) | 11 | 19 | 31 | 29 | 10% |
| c. AM Performance Test - Carelton | 11 | 28 | 30 | 21 | 4% |
| d. PM Performance Test - Lee | 35 | 31 | 20 | 10 | 11% |

11) In your opinion, how good a measure of your ABILITY TO PERFORM AS AN ATTORNEY was each part of the exam?  Circle one number for each part.

|  | Very poor 1 | Poor 2 | Fair 3 | Good 4 | Very good 5 |
|---|---|---|---|---|---|
| a. Essay | 16 | 20 | 37 | 23 | 4% |
| b. Multistate (MBE) | 32 | 32 | 26 | 7 | 2% |
| c. AM Performance Test - Carelton | 18 | 19 | 25 | 29 | 9% |
| d. PM Performance Test - Lee | 30 | 23 | 19 | 20 | 7% |

12) Circle one number for each part of the exam to indicate your opinion of the REALISM OF ITS CASE SITUATIONS:

|  | Very poor 1 | Poor 2 | Fair 3 | Good 4 | Very good 5 |
|---|---|---|---|---|---|
| a. Essay | 7 | 16 | 44 | 29 | 5% |
| b. Multistate (MBE) | 20 | 28 | 36 | 14 | 3% |
| c. AM Performance Test - Carelton | 5 | 7 | 34 | 40 | 15% |
| d. PM Performance Test - Lee | 15 | 15 | 32 | 29 | 9% |

13) Circle one number for each part of the exam to indicate your opinion of whether ENOUGH TIME WAS ALLOWED to answer it:

|  | Far less than enough 1 | 2 | About right 3 | 4 | Far more than enough 5 |
|---|---|---|---|---|---|
| a. Essay | 3 | 18 | 72 | 7 | 1% |
| b. Multistate (MBE) | 10 | 27 | 56 | 5 | 1% |
| c. AM Performance Test - Carelton | 33 | 31 | 33 | 3 | 1% |
| d. PM Performance Test - Lee | 61 | 23 | 14 | 2 | 0% |

25

14) Which one of the following statements best reflects your opinion of the multiple choice portions of the performance test?

9% a. Led me off in the wrong direction for the written portion
53% b. Did not help or hurt me in preparing for the written portion
38% c. Helped me prepare for the written portion

15) Circle one number for each performance test to indicate the ADEQUACY OF THE FILE MATERIALS for preparing your written answer (memo):

|  | Not adequate | | | | Very adequate |
|  | 1 | 2 | 3 | 4 | 5 |
| a. AM Performance Test - Carelton | 4 | 12 | 39 | 34 | 11% |
| b. PM Performance Test - Lee | 15 | 22 | 35 | 20 | 8% |

16) Circle one number for each performance test to indicate the ADEQUACY OF THE LIBRARY MATERIALS for preparing your written answer (memo):

|  | Not adequate | | | | Very adequate |
|  | 1 | 2 | 3 | 4 | 5 |
| a. AM Performance Test - Carelton | 5 | 15 | 35 | 32 | 13% |
| b. PM Performance Test - Lee | 23 | 22 | 28 | 18 | 10% |

17) Circle one number for each performance test to indicate the ADEQUACY OF ITS INSTRUCTIONS:

|  | Not adequate | | | | Very adequate |
|  | 1 | 2 | 3 | 4 | 5 |
| a. AM Performance Test - Carelton | 4 | 7 | 31 | 36 | 21% |
| b. PM Performance Test - Lee | 12 | 14 | 30 | 27 | 17% |

18) What is your opinion regarding whether the performance test should continue to be a regular part of the bar exam?

16% a. strongly opposed
18% b. opposed
14% c. neutral
37% d. favor
15% e. strongly favor

19) What were your general reactions to the Performance Test? How could it be improved? What parts should be maintained, eliminated, and changed? Please put your comments on the reverse side of this form.

PR-87-5

# A COMPARISON OF INITIAL AND EVENTUAL PASSING RATES

## ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.

Roger Bolus, Ph.D.

October 30, 1987

## SUMMARY

An analysis of the initial and eventual passing rates of July 1977, 1981, 1982, and 1984 first timers indicated that:

o In the last three cohorts studied, about 80 percent eventually passed; another 7 percent took the exam once, failed, and did not try again; and the remaining 13 percent did not pass after retaking the exam one or more times.

o The 1977 cohort's eventual passing rate was higher than that in each of the last three cohorts studied, however, a portion of this difference stemmed from tracking the 1977 group over as many as seven exams whereas the 1981 and 1984 cohorts were each followed for five exams and the 1982 cohort for only three exams.

o Nine out of ten applicants who came close to passing but failed on their first attempt did eventually pass the exam.

o The higher the initial total bar exam score, the more likely the applicant was to eventually pass. However, there was no initial score that clearly differentiated between those who did and did not eventually pass. And, initial total score was not a good predictor of how many attempts an applicant would have to make in order to achieve a passing status.

o Given their scores on their first attempt, about one-third to one-half of the applicants who initially failed and chose not to try again probably would have passed had they taken the exam one or two more times. Thus, the overall eventual passing rate probably would have risen a few percentage points if these applicants had repeated the exam one or two times.

- ii -

o Most of the applicants who failed initially but eventually passed
  achieved their passing status on their second or third attempt.

o Eventual passing rates were very consistent for the last three
  cohorts studied (July 1981, 1982, and 1984 first timers) even
  though they had substantially different initial passing rates.

o The initial and eventual passing rates of ABA graduates was much
  higher than the corresponding rates of California Accredited
  graduates which in turn was higher than graduates of unaccredited
  schools.

o The initial and eventual passing rates of white applicants was
  much higher than the corresponding rates of minority applicants.
  This pattern was observed with applicants from both ABA and
  non-ABA schools.  However, on all the exams studied, close to
  two-thirds of the minority applicants (and nearly 75 percent of
  those from ABA schools) eventually passed.

o Men and women now have about the same eventual passing rates.

PR-87-5

# A COMPARISON OF INITIAL AND EVENTUAL PASSING RATES
## ON THE CALIFORNIA BAR EXAMINATION

This report describes the initial and eventual passing rates of
applicants who took the California bar exam for the first time in July
1981, 1982, or 1984.  The passing rates in these three cohorts are
contrasted with those obtained in a study of July 1977 first timers.

## PASS/FAIL CATEGORIES

The applicants in each cohort were classified into the following groups:

  Initial Pass - applicants who passed on their first attempt

  Subsequent Pass - applicants who failed on their first attempt,
  but passed after taking the exam two or more times

  Subsequent Fail - applicants who failed on their first attempt and
  repeated the exam at least once, but did not pass on any attempt

  Nonrepeating Fail - applicants who failed on their first attempt
  and did not take the exam again

The combination of the Initial and Subsequent Pass groups is defined as
the "Eventual" passers.

## EXAM STRUCTURE AND PASS/FAIL RULES

The July 1977 exam had had two sections, the Multistate Bar Examination
(MBE) and a 12-question essay test.  Applicants could earn up to 514
points on the MBE and 1200 on the essay.  The passing score was 1200.

The July 1981 and 1982 exams had two sections, the MBE and a 9-question
essay test.  Applicants could earn up to 600 points on the MBE and 900

on the essay.  The passing score was 1050.  However, some applicants were passed if their scores on the MBE and three essay questions were high enough to indicate that they almost certainly would achieve a 1050 if their other six essay answers were graded.  The total "essay" score of an applicant who passed under this phased grading policy was estimated by multiplying by 3.0 the sum of that applicant's scores on the three questions that were graded.

July 1981 and 1982 first timers also could eventually pass using the "bifurcation" rule.  Under this rule, applicants were deemed to have passed the exam if they passed the MBE on one administration and the essay on another administration (where passing a section was defined as earning 70 percent of the possible points on that section).  A "passing" status on a section could be retained for 21 months.  Although the bifurcation rule was discontinued in July 1983, applicants could still use it if they had passed a section prior to the July 1983 exam.

The July 1984 exam had three sections: the MBE, a 6-question essay test, and a 2-problem Performance Test (PT).  Applicants could earn up to 600 points per section.  The passing score was 1260.  The bifurcation rule was discontinued before the July 1984 first timers took the exam.

TRACKING STUDY PROCEDURES

Computer records for applicants in the July 1981 and 1984 cohorts were searched to determine these applicants' test taking activities on up to four additional administrations of the exam after their initial attempt.

Because of a change in the methods used to record identification numbers, there was no efficient means of checking the test taking activities of the July 1982 cohort after 1983.  Thus, we could only track them for a total of three attempts.  This shortened period probably reduced their eventual passing rates slightly.  For instance, results with the July 1981 and 1984 cohorts suggest that eventual passing rates in the July 1982 cohort would be about 2 to 4 percent

3

higher than those presented in this report if it had been possible to follow this cohort for a total of five administrations of the exam.

The July 1977 cohort was followed for a total of seven administrations of the exam.

Column and subcolumn totals in the report's tables may not correspond exactly to the sum of the values in the column due to rounding. And, counts of the number of applicants in a group may differ slightly between tables because a few applicants were missing data on certain variables (such as race, sex, and school type).

## RESULTS WITH ALL FIRST TIMERS

Table 1 shows that three cohorts had very similar eventual passing rates even though they had markedly different initial rates. A comparison of the 1977 first timer results with those on the July 1981, 1982, and 1983 cohorts indicates the 1977 group had a higher initial and eventual passing rate. However, it should be remembered throughout this report, that the 1977 group was tracked over as many as seven total attempts and the 1982 group over no more than three total attempts.

The data in Table 1 are consistent with findings from previous research that indicated the bifurcation rule did not increase eventual passing rates. Specifically, the eventual passing rates in the 1977 and 1984 cohorts (who could not benefit by this rule) were as high or higher than those in the 1981 and 1982 cohorts (who could benefit from this rule).

Table 2 shows for each pass/fail category, the percentile rank of the average applicant's total bar score on the first attempt relative to all first timers. For example, on the average, a July 1982 first timer in the initial pass category had a total bar score that was at the 72nd percentile point in the distribution of all first timer total bar scores whereas the typical applicant in the subsequent fail group was at the 9th percentile.

4

Table 2's data indicate that applicants with relatively high (albeit not passing) scores on their first attempt were more likely to pass on a subsequent attempt than were repeaters who did not eventually pass.  In other words, the higher the initial score, the greater the chances of eventually passing.  However, there were many applicants with relatively low initial scores who did eventually pass and some with relatively high initial scores who despite repeated attempts did not pass.  Thus, there was no one initial total score that would clearly separate those who did and did not eventually pass.  These results are further illustrated in Table 3 where it can be seen that there is a close but far from perfect relationship between initial total score and eventual pass/fail status.

The less than perfect relationship between initial total score and eventual pass/fail status suggests that many of the applicants in the Nonrepeating Fail category would have passed had they taken the exam at least one or two more times.  This is particularly so given that many of them had higher initial scores than those in the Subsequent Pass group.  In fact, projections based on their initial scores suggest that the eventual passing rate in each cohort would have risen about 3 percentage points if all the Nonrepeating Fails had taken the exam at least twice.

The rank ordering of pass/fail groups on total bar exam score paralleled their rank ordering on the various sections of the exam and on the Law School Admission Test (LSAT); i.e., the Initial Pass group had the highest average scores and the Subsequent Fail group the lowest average scores.  Table 4 illustrates this pattern on the LSAT.

Table 5 shows that most applicants who eventually pass achieve their passing status by their second or third attempt.  In general, if a repeater eventually passes, the chances are about 4 out of 5 that the pass will come by the second or third time the applicant takes the exam.  Nevertheless, some applicants pass after more than three attempts.

The number of times it took an applicant to pass was correlated weakly with that applicant's initial total score.  In other words, applicant's with relatively high (but below passing) total scores on their first

attempt were only slightly more likely to require fewer attempts to achieve their passing status than were those in the Subsequent Pass group who had relatively low initial total scores. For instance, the difference in average total raw score between those who passed on their second attempt and those who passed after three or more attempts was 3 points in the July 1982 cohort and 8 points in the July 1984 cohort.

Thus, while initial total score is a fairly good (but far from perfect) predictor of eventual pass/fail status, it is not a good predictor of how many attempts a repeater will require to achieve a passing status. The same pattern holds when the Law School Admission Test is used as the predictor of eventual passing status.


RESULTS WITH SUBGROUPS

There has been a consistent trend over the past ten years in the direction of women making up an increasingly large percentage of all first timers. This trend is paralleled by a decline in the advantage women enjoyed over men in overall passing rate so that by the 1980s, male first timers began having as high or higher passing rates than women. Table 6 shows that the convergence of the sexes in initial passing rates also carried over into eventual passing rates.

Table 7 shows that ABA applicants had higher initial and eventual passing rates than applicants from California Accredited schools who in turn had higher rates than applicants from Unaccredited schools. About 85 percent of the ABA applicants eventually passed. The Unaccredited Schools' sharp decline in both passing rates and percentage contribution to the total pool of applicants may stem from some schools changing their accreditation status between 1977 and 1984.

The ALL OTHERS category in Table 7 is composed mainly of applicants from who did not take the exam within one year of graduation from law school, but who did take all the sections of the exam (i.e., they did not take the Attorney's Exam). The ALL OTHERS category also includes a few

applicants who obtained their legal education through correspondence
courses or law office study.

Table 8 shows that differences among racial/ethnic groups in their
eventual passing rates generally corresponded to differences in their
initial passing rates.  However, despite these differences, about two
out of every three nonwhite applicants eventually passed.  The nonwhite
eventual passing rates for the 1977, 1981, 1982, and 1984 exams were:
76, 64, 63, and 60 percent, respectively.

Table 9 shows that the eventual passing rates in all racial/ethnic
groups increased when the analysis sample was restricted to ABA
graduates and that about 75 percent of the ABA minority applicants
passed the exam.  Moreover, the passing rate in most groups probably
would have increased by about another three percent had some of the
Nonrepeating Fails taken the exam a few times.

Table 1

PERCENTAGE OF APPLICANTS IN EACH PASS/FAIL CATEGORY

| Pass/Fail Status | 1977 | 1981 | 1982 | 1984 |
|---|---|---|---|---|
| Initial Pass | 68 | 65 | 64 | 55 |
| Subsequent Pass | 20 | 15 | 14 | 25 |
| Total Pass | 88 | 80 | 77 | 80 |
| | | | | |
| Subsequent Fail | 8 | 14 | 15 | 14 |
| Nonrepeating Fail | 4 | 7 | 8 | 6 |
| Total Fail | 12 | 21 | 23 | 20 |
| Total N | 5419 | 4834 | 4620 | 4783 |

The total number of exams over which an
applicant in a cohort could be tracked were:
1977 (7), 1981 (5), 1982 (3), and 1984 (5).

Table 2

PERCENTILE EQUIVALENT OF MEAN TOTAL BAR SCORES
OF APPLICANTS IN EACH PASS/FAIL CATEGORY

| Pass/Fail Status | 1977 | 1981 | 1982 | 1984 |
|---|---|---|---|---|
| Initial Pass | 71 | 72 | 72 | 76 |
| Subsequent Pass | 19 | 21 | 25 | 28 |
| Subsequent Fail | 6 | 8 | 9 | 9 |
| Nonrepeating Fail | 8 | 16 | 14 | 15 |

Table 3

NUMBER OF JULY 1984 INITIAL FAILS AND THEIR EVENTUAL STATUS
RELATIVE TO THEIR INITIAL TOTAL BAR SCORE

| July 1984 Total Score | Subsequent Pass | Subsequent Fail | Repeater Passing Rate | Did Not Repeat |
|---|---|---|---|---|
| < 1200 | 429 | 543 | 44% | 204 |
| 1200 - 1219 | 251 | 69 | 78% | 37 |
| 1220 - 1239 | 303 | 28 | 92% | 34 |
| 1240 - 1259 | 190 | 21 | 90% | 23 |
| Total | 1173 | 661 | 64% | 298 |

The July 1984 passing score was 1260.

Table 4

MEAN LSAT SCORES IN EACH PASS/FAIL CATEGORY

| Pass/Fail Status | 1981 | 1982 | 1984 |
|---|---|---|---|
| Initial Pass | 628 | 625 | 642 |
| Subsequent Pass | 560 | 569 | 573 |
| Subsequent Fail | 512 | 510 | 516 |
| Nonrepeating Fail | 545 | 542 | 557 |

Table 5

PERCENTAGE OF APPLICANTS WITHIN THE SUBSEQUENT PASS AND FAIL
CATEGORIES WHO TOOK THE EXAM 2, 3, 4, OR MORE THAN 4 TIMES

| Number of times took the exam | Subsequent Pass | | | | Subsequent Fail | | | |
|---|---|---|---|---|---|---|---|---|
| | 1977 | 1981 | 1982 | 1984 | 1977 | 1981 | 1982 | 1984 |
| 2 | 61 | 64 | 74 | 64 | 24 | 31 | 49 | 30 |
| 3 | 17 | 24 | 26 | 26 | 19 | 26 | 51 | 25 |
| 4 | 14 | 8 | -- | 7 | 18 | 24 | -- | 25 |
| >4 | 7 | 4 | -- | 4 | 39 | 19 | -- | 21 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

The number of exams over which an applicant in a cohort could
be tracked were: 1977 (7), 1981 (5), 1982 (3), and 1984 (5).

9

Table 6

PERCENTAGE OF MALES AND FEMALES IN EACH PASS/FAIL CATEGORY
IN THE 1977, 1981, 1982, AND 1984 COHORTS

|  | MALES | | | | FEMALES | | | |
|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 |
| Initial Pass | 67 | 66 | 72 | 56 | 70 | 63 | 66 | 54 |
| Subsequent Pass | 20 | 14 | 13 | 23 | 21 | 15 | 15 | 26 |
| Total Pass | 87 | 80 | 85 | 80 | 91 | 78 | 81 | 80 |
| Subsequent Fail | 9 | 13 | 9 | 13 | 6 | 14 | 13 | 15 |
| Nonrepeating Fail | 4 | 7 | 5 | 7 | 2 | 8 | 6 | 5 |
| Total Fail | 13 | 20 | 15 | 20 | 9 | 22 | 19 | 20 |
| Percent of Cohort | 74 | 65 | 64 | 60 | 26 | 35 | 36 | 40 |

Table 7

PERCENTAGE OF APPLICANTS FROM EACH SCHOOL TYPE IN EACH PASS/FAIL CATEGORY
IN THE 1977, 1981, 1982, AND 1984 COHORTS

|  | ABA | | | | CAL ACCR | | | | UNACCR | | | | ALL OTHERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 |
| Initial Pass | 76 | 72 | 70 | 60 | 53 | 40 | 39 | 28 | 44 | 35 | 42 | 21 | 48 | 56 | 43 | 52 |
| Subsequent Pass | 17 | 14 | 14 | 26 | 31 | 19 | 15 | 27 | 31 | 17 | 6 | 15 | 19 | 14 | 13 | 13 |
| Total Pass | 93 | 85 | 84 | 86 | 84 | 59 | 54 | 55 | 75 | 52 | 48 | 36 | 67 | 70 | 56 | 65 |
| Subsequent Fail | 5 | 9 | 11 | 9 | 14 | 33 | 38 | 37 | 22 | 39 | 38 | 50 | 16 | 16 | 19 | 17 |
| Nonrepeating Fail | 2 | 6 | 6 | 4 | 2 | 9 | 8 | 8 | 4 | 9 | 14 | 14 | 17 | 14 | 25 | 18 |
| Total Fail | 7 | 15 | 16 | 14 | 16 | 41 | 46 | 45 | 25 | 48 | 52 | 64 | 33 | 30 | 44 | 35 |
| Percent of Cohort | 69 | 76 | 78 | 78 | 17 | 14 | 12 | 11 | 9 | 3 | 3 | 2 | 5 | 6 | 8 | 9 |

- 10 -

Table 8

PERCENTAGE OF APPLICANTS IN EACH RACIAL/ETHNIC GROUP IN EACH PASS/FAIL
CATEGORY IN THE 1977, 1981, 1982, AND 1984 COHORTS

|  | WHITE | | | | ASIAN | | | | HISPANIC | | | | BLACK | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 | 77 | 81 | 82 | 84 |
| Initial Pass | 71 | 68 | 68 | 60 | 48 | 58 | 51 | 40 | 43 | 38 | 36 | 29 | 30 | 31 | 22 | 16 |
| Subsequent Pass | 19 | 14 | 13 | 24 | 30 | 20 | 15 | 31 | 37 | 26 | 19 | 32 | 34 | 17 | 16 | 24 |
| Total Pass | 90 | 82 | 81 | 84 | 77 | 78 | 66 | 71 | 80 | 65 | 54 | 61 | 64 | 48 | 38 | 40 |
| Subsequent Fail | 7 | 12 | 12 | 11 | 16 | 17 | 23 | 16 | 15 | 24 | 36 | 30 | 27 | 38 | 48 | 43 |
| Nonrepeating Fail | 3 | 6 | 7 | 5 | 7 | 5 | 11 | 13 | 5 | 11 | 10 | 9 | 8 | 14 | 14 | 16 |
| Total Fail | 10 | 18 | 19 | 16 | 23 | 22 | 34 | 29 | 20 | 35 | 46 | 41 | 35 | 52 | 62 | 60 |
| Percent of Cohort | 89 | 87 | 86 | 84 | 3 | 4 | 4 | 5 | 4 | 4 | 5 | 5 | 3 | 4 | 4 | 4 |

About one percent of the applicants did not belong to one of the groups
above.  The eventual passing rate of applicants in the "Other" category
was: 85% in 1977, 61% in 1981, 55% in 1982, and 70% in 1984.

Table 9

PERCENTAGE OF ABA APPLICANTS IN EACH RACIAL/ETHNIC GROUP IN EACH
PASS/FAIL CATEGORY IN THE 1981, 1982, AND 1984 COHORTS

|  | WHITE | | | ASIAN | | | HISPANIC | | | BLACK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 81 | 82 | 84 | 81 | 82 | 84 | 81 | 82 | 84 | 81 | 82 | 84 |
| Initial Pass | 75 | 74 | 65 | 62 | 60 | 46 | 45 | 40 | 32 | 35 | 30 | 20 |
| Subsequent Pass | 13 | 13 | 25 | 19 | 16 | 32 | 31 | 22 | 35 | 22 | 17 | 34 |
| Total Pass | 87 | 87 | 89 | 81 | 76 | 78 | 77 | 62 | 67 | 57 | 47 | 54 |
| Subsequent Fail | 7 | 8 | 7 | 15 | 15 | 13 | 13 | 29 | 25 | 28 | 45 | 35 |
| Nonrepeating Fail | 5 | 5 | 4 | 4 | 9 | 9 | 10 | 9 | 8 | 15 | 8 | 11 |
| Total Fail | 13 | 13 | 11 | 19 | 24 | 22 | 23 | 38 | 33 | 43 | 53 | 46 |
| Percent of Cohort | 87 | 87 | 84 | 4 | 4 | 5 | 4 | 5 | 5 | 4 | 3 | 3 |

PR-93-03

# ANALYSIS OF THE FEBRUARY 1993 EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

GANSK & ASSOCIATES

August 5, 1993

SUMMARY

The February 1993 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written Examination composed of six essay questions and two Performance Test (PT) problems. There were 3,682 applicants who completed both sections, 65 percent of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the exam to the next.  Essay and PT answers were graded on a 40 to 100 point scale.  Scores on this scale were assigned in 5-point intervals.  Each PT score was then multiplied by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE.  This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded.  An applicant's total score was computed using the formula below:

Total Scale Score = (.35)(MBE Scale) + (.65)(Essay Scale)

A three phased grading process was used to determine an applicant's pass/fail status.  In Phase 1, applicants were: failed if their Total score was less than 1391, passed if their Total was greater than 1465, and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time.  At the end of this phase, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal if their scores were in the 1412 - 1439 range.  Applicants also were placed in reappraisal if their Total score after the first reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision.  Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant came to the pass/fail line of 1440.

The major findings with the applicants who had all of their answers read at least once and the group of 875 applicants who had them read at least twice were as follows:

- ii -

o  After the first reading of all answers, 41 percent of the
   applicants failed and 35 percent passed.  The total percent
   passing after the second reading and the reappraisal process
   were 42 and 45 percent, respectively.

o  California applicants scored higher than the national average
   on all of the six MBE subjects.

o  The degree of agreement between readers in their evaluations of
   the relative quality of the written answers was about the same
   on an essay question as it was on a PT problem.  However, because
   reader assigned PT scores were multiplied by 2, differences in
   final scores between the first and second reading on an answer
   were larger on a PT than on an essay answer.

o  The reliability of the Written and Total scores (.73 and .84,
   respectively) was comparable to that of previous exams.

o  The correlation between MBE and Written scores (.59) was in
   the normal range.

o  The phased grading cutoff scores led to rereading and
   reappraising the answers of the applicants who were most
   likely to benefit from these additional reviews.

o  Males tended to earn higher scale scores on the MBE than on
   the Written section.  The reverse was true for females.

During the PT-A portion of the examination, an applicant who was seated
at the very rear of Pasadena Test Center became seriously ill.  Several
applicants who were seated nearby came to his assistance.  Paramedics
arrived a few minutes later, they administered aid, and then transported
the ill applicant to the hospital.  The incident lasted over 30 minutes
and created a disturbance, especially in the immediate vicinity of the
applicant who became ill -- people talking, paramedic radios, etc.

- iii -

Special analyses were conducted to investigate whether a Pasadena
applicant's pass/fail status was affected by this incident.  These
analyses found that as a group, Pasadena applicants did as well on PT-A
as would be expected on the basis of their scores on the rest of the
exam.  Moreover, an applicant's physical proximity to the incident was
not related to that applicant's PT-A score.  Finally, none of the five
so-called "good Samaritans" had their pass/fail status affected by
whether PT-A scores were or were not used to determine that status.

ANALYSIS OF THE FEBRUARY 1993 EXAM

TEST SECTIONS

The February 1993 exam had two sections: the Multistate Bar Examination
(MBE), a 200-item multiple choice test; and a Written section composed
of six essay questions and two Performance Test (PT) problems.  The exam
was administered over three consecutive days, with two 3-hour sessions
per day.  Day 1 consisted of essay questions 1 - 3 and PT problem A.
Day 2 was devoted to the MBE.  Day 3 consisted of essay questions 4 - 6
and PT problem B.

SCORING RULES

MBE raw scores (the number of MBE questions answered correctly) were
converted by the American College Testing Program (ACT) to equated
("scaled") scores and then multiplied by 10 using the formula below.
This procedure adjusts the raw scores for possible differences in mean
question difficulty from one administration of the MBE to the next.

$$MBE\ Scale = (8.9094)(MBE\ Raw) + 269.8051$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point
scale.  The same procedure was used to grade each PT answer.  PT scores
were then multiplied by 2 so that the maximum possible Written raw score
was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200
points each).

Written raw scores were converted to a score distribution that had the
same mean and standard deviation as the applicants' MBE scores.  This
scaling was done using the MBE and Written scores of the random sample
of about 1,000 applicants who had their Written answers graded first.
The formula used to convert written raw scores to scale scores was:

$$Written\ Scale\ Score = 3.2316\ (Written\ Raw\ Score) - 731.5801$$

An applicant's Total scale score was a weighted combination of that
applicant's MBE and Written scale scores.  The formula for computing
Total scale scores was:

$$Total\ Scale\ Score = (.35)(MBE\ Scale) + (.65)(Written\ Scale)$$

A three-phased grading process was used to determine an applicant's
pass/fail status.  In Phase 1, applicants were: failed if their Total
score was less than 1391, passed if their Total was greater than 1465,
and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time. The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader.

The scores assigned on the first and second readings were averaged and new Total scale scores were computed using the formulas above. At the end of Phase 2, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal if their scores were in the 1412 - 1439 range. Applicants also were placed in reappraisal if their Total score on the first reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.

SAMPLE

The analyses of the February 1993 exam were conducted with the 3,682 applicants who had both an MBE and a Written score. This sample contained 1,289 applicants who were taking the exam for the first time and 2,393 repeaters. The percentage of applicants from ABA approved, California Accredited, and Nonaccredited schools were 46, 26, and 7, respectively. The remaining 21 percent were not assigned to a school.

MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows that California applicants scored higher than the national average on 5 of 6 MBE subtests. California's average total raw score (the average number of questions answered correctly) was 3.4 points higher than the national average (which included California scores).

WRITTEN SECTION

Table 2 presents the means and standard deviations on each question after all readings of all answers.

Applicants who came close to the examination's pass/fail line after one reading of their answers had all of their answers read again by readers who had not graded them previously.

- 3 -

Table 1

NATIONAL AND CALIFORNIA AVERAGE MBE SCORES AND THE
DIFFERENCE BETWEEN THESE AVERAGE SCORES

| Test Score | Number of Items | National Mean | CA Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 30 | 22.1 | 22.4 | 0.3 |
| Contracts | 40 | 25.2 | 26.2 | 1.0 |
| Criminal Law | 30 | 18.4 | 19.0 | 0.6 |
| Evidence | 30 | 18.1 | 18.2 | 0.1 |
| Real Property | 30 | 16.9 | 16.9 | 0.0 |
| Torts | 40 | 24.7 | 26.1 | 1.4 |
| Total Raw Score | 200 | 125.4 | 128.8 | 3.4 |
| NCBE/ACT Scale | 200 | 138.7 | 141.8 | 3.1 |

Table 2

SUMMARY STATISTICAL DATA AFTER ALL READINGS
OF THE ESSAY AND PT ANSWERS (N = 3,682)

| Question Number | Subject Matter Area | Mean Score | Standard Deviation |
|---|---|---|---|
| 1 | Civil Procedure | 66.1 | 8.32 |
| 2 | Criminal Law | 63.0 | 7.47 |
| 3 | Evidence | 64.2 | 9.24 |
| 4 | Community Property | 68.3 | 7.46 |
| 5 | Torts/Professional Responsibility | 66.1 | 6.44 |
| 6 | Contracts | 66.1 | 6.83 |
| PT-A | Real Property | 133.8 | 12.09 |
| PT-B | Criminal Law | 136.0 | 14.73 |

- 4 -

Table 3 contrasts the applicants' scores on the first reading with their scores on the second reading.  The last row shows that as on past exams, the mean total written score after the first set of readings (667) was higher than it was on the second set (663).  There was a .41 correlation between the total written raw scores on the first and second set of readings.  And, on the average, the total score on the first set of readings differed by 18 points from the total on the second set.

The upper portion of the next to last column of Table 3 shows that the two readers who graded an answer usually assigned scores to that answer that were within 4 points of each other (before multiplying PT scores by 2).  The correlation coefficients in the last column indicate that on a typical question, the relative standings of the applicants on the first reading were generally consistent with their relative standings on the second reading.  The average of the eight coefficients was .57.

Table 3's data underestimate the true degree of agreement among readers because: (1) there is a much narrower range of ability in the reread sample than in the total applicant pool and (2) the method used to assign the second reader is designed to offset systematic differences among readers in their tendency to give relatively high or low grades.

Table 3

INDICES OF AGREEMENT BETWEEN THE FIRST AND SECOND READINGS (N = 875)

| Question Number | Mean on First Reading | Mean on Second Reading | Difference Between Means | Mean Absolute Difference | Correlation Between Readings |
|---|---|---|---|---|---|
| 1 | 66.8 | 66.4 | 0.4 | 3.81 | .70 |
| 2 | 63.1 | 62.8 | 0.3 | 3.85 | .62 |
| 3 | 65.0 | 63.7 | 1.3 | 4.94 | .62 |
| 4 | 68.8 | 67.9 | 0.9 | 4.31 | .59 |
| 5 | 66.2 | 65.8 | 0.4 | 4.01 | .51 |
| 6 | 66.4 | 66.3 | 0.1 | 3.77 | .62 |
| PT-A | 134.0 | 133.7 | 0.3 | 6.64 | .50 |
| PT-B | 137.0 | 136.1 | 0.9 | 9.78 | .40 |
| Total | 667.3 | 662.7 | 4.6 | 18.19 | .41 |

Reader assigned PT scores are multiplied by 2.0.

RELATIONSHIPS AMONG SECTIONS

Table 4 presents summary statistical data on each section after all
readings.  Table 5 shows the correlations among sections and the LSAT.

Appendix E shows that MBE and Written scores correlated about as highly
with each other (.59 on the February 1993 exam as they did on previous
February exams.  About 70 percent of the applicants had the same pass/fail
status on the MBE as they had on the Written section (where a scale
score of 1440 on a section was considered passing).

Table 4

SUMMARY STATISTICAL DATA AFTER ALL READINGS (N = 3,682)

| Test Statistic | MBE Scale | Written Raw Score | Total Scale |
|---|---|---|---|
| Average Score | 1417.7 | 663.6 | 1414.6 |
| Standard Deviation | 145.6 | 44.4 | 130.0 |
| Internal Consistency | .873* | .727 | .836 |

* Computed by ACT using national data.

Table 5

CORRELATIONS AMONG SECTIONS AND LSAT AFTER ALL READINGS

| | LSAT* | MBE | Written |
|---|---|---|---|
| MBE | NA | | |
| Written | NA | .59 | |
| Total | NA | .82 | .95 |

*LSAT (Law School Admissions Test) scores
were not available for this exam.

SUBGROUP ANALYSES

Table 6 shows that on the average, women scored 38 points higher on the Written section than on the MBE whereas there was a 36 point average differential in the opposite direction for male applicants.

Anglos and Asians did better on the MBE than on the Written section while the reverse was true for Asians and Hispanics.  However, the size of these differences were far less than they were between sex groups and quite small relative to the variation around these means (i.e., all the differences were less than a tenth of a standard deviation).

Table 6

MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND SEX GROUPS AND THE
NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
|------|-------|-------|-------|----------|--------|------|
|      | Anglo | Asian | Black | Hispanic | Female | Male |
| MBE | 1444 | 1384 | 1337 | 1377 | 1406 | 1426 |
| Written | 1435 | 1374 | 1343 | 1385 | 1444 | 1390 |
| Total | 1439 | 1377 | 1341 | 1383 | 1431 | 1403 |
| Number of Applicants | 2411 | 403 | 402 | 291 | 1492 | 2104 |
| % Male | 59% | 63% | 50% | 58% | - 0 - | 100% |

* There were 89 applicants who did not fall in one of the four largest racial/ethnic groups and 86 applicants who did not indicate their racial/ethnic or gender group.

PHASED GRADING

As noted previously, a three-phased grading process was used to focus
reader time on the applicants who were near the pass/fail line. Table 7
presents the number and percentage of applicants in each of the exam's
pass/fail categories. These data indicate that 1,640 (45%) passed.

Table 7

NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED
IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Pass/Fail Category | Number | Percent |
|---|---|---|
| Fail - Phase 1 | 1521 | 41.3 |
| Fail - Phase 2 | 327 | 8.9 |
| Fail - Phase 3 | 194 | 5.3 |
| Total Fail | 2042 | 55.5 |
| | | |
| Pass - Phase 1 | 1286 | 34.9 |
| Pass - Phase 2 | 262 | 7.1 |
| Pass - Phase 3 | 92 | 2.5 |
| Total Pass | 1640 | 44.5 |
| | | |
| Phase 1 = 1st reading | 2807 | 76.2 |
| Phase 2 = Reread | 589 | 16.0 |
| Phase 3 = Reappraisal | 286 | 7.8 |

Table 8 shows the number of Phase 2 applicants who passed and failed
after all readings relative to their Phase 1 scores. This table
illustrates the strong, but far from perfect relationship between Phase
1 scores and final pass/fail status. These data also indicate that the
width of the Phase 2 reread band (1389.5 - 1465.0) was about right
because almost all the applicants with relatively high scores on the
first reading passed and almost all with low initial scores failed.

Similarly, Table 9 shows that the higher an applicant's score at the
end of Phase 2, the greater the likelihood that applicant passed as a
result of reappraisal. The lower limit of the reappraisal band (1412)
also appears to be appropriate because only 2 of the 84 applicants with
Phase 2 Total scores below 1420 passed as a result of reappriasal.

Table 8

NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE
TO THEIR TOTAL SCORES AFTER THE FIRST READING

| Score After 1st Reading | Number of Applicants | | | Percent Passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1450 - 1465 | 34 | 151 | 185 | 82 |
| 1435 - 1449 | 63 | 106 | 169 | 62 |
| 1420 - 1434 | 112 | 59 | 171 | 35 |
| 1405 - 1419 | 145 | 30 | 175 | 17 |
| 1390 - 1404 | 167 | 8 | 175 | 5 |
| Total | 521 | 354 | 875 | 40 |

Table 9

NUMBER OF REAPPRAISED APPLICANTS WHO PASSED AND FAILED
RELATIVE TO THEIR TOTAL SCORES AFTER REREAD

| Total Score After Reread | Number of Applicants | | | Percent Passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1435 - 1439 | 5 | 44 | 49 | 90 |
| 1430 - 1434 | 27 | 27 | 54 | 50 |
| 1425 - 1429 | 39 | 13 | 52 | 25 |
| 1420 - 1424 | 41 | 6 | 47 | 13 |
| 1415 - 1419 | 47 | 0 | 47 | 0 |
| <1415 | 35 | 2 | 37 | 5 |
| Total | 194 | 92 | 286 | 32 |

Appendix A: HISTORICAL EXAM RESULTS

|      | FEBRUARY | | | | JULY | | | |
| Year | Mean MBE | Mean Essay | N | Pass Rate | Mean MBE | Mean Essay | N | Pass Rate |
|------|----------|------------|---|-----------|----------|------------|---|-----------|
| 1976 | 137 | 68 | 3088 | 38 | 145 | 69 | 6709 | 60 |
| 1977 | 139 | 68 | 3399 | 44 | 143 | 69 | 7191 | 55 |
| 1978 | 139 | NA | 4222 | 38 | 145 | 70 | 6835 | 55 |
| 1979 | 139 | 69 | 4166 | 45 | 144 | 70 | 7152 | 55 |
| 1980 | 137 | 67 | 3758 | 34 | 142 | 69 | 7379 | 49 |
| 1981 | 138 | 67 | 3837 | 33 | 142 | 69 | 7080 | 50 |
| 1982 | 137 | 66 | 4033 | 31 | 143 | 68 | 7038 | 49 |
| 1983 | 136 | 66 | 4200 | 28 | 144 | 68 | 7277 | 50 |
| 1984 | 137 | 66 | 3899 | 30 | 141 | 68 | 7201 | 42 |
| 1985 | 140 | 66 | 4661 | 33 | 142 | 68 | 7622 | 46 |
| 1986 | 140 | 66 | 4689 | 28 | 144 | 68 | 7780 | 45 |
| 1987 | 141 | 66 | 4682 | 43 | 144 | 67 | 7481 | 51 |
| 1988 | 142 | 67 | 4530 | 46 | 144 | 68 | 7146 | 53 |
| 1989 | 143 | 66 | 4230 | 50 | 146 | 68 | 6970 | 60 |
| 1990 | 141 | 67 | 3819 | 44 | 145 | 69 | 6963 | 58 |
| 1991 | 143 | 66 | 3685 | 51 | 145 | 67 | 7219 | 55 |
| 1992 | 143 | 66 | 3907 | 51 | 146 | 67 | 7108 | 60 |
| 1993 | 142 | 66 | 3682 | 45 | | | | |

Mean essay = mean score on a written answer after all readings
across all answers, but before PT scores are multiplied by a
constant).  The PT was introduced in July 1983.  Scaling the
written scores to the MBE began with the February 1987 exam.

Appendix B: COMPARISON OF NATIONAL AND CALIFORNIA MEAN MBE SCORES

|      | February | | | July | | |
| Year | Nation | Calif. | Diff. | Nation | Calif | Diff. |
|------|---------|--------|-------|--------|-------|-------|
| 1984 | 135.1 | 137.1 | 2.0 | 139.2 | 140.6 | 1.4 |
| 1985 | 136.4 | 140.2 | 3.8 | 140.5 | 141.9 | 1.4 |
| 1986 | 135.6 | 139.8 | 4.2 | 140.3 | 143.6 | 3.3 |
| 1987 | 136.4 | 140.6 | 4.2 | 140.3 | 143.9 | 3.6 |
| 1988 | 137.2 | 141.9 | 4.7 | 139.8 | 143.7 | 3.9 |
| 1989 | 137.8 | 142.9 | 5.1 | 142.0 | 146.3 | 4.3 |
| 1990 | 135.9 | 141.5 | 5.6* | 141.4 | 145.1 | 3.6 |
| 1991 | 137.8 | 143.0 | 5.2 | 142.1 | 145.4 | 3.3 |
| 1992 | 139.1 | 143.2 | 4.1 | 143.0 | 146.4 | 3.4 |
| 1993 | 138.7 | 141.8 | 3.1 | | | |

* California data not included in computation of national
  mean; California MBE scores imputed using AM scores.

- 10 -

Appendix C

INDICES OF READER AGREEMENT ACROSS EXAMS

| Exam | Mean difference between | | Correlation between | |
|------|------------------------|-----------------------|------------------------|-----------------------|
|      | Readers on an answer | 1st-2nd set of readings | Readers on an answer | 1st&2nd set of readings |
| 2/85 | 4.7 | 5.3 | .64 | .55 |
| 2/86 | 4.7 | 9.3 | .60 | .60 |
| 2/87 | 4.5 | 3.8 | .59 | .45 |
| 2/88 | 4.4 | 3.1 | .54 | .34 |
| 2/89 | 4.7 | 3.5 | .54 | .41 |
| 2/90 | 4.0 | 4.0 | .59 | .43 |
| 2/91 | 4.1 | 2.7 | .59 | .37 |
| 2/92 | 3.8 | 3.9 | .59 | .40 |
| 2/93 | 4.1 | 4.6 | .57 | .41 |
| 7/85 | 4.4 | 5.5 | .58 | .62 |
| 7/86 | 4.5 | 5.4 | .61 | .58 |
| 7/87 | 4.3 | 3.8 | .56 | .42 |
| 7/88 | 5.6 | 6.4 | .54 | .46 |
| 7/89 | 4.3 | 2.9 | .54 | .34 |
| 7/90 | 3.7 | -1.9 | .56 | .41 |
| 7/91 | 3.9 | 3.1 | .57 | .43 |
| 7/92 | 3.9 | 4.1 | .55 | .38 |

Mean difference between readers on an answer = mean of the absolute
differences between the scores assigned by the readers (i.e., before
multiplying PT scores by a constant).  The second column = difference
between the mean total written raw score across all essay and PT
questions on the first set of readings minus the mean on the second set
of readings.  Total written raw scores for columns 2 and 4 were computed
for the pre-1987 exams using the current scoring rules.

- 11 -

Appendix D

PERCENTAGE OF ALL APPLICANTS WHO WENT TO REREAD AND REAPPRAISAL;
AND, THE PERCENTAGE OF THOSE IN THESE PHASES WHO PASSED THE EXAM

| | Reread | | Reappraisal | |
|---|---|---|---|---|
| Exam | Percent of total | Percent passing | Percent of total | Percent passing |
| 2/85 | 22 | 29 | 8 | 36 |
| 2/86 | 22 | 36 | 7 | 34 |
| 2/87 | 24 | 42 | 8 | 34 |
| 2/88 | 26 | 42 | 9 | 31 |
| 2/89 | 26 | 41 | 9 | 29 |
| 2/90 | 25 | 41 | 9 | 25 |
| 2/91 | 24 | 44 | 9 | 25 |
| 2/92 | 24 | 44 | 9 | 33 |
| 2/93 | 24 | 40 | 8 | 32 |
| 7/85 | 24 | 43 | 9 | 32 |
| 7/86 | 23 | 42 | 8 | 33 |
| 7/87 | 22 | 40 | 8 | 31 |
| 7/88 | 23 | 41 | 9 | 31 |
| 7/89 | 20 | 45 | 8 | 32 |
| 7/90 | 20 | 47 | 8 | 31 |
| 7/91 | 21 | 42 | 7 | 27 |
| 7/92 | 19 | 43 | 7 | 32 |
| Mean | 23 | 41 | 8 | 32 |

Appendix E: CORRELATION BETWEEN MBE AND WRITTEN SCORES

| Year | February | July | Year | February | July |
|---|---|---|---|---|---|
| 1976 | .62 | .70 | 1987 | .57 | .66 |
| 1977 | .65 | .70 | 1988 | .58 | .62 |
| 1980 | NA | .68 | 1989 | .60 | .65 |
| 1982 | .60 | .65 | 1990 | .55 | .67 |
| 1983 | NA | .73 | 1991 | .58 | .67 |
| 1984 | .59 | .63 | 1992 | .60 | .64 |
| 1985 | .61 | .60 | 1993 | .59 | |
| 1986 | .58 | .66 | | | |

Data were not available for 1978, 1979, and 1981. Correlation
between MBE and Essay through July 1986; after that, it is
between MBE and Written scale scores.

PR-08-01

# ANALYSIS OF THE
# FEBRUARY 2008 GENERAL BAR EXAMINATION

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

GANSK & ASSOCIATES

August 12, 2008

# SUMMARY

The February 2008 General Bar Examination (GBX) had two sections: the Multistate Bar Examination (MBE), a 190-item multiple choice test; and a Written examination composed of six essay questions and two Performance Test (PT) problems.  There were 4497 applicants who completed both sections, 66.9% of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the examination to the next.  Essay and PT answers were graded on a 40 to 100 point scale.  Scores on this scale were assigned in 5-point intervals.  PT scores were multiplied by two (2) so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE.  This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded.  An applicant's Total score was computed using the formula below:

$$\text{Total Scale Score} = (.35 \times \text{MBE Scale}) + (.65 \times \text{Written Scale})$$

A two-phased grading process was used to determine an applicant's pass/fail status.  In Phase 1, the applicant was passed if the Total scale score was at least 1440 and failed if it was less than 1390.  All the remaining applicants (i.e., those with total scores between 1390 and 1439) went to Phase 2 where they had all their essay and PT answers read again.  The second Grader on an answer was a different person than the first Grader, and the second Grader did not have access to the grade assigned by the first Grader.

If the scores assigned by the Phase 1 and 2 Graders on an answer were no more than 10 points apart, then the final score on the answer was the average of the two Graders' scores.  However, if the scores assigned to an answer by the Phase 1 and 2 Graders differed by more than 10 points and the applicant would fail based on these scores, the reading team leader for the question reviewed these scores and the answer, and then assigned a final grade to it.  That grade could be higher but not lower than the one assigned by either regular Grader.

All the applicants in Phase 2 had their total scale scores recomputed based on the final scores on their essay and PT answers.  Applicants with total scores of 1440 or higher passed.  Those with scores of 1439 or less failed.

i

The major findings with the applicants who had all of their answers read at least once and the group of 745 applicants who had them read at least twice were as follows:

- After the first reading of all answers, 45.4% of the applicants failed and 38.0% passed. A total of 40.0% passed after the second reading and the grade resolution process.

- California applicants scored higher than the national average on four of the six MBE subjects.

- The reliability of the Written and Total scores (0.78 and 0.86, respectively) was higher (i.e., better) than normal for a February examination.

- The correlation between MBE and Written scores (.55) was in the normal range for a February examination.

- The phased grading cutoff scores led to rereading the answers of the applicants who were most likely to benefit from this additional review.

- Males tended to earn higher scale scores on the MBE than on the Written section. The reverse was true for females. Racial and ethnic minority applicants tended to earn the same scale scores on the MBE as they did on the Written section.

- First-timers had a higher passing rate than second-timers who in turn had a higher rate than those taking the examination three or more times. The corresponding passing rates were 54%, 48%, and 9%.

# ANALYSIS OF THE
# FEBRUARY 2008 GENERAL BAR EXAMINATION

## TEST SECTIONS

The examination had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six (1-hour) essay questions and two (3-hour) Performance Test (PT) problems. The examination was administered over three consecutive days, with two 3-hour sessions per day. Day 1 consisted of essay questions 1 - 3 and PT problem A. Day 2 was devoted to the MBE. Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES, FORMULAS, AND PHASED GRADING

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores using an IRT methodology. This procedure adjusts the raw scores for possible differences in mean question difficulty from one administration of the MBE to another. California multiplied the scale scores by 10.

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale. The same procedure was used to grade each PT answer. PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200 points each). Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores. This scaling was done using the MBE and Written scores of the random sample of about 1,000 applicants who had their Written answers graded first. The formula used to convert Written raw scores to scale scores was:

$$\text{Written Scale} = (2.9792 \times \text{Written Raw}) - 429.2559$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores. The formula for computing Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants passed if their Total scale score was 1440 or higher and failed if it was less than 1390. The remaining applicants, i.e., those with total scale scores of 1390 to 1439, had their essay and PT answers read again. The second Grader on an answer was a different grader than the first Grader and the second Grader did not know the score assigned by the first Grader. If the scores assigned by the Phase 1 and 2 Graders were no more than 10 points apart, then the final score on the answer was the average of the two Graders' scores. However, if the scores assigned to an answer by the Phase 1 and 2 Graders differed by more than 10 points and the applicant would fail based on these scores, the grading team leader, a member of the Examination Development and Grading Team, for the question reviewed these scores and the answer, and then assigned a final grade to it. That grade could be higher but not

1

lower than the one assigned by either regular Grader.

All the applicants who had their answers reread had their total scale scores recomputed based on the final scores on their essay and PT answers. Applicants with total scores of 1440 or higher passed. Those with scores of 1439 or less failed.

## SAMPLE

Analyses were conducted with the 4497 applicants who had both an MBE and a Written score. This sample contained 1489 applicants who were taking the examination for the first time and 3008 repeaters. The General Statistics Report contains data on the number of first timers and repeaters by school type.

## MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows California applicants scored higher than the national average on four of the six MBE subtests. California's mean Total scale score (on the MBE's 200-point scale) was almost 3 points higher than the national average (which included California scores).

Table 1 - NATIONAL AND CALIFORNIA MEAN MBE SCORES AND THE DIFFERENCE BETWEEN THESE MEANS

| Test Score | Number Of Items | National Mean | California Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 31 | 19.14 | 19.23 | -0.09 |
| Contracts | 33 | 20.55 | 19.50 | -1.05 |
| Criminal Law | 31 | 18.82 | 20.99 | 2.17 |
| Evidence | 31 | 18.90 | 19.91 | 1.01 |
| Real Property | 31 | 19.69 | 20.26 | 0.57 |
| Torts | 33 | 22.92 | 23.68 | 0.76 |
| NCBE/ACT Scale | 190* | 137.67 | 140.54 | 2.87 |

* Applicants also answer 10 items that are being pre-tested for future forms of the test. The applicants' responses to these items do not affect their MBE scores.

## WRITTEN SECTION

There were 745 applicants who had their answers read at least twice. On the average, an applicant's total Written raw score on the first reading was 7 points higher than it was on the second reading.

## SUMMARY STATISTICS

Table 2 provides summary statistical data on each section after all readings. There was a 0.55 correlation between MBE and Written scores. The mean and standard deviation of Law School Admission Test (LSAT) scores among the ____ ABA first timers were ___ and ____, respectively.

Table 2 - SUMMARY TEST STATISTICS AFTER ALL READINGS

| Test Statistic | MBE Scale | Written Raw | Total Scale |
|---|---|---|---|
| Mean Score | 1405.4 | 614.1 | 1402.0 |
| Standard Deviation | 143.3 | 141.9 | 126.8 |
| Reliability | 0.90 | 0.78 | 0.86 |

The MBE's reliability was computed by ACT using national data.

## SUBGROUP ANALYSES

On the average, women scored 34 points higher on the Written section than on the MBE whereas there was a 38 point average differential in the opposite direction for male applicants (Table 3). On the average, racial and ethnic minority groups scored about as well on the Written section as they did on the MBE.

Table 3 - MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND GENDER GROUPS AND THE NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
|---|---|---|---|---|---|---|
| | Anglo | Asian | Black | Hispanic | Female | Male |
| Written | 1410 | 1401 | 1338 | 1385 | 1421 | 1383 |
| MBE | 1427 | 1383 | 1355 | 1378 | 1387 | 1421 |
| Total | 1416 | 1395 | 1344 | 1383 | 1409 | 1396 |
| N | 2365 | 841 | 362 | 516 | 2052 | 2444 |
| % Male | 57 | 51 | 50 | 50 | 0% | 100% |

* There were 412 applicants who did not fall in one of the four largest racial/ethnic groups or were missing demographic data.

**PHASED GRADING**

A three-phased grading process was used to focus on the applicants who were just below passing. Table 4 presents the number and percentage of applicants in each pass/fail category at each phase. Overall, 2700 (40%) of the applicants passed. There were 176 applicants who had their final scores on one or more answers resolved by a member of the Examination Development and Grading Team and 7 of them passed; i.e., they would have failed were it not for the resolution process.

Table 4 - NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Phase | Fail | | Pass | | Total | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| 1 | 2043 | 45.4 | 1709 | 38.0 | 3752 | 83.4 |
| 2 | 488 | 10.9 | 81 | 1.8 | 569 | 12.7 |
| 3 | 169 | 3.8 | 7 | 0.2 | 176 | 3.9 |
| Total | 2700 | 60.0 | 1797 | 40.0 | 4497 | 100.0 |

Table 5 shows the strong relationship between Phase 1 scores and final pass/fail status. These data also indicate that the width of the reread band (1390 - 1439) was about right in that only a very small percentage of the applicants with relatively low initial total scores passed as a result of reread.

Table 5 - NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE TO THEIR TOTAL SCORES AFTER THE FIRST READING

| Score after the first reading | Number of Applicants | | | Percent passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1430 – 1439 | 107 | 43 | 150 | 28.7 |
| 1420 – 1429 | 118 | 27 | 145 | 18.6 |
| 1410 – 1419 | 121 | 14 | 135 | 10.4 |
| 1400 – 1409 | 150 | 3 | 153 | 2.0 |
| 1390 – 1399 | 161 | 1 | 162 | 0.6 |
| Total | 657 | 88 | 745 | 11.8 |

4

Table 6 provides information about the answers that had more than a 10-point difference between the first and second Grader's scores.  These data indicate that the number of answers going to resolution varied somewhat by question and that the resolution score usually fell about halfway between the scores assigned by the first and second Grader.

Table 6 – DATA ON ANSWERS GOING TO RESOLUTION GRADING

| Question | Number of answers | Mean on 1st reading | Mean on 2nd reading | Mean after resolution |
|----------|-------------------|---------------------|---------------------|-----------------------|
| 1 | 29 | 67.9 | 62.9 | 66.7 |
| 2 | 21 | 69.0 | 59.8 | 62.4 |
| 3 | 13 | 67.7 | 61.5 | 64.6 |
| 4 | 31 | 69.4 | 61.8 | 63.4 |
| 5 | 21 | 69.0 | 61.0 | 63.3 |
| 6 | 13 | 64.2 | 60.8 | 58.1 |
| PT-A | 47 | 68.4 | 59.5 | 63.5 |
| PT-B | 16 | 71.3 | 60.6 | 65.3 |

## APPENDIX A: SUMMARY TEST STATISTICS ON FEBRUARY EXAMINATIONS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|-----|------|------|------|------|------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1991 | 3685 | 51 | 1430 | 667 | .68 | .58 |
| 1992 | 3907 | 51 | 1432 | 663 | .69 | .60 |
| 1993 | 3682 | 45 | 1418 | 666 | .73 | .59 |
| 1994 | 3638 | 44 | 1421 | 657 | .68 | .59 |
| 1995 | 3488 | 42 | 1412 | 653 | .74 | .60 |
| 1996 | 3834 | 44 | 1417 | 646 | .67 | .58 |
| 1997 | 4103 | 49 | 1434 | 651 | .66 | .59 |
| 1998 | 3871 | 40 | 1412 | 650 | .70 | .60 |
| 1999 | 4309 | 41 | 1416 | 642 | .65 | .55 |
| 2000 | 4447 | 40 | 1415 | 638 | .66 | .57 |
| 2001 | 4461 | 38 | 1405 | 640 | .72 | .58 |
| 2002 | 4030 | 34 | 1396 | 633 | .71 | .53 |
| 2003 | 4162 | 38 | 1398 | 611 | .68 | .58 |
| 2004 | 4363 | 36 | 1392 | 625 | .72 | .50 |
| 2005 | 4458 | 41 | 1407 | 607 | .72 | .62 |
| 2006 | 4758 | 39 | 1402 | 621 | .77 | .58 |
| 2007 | 5109 | 37 | 1398 | 611 | .75 | .59 |
| 2008 | 4497 | 40 | 1405 | 614 | .78 | .55 |

## APPENDIX B:  SUMMARY TEST STATISTICS ON JULY EXAMINATIONS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|-----|------|------|------|------|------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1990 | 6963 | 58 | 1451 | 684 | .76 | .67 |
| 1991 | 7219 | 55 | 1454 | 674 | .75 | .67 |
| 1992 | 7108 | 60 | 1464 | 674 | .71 | .64 |
| 1993 | 7018 | 59 | 1465 | 671 | .77 | .68 |
| 1994 | 7027 | 64 | 1482 | 672 | .76 | .70 |
| 1995 | 7109 | 60 | 1471 | 660 | .75 | .68 |
| 1996 | 7445 | 56 | 1458 | 667 | .76 | .70 |
| 1997 | 7678 | 62 | 1478 | 655 | .75 | .68 |
| 1998 | 7548 | 53 | 1446 | 656 | .74 | .65 |
| 1999 | 7684 | 51 | 1449 | 644 | .75 | .66 |
| 2000 | 7603 | 56 | 1460 | 645 | .74 | .62 |
| 2001 | 7585 | 57 | 1468 | 637 | .77 | .64 |
| 2002 | 7477 | 51 | 1445 | 632 | .72 | .64 |
| 2003 | 7732 | 50 | 1443 | 634 | .73 | .67 |
| 2004 | 8020 | 49 | 1434 | 621 | .75 | .67 |
| 2005 | 8310 | 49 | 1437 | 630 | .79 | .68 |
| 2006 | 8858 | 52 | 1452 | 630 | .80 | .65 |
| 2007 | 8115 | 56 | 1459 | 630 | .79 | .67 |

AN ANALYSIS OF POSSIBLE VARIATIONS IN PASS/FAIL STANDARDS
ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
January 15, 1981

PURPOSE

This study was conducted to investigate whether there has been any
variation over time in the standard used for determining whether an
applicant has passed California's bar examination.  The impetus for this
study came from the relatively low pass rate on both the February and
July examinations given in 1980.

MEASURES

California's bar examination has two sections, Multistate Bar Examination
and Essay.

The Multistate Bar Examination (MBE) consists of 200 multiple choice
questions drawn from six content areas.  About 150 of these questions
are unique to each administration; i.e., they have not been used
previously.  The remaining 50 questions, called linkage items, are a
representative sample of questions that have been used previously.  The
purpose of the linkage items is to adjust the scores on the MBE to take
into account the relative difficulty of the 150 unique items.  For
example, if on different administrations the average score on the
linkage items remains at 33, but the average score on the 150 unique
items is 107 on one administration and 104 on a subsequent administra-
tion, then it can be inferred that the 150 questions used on the second
occasion were, as a set, slightly more difficult than the unique
questions used in the previous administration of the MBE.  In other
words, since the average score was the same for different groups of
applicants on the common set of questions but the average score was not
the same on their respective sets of unique items, it is assummed that
the two unique sets must have differed in difficulty.  The total scores
of the applicants who took the second set of unique questions are,
therefore, adjusted upwards by three points so as to compensate for
their having taken a slighlty more difficult version of the MBE.  Thus,
as a consequence of this adjustment process, an MBE score obtained on
one administration can be compared directly with an MBE score obtained
on another administration.

The answer to a given question on the Essay portion of the examination
is graded by one or more members of a team of specially trained and
calibrated attorneys; i.e., there is a different team of readers for
each question.  Scores are assigned to answers in five point intervals
on a theoretical scale of 0 to 100; however, most of the scores usually
fall between 55 and 90.

Between February, 1976 and July, 1980, there has been a reduction (from 12 to 9) in the number of essay questions applicants were instructed to answer. During this same period, the average time that was allocated to answer each question was increased from 52.5 to 60 minutes; and, the rules were changed to no longer allow applicants some choice in which questions they answered.

An applicant's Total score on the examination is a weighted composite of the MBE and Essay scores. The current policy is to assign 40 percent of the theoretical maximum number of points an applicant can earn on the examination to the MBE and the remaining 60 percent to the Essay. For example, an applicant can currently earn a maximum score of 1500 points (9 essay questions at 100 points each plus three times the applicant's adjusted score on the MBE). When the Essay portion contained 12 questions and given 70 percent of the weight, then the MBE scores were multiplied by 2.57 to yield a theoretical maximum of 1714 points; i.e., $(12)(100) + (2.57)(200) = 1714$.

The nominal weights of 70:30 or 60:40 of Essay to MBE do not necessarily reflect their actual effective weights. The reason for this is that the relative influence of a section score on a total score is a function of the relative standard deviations of the two scores. It is not a function of the number of points assigned to each section or even the average score on each section. For example, previous research on California's examination has indicated that when the nominal weights of 70:30 were in force, the actual weights were closer to 65:35.

An applicant can pass the examination in either or both of two ways: (1) earning 70 percent or more of the theoretical total score or (2) earning 70 percent or more on each section (i.e., as a result of taking the examination more than once).

A screening procedure (involving an applicant's score on the MBE and the scores on a subset of essay questions) was implemented in 1978 to estimate whether the applicant was likely to pass by the first method if the remainder of that applicant's essay answers were read. Applicants with extremely high probabilities of passing (i.e., greater than 99.5) were passed by this screening process without any further evaluation of their answers. The remaining applicants had all of their essay answers read at least once. Applicants who came close to the pass/fail line after a single reading of all of their essay answers had their essay answers graded again by a different set of readers. If the average of these two readings plus the applicant's MBE score resulted in the applicant falling just below the pass/fail line, then the applicant was placed in the reappraisal category.

All the essay answers written by an applicant in the reappraisal category were evaluated as a set by one or more members of the Board of Reappraisors. The individuals who serve on this board are attorneys with several years of experience in grading California essay answers. Although the reappraisal process also has varied somewhat over time, it has always involved reviewing an applicant's essay answers to determine whether enough extra points can be found to pass the applicant. Thus, reappraisors are aware of how many points an applicant needs to pass. Previous research has indicated that with few exceptions, the reappraisal process results in passing applicants who fell just below the pass/fail line and failing applicants who fell well below it.

As a result of previous research, data were readily available on nine of
the ten bar examinations given between February, 1976 and July, 1980.
Data on the February, 1978 administration had not been used in these
studies.  Moreover, the time and cost required to obtain the February,
1978 data did not seem warrented given the overall purpose of the
present research.  Thus, only MBE scores, obtained from the National
Conference of Bar Examiners, will be reported for the February, 1978
administration.

With the exception of the February, 1978 test, the sample used in the
analysis of each examination consisted of those applicants who took both
the MBE and Essay portions.  Attorney applicants and others who took
only one section (i.e., as a result of passing one section on a previous
administration, illness, etc.) were excluded from the applicant pool.
Thus, the results presented in this report may not conform exactly with
previously published statistics on each examination.


ANALYSIS PLAN

Differences or similiarities in the percent passing different
administrations of an examination do not in themselves indicate whether
a consistent pass/fail standard has been used over time.  This is
because the average level of legal skills and knowledge of the
applicants taking one examination can differ from the average level of
those taking another examination.  For example, there is a larger
proportion of repeaters (i.e., applicants who failed one or both
sections previously) in February than in July.  The February applicants
also tend to have lower law school grades and admissions scores.  Thus,
one would not expect the passing rate in February to be as high as it is
in July.

Moreover, setting a passing score of "70 Percent of the Theoretical
Maximum Score" may not result in a consistent standard because the
difficulty of the Essay portion of the examination (and the leniency
with which it is graded) may vary across administrations.  There also
can be variation across administrations in the "nominal" and "effective"
weighting of the Essay section relative to the MBE.

The foregoing considerations led to the development of a bar
examination score that would not be affected by possible variations
across administrations in the the difficulty of the MBE and Essay
portions.  The procedure for deriving this score was as follows:

   1) The average score on an essay question was computed for each
      applicant so as to adjust for the variation both across and
      within examinations in the number of questions answered and
      graded.

   2) California MBE scores were divided by either 2.57 or 3.00
      (depending upon the particular administration of the
      examination) so as to put them back into scale score form.  It
      will be recalled that the MBE scores in this form had already
      been adjusted, through linkage items, for possible differences
      in test difficulty across administrations.

3) The applicants' average essay question scores on a given administration of the examination were transformed to the same mean and standard deviation as their MBE scores. Because of the strong correlation between MBE and essay scores, this transformation resulted in adjusting the essay scores for possible differences across administrations in the difficulty of the questions asked and/or in the leniency with which the answers to these questions were graded.

4) A Scale score was computed for each applicant that reflected the current policy of weighting the Essay and MBE portions 60:40, respectively. The formula for computing this score was:

Scale score = (.60)(Transformed Average Essay Score) + (.40)(MBE)

If the same level of performance is required for passing across administrations, then the Scale score corresponding to the pass/fail line on one administration should be the same as the Scale score needed for passing on every other administration. For example, if 38 percent of the applicants pass on one occasion and 60 percent on another, then the Scale score above which there were 38 percent on the first occasion should be identical to the Scale score above which there were 60 percent on the second occasion. If less than 60 percent of the applicants who took the second administration had Scale scores above the one that was needed to pass 38 percent on the first administration, then it is apparent that the level of performance required for passing the second administration was higher than the level needed for passing the first administration.

In summary, similiarities or differences in passing rates across administrations do not necessarily reflect consistent or inconsistent pass/fail standards because of possible variations in the legal skills and knowledge of the applicants taking those examinations. Similarly, setting a certain score as the pass/fail line, such as 70 percent of the maximum possible points, also does not guarantee consistency because the examination can vary in difficulty across administrations. The foregoing considerations led to the computation of a Scale score for each applicant that reflected that applicant's performance level in a way that was independent of the difficulty of the particular version of the examination on which the score was earned.

The major value of the Scale score is that it permits measuring the degree to which California has been using a consistent performance standard in determining an applicant's pass/fail status. This is done by assessing whether the Scale score that was apparently needed for passing on one administration has been essentially the same as that needed for passing on another administration. If these Scale scores are the same, then: (1) a consistent standard has been used and (2) any differences in passing rates between administrations can be attributable to general differences in the legal skills and knowledge of the applicants taking these examinations.

RESULTS

Tables 1 and 2 contain summary statistical data on the February and July examinations, respectively. The percent passing in these tables includes applicants who passed as a result of reappraisal; i.e., it reflects final pass/fail decisions. It does not reflect the additional (but small) percent of applicants who passed the July, 1980 examination as a result of their participation in that examination's Special Session and/or Assessment Center.

The numbers in the column headed "Passing Score" are the Scale scores that would have passed the same percent of applicants as actually did pass. For example, 38 percent of the applicants passed the February, 1976 examination. And, an inspection of the distribution of Scale scores on this examination indicated that 38 percent of the applicants had Scale scores of 141 or higher.

The data in the CA column under the heading "Average MBE" are the average MBE scores of the California applicants. The Non-CA column contains the average MBE scores of the applicants in all the other jurisdictions that gave the MBE.

Table 1

SUMMARY STATISTICS ON FEBRUARY EXAMINATIONS.

| Exam Date | Number Taking | % Pass | Passing Score | % 1st Timers | % ABA | Average MBE CA | Average MBE Non-CA | ABA First Timers % of Scale | ABA First Timers Average MBE* | ABA First Timers % Pass |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/76 | 3088 | 38 | 141 | 38 | 49 | 137 | 134 | 16 | 144 | 61 |
| 2/77 | 3399 | 44 | 141 | 35 | 43 | 139 | 134 | 14 | 146 | 72 |
| 2/78 | | | | | | 139 | 134 | | | |
| 2/79 | 4166 | 45 | 141 | 32 | 43 | 139 | 134 | 13 | 146 | 65 |
| 2/80 | 3758 | 34 | 141 | 36 | 42 | 136 | 134 | 14 | 145 | 59 |
| Mean | 3603 | 40 | 141 | 35 | 44 | 138 | 134 | 14 | 145 | 64 |

Table 2

SUMMARY STATISTICS ON JULY EXAMINATIONS.

| Exam Date | Number Taking | % Pass | Passing Score | % 1st Timers | % ABA | Average MBE CA | Average MBE Non-CA | ABA First Timers % of Scale | ABA First Timers Average MBE* | ABA First Timers % Pass |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/76 | 6709 | 60 | 143 | 77 | 64 | 145 | 142 | 54 | 152 | 80 |
| 7/77 | 7191 | 55 | 142 | 77 | 61 | 143 | 140 | 52 | 150 | 76 |
| 7/78 | 6835 | 55 | 143 | 80 | 62 | 145 | 141 | 55 | 151 | 73 |
| 7/79 | 7152 | 55 | 142 | 74 | 62 | 144 | 140 | 53 | 150 | 75 |
| 7/80 | 7379 | 49 | 142 | 69 | 62 | 141 | 140 | 50 | 148 | 73 |
| Mean | 7053 | 55 | 142 | 75 | 62 | 144 | 141 | 53 | 150 | 75 |

An inspection of the data in Tables 1 and 2 indicated the following:

o The performance standard required for passing the examination
  has remained essentially constant over the nine examinations
  studied.  It was observed, however, that the standard used in
  February (141) has been slightly lower than the one used in
  July (142).  Thus, even though more applicants pass in July,
  the February test is very slightly easier.

o The February, 1980 applicants had the lowest average MBE score
  (136) of all the tests studied.  On the only other examination
  which had a mean MBE almost as low as 136 (i.e., February,
  1976), the passing rate (61%) was just two percentage points
  higher than the February, 1980 rate (59%).  Moreover, a higher
  percentage of the February, 1976 than the February, 1980
  applicants were first time takers from ABA schools.

o The July, 1980 applicants had the lowest average MBE score
  (141) of all the July groups studied.  This average also was
  only one point higher than the national non-California average
  on this examination (140) rather than the usual three to five
  points higher.  One factor that probably contributed to
  California's low average MBE score in July, 1980 was the
  especially low percentage of applicants who were taking the
  examination for the first time.

o The unusually low average MBE score among all July, 1980
  examinees also was present in the subset of applicants from ABA
  schools who were taking the examination for the first time.
  The reason that the ABA first timers in July, 1978 and 1980 had
  the same passing rate (despite their different average MBE
  scores) is that the standard for passing in July, 1978 was
  slightly higher (143) than it was in July, 1980 (142).


SUMMARY AND CONCLUSIONS

A Scale score was computed for each applicant.  This score adjusted
for differences across administrations in the difficulty of the
questions asked, the leniency with which essay answers were graded,
the number of essay questions answered and graded, and the weight
attached to the MBE and Essay sections in arriving at a total
score.

A comparison of the distribution of Scale scores to the percent
passing was made for nine of the ten bar examinations administered
between February, 1976 and July, 1980.  The results of this
analysis indicated that the level of performance required for
passing the California bar examination has remained essentially
constant over the last five years.  It was observed, however, that
the Scale score needed for passing was slightly higher in July
(142) than it was in February (141).  It was further observed that
the average MBE scores of the 1980 applicants were lower than
usual.  Thus, this difference in average score, rather than any
changes in California's standards for passing, was the apparent
source of the relatively low passing rate among February and July,
1980 applicants.

Appendix B

HOW THE MBE IS SCALED ACROSS ADMINISTRATIONS
OF THE EXAMINATION

Each form of the MBE contains two groups of items.  One set is new items; i.e., they have not appeared on previous forms of the test. Usually about 150 of the 200 items on each form fall in this group. The remaining set of about 50 items are called "scaling" or "linkage" items.  These items have appeared on one or more previous forms of the test.

. The hypothetical data in the table below will be used to illustrate how the applicants' performance on these two groups of items are used to scale the MBE scores across administrations.

HYPOTHETICAL AVERAGE SCORES

| Examination Date | Linkage Items | Unique Items | Raw Score | Scale Score |
|---|---|---|---|---|
| July 1980 | 35 | 105 | 140 | 140 |
| July 1981 | 35 | 100 | 135 | 140 |
| February 1982 | 30 | 115 | 145 | 120 |
| Number of Items | 50 | 150 | 200 | 200 |

A linkage item is a question that is used across administrations of the examination whereas a unique item is used on only one administration of the examination.

An inspection of these data indicates that the applicants who took the July 1980 examination had the same average score on the linkage items as did the applicants who took the examination in July 1981. It may be inferred, therefore, that the two groups of applicants were generally comparable with respect to the skills and knowledge that are measured by the MBE. In other words, since they had the same average score (35) on the same set of 50 items, we assume the two groups were equal in ability.

Although the 1980 and 1981 applicants performed at the same level on the linkage items, the former group had a higher average score (105) than the latter group (100) on their respective sets of unique items. The source of this five-point discrepancy must therefore be that the 1981 unique items were more difficult than were the 1980 items since we know from the linkage items that the two groups were equal in ability. Thus, in order to make the 1981 scores comparable to the 1980 scores, all the applicants who took the 1981 examination would have five points added to their total score. In other words, the total raw scores in 1981 are adjusted or "scaled" upwards to reflect the fact the unique questions asked in 1981 were slightly more difficult than those asked in 1980.

The performance on the linkage items of the applicants who took the examination in February 1982 is below that of the applicants who took the examination in July of 1980 or 1981. It may be inferred, therefore, that the applicants who took the examination in February of 1982 were less able (in terms of the skills and knowledge measured by the MBE) than were the other two groups of applicants even though the

1982 group had the highest average score on its set of unique items (115) and on the total test (145). It is evident, therefore, that the unique questions asked in 1982 must have been substantially easier than those asked in 1980. To make the scores on the 1980 and 1982 versions of the test comparable, one must scale each 1982 raw score downwards by 25 points. In other words, if the difference between the two groups on the common set of 50 linkage questions was 5 points, and if the entire 200 item examination had been equally difficult across administrations, then there should have been a 20 point difference between the groups in their respective total scores. This difference is obtained by the scaling process.

The foregoing is presented solely to illustrate how linkage items can be used to equate two different forms of a test. The actual scaling procedures are somewhat more complicated, because they consider how the groups spread out on the linkage items (not just their respective averages) as well as the correlation between the linkage and unique items in each group. Moreover, good test construction practices generally produce forms that are already almost equivalent in difficulty; i.e., the amount of the adjustment required is usually far less than that indicated in this hypothetical example.

The foregoing discussion also points to the extreme importance of maintaining test security. In other words, the scaling process assumes that applicants who take a future examination have no advantage on the linkage items relative to the groups who took these items previously. If the linkage items' security is breached (such that they become available to a significant proportion of new applicants), then they cannot be used for scaling purposes.

SCALING METHODS

## I. Standard Deviation Method

### A. Steps

1. Compute the mean and standard deviation of the MBE Scale scores and the Raw Essay scores. The following notation may be used:

|  | Score on the test | Mean Score | Standard Deviation | Standard Score |
|---|---|---|---|---|
| MBE | mbe | Mmbe | SDmbe | Zmbe |
| Essay | e | Me | SDe | Ze |

2. Convert each applicant's raw essay score to a standard score using the following formula:

$$Ze = \frac{e - Me}{SDe}$$

3. Insert the standard score (Ze) into the following formula to obtain an applicant's Essay Scale score:

Essay Scale Score = (Ze)(SDmbe) + Mmbe

4. Check the results. The mean and standard deviation of the Ze scores should equal 0.00 and 1.00, respectively. The mean and standard deviation of the Essay Scale scores should equal the mean and standard deviation of the MBE Scale scores, respectively.

### B. Numerical Example

1. Given the following data:

|  | Mean | Standard Deviation |
|---|---|---|
| MBE Scale | 133.06 | 16.40 |
| Raw Essay | 155.69 | 17.78 |

2. An applicant with a Raw Essay score of 150 would have a standard score of:

$$Ze = \frac{150 - 155.69}{17.78} = -.32$$

3. An applicant with a Raw Essay score of 150 would have an Essay Scale score of:

Essay Scale Score = (ze)(SDmbe) + Mmbe = (-.32)(16.4) + 133.06 = 12?

II. Equipercentile Method

A. Construct the cumulative frequency distribution of the Raw Essay Scores. This will be a table in which one column will list (from lowest to highest) all of the different essay scores that were assigned. The second column indicates the percent of all applicants who achieved each score or lower.

| Possible Raw Essay Scores | Cumulative Percent |
|---|---|
| 79 | 0.2 |
| 93 | 0.5 |
| 101 | 0.7 |
| 102 | 1.0 |
| 103 | 1.2 |
| 110 | 1.4 |
| 111 | 1.7 |
| 113 | 1.9 |
| 115 | 2.1 |
| 116 | 2.6 |
| ⋮ | ⋮ |
| ⋮ | ⋮ |
| 192 | 100.0 |

Note: The lowest and highest Essay scores on this examination were 79 and 192, respectively.

The cumulative percents do not move in equal units because there are different numbers of applicants earning each score.

B. Construct the cumulative frequency distribution of the MBE Scale Scores.

| Possible MBE Scale Scores | Cumulative Percent |
|---|---|
| 85 | 0.2 |
| 91 | 0.5 |
| 93 | 0.7 |
| 94 | 1.0 |
| 95 | 1.2 |
| 98 | 1.7 |
| 99 | 2.4 |
| 100 | 2.6 |
| 101 | 3.6 |
| ⋮ | ⋮ |
| ⋮ | ⋮ |
| 176 | 100.0 |

C. Merge the two distributions into one table of three columns so that for a given cumulative percentile value in the Raw Essay table, one can find the corresponding value in the MBE Scale score table.

| Possible Raw Essay Scores | Cumulative Percent | Corresponding MBE Scale Score |
|---|---|---|
| 79 | 0.2 | 85 |
| 93 | 0.5 | 91 |
| 101 | 0.7 | 93 |
| 102 | 1.0 | 94 |
| 103 | 1.2 | 95 |
| 110 | 1.4 | 96.2 |
| 111 | 1.7 | 98 |
| 113 | 1.9 | 98.3 |
| 115 | 2.1 | 98.6 |
| 116 | 2.6 | 100 |

Note that to find the corresponding MBE Scale score for a given Raw Essay score may require the mathematical procedure called interpolation. For example, the MBE Scale score below which there are only 2.1 percent of the applicants (i.e., MBE Scale score corresponding to a Raw Essay score of 115) is obtained as follows:

$$\left\{ \frac{2.1 - 1.7}{2.4 - 1.7} \right\} \quad (99 - 98) + 98 = 98.57$$

Similarly, MBE equivalent of a Raw Essay score of 110 is given by the following computations:

$$\left\{ \frac{1.4 - 1.2}{1.7 - 1.2} \right\} \quad (98 - 95) + 95 = 96.2$$

D. To find an applicant's Essay Scale score using this method, read down the column of Raw Essay scores until you come to the applicant's Raw Essay score. Read across this row to the column headed "Corresponding MBE Scale Score." The value in this column will be the Essay Scale score for that applicant.

III. Comparison of the Two Methods

A. In general, the two methods will yield fairly similar results (especially for the bulk of the applicants) provided that both score distributions are similar in shape.

B. The equipercentile method is usually preferred when the shapes of the two distributions are not similar. However, the standard deviation method tends to give a "better" estimate for extremely high and low Raw Essay scores. Because of the generally strong correlation between the Essay and MBE and because only a pass/fail decision is needed at a point some distance away from the extremely low score end, the equipercentile method is probably the best approach for most jurisdictions.

C. The table below compares the two scaling methods for a Southeastern state with slightly more than 400 applicants:

| Raw Essay Score | Cumulative Percent | Corresponding Essay Scale Scores | |
|---|---|---|---|
| | | Equipercentile | Standard Deviation |
| 110 | 1.4 | 96.2 | 90.9 |
| 120 | 3.2 | 100.6 | 100.2 |
| 130 | 8.1 | 109.3 | 109.4 |
| 140 | 18.6 | 117.9 | 118.6 |
| 150 | 35.8 | 127.2 | 127.8 |
| 160 | 57.3 | 134.9 | 137.0 |
| 170 | 78.0 | 145.8 | 146.3 |
| 180 | 94.5 | 160.5 | 155.5 |
| 190 | 99.8 | 175.0 | 164.7 |

PR-88-4

ANALYSIS OF THE FEBRUARY 1988 EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

GANSK & ASSOCIATES

August 8, 1988

SUMMARY

The February 1988 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written Examination composed of six essay questions and two Performance Test (PT) problems. There were 4,530 applicants who completed both sections, 70 percent of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the exam to the next. Essay and PT answers were graded on a 40 to 100 point scale. Scores on this scale were assigned in 5-point intervals. Each PT score was then multiplied by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE. This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded. An applicant's total score was computed using the formula below:

$$Total\ Scale\ Score = (.35)(MBE\ Scale) + (.65)(Essay\ Scale)$$

A three phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants were: failed if their Total score was less than 1391, passed if their Total was greater than 1465, and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time. At the end of this phase, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal if their scores were in the 1412 - 1439 range. Applicants also were placed in reappraisal if their Total score after either the first or second reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant came to the pass/fail line of 1440.

The major findings with the 4,530 applicants who had all of their answers read at least once and the group of 1,170 applicants who had them read at least twice were as follows:

- ii -

o After the first reading of all answers, 39 percent of the
  applicants failed and 35 percent passed.  The total percent
  passing after the second reading and the reappraisal process
  were 43 and 46, respectively.

o California applicants scored higher than the national average
  on all of the six MBE subjects.  And, the mean California MBE
  scale score was higher on the February 1988 exam than on all
  of the 12 previous February California exams.

o The degree of agreement between readers in their evaluations of
  the <u>relative</u> quality of the written answers was higher on an
  essay question than it was on a PT problem.  Moreover, because
  reader assigned PT scores were multiplied by 2, differences in
  final scores between the first and second reading on a given
  answer were much larger on a PT than on an essay answer.

o The reliability of the Written score (.70) was comparable to
  the reliabilities of written scores on previous February exams,
  and the correlation between MBE and Written scores (.58) also
  was about the same as it was on these previous tests.

o The reliability of the Total score was comparable to that of
  previous February exams.

o In general, an applicant's total score after the first
  reading was highly related to both that applicant's total
  score after two readings and final pass/fail status.

o The phased grading cutoff scores led to rereading and
  reappraising the answers of just the applicants who were
  likely to benefit from these additional reviews.

o Males tended to earn higher scale scores on the MBE than on
  the Written section.  The reverse was true for females.

o Anglos and blacks tended to earn slightly higher MBE than
  Written scores.  The reverse was true for Hispanic and
  Asian applicants.

ANALYSIS OF THE FEBRUARY 1988 EXAM

TEST SECTIONS

The February 1988 exam had two sections: the Multistate Bar Examination
(MBE), a 200-item multiple choice test; and a Written section composed
of six essay questions and two Performance Test (PT) problems. The exam
was administered over three consecutive days, with two 3-hour sessions
per day. Day 1 consisted of essay questions 1 - 3 and PT problem A.
Day 2 was devoted to the MBE. Day 3 consisted of essay questions 4 - 6
and PT problem B.

SCORING RULES

MBE raw scores (the number of MBE questions answered correctly) were
converted by the American College Testing Program (ACT) to equated
("scaled") scores using the formula below. This procedure adjusts the
raw scores for possible differences in average question difficulty from
one administration of the MBE to the next.

$$\text{MBE Scale} = (9.3456)(\text{MBE Raw}) + 231.8859$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point
scale. The same procedure was used to grade each PT answer. PT scores
were then multiplied by 2 so that the maximum possible Written raw score
was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200
points each).

Written raw scores were converted to a score distribution that had the
same mean and standard deviation as the applicants' MBE scores. This
scaling was done using the MBE and Written scores of the random sample
of 1,000 applicants who had their Written answers graded first. The
formula used to convert written raw scores to scale scores was:

$$\text{Written Scale Score} = 3.2609 \ (\text{Written Raw Score}) - 770.1895$$

An applicant's Total scale score was a weighted combination of that
applicant's MBE and Written scale scores. The formula for computing
Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's
pass/fail status. In Phase 1, applicants were: failed if their Total
score was less than 1391, passed if their Total was greater than 1465,
and placed in reread if their Total was in the 1391 to 1465 range.

- 2 -

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time.  The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader.

The scores assigned on the first and second readings were averaged and new Total scale scores were computed using the formulas above.  At the end of Phase 2, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal (Phase 3) if their scores were in the 1412 - 1439 range.  Applicants also were placed in reappraisal if their Total score after either the first or second reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision.  Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.


SAMPLE

The analyses of the February 1988 exam were conducted with the 4,530 applicants who had an MBE and a Written score.  This sample contained 3,163 repeaters and 1,367 applicants who were taking the exam for the first time.  The percentage of applicants from ABA approved, California Accredited, and Nonaccredited schools were 46, 27, and 5, respectively.


MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows that California applicants scored higher than the national average on all six MBE subtests.  California's average total raw score (the average number of questions answered correctly) was 5 points higher than the national average.  This converted to the highest mean February MBE scale score in California in the last 13 years (see Appendix A).


WRITTEN SECTION

Table 2 presents the means and standard deviations on each question after all readings of all answers.  The last column of this table shows the correlation between the scores on a question and the sum of the scores on the other seven questions.  The consistent size of these correlations suggests that no question stood out as measuring something quite different than the other questions.

- 3 -

## Table 1

### NATIONAL AND CALIFORNIA AVERAGE MBE SCORES AND THE DIFFERENCE BETWEEN THESE AVERAGE SCORES

| Test Score | Number of Items | National Mean | CA Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 30 | 20.85 | 21.74 | 0.89 |
| Contracts | 40 | 22.89 | 23.86 | 0.97 |
| Criminal Law | 30 | 18.55 | 19.41 | 0.86 |
| Evidence | 30 | 16.04 | 16.33 | 0.29 |
| Real Property | 30 | 16.40 | 17.04 | 0.64 |
| Torts | 40 | 27.30 | 28.68 | 1.38 |
| Total Raw Score | 200 | 122.02 | 127.06 | 5.04 |
| NCBE/ACT Scale | 200 | 137.22 | 141.93 | 4.71 |

## Table 2

### SUMMARY STATISTICAL DATA AFTER ALL READINGS OF THE ESSAY AND PT ANSWERS (N = 4530)

| Question Number | Subject Matter Area | Mean Score | Standard Deviation | Corrected Part-Whole Correlation |
|---|---|---|---|---|
| 1 | Civil Procedure | 67.25 | 7.70 | .46 |
| 2 | Real Property/Evidence | 68.76 | 7.67 | .43 |
| 3 | Community Property | 64.58 | 8.42 | .39 |
| 4 | Torts/Contracts | 68.37 | 7.38 | .37 |
| 5 | Constitutional Law | 65.57 | 7.99 | .48 |
| 6 | Corporations | 66.32 | 7.57 | .40 |
| PT-A | Contracts/Remedies | 133.49 | 12.82 | .42 |
| PT-B | Civil Procedure/ Evidence/Remedies | 134.57 | 13.93 | .37 |

- 4 -

## READER AGREEMENT

Applicants who came close to the examination's pass/fail line after one
reading of their answers had all of their answers read again by readers
who had not graded them previously. Readers were "paired" on an answer
to offset possible differences in leniency among them. For instance, if
the first reader tended to give relatively low grades (on a substantial
number of first read answers), then the second reader was picked from
among those who had the opposite tendency. This pairing practice tends
to increase observed differences between readers.

Table 3 contrasts the applicants' scores on the first reading with their
scores on the second reading. As on past exams, the score assigned to
an answer on the first reading tended to be slightly higher than the
score assigned to that answer on the second reading.

The last column of Table 3 shows the correlation between the scores on
the first and second readings. This coefficient reflects the degree to
which the relative standings of the applicants on the first reading were
consistent with their standings on the second reading. The higher the
coefficient (up to a maximum of 1.00), the stronger the relationship.

The correlations in Table 3 show there was usually less agreement among
readers on PT answers than on essay answers. There was only a .34
correlation between the total written raw score on the first and second
readings. Although correlations in the reread sample underestimate the
true degree of agreement among readers (because of the relatively narrow
range of ability of the applicants in this sample), the observed overall
agreement level was lower than on previous February exams.

Table 4 shows each question's distribution of absolute difference scores
and average absolute difference scores. The absolute difference is the
difference in score assigned to an answer by the two readers who graded
it, regardless of the algebraic sign of that difference (e.g., if an
answer received scores of 65 and 70 from different readers, then the
absolute difference was 5, regardless of which reader graded it first).

Two readers usually differed by about 4 to 5 points in the score they
assigned to an essay or PT answer. The largest absolute difference was
30 points. This occurred once (on essay question 5). Final absolute
differences were about twice as high on PT answers as they were on essay
answers because the reader assigned PT scores were multiplied by 2.

## RELATIONSHIPS AMONG SECTIONS

Table 5 presents summary statistical data on each section after all
readings. The internal consistency of the total score, 0.814, was based
on a formula developed by Gullickson for a weighted composite.

- 5 -

Table 3

AVERAGE ESSAY AND PT SCORES ON THE FIRST AND SECOND READINGS,
THE DIFFERENCE BETWEEN THESE AVERAGES, AND THE CORRELATION
BETWEEN SCORES ON THE FIRST AND SECOND READING (N = 1170)

| Question Number | Mean on First Reading | Mean on Second Reading | Difference in Means | Correlation Between Readings |
|---|---|---|---|---|
| 1 | 67.7 | 67.0 | 0.7 | .63 |
| 2 | 69.6 | 69.1 | 0.5 | .72 |
| 3 | 64.8 | 64.8 | 0.0 | .73 |
| 4 | 68.6 | 68.1 | 0.5 | .56 |
| 5 | 66.3 | 65.8 | 0.5 | .43 |
| 6 | 66.6 | 67.1 | -0.5 | .47 |
| PT-A | 134.2 | 133.4 | 1.3 | .38 |
| PT-B | 134.6 | 133.9 | 1.0 | .43 |
| Total | 672.3 | 669.2 | 3.1 | .34 |

Table 4

CUMULATIVE PERCENTAGE OF ANSWERS WITH DIFFERENT SIZED
ABSOLUTE DIFFERENCE SCORES (N = 1170)

| Mean Size of Absolute Difference | Essay Questions | | | | | | PT | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | A | B |
| 0 | 40 | 46 | 45 | 39 | 30 | 30 | 34 | 38 |
| 5 | 86 | 90 | 86 | 80 | 72 | 75 | | |
| 10 | 98 | 99 | 97 | 95 | 92 | 92 | 80 | 80 |
| 15 | 99 | 100 | 100 | 99 | 98 | 98 | | |
| 20 | 100 | * | * | 100 | 100 | 100 | 96 | 95 |
| 25 | | | * | * | * | * | | |
| 30 | | | | | * | | 100 | 99 |
| >30 | | | | | | | * | 100 |
| Average Difference | 3.9 | 3.3 | 3.6 | 4.4 | 5.4 | 5.3 | 9.1 | 8.9 |

* More than 0 but less than 0.5% of the applicants.
Differences are for essay answers on a 100-point
scale and PT answers on a 200-point scale.

- 6 -

Table 6 contains the correlations among sections and the LSAT.  These
correlations are biased downwards by the less than perfect reliability
of the measures; e.g., if all the measures were perfectly reliable, then
the correlation between MBE and Written scores would be .75.  MBE and
Written scores correlated about as highly with each other (.58) on the
February 1988 exam as they did on previous February exams.  About 69
percent of the applicants had the same pass/fail status on the MBE as
they had on the Written section (where a scale score of 1440 on a
section was considered passing).


SUBGROUP ANALYSES

Table 7 shows that on the average, women scored 25 points higher on the
Written section than on the MBE whereas there was a 28 point average
differential in the opposite direction for male applicants.  Anglos and
Blacks scored higher on the MBE than on the Written section whereas the
reverse was true for Asian and Hispanic applicants.  The true size of the
difference between sections for Black applicants is hidden somewhat by
the relatively smaller percentage of males in this group.


PHASED GRADING

As noted previously, a three-phased grading process was used to focus
reader time on the applicants who came close to the pass/fail line.
Table 8 presents the number and percentage of applicants in each of the
exam's six pass/fail categories.  These data indicate that 2,076 (45.8
percent) passed.

Table 9 shows the number of Phase 2 applicants who passed and failed
after all readings relative to their Phase 1 scores.  This table
illustrates the strong, but far from perfect relationship between Phase
1 scores and final pass/fail status.  These data also indicate that the
width of the Phase 2 reread band (1391 - 1465) was about right in that
almost all applicants with high scores on the first reading passed and
almost all with low initial scores failed.  For instance, only 4 of the
72 applicants with first read scores below 1395 passed the exam.

Similarly, Table 10 shows that the higher an applicant's score at the
end of Phase 2, the greater the likelihood that applicant passed as a
result of reappraisal.  The lower limit of the reappraisal band (1412)
also appears to be appropriate in that none of the 46 applicants with
Phase 2 Total scores below 1415 passed as a result of reappriasal.

- 7 -

Table 5

SUMMARY STATISTICAL DATA AFTER ALL READINGS (N = 4530)

| Test Statistic | MBE Scale | Written Raw Score | Total Scale |
|---|---|---|---|
| Average Score | 1419.3 | 668.9 | 1414.0 |
| Standard Deviation | 146.8 | 43.4 | 128.6 |
| Internal Consistency | .860 | .703 | .814 |

* Computed by ACT using national data.

Table 6

CORRELATIONS AMONG SECTIONS AND LSAT
AFTER ALL READINGS (N = 4530)

| | LSAT* | MBE | Written |
|---|---|---|---|
| MBE | .47 | | |
| Written | .40 | .58 | |
| Total | .48 | .81 | .95 |

*LSAT (Law School Admissions Test) scores
were available for 3685 applicants.

- 8 -

Table 7

MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND SEX GROUPS AND THE
NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Sex | |
|------|-------|-------|-------|----------|--------|------|
| | Anglo | Asian | Black | Hispanic | Female | Male |
| MBE | 1437 | 1378 | 1351 | 1371 | 1404 | 1428 |
| Written | 1427 | 1379 | 1342 | 1374 | 1429 | 1400 |
| Total | 1431 | 1379 | 1346 | 1372 | 1420 | 1410 |
| Number of Applicants | 3375 | 322 | 398 | 359 | 1707 | 2809 |
| % Male | 63 | 66 | 51 | 61 | 0 | 100 |

* There were 62 applicants who did not fall in the four
  largest racial/ethnic groups and 14 applicants who did
  not provide data about their racial/ethnic or sex group.

Table 8

NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED
IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Pass/Fail Category | Number | Percent |
|--------------------|--------|---------|
| Fail - Phase 1 | 1776 | 39.2 |
| Fail - Phase 2 | 379 | 8.4 |
| Fail - Phase 3 | 299 | 6.6 |
| Total Fail | 2454 | 54.2 |
| Pass - Phase 1 | 1584 | 35.0 |
| Pass - Phase 2 | 365 | 8.1 |
| Pass - Phase 3 | 127 | 2.8 |
| Total Pass | 2076 | 45.8 |
| Phase 1 = 1st reading | 3360 | 74.2 |
| Phase 2 = Reread | 744 | 16.4 |
| Phase 3 = Reappraisal | 426 | 9.4 |

- 9 -

Table 9

NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE
TO THEIR TOTAL SCORES AFTER THE FIRST READING (N = 1170)

| Score After | Number of Applicants | | | Percent |
|-------------|------|------|-------|---------|
| 1st Reading | Fail | Pass | Total | Passing |
| 1450 - 1465 | 49  | 195 | 244  | 80 |
| 1435 - 1449 | 83  | 134 | 217  | 62 |
| 1420 - 1434 | 136 | 99  | 235  | 42 |
| 1405 - 1419 | 194 | 47  | 241  | 20 |
| 1390 - 1404 | 216 | 17  | 233  | 7  |
| Total       | 678 | 692 | 1170 | 42 |

Table 10

NUMBER OF REAPPRAISED APPLICANTS WHO PASSED AND FAILED
RELATIVE TO THEIR TOTAL SCORES AFTER REREAD (N = 586)

| Total Score | Number of Applicants | | | Percent |
|-------------|------|------|-------|---------|
| After Reread | Fail | Pass | Total | Passing |
| 1435 - 1439 | 13 | 52  | 65  | 80 |
| 1430 - 1434 | 35 | 38  | 73  | 52 |
| 1425 - 1429 | 51 | 21  | 72  | 29 |
| 1420 - 1424 | 60 | 10  | 70  | 14 |
| 1415 - 1419 | 74 | 6   | 80  | 8  |
| <1415       | 46 | 0   | 46  | 0  |
| Total       | 279 | 127 | 406 | 31 |

- 10 -

Appendix A: HISTORICAL EXAM RESULTS

| | FEBRUARY | | | JULY | | |
|---|---|---|---|---|---|---|
| Year | Mean MBE | Number of Applicants | Percent Passing | Mean MBE | Number of Applicants | Percent Passing |
| 1976 | 1367 | 3088 | 38 | 1453 | 6709 | 60 |
| 1977 | 1387 | 3399 | 44 | 1430 | 7191 | 55 |
| 1978 | ** | ** | ** | 1447 | 6835 | 55 |
| 1979 | 1390 | 4166 | 45 | 1440 | 7152 | 55 |
| 1980 | 1367 | 3758 | 34 | 1417 | 7379 | 49 |
| 1981 | 1380 | 3837 | 33 | 1420 | 7080 | 50 |
| 1982 | 1373 | 4033 | 31 | 1427 | 7038 | 49 |
| 1983 | 1360 | 4200 | 28 | 1437 | 7277 | 50 |
| 1984 | 1370 | 3899 | 30 | 1407 | 7201 | 42 |
| 1985 | 1403 | 4661 | 33 | 1417 | 7622 | 46 |
| 1986 | 1397 | 4689 | 28 | 1437 | 7780 | 45 |
| 1987 | 1406 | 4682 | 43 | 1439 | 7481 | 51 |
| 1988 | 1419 | 4530 | 46 | | | |

Data were not available for the February 1978 exam.  The
February 1987 exam was the first one on which written scores
were scaled to the MBE.

AN EVALUATION OF THE MULTISTATE BAR EXAMINATION

A Report Prepared for the

National Conference of Bar Examiners

Prepared by

Stephen P. Klein
GANSK & Associates
Los Angeles, California

August 30, 1982

PREFACE

The National Conference of Bar Examiners (NCBE) is a nonprofit organization composed of present and former members of boards of bar examiners throughout the country.  One of NCBE's main goals is to protect the public by helping to insure that persons admitted to the bar are adequately equipped from the standpoint of knowledge and ability to serve as lawyers.  In keeping with this goal, NCBE developed a 200 question multiple choice test called the Multistate Bar Examination (MBE).  The first version of this test was administered in 1972.  Since that time, the MBE has been included in the bar examinations of almost every state in the country.  Over 50,000 applicants to the bar now take the MBE each year.

Several studies have been conducted on the MBE prior to those described in this report.  These studies have shown that:

o MBE scores correlate well with scores on state developed essay and multiple choice bar examinations, with scores on the Law School Admissions Test (LSAT), and with grades in law school (Carlson and Werts, 1976; Klein, 1979).

o The MBE does not increase the difference in performance level between Anglo and minority groups that is present in their LSAT scores, law school grades, and bar examination essay scores (Klein, 1979 and 1981a).

o Lengthening the MBE's time limits improves scores only slightly and does not improve the performance of minority or generally low scoring applicants more than it improves the scores of other applicants (Klein, 1981b).

o MBE scores correlate well with scores on experimental measures of an applicant's ability to perform certain law practice related tasks, such as conducting legal research (Klein, 1981c).

The studies described in this report were undertaken to provide information about important aspects of the MBE that had not been already investigated. These studies were funded by NCBE as part of its mission to conduct research related to the bar admissions process.  To insure the independence and objectivity of these studies, NCBE required that they be carried out by a technical research team and panels of attorneys who had not drafted MBE questions or been involved in the MBE's development.

Two types of studies are presented in this report: expert panel evaluations of various important substantive characteristics of the MBE, and statistical analyses of MBE data.  The expert panels evaluated: whether the MBE's questions were material to the practice of law, whether they presented realistic case situations, whether they were allocated properly across content areas, and whether answering them correctly required appropriate degrees of legal knowledge and the ability to apply that knowledge.  The statistical studies focused on question length, the relative attractiveness of the choices, whether some of the MBE's subtests (or items) were especially difficult for minority groups, and the adequacy of the test's time limits.

SUMMARY

The Multistate Bar Examination (MBE) is administered by almost every
jurisdiction in the United States.  This 200 item multiple choice test is
generally used in conjunction with state developed essay tests to determine
whether applicants to the bar have some of the important skills and
knowledge that are considered necessary (albeit not sufficient) to practice
law.

The MBE is developed by the National Conference of Bar Examiners and is
administered under the direction of each jurisdiction's board of bar
examiners.  The Educational Testing Service prints, distributes, and scores
the test.  A new version of the test is constructed for each of its twice
yearly administrations.  About 50,000 applicants per year take the MBE.

This report describes three sets of studies that were conducted in order
to provide an independent evaluation of various important characteristics
of the MBE.  The general design for these studies was developed by a
team of technical consultants with nationally recognized expertise in the
field of testing.

In the first set of studies, a joint committee from the Section of Legal
Education of the American Bar Association, the Association of American Law
Schools, and the National Conference of Bar Examiners selected five
generalists, i.e., attorneys with expertise in several areas of the law.
None of the panelists selected by this committee had ever been involved in
drafting MBE items.  The generalists individually and jointly evaluated
several characteristics of all the items on the February 1978 version of
the MBE.  The major findings with the generalist panel were:

   o Most of the items were judged to be material to the practice of
     law.  Overall, 4 percent were rated low, 45 percent were rated
     high, and 51 percent were rated very high in materiality.

   o Most of the items were judged to be appropriate for a test of
     basic competency.  None of the items were considered to be
     clearly inappropriate for such a test, 12 percent were judged to
     have questionable appropriateness, and the remaining 88 percent
     were rated as appropriate to highly appropriate.

   o In general, the panelists were satisfied with the realism of the
     case situations presented in the items, the levels of knowledge
     required in different content areas, and the relative emphases on
     memorization and analytic skills.

   o The generalists agreed almost perfectly with the test developers
     in the relative allocation of items to the MBE's six content
     areas and they did not recommend expanding or contracting the
     number of areas assessed.

In the second set of studies, a panel of three experts was formed for each
of the MBE's six content areas, i.e., Constitutional Law, Contracts,
Criminal Law, Evidence, Real Property, and Torts.  The 18 panelists were
selected by the same committee that selected the generalists.

The members of each specialist panel individually and jointly evaluated several characteristics of the items in their area. These items were drawn from the February 1978 and July 1979 versions of the MBE. The major findings of the specialists were as follows:

o Panelists concurred with the test developers in deciding which choice should be keyed correct on almost every item even though the panelists did not have the opportunity to discuss the rationale for the scoring key with the test developers.

o In general, the panelists and the test developers were in close agreement as to the percentage of items that should be allocated to each topic within a content area.

o Most of the items were judged to be material to the practice of law. Overall, 12 percent were rated low, 18 percent were rated medium, and 70 percent were rated high in materiality. This pattern was generally consistent across content areas.

o The panelists felt that the items required about the right amount of emphasis on legal knowledge and analytic skills.

The third set of studies involved statistical analyses of examination data in order to supplement research that had already been done on the MBE. The database for these studies consisted of the responses of California examinees to the February 1978 and July 1979 versions of the MBE. The results of these studies indicated that:

o An item's correct choice was usually chosen by 65 percent of the examinees. The most attractive incorrect choice was selected by 22 percent of the examinees. The second and third most attractive incorrect choices were selected by 9 and 4 percent, respectively. While it is consistent with good testing practices for an item's distractors to differ in attractiveness, the observed differences in the relative proportions were somewhat greater than desired.

o There was no systematic relationship between the length of an item, i.e., the number words in it, and any of the following characteristics: the percentage of applicants who answered it correctly, the degree to which performance on the item was indicative of performance on the other 199 items, and the specialists' assessment of the item's materiality.

o In general, there was no systematic relationship between the number of other items with which a particular question shared a fact pattern and any of the three characteristics noted above.

o The relative differences among racial groups on one item was essentially the same as the differences among these groups on all the other items on the examination. In short, there was no evidence that certain items (or subtests) were especially easy or difficult for a particular group.

All of the foregoing findings are strongly supportive of the structure, format, and content of the MBE relative to its use as part of a state licensing examination program.

ACKNOWLEDGMENTS

The Board of Managers of the National Conference of Bar Examiners (NCBE) provided the resources and other support that were necessary for carrying out the research described in this report. NCBE also established an advisory committee that helped in planning and coordinating the research activities. This committee consisted of Douglas D. Roche (Chair), John Germany, Armando M. Menocal, III, and Joe Covington. The author was particularly appreciative of this committee's ability to provide assistance without interfering with the independence of the research or the interpretation of results.

Roger Bolus of GANSK & Associates and the University of California served as project manager. In that capacity, he helped in planning the research; arranging and conducting the panelist meetings; developing evaluation materials, directions, and rating forms; distributing these materials to panelists; tallying the results; and conducting statistical analyses of the data.

Earl Medlinsky and John Winterbottom of the Educational Testing Service were among the first to suggest that the study be done. In addition, they offered many useful suggestions for the research activities and provided data for some of the statistical analyses that were conducted. The Committee of Bar Examiners of the State Bar of California also provided some of the data used in this research.

A team of technical consultants with expertise in testing participated in designing the research and data analysis procedures. The members of this team and their institutional affiliations are described on page 2.

John Eckler of NCBE, Talbot D'Alemberte of the American Bar Association, and Millard Ruud of the Association of American Law Schools participated in the nomination and selection of the attorneys that served on the generalist and specialist panels.

Each panelist listed on page 5 and in Appendix A donated several days of his/her time to the project, including attendance at out-of-town meetings. The author also appreciated the effort and good nature they exhibited in carrying out their assigned tasks.

Everyone who participated in the project reviewed the initial version of this report. Their comments and suggestions were most helpful in identifying areas that needed revision. And, while the success of the project owes mainly to the contributions of these individuals, the author takes responsibility for any errors that still remain.

CONTENTS

PREFACE.................................................... i

SUMMARY................................................... ii

ACKNOWLEDGMENTS........................................... iv

TABLES................................................... vi

Chapter
  1. INTRODUCTION........................................ 1
     Multistate Bar Examination.......................... 1
     Purposes............................................ 2
     General Approach.................................... 2
     Selection of Panelists.............................. 3

  2. GENERALIST PANEL.................................... 4
     Overview of Activities.............................. 4
     Results............................................. 5
       Materiality....................................... 5
       Appropriateness for Testing Basic Competency...... 5
       Other Dimensions.................................. 6
       Allocation of Items to Content Areas.............. 7

  3. SPECIALIST PANELS................................... 9
     Overview of Activities.............................. 9
     Results............................................. 9
       Correctness of Scoring Key........................ 9
       Allocation of Items to Topics..................... 10
       Materiality....................................... 11
       Legal Knowledge and the Ability to Apply it....... 12
       Correlation of Rating Scales with Item Statistics. 13
       Panelist Comments................................. 13

  4. STATISTICAL ANALYSIS OF EXAMINATION DATA............ 14
     Attractiveness of Item Choices...................... 14
     Effect of Item Length............................... 15
     Effect of the Number of Items in a Fact Pattern..... 15
     Item Bias........................................... 15
     Time Limits......................................... 17

Appendix
  A. Members of the Specialist Panels................... 20
  B. Description of the MBE............................. 21
  C. Statistical Tables................................ 24

REFERENCES................................................ 26

TABLES

1. Percentage of items in each category of materiality................. 5

2. Percentage of items in each category of appropriateness for
   testing basic competency............................................ 6

3. Overall ratings of item characteristics............................ 6

4. Percentage allocation of MBE items to subtests.................... 8

5. Percentage of items on which panelists agreed with the scoring key
   before and after discussing which choices should be keyed correct... 10

6. Differences between panelists and test developers in the percentage
   of items they would allocate to a given topic...................... 10

7. Percentage of items rated medium to high in materiality............ 12

8. Percentage of items rated low in requiring legal knowledge and
   reasoning skills in order to be answered correctly.................. 12

9. Average percentage of examinees selecting each type of choice....... 14

10. Percentage of items on each subtest that were answered correctly
    by the applicants in each racial group............................. 16

11. Characteristics of items answered at the beginning, middle, and end
    of each test session of each examination given in 1981.............. 18

12. Correlation of item statistics with serial position................. 19

Chapter 1

INTRODUCTION

The purpose of a bar examination is to protect the public by requiring that
persons licensed to practice law possess the basic legal knowledge and
skills necessary for such practice.  These skills include the ability to
analyze fact situations, to apply fundamental principles of law in this
analysis, to reason logically, to organize ideas, and to present these
ideas clearly and persuasively.  While an essay test can assess these
skills, its breadth of coverage on any given administration is limited to a
few issues in each content area.  Moreover, the inherent nature of essay
tests requires a certain degree of subjective judgment in grading answers.


MULTISTATE BAR EXAMINATION

The foregoing limitations of the essay format led the National Conference
of Bar Examiners (NCBE) to develop the Multistate Bar Examination (MBE).
The MBE was designed to supplement a state's own essay test by providing a
reliable and objective measure of the ability to apply fundamental legal
principles in analyzing fact situations in several content areas.

NCBE is responsible for drafting MBE items and making policy decisions
regarding the use of this test.  The Educational Testing Service provides
editorial assistance in the drafting process; prints, distributes, and
scores the test; and conducts statistical analyses of the results.  The
MBE is administered by the states choosing to use it in accordance with
strict NCBE/ETS guidelines.

The MBE consists of 200 multiple choice questions (or "items").  Each MBE
item has four choices.  An applicant's raw score is the number of questions
answered correctly.  There is no correction for guessing.

The six areas covered by the MBE and the number of items in each area are:
Constitutional Law (30), Contracts (40), Criminal Law (30), Evidence (30),
Real Property (30), and Torts (40).  Some of the questions share a fact
pattern (case example) while other items stand by themselves.  Items are
not grouped by area within the test.

The items within each area are drafted by a team of attorneys.  Each team
consists of law professors, members of state boards of bar examiners, and
other practicing attorneys.  The items written by a team are reviewed by
state boards of bar examiners, law professors, and testing experts.  The
suggestions of these external reviewers are considered by the drafting team
and revisions in the items are made prior to their inclusion in the MBE.

A preliminary scoring of the answer sheets from several jurisdictions is
performed shortly after the test is administered.  This is done in order to
identify items that did not appear to function properly (e.g., applicants
who generally did well on the total examination did not select the choice
that was keyed correct).  The drafting teams review the items that are
flagged by this procedure.  They then determine the nature of any changes
that need to be made in the scoring key (e.g., keying two or more choices
on a given item as correct).  Usually less than five items per test have
their scoring key changed by this procedure.

A new form of the test is constructed for each administration. About 20 percent of the items in a form have appeared in a previous, but still secure, version of the MBE. These repeated items are used to adjust an applicant's raw score on the other 80 percent of the items so that the applicant's total score is not affected by possible differences in average item difficulty across administrations of the test.

The MBE is administered in two test sessions. Each session has 100 items (drawn proportionately from the six areas). Applicants are given three hours to complete each session and a break between sessions for lunch.

The first version of the MBE was administered in 1972. Since that time, it has been given twice per year, once in February and again in July. In 1981, about 54,000 applicants to the bar in 46 states and the District of Columbia took the MBE. Appendix B contains a more complete description of the MBE.

## PURPOSES

In 1979, the National Conference of Bar Examiners commissioned a study that would provide an independent and external assessment of the quality of the MBE. Specifically, the study was designed to: (1) determine whether the MBE was measuring some of the skills and knowledge that were necessary (albeit not sufficient) for the practice of law, i.e., were MBE scores a valid indicator of the degree to which examinees possessed these skills and knowledge? and (2) identify ways in which the test could be improved.

## GENERAL APPROACH

A team of nationally recognized experts in the field of testing was formed to design the study. The members of this technical consultant team are listed below:

Prof. Robert M. Guion
Bowling Green State University
Chair, Board of Scientific Affairs and
President elect, Division of Evaluation and Measurement
American Psychological Association

Dr. Stephen P. Klein
Senior Research Scientist
The Rand Corporation

Prof. Robert L. Linn
University of Illinois
President, the National Council of Measurement in Education
President, Division of Evaluation and Measurement
American Psychological Association

Prof. Jane R. Mercer
University of California, Riverside

Dr. Esteban L. Olmedo
Administrative Officer, Minority Affairs Program
American Psychological Association

The technical team determined that were was no generally acceptable and quantifiable index of an attorney's ability to practice law. Thus, it would not be possible to compare MBE scores with an appropriate measure of "on-the-job" performance. This situation led the technical team to recommend the formation of a panel of experts for each area covered by the MBE and that each panel evaluate a large sample of MBE items in its area. It also was decided to form a panel of generalists who would evaluate the test as a whole.

The technical team unanimously rejected the idea of forming a separate panel to make subjective judgments regarding whether certain MBE items might be biased against different sex and racial/ethnic groups. The reasons for this decision were: (1) the items undergo an extensive review for possible bias before they are included in the examination; (2) subjective judgments regarding bias, even by experts, rarely correspond to differential group performance (e.g., the difference in percentage of Anglo and minority examinees answering correctly an item rated as biased is usually the same as the difference between these groups on the items that are not rated as biased); and (3) statistical studies of the MBE have shown that differences in performance level between groups remains essentially constant across all the items in the test. However, the technical team did recommend replicating these statistical studies with a recent version of the test by means of standard and newly developed techniques for assessing bias.

Chapter 2 of this report describes the procedures that were used by the generalists and the results of their evaluations. Chapter 3 provides corresponding information on the six specialist panels. The final chapter discusses the procedures and results of the statistical studies that were recommended by the technical consultants and the panelists. These statistical studies were designed to supplement the research that had already been done on the MBE.

SELECTION OF PANELISTS

A three member committee was formed to participate in the nomination and selection of attorneys for the generalist and specialist panels. The members of this committee and the organizations that appointed them were as follows: John Eckler, National Conference of Bar Examiners; Talbot D'Alemberte, Section on Legal Education of the American Bar Association; and Millard Ruud, Association of American Law Schools.

Each committee member could veto the appointment of any proposed panelist. The only restrictions placed on who could be selected were that a panelist could not have been involved in the drafting of MBE items and could not be opposed in principle to the use of multiple choice questions on a bar examination. The selection committee was encouraged to form panels that not only exhibited content expertise but also had geographic, sex, and racial/ethnic diversity.

Chapter 3

GENERALIST PANEL

OVERVIEW OF ACTIVITIES

The Generalist Panel portion of the study had three phases. Phase 1 consisted of the nominating committee described in Chapter 1 selecting panelists and obtaining a commitment from them to participate in the research activities. The five panelists were:

E. Robert Blaske, Battle Creek, Michigan. J.D., University of Michigan, 1969. General practice of law with Blaske & Blaske. Chairman, Michigan Board of Law Examiners.

Charles D. Breitel, New York, New York. LL.B., Columbia Law School, 1932. Chief District Attorney, New York. Professor, Columbia Law School. Justice, New York Supreme Court. Chief Judge, New York Court of Appeals. Counsel, Proskauer Rose Goetz & Mendelsohn.

Ronald E. Kennedy, Chicago, Illinois. J.D., Northwestern University, 1973. Professor of Law, Northwestern University. President, Board of Governers, Chicago Council of Lawyers. Member, American Bar Association House of Delegates. Member, Board of Directors, Minority Legal Educational Resources.

Richard H. Montgomery, Seymour, Indiana. LL.B., Harvard Law School, 1950. General practice of law, Montgomery, Elsner & Pardieck. Member, State Board of Law Examiners. Member, Board of Managers, Indiana State Bar Association.

Wallace A. Tashima, Los Angeles, California. LL.B., Harvard Law School, 1961. Deputy Attorney General for the State of California. Member of the firm of Morrison & Foerster. Chair, California Committee of Bar Examiners. Judge, United States District Court.

In Phase 2, each panelist was mailed a copy of all the items that appeared on the February 1978 version of the examination. The generalists were asked to evaluate each item with respect to its materiality to the practice of law and its appropriateness in a test of basic competency for such practice. These evaluations were returned by mail to the project director.

In Phase 3, the panelists met to discuss and resolve differences in their Phase 2 evaluations, discuss other characteristics of the test, and make recommendations regarding: the percentage allocation of items to content areas, directions for future research, and ways in which the test could be improved.

RESULTS

Materiality

In Phase 2, the generalists were asked to evaluate all the items on the February 1978 test in terms of the degree to which the knowledge and skills they measured were material to the practice of law.  In other words, did the items deal with trivial versus important legal issues and abilities? The panelists were further instructed that their rating of one item should be independent of their assessment of another item; e.g., they were not to mark an item as "low" simply because it was less material than some other item.  These ratings were made on a scale from 1=Very Low to 5=Very High. The independent ratings of the five panelists on each item were averaged. Table 1 contains the percentage of items in each rating category.

Table 1

PERCENTAGE OF ITEMS IN EACH CATEGORY OF MATERIALITY

| Rating Category | Average Score Range | Percentage of all Items |
|---|---|---|
| Very Low | 1.00 - 1.99 | 0 |
| Low | 2.00 - 2.99 | 4 |
| High | 3.00 - 3.99 | 45 |
| Very High | 4.00 - 5.00 | 51 |

The generalists panel determined that 96 percent of the items had a high to very high degree of materiality to the practice of law.  These results are very consistent with those obtained with the specialist panels (see Chapter 3) and strongly support the appropriateness of the use of the MBE in determining whether an attorney should be licensed to practice law.

Appropriateness for Testing Basic Competency

State bar examinations are not designed to predict who will become a good attorney.  Rather, their goal is to identify those applicants to the bar who are not competent to practice (within the considerable limits of any testing device to make such a determination).  This important distinction led to the decision to ask the generalists in Phase 2 to evaluate each MBE item in terms of the degree to which it measured skills and knowledge that would be appropriate for a test of basic competency to practice law.  In short, were the skills and/or knowledge measured by an item generally necessary (albeit not sufficient) for practicing law in the broad content area covered by the item?  Each generalist independently rated each item on a scale from 1=Highly Inappropriate to 4=Highly Appropriate.

The ratings of the five panelists on each item were averaged.  Table 2 contains the percentage of items in each rating category.  The data in this table indicate that the generalist panel determined that almost all the items were appropriate for a test of basic competency to practice law (the generalists' average rating across all the items was 3.35 out of a possible 4.00).

Table 2

PERCENTAGE OF ITEMS IN EACH CATEGORY OF
APPROPRIATENESS FOR TESTING BASIC COMPETENCY

| Rating Category | Average Score Range | Percentage of all Items |
|---|---|---|
| Inappropriate | 1.00 - 1.99 | 0 |
| Questionable | 2.00 - 2.99 | 12 |
| Appropriate | 3.00 - 4.00 | 88 |

Other Dimensions

Each generalist was asked to review all 200 items on the February 1978
test, identify items he thought presented especially realistic case
situations, and identify items he felt presented the most unrealistic
situations. The panelists then met and discussed the characteristics of
both types of items. Following this discussion, each panelist
independently evaluated the test as a whole in terms of the general level
of realism of the case situations.

The generalists repeated the foregoing steps, i.e., review, identification
of illustrative items, discussion, and independent ratings, for three other
dimensions: the level of knowledge required to answer the items, the degree
to which the items emphasized memorization of legal principles, and the
degree to which the items emphasized analytic skills.

The ratings of all four dimensions were on a five point scale from 1=Very
Low to 5=Very High. Table 3 presents the panelists' average score on each
dimension. These data indicate that the generalists felt that the items
generally had moderate to high degrees of realism and that they required
moderate to high degrees of knowledge of general legal principles and
analytic skill. They further felt that the items required only a low to
moderate degree of memorization of specific information.

Table 3

OVERALL RATINGS OF ITEM CHARACTERISTICS

| Characteristic Evaluated | Average Rating |
|---|---|
| Realism of Case Examples | 3.7 |
| Level of Knowledge | 3.5 |
| Memorization | 2.8 |
| Analytic Skills | 3.8 |

The generalists' discussion of the February test led them to make the
following recommendations and comments with respect to the characteristics
listed in Table 3:

o Items should generally strive to be realistic, i.e., involve fact
  situations that arise frequently in daily practice or at least
  could arise.

o Some items should require "spot knowledge" of key principles and
  rules.

o No effort should be made to change the general level or range of
  legal knowledge required by the test. The items should not be
  made easier or more difficult. However, some of the more simple
  items, those requiring no more than common sense to answer,
  should be eliminated.

o It was appropriate for certain areas, such as Real Property, to
  require the examinee to possess a higher degree of legal
  knowledge than other areas because of the varying degree to
  which specific knowledge was required for practice in each area.

o The general level and balance of memorization and analytic
  skills required by the test were about right.

The foregoing results are generally consistent with those in Table 6 in
that both the generalists and the specialists determined that hardly any of
the MBE's items required overly advanced skills or knowledge.


Allocation of Items to Content Areas

The generalists were asked to give their independent assessment of the
percentage of items that should be allocated to each of the MBE's six
content areas. These allocations and the percentage of items in each area
that actually appear on the test are presented in Table 4. An inspection
of these data indicates an extremely close correspondence among the
panelists. There also is a high degree of consistency between their
average allocation to an area and the percentage of items in that area on
the examination.

The generalists also were asked to make recommendations regarding whether
the MBE should be expanded to include any additional areas. This request
led to a discussion of the importance and appropriateness of several areas
that were not now included in the examination (none of the panelists
recommended dropping any of the existing areas). Some of the areas
considered were: Civil Procedure, Taxation, Administrative Law, Family
Law, Remedies, Agency, Trusts, and Corporations. Of these, only Civil
Procedure was nominated by at least two panelists. However, it was agreed
that jurisdictional differences in these procedures would probably preclude
adding a Civil Procedure section to a nationally used test. Family Law
faced the same problem. It was further agreed that if taxation were going
to be tested, then it should involve an open book type of examination.
Thus, the consensus of the group was that the current allocation of MBE
items to areas should not be changed.

Table 4

PERCENTAGE ALLOCATION OF MBE ITEMS TO SUBTESTS

| Subtest | Panelist Number | | | | | Average Across All Panelists | Actual Allocation |
|---------|----|----|----|----|----|------|------|
| | 1 | 2 | 3 | 4 | 5 | | |
| Constitutional Law | 15 | 20 | 15 | 10 | 20 | 16 | 15 |
| Contracts | 20 | 15 | 20 | 20 | 20 | 19 | 20 |
| Criminal Law | 15 | 20 | 15 | 10 | 20 | 16 | 15 |
| Evidence | 15 | 15 | 15 | 20 | 10 | 15 | 15 |
| Real Property | 15 | 15 | 15 | 20 | 10 | 15 | 15 |
| Torts | 20 | 15 | 20 | 20 | 20 | 19 | 20 |

Chapter 3

SPECIALIST PANELS

OVERVIEW OF ACTIVITIES

The Specialist Panel portion of the study had three phases.  Phase 1
involved selecting three panelists for each of the MBE's six content areas
and obtaining a commitment from them to participate in all the research
activities.  Appendix A lists the panelists in each area.

In Phase 2, each of the 18 panelists was mailed a set of 30 to 40 items in
his/her assigned content area.  These items were drawn from the February
1978 version of the MBE (which was chosen because it was the most recent
publicly released form of the test).  The panelists were asked to evaluate
each item with respect to several characteristics (e.g., its materiality to
the practice of law) and then return these evaluations by mail to the
project director.

In Phase 3, each of the six teams of panelists met to discuss and resolve
differences in their Phase 2 evaluations, evaluate items from the July 1979
version of the MBE, and make recommendations regarding the ways in which
the test could be improved.


RESULTS

Correctness of Scoring Key

In Phase 2 of the activities described above, panelists were asked to
identify the choice they considered to be the best answer to each item on
the February 1978 test.  At least two of the three members of each panel
agreed with the keyed response on 86 percent of the items.

The agreement rate rose to 95 percent in Phase 3 when the panelists had an
opportunity to discuss with one another why they felt certain answers were
correct.  It is very likely that the level of agreement with the scoring
key would have increased still further had the panelists been able to
discuss the rationale for the keying with those who drafted the items.

Most of the disagreements with the scoring key occurred on the Criminal Law
and Real Property subtests (see Table 5).  An analysis of the 9 items on
which agreement with the scoring key was not reached indicated these items
tended to be more difficult than the other items on the test in terms of
the percentage of applicants who answered them correctly.  However,
applicants who chose the keyed choice on an item where disagreements
occurred had a higher average total test score than applicants who did not
select the correct choice (the average biserial correlation on the 9 items
was essentially the same as the overall average biserial correlation).

Two other factors should be considered in interpreting these findings: (1)
all MBE items undergo extensive review prior to their inclusion in the test
as well as statistical analysis after their administration but prior to
assigning scores in order to detect any errors in the scoring key (see
Appendix B), and (2) the overall level of agreement among raters was not
especially high on any of the dimensions evaluated; i.e., the reliability
problem was not restricted to judging correctness (see Appendix C).

Table 5

PERCENTAGE OF ITEMS ON WHICH PANELISTS AGREED WITH THE SCORING KEY
BEFORE AND AFTER DISCUSSING WHICH CHOICES SHOULD BE KEYED CORRECT

| Content Area | Independent Evaluations | After Group Discussion |
|---|---|---|
| Constitutional Law | 80 | 97 |
| Contracts | 80 | 100 |
| Criminal Law | 87 | 87 |
| Evidence | 100 | 100 |
| Real Property | 80 | 87 |
| Torts | 88 | 100 |
| Average | 86 | 95 |

Allocation of Items to Topics

The items within each of the six subtests can be drawn from several topic
areas.  For example, items in the Contracts subtest can deal with
consideration, conditions, remedies, etc.  In Phases 2 and 3, the
panelists were asked to review the list of topics in their subtest area
that was used by the drafting team, add any additional topics they thought
should be included, and then indicate the percentage of items in the
subtest that should be allocated to each topic.  They were further
instructed to make these allocations on the basis of their assessment of
the relative importance of the topics to the practice of law.

Table 6 presents the average difference in the percentage of items a panel
recommended allocating to a particular topic and the percentage of items
that were actually devoted to that topic on February 1978 examination.  An
inspection of these data indicates that there was generally a fairly close
correspondence between the panelists' and the test developers' allocation
of items to topic areas.  For example, on any given topic, the two groups
usually differed by only 7 percent (about 2 items on a 30 item subtest).

Table 6

DIFFERENCES BETWEEN PANELISTS AND TEST DEVELOPERS IN THE
PERCENTAGE OF ITEMS THEY WOULD ALLOCATE TO A GIVEN TOPIC

| Content Area | Number of Topics | Average Difference | Largest Difference |
|---|---|---|---|
| Constitutional Law | 5 | 10.0 | 15.5 |
| Contracts | 10 | 5.2 | 13.0 |
| Criminal Law | 6 | 3.5 | 9.0 |
| Evidence | 6 | 7.8 | 22.5 |
| Real Property | 6 | 5.0 | 10.0 |
| Torts | 5 | 9.2 | 17.0 |
| Average | 6 | 6.8 | 14.5 |

The largest disagreements between the panelists and the test developers
would lead the panelists to recommend changing the current allocations in
the following ways:

    o Constitutional Law - add more items to Individual Rights.

    o Contracts - add more items to Parol Evidence and Interpretation
      and subtract items from Contract Formation and Consideration.

    o Criminal Law - add more items to Constitutional Protection and
      subtract items from Inchoate Crimes.

    o Evidence - add more items to Presentation of Evidence and
      subtract items from Relevancy.

    o Real Property - include items dealing with Land Finance and Land
      Use Control.

    o Torts - add more items to Defamation and Privacy, and subtract
      items from Negligence.

Some of the differences between the test developers' and the panelists'
allocations may have stemmed from the need to include in a given version of
the examination items from previous administration of the test (in order to
provide a basis for scaling scores). The relatively short length of each
subtest and the use of multiple items for a single fact pattern further
constrained the number of different topics that could be covered in a
single administration. In other words, there is likely to be some
variation across test forms in the percentage allocation of items. And, if
a different set of panelists were selected, they would likely disagree with
at least some of the allocations made by the panelists in this study.
Thus, while there was relatively close agreement between the panelists and
the test developers on the allocation of items to most topics, it was not
at all surprising to observe some differences between them. What is
important, however, is that the size of these differences were generally
quite small.


Materiality

The panelists were asked to evaluate the items in their assigned area in
terms of the degree to which the knowledge and skills they measured were
material to the practice of law (from 1=very low to 5=very high). In other
words, did the items deal with trivial versus important legal issues and
abilities? Each item on both the February 1978 and July 1979 examinations
was evaluated on this dimension. Table 7 contains the percentage of items
on each subtest on each examination that the panelists placed in the
"medium to high" category of materiality. Overall, about 12 percent were
rated low, 18 percent medium, and 70 percent as high in materiality. The
low percentage for Contracts on the February examination in Table 7 was due
mainly to one panelist. This panelist apparently reversed the rating scale
(so that 24 of the 40 items were rated as low or very low in materiality)
because this panelist gave just the opposite ratings of materiality to the
July items. Thus, the overall percentage of items rated as medium to high
is probably over 90 percent.

Table 7

PERCENTAGE OF ITEMS RATED MEDIUM TO HIGH IN MATERIALITY

| Content Area | February | July | Average |
|---|---|---|---|
| Constitutional Law | 92 | 93 | 93 |
| Contracts | 55 | 87 | 71 |
| Criminal Law | 76 | 86 | 81 |
| Evidence | 93 | 100 | 96 |
| Real Property | 93 | 80 | 87 |
| Torts | 97 | 97 | 97 |
| Average | 84 | 91 | 88 |

Legal Knowledge and the Ability to Apply it

The panelists also were asked in Phase 3 to evaluate the July 1979 items in
terms of (1) the level of legal knowledge (from basic to advanced) that is
required in order to answer the questions correctly and (2) the extent to
which an examinee had to use reasoning skills in applying legal knowledge
to the facts presented. A three point scale from 1=low to 3=high was used
for making both types of evaluations.

On both dimensions, about 25 percent of the items were placed in the low
category, 68 percent in the medium category, and less than 10 percent in
the high category. Table 8 presents the percentage of items in each area
that were rated in the low category on each dimension.

It is not clear whether the massing of items in the medium category was due
to the panelists' true assessment of the items, the ability of the
directions to explain the rating scales, or simply the tendency on the part
of the panelists to avoid extreme rating categories. In any event, it is
evident that the panelists felt strongly that the items did not generally
require unusually high or low degrees of knowledge and/or reasoning skills.

Table 8

PERCENTAGE OF ITEMS RATED LOW IN REQUIRING LEGAL KNOWLEDGE AND
IN APPLYING LEGAL KNOWLEDGE IN ORDER TO BE ANSWERED CORRECTLY

| Content Area | Legal Knowledge | Ability To Apply |
|---|---|---|
| Constitutional Law | 13 | 20 |
| Contracts | 35 | 20 |
| Criminal Law | 43 | 30 |
| Evidence | 24 | 10 |
| Real Property | 23 | 30 |
| Torts | 18 | 26 |
| Average | 26 | 23 |

Correlations of Rating Scales with Item Statistics

An analysis of the data indicated that there was only a weak inverse
relationship between the percentage of examinees answering a question
correctly and the degree to which the panelists felt that item required
specialized legal knowledge and (to a lesser extent) advanced analytic
skills.  The reverse was true for materiality (i.e., easier items tended to
have slightly higher materiality ratings than more difficult items).  This
pattern of relationships was most apparent on the Contracts, Evidence, and
Real Property subtests.

There was no systematic relationship between how well an item performed (as
indicated by how well it predicted an applicant's total score) and and the
ratings assigned to that item by the panelists.


Panelist Comments

After completing all the activities described above, the panelists were
asked to provide written recommendations regarding any aspect of the
examination.  Most of the comments that were made were directed toward their
assigned subtest and included suggestions for additional topic areas.  The
general recommendations made by two or more panels are summarized below:

   o Increase the realism of the fact situations; especially by
     drawing upon the kinds of cases an examinee is likely to
     encounter in actual practice.  For instance, one member of the
     criminal law panel felt that the need to use "jurisdictionless"
     items led to unrealistic case examples.  This panelist suggested
     providing examinees with a particular statutory pattern and then
     asking them several questions that are based on this pattern.

   o Increase the consistency of the grammatical form in which the
     questions are posed to applicants.

   o Use descriptive terms like "Buyer" and "Seller" instead of
     names like Bob and Sam.

In general, the panelists thought that the existing approach and coverage
of the examination was good, but that there was room for improvement.  They
also suggested some revisions in the organization of topics within an area
(most of which have already been reflected in the 1981 examinations).

Chapter 4

STATISTICAL ANALYSES OF EXAMINATION DATA

The technical consultants and the panelists suggested that certain studies be conducted to supplement research that had already been done on the MBE. They recommended investigations of: the relative attractiveness of the choices on each item, the effect of item length on examinee performance, the effect of the number of items in a fact pattern on test statistics, the extent to which differences among racial groups remained constant across subtests and items, and the appropriateness of the test's time limits.

The database for the studies described in this chapter consisted of the responses made by the examinees who took the February 1978 and/or July 1979 administration of the MBE in California. This database was used because of the large number of applicants who took the test in this jurisdiction, the availability of item and race data on these examinee, and the use of these tests with the specialist and generalist panels.

ATTRACTIVENESS OF ITEM CHOICES

The Item Choice Study investigated the following issues: (1) did examinees generally pick the correct choice, and (2) what was the relative pulling power of the "distractors" (choices that were keyed incorrect).

Table 9 presents the percentage of examinees selecting the correct choice as well as those choosing the first, second, and third most attractive distractor on all the items in the February 1978 and July 1979 versions of the examination. These data indicate that the correct choice was usually chosen by about 65 percent of the applicants and that the distractors were not equally attractive. This general pattern was present on all subtests.

Analyses indicated that applicants who selected the correct choice on an item had a higher average total score on the other items than those who selected the most attractive distractor. And, those who selected the most attractive distractor had a higher average score than those that selected the second or third most attractive distractor. These findings indicate the more able examinees were eliminating incorrect choices that less able examinees found attractive. Thus, applicants who knew more were better able to eliminate clearly incorrect choices.

Table 9

AVERAGE PERCENTAGE OF EXAMINEES SELECTING EACH TYPE OF CHOICE

| Type of Choice | February | July | Average |
|---|---|---|---|
| Correct Choice | 64 | 66 | 65 |
| Most Attractive Distractor | 23 | 21 | 22 |
| 2nd Most Attractive Distractor | 9 | 9 | 9 |
| 3rd Most Attractive Distractor | 4 | 4 | 4 |

EFFECT OF ITEM LENGTH

There are three major ways in which the length of MBE items differ from one another:

o The number of words in the fact pattern on which the item is based.

o The number of words in the item (including the number of words in each alternative).

o The total number of words that have to be read per item, including the item's proportionate share of the fact pattern on which it is based.

These three characteristics of an item were correlated with its difficulty (the percentage of examinees who answered it correctly), its discriminability (the extent to which examinees who answered it correctly also tended to answer the other items correctly), and its materiality (as judged by the specialist panels). The results of this analysis indicated that there was generally no systematic relationship between any of the dimensions of an item's length and its difficulty, discriminability, or materiality. The only exceptions to this trend were that longer Criminal Law and Torts questions tended to have slightly better discriminability and higher ratings of materiality than shorter questions. There were no statistically significant negative correlations; e.g., there was no evidence that longer items tended to be more difficult or have lower discriminability and materiality than shorter items.


EFFECT OF THE NUMBER OF ITEMS IN A FACT PATTERN

In general, there was no statistically significant correlation between an item's characteristics (its difficulty, discriminability, and materiality) and the number of other items with which it shared a fact pattern. The two exceptions to this trend were: Criminal Law items tended to have higher discriminability if they shared a fact pattern with other items and Torts items tended to have higher materiality if they shared a fact pattern with other items. It also was observed that performance on items that shared a fact pattern tended to correlate only very slightly higher with performance on the other item(s) in that fact pattern than with performance on the other items in the test.


ITEM BIAS

Past research on the MBE has indicated that the differences in performance level between sex and racial groups in one area, such as Torts, are generally consistent with the differences between these groups in other areas (Klein, 1976). In other words, the questions in one area are not especially difficult for a particular group (relative to how well that group generally performs on items in other areas). However, since these studies were conducted several years ago, it was decided to replicate them with a current version of the examination.

The first step in conducting this analyses involved drawing a random 10
percent sample of Anglo applicants who took the July 1979 version of the
MBE (N = 561).  This sample was then combined with all the Asian (N = 256),
Black (N = 376), and Hispanic (N = 403) applicants who took this test.
California applicants were used for this purpose because California is one
of the few states that collects racial data on its applicants and it has
the largest number of applicants in each racial group.

The second step involved conducting an analysis of the degree to which
differences in average performance among groups paralleled differences
among them on each of the other five subtests.  The statistical technique
used for this purpose was a repeated measures analysis of variance in which
Race (4 levels) and Subtest (6 levels) were the independent variables.

The results of this analysis indicated that far less than one percent of
the differences in scores among applicants was due to one subtest being
particularly difficult for one or more groups; i.e., the relative
differences among groups stayed almost perfectly constant across the six
subtests even though the subtests themselves varied in difficulty (see
Table 10).  For instance, about 70 percent of the Anglo applicants but only
64 percent of the minority applicants answered a typical Criminal Law
question correctly; i.e., a difference of six percent.  However, there also
was about a six percent difference between Anglo and minority applicants on
each of the other five subtests.  And, the relative standings of the groups
was consistent across all six subtests.

Table 10

PERCENTAGE OF ITEMS ON EACH SUBTEST THAT WERE ANSWERED CORRECTLY
BY THE APPLICANTS IN EACH RACIAL GROUP

|  | Const Law | Crim Law | Con-tracts | Evi-dence | Real Prop | Torts | Average |
|---|---|---|---|---|---|---|---|
| Anglo | 68 | 70 | 71 | 70 | 61 | 67 | 68 |
| Asian | 62 | 65 | 67 | 67 | 56 | 64 | 63 |
| Hispanic | 61 | 64 | 66 | 65 | 55 | 62 | 62 |
| Black | 60 | 63 | 65 | 64 | 54 | 60 | 61 |
| Anglo vs. Minority Average | 7 | 6 | 5 | 5 | 6 | 5 | 6 |

Mean Subtest Score = % answered correctly X number of items

A set of six repeated measures analyses of variance were run for the items
within each subtest using the procedures described by Cleary and Hilton
(1968).  In each analysis, Item (30 to 40 levels depending upon the
subtest) and Race (4 levels) were the independent variables.  The score
earned by each applicant on each item (where 0 = wrong and 1 = correct) was
the dependent variable.  The results of this analysis were identical to
those described above; i.e., none of the items within a subtest were
especially difficult or easy for a particular group.

The six analyses of variance described above considered each item within a subtest relative to the other items in that subtest. Recent developments in the field of testing have provided methods for assessing whether a particular item is biased relative to a group's performance on the total examination. This type of analysis involves determining whether examinees of comparable ability (but belonging to different groups) had the same success on any given item. In this context, comparable ability is defined as having similar total scores on the examination. The procedures used to conduct this analysis with each of the 200 items on the July 1979 examination are summarized below (see Ironson & Subkoviak, 1979; and Scheuneman, 1979 for a more technical discussion of these procedures):

1) Examinees in each of the four racial groups used in the analyses of variance described above were classified into five ability groups based on the overall distribution of total MBE scores.

2) The number of examinees in each racial group at each ability level was tabulated.

3) The percentage of examinees in each ability group (regardless of race) who answered a given item correctly was computed.

4) The data from steps 2 and 3 were used to calculate the percentage of applicants in each combination of race and ability group that would be expected to answer the item correctly.

5) The actual percentages from step 2 were compared to the expected percentages from step 4 by means of a chi square test.

The results of the foregoing analyses indicated that none of the items had a statistically significant chi square value ($p = .05$); i.e., there was not a single item on which performance differences between racial groups systematically deviated from the general pattern of performance differences between these groups. This finding corroborates the analysis of variance results described previously which indicated that there was absolutely no evidence of bias due to race. It must be noted, however, that all of the foregoing analyses were run on California applicants. No data were available to assess whether the results obtained would hold up with other minority groups, such as Hispanic applicants of Puerto Rican descent.


TIME LIMITS

Analyses of MBE data have found that almost all applicants answer every question in the time allotted (e.g., Dorans and Wright, 1981). This could occur because essentially all applicants had enough time to attempt each item. It also could occur because most applicants realize they can maximize their score by using the last minute of the morning and afternoon test sessions to mark randomly one choice for each item they had not yet attempted to answer (because there is no correction for guessing). In other words, if applicants did not have enough time to complete the MBE, there would be far more guessing on the questions towards the end of each test session than there would be towards the beginning or middle of a session.

If guessing occurred more often towards the end of a test session, then: (1) scores on the items appearing at the end of a test booklet would be lower than those appearing near the beginning and middle of the booklet, and (2) scores on the items at the end of a test booklet would not be as highly correlated with total scores as would scores on the items that appeared towards the beginning and middle of the booklet (because they would be more affected by chance).

Tables 11 and 12 contain data on item difficulty (deltas) and correlations with total scores (biserials) for the February and July tests given in 1981. These data indicate that there was no consistent tendency for the items towards the end of a test booklet to be more difficult or have lower correlations with total scores than items towards the beginning and middle of a test booklet. Thus, there is no statistical evidence that guessing occurs more often towards the end than towards the beginning or middle of a test session which in turn suggests that the time limits are adequate for completing the examination. These findings are consistent with an experiment (Klein, 1981b) that found that there would be only a very slight improvement in raw scores (about 3 points per 100 items) if applicants had essentially unlimited time to answer MBE questions.

Table 11

CHARACTERISTICS OF ITEMS ANSWERED AT THE BEGINNING, MIDDLE, AND END
OF EACH TEST SESSION OF EACH EXAMINATION GIVEN IN 1981

| Test Session | Item Number | Mean Equated Delta | | Mean r-biserial | |
|---|---|---|---|---|---|
| | | Febr | July | Febr | July |
| Morning | 1-33 | 10.7 | 10.6 | .26 | .30 |
| | 34-66 | 11.3 | 11.2 | .25 | .32 |
| | 67-100 | 11.5 | 11.5 | .26 | .32 |
| Afternoon | 101-133 | 11.1 | 11.5 | .32 | .33 |
| | 134-166 | 12.4 | 11.4 | .27 | .29 |
| | 167-200 | 11.7 | 11.3 | .23 | .29 |
| Average | 1-200 | 11.5 | 11.3 | .27 | .31 |

Mean Equated Delta = index of item difficulty (the higher the delta, the more difficult the item). The average standard deviation of the deltas within a block of 33 items was 1.89 for February and 2.23 for July. There was no systematic relationship between the standard deviations and the sequence of blocks.

Mean r-biserial = index of item discriminability (the higher the r-biserial, the stronger the relationship between an applicant's score on the item and that applicant's total score on the other 199 items in the test). The average standard deviation of the r-biserials within a block of 33 items was .11 for both February and July. There was no systematic relationship between the standard deviations and the sequence of blocks.

Table 12

CORRELATION OF ITEM STATISTICS WITH SERIAL POSITION

| Test Session | Correlation with Mean Equated Delta | | Correlation with Mean r-biserial | |
|---|---|---|---|---|
| | Febr | July | Febr | July |
| Morning | -.15 | .06 | .31 | -.05 |
| Afternoon | -.10 | .11 | .10 | -.08 |
| Average | -.13 | .08 | .20 | -.06 |

The data in this table indicate that the higher the item number on the morning sesson of the February examination, the more likely it was to have a higher biserial.  None of the other correlations with an item's serial position were statistically significant.

APPENDIX A

MEMBERS OF THE SPECIALIST PANELS

Constitutional Law

    Justice Arthur J. England Jr., Tallahassee, Florida
    Dean James C. Kirby Jr., University of Tennessee
    Francis P. Mood, Columbia, South Carolina

Contracts

    Carole Kamin Bellows, Chicago, Illinois
    Stuart Duhl, Chicago, Illinois
    Prof. Curtis R. Reitz, Philadelphia, Pennsylvania

Criminal Law

    *E. Robert Blaske, Battle Creek, Michigan
    Prof. Robert J. Levy, Minneapolis, Minnesota
    Mary P. Walbran, Owatonna, Minnesota

Evidence

    C. A. Powell III, Birmingham, Alabama
    Maurice Reuler, Denver, Colorado
    Prof. M. Michael Sharlot, Austin, Texas

Real Property

    Jerome Hafter, Greenville, Mississippi
    Henry Kordes, Sea Girt, New Jersey
    Prof. Edward H. Rabin, Davis, California

Torts

    Prof. Carl S. Hawkins, Provo, Utah
    Martin L. Gross, Concord, New Hampshire
    Justice Robert P. Smith Jr., Tallahassee, Florida

* Also served on the Generalist Panel

Appendix B

DESCRIPTION OF THE MBE

GENERAL CHARACTERISTICS

The Multistate Bar Examination (MBE) is a 200 item (question) multiple choice test. Each item contains four choices. The six areas covered by the MBE and the number of items in each area are: Constitutional Law (30), Contracts (40), Criminal Law (30), Evidence (30), Real Property (30), and Torts (40). The items in an area are distributed throughout the test rather than presented together. As many as 4 items may deal with the same fact pattern (reading passage) although many items stand by themselves.

The MBE is divided into two sessions. The 100 items given in each session are drawn proportionately from the six areas. Applicants are given 3 hours per session. An applicant's raw score is the total number of questions answered correctly; there is no correction for guessing. Almost all applicants answer all items.

The MBE is administered twice per year, once in February and again in July. About 160 new items are constructed for each administration. The remaining items are drawn proportionately from the six areas from a previously administered but still secure version of the MBE. The items from a past administration are used for equating, i.e., transforming raw scores to scale scores. The transformation process adjusts the raw scores for possible differences in average item difficulty across administrations. Thus, a given scale score denotes a level of proficiency that is not affected by the relative difficulty of the particular set of items that were answered.

There is no national passing score on the MBE. Instead, each state sets its own policies regarding standards for passing and how MBE raw or scale scores are combined with scores on the state developed portion(s) of the bar examination.

TEST DRAFTING AND REVIEW

There are six MBE drafting teams, one per area. Each team consists of two bar examiners and three law professors with expertise in their assigned content area plus a test development specialist. One of the law professors serves as the team's chairperson. The NCBE's director of testing recruits team members and monitors their activities.

A team's first activity involves preparing specifications for its area. The specifications describe the major topics and concepts to be covered. The topics and concepts chosen are ones that are commonly included in a basic course in the area, are important for legal practice, and can be measured adequately by a multiple choice test. The specifications are reviewed and, if necessary, revised annually.

The next step involves the team members individually drafting items. Written guidelines for the item drafters emphasize clarity, conciseness, and fairness. There is never an intent to trap or trick applicants into the wrong answer.

The first draft of each item is sent to ETS where it is reviewed and edited
to insure consistency with the MBE's style and format. The complete set of
revised items is sent to all team members prior to their next meeting.

At this meeting, the team members review and revise items, designate those
that are rejected, those that are preliminarily accepted, and those that
require further revision before they can again be considered for inclusion.
Items that eventually appear in the MBE undergo two such reviews. An
assessment is then made of the difficulty of the preliminarily accepted
items. In addition, the team reviews alternative sets of items from past
administrations in order determine which set should be used for equating.
Sets of equators are chosen on the basis of content and statistical
considerations. Some time also is spent on reviewing the characteristics
of items they drafted for previous administrations. This is done to help
team members estimate item difficulties and improve their item writing
skills.

A draft test is prepared for each area. The items in this draft are
selected by the team (or team chairperson) on the basis that they conform
to the specifications for content coverage and span a range of item
difficulties. The items then undergo an editorial review. The reviewer's
questions are resolved by the test consultant or the team (if the questions
are substantive in nature).

The six drafts are assembled into AM and PM test books. The construction
of these books takes into consideration content coverage and arrangement,
estimated item difficulties, the placement of equating items, and other
important factors. For instance, there is balance with respect to the
frequency with which each choice (A, B, C, or D) is keyed correct and, to
avoid confusion, a name that appears in one item is not used again in
another unrelated item. The items also are checked and, if necessary,
revised to make sure they avoid any language or situational description
that is likely to be offensive to subgroups of applicants.

A mock up version of the test is constructed and sent to the teams for
review. Scoring keys are not provided during the initial phase of this
review. Instead, team members answer the questions in their area as if
they were applicants taking the test for the first time. They then discuss
the items and suggest additional revisions if they feel problems still
exist.

The revised mock ups are sent to interested state boards of bar examiners
and to NCBE's MBE committee. Comments by these external reviewers are
forwarded to the appropriate teams. The teams review the comments and
decide whether further revisions are warranted and, if so, what they should
be. The final version of the test is then constructed and the answer key
and other documentation are once again carefully checked to make certain
that all changes have been made correctly.

The final version of the test is printed and distributed to the states in
accordance with policies and procedures that help to ensure test security.
The states administer the MBE under guidelines designed to maintain
security, standardization, and fairness.

EARLY ITEM ANALYSIS

A sample of answer sheets is analyzed prior to processing all of them.
This "early" item analysis involves checking that the computer programs
used for scoring the answer sheets are consistent with the scoring key.  It
also involves flagging items that are answered incorrectly by applicants
who otherwise perform well on the test.  Each flagged item is reviewed by
ETS, NCBE, and the appropriate team chairperson.  As a result of this
review, the answer key for a flagged item could be changed or more than
one of its choices could be keyed correct.  This final safeguard on test
quality and fairness usually results in modifying the scoring key for about
five items.


SCORING AND SCORE REPORTING

The revised scoring key is used for grading all the answers, i.e.,
including the ones used in the early item analysis.  The scoring is done by
machine, but at least 0.5% of the answer sheets are hand graded to monitor
accuracy.  There also are several other quality control checks in the
procedures used for transforming raw scores to scale scores and for
preparing the final roster of applicant identification numbers and grades.
Only after all of these checks have made is an applicant's score sent to
the state in which he/she took the examination.

The following scores can be obtained: total raw score (the number of
questions answered correctly), raw score in each of the six areas, and
total scale score.  States are strongly encouraged by both NCBE and ETS to
use just the total scale score in making pass/fail decisions.

APPENDIX C: STATISTICAL TABLES

Table C.1

AVERAGE INTERRATER CORRELATIONS

| | Generalists | | Specialists | | |
|---|---|---|---|---|---|
| Area | Basic Competency | Materiality | Materiality | Knowledge | Reasoning |
| Constitutional Law | .25 | .30 | .07 | .19 | .48 |
| Contracts | .49 | .53 | .36 | .62 | .39 |
| Criminal Law | .35 | .47 | .37 | .23 | .64 |
| Evidence | .21 | .00 | .59 | .24 | .24 |
| Real Property | .14 | .26 | .61 | .15 | .33 |
| Torts | .35 | .38 | .41 | .30 | .32 |
| Average | .30 | .32 | .40 | .29 | .40 |

The generalists rated each February 1978 item in terms of its appropriateness for a test of basic competency and the degree to which the knowledge and skills it measured were material to the practice of law. The specialists rated each July 1979 item on this latter dimension as well as in terms of the level of legal knowledge that is required to answer it correctly and the extent to which an examinee had to use reasoning skills in applying legal knowledge to the facts presented.

Table C.2

CORRELATIONS OF SPECIALISTS' RATINGS WITH ITEM CHARACTERISTICS

| | Materiality | | Knowledge | | Reasoning | |
|---|---|---|---|---|---|---|
| Area | Percent Correct | r-bis | Percent Correct | r-bis | Percent Correct | r-bis |
| Constitutional Law | .17 | .02 | -.29 | -.09 | -.27 | -.05 |
| Contracts | .28 | .15 | -.54 | -.23 | -.40 | -.31 |
| Criminal Law | .14 | .01 | -.18 | -.02 | .15 | -.27 |
| Evidence | .17 | .18 | -.49 | -.03 | -.37 | .05 |
| Real Property | .33 | -.15 | -.46 | -.12 | -.22 | .01 |
| Torts | .28 | -.02 | .06 | -.21 | .21 | -.15 |
| Average | .23 | .03 | -.32 | -.12 | -.15 | -.12 |

The average of the three panelists' ratings of an item on a dimension was correlated with the percent answering that item correctly and that item's correlation with the sum of the scores on the other items on the test (i.e., its r-biserial correlation). Results indicated a tendency for easy items to be judged more material to the practice of law and require less reasoning skills than difficult items.

Table C.3

FREQUENCY DISTRIBUTION OF CHI SQUARE VALUES IN ITEM BIAS ANALYSIS

| Chi Square | Frequency | Chi Square | Frequency |
|------------|-----------|------------|-----------|
| 0   - 1.0  | 11        | 9.1  - 10.0  | 11 |
| 1.1 - 2.0  | 14        | 10.0 - 11.0  | 13 |
| 2.1 - 3.0  | 26        | 11.1 - 12.0  | 10 |
| 3.1 - 4.0  | 20        | 12.1 - 13.0  | 5  |
| 4.1 - 5.0  | 12        | 13.1 - 14.0  | 3  |
| 5.1 - 6.0  | 22        | 14.1 - 15.0  | 3  |
| 6.1 - 7.0  | 16        | 15.1 - 17.0  | 4  |
| 7.1 - 8.0  | 17        | 17.1 - 20.0  | 4  |
| 8.1 - 9.0  | 9         | 20.1 - 21.0  | 1  |

Chi square critical (at alpha = .05) = 21.03

# REFERENCES

Carlson, A. B. and Werts, C. E.  Relationship among law school predictors, law school performance, and bar examination results.  Princeton, N.J.: Educational Testing Service, 1976.

Cleary, T. A. and Hilton, T. L.  An investigation of item bias.  Educational and Psychological Measurement, 1968, 28, 61-75.

Dorans, N. and Wright, R.  Test Analysis: Multistate Bar Examination, Forms 3CEB2 and S-3CEB2.  Unpublished Statistical Report, SR-80-117.  Princeton, N.J.: Educational Testing Service, October, 1980.

Ironson, G. H. and Subkoviak, M. J.  A comparison of several methods of assessing item bias.  Journal of Educational Measurement, 1979, 16, 209-225.

Klein, S.  An investigation of possible item and grader bias in a state bar examination.  Paper presented at the meetings of the Western Psychological Association, Los Angeles, April, 1976.

Klein, S.  An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group.  Paper presented at the American Bar Association meetings, Dallas, Texas; August 14, 1979.  Reprinted in The Bar Examiner, 1980, 49, 14-18.

Klein, S.  Factors associated with the difference in passing rate between Anglo and Hispanic applicants on the New Mexico Bar Examination.  Report prepared for the New Mexico Board of Bar Examiners, 1981a.

Klein, S.  The effect of time limits, item sequence, and question format on applicant performance on the California Bar Examination.  Report prepared for the Committee of Bar Examiners of the State Bar of California and for the National Conference of Bar Examiners, 1981b.

Klein, S.  Testing research skills on the California Bar Examination.  Report prepared for the Committee of Bar Examiners of the State Bar of California and for the National Conference of Bar Examiners, 1981c.

Scheuneman, J.  A method of assessing bias in test items.  Journal of Educational Measurement, 1979, 16, 209-225.

AN ANALYSIS OF GRADING PRACTICES ON THE

CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.

GANSK and Associates

2501 Ocean Front Walk

Venice, California 90291

December 15, 1977

77-1P

PREFACE

This report describes a series of studies that were conducted with the February 1977 State of California Bar Examination. The overall goals of this research were to determine the effects of current practices on the precision with which scores were assigned to applicants and to identify ways in which these practices might be improved. The report itself is divided into seven sections. The first section provides the salient features of the present examination process. The second section discusses certain statistical principles and concepts regarding test reliability. The next three sections describe the procedures and results of a series of studies of the initial grading and the reappraisal processes. Section VI summarizes the major findings relative to their policy implications. The final section presents specific recommendations for ways in which current practices may be improved.

The studies described in this report required the help, patience, and cooperation of several individuals, including the members of the Committee of Bar Examiners, their Board of Reappraisors, and the teams of readers who graded the essay portion of the test. Special thanks also goes to Mr. Kenneth McCloskey, Administrator for the Committee of Bar Examiners, for coordinating all the data collection activities, to Dr. John Bianchini of the Educational Testing Service for supplying necessary data, and to Mr. Roger Bolus of UCLA for providing the necessary statistical programming and data management functions.

The author also appreciated the openness, freedom, and funds the Committee granted for the design and conduct of the research. Their support in this regard permitted the author to function as a wholly independent researcher and to take full responsibility for the methodology and conclusions presented in this report.

Table of Contents

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . iii

Section I: Background . . . . . . . . . . . . . . . . . . . . . 1

    Overview
    Multistate Bar Examination
    Essay Test
    Essay Grading Standards
    Initial Performance Decision
    Reappraisal Process
    Score Reporting
    Test Characteristics

Section II: Reliability of the Bar Examination. . . . . . . . . . . 9

    Introduction
    Types of Reliability
    Factors Affecting Internal Consistency
    Percentage of Variation
    Reliability of the MBE, Essay, and Composite Scores
    Methods for Increasing Test Reliability

Section III: Reader Consistency Studies . . . . . . . . . . . . . 17

    Purpose
    Data Base
    Indices of Agreement
    Interreader Agreement
    Intrareader Agreement
    Affect of Reader Variation on Essay Scores

Section IV: Scorecard Studies . . . . . . . . . . . . . . . . . . 25

    Scorecard Development
    Procedures
    Intrareader Agreement With the Scorecard
    Interreader Agreement With the Scorecard
    Degree of Agreement Between Methods
    Weighted Scorecard Development
    Results With the Weighted Scorecard
    Agreement Regarding Relative Weights
    Analysis of Artifacts
    General Factors Related to Readers' Grades

Section V: Reappraisor Studies. . . . . . . . . . . . . . . . . . 37

    Introduction
    Purposes
    Reread Methods
    Applicants
    Reappraisor Assignments
    Procedures
    Intrareappraisor Agreement With Method #1
    Interreappraisor Agreement Within Methods
    Intermethod Agreement
    Reappraisor Agreement With Initial Score

Section VI: Summary of Major Findings and Their Policy Implications. . 48

    Summary
    Policy Considerations and Options

Section VII: Specific Recommendations . . . . . . . . . . . . . . . 53

    Test Planning
    Reader Calibration
    Test Scoring
    Reappraisal Process
    Conclusions

References. . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Appendices

    A. Glossary of Statistical Terms

    B. Procedures For Estimating the Reliability of the
       Composite Essay + MBE Score

    C. Essay Questions

    D. Sample Scorecard

SECTION I:    BACKGROUND

Overview

The California Bar Examination has two sections.  One section consists of a multiple choice test, called the Multistate Bar Examination (MBE), which is used by several states as part of their bar examination.  The second section of the test consists of three sets of essay questions with five questions per set.  Each applicant selects four questions from each set, for a total of 12 answers per applicant.

At the time of the February 1977 administration of the test, an applicant had to have a composite score (i.e., MBE plus Essay) of 1200 or more points to pass the test outright.*  A score of 1139 or less was classified as a "fail," while one between 1140 and 1199 resulted in the applicant being placed in a "reappraisal" category.  Applicants in this latter category had their entire set of 12 answers reread by two independent and highly experienced readers (members of the Board of Reappraisors).  The purpose of this reread process was to help insure the appropriateness of the final decision on each applicant's pass/fail status.

The remainder of this section describes those features of the foregoing process that are especially relevant to the subsequent portions of this report.

*An applicant can now pass each section of the test separately; i.e., the applicant may pass the exam by passing the MBE on one occasion and the Essay on another occasion.

Multistate Bar Examination (MBE)

The MBE consists of 200 multiple-choice questions divided among six content areas: Contracts, Torts, Criminal Law, Real Property, Evidence, and Constitutional Law. The test is partitioned into four separately timed sessions of one-and-one-half hours each. All the applicants on a given administration of the test answer the same set of questions; however, a different form of the test is used for each administration.

An applicant's total raw score on the test is based on the total number of questions answered correctly; i.e., there is no penalty for guessing. This raw score is transformed to a "standard score" so that performance on one administration of the test can be compared to performance on some other administration of the test. In other words, different forms of the test are converted to a common scale of measurement that takes into consideration both the relative difficulty of the questions and the relative level of ability of the applicants for each test administration. This process equates different forms of the test so that they become calibrated to the same scale of measurement.

Essay Test

The essay portion of the bar examination consists of three sets of five questions each. An applicant is instructed to select four questions per set to answer in the three-and-one-half hours allotted to each essay test session. Each question involves several issues from one or more content areas, such that the test as a whole is intended to cover the major subjects taught in law school.

A new set of questions is developed for each test administration. These questions are generally drafted initially by non-California law professors. The members of the Committee of Bar Examiners, their Board of Reappraisors, and the Committee's staff then revise, edit, and organize the questions into the three test sessions.

Essay Grading Standards

A prototype answer to the initial draft of a question is prepared by the person who wrote that question. The team of readers who are assigned to grade the answers to that question use this prototype and their own additional research in preparing an analysis of the edited version of the question. Although the readers are given explicit instructions regarding the nature and length of the analysis to be prepared, there is considerable variability across questions in the way these instructions are translated into practice. For example, while one team of readers may follow these directions exactly, another team may prepare a very abbreviated or a greatly expanded version of the specified analysis.

A sample of 75 applicants is then drawn from among those who took the examination. Since an applicant answers only 12 of the possible 15 questions, this provides 15 sets of answers with approximately 60 answers per set. All four readers on the team assigned to a particular question are instructed to grade all of the answers to that question independently. In other words, for the purposes of initial reader calibration, every answer is graded by four separate readers.

The grades that may be assigned to an answer range from 40 to 100 points in five-point increments. A score of 70 is considered "passing" for that question. Directions to the readers regarding how they should distribute their grades over the possible score range are as follows:

> "Past experience has shown that the exercise of principles
> of good grading will result in a reasonable spread of grades.
> If a large proportion of the answers receive the same grade
> (e.g., 65 or 70), that fact would indicate the desired degree
> of quality differentiation in grading is not being made."

The general instructions also discuss the criteria that should be applied to certain characteristics of the answer, namely: analysis of the problem, knowledge of the law, application of legal principles, reasoning, and the appropriateness of the conclusions reached. The objective "correctness" of the answer are not supposed to affect the grade assigned.

The next step in the establishment of grading standards for a particular question consists of a conference involving that question's team of readers, members of the Committee of Bar Examiners, and the Board of Reappraisors. During this approximately one-hour conference, the team's analysis of the question is reviewed and the readers' interpretation of this analysis, as reflected by the grades they assigned, is examined. Frequently, the group focuses its discussion on the two or three answers in the set on which there was the least agreement among the readers as to the grade that should be assigned.

Once the regular grading process begins, a given answer is scored by one and only one reader. Two additional procedures have therefore been instituted to help maintain the standards established by the steps described above: (1) the leader of each team periodically selects one or two answers for cross grading and discussion by the other members of the team; and (2) the Committee's staff monitors the average grade assigned by each reader so as to identify and counsel a reader whose standards begin to drift away from those of the other readers assigned to the same question. In addition, the reappraisal process, which is described in more detail below, is designed to provide an indirect correction for any major deviation in standards that may have affected a given applicant's pass/fail status.

## Initial Performance Decision

The Committee of Bar Examiners established a policy of weighting the MBE portion of the test 30 percent and the essay portion 70 percent. They also set 70 percent as the passing level on the composite total score. The Committee's translation of this policy into practice resulted in a test with a maximum possible score of 1714 points (514 MBE and 1200 Essay). This was achieved by multiplying the raw standardized MBE score by 2.57 and adding it to the total essay score. However, because of certain statistical properties of the MBE and Essay portions of the test (namely, the relative magnitudes of their standard deviations), the actual effective weights of these two measures in determining the relative performance of the applicants on the February 1977 exam was 38 percent for the MBE and 62 percent for the Essay.

An applicant whose total score is 1200 or higher (70 percent of 1714) is passed outright, while an applicant with a score of 1139 or lower is failed outright. Applicants with scores between 1140 and 1199 are placed in the reappraisal category.

## Reappraisal Process

Each applicant in the reappraisal category has his/her 12 answers read by two independent reappraisors. This process differs from the regular reading process in a number of important respects. First, the members of the Board of Reappraisors who provide this service have had several years of experience as readers and are intimately involved in the grading standards conference for all 15 questions. Second, the applicant's answers are read as a set, rather than by a different reader for each question. Third, each set of answers is read at least twice by different graders, as contrasted with the single reading in the initial grading process.

After reviewing the applicant's set of 12 answers, the reappraisor indicates whether or not the applicant should pass or fail. If the two reappraisors agree on the applicant's pass/fail status, then that decision is adopted. If they disagree, then a third reappraisor makes the decision after reading the applicant's set of 12 answers. In short, applicants whose status is considered highly questionable have their set of answers read as many as four times (once during the initial reading and up to three times during reappraisal).

One important feature of this process is that the reappraisors see the MBE score and the grades assigned by the initial readers before they make their own decision as to the applicant's pass/fail status. The tie-breaking reappraisor is similarly informed of these scores, as well as those assigned by the other two reappraisors.

Score Reporting

An applicant is informed of the final pass/fail decision. If the applicant passed, no further information is provided; i.e., the applicant is not told the score received or even whether it was a result of the re-appraisal process. Applicants who fail, on the other hand, are told the scores they received on the MBE and on the initial reading of their essay answers. It is important to note that scores are not released to prospective employers or others who might use such information to make a decision about an individual applicant. Thus, the goal of the test is to be as precise as possible in determining the applicant's pass/fail status rather than in assessing the degree to which that applicant passed or failed.

Test Characteristics

Tables 1 and 2 present basic data regarding the February 1977 bar exam-
ination.  The results in Table 1 are for all applicants taking the examination
while those in Table 2 are limited to those who answered 12 essay questions
and took the MBE.  An analysis of the Essay Test indicated that the applicants'
scores in the last test session (questions #11-#15) were slightly higher than
the scores they received in either of the first two sessions.  This difference
was about one point per question.

Care should be taken in interpreting the data presented in these tables
in that the applicants who take the test in February tend to have a somewhat
lower average ability level (as indicated by their MBE scores and other
measures) than those who take the July examination.  A glossary of
statistical terms has been provided in Appendix A to help the reader
interpret the data presented in Table 2 and other portions of this report.

Table 1.  Number and Percent of Applicants in Each Performance Category

| Performance Category | Number of Applicants | Percent of Applicants |
|---|---|---|
| Pass | 1298 | 37.8 |
| Pass-Reappraisal | 195 | 5.7 |
| Fail-Reappraisal | 796 | 23.2 |
| Fail | <u>1143</u> | <u>33.3</u> |
| Total | 3432 | 100.0 |

Table 2.  Test Statistics for the February 1977 Bar Examination (N = 3359).

| Test Statistic | Essay | MBE | Essay + MBE* |
|---|---|---|---|
| Mean (Average) | 814.19 | 355.83 | 1170.02 |
| Standard Deviation | 57.80 | 35.66 | 85.30 |
| Standard Error of Measurement | 27.72 | 11.28 | 29.55 |

*Correlation between Essay and MBE = .65

SECTION II:  RELIABILITY OF THE BAR EXAMINATION

Introduction

The term "reliability" refers to the degree of consistency between two or more measurements of the same thing.  A test is said to be reliable if there is a strong correspondence (correlation) between an applicant's relative performance level on one administration of the test and the applicant's performance on a second administration of that same test.  For instance, a bathroom scale would be classified as unreliable if on one occasion it read two pounds too few, on another occasion three pounds too many, etc.  If the bathroom scale always read ten pounds too few no matter who was weighed, then the scale would be reliable in the sense of being consistent.  Such a scale would not be "valid," however, in that it would not provide an accurate assessment of a person's weight.

It is evident that in order for a test to be valid – that is, to measure accurately what it attempts to measure – it must first be reliable.  On the other hand, reliability alone is not sufficient to insure the relevancy of the measurement (e.g., a highly reliable bathroom scale would not provide an adequate indication of an applicant's legal prowess).  Thus, a basic testing principle is that "reliability is a necessary, but not sufficient, condition for validity."

The validity of the bar examination might most appropriately be addressed in terms of the adequacy of its content coverage and format.  For example, does it provide a sufficient sampling of the basic legal knowledge and skills the applicant will need to enter the practice of law?  Are the questions able to elicit answers that will demonstrate and applicant's legal abilities?

While the foregoing questions are crucial to an analysis of the test's validity, their answers provide little insight into the prior question of the test's reliability.  For instance, although a test may appear to assess the relevant content areas and skills, it still will not be valid unless the scores on it provide a sufficiently precise measurement of an applicant's performance on that test.  No matter how good the test questions may seem, if the persons scoring the answers cannot agree on their quality, then the test has little value for the purposes for which it was intended.

Types of Reliability

There are several ways of assessing the reliability (consistency of measurement) of a test.  One may give the test to the same group of applicants on two occasions and determine the correspondence of the scores assigned (test-retest reliability), or one may give alternate forms of the measure to the same group on a single occasion (parallel-form reliability).  Each of these strategies has certain advantages, limitations, and most importantly, implications for the interpretation of the results obtained.

A third strategy, and one more feasible to employ within the constraints of the bar examination process, is to determine the "internal consistency" reliability of the test.  This provides an index of the degree to which an applicant's performance on one question corresponds with that applicant's performance on the other questions.  The major assumption underlying this approach to measuring a test's reliability is that all the questions are relatively homogeneous.  In the context of the bar examination, this means that an applicant's general legal knowledge and skills have a major influence on that applicant's score on each question, as distinct from the unique knowledge that may be required to answer a particular question.

-10-

Factors Affecting Internal Consistency

The internal consistency reliability of a test is based on determining the degree to which an applicant's performance on one question is correlated with that applicant's performance on the other questions. The major factors that affect this reliability estimate are as follows:

1.  Systematic and Relevant Applicant Characteristics. An applicant's performance on one question will be related to that applicant's performance on another question if both questions require the same general skills and knowledge and/or if the skills and knowledge required to answer one question are highly correlated with (even though theoretically different than) those required to answer other questions on the test. This latter proviso is important, in that high correlations between questions dealing with very different content areas may be obtained if the applicant who tends to be knowledgeable in one area of the law also tends to be knowledge-able in other areas.

2.  Systematic But Irrelevant Applicant Characteristics. Any factor that systematically affects an applicant's score will tend to increase the internal consistency of the test, even though that factor may be irrelevant to an accurate assessment of the applicant's abilities. An example of such a factor might be the legibility of the applicant's handwriting on the answers written to the essay questions. If the applicant's handwriting quality is consistent across questions and if the graders tend to give high scores to more legible answers, then this will artificially increase the correlation between an applicant's performance across questions.

-11-

3.  <u>Random Applicant Characteristics</u>.  Some applicants may do unusually poorly or well on particular questions because of such random factors as having felt ill during a test session, having studied an esoteric aspect of the law that was especially relevant to a particular question, etc.  Such random factors tend to diminish the internal consistency of the test.

4.  <u>Uniqueness of the Questions</u>.  If a test contains questions that require different <u>and</u> uncorrelated skills and knowledge, then the internal consistency reliability would underestimate the correlation between an applicant's performance on two different forms of the test or even on the same test given on separate occasions.

5.  <u>Reader Variation</u>.  Scores on different questions may fail to correlate highly with one another because of inconsistencies in the grading process, such as two readers not agreeing on the quality of the same answer.  Such variation could come about as a result of systematic differences between readers in how much emphasis they place on different aspects of an answer (such as how much weight is given to how an applicant handles a particular issue), in how much they are affected by extraneous factors (such as handwriting quality or answer length), or simply in their relative tendencies to grade severely versus leniently.  Reader variation also could come about as a result of random errors, such as a reader assigning a high grade to one answer and a low grade to another even though the two answers were essentially identical.

-12-

## Percentage of Variation

As noted previously, the reliability of a test score is usually expressed in terms of a correlation coefficient. Under the assumption of relatively homogeneous test content, this coefficient estimates the degree or correlation that would be obtained between these applicants' scores on two different but very similar forms or parts of the test, such as their scores on the odd-numbered versus even-numbered questions. When the square of this correlation coefficient is multiplied by 100, it indicates what percentage of the observed differences between applicant scores on one measure could have been predicted by their scores on the other. For example, if two different forms of the same test correlate .90 with each other, it means that 81 percent of the difference between two applicants' scores on one form could have been pre-dicted by their respective scores on the other form.

The percentage of variation also represents the degree to which an applicant's test score is a function of _systematic_ relevant and irrelevant applicant characteristics. If 81 percent of the variation in test scores is due to these two systematic factors, then 19 percent must be due to the combination of the other three factors described above.

## Reliability of the MBE, Essay, and Composite Scores

The internal consistency reliability coefficient of the Essay portion of the February 1977 bar examination was .77, as determined by standard statistical techniques (see Appendix B). This figure is consistent with reliability estimates computed for previous Essay examinations (Bianchini, 1977), and indicated that about 59 percent of the Essay score is due to systematic differences between applicants (presumably in their respective levels of legal ability).

The MBE's internal consistency reliability has been estimated to be .90 (Bianchini, 1977).  This is substantially higher than the reliability of the Essay test, even though both measures assess the applicant's skills and knowledge in diverse content areas.  Moreover, the MBE uses less than one-half of the testing time required for the Essay portion of the examination.

The composite score derived from the combination of Essay and MBE scores had a reliability of .88 (see Table 3).  This was consistent with the .89 reliability estimate Bianchini (1977) obtained for the composite score on the July 1976 examination.  These reliability estimates are essentially at the minimum level recommended for tests of this kind.  For instance, according to Nunnally (1967), "In those applied settings where important decisions are made with respect to specific test scores, a reliability of .90 is the minimum that should be tolerated, and a reliability of .95 should be considered the desirable standard" (pg. 226).

Table 3.  Estimated Reliability of the Essay Test and the Examination as a Whole for Essay Tests of Different Lengths

| Number of Essay Questions Answered | Reliability | |
|---|---|---|
| | Essay Test | Essay + MBE* |
| 4 | .53 | .72 |
| 8 | .69 | .83 |
| 12 | .77 | .88 |
| 16 | .82 | .90 |
| 20 | .85 | .92 |
| 24 | .87 | .93 |

*See Appendix B for a description of the procedures that were used to estimate the reliability of the MBE + Essay score.

## Methods for Increasing Test Reliability

It is apparent that whatever unreliability exists in the applicant's total score stems mainly from the Essay portion of the test. Thus, efforts to improve the reliability of the composite score should probably focus on this part of the examination.

The reliability of an essay examination can be improved in four ways. One option is to increase the number of questions asked. This approach tends to compensate for random applicant characteristics and reader variation. The relationship between test length and reliability is not linear, however, in that each increase in the number of questions results in smaller and smaller increments in the test's reliability. The data in Table 3 illustrate this phenomenon and that even when the Essay test is doubled in length, it still does not reach the .90 level on its own.

A related but somewhat different approach is to construct questions that can be scored more reliably than the types of questions currently being used. The utility of this strategy would, of course, depend on (1) the degree to which this can be accomplished without sacrificing the test's validity, and (2) the extent to which questions differ in terms of how reliably they are scored.

A third option is to increase the number of times a given answer is read, so as to balance out differences between readers. The fourth strategy is also aimed at reducing reader variability, but it does this by improving the degree to which the readers of a given question are consistent with one another in the scores they assign.

The potential value of strategies aimed at reducing reader variation is, of course, a function of the extent to which such variation now exists. In other words, these strategies would be effective only if the relatively low internal consistency of the Essay test were more a function of inconsistencies among the readers in how they assign scores than of the uniqueness of the skills and knowledge required to answer different questions.

SECTION III:   READER CONSISTENCY STUDIES

Purpose

The purpose of the reader consistency studies was to determine the extent to which the observed reliability of the Essay test was a function of reader variation, rather than the other factors discussed previously.  If a substantial portion of an applicant's test score was due to reader variation, it would mean that the overall internal consistency of the examination could be improved if a feasible way were found to increase reader reliability.

Data Base

Two sets of data were used in the reader consistency studies.  The first set consisted of the scores assigned to the answers written by the 75 applicants in the initial reader standardization process (described in Section I of this report).  It will be recalled that in this process, each of the four readers assigned to a question scored all the answers to that question written by the 75 applicants.  Since an applicant answered only 80 percent of the questions asked, this amounted to about 60 answers per question.

The second data base was developed for questions #1 (Contracts), #3 (Community Property), #9 (Corporations), and #10 (Real Property).  These questions were felt to be representative of the different kinds of questions asked on the examination.  A copy of each question appears in Appendix C. Thirty answers to each of these four questions were then selected randomly and interspersed in the total batch of answers that were graded by each reader during the normal grading process.  Fictitious code numbers were assigned to the answers so that they could be embedded without detection in the regular set of answers ($N \simeq 680$) to be scored by each reader.  Thus, the readers did not know which answers were being used for research purposes, nor did they even know the nature of the study being conducted.

-17-

This insertion of the special set of 30 answers was done twice, once near the beginning of the six-week reading period and again near the end. In addition, each answer was scored by one reader near the middle of the grading period. In fairness to the applicant, the latter score was the one combined with that applicant's scores on other questions in order to determine his or her pass/fail status.

Indices of Agreement

Three indices of reader variation were examined for each data set. The first index was a reliability coefficient that measured the degree to which the four readers per question generally agreed or disagreed as to which applicants performed better than other applicants. The second index was the degree to which the mean (average) score was consistent; e.g., was there agreement in the actual level of the scores assigned or was there any reader variation due to differences in leniency? Finally, and perhaps most importantly from the standpoint of policy decisions, an examination was made of the degree of agreement on the pass/fail decision on each question, where a score of 70 was considered passing.

The foregoing indices were computed for the degree of consistency between readers (interreader variation) for both data sets (calibration and embedded answers). Within reader consistency (intrareader variation) was computed for just the latter data set.

## Interreader Agreement

An inspection of Table 4 indicates that there was far more consistency among the readers before the regular reading process began (calibration data set) than there was once this process was underway. This difference is evident on all three indices of agreement and clearly illustrates that the initial calibration data does not reflect accurately the degree of agreement among the readers in the scores that are subsequently used in determining an applicant's pass/fail status. For instance, with the calibration sample there was a range of 70-85 percent agreement on the pass/fail decision, whereas this range dropped to 27-57 percent at the beginning and to 23-53 percent at the end of the regular reading period. In other words, during the normal reading process, the readers agreed with one another about one-half as well as they did during the calibration process!*

## Intrareader Agreement

A comparison of the data in Tables 4 and 5 indicates that the readers tended to agree more with themselves across different occasions than they did with each other on the same occasion. For instance, the average correlation between any two readers on the same occasion was about .45, whereas the average correlation between the scores assigned by the same reader on different occasions was .62. Similarly, of the 16 tests of the differences between means on the two occasions (four tests per question), only two of them indicated that the reader was significantly different in the average score assigned.

---

*A study conducted with all 15 questions on the July 1977 examination replicated the finding that the level of agreement among the readers on answers that were graded prior to the calibration conference was substantially greater than it was on answers embedded into each reader's batch during the regular scoring period.

Table 4.   Indices of Interreader Agreement at Calibration and Toward the Beginning and End of the Regular Reading Period for Questions #1, #3, #9, and #10

| Index of Agreement | Calibration | | | | Beginning | | | | End | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | #1 | #3 | #9 | #10 | #1 | #3 | #9 | #10 |
| Average correlation between readers | .90 | .87 | .88 | .85 | .55 | .31 | .50 | .54 | .56 | .41 | .33 | .41 |
| Significant differences between average scores* | No | No | No | No | Yes | Yes | No | No | Yes | No | Yes | Yes |
| Percent consensus on pass/fail decision | 85 | 76 | 80 | 70 | 57 | 27 | 53 | 43 | 53 | 23 | 33 | 30 |

*Significant differences between average scores were determined by testing the main effect due to readers in a repeated measures analysis of variance (4 readers X 30 applicants) that was used to compute the reliability of the readers within each question.

The figures for the percentage of consensus on the pass/fail decision are not directly comparable between the two tables, in that Table 4 presents data for four readings, whereas Table 5 presents data for just two readings. Thus, a separate analysis was conducted to determine the average percentage of agreement on the pass/fail decision between all possible pairs of readers for each question on each occasion. The results of this analysis are presented in Table 6 and indicate that two readers of the same question generally agreed with each other about 67 percent of the time on the pass/fail decision, whereas a single reader agreed with himself or herself on different occasions about 75 percent of the time.

## Affect of Reader Variation on Essay Scores

It is evident from the foregoing results that a significant portion of the relatively low correlation between essay questions can be attributed to reader inconsistencies. A series of standard statistical procedures was therefore carried out in order to determine the magnitude of this extraneous influence relative to that of the other factors that affect an applicant's score.

The first step in this process was to estimate what the average correlation between questions would have been if there were no reader inconsistencies. This was done by a technique called "correction for attenuation" (Nunnally, 1967).* The results of this analysis indicated that the average correlation between questions would have risen from .22 to .49 if reader variation had been eliminated.

---

*The formula for the correlation between two measures after correcting for their respective reliabilities equals the observed correlation between these measures divided by the square root of the product of their respective reliabilities (Nunnally, 1967). In this study, the average correlation between two questions was .22. The average correlation between two readers of the same answer (.45) was used as the estimate of the reliability of each question.

Table 5.  Intrareader Agreement on Answers Embedded Toward the
Beginning and Toward the End of the Reading Period

| Indices of Agreement* | Question Number | | | | Average |
|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | |
| Average correlation between occasions | .79 | .58 | .57 | .65 | .62 |
| Number of significant differences in mean scores | 0 | 0 | 1 | 1 | .50 |
| Average percent consensus on the pass/fail decision | 78 | 74 | 73 | 76 | 75 |

*Statistical Notes:  The correlation between each reader's
scores on the two occasions were averaged using z score
conversions.  Significant differences in mean scores
(alpha = .01) were determined by a correlated t-test between
each reader's mean score on the two occasions; i.e., four
tests per question.  Average percent consensus on the pass/
fail decision was computed by determining the percentage of
agreement for each reader on the two occasions and then
computing the average of these four percentages for each
question.

Table 6.  Average Percentage of Agreement on the Pass/Fail
Decision for All Possible Pairs of Readers on
Each Question on Each Occasion

| Occasion | Question Number | | | | Average |
|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | |
| Beginning | 74 | 60 | 74 | 70 | 70 |
| End | 73 | 58 | 65 | 61 | 64 |
| Average | 74 | 59 | 70 | 65 | 67 |

The second step in assessing the magnitude of the effect of reader inconsistencies on test scores was to estimate what the internal consistency reliability of the Essay test would have been if the readers had agreed with one another about the relative quality of the answers they graded. This was done by stepping-up the corrected average inter-question correlation with the Spearman-Brown formula (Nunnally, 1967). The results of this procedure indicated that the reliability of the Essay test would be .92 if reader inconsistencies were eliminated, versus the .77 that was actually obtained with the February 1977 Essay examination.

The third step in the process involved multiplying the square of each of these internal consistency reliability coefficients by 100 so as to determine their respective estimates of the percentage of an applicant's score that was due to general factors across questions. The results of these calculations indicated that the percentage of an applicant's score that could be attributed to these general factors would rise from 59 to 85 percent if reader inconsistencies were eliminated. It is evident, therefore, that about 26 percent of an applicant's Essay score was due to the lack of agreement among readers.

The difference between 85 percent and 100 percent reflects the relative influence of all the other factors that may have affected an applicant's score. These factors include, but are not limited to, the uniqueness of the skills and knowledge required to answer different types of questions, differences in the extent and nature of applicant preparation across content areas, variations in the applicant's level of fatigue and attention during the examination, etc.

Figure 1 illustrates how an applicant's total Essay score may be partitioned into the major factors that affect it. This figure includes the role of answer length, which is discussed in Section IV of this report. This role is part of (rather than in addition to) the 59 percent of an applicant's score that is attributable to general and systematic factors.



Figure 1.  Partitioning of an Applicant's Total Essay Score

SECTION IV:  SCORECARD STUDIES

An additional set of studies was conducted during the reading process to determine the factors within each question that were related to the grades assigned.  A second purpose of these studies was to determine whether the use of a component-oriented scoring system (as contrasted with the present holistic approach) would increase the Essay test's reliability by decreasing reader variation.

## Scorecard Development

In order to conduct these studies, a "scorecard" was developed for each of the four questions used in the reader consistency studies.  This development was done by a group composed of a staff person to the Committee of Bar Examiners, the member of this committee who was primarily responsible for leading the discussion of the question at the calibration conference, the member of the Board of Reappraisors assigned to that question, and the author of this report.  An additional reader per question also participated in this process; i.e., a reader who was not one of the four readers involved in the regular reading process.  This fifth or so-called "scorecard reader" was selected from the pool of available readers for the question and was considered typical of the other readers in terms of prior reading experience and ability. However, this reader did not participate directly in the calibration process described in Section I of this report.

The scorecard itself consisted of a listing of the major issues that were unique to the question, and that should have been addressed by the applicants who answered it, as well as five general dimensions that were common to all four questions.  The instructions for using this scorecard, the number of points that could be assigned to each dimension, and the criteria for this scoring are presented in Figure 2.  Appendix D contains a sample scorecard.

The five-point scale to be applied in evaluation of the applicant's work as to individual issues peculiar to your question is as follows:

0 = No recognition of issue

1 = Recognized as a legal issue only – not passing

2 = Discussed issues – some doubt regarding passing

3 = Discussed issue well enough to be a clear pass

4 = Discussed issue extremely well

A ten-point scale is to be applied in the evaluation of the following general dimensions, indicating the extent to which the applicant:

A.  Properly states the applicable rules;

B.  Properly applies the rules to the facts;

C.  Reaches objectively correct conclusions;

D.  Reasons and analyzes the case logically; and

E.  Articulates the answer in clear, lawyer-like manner and uses appropriate legal terminology.

The ten-point scale should be constructed about the concept that "7" indicates performance creating doubt as to passing, like "70" in the former grading system.  Do not use any official "floor."  Try to use the full ten-point range, but don't "force" it.

You are also to indicate your overall evaluation of each answer by using a grading scale of 0-100 in five-point increments in the same manner as you have previously graded: 70 being doubtful, 75 a clear pass, etc. However, you are to indicate the grade only on a score sheet and not write it on the answer book.

Figure 2.  Directions for Scorecard Grading

Users of the scorecard were also instructed to indicate their "overall evaluation" of each answer using the standard 100-point grading scale, where 70 was considered a "doubtful" pass and 75 was a "clear" pass.

The number of unique dimensions for each question is listed in Table 7. The variation in the number of dimensions per question apparently stemmed mainly from the nature of the questions and the content areas they addressed.

Table 7. Number of Unique Dimensions Per Question

| Question Number | Number of Dimensions |
|---|---|
| #1 | 8 |
| #3 | 14 |
| #9 | 11 |
| #10 | 6 |

## Procedures

The scorecard reader for each question graded a stratified random sample of 600 answers (150 per regular reader) plus the 30 answers that were selected for the reader consistency studies. The scorecard reader graded these 30 answers at the beginning of the six-week grading period and again toward the middle and end of this period. At the conclusion of this grading period, an additional random sample of 60 answers was chosen for questions #1, #3, #9, and #10, and the two types of readers (regular and scorecard) switched grading methods. In other words, the regular readers graded this sample of 60 answers using the scorecard while the "scorecard reader" graded the sample using the regular method.

Both types of readers, regular and scorecard, used a holistic approach in assigning their respective overall grades. The only major difference between the two procedures was that the scorecard reader had to evaluate and grade each answer component before making a judgment as to the general quality of the answer. While this latter grade was not a systematic composite of the scores on each issue (i.e., the total scorecard grade was not a weighted or unweighted sum of the dimension scores), it was hypothesized that the process of scoring each answer component separately would influence the overall grade assigned by the scorecard reader. The scorecard readers also reported that their method required about twice as much time to grade an answer as did the regular method.

## Intrareader Agreement With the Scorecard

An analysis of the consistency data with the scorecard indicated that this approach made a slight improvement in the intrareader reliability of the essay grading process. Intrareader agreement was examined by comparing the consistency in the overall grades assigned to the set of 30 answers that were graded with the scorecard by the same reader on three occasions. Table 8 compares the results of this analysis with the percentage of intrareader consensus for regular readers on these same answers.

Table 8.    Percentage of Answers on Which there was Intrareader Consensus on the Pass/Fail Decision at the Beginning, Middle, and End of the Reading Period (N = 30 answers per question)

| Type of Reader | Question Number | | | | Average |
|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | |
| Regular* | 57 | 70 | 50 | 60 | 59 |
| Scorecard | 63 | 60 | 77 | 50 | 63 |

*The data for the "regular reader" were computed for the 7 to 8 answers per reader that were graded on all three occasions.

-28-

Interreader Agreement With the Scorecard

Table 9 presents the data for interreader consistency when the four regular readers switched over and used the scorecard on the set of 60 answers per question. An inspection of these data in comparison to the level of agreement achieved by these same four readers when they used the regular method reveals certain differences and similarities. First, the scorecard method yielded substantially higher interreader correlations; i.e., the scorecard method produced more agreement in how the readers rank-ordered the applicants than did the regular method. On the other hand, both methods yielded significant differences in the average scores assigned by different readers, which in turn probably led to the relatively low degree of consensus (four-out-of-four agreement rate) among the readers with both methods.

Table 9.  Interreader Agreement With the Scorecard Method in Contrast to the Average Across Questions With the Regular Method*

| Index of Agreement | Scorecard Method | | | | | Regular Method | |
|---|---|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | Average | Beginning | End |
| Average correlation between readers | .47 | .61 | .77 | .74 | .66 | .48 | .43 |
| Significant differences between average scores | Yes | No | Yes | Yes | 75% | 50% | 75% |
| Percent consensus on pass/fail decision | 33 | 43 | 42 | 50 | 42 | 45 | 34 |

*Scorecard reader data were based on 60 answers per question. Regular reader data were based on the 30 answers per question that were scored by all four readers per question on two occasions during the six-week scoring period. The same four readers per question used both methods.

Degree of Agreement Between Methods

The results presented in Table 10 indicate the degree of agreement between the two grading methods, regular and scorecard, with the 600 answers per question that were read by both methods during the six-week scoring period. A comparison of these results with those presented in Table 9 indicates that there was generally as much agreement between methods as there was within each method. For instance, the two types of readers agreed with one another on the pass/fail decision about 60 percent of the time in contrast to the 67 percent and 68 percent between any pair of readers with the regular and scorecard approaches, respectively. Both methods also passed about 45 percent of the applicants per question.

Table 10.  Degree of Agreement Between Scoring Methods (N = 600)

| Index of Agreement | Method | Question Number | | | | Average |
|---|---|---|---|---|---|---|
| | | #1 | #3 | #9 | #10 | |
| Correlation between methods | Regular vs. Scorecard | .42 | .42 | .55 | .54 | .48 |
| Average Score | Regular | 70.5 | 69.4 | 69.7 | 67.8 | 69.4 |
| | Scorecard | 62.7 | 71.9 | 64.3 | 65.3 | 66.0 |
| Significant differences between average scores | Regular vs. Scorecard | Yes | Yes | Yes | Yes | Yes |
| Percentage of applicants passing | Regular | 60 | 54 | 67 | 49 | 46 |
| | Scorecard | 33 | 70 | 39 | 38 | 45 |
| Percent of consensus on pass/fail decision | Regular vs. Scorecard | 57 | 65 | 68 | 52 | 60 |

Weighted Scorecard Development

All of the foregoing analyses involving the scorecard used the overall grade assigned by the reader. It was anticipated that this grade would be influenced, at least in part, by having the reader evaluate each answer component. However, the overall score itself was not computed from the component scores. One reason for this was the desire to evaluate each component on its own merits, and a second reason was to maintain consistency across questions in how components were scored.

It was recognized, of course, that certain answer components (issues) should have a somewhat greater influence than others in determining an applicant's overall score. In other words, dealing well with certain issues should not necessarily compensate for comparatively poor performance on other issues. An attempt was made, therefore, to weight the various answer dimensions so as to arrive at an overall composite score that reflected the relative importance of each answer component. The persons asked to participate in this activity were essentially the same as those involved in developing each scorecard. Unfortunately, relatively few of these individuals provided usable data. Further, those that did participate in this activity rarely agreed well with one another as to the relative importance of the issues.

It was decided, therefore, to develop the weights in an empirical rather than a subjective fashion. The first step in this process involved computing the average score on each unique dimension for the 60 answers per question that were graded by the four readers per team in the switchover study. The correlation was then computed between the average of these four readers' holistic total score and the average of each of the dimension scores. Next, the resulting correlation coefficients were transformed to a standard scale of measurement (z scores). The weights derived from this process therefore

reflected the actual relative influence of each dimension on the total holisitc score assigned by the typical reader in the switchover study.*  Finally, these weights were combined and scaled so that a weighted scorecard grade of 70 had the same meaning – namely, "just pass" – as did a 70 in the regular reading process.

Results With the Weighted Scorecard

The foregoing weighting and scaling system was applied to the scores assigned to each of the dimensions on the sample of 600 applicants who had their answers graded by the scorecard method during the six-week reading period.  The results of this analysis indicated that the weighted scorecard grades correlated only slightly (and not statistically significantly) better with regular readers' grades (r = .53) than did the holistic grade assigned by the scorecard reader (r = .48).  As might be expected, there was a strong correlation (r = .87) between the weighted and holistic scorecard grades. Further, after making the necessary adjustments in the scale values of the weighted composite, the mean scores and the percent passing each question were essentially the same for all three types of grades (regular reader, holisitc scorecard, and weighted scorecard).

---

*An alternative statistical technique (called multiple regression analysis) that might have been used for the weighting process was not employed, for two reasons: (1) there were too many dimensions per question to get satisfactorily stable weights with only 60 answers per question, and (2) the weights derived from such a process would be affected by the inter-correlations between the dimension scores.

## Agreement Regarding Relative Weights

The distinct lack of agreement regarding the relative importance of the answer dimensions among the group who were asked to make these subjective judgments led the author to suspect that this situation may have been one of the underlying causes of the substantial reader variation noted previously. To investigate this matter further, the switchover data were used in computing the correlation between the overall holistic score assigned and each dimension score for each of the four readers per question who were involved in this study. The resulting correlation coefficients were then transformed to a standard scale of measurement (z scores) and analyzed to determine the extent to which the four readers per question agreed in the relative importance of the dimensions. In other words, the purpose of this analysis was to determine whether some of the variation among readers was due to differences between them in how much conscious or unconscious emphasis they placed on each answer dimension during the scoring process.

The results of this analysis indicated that the average correlation between two readers' weights for questions #1, #3, #9, and #10 were .64, .28, .72, and .74, respectively. The average correlation between readers in the weights they assigned was .62. This figure suggests that at least one source of reader variation may be underlying differences between readers in how much weight they place on how well an applicant handles various aspects of the question. On the other hand, the degree of agreement on most questions was strong enough to identify clearly which issues generally had the greatest impact on the grading process. It is not known, however, whether these trends across readers were consistent with the relative emphasis the Committee members would have assigned when they selected the question.

Analysis of Artifacts

Previous research on essay grading in general and on law school and bar grades in particular (Klein and Hart, 1968; Klein, 1976) have indicated moderate correlations between the grade assigned to an answer and that answer's length and handwriting quality (legibility).  If such factors were influencing the grades assigned, they would tend to increase the observed correlations between the readers.  In other words, the observed reliabilities may be an overestimate of the true relationships because of the effects of systematic but extraneous factors.

This possibility was investigated by determining the length and handwriting quality of the set of 60 answers per question used in the switchover study.  These answers were chosen because they had been graded by several readers and therefore the average grade assigned was substantially more reliable than that of a single reader.

The correlation of this average total grade with the answer's length and handwriting are presented in Table 11.  An inspection of these data indicates that the number of words written on an answer had a low positive correlation ($\bar{r}$ = .29) with the grade assigned, whereas handwriting was unrelated to grades.  Slightly higher correlations ($\bar{r}$ = .42) were obtained between average grade and length of answer with the sets of 30 answers per question that were graded in the consistency studies described in Section III of this report.

Table 11.  Correlations Between Average Score, Length, and Handwriting
Quality for a Set of 60 Answers Per Question

| Artifact | Average Score on Question | | | | | Total Essay Score* |
|---|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | Average | |
| Answer Length | .29 | .45 | .21 | .21 | .29 | .37 |
| Handwriting Quality | .12 | .08 | .10 | .03 | .08 | .04 |

*The correlations in this column were based on the average artifact score
over 4 questions versus the applicant's total essay score over 12 questions.

The last column of Table 11 contains the correlation between the applicant's
total Essay score (i.e., based on 12 answers) with that applicant's average
answer length and handwriting scores.  On the basis of these data it appears
that applicants who wrote more tended to get higher Essay grades than those
who wrote less.  While it may be argued that this occurred because those who
knew more were able to write more, the low correlation (r = .10) between
answer length and MBE scores, coupled with the strong correlation between MBE
and Essay scores, would suggest that length alone may have had a small but
significant influence on the scores assigned.

An analysis of possible changes in reader leniency over the six-week
grading period was conducted for questions #1, #3, #9, and #10 for the set of
600 answers per question that was used in the scorecard study.  The results of
this analysis indicated that the average grade of the answers that were scored
near the beginning of this period was essentially the same as the average
grade assigned near the middle and end of the period.  Thus, score migration
over time did not appear to be a source of the observed inconsistencies in the
grading process.

General Factors Related to Readers' Grades

Each answer was evaluated on the scorecard on five general dimensions across the four questions studied. Table 12 contains the correlations between these dimensions and the score assigned by the regular reader to the 600 answers that were graded during the six-week scoring period.

An examination of these data indicates that no one dimension was generally more or less associated with the total score than was any other dimension. In fact, there appeared to be more differences in the level of the coefficients between questions than within questions. Additional analyses further indicated that the dimension scores were generally highly correlated with each other. This meant that the scorecard readers could not differentiate especially well between these dimensions and/or that an applicant who did well on one of them also tended to do well on the others. In any event, combining the various dimensions into a weighted score did not substantially increase their ability to predict the regular readers' grades.

Table 12.    Correlation Between General Dimension Scores
and Reader's Grades (N = 600)

| Dimension | Question | | | | Average |
|---|---|---|---|---|---|
| | #1 | #3 | #9 | #10 | |
| Properly States the applicable rules | .31 | .40 | .55 | .52 | .45 |
| Properly applies the rules to the facts | .32 | .35 | .54 | .55 | .44 |
| Reaches objectively correct conclusions | .39 | .36 | .55 | .54 | .47 |
| Reasons and analyzes the case logically | .24 | .19 | .53 | .46 | .36 |
| Articulates answer in a lawyer-like manner | .32 | .26 | .51 | .35 | .36 |

SECTION V:  REAPPRAISOR STUDIES

## Introduction

As noted in Section I of this report, an applicant whose combined MBE
and Essay score is between 1140 and 1199 is placed in the reappraisal category.
The applicants in this category have all 12 of their answers read as a set by
two reappraisors who independently make a pass/fail decision.  If they agree,
the decision stands.  If they disagree, a third reappraisor reads the set of
12 answers in order to break the tie.

The presumed main virtue of this reappraisal process is that it corrects
for possible deficiencies in the readers' initial scores that would cause an
applicant who should have passed, to fail.  However, prior to the present study,
relatively little was known about the effects of this system on the precision
with which the reappraisors' pass/fail decision was made.

## Purposes

The reappraisor studies were undertaken to learn more about the nature of
this process and to explore ways in which it might be improved.  Some of the
major questions to be answered by this investigation were as follows:  How
reliable is the reappraisal process?  To what degree, if any, are the re-
appraisors influenced by the initial scores assigned to an applicant's answers?
Does reading an applicant's answers as a set provide any unique information
about that applicant's performance level?  Do the initial readers and re-
appraisors agree on the relative and absolute quality of the answers; i.e.,
are they using the same grading standards?

Reread Methods

Three different reread procedures were utilized in order to gather the data needed to answer the questions above. These three methods were as follows:

Method #1. This was the standard system in which the reappraisors graded all the answers written by one applicant before they graded the set written by another applicant. Further, the reappraisors were cognizant of an applicant's score on the MBE and on the essay questions that were graded during the regular reading process.

Method #2. This method was the same as #1 with the exception that the reappraisors were not told the applicant's MBE or Essay scores.

Method #3. This method involved the reappraisor grading all the answers to a particular question for all applicants before going on to grade all the answers to another question. As in Method #2, the reappraisors who used this strategy were not aware of the applicant's MBE or Essay scores.

Applicants

Eight sets of 15 applicants each were selected from among the applicants whose combined MBE and Essay scores fell between 1170 and 1199. Within each set, about one-half of the applicants had total scores between 1170 and 1184, while the other applicants had scores between 1185 and 1199. It was decided not to use applicants whose scores fell between 1140 and 1169, in that prior research had indicated that there was little likelihood that applicants in this region would be passed as a result of the reappraisal process.

Table 13 illustrates how the eight sets of applicants were assigned to reappraisors. A distinction was made between Methods #1A and 1B in this table, so as to depict more clearly the various types of data that were collected and the fact that certain sets of applicants had their answers read twice by the same reappraisor with Method #1.

Table 13.  Assignment of Applicants to Reappraisors

| Set Number | Method #1A | | | | | | | | Method #1B | | | | | | | | Method #2 | | | Method #3 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | A | B | C | D | E | F | G | H | A | C | E | B | D | F |
| 1 | X | X | | | | | | | | | | | | | X | X | X | X | X | X | X | X |
| 2 | X | X | | | | | | | X | | | | | | | | | | | | | |
| 3 | | | X | X | | | | | | | | | | | X | X | X | X | X | X | X | X |
| 4 | | | X | X | | | | | | | X | X | | | | | | | | | | |
| 5 | | | | | X | X | | | | | | | | | X | X | X | X | X | X | X | X |
| 6 | | | | | X | X | | | | | | | | X | | | | | | | | |
| 7 | | | | | | | X | X | | | | | | | X | X | X | X | X | X | X | X |
| 8 | | | | | | | X | X | | | | | | | | | | | | | | |
| Total | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 0 | 1 | 1 | 0 | 1 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

Note:  Each "X" refers to a set of applicants who had their answers read by a particular reader with a given method.  For example, the applicants in set #2 had their answers graded twice by Reappraisor A and once by Reappraisor B with Method #1.

Reappraisor Assignments

Eight reappraisors (A to H) were assigned to applicant sets according to the plan presented in Table 13.  In this plan, each reappraisor graded one or more applicant sets twice:  once using Method #1 and again with either Method #1, #2, or #3.  This assignment system was devised in order to reduce the chances that a given reappraisor would recognize a particular applicant's answers when they were being scored for the second time as well as to have at least three reappraisors per method.  This latter requirement also was adopted to help balance out any idiosyncratic grading behavior.

Procedures

The reappraisors using Methods #1 and #2 completed a score sheet for each applicant on which they indicated the grade they assigned to each answer. Space also was provided on this form for the reappraisors to add or delete points to reflect their assessment of the overall quality of the answers as a set. In other words, the reappraisors were encouraged to use this adjustment when they felt that the applicant's total score on the individual questions was not an adequate reflection of that applicant's true performance level.

All of the grading with Method #1 was embedded into the regular reappraisal process. Methods #2 and #3 were employed immediately after all 991 eligible applicants had gone through the regular reappraisal process. Thus, the re-appraisors using Methods #2 and #3 were aware that research was underway but they were generally not aware of the fact that they may have graded an applicant's answers on a previous occasion. A variety of other procedures were also employed to counterbalance possible sequence or order effects in all three methods.

Intrareappraisor Agreement With Method #1

The degree to which a reappraisor agreed with himself or herself on two separate occasions with Method #1 was assessed for six of the eight reappraisors (A, C, D, F, G, and H), with 15 applicants per reappraisor. Four of the six correlation coefficients between occasions were .90 or greater, and the average of all six was .90. This high degree of consistency across the two occasions was also reflected in the average total score assigned, the average passing, and the degree of agreement on the pass/fail decision. For example, on the average, a reappraisor agreed with himself or herself 93 percent of the time on whether or not the applicant should pass.

Interreappraisor Agreement Within Methods

Table 14 presents various indices of the degree of agreement among the three reappraisors who used each method. An inspection of this table indicates that the average correlation among the reappraisors (i.e., how they rank-ordered the relative performance of the applicants) was somewhat higher with Method #1 than with either of the other two methods. On the other hand, the reappraisors within each method agreed with one another about 54 percent of the time on the pass/fail decision when this decision was based on the combination of Essay plus MBE scores. Since this latter index is more policy-relevant than the average correlation among readers, one may conclude that the methods do not differ substantially from one another in terms of their respective degrees of interreappraisor agreement.

It is important to note, however, that the absolute level of agreement, 54 percent, is not especially high when one considers the importance of the pass/ fail decision to the applicant. In other words, when one limits the reappraisal process to the applicants in the truly questionable zone (i.e., those with scores between 1170 and 1199), then it is difficult to get reappraisors to agree on whether or not the applicant should pass or fail. This is true regardless of which reappraisal method is employed.

One reason for the difficulty in achieving consensus may have been that the performance levels of the "true" pass and "true" fail applicants were so close to one another that any method was essentially asking the reappraisors to make distinctions where there are no real differences. The range of scores may have been so restricted as to preclude any other method from doing much better. It will be recalled, however, that applicants were placed in the reappraisal category on the basis of their composite MBE and Essay score. Thus, there were many applicants in this group who had high Essay and low MBE scores, as well as those who had low Essay and high MBE scores.*

---

*The mean and standard deviation (SD) of the total Essay score (prior to re-appraisal) of the 60 applicants in this group were 823.75 and 16.71, respectively, as compared to a mean of 814.19 and a SD of 57.80 in the total group who took the test.

Table 14.  Interreappraisor Agreement Within Methods
(60 Applicants and 3 Reappraisors per Method)

| Indices of Agreement | Method #1 | Method #2 | Method #3 |
|---|---|---|---|
| Average correlation among reappraisors | .43 | .22 | .12 |
| Significant difference in average scores* | Yes | Yes | Yes |
| Percent consensus on the pass/fail decision | 55.0 | 53.3 | 53.3 |

*Statistical Note:  Significant differences within each method were
assessed by examining the main effects due to reappraisors in a
3 X 60 repeated-measures analysis of variance for each method
(Winer, 1962).  All tests were statistically significant with alpha
less than .01.  A dummy variable was created to serve as the third
reappraisor (i.e., in addition to reappraisors G and H) for Method
#1.  This was done by computing the average score between re-
appraisors A and B for each applicant in set 1, between C and D for
each applicant in set 3, etc.  An inspection of the intercorrelation
matrix for Method #1 as well as the means and variance for all three
"reappraisors" indicated that the dummy variable behaved in
essentially the same fashion as reappraisors G and H.  This would
suggest that any extraneous variance introduced by using eight
different reappraisors to create the dummy variable was essentially
offset by the somewhat higher reliability of each applicant's score,
since that score was the average of two reappraisors.

It is also possible that the very same factors that may have produced the substantial degree of reader variation discussed in Sections III and IV of this report led to a similarly high levels of reappraisor variation. The relatively large and statistically significant range of average total Essay scores within each method (10 points for Method #1, 45 points for Method #2, and 13 points for Method #3) further support the hypothesis that the reappraisors were not especially consistent with one another in their grading behavior, regardless of which method was used. In other words, the reappraisors may have been no more highly calibrated with each other in terms of grading standards than were the initial readers.

In all likelihood, the major restriction in the range of applicant scores combined with a substantial degree of reappraisor variation in grading standards produced the relatively low interreappraisor reliabilities that were observed.

Intermethod Agreement

Tables 15 and 16 present various indices of the degree of agreement between the three reappraisal methods. In these tables, the average of each applicant's total Essay score across the three reappraisors within a method was used as that applicant's score for that method, so as to maximize the reliability of the method scores.

An inspection of the data in Tables 15 and 16 indicates that the major difference between the three methods was in the average score assigned. Method #1 had a 15-point higher average total Essay score than either Method #2 or Method #3. On the other hand, all three methods tended to agree with one another in the final pass/fail decision. The strong degree of agreement (83 percent) between Methods #2 and #3 also suggests that little or no additional information was provided by having an applicant's answers read as a set rather than graded

individually.  Further, the degree of consensus across all three methods regarding whether or not an applicant should pass or fail was 71 percent. Given the fact that none of the methods themselves were especially reliable, the 71 percent figure would suggest that if the reliability of the reappraisal process could be improved, then all three methods would yield essentially the same pass/fail decision.

Table 15.  Consensus on the Pass/Fail Decision and the Correlations
Between Methods (N = 60 Applicants/Method)*

|  | Method #1 | Method #2 | Method #3 |
|---|---|---|---|
| Method #1 |  | .41 | .44 |
| Method #2 | 76% |  | .46 |
| Method #3 | 78% | 83% |  |

*The percentages of consensus on the pass/fail decision and the correlations between methods appear below and above the main diagonal, respectively.

Table 16.  Average Total Essay Score and Percent Passing With
Each Method (N = 60 Applicants/Method)

|  | Method #1 | Method #2 | Method #3 |
|---|---|---|---|
| Average total essay score | 825.79 | 809.22 | 810.89 |
| Percent passing | 24.4 | 20.0 | 21.0 |

Reappraisor Agreement With Initial Score

The presumed major value of the reappraisal process is that it corrects for possible inaccuracies in the initial scoring so as to avoid the error of failing an applicant whose performance is really at the passing level. The question arises, however, as to whether the reappraisal process is performing this function or simply passing those applicants who came very close to the initial cutoff score of 1200 points.

This issue was investigated in several ways. The first approach involved comparing the final pass/fail decision for every applicant in the reappraisal category with these applicants' initial total MBE plus Essay scores. The results of this analysis are presented in Table 17 and indicate a very strong correspondence between initial score and the subsequent pass/fail decision. For example, if an applicant's total score was 1190 or higher, that applicant had an 85 percent chance of passing as a result of the reappraisal process, whereas if an applicant's score was below 1190, the applicant had only an 8 percent chance of passing. No one with a composite score below 1170 passed!

Table 17.   Relationship Between Initial Total Score and the Reappraisal Pass/Fail Decision for All Reappraised Applicants (N = 991)

| Initial Total Score | Reappraisal Decision | | Total |
|---|---|---|---|
| | Fail | Pass | |
| 1190 to 1199 | 24 | 131 | 155 |
| 1180 to 1189 | 112 | 57 | 169 |
| 1170 to 1179 | 152 | 7 | 159 |
| 1160 to 1169 | 175 | 0 | 175 |
| 1150 to 1159 | 171 | 0 | 171 |
| 1140 to 1149 | 162 | 0 | 162 |
| Total | 796 | 195 | 991 |

-45-

One explanation for the foregoing findings is that the initial readers' scores were so accurate that only very small adjustments were required, and therefore, there was little likelihood of an applicant with a relatively low score receiving enough extra points to be placed in the passing category. While there may be some merit in this hypothesis, the results presented in Section III of this report suggest that a considerable portion (26%) of an applicant's Essay score was due to random variation among the readers. An alternative, but related, explanation of the results presented in Table 17 is that the reappraisors and initial readers had essentially the same grading standards, and therefore reached basically the same conclusion about an applicant's performance. This hypothesis also seems tenuous in light of the fact that the reappraisors did not agree especially highly with one another within any of the reappraisal methods. In other words, it would seem unlikely that they would agree highly with the regular readers and not with each other. On the other hand, a high level of agreement between the Method #1 results and the initial readers' scores might be obtained if those initial scores had a substantial influence on the reappraisors' judgments.

A direct test of the "substantial influence" hypothesis was provided by a comparison between the extent to which the sum of the initial readers' Essay scores correlated with the reappraisors' score with Method #1 versus Method #2 or Method #3. The results of this analysis, which are presented in Table 18, indicate that the average Method #1 Essay scores were far more highly correlated with the initial total Essay scores (r = .81) than were the Essay scores in either of the other two methods. The strong degree of agreement between the initial readers' judgment and that of the reappraisors all but disappeared when the reappraisors were not aware of the initial scores.

Table 18.  Correlation Between Initial Scores and the Average
Reappraisal Score With Each Method (N = 60 Applicants/
Method)

| Type of Initial Score | Method #1 | Method #2 | Method #3 |
|---|---|---|---|
| Total Essay | .81 | .21 | .22 |
| Essay + MBE | .29 | .09 | .23 |

Note:  The average score within each reappraisal method was used
in order to obtain the most reliable set of scores possible with
the available data.

SECTION VI:  SUMMARY OF MAJOR FINDINGS AND THEIR POLICY IMPLICATIONS

Summary

The analyses presented in Section II indicated that the total examination score (MBE + Essay) fell within the range of meeting the minimum reliability requirement for a test that is used in making decisions about individual applicants. When the MBE is used by itself, it meets this minimum standard.  The present 12-answer-per-applicant Essay portion of the test does not reach this level, even though it requires more than twice as much testing time as the MBE.  Further, the two portions of the examination appear to be measuring the same or comparable abilities, in that scores on the MBE and Essay correlate .65 with each other despite the comparatively low reliability of the Essay test.

Section III's results revealed that the relatively low correlation between essay questions was more a function of inconsistencies in the regular grading process than of the uniqueness of the skills and knowledge required to answer different questions.  For instance, two readers of the same set of answers agreed with each other only about two-thirds of the time as to the pass/fail status of an answer in that set.

The corresponding analyses of the data obtained with the 75 applicants who had their answers graded prior to the calibration conference produced substantially higher levels of reader agreement.  The discrepancy between the results with these data and results obtained during the regular reading process may have been due to one or both of the following factors:  (1) lack of independence among the readers during the calibration period, such as might stem from their discussing the answers with one another before assigning their final grades, and (2) spending more effort in grading each answer in the calibration set than was devoted to the typical answer during the regular scoring process.

The studies described in Section IV suggested that the scorecard approach to grading made only a slight improvement in the overall level of test reliability. This may have been due to limitations in the approach itself (such as not devoting enough time to scorecard development) and/or in its implementation (such as not providing adequate reader training or monitoring of scorecard use). Regardless of the influence of such factors, it was clear that the utility of the scorecard approach per se was substantially undermined when its users reported that it required almost twice as much time per answer as did the regular method.

One important by-product of the scorecard studies was the discovery of an only moderate degree of agreement among readers and other relevant parties as to the relative importance of various answer components. However, when one looked for trends across readers, it was apparent that an applicant's performance on certain issues consistently carried far more weight than that applicant's performance on other issues.

The analyses of the potential impact of certain irrelevant factors on the scores assigned suggested that a small portion of the systematic differences between applicants was due to the respective lengths of their answers. While some of this relationship may have been a function of the more knowledgeable applicant writing more, length alone seems to play a role. This observation was based on the fact that although the Essay and MBE portions of the test assess the same or comparable legal abilities (as indicated by the strong correlation between them), only the Essay portion of the examination was correlated with answer length.

The results of the reappraisor studies provided several important insights into the reappraisal process. First, having an applicant's answers read as a set versus individually had essentially no impact on the pass/fail decision. Second, when the reappraisors did not know the initial readers' scores, they tended to assign somewhat lower total Essay scores than when the initial scores were made available to them. Third, all things considered, the reappraisors did not appear to be significantly more consistent in their grading practices than did the regular readers. And finally, the present reappraisal process appears to have the net effect of essentially passing applicants whose initial combined score (Essay + MBE) was higher than 1189 and failing those who fell below this cutoff point. For instance, using the "1190 or better" rule, one would make a correct prediction of a reappraisor's pass/fail decision 92 percent of the time. Even when one restricts the reappraisal sample to applicants in the 1170 to 1199 zone, the 1190 rule still works 82 percent of the time. This is substantially better than the level of agreement between reappraisors! For instance, regardless of the reappraisal method, three reappraisors achieved consensus on only 55 percent of the applicants in the 1170 to 1199 zone.

<u>Policy Considerations and Options</u>

It appears that the Committee of Bar Examiners can continue with their current practices and still essentially meet the minimum requirements for test reliability. The results presented in this report also indicate that improvements in these procedures could increase the efficiency and/or reliability of the essay grading and reappraisal processes.

One direction for such changes would be toward improving the degree to which the readers are calibrated with one another both before and during the regular reading period. A second approach would be to increase the number of questions answered during the examination, while at the same time selecting questions that can be addressed adequately in less time than is now allocated to each question. This option has the potential advantage of increasing both test reliability (as a result of more independent measures of an applicant's skills) and validity (as a result of wider sampling of the applicant's knowledge). On the other hand, the appropriateness of shorter questions for a bar examination would have to be assessed, and the increase in scoring time and logistical problems (stemming from more questions to grade) would have to be weighed against the potential benefits to be derived from this approach.

A third strategy would be to explore ways of increasing the number of independent readers per answer so as to balance out inconsistencies in grading practices. While such an approach does not take the place of asking enough questions to insure adequate content sampling for validity purposes, it is an option that can make a substantial contribution to the test's reliability. For instance, the average correlation between questions #1, #3, #9, and #10 was .21 when there was only one reader per answer whereas it was .41 when the applicant's score was based on the average of four readers per answer.

It is recognized that it may not be feasible to have several readers per answer for all applicants. On the other hand, multiple readers are only really needed for those applicants whose overall performance is truly questionable; i.e., their total scores place them near the cutoff point. This means that the Committee may be able to increase measurement precision at no additional expense (or even at reduced cost) by some reallocation of the readers' time such that more effort is devoted to applicants in the questionable zone. The

implementation of this approach would require certain changes in present procedures as well as some means for making an early and accurate identification of applicants who are in each decision category (i.e., clear pass, questionable, and clear fail).

The major purpose of the reappraisal process is supposedly to correct for possible inequities in the regular readers' scores by providing for additional readings of answers written by applicants whose performance was considered "questionable." The data presented in this report strongly suggest that this function is not being served. Instead, all the reappraisal process really does is to lower the overall cutting score by about 10 points. The present reappraisal process also does not even address inconsistencies in the initial scoring that result in passing applicants who, if their answers had been read again, would have failed. It would seem, therefore, that a far better use could be found for the expertise and experience that is provided by the Board of Reappraisors, as well as for the funds and staff time devoted to the reappraisal process. Moreover, the minimum score required to place an applicant in reappraisal could be increased substantially. This would reduce the time, costs, and score reporting delays that are now associated with the reread process without changing the accuracy of the pass/fail decisions or diminishing the public relations value of the process itself.

SECTION VII:  SPECIFIC RECOMMENDATIONS

The recommendations presented below were based on the results of the studies described in this report along with the author's personal observations of the test development and calibration processes.  Many of these recommendations have been discussed with the Committee of Bar Examiners and its staff.  Thus, the ramifications of some of these recommendations are now undergoing examination, whereas other suggestions are already being considered for implementation.

Test Planning

At the present time, Essay test questions are selected primarily by content area (such as Torts and Contracts), although some attention is given to the extent to which the question may require integration of legal principles across areas.  There is no other systematic sampling of the relevant content within each of these areas across test administrations.  Further, it is not known whether a question was able to elicit the kinds of appropriate responses that were presumably built into it.  The varying degrees to which an applicant's performance on different issues correlated with the overall score assigned indicated that the readers were placing more emphasis on certain components than they were on others.  The question arises, therefore, as to whether these differences are consistent with what the Committee of Bar Examiners had in mind when they constructed the test.

It is recommended, therefore, that the Committee of Bar Examiners conduct a content analysis of recent test questions so as to (1) determine which topics and issues within a given content area have been over- or under-stressed, and (2) provide a basis for subsequent question development and selection. The implementation of this recommendation also would be a feasible and cost-effective means for making an initial assessment of the test's validity, in that it would provide information regarding the breadth of relevant content coverage. A subsequent step would be to conduct a similar content analysis of the answers written, to determine whether the intended content and scoring emphasis were reflected in the answers written and the grades assigned.

It is the author's opinion that such a series of analyses would represent an important direction for subsequent research, in that the results obtained would have implications for the test construction process, as well as providing needed data on important aspects of the Essay test's validity.

The results with the four questions discussed in Sections III and IV indicated that no one question was generally scored any more or less reliably than any other question. For instance, Question #1 had the best interreader agreement rate on the pass/fail decision with the regular method but the worse rate with the scorecard method (see Tables 4 and 9). This occurred despite the fact that in both methods, holistic judgments were made by the same set of four readers per question. On the other hand, a few of the 15 questions on the February 1977 examination tended to have substantially above average correlations with the other questions on the test. This pattern may in part be due to systematic and manipulatable differences between questions in how reliably they can be scored, such as might stem from the number of issues than can be addressed in a passing answer. If this were so, it would have obvious implications for how future questions might be constructed. Thus, it is suggested that reader

reliability be monitored over a few test administrations so as to provide a data base for assessing whether these differences are related to a question's structural characteristics.

Finally, it appears that there are too many people involved in the test development process, which has resulted in considerably more effort being devoted to question construction and editing than to establishing relevant criteria for grading answers. It is suggested that this problem might best be addressed by splitting the Committee members and the Board of Reappraisors into teams that would focus on different content areas corresponding to each member's individual areas of expertise.

Reader Calibration

The reader calibration process was not wholly successful, in that two readers agreed with one another only about two-thirds of the time as to whether or not a given answer was considered to be passing. Only when an applicant's scores were summed over several questions did the effect of this reader variation diminish enough to provide a reasonably accurate estimate of the applicant's overall performance level.

This situation indicates that the Committee of Bar Examiners should consider the procedures listed below as possible ways of achieving and maintaining greater reader calibration.

1. Provide the readers with a list of the major issues in each question and some indication of their relative importance before they are even asked to begin the calibration process. This list should be constructed at the time the question is selected for inclusion in a given examination.

2. Encourage the readers to collaborate in grading a set of about 25 answers to help establish grading standards. Then have them independently grade a set of about 50 answers to determine their degree of agreement before the calibration conference.

3. Split the members of the Committee and the Board of Reappraisors into groups, with each group devoting its attention to only a few questions. In this way, more time can be spent with each reader team in reviewing grading standards. It is further suggested that a sample of about five answers be graded independently by all present at the calibration conference and the results immediately tallied and discussed. This approach will help insure that the readers are indeed calibrated to one another and to the Committee before they begin the regular reading process. The implementation of this recommendation will require modifying the reappraisal process in that a given reappraisor will not have participated in the calibration conference for each question. This modification can be made without jeopardizing the value of the reappraisal procedure, since the results presented in Section V of this report indicated that such a change would not have any appreciable impact on the pass/fail decisions that come out of the reappraisal process.

4. Establish a set of readily interpretable test statistics on the degree of agreement for each question. This set might include the correlation between readers as well as the average of these correlations; differences between readers in their average scores, standard deviations, and percent passing; and the degree of consensus on the pass/fail decision. A frame of reference should be provided for interpreting these statistics (i.e., what is considered "good," "acceptable," and "poor"), as well as a booklet for new Committee members that explains the use of these statistics.

5. Provide the readers with a set of benchmark answers against which to compare other answers about which there is some doubt as to the grade that should be assigned. The benchmark answers may be drawn from the set of 50 answers noted above that are used for calibration purposes.

-56-

6. Periodically have each team of readers independently grade and then discuss a common set of 10 answers, in order to insure the maintenance of calibration.

Test Scoring

It will be recalled that the purpose of the scoring process is to separate applicants into two groups, pass versus fail. The present system spreads its measurement precision across the entire score range rather than focusing on the pass/fail decision point. There is good reason to believe, therefore, that a stepwise classification process involving a reallocation of reader time could provide a substantial improvement in the measurement precision of the pass/fail decision.

Such a plan would involve using a portion of the test results (e.g., MBE plus the scores on four essay questions) to identify those applicants who stand an essentially 100 percent chance of passing the examination. Then all of the answers written by the remaining group would be graded by one or two readers. On the basis of the total score derived, these applicants could be placed into the following three categories: "clear pass," "still questionable," and "clear fail," The applicants who were placed in the "still questionable" category could then have their answers independently graded again by one or more readers so that an average score per answer could be computed, which in turn could be summed to determine the applicant's pass/fail status.

It is important to note that any system of this kind will not make exactly the same pass/fail decisions as were made on any previous examination. It also is true that exactly the same decisions would not be made if the applicants on a given administration had their answers graded again by a different (or even by the same) set of readers (or when indicated, set of

reappraisors). The reason for this state of affairs is the demonstrated presence of a substantial degree of unreliability in an applicant's Essay score that is directly attributable to inconsistencies in the grading process. In other words, it is highly unlikely that any stepwise grading approach will make exactly the same decisions as the present system when the present process cannot even duplicate its own decisions. Thus, any assessment of the potential utility of a stepwise system that involves a comparison to previous pass/fail decisions must allow for a small percentage of discrepancies (e.g., 5 percent) that are due to reader variation rather than any inherent differences between systems in the criteria they use for making pass/fail decisions.

Reappraisal Process

As noted previously, the present reappraisal process adds little if anything to the precision of the final pass/fail decision. Empirically, its main function has been to lower the cutoff score to approximately 1190 points. It is recommended, therefore, that if a reappraisal process is to be retained (such as for public relations purposes), it should be modified in the following ways:

1. Raise the minimum score required to place an applicant in the reappraisal category. This will avoid rereading the answers written by large numbers of applicants who have no chance of passing as a result of the reappraisal process (e.g., those with scores below 1160).

2. Have the reappraisors grade the applicants' answers without knowledge of these applicants' MBE and initial Essay scores.

3. Have the reappraisors use some of the strategies discussed above for improving reader agreement, such as participating in periodic calibration discussions.

It is further recommended that the requirement of having each applicant's answers reappraised as a set be dropped. This requirement does not change the pass/fail decision, but it may inhibit the introduction of important improvements in other procedures. The skills and experience of the Board of Reappraisors might best be employed in the service of drafting model answers and in establishing and maintaining reader calibration.

Conclusions

The research presented in this report indicated that an applicant's total examination score was sufficiently reliable to make pass/fail decisions. The MBE also met the minimum reliability requirement, but the more heavily weighted Essay section did not. This failure was primarily due to reader inconsistencies in the grading process. The most immediate and practical ways of correcting this problem are to increase the effective weight of the MBE, improve the reader calibration process, and increase the number of readers per answer (especially for those applicants whose performance level is near the pass/fail decision point). Increasing the number of questions per applicant while shortening their length would probably provide an increase in both reliability and validity, but this option would have to be weighed relative to its effect upon the time and resources required for test construction, administration, and scoring.

Finally, the reappraisors' expertise and experience appear to be greatly underutilized. Their skills are spread thinly over 15 questions per test rather than focused on just a few. Their contribution to correcting inequities in the initial grading process is questionable at best, especially considering the time and effort they devote to this function. It is evident that some reallocation of reappraisor time is warranted, particularly if it could be directed toward improving and maintaining reader calibration.

References

Bianchini, John.  Personal communication.  January 3, 1977.

Gulliksen, Harold.  Theory of Mental Tests.  New York: Wiley, 1950.

Klein, S.P.  An investigation of possible item and grader biases in a
     state bar examination.  Paper presented at the meetings of the
     Western Psychological Association, Los Angeles, California;
     April 9, 1976.

Klein, S.P. and Hart, F.  Chance and systematic factors affecting
     essay grades.  Journal of Educational Measurement, 1968, Vol. 5,
     197-206.

Nunnally, Jum C.  Psychometric Theory.  New York: McGraw-Hill, 1967.

Winer, B. J.  Statistical Principles in Experimental Design.  New York:
     McGraw-Hill, 1962.

Appendix A.  Glossary of Statistical Terms

## Appendix A

## Glossary of Statistical Terms

Mean Score

The mean score is the arithmetic average score. It is computed by adding all the scores and then dividing by the number of scores added.

Standard Deviation

The standard deviation of a test is an index of the degree to which the scores on that test spread out on either side of the mean (average) score. The larger the standard deviation, the greater the spread. Approximately 68 percent of the applicants fall within plus or minus one standard deviation of the mean, and about 95 percent fall within plus or minus two standard deviations. For example, the February examination had an average total score of 1170 and a standard deviation of 85 points. This means that applicants with scores between 1085 and 1255 comprised about 68 percent of those taking the test.

Correlation Coefficient

The correlation coefficient (symbolized by the letter "r") is an index of the degree to which the relative performance of the applicants on one measure corresponds to their relative scores on another measure. The correlation may be positive (which means that high scores on one measure correspond to high scores on the other) or negative. The coefficients themselves may range between $\pm 1.00$; the higher the coefficient, the stronger the relationship between the two measures (regardless of its algebraic sign). A zero correlation means that there is no relationship between the measures.

Internal Consistency Coefficient

An internal consistency coefficient is a type of correlation coefficient. It indicates the extent to which an applicant's performance level is consistent throughout the test, relative to the other applicants who took that test. If the content of the test is relatively homogeneous (e.g., all of the questions measure the applicants' general legal knowledge and skills), then its internal consistency coefficient provides an estimate of what the correlation would be between that measure and a parallel form of it. For example, the internal consistency of the 12-question Essay test was .77. This means that if the applicants answered another 12 questions, their scores on this second set would correlate about .77 (all other factors being equal) with their scores on the first set.

Standard Error of Measurement

The standard error of measurement is an index of the range within which an individual applicant's score is likely to fall on a parallel form of the test. For example, the standard error of measurement on the Essay + MBE equals 30 points (see Table 2). Thus, if an applicant had a score of 1170 on this test, the chances are two out of three that this applicant would have received a score between 1140 and 1200 had that applicant taken a different form of this test. The more reliable the test, the smaller the standard error of measurement.

Appendix B.  Procedures For Estimating The Reliability

Of The Composite Essay + MBE Score

Appendix B

Procedures for Estimating the Reliability of the

Composite Essay + MBE Score

The following procedures were used in obtaining the estimates presented in Table 3:

1. The nominal weights of 70 percent for the Essay test and 30 percent for the MBE were employed regardless of the number of essay questions answered. Since each essay question was worth a maximum of 100 points, the total possible score on the MBE scaled to an Essay test of a given length equaled 42.86 times the number of questions answered. It was noted, however, that the relative sizes of the Essay's and MBE's standard deviations, and therefore their actual effective weights, were not proportional to their nominal weights. The four answer Essay test had a 66/34 split while the 24 answer test had a 60/40 split.

2. The reliability of the 12 answer essay test was estimated on the basis of the average correlation between the questions, between the three essay test sessions, and between the first and second six questions answered. After being adjusted by the Spearman-Brown formula (Nunnally, 1967), a reliability of .77 was obtained with all three estimates.

3. The reliability of the MBE has been reported to be .90 (Bianchini, 1977). The length and therefore the reliability of this test remained constant despite its being scaled to a nominal weight of 30 percent. The reliability of the Essay test, on the other hand, had to be adjusted for the number of questions answered. This was done with the Spearman-Brown formula.

4. The standard deviation of the MBE was scaled for combination with Essay tests of varying length by multiplying the MBE's observed standard deviation (35.66) by the number of times the Essay test was changed in length. For instance, the MBE's standard deviation was scaled to 71.32 when the MBE was coupled with a 24 answer Essay test.

5. The standard deviation of the Essay test and the correlation between the MBE and Essay test were estimated by the procedures described by Gullicksen (1950, pg. 71, Eq. 12 and pg. 104, Eq. 5).

6. The reliability of the Essay + MBE composite score for an Essay test of a given length was estimated with the procedures described by Nunnally (1967, pg. 229, Eq. 7-11).

Appendix C.   Essay Questions

# QUESTION NO. 1

*(Answer this question in Book No. 1)*

In December 1975, during his last year of college, Paul applied for post-graduation employment with Dryden, an accountant. On January 15, 1976, Dryden wrote to Paul: "I offer you employment with my firm, beginning August 1, 1976 at $15,000 per year." A few hours after mailing the letter, Dryden telephoned Paul. Dryden stated that a letter offering employment was in the mail and that he wanted to make it clear that "I will keep you on staff and expect you to stay for at least a year to see how things work out if you accept the job." Paul stated that he would reply promptly.

Upon receipt of Dryden's letter, Paul responded by letter, "I accept your employment offer of January 15, 1976."

On March 3, 1976, Paul received a letter from Dryden stating: "It was my intention in hiring you to have you work with my International Union account. However, the Union no longer retains my firm. Therefore I lack the funds and will not hire you. Good luck in securing other employment."

Thereafter several weeks of communication ensued, in which Paul demanded at least $5,000 in compensation and Dryden refused to pay more than $200. At last Dryden wrote: "I am tired of hassling. I enclose a check for $500 to settle this mess." The check was conspicuously marked: "In full satisfaction of all claims of Paul against Dryden." On April 15, 1976, Paul cashed the check, but printed above the endorsement: "Under protest, reserving all rights."

On May 1, 1976, Paul consults you regarding his rights, if any, against Dryden. Advise him concerning the potential causes of action available to him, the defenses that may be asserted by Dryden, the likelihood of Paul's overcoming these defenses, and the measure of damages he may recover or other relief that may be ordered if Paul is successful in his lawsuit.

# QUESTION NO. 3

*(Answer this question in Book No. 3)*

All the following events occurred in California:

Harold and Wilma were married in 1945. Harold commenced working for the State of California in 1946 and retired in January 1974. Later in 1974 the two separated and obtained a dissolution decree. They were unable to agree on a settlement of their property rights, and the court retained jurisdiction to divide the community property. In 1975 Harold married Mary. Two months later he died. His will left all property subject to his testamentary disposition to Mary. At the time of his death, Harold and Wilma had or claimed an interest in the following:

(a) *Right to Book Royalties.* In 1974 Wilma was able to sell a publisher a manuscript for a book which she had written in 1944. She will be entitled to receive royalties of $50,000 under the sale contract.

(b) *Vacation Cabin and Lot.* In 1970 Wilma inherited from her father a lot at Donner Lake, California. The lot was worth $10,000 and was subject to a deed of trust securing a $2,000 note, which had been given as part of the purchase price for the lot. Harold promptly paid the note from his saved earnings and until his death paid taxes on the lot. In 1973 Harold had a vacation cabin built on the lot for $10,000, again using his savings.

(c) *Employment Benefits.* (i) At the time of his death Harold had in a bank account $15,000 which he had saved from his retirement pay. (ii) The State Retirement Program provides that upon the death of a retired employee, the surviving spouse will receive a monthly payment for life equal to one half of the employee's monthly retirement payment. In Harold's case, the survivor's pension is $500 per month.

(d) *Apartment House and Rentals.* In 1960 Harold purchased an apartment house, using money inherited from his parents as a down payment and giving a note secured by a deed of trust for the balance. Thereafter he paid off the note, and paid all taxes and operating expenses, using the rental income. Harold devoted whatever time was necessary to managing the apartment house. At the time of his death he had in a separate savings account $4,000 saved from rental income.

Advise Wilma of her rights in each of the above interests in accordance with California law.

# QUESTION NO. 9

*(Answer this question in Book No. 9)*

Jax, Inc. was incorporated in 1969 with 2,500 shares of common stock at a par value of $100 per share authorized. 2,200 shares of Jax stock have been issued and are outstanding. From 1969 through 1974, Jax has incurred net operating losses totalling $80,000. At the end of 1975, the corporation had net earnings of $25,000 for that year. The Jax board of directors, consisting of A, B, and C, met on February 16, 1976, and unanimously voted to declare a cash dividend of $10 per share on outstanding stock.

Pursuant to a by-law authorizing the board to appoint officers and committees, at the February meeting A, B, and C also unanimously voted to create an Executive and Finance Committee composed of B, C, and W. W was not a director or officer of Jax, but was a shareholder. The by-law permitted and the board resolution provided that the Committee would have all the powers of the board of directors.

On June 15, 1976, the board authorized the purchase by Jax of 200 shares of Jax stock held by D, at a price of $95 per share. D had indicated he was ready to sell them at that price to a competitor of Jax.

On July 18, 1976, the Executive and Finance Committee directed Jax to issue 100 shares of previously unissued stock to E, as "fully paid" shares in return for E's promissory note to Jax in the sum of $7,500. Such stock was issued to E for his note as described.

On August 31, 1976, as president of Jax, A wrote to F, a shop superintendent employed by the company who was retiring on his 65th birthday, as follows:

"In light of your years of faithful service to this company since it was established, I have decided that upon your retirement today, Jax will pay you a monthly pension of $300 for the rest of your life, so long as our financial condition warrants it."

X, a Jax shareholder, asks you to advise him on the legality of:
1. The declaration of the cash dividend.
2. The appointment of the Executive and Finance Committee.
3. The purchase of shares from D.
4. The issuance of the 100 shares to E.
5. The promise to F to pay him a monthly pension.

Discuss.

# QUESTION NO. 10

*(Answer this question in Book No. 10)*

For many years prior to June 13, 1973, Olga operated a tavern on property owned by her at 2 Harvard Place in the Town of Waterbury. On June 13, 1973, she broke her leg and closed the tavern but did not remove any of the merchandise or fixtures. She reopened the tavern on September 10, 1973.

Effective July 1, 1973, Waterbury adopted a zoning ordinance restricting use of property on Harvard Place to single family dwellings but providing for continuation of any existing non-conforming uses by the owner or successors in title subject to the following provision:

"No non-conforming use, once abandoned, shall be reinstituted. For the purpose of this section 'abandoned' is defined as cessation of the non-conforming use for six months or more."

On March 15, 1975, Olga executed and delivered a grant deed to 2 Harvard Place to Dr. Baker to pay a past due bill for medical services he had rendered to her. Dr. Baker allowed Olga to continue to operate the tavern and did not immediately record his deed.

On September 15, 1975, Olga for valuable consideration executed and delivered a conveyance of "all my right, title and interest" in 2 Harvard Place to Charles who had no knowledge of Dr. Baker's deed. Dr. Baker recorded his deed on October 1, 1975, and Charles recorded his deed two days later.

Charles operated the tavern continuously from September 15, 1975 to January 10, 1977 when he closed the tavern because his liquor license was then suspended for nine months by the state board of liquor control.

(1)  Who should prevail in a quiet title action between Baker and Charles? Discuss.

(2)  If Charles prevails, will he be legally entitled to reopen the premises as a tavern when the suspension of his liquor license terminates?  Discuss.

Appendix D.  Sample Scorecard

Appendix D

Sample Scorecard

DIMENSIONS FOR "SCORECARD GRADING - QUESTION <u>10</u>

I.  Individual issues peculiar to the                Abbreviated on score sheet
    question (grade on 0-4 scale)

    1.  Does purchase for cancellation of           Pre-existing debt
        pre-existing debt prevent Baker
        from being a BFP or deprive him of
        protection of recording?

    2.  Does quit claim deed provide                 Quit claim deed
        constructive notice of possible
        defect in title?

    3.  Types and effect of recording               Recording statutes
        statutes

    4.  What of fact that premises not              Existing non-confirming use
        actually in use at time statute
        became effective?

    5.  Does non-use through closure by             Abandonment
        state authority constitute
        abandonment?

    6.  Was the non-conforming use                  Use personal to Olga
        exception personal to Olga?

II. General Dimensions (grade 0-10 scale)

    A.  Does the applicant correctly state          Correctly states applicable rule
        the applicable rules?

    B.  Does the applicant correctly apply          Correctly applies applicable
        the applicable rules?                       rules

    C.  Are the applicant's conclusions             Objective correctness of
        objectively correct?                        conclusions

    D.  The applicant's reasoning and his           Logical analysis and reasoning
        analyses of the case logical?

    E.  Articulates answer in clear, lawyer-        Legal terminology and clarity
        like manner and uses appropriate            of expression
        legal terminology.

-D1-

AN ANALYSIS OF THE RELATIONSHIP BETWEEN
CLINICAL LEGAL SKILLS AND BAR EXAMINATION RESULTS

A Report Prepared for the
Committee of Bar Examiners of the State Bar of California
and the National Conference of Bar Examiners

Prepared by

Stephen P. Klein and Roger E. Bolus
GANSK & Associates

July 1, 1982

PREFACE

In 1979, the Committee of Bar Examiners (CBE) of the State Bar of
California held a series of conferences with experts in legal education and
testing.  These meetings focused on identifying the kinds of skills that
should and could be measured by a bar examination, especially those that
were important in actual legal practice.  It was apparent from these
discussions that many of the skills and new assessment techniques that were
considered warranted further investigation.

The National Conference of Bar Examiners (NCBE) concurred with this view
and with their financial assistance, the CBE undertook the development and
field testing of several new measures of lawyering skills (e.g., the
ability to conduct legal research and to make timely and appropriate
decisions during a trial).  These tests were given in conjunction with the
July 1980 administration of California's general bar examination (GBX).

The results of these studies are being presented in a series of reports.
The first report (Klein, 1981b) discussed the findings with the Research
Test.  As its name implies, the Research Test assessed some of the skills
that are required for carrying out legal research (such as the ability to
determine whether existing case law can be used to support a client's
case).  One unique feature of this test is that examinees are given copies
of the cases and statutes on which they are to base their answers; i.e., it
is analogous to an open book examination.

This report is the second in the series.  It discusses the results with a
study that involved 485 applicants to the bar that participated in an
Assessment Center (AC) in addition to taking the July 1980 examination.
The AC was conducted over a two-week period in mid-August of 1980.
However, each AC participant attended for only two days.  On one day, the
participant functioned as counsel for the plaintiff in a simulated case and
on the other day as counsel for the defendant in a different simulated
case.  On both days, the participant took several oral and written tasks.
Statistical analyses of the data examined the relationships among the
different types of AC scores and their relationships with scores on the
GBX and other measures.  Special attention was given to investigating
whether the inclusion of AC type tasks on the GBX would affect minority
passing rates.

Several other NCBE/CBE supported studies also were conducted in conjunction
with the July 1980 administration of the California examination.  These
studies focused on a variety of issues associated with the current form of
the examination, such as the degree to which scores on the multiple choice
and essay portions of it are affected by the amount of time applicants are
given to complete these sections.  The results of these studies are
presented in another report (Klein, 1981a).

## SUMMARY

State bar examinations have been criticized for measuring only some of the important skills and abilities that are needed for the practice of law. The studies described in this report were conducted to answer the following questions regarding this issue:

o Is it feasible to construct measures of clinical legal skills that can be administered under standardized testing conditions and scored reliably?

o Do applicants who perform relatively well on the General Bar Examination (GBX) also perform well on clinical skills measures?

o Are applicants more or less proficient in clinical skills than they are in the skills measured by the GBX?

o Are scores on clinical skills tests related to an applicant's legal training and experience?

o Would the use of clinical skills tests on a bar examination narrow the difference in passing rates that currently exists among racial/ethnic groups?

It was decided to investigate these questions through the use of an Assessment Center (AC). The major features of the AC were: (1) it operated over a two week period beginning shortly after the regular bar examination; (2) each AC enrollee participated for two days at either the Los Angeles or Oakland test site; (3) each participant took several written and oral tasks each day, one set of these tasks involved the participant functioning as the attorney for the plaintiff in a simulated case while a second set involved the participant functioning as the counsel for the defendant in another case; and (4) different but parallel sets of tasks (called problems) were used to help ensure test security. A cadre of specially trained actors played the roles of clients and witnesses for the oral tasks. Performances on the oral tasks were videotaped for later evaluation. A strong desire to participate and do well in the AC was achieved by advising applicants that a high score in the AC would substantially improve their chances of passing the regular bar examination.

Over 4,000 of the 7,439 applicants taking the July 1980 GBX requested to participate in the AC. A sample of 500 applicants was selected from this group on the basis of several factors including racial/ethnic background, sex, law school type, and amount of prior clinical experience.

Analyses of the data on the 485 participants who completed the AC indicated that:

o Parallel forms of the AC tasks could be constructed in the sense that a participant's score on a task was not a function of the unique fact pattern used or the characteristics of the actors with whom the participant interacted. And, the scores on a given task tended to have the same pattern of correlations with scores on other measures regardless of the particular case situation (problem) used with that task.

o A participant's score on a problem was not affected by whether
  he/she had taken another problem previously (i.e., there were no
  warm-up effects); by the sequence in which problems were taken;
  by whether the AC was taken in Los Angeles or Oakland; or by
  whether the problems were taken toward the beginning, middle, or
  end of the two week testing program.

o The attorneys that graded the AC tasks generally agreed with one
  another in the scores that should be assigned to an applicant,
  however, the level of agreement was higher on the written tasks
  than on the oral tasks.  Scores on the written tasks also tended
  to correlate higher with one another than did scores on the oral
  tasks.  In short, scores on written tasks tended to be more
  reliable than scores on oral tasks.

o Scores on one oral task tended to correlate more highly with
  scores on another oral task than with scores on a written task.
  Similarly, scores on one written task tended to correlate more
  highly with scores on another written task than with scores on a
  oral task.  However, there were several exceptions to this trend.

o Scores on a task within a particular problem did not tend to
  correlate higher with the scores on the other tasks in that
  problem than they did with scores on tasks in a different
  problem.  Thus, scores were related to task type but not to
  problem type.

o AC oral and written scores were generally more highly correlated
  with each other than they were with GBX scores.

o The corrected correlation between AC oral and written tasks was
  about as strong as the corrected correlation between the Essay
  and MBE sections of the GBX.

o The corrected correlation between the total AC score and the
  total GBX score was about as strong as the corrected correlation
  between the Essay and MBE sections of the GBX.

o The corrected correlation between the two types of problems used
  in the AC was so high as to imply that they were measuring the
  same skills.

o Applicants that had some prior clinical experience had higher AC
  scores than applicants that had no prior experience even after
  controlling for differences in the average GBX scores of these
  groups.  However, the amount of experience was not related to AC
  scores.

o The relationship of the applicants' AC scores to their background
  characteristics almost always paralleled the relationship between
  these characteristics and GBX scores.  For instance, applicants
  that graduated from American Bar Association (ABA) approved law
  schools tended to do better on both the GBX and the AC than
  graduates of non-ABA approved schools.

○ The inclusion of AC type tasks on the GBX would make a small but noticeable change in who passed versus failed the examination; i.e., adding AC type tasks would result in some applicants going from a pass to a fail status while the reverse would be true for other applicants. The percentage of applicants changing status would depend on several factors, including how much weight was placed on a practical skills section in determining total score.

Taken together, the foregoing findings suggest that the AC's tasks measured certain skills and abilities that are similar but not identical to those measured by the GBX. And, the degree of similarity is about as strong as it is between the Essay and MBE portions of the GBX.

An in depth analysis of racial/ethnic differences indicated that Asian and especially Black applicants did slightly better on the AC type tasks than would be expected on the basis of their GBX scores. Anglo and Hispanic applicants did slightly less well than would be expected. Most of this differential occurred on the oral tasks; e.g., Blacks had the lowest average written score but the second highest average oral score. The reverse was true for Asian applicants. The differences in average scores among racial/ethnic groups also was relatively smaller on the oral than on the written tasks.

While the foregoing findings regarding racial/ethnic differences are interesting, they have little practical importance. Almost all of the systematic differences in GBX and AC scores among applicants were due to factors that were not related to race or the type of AC task or GBX score studied. A substantial portion of the narrowing of the differences among groups on the oral tasks was due to the relatively lower reliability of these tasks (i.e., scores on the oral tasks were more affected by chance factors than were scores on the written tasks). Scores on the oral tasks also could have been affected by the evaluators of these tasks knowing the race, sex, and approximate age of the applicants. And finally, adding AC type tasks to the GBX would not substantially change the relative passing rates of the groups because of the generally strong relationship between AC and GBX scores.

A panel of 25 lawyers spent over two days conducting an in depth evaluation of the performance of 18 AC participants. Their independent and collective ratings of the applicants' responses correlated very highly with the scores assigned by the AC's graders. They also indicated that in general, the applicants were just as proficient in performing AC oral and written tasks as they were in answering GBX essay and multiple choice type questions.

In summary, the results of the research presented in this report indicated that it is feasible to construct, administer, and reliably score certain types of clinical skills tests. The applicants who took these tests generally felt they were better measures of their legal skills than were the regular sections of the GBX. It also was apparent that while scores on both the oral and written portions of the AC were generally related to performance on the GBX, they still provide some unique information about an applicant's legal skills. And, while clinical skills tests would not substantially or even uniformly narrow the gap in passing rates between Anglo and minority groups, neither would they widen this gap. Thus, it is recommended that further consideration be given to the inclusion of clinical skills tests in a state's bar examination.

ACKNOWLEDGMENTS

The Committee of Bar Examiners of the State Bar of California provided the advice and cooperation that were necessary for carrying out the studies described in this report. Two members of this committee, Armando M. Menocal, III and Martin R. Glick, made especially important contributions in the design, implementation, analysis, and report preparation phases of this research. The Committee's former chairman, John O'Hara, was instrumental in making it a jointly supported effort of the Committee of Bar Examiners and the National Conference of Bar Examiners.

The Committee's staff and consultants under the direction of Judith Ford developed, reviewed, pilot tested, edited, printed, and administered the research tasks. Staff and consultants also helped in scheduling participants, and in selecting, training, and calibrating the cadre of lawyers who served as graders. Kenneth D. McCloskey, the Committee's former Director of Testing, participated actively in all of these activities. The efficiency with which these tasks were completed and the quality of the data obtained testify to the energies and unstinting dedication that Judy and Ken provided. James B. Tippin, Jr., Suzanne M. Obermeier, and Philip Schoner also assisted in coordinating activities, data cleaning, and records management.

Professor Paul Bergman of UCLA and Jane Wolf Eldridge supervised the test drafting teams. They also were primarily responsible for designing the particular types of tasks that were used in this research as well as specifying the general criteria employed to evaluate performance on these tasks. Professors Charles and Jane Kelso of McGeorge Law School converted these general guidelines into specific scoring guides for each of the Assessment Center's 33 unique tasks. Jane Kelso was further in charge of the activities associated with the expert panel's in depth evaluation of participant performance that is discussed in Chapter 6 of this report.

Allison Hoffman and Terry Lamb coordinated all the activities associated with videotaping the participants performances on the oral tasks. They also selected, trained, and standardized the over 20 actors and actresses that served as clients and witnesses in these tasks.

Dr. John Bianchini and Andrew York of the Educational Testing Service developed and implemented the computer systems that were used in converting raw scores on each participant into data that was amenable for analysis. Randy Onishi of GANSK & Associates also was involved in the computer data cleaning and file management activities.

Dr. Ralph Hoepfner of the System Development Corporation and Professor Richard Shavelson of UCLA and The Rand Corporation provided thorough and extremely helpful technical reviews of drafts of this report.

Finally, the project could not have been carried out without the excellent cooperation of the applicants who participated in it and the services of the more than 30 attorneys that developed the Assessment Center's tasks and evaluated applicant performance on these tasks.

CONTENTS

PREFACE......................................................... i

SUMMARY........................................................ ii

ACKNOWLEDGMENTS................................................. v

TABLES ......................................................viii

Chapter

1. INTRODUCTION................................................ 1
   Background................................................ 1
   Purpose................................................... 1
   Measurement Problems...................................... 2
   Research Plan............................................. 2
   Organization of Report.................................... 3

2. CHARACTERISTICS OF THE APPLICANT POOL AND PARTICIPANT SAMPLE.... 4
   General Bar Examination................................... 4
   Applicant Pool............................................ 4
   Sampling Procedures....................................... 4
   Participant Sample........................................ 5

3. ASSESSMENT CENTER TASKS AND PROCEDURES.................... 8
   Overview.................................................. 8
   Test Development.......................................... 8
   Participant Orientation and Directions.................... 9
   Schedule.................................................. 9
   Special Procedures for Oral Tasks........................ 10
   Answer Formats........................................... 11
   Scoring Guides and Calibration Aids...................... 11
   Evaluator Selection, Assignment, and Training............ 12
   Scoring Process.......................................... 12
   Computation of Part, Task, and Problem Scores............ 13
   Summary of Activities.................................... 14

4. PRELIMINARY ANALYSES...................................... 15
   Overview................................................. 15
   Balance of Applicant Ability Across Problems............. 15
   Sequence and Warm-up Effects............................. 15
   Site Effects............................................. 16
   Internal Task Consistency................................ 16
   Interevaluator Consistency............................... 17
   Correlations Among Tasks................................. 18

5. RESULTS.................................................. 20
   Overview................................................. 20
   Relationship of AC Scores to GBX Scores.................. 20
   Relationship of AC Scores to Racial/Ethnic Group......... 22
   Relationship of AC Scores to Clinical Experience......... 25
   Relationship of AC Scores to Background Characteristics.. 26
   Participant Evaluations of AC Tasks and Procedures....... 26

6. EXPERT PANEL EVALUATIONS...................................... 28
   Purpose...................................................... 28
   Procedures................................................... 28
   Results...................................................... 29

7. DISCUSSION OF RESULTS......................................... 32
   Overview..................................................... 32
   Feasibility.................................................. 32
   Relationship Among AC and GBX Scores......................... 34
   Relationship of AC Scores to Applicant Characteristics....... 36
   Relationship of AC Scores to Racial/Ethnic Group............. 37
   Conclusions and Recommendations.............................. 37

REFERENCES....................................................... 38

Appendix

A. Description of the Multiphased Grading Process................. 39
B. Announcement to Applicants.................................... 41
C. Pre-examination Questionnaire................................. 43
D. Sampling Procedures.......................................... **
E. Description of Assessment Center Tasks........................ **
F. Criteria for Evaluating Performance on Each Task.............. **
G. General Directions for Each Task............................. 45
H. General Instructions and Orientation Materials............... 57
I. Sample Scoring Guide and Calibration Aid..................... **
J. Sample Formulas for Computing Raw Task Scores................ **
K. Technical Discussion of Factor Analysis Results............. 64
L. Post Assessment Center Questionnaire......................... 65

   ** Certain appendixes are not included in this version of the
      report because of their length or the information in them is
      still secure.

viii

TABLES

2.1   Summary statistics for total applicant pool and Assessment
      Center participants...........................................   6

2.2   Number of AC participants by sex and race.....................   6

2.3   Number of AC participants by school type and repeater status....   6

2.4   Number of AC participants by experience and school categories...   7

2.5   Number of AC applicants in each racial/ethnic group by number of
      hours of clinical experience..................................   7

3.1   Lists of tasks within each problem type.......................   8

3.2   Percentage of participants taking each problem first at each
      site..........................................................  10

3.3   Number of participants taking each combination of problems......  10

3.4   Number of separately graded facets and general dimensions per
      task..........................................................  12

4.1   Average GBX scores of the applicants that took each problem.....  15

4.2   Average GBX total and AC task scores by problem sequence........  16

4.3   Average GBX total and AC task scores by site..................  16

4.4   Average internal consistency coefficient of each task..........  17

4.5   Average correlation between evaluators on each task............  18

4.6   Intertask and task/total correlations.........................  18

4.7   Reliability of AC task type, problem, and total scores.........  19

5.1   Correlation of GBX and AC task scores.........................  20

5.2   Observed and corrected correlations between GBX and AC problem
      scores........................................................  21

5.3   Observed and corrected correlations between GBX and AC oral and
      written scores................................................  22

5.4   Additional percent passing if applicants were allowed to
      substitute an AC score for a GBX MBE or essay score............  23

5.5   Percentage of participants in each pass/fail category on the GBX
      and AC........................................................  23

5.6   Average GBX and AC task scores within each racial/ethnic group..  24

5.7   Observed correlations of AC scores with Total GBX scores within
      racial/ethnic groups..........................................  25

5.8    Average adjusted AC task scores for applicants with none versus
       some clinical experience relative to where that experience was
       obtained........................................................... 25

5.9    Average GBX and AC task scores within each school type, repeater
       classification, and sex group..................................... 26

5.10   Percentage of respondents checking each choice to the question:
       "How well did the actors play their roles?"...................... 27

5.11   Participant ratings of task quality:  Average rating and
       percentage selecting each choice................................. 27

6.1    Average of the panelists' ratings regarding the relative weight
       that should be assigned to each task............................. 29

6.2    Means and standard deviations for AC evaluators and expert
       panelists (N = 18)............................................... 30

7.1    Percentage passing in each racial/ethnic group if the AC carried
       all, some, or none of the weight in determining who passed...... 35

7.2    Observed and corrected correlations among GBX, AC, and RT scores 37

A.1    Distribution of July 1980 applicants across pass/fail categories 40

K.1    Factor loadings after verimax rotation........................... 64

-1-

Chapter 1

INTRODUCTION

BACKGROUND

Many newly licensed attorneys have received little training in several of
the areas that are needed for legal practice.  Some of these areas include
conducting legal research, interviewing clients, examining witnesses,
negotiating a settlement, and drafting legal documents.  Most law schools
do not require that their students take the so called clinical courses that
provide such training and experience.  And, while there is some evidence
that suggests that those who take these courses are more proficient in
performing these tasks than those who have not had the training (Alderman,
Evans, and Wilder, 1980), there is still a question as to whether the
training results in an adequate level of proficiency.

Many (if not most) law schools do not see their mission as preparing their
graduates to perform the types of day-to-day tasks noted above.  Instead,
they see their goal as teaching students to "think like a lawyer."  Boards
of bar examiners, on the other hand, are charged with the responsibility of
licensing individuals who are capable of functioning as practicing
attorneys.  Despite this charge, the bar examinations given throughout the
United States appear to measure only a some of the important skills and
areas of knowledge that are required for legal practice, such as probing
for detail and marshaling facts (O'Hara & Klein, 1981).  While these
examinations measure analytic ability, they do not assess how well an
applicant performs many tasks that are associated with legal practice.
There is therefore concern that those who are licensed to practice may not
have some of the basic competencies that are actually needed.  In short, it
is questionable whether the typical bar examination is a sufficiently good
indicator of the degree to which an applicant is prepared to practice law.

An additional concern about the bar examination has been expressed by those
who feel that the present large gap in passing rates on it between Anglo
and minority groups (Klein, 1981) would be reduced if the examination was
expanded to include the assessment of clinical skills, especially skills
involving oral communication.  This prediction is based on two beliefs,
namely: minority applicants to the bar are more apt to have relevant
clinical experience than their Anglo classmates and minority applicants
find it easier to express their ideas orally than in writing.  These
assumptions (let alone the accuracy of the prediction itself) have yet to
be tested adequately with applicants to the bar.

PURPOSE

It is evident from the foregoing discussion that there are questions about
whether bar examinations indicate the degree to which applicants have many
of the important skills that are necessary for legal practice, whether
clinical training and/or experience substantially improves these skills,
whether the passing score on a bar examination insures that those who are
licensed have an adequate level of these skills, and whether differences in
passing rates among racial/ethnic groups would be affected if bar
examinations were expanded to include the measurement of clinical skills.
The studies described in this report were undertaken to provide information
regarding these issues.

MEASUREMENT PROBLEMS

One major obstacle to investigating questions about clinical skills has
been the lack of good indices of them.  It is very difficult to develop
measures that are not affected by the many extraneous factors that might
interfere with obtaining reliable and valid scores.  For example, a test of
the ability to interview clients should involve face-to-face oral
communication.  It also should involve more than one such encounter so that
an examinee's score is not more a function of the person interviewed and
the uniqueness of a particular case than it is of the underlying skills of
the person doing the interviewing (Erlich and Shavelson, 1978).  Similarly,
the interview tasks must be structured in a way that permits reliable and
systematic evaluations of important skills without overly restricting the
realism of the interaction or relying on the idiosyncratic views of the
evaluator.  Finally, the evaluation system must ensure that a person's
score is not affected by special knowledge about the assessment procedures.
This last requirement is satisfied on any given bar examination because all
applicants take it at the same time.  The strategy of simultaneous
administration is impractical, however, when research requirements dictate
that a large number of individuals have to have both their oral and written
clinical skills assessed.


RESEARCH PLAN

The first two steps involved in conducting the research described in this
report were:

    1) Obtain expert advice regarding the types of clinical skills that
       were important and potentially feasible to measure under
       standardized testing conditions.

    2) Develop strategies for testing clinical skills that considered
       fiscal and logistical constraints as well as factors that were
       likely to affect the reliability and validity of the assessment
       procedures, such as the realism of the case situations, the
       motivation of the examinees, test security, and methods for
       evaluating oral performance.

The foregoing activities led to the decision that an Assessment Center (AC)
would be an appropriate way to measure clinical skills.  Some of the major
features of the AC were: (1) it operated over a two week period beginning
shortly after the regular bar examination, (2) each AC enrollee
participated for two days and took several written and oral tasks each day,
(3) one set of these tasks involved the participant functioning as the
attorney for the defendant in a simulated case while a second set involved
the participant functioning as the counsel for the plaintiff in another
case, and (4) different but parallel forms of each test were used to help
ensure test security.  A strong desire to participate and do well in the AC
was achieved by advising applicants that a high score in the AC would
substantially improve their chances of passing the regular bar examination.

Chapter 2

CHARACTERISTICS OF THE APPLICANT POOL AND PARTICIPANT SAMPLE

GENERAL BAR EXAMINATION (GBX)

All the participants in the Assessment Center (AC) took both sections of the July 1980 California General Bar Examination (GBX). One of these sections consisted of 9 essay questions. Each essay question was graded on a 100 point scale. The other section was the Multistate Bar Examination (MBE), a 200 question multiple choice test developed by the National Conference of Bar Examiners. The MBE is used by almost every jurisdiction in the country. MBE scores are scaled across administrations in order to adjust for possible differences in average question difficulty from one examination to another. California MBE scores are then scaled so that the theoretical maximum score equals 600 points.

The sum of an applicant's MBE score plus total score on the first three essay questions graded was computed. If this sum (which was called the Phase I score) was greater than 665, the applicant passed. If the Phase I score was 665 or lower, the remainder of that applicant's essay answers were graded. Applicants having all 9 essay answers graded had to have a total score of 1050 or higher in order to pass (see Appendix A for a discussion of these procedures).

APPLICANT POOL

All of the approximately 7500 applicants who planned to take both sections of the July 1980 GBX were invited to apply to participate in the AC. This invitation, which appears in Appendix B, indicated that AC participants could substitute an AC score for either an essay total score or an MBE score (but not both). Thus, doing well in the AC could substantially improve but not diminish an applicant's chances of passing the GBX.

In order to enroll in the AC, an applicant had to complete and return a questionnaire (see Appendix C). This questionnaire inquired about various aspects of the applicant's legal training, experience, and background. A total of 6987 applicants returned questionnaires by the July 10 cutoff date. Of this group, 4330 (62%) indicated they wanted to participate in the AC. Many other applicants indicated that would have liked to enroll but could not do so because of previous commitments and/or travel plans.

SAMPLING PROCEDURES

A stratified random sample of 500 applicants was selected from among the 4330 that asked to participate. Enough applicants were selected in each of several subgroups to ensure that reliable conclusions could be drawn about the performance of each subgroup. The variables forming the strata were:

The remaining steps in the research process were:

3) Develop a general plan for each type of AC test. This plan specified the types of skills to be tested, important facets of the task/problem situation that were designed to test these skills, instructions to the applicants, materials, and criteria for evaluating performance.

4) Construct, field test, and revise the tests and the procedures used to evaluate performance on these measures.

5) Obtain information about the background characteristics of potential examinees and use this data to select a sufficiently large and representative sample of them so that the results obtained would be generalizable to all applicants.

6) Obtain adequate testing sites, train and supervise testing staff, purchase and operate a bank of video cameras and recorders, schedule examinees for testing, print test materials, and administer tests.

7) Train teams of evaluators to score the written and oral responses.

8) Score each examinee's performance on each of a set of 11 separate tasks using a relative scale (i.e., how well did the applicant do relative to the other applicants who took the same test?), assess the reliability of the scoring process, and adjust scores so that results could be combined with scores on the regular bar examination.

9) Have an expert panel use an absolute scale (as distinct from a relative one) in evaluating the performance of a subset of examinees.

10) Analyze results in order to answer questions about the adequacy of the testing and scoring procedures, the relationship between performance on clinical skills tests and scores on the essay and multiple choice sections of the regular bar examination, and the relationship between scores on all of these tests and an applicant's background characteristics (especially race and clinical experience).

ORGANIZATION OF REPORT

Chapter 2 of this report describes how the participants were selected for this study and their background characteristics. Chapter 3 describes the 11 clinical skills tests and the procedures used to administer and score them. Chapter 4 presents the results of preliminary analyses. Chapter 5 presents analyses of the relationships among background characteristics, clinical skills test scores, and scores on the regular bar examination. Chapter 6 describes the procedures and results of an ancillary study that investigated the relationship between the relative scores assigned by the evaluators and the absolute judgments of the quality of performance that were made by the expert panel. The final chapter discusses the implications of these findings.

o Number of Hours of Clinical Experience.  Applicants were divided
  into three groups depending upon whether they had less than 15,
  15 to 100, or more than 100 hours of experience in conducting
  simulated or actual direct and cross-examinations, interviewing
  clients and witnesses for hearings, interviewing clients for
  general legal matters, and presenting oral arguments at legal
  proceedings.

o Law School's Passing Rate.  Applicants were divided into four
  groups on the basis of the percentage of applicants at their
  law school that passed the July 1979 GBX.  This variable was
  used as a proxy for the applicant's own general ability level.
  Approximately one fourth of the applicants fell into each of
  the following categories: less than 30%, 30 to 53%, 54 to 71%,
  and over 71%.

o Repeater Status.  Applicants were divided into two groups on
  the basis of whether they had taken the GBX previously.  If
  they had taken it previously, they were divided further on the
  basis of the number of attempts.  More repeaters were drawn
  from schools with relatively low July 1979 passing rates than
  from schools with high rates.

o Sex.  Data regarding an applicant's sex and racial/ethnic group
  was obtained from a questionnaire completed by all applicants
  at the time they applied to take the GBX.

o Racial/Ethnic Group.  The four major groups taking the GBX
  were: Anglo, Asian (including Filipino), Black, and Hispanic.
  An effort was made to select applicants within the Asian and
  Hispanic groups who did and did not come from homes where
  English was the dominant language.

The selection process also took into consideration the days the applicant
said he/she could participate in the AC and whether the applicant was
willing to participate at the Los Angeles and/or the Oakland site.
Finally, an alternate was picked for each selected applicant in the event
that applicant could not be tested.  About 10% of the alternates
participated in the AC.  Appendix D contains a more detailed discussion of
the sampling procedures.

PARTICIPANT SAMPLE

Table 2.1 contrasts the GBX scores of all the applicants who took both the
Essay and MBE sections with the GBX scores of the 485 applicants who also
had a complete set of AC scores (10 applicants were deleted from the sample
because of missing data problems, such as not completing the AC due to
illness).  An inspection of this table indicates that the AC participants
tended to have slightly lower average scores than applicants in general.
This difference is attributable mainly to the larger proportion of minority
applicants in the AC sample than in the applicant pool.

Tables 2.2 through 2.5 provide additional information about the participant
sample and the applicant pool from which they were selected.

Table 2.1

SUMMARY STATISTICS FOR TOTAL APPLICANT POOL
AND ASSESSMENT CENTER PARTICIPANTS

|  | | Assessment Center | All Applicants |
|---|---|---|---|
| Number of Applicants | | 485 | 7379 |
| Means | MBE | 414.6 | 424.5 |
| | Essay | 607.7 | 617.5 |
| | Total | 1022.3 | 1042.0 |
| SD's | MBE | 42.7 | 46.0 |
| | Essay | 51.6 | 54.4 |
| | Total | 86.0 | 92.2 |
| MBE - Essay Correlation | | .66 | .68 |

SD = Standard Deviation

Table 2.2

NUMBER OF AC PARTICIPANTS BY SEX AND RACE

| Race | Male | Female | Total |
|---|---|---|---|
| Anglo | 199 | 69 | 268 |
| Asian | 53 | 23 | 76 |
| Black | 44 | 28 | 72 |
| Hispanic | 44 | 25 | 69 |
| Total | 340 | 145 | 485 |

Table 2.3

NUMBER OF AC PARTICIPANTS BY SCHOOL TYPE AND REPEATER STATUS

| School Type | 1st Timer | Repeater | Total |
|---|---|---|---|
| ABA Approved | 229 | 86 | 315 |
| CA Accredited | 75 | 43 | 118 |
| Unaccredited | 24 | 15 | 39 |
| Other | 8 | 5 | 13 |
| Total | 336 | 149 | 485 |

Table 2.4

NUMBER OF AC PARTICIPANTS BY EXPERIENCE AND SCHOOL CATEGORIES

| Passing Rate at Applicant's Law School in 1979 | Number of Hours of Clinical Experience | | | Total |
|---|---|---|---|---|
| | <15 | 15-100 | >100 | |
| Less than 30% | 32 | 33 | 37 | 102 |
| 30 to 53% | 43 | 41 | 48 | 132 |
| 54 to 71% | 40 | 41 | 44 | 125 |
| More than 71% | 42 | 42 | 42 | 126 |
| Total | 157 | 157 | 171 | 485 |

Table 2.5

NUMBER OF APPLICANTS IN EACH RACIAL/ETHNIC GROUP
BY NUMBER OF HOURS OF CLINICAL EXPERIENCE

| Group | Number of Hours of Clinical Experience | | | Total |
|---|---|---|---|---|
| | <15 | 15-100 | >100 | |
| Anglo | 92 | 88 | 88 | 268 |
| Asian | 22 | 22 | 32 | 76 |
| Black | 20 | 24 | 28 | 72 |
| Hispanic | 23 | 23 | 23 | 69 |

Chapter 3

ASSESSMENT CENTER TASKS AND PROCEDURES

OVERVIEW

The Assessment Center (AC) utilized six case situations (or problems).
Three problems required the examinee to function as counsel for the
plaintiff. These were designated as the A type problems. In the three B
type problems, the examinee functioned as counsel for the defendant. Each
A problem had five separate subtests or tasks, such as interviewing a
client, while each B problem had six tasks. Each type of problem took
about six hours to complete and each participant took one A and one B
problem.

Each problem involved both written and oral tasks. The oral tasks, such as
interviewing a client, were videotaped so that an applicant's performance
could be evaluated at a later time. Four oral tasks utilized specially
trained actors to play the role of clients or witnesses, while two oral
tasks (opening statement and closing argument) involved the participant
speaking to a hypothetical jury. Table 3.1 contains a list of the tasks
within each problem type.

Table 3.1

LIST OF TASKS WITHIN EACH PROBLEM TYPE

| Task Number | Problem Type | Task Type | Task Title |
|---|---|---|---|
| 1 | A | Oral | Initial Client Interview |
| 2 | A | Written | Discovery Plan and Interrogatives |
| 3 | A | Oral | Preparation of Client for Direct Examination |
| 4 | A | Written | Trial Brief |
| 5 | A | Oral | Closing Argument |
| 6 | B | Written | Memorandum for the File |
| 7 | B | Oral | Client Interview and Counseling |
| 8 | B | Written | Draft of Counter Proposal and Letter to Client |
| 9 | B | Oral | Opening Statement |
| 10 | B | Written | Reply to Points and Authorities Memorandum |
| 11 | B | Oral | Cross-Examination |

TEST DEVELOPMENT

There was one drafting team per problem. The six drafting teams were
composed of practicing attorneys and law professors who were involved in
clinical courses. A detailed test plan was used to guide the development
process and to help ensure that all three problems of a given type
presented essentially the same kinds of tasks and measured the same kinds
of skills. This plan included general directions to applicants, required
task elements (such as a client suggesting to take an illegal action like
destroying evidence), the types of materials that would be given to the
applicant, and guidelines for evaluating performance on the task.

Appendix E contains a description of the tasks in each problem type and Appendix F contains the general evaluation schema. These two appendixes provided the basis for the drafting process. It should be noted, however, that the plans underwent several revisions. Some changes were due to suggestions made by the drafting teams (such as when they found that a given task requirement would be unrealistic for one or more of the problems), some modifications stemmed from comments made by a panel of outside experts who reviewed all the materials, and some were based on field tests of the tasks. Changes in the fundamental nature of a task were made across all three problems that used that task.

All the tasks in all the problems were field tested at least once and some were tested twice. This testing was done with about four to five attorneys per problem. These attorneys had recently passed the California Bar Examination and most had applied to be readers for the Essay portion of the GBX. The field testing was conducted to check the clarity of directions, the appropriateness of time limits, the feasibility of the videotaping system, logistics, examinee attitudes towards the tasks, the evaluation guidelines, and the consistency of actor performance across participants. One A and one B problem were tested prior to completing the development of the other problems so that any major difficulties could be detected and corrected before all the problems were constructed.


PARTICIPANT ORIENTATION AND DIRECTIONS

Participants were sent materials in advance of the date they were to come to the AC. These materials contained the final set of general directions for all 11 tasks (see Appendix G). An orientation session on procedures also was conducted at the AC for each group of participants. Appendix H contains information given to the participants during this on site orientation session.


SCHEDULE

An AC participant attended either the Los Angeles or Oakland test site. There were about 24 participants per day at the Los Angeles site and about 18 participants per day at the Oakland site. The AC ran for six pairs of days at each site. The two sites were operated concurrently.

Each AC participant took one complete plaintiff (A) problem and one complete defendant (B) problem. Participants worked on one problem on one day and the other problem on the following day. On one pair of days, participants took Problem A on the first day and Problem B on the following day. The reverse order was used with the next set of participants. Thus, A and B problems were never given on the same day at a site.

Three groups of participants went through the AC each day, with one group starting about one hour after the previous group. All the applicants within a group worked on the same problem. However, a different problem was assigned to each group. Applicants were reassigned to groups on the second day so as to counter-balance the number of applicants receiving each combination of problems (and the order in which the problems within a combination were given). Table 3.2 shows the number of applicants that took each problem at each site and Table 3.3 shows the number that took each combination of problems and the total number that took each problem.

Table 3.2

PERCENTAGE OF PARTICIPANTS TAKING EACH PROBLEM FIRST AT EACH SITE

|            |            | Problem Number |     |     |     |     |       |
| Test Site  | A-1 | A-2 | A-3 | B-1 | B-2 | B-3 | Total |
|------------|-----|-----|-----|-----|-----|-----|-------|
| Los Angeles | 9  | 10  | 10  | 10  | 9   | 10  | 58    |
| Oakland    | 7   | 7   | 7   | 7   | 7   | 7   | 42    |

Table 3.3

NUMBER OF PARTICIPANTS TAKING EACH COMBINATION OF PROBLEMS

|       | A-1 | A-2 | A-3 | Total |
|-------|-----|-----|-----|-------|
| B-1   | 54  | 52  | 55  | 161   |
| B-2   | 54  | 55  | 52  | 161   |
| B-3   | 55  | 54  | 54  | 163   |
| Total | 163 | 161 | 161 | 485   |

## SPECIAL PROCEDURES FOR ORAL TASKS

The AC's use of oral communication tasks was one of the most significant ways in which it differed from the General Bar Examination. The inclusion of these tasks required that a cadre of specially trained actors be used to play the roles of clients and witnesses. The thespian staff varied in age, sex, and racial/ethnic background. Professional actors were employed because they were used to giving essentially the same performance over and over again. The actors also were given extensive written instructions and rehearsed in order to standardize how they played their roles (e.g., when to offer certain pieces of information, the attitudes they were supposed to project, etc.).

One set of actors was used for the A problems and another set for the B problems. This was done so that an applicant would not encounter the same actor playing different roles.

Each site contained one testing room per group member for the oral tasks. Each room had two chairs (one for the participant and one for the actor), a desk or table, a videocamera, and a microphone. The microphones and cameras were connected by an extensive cable system to a control room. The control room contained one 1/2" videocassette recorder and TV monitor for each test room plus backup equipment and all the peripheral equipment that was required to coordinate activities.

OTHER PROCEDURES

All the tasks were separately timed, although more time was allowed for
some tasks, such as preparing a memo to the file, than for other tasks,
such as initial client interview (see Appendix G).

One segment of Task 9, Opening Statement, involved the applicants watching
a videotape of opposing counsel's opening statement. A room with a bank of
TV monitors and earphones was set aside for this purpose. All the
applicants taking a particular problem saw the same videotape.

The five written tasks were administered under proctored conditions. One
room was set aside for those writing their answers on these tasks and
another room for those who typed their answers.

Certain written tasks, such as the preparation of a discovery plan and
interrogatories, involved the use of a "mini-library." This library
contained an index and over 100 pages of case materials that applicants
could use in preparing their answers. There was one mini-library for all
three A problems and another mini-library for all three B problems.
Applicants were given their own copies of the mini-library each day.

Applicants were allowed to keep and refer to their work products during the
day. However, applicants were not allowed to talk with one another during
the day and all materials had to be turned in at the end of each day.


ANSWER FORMATS

An applicant had one videocassette per problem. This cassette contained
about 75 minutes of performance (about 10 to 30 minutes per task). Each
cassette was documented so that an evaluator could identify quickly the
location on the cassette of the performance he/she was assigned to grade.
The answers to the written tasks were in standard blue books or on typed
sheets, depending upon the applicant's choice of answer format.


SCORING GUIDES AND CALIBRATION AIDS

A general scoring guide was developed for each task. Each guide was
designed to be applicable to the three problems that included the task.
However, a different version of a task's guide was developed for each
problem so that the guide used with a particular problem could contain
reference to the unique names and events in that problem. A detailed
explanation of the guide, called a Calibration Aid, also was developed.
Appendix I contains an example of a scoring guide and its calibration aid
for one written task and one oral task on one of the six problems.

Each of the 33 guides was in the form of a score card. Evaluators were
instructed to rate how well an applicant performed on each facet of a task
relative to how well the other applicants who took that same task/problem
combination performed. A five point rating scale, from 1 = very poor to
5 = very good, was generally used for this purpose. There are two
important ways in which this procedure differed from the one used to score
the Essay portion of the GBX. First, evaluators graded each facet of an
answer rather than just providing holistic assessment of answer quality.
And second, applicants were graded relative to one another rather than in
terms of an absolute scale that focused on whether an answer was "passing."

The number of facets that were evaluated varied across tasks and sometimes
within tasks.  The scoring guide also required the evaluator to provide an
assessment of the relative quality of performance with respect to as many
as six general dimensions, including an overall assessment of answer or
performance quality.  Table 3.4 contains the average number of separate
facets and general dimensions per task type.

Table 3.4

NUMBER OF SEPARATELY GRADED FACETS AND GENERAL DIMENSIONS PER TASK

|  | Task Number | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Facets | 21 | 10 | 19 | 11 | 22 | 8 | 17 | 14 | 7 | 12 | 16 |
| General Dimensions | 2 | 5 | 3 | 4 | 6 | 5 | 2 | 4 | 1 | 3 | 1 |

EVALUATOR SELECTION, ASSIGNMENT, AND TRAINING

Evaluators were selected from the pool of attorneys who regularly score the
essay portion of the General Bar Examination, the Board of Reappraisers who
supervise this grading, and the consulting staff who designed and developed
the AC tasks.

Two evaluators graded all the written answers on the A problems (i.e., a
total of 6 task/problem combinations) and three evaluators graded all the
written answers on the B problems (9 task/problem combinations).  There
were three evaluators assigned to each oral task.  These three evaluators
graded all the performances on that task across problems.  Thus, there was
a total of 18 oral task evaluators (6 oral tasks X 3 evaluators per task).

The evaluators assigned to a particular task met with a member of the
Committee of Bar Examiners and/or its staff and consultants prior to the
grading of the answers.  This one day meeting involved a detailed review of
the problem, task, scoring guide, and calibration aid; round robin grading
of a sample of written answers or independent assessments of oral
performances; and a discussion of the tentative scores assigned.  These
activities focused on helping the evaluators employ the same grading
criteria and standards across applicants so that an applicant's score on a
task would not be a function of who was assigned to evaluate it.

There was a separate calibration meeting for each task/problem combination;
i.e., a total of 33 meetings.  However, the time required for the meetings
generally declined as the evaluators became more familiar with the grading
system.

SCORING PROCESS

All the answers (or cassettes) on one task/problem combination were graded
before an evaluation team held its calibration meeting and began scoring
the responses to another combination.

Answers and cassettes were assigned randomly to evaluators within each
task/problem combination.  About 15 answers and cassettes from the pool of
about 162 applicants that took a given combination were duplicated.  These
duplicates were inserted into each evaluator's batch.  Thus, an evaluator
grading a written task had about 89 answers to score per combination
([162 - 15]/2 + 15 = 89) while an evaluator assigned to an oral task had
about 64 cassettes per combination ([162 - 15]/3 + 15 = 64).

The sequence of grading the oral tasks was counterbalanced across problems
in order to allow the evaluation teams to work concurrently.  For example,
one team graded Task 1 on Problem A-1 first and then Task 1 on Problem 2
while another team graded Task 3 on Problem A-3 first and Task 3 on Problem
A-1 second.  This procedure also helped to avoid any bias in the total
score on a problem that might be related to the order in which the problems
were graded.

All the answers to a written task on one problem were scored before the
evaluators graded the answers to the next problem.  This strategy was used
so that the evaluators did not have to relearn a problem's general fact
pattern each time they went to grade a new task.

Written answers and cassettes were identified solely by code numbers in
order to protect anonymity.  Oral task evaluators disqualified themselves
from grading an applicant's cassette if they recognized that applicant.


COMPUTATION OF PART, TASK, AND PROBLEM SCORES

There was general agreement among the test planners, drafters, and
evaluators that some of the facets and overall dimensions were more
important than others.  This view led to the use of a complex system for
weighting and combining each facet and general dimension score into a set
of part scores and then weighting and combining the part scores into total
task scores.

For example, the "content" part score for Task 2 on problem A-2 was the sum
of the scores on facet 24, 26, and 27; plus two times the sum of the scores
on facet 20 - 23, 25, and 28.  All the raw scores on this part on this
task/problem combination were then scaled to a mean of 50 and standard
deviation of 10 (i.e., across all the applicants who took Problem A-1, Task
2).  An applicant's scale score on a part was then multiplied by a weight
to reflect the relative importance of that part score in computing the
total task score.  For example, on Task 2, the "content" part score carried
45% of the weight while the "method" and "overall" part scores carried 35%
and 20% of the weight, respectively.

The next step in the process involved summing each applicant's weighted
part scores.  The sums for a particular task/problem combination were then
scaled to mean of 50 and standard deviation of 10 (i.e., across all the
applicants who took that task/problem combination).  As a result of these
procedures, the scores on every task/problem combination had a mean of 50
and a standard deviation of 10.  Appendix J contains the formulas for
computing the total raw score on each task for one of the A problems (i.e.,
it is one of the six sets of scoring formulas).

The total score on an A Problem was the sum of its five task scores. Similarly, the total score on a B Problem was the sum of its six task scores. The total scores on a a given combination of problems (e.g., A-1 + B-3) were converted to the same mean and standard deviation as the MBE scores of the applicants who took that combination in order to place the total AC score on the same scale of measurement as the MBE. A parallel process was used to convert AC total scores to the same scale of measurement as the Essay section of the GBX (more precisely, to three times the score in Phase I of the essay grading process because all applicants did not have all of their essay answers scored).


SUMMARY OF ACTIVITIES

The major activities associated with developing, administering, and scoring the AC are listed below. Over 150 persons were involved in these activities.

o Developing the general design for the AC, including specifying the types of case situations that should be used and the kinds of skills and abilities that should and could be tested.

o Designing each task and developing the criteria for evaluating performance on each facet of it.

o Drafting, reviewing, and revising test materials (including making sure that all three problems of the same type were consistent in how they adhered to the test plan).

o Typing, editing, duplicating, and distributing materials.

o Arranging, administering, and participating in field tests.

o Coordinating activities, site selection, and management.

o Purchasing, setting up, and running the videotaping equipment.

o Selecting, scheduling, and notifying participants.

o Selecting, training, and directing actors and actresses.

o Checking-in participants, providing orientation, proctoring test sessions, controlling test and answer materials, etc.

o Developing scoring guides and calibration aids.

o Organizing answers and videocassettes for scoring.

o Recruiting, selecting, training, and supervising evaluators.

o Distributing and collecting answers, cassettes, and score report forms; including supervising the circulation of cassettes across evaluation teams and monitoring interevaluator agreement indices.

o Developing and implementing the procedures used to compute AC part, task, problem, and total scores.

Chapter 4

PRELIMINARY ANALYSES

OVERVIEW

This chapter discusses the results of analyses that investigated the degree to which: applicants taking different combinations of problems were of comparable ability, problem sequence or test site affected scores, separately scored facets and dimensions of a task were correlated with one another, evaluators agreed with one another in their assignment of scores, and scores on different tasks correlated with one another.

BALANCE OF APPLICANT ABILITY ACROSS PROBLEMS

Table 4.1 presents the average total GBX scores of the applicants that took each problem. An inspection of these data (and an analysis of variance within each problem type) indicated that the different groups had very similar average GBX scores.

Table 4.1

AVERAGE GBX SCORES OF THE APPLICANTS THAT TOOK EACH PROBLEM

| Problem | A-1 | A-2 | A-3 | B-1 | B-2 | B-3 | Total |
|---------|-----|-----|-----|-----|-----|-----|-------|
| Total GBX | 1026 | 1023 | 1019 | 1028 | 1018 | 1020 | 1022 |

SEQUENCE AND WARM-UP EFFECTS

Table 4.2 presents the average total GBX score and the average task score on each problem type for the applicants that took Problem A first and for those that took Problem B first. These data indicate that although the applicants that had the sequence A then B were slightly more able than those that had B then A, the two groups had almost identical average task scores on both problems. While these data suggest that the sequence B then A might have been slightly more beneficial than the opposite sequence, an analysis of the difference in average task scores (after controlling for the difference in average GBX scores) indicated that this slight tendency was not statistically significant.

It also is evident from the data in Table 4.2 that there was no "warm-up" effect; i.e., the average score on a problem was not related to whether that problem was taken first or second.

None of the tasks or types of tasks (i.e., oral versus written) deviated from the trends observed in Table 4.2.

The average AC and GBX scores of the applicants who participated during the first two pairs of days at a site were essentially the same as the average scores of the applicants who participated during the middle or last two pairs of days at that site. This is an important finding because it suggests that the participants adhered to the security restrictions (or at the very least, applicants who had not yet participated in the AC did not benefit from any information they may have obtained from those who had participated).

Table 4.2

AVERAGE GBX TOTAL AND AC TASK SCORES BY PROBLEM SEQUENCE

| Problem Sequence | Total GBX | Problem A | B | Task Type Oral | Written |
|---|---|---|---|---|---|
| A then B | 1030 | 49.7 | 49.8 | 49.1 | 50.2 |
| B then A | 1015 | 50.0 | 50.3 | 50.1 | 50.2 |

SITE EFFECTS

Table 4.3 presents average GBX and AC scores by site. These data indicate that the Los Angeles and Oakland participants had almost identical average scores. The comparability of the average oral task scores is especially important because it indicates that the use of one group of actors in Los Angeles and a different group in Oakland had no affect on AC scores.

Table 4.3

AVERAGE GBX TOTAL AND AC TASK SCORES BY SITE

| Test Site | Total GBX | Problem A | B | Task Type Oral | Written |
|---|---|---|---|---|---|
| Los Angeles | 1022 | 49.6 | 49.8 | 49.8 | 49.7 |
| Oakland | 1023 | 50.2 | 50.3 | 50.2 | 50.2 |

INTERNAL TASK CONSISTENCY

An analysis was conducted to determine the degree to which the facets and general dimension scores within a task were correlated with one another. The results of this study (which involved a statistical technique called factor analysis) indicated that the facets that went to make up one part score were generally no more highly correlated with each other than they were with the facets that were used to construct another part score. And, the level of correlations among the scores was generally quite high.

One explanation of these findings is that an evaluator formed a general
impression of an applicant's performance level on a task and that this
impression influenced all the separate scores the evaluator assigned to
that applicant.  This tendency often occurs with rating scales and is
called a "halo" effect.

Table 4.4 provides the average internal consistency (coefficient alpha) of
each task type (where the "items" used in the computation were all the
separately scored facets and general dimensions).  These data are
consistent with the factor analysis results discussed above and indicate
that no unique information would be obtained from an analysis of each
task's part scores.  These data also indicate that there was no consistent
difference in internal consistency levels between oral (odd numbered) and
written (even numbered) tasks.  The insensitivity of the alphas to the
number of separate dimensions scored (see Table 3.4) provides additional
support for the hypothesis that the scores assigned to each facet were
influenced by a halo effect.

Table 4.4

AVERAGE INTERNAL CONSISTENCY COEFFICIENT OF EACH TASK

| Task | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Mean Alpha | .90 | .91 | .86 | .90 | .92 | .88 | .94 | .91 | .87 | .83 | .90 |

INTEREVALUATOR CONSISTENCY

An analysis was conducted of the degree to which the 2 to 3 evaluators that
graded a task agreed with one another in the scores they assigned.  The
data for this analysis consisted of the scores that were assigned to the 15
applicants on each task/problem combination that had their responses graded
by all the evaluators that scored that combination.  The results of this
analysis indicated that the evaluators agreed highly with one another with
respect to average scores they assigned; i.e., one evaluator did not tend
to be more lenient than another.

The average correlation between readers on each task/problem combination is
presented in Table 4.5.  These data indicate that there was a moderate to
high degree of agreement between the evaluators in their assessments of the
relative quality of the applicants' responses.  Written tasks had a higher
average level of interevaluator consistency (.59) than the oral tasks
(.42).  Problem A tasks had a higher average level of interevaluator
agreement (.64) than the Problem B tasks (.48).  There was no apparent
relationship between the degree of interevaluator agreement and the
sequence in which the task/problem combinations were graded.

Table 4.5

AVERAGE CORRELATION BETWEEN EVALUATORS ON EACH TASK

|         |     |     |     |     | Task Number | | | | | | |
|---------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Problem | 1   | 2   | 3   | 4   | 5   | 6   | 7   | 8   | 9   | 10  | 11  |
| 1       | .66 | .66 | .40 | .71 | .56 | .69 | .42 | .31 | .41 | .38 | .29 |
| 2       | .57 | .86 | .81 | .52 | .58 | .62 | .57 | .71 | .61 | .41 | .39 |
| 3       | .77 | .80 | .47 | .72 | .47 | .68 | .23 | .68 | .50 | .12 | .67 |
| Average | .67 | .77 | .56 | .65 | .54 | .66 | .41 | .57 | .51 | .30 | .45 |

CORRELATIONS AMONG TASKS

Table 4.6 contains the correlations among the task scores. A factor
analysis of these data (see Appendix K) suggested that there was one
cluster of oral tasks and another cluster of written tasks (although Task 8
fell in both clusters and Task 9 tended to correlate more highly with the
tasks in the written cluster than with the tasks in the oral cluster).

The tasks on Problem A were no more highly correlated with one another than
they were with the tasks on Problem B. The last row of Table 4.6 contains
the average of the correlations with each task while the right hand column
presents the correlation of the scores on a task with the sum of the scores
on the other 10 tasks. These data indicate that the scores on Task 7
(client interview and counseling) had unusually low correlations with the
scores on the other tasks. There was no apparent reason for Task 7's
unusually low correlations, except that the evaluators on this task had a
relatively low average level of agreement with one another (see Table 4.5).

Table 4.6

INTERTASK AND TASK/TOTAL CORRELATIONS

|      | 1   | 2   | 3   | 4   | 5   | 6   | 7   | 8   | 9   | 10  | 11  | Task/Total Correlation |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------------------------|
| 1    | -   | .12 | .25 | .10 | .20 | .08 | .12 | .16 | .11 | .10 | .13 | .28 |
| 2    |     |     | .16 | .25 | .22 | .22 | .08 | .19 | .14 | .21 | .06 | .33 |
| 3    |     |     |     | .22 | .31 | .17 | .04 | .19 | .14 | .11 | .20 | .36 |
| 4    |     |     |     |     | .22 | .28 | .12 | .19 | .15 | .30 | .07 | .38 |
| 5    |     |     |     |     |     | .22 | .13 | .24 | .18 | .19 | .20 | .43 |
| 6    |     |     |     |     |     |     | .12 | .22 | .19 | .27 | .13 | .38 |
| 7    |     |     |     |     |     |     |     | .05 | .10 | .06 | .17 | .20 |
| 8    |     |     |     |     |     |     |     |     | .11 | .18 | .15 | .34 |
| 9    |     |     |     |     |     |     |     |     |     | .20 | .11 | .29 |
| 10   |     |     |     |     |     |     |     |     |     |     | .08 | .34 |
| 11   |     |     |     |     |     |     |     |     |     |     | -   | .26 |
| Mean | .14 | .17 | .17 | .19 | .21 | .19 | .09 | .17 | .14 | .17 | .13 |     |

The average correlation between tasks of the same type (i.e., oral versus written) and between tasks within the same problem are presented in Table 4.7. These data indicate that the correlations among the written tasks tended to be slightly higher than they were among the oral tasks. The relatively low average intercorrelation among Problem B's tasks was due mainly, but not entirely, to the scores on Task 7 (client interview and counseling) not correlating well with the scores on the other tasks in this problem.

The last column of Table 4.7 contains the estimated (internal consistency) reliability of each Task Type, Problem, and Total AC score based on the correlations among tasks. These estimates were computed using the Spearman Brown formula. Stepping up the .48 correlation between the Problem A and B scores provided an estimate of .65 for the reliability of the combined total score as compared to .67 based on the average of the intertask correlations. For consistency throughout the remainder of this report, analyses employing the reliability of AC scores will use the values in Table 4.7. Previous studies (Klein, 1981) have reported MBE, Essay, and Total GBX score reliabilities of .88, .81, and .91; respectively.

Table 4.7

RELIABILITY OF AC TASK TYPE, PROBLEM, AND TOTAL SCORES

|  | Average Intertask Correlation | Number of Tasks | Estimated Reliability |
|---|---|---|---|
| Oral | .16 | 6 | .53 |
| Written | .23 | 5 | .60 |
|  |  |  |  |
| Problem A | .21 | 5 | .56 |
| Problem B | .14 | 6 | .49 |
|  |  |  |  |
| AC Total | .16 | 11 | .67 |

Chapter 5

RESULTS

OVERVIEW

This chapter presents a summary of the major findings of the Assessment
Center (AC).  This summary presents information regarding the relationships
between AC scores and scores on the Essay and Multistate (MBE) portions of
the General Bar Examination (GBX) as well as between AC scores and back-
ground characteristics (including race, law school type, and amount of
prior legal clinical experience).  The final portion of this chapter
discusses the participants' evaluation of various aspects of the AC.

Throughout this chapter, results are presented as averages across the three
problems of the same type.  There are four reasons for this strategy: (1)
the pattern and level of correlations within one problem were essentially
the same as those on the other two problems (e.g., the correlation of GBX
Total score with the total scores on Problems A-1, A-2, and A-3 were .45,
.47, and .44, respectively); (2) there was essentially the same number of
applicants taking each problem (see Table 3.3), (3) there was very little
difference in the average GBX scores of the applicants taking each problem
(see Table 4.1), and (4) the focus of this report is on general trends
rather than on the unique characteristics of particular problems.

RELATIONSHIP OF AC SCORES TO GBX SCORES

Table 5.1 shows the relationships among GBX and AC task scores.  These data
indicate that scores on certain tasks were more highly related to GBX
scores than scores on other tasks.  Tasks 1 and 7 had the lowest
correlations with GBX scores.  Both of these tasks involved interviewing a
client.  However, the source of this pattern did not appear to be something
that was unique to interviewing skills in that Task 1 scores had only a .12
correlation with Task 7 scores.  And, with the exception of Tasks 1 and 7,
oral and written tasks tended to correlate with GBX scores to about the
same degree.  There also was no systematic difference in the pattern of
correlations due to problem type (e.g., the tasks in both problems had an
average correlation .27 with GBX total).

Table 5.1

CORRELATION OF GBX AND AC TASK SCORES

| GBX | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MBE | .15 | .26 | .24 | .21 | .33 | .35 | .15 | .28 | .20 | .27 | .21 |
| Essay | .14 | .32 | .20 | .32 | .32 | .36 | .14 | .22 | .27 | .37 | .16 |
| Total | .16 | .32 | .24 | .29 | .35 | .39 | .16 | .27 | .26 | .36 | .20 |

One explanation of the pattern of correlations with Tasks 1 and 7 is that
the applicants' scores on these tasks may have been affected by the
characteristics of the actors with whom they interacted.  Such an effect
could be systematic (e.g., the actors may have varied in how they played
there assigned roles) or random (e.g., one participant might relate well to
Actor A but not to B while the reverse might be true for another
participant).

The values above the main diagonal in Table 5.2 are the observed
correlations among GBX and AC scores.  These data indicate that GBX scores
correlated slightly higher with Problem B scores than with Problem A scores
even though the Problem B scores were slightly less reliable than the
Problem A scores (see Table 4.7).  However, none of these differences were
statistically significant.

Table 5.2

OBSERVED AND CORRECTED CORRELATIONS BETWEEN GBX AND AC PROBLEM SCORES

|  | GBX Scores | | | Assessment Center Scores | | |
|---|---|---|---|---|---|---|
|  | MBE | Essay | Total | Problem A | Problem B | Total |
| MBE | - | .66 | .89 | .39 | .45 | .50 |
| Essay | .78 | - | .93 | .43 | .46 | .52 |
| Total | NC | NC | - | .45 | .50 | .56 |
| Problem A | .56 | .64 | .64 | - | .48 | .85 |
| Problem B | .69 | .73 | .75 | .93 | - | .86 |
| AC Total | .65 | .71 | .72 | NC | NC | - |

Observed and corrected correlations appear above and below
the main diagonal, respectively.  The corrected correlation
between a total score and the score on one of its parts was
not computed (and designated NC in the table above).

The observed correlations in Table 5.2 also shows that AC scores correlated
to about the same degree with MBE scores as they did with Essay scores (r =
.50 and .52, respectively).

The values below the main diagonal in Table 5.2 are the correlations among
the variables after they have been corrected for "attenuation" (i.e., the
less than perfect reliability of the measures).  The corrected correlations
provide an estimate of the magnitude of the true underlying relationship
between the tests.  For example, there would be a near perfect correlation
(r = .93) between the Problem A and B scores if both of these scores were
perfectly reliable.  This finding suggests that the two problems are
measuring almost identical skills and abilities.

The data in Table 5.2 further suggest that if AC scores were more reliable,
there would be a strong but far from perfect relationship between AC and
GBX scores.  This relationship (r = .72) is about as strong as the
underlying relationship between the Essay and MBE sections of the GBX (r =
.78).  In short, the AC and the GBX appear to be measuring similar but not
identical abilities.

Table 5.3 contains the correlations between GBX scores and scores on the AC's written and oral tasks.  These data indicate that the total score on the written tasks correlated more highly with GBX scores than did the total score on the oral tasks.  As expected, the highest correlation was between the written tasks and the Essay portion of the GBX.  The corrected correlation between oral and written tasks (r = .73) was about as strong as the underlying relationship between the Essay and MBE.

An analysis of the total oral and written scores within problems indicated that the highest correlation was between Oral A and Written B (r = .33) while the lowest was between Oral B and Written A (r = .20).  The relatively low correlations with Written A were probably a function of this score being based on only two tasks whereas all the other task type scores within problems were based on three tasks (and thereby more reliable).

Table 5.3

OBSERVED AND CORRECTED CORRELATIONS
BETWEEN GBX AND AC ORAL AND WRITTEN SCORES

|  | Observed | | Corrected | |
|  | Oral | Written | Oral | Written |
|---|---|---|---|---|
| Oral | - | .41 | - | .73 |
| Written | .41 | - | .73 | - |
|  |  |  |  |  |
| MBE | .39 | .44 | .57 | .61 |
| Essay | .37 | .51 | .56 | .73 |
| Total | .42 | .52 | .60 | .70 |

RELATIONSHIP OF AC SCORES TO RACIAL/ETHNIC GROUP

One of the major reasons for conducting the AC was to investigate whether the large differences in GBX passing rates among racial/ethnic groups would be reduced if the GBX were expanded to include AC type tasks.  Table 5.4 addresses this issue by showing the percentage of applicants in each group that would fall in each pass/fail category if applicants were allowed to substitute their AC score for their MBE score, their Essay score, or either their MBE or Essay score (but not both).  This third option was the one offered to all GBX applicants to encourage them to apply for (and if selected) to do well in the AC.  When a substitution was made, the AC score on the MBE scale replaced the MBE and the AC score on the Essay scale replaced the Essay.

The data in Table 5.4 suggest that Asian applicants benefited the most and Hispanic applicants the least from the AC's substitution rule.  However, differences were not statistically significant (i.e., they could have occurred by chance).  More applicants were able to pass as a result of replacing their Essay than their MBE scores because in California, fewer applicants pass the Essay than pass the MBE.  Overall, 11% (52 of the 485 applicants) were able to pass the complete California July 1980 examination (GBX + AC) as a result of their efforts in the AC.

Table 5.4

ADDITIONAL PERCENT PASSING IF APPLICANTS WERE ALLOWED
TO SUBSTITUTE AN AC SCORE FOR A GBX MBE OR ESSAY SCORE

| When AC score replaced GBX: | Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|
| MBE | 8 | 8 | 7 | 1 |
| Essay | 6 | 13 | 6 | 6 |
| MBE or Essay | 10 | 18 | 10 | 6 |

The major reason the passing rate went up by only 11% when AC scores were
substituted for GBX scores is that there was a relatively strong relation-
ship between an applicant's pass/fail status on the GBX and that applicant's
overall performance level in the AC. This relationship is illustrated in
Table 5.5. For the purposes of this table, an applicant was considered to
have passed the AC if the sum of that applicant's AC MBE and AC Essay
scores was equal to or greater than 1050.

Table 5.5

PERCENTAGE OF PARTICIPANTS IN EACH PASS/FAIL CATEGORY ON THE GBX AND AC

| Group | Fail Both | Pass AC Fail GBX | Fail AC Pass GBX | Pass Both | Total Passing AC | GBX |
|---|---|---|---|---|---|---|
| Anglo | 39 | 13 | 16 | 32 | 45 | 48 |
| Asian | 61 | 16 | 13 | 11 | 27 | 24 |
| Black | 68 | 17 | 11 | 4 | 21 | 15 |
| Hispanic | 71 | 9 | 12 | 9 | 18 | 21 |

The data in Table 5.5 show that Anglo and Hispanic applicants had slightly
lower AC than GBX pass rates while the reverse was true for Asian and Black
applicants. The reader is cautioned not to over interpret these small
differences in that a chi square test (on the number of Black and Anglo
applicants in each of the two categories where the AC and GBX results led
to different pass/fail decisions) indicated that these differences could
easily have occurred by chance. A parallel analysis limited to ABA
graduates produced the same pattern of results although total passing rates
on both the AC and GBX were higher for all groups.

About 76% of the applicants had their pass/fail status classified the same
way by the AC and GBX (i.e., percent passing both plus percent failing
both). About 75% of all applicants and 75% of all AC participants had
their pass/fail status classified the same way by the Essay and MBE.

Table 5.6 shows that Anglo applicants had the highest average GBX and AC scores whereas Black applicants had the lowest average total scores. The smallest difference between Anglo and minority applicants was on the oral tasks. The same pattern of results was obtained when the participant sample was limited to ABA graduates.

Table 5.6

AVERAGE GBX AND AC TASK SCORES WITHIN RACIAL/ETHNIC GROUPS

|  | GBX Scores | | | AC Scores | | |
|---|---|---|---|---|---|---|
| Group | MBE | Essay | Total | Oral | Written | Total |
| Anglo | 428 | 620 | 1047 | 51.0 | 51.1 | 51.1 |
| Asian | 407 | 604 | 1011 | 48.3 | 49.9 | 49.0 |
| Black | 388 | 577 | 965 | 48.9 | 46.9 | 48.0 |
| Hispanic | 398 | 598 | 997 | 48.8 | 48.6 | 48.7 |

The standard deviations of the AC oral, written, and total scores were 4.8, 5.0, and 4.1, respectively.

Some of the oral tasks' ability to narrow the gap in scores between Anglo and minority groups was a function of the lower reliability of the oral scores; i.e., they were more subject to chance variation than were the AC written or GBX scores (see Table 4.6). Specifically, how well an applicant performed on one oral task had a relatively low correlation with how well that applicant performed on another oral task even when the two oral tasks were similar in nature, such as client interviewing. Part of this lower reliability was due to evaluators being less consistent with one another in assigning scores to oral tasks then to written tasks (see Table 4.5). And, the more scores are a function of random error, the greater the the likelihood they will mask true differences between groups.

If the oral score was based on 18 rather than 6 tasks, then the oral test would take about 3 days to complete and its reliability would be about as high as the reliability of the essay score, but not nearly as high as the reliability of the Total GBX score. Statistical analyses (based on normal curve projections and the reliability and standard deviation of an 18 task oral test) indicated that the passing rate for Blacks would increase by about 12% and the rate for Asians would decrease by about 10% if pass/fail decisions were determined solely by an 18 task oral test rather than by the GBX. If the oral test contained 50 tasks, its reliability would be comparable to that of the Total GBX score, but it would be far less likely to narrow the gap between Anglo and minority passing rates.

Table 5.7 contains the correlations between Total GBX scores and AC oral, written, and total scores within each racial/ethnic group. These data indicate that the relationships between the measures in one group were generally consistent with the pattern and level of relationships in another group. The one exception was with Hispanic participants. Their AC scores and particularly their oral scores did not correlate as highly with their total GBX scores as would be expected given the pattern of relationships in the other groups. There was no apparent reason for this anomaly.

RELATIONSHIP OF AC SCORES TO BACKGROUND CHARACTERISTICS

Table 5.9 contains the mean GBX and AC scores for applicants in each school type, repeater classification, and sex group.  These data indicate that the relationships of these background variables to GBX scores are generally consistent with the relationship of these variables to AC scores.

Table 5.9

AVERAGE GBX AND AC TASK SCORES WITHIN EACH
SCHOOL TYPE, REPEATER CLASSIFICATION, AND SEX GROUP

| Group | N | GBX Scores | | | AC Scores | | |
|-------|---|-----|-------|-------|------|---------|-------|
| | | MBE | Essay | Total | Oral | Written | Total |
| ABA approved | 315 | 422 | 617 | 1039 | 50.6 | 50.8 | 50.7 |
| CA accredited | 118 | 401 | 591 | 992 | 48.6 | 48.2 | 48.2 |
| Unaccredited | 39 | 401 | 586 | 987 | 49.2 | 48.3 | 48.8 |
| Other | 13 | 408 | 588 | 997 | 48.7 | 50.1 | 49.4 |
| Repeater | 149 | 397 | 589 | 986 | 48.9 | 48.2 | 48.6 |
| First Timer | 336 | 423 | 616 | 1038 | 50.4 | 50.7 | 50.5 |
| Male | 340 | 419 | 607 | 1026 | 49.8 | 49.7 | 49.8 |
| Female | 145 | 404 | 610 | 1014 | 50.2 | 50.4 | 50.3 |

PARTICIPANT EVALUATIONS OF AC TASKS AND PROCEDURES

Participants were asked to complete a questionnaire regarding their experiences in and evaluation of the AC.  This questionnaire was completed at the end of the second day of participation.  A copy of the questionnaire appears in Appendix K along with a tabulation of the responses of the 400 participants for whom data were available.  These data indicated that:

o About 43% of the participants prepared for the AC by reading a book on clinical practice and 27% did not engage in any special preparation activities.

o When asked how helpful it was to have a copy of the directions for each task in advance of participation, 3% said it was no help, 46% said it was somewhat helpful, 42% said it was very helpful, and 8% reported that they did not receive them.

o When asked to evaluate the clarity of the directions; 5% said they were poor or very poor, 29% said they were fair, and 66% said they were good or very good.

o About 80% of the respondents said the time limits on the written tasks were too short.  Less than 20% of the applicants complained about the time limits on the oral tasks.

Table 5.7

OBSERVED CORRELATIONS OF AC SCORES WITH TOTAL GBX SCORES
WITHIN EACH RACIAL/ETHNIC GROUP

| Group | Oral | Written | Total |
|-------|------|---------|-------|
| Anglo | .38 | .46 | .52 |
| Asian | .49 | .48 | .54 |
| Black | .39 | .51 | .52 |
| Hispanic | .21 | .44 | .39 |

RELATIONSHIP OF AC SCORES TO CLINICAL EXPERIENCE

The effect of clinical experience on AC scores was assessed by examining
the relationship between various combinations of AC scores and: (1) having
held a job related to legal practice, (2) the number of hours spent in each
of various types of legal practice activities (such as interviewing
clients), (3) the number of hours spent in these kinds of cases across the
various types of activities, and (4) the number of clinical courses taken
(see items 3, 9, and 10 in Appendix C).  These analyses indicated that
applicants that had some prior clinical experience on actual cases outside
of law school and/or on simulated cases in law school had significantly
higher AC scores than applicants that had no experience.  These differences
were statistically significant even after controlling (through analysis of
covariance) for differences in the average GBX scores among experience
groups.  However, experience obtained on actual cases as part of a law
school program was not related to AC scores (see Table 5.8).

The amount of experience (such as 5 hours versus 50 hours) was not related
to AC scores.  This may have been due to many applicants indicating they
had far more experience than would be reasonable given that most of them
had just graduated from law school.  For instance, 65% said they had over
100 hours of paid or volunteer time on actual cases outside of law school.

Table 5.8

AVERAGE ADJUSTED AC TASK SCORES FOR APPLICANTS WITH NONE VERSUS SOME
CLINICAL EXPERIENCE RELATIVE TO WHERE THE EXPERIENCE WAS OBTAINED

| | Oral | | Written | | AC Total | |
|---|------|------|---------|------|----------|------|
| | None | Some | None | Some | None | Some |
| Simulated cases in law school | 48.2 | 50.4 | 48.6 | 50.3 | 48.3 | 50.3 |
| Actual cases in law school | 49.6 | 50.1 | 49.8 | 50.0 | 49.5 | 50.2 |
| Actual cases not in law school | 48.1 | 50.2 | 48.1 | 50.1 | 48.1 | 50.1 |

Averages adjusted for differences in GBX scores.

272

o About 45% of the respondents said the AC was a good to very good
    measure of their legal skills and abilities as compared to 11%
    and 30% checking these choices for the MBE and Essay, respectively.

Table 5.10 contains the respondents' evaluations of how well the actors
played their roles.  These data indicate that the participants were
generally quite satisfied with this aspect of the AC.

Table 5.10

PERCENTAGE OF RESPONDENTS CHECKING EACH CHOICE TO THE QUESTION:
"HOW WELL DID THE ACTORS PLAY THEIR ROLES?"

|  | Evaluation | | |
| Type of Role | Poor | Fair | Good |
|---|---|---|---|
| Your Client | 1 | 9 | 90 |
| Other Witness | 2 | 21 | 77 |

Table 5.11 shows the percentage of respondents saying that a task was a
poor, adequate, or good measure of the type of skill it was designed to
assess ("did the nature of the problem, actors, materials, etc. give you
the opportunity to do the things you were instructed to do by the
directions?").  These data show that the evaluations of the oral (odd
numbered) tasks tended to be higher than the evaluations of the written
(even numbered) tasks.  This trend paralleled the participants' complaint
about the time available to complete the written tasks.

Table 5.11

PARTICIPANT RATINGS OF TASK QUALITY:
AVERAGE RATING AND PERCENTAGE SELECTING EACH CHOICE

| Rating | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 = Poor | 2 | 35 | 9 | 46 | 13 | 26 | 4 | 17 | 15 | 30 | 24 |
| 2 = Adequate | 39 | 45 | 49 | 37 | 53 | 54 | 49 | 52 | 52 | 45 | 48 |
| 3 = Good | 59 | 20 | 42 | 17 | 34 | 20 | 47 | 31 | 34 | 24 | 28 |
| Mean Rating | 2.6 | 1.9 | 2.3 | 1.7 | 2.2 | 1.9 | 2.4 | 2.1 | 2.2 | 1.9 | 2.0 |

None of the variables in the questionnaire were significantly correlated
with an applicant's AC or GBX scores.  For instance, whether or not an
applicant felt there was adequate time to complete a task was unrelated
to how well the applicant performed on that task.

Chapter 6

EXPERT PANEL EVALUATIONS

PURPOSE

A panel of 25 lawyers was convened for 2.5 days to evaluate the quality of
applicant performance in the Assessment Center (AC). This was done to
determine whether: (1) the panelists' independent and collective judgments
about the quality of performance in the AC were consistent with those made
by the attorneys who did the actual grading and (2) whether the pass/fail
line in the AC was drawn at the appropriate place.

PROCEDURES

The lawyers who served on the panel generally had considerable clinical
experience and with few exceptions, were not involved in the regular
grading of AC tasks. On the first half day, the panelists received an
orientation to the project and general directions for evaluating an
applicant's performance. The panelists were then divided into six teams.
Four panelists served on each of five teams and five panelists (including a
member of the Committee of Bar Examiners) served on the sixth team. The
panelists also received copies of the problem to which they were assigned,
scoring guides, calibration aids, directions to the AC's participants, and
other related materials and information.

The remaining two days were spent in evaluating the performance of three
applicants on one of the AC's six problems; i.e., there was one panelist
team per problem. All the members of a team evaluated an applicant's
performance on all of the tasks associated with the problem to which they
were assigned (i.e., five or six tasks, depending upon whether it was a
Plaintiff or Defendant problem, respectively). The sequence of steps for
making these evaluations consisted of the panelists (1) reviewing the
directions and applicant materials for a task, (2) independently evaluating
the performance of each of their three applicants on this task, (3)
depositing their evaluations in an envelope, (4) discussing their
evaluations with their teammates, and (5) assigning a consensus rating to
each applicant. This process was repeated for each of their problem's five
or six tasks. The panelists also rated the relative importance of each
task and assigned an overall grade to each applicant.

Performance on a task was evaluated on three to five dimensions, depending
upon whether the task was written or oral. The five dimensions were
Content, Method, Relationship to Client (on oral interview tasks), General
Dimensions, and Overall Evaluation. All of these ratings were made using
the following five point scale:

        1 = Very Unsatisfactory (clear fail)
        2 = Unsatisfactory (fail)
        3 = Borderline
        4 = Satisfactory (pass)
        5 = Very Satisfactory (clear pass)

Panelists were directed to interpret the scale literally rather than make
relative judgments about performance quality among the three applicants
they evaluated.  They were further advised that some teams were assigned
applicants who did relatively well in the AC, some teams were assigned
applicants who did relatively poorly, and some were assigned applicants who
represented the full range of quality that was exhibited.  Panelists were
not told the grades given to the applicants they evaluated or whether they
did relatively well or poorly in the AC.


RESULTS

In general, the panelists agreed fairly well with one another in their
evaluations of an applicant's performance (e.g., two panelists rarely
differed by more than one point).  However, the three teams assigned to a
particular problem type did differ from one another in their suggestions as
to how much emphasis should be placed on each task in determining a total
problem score.  The average of the relative weights for each task within a
problem are presented in Table 6.1.


Table 6.1

AVERAGE OF THE PANELISTS' RATINGS REGARDING
THE RELATIVE WEIGHT THAT SHOULD BE ASSIGNED TO EACH TASK

| Task | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|------|---|---|---|---|---|---|---|---|---|----|----|
| Rating | 20 | 18 | 18 | 22 | 22 | 18 | 25 | 17 | 10 | 15 | 15 |

Ratings sum to 100% within problems (A = 1-5, B= 6-11)


Table 6.2 provides the mean and standard deviation on the following
variables for the 18 applicants whose AC responses were evaluated by the
expert panel: average score across five or six tasks on the problem
evaluated, the average of the panelists' consensus ratings on these same
tasks, and the applicants' average total General Bar Examination (GBX)
score.  Note that the standard deviation of the average score across tasks
is substantially smaller than it is withing a single task due to the only
moderate correlation among tasks.

The data in Table 6.2 show that the average score assigned by the panelists
was 2.97; i.e. "borderline."  The 18 applicants' average GBX score (1044)
also was borderline in the sense that a score of 1050 was needed for
passing the GBX.  This finding suggests that the overall quality of
performance in the AC was about the same as it was on the GBX.

There was no evidence of any systematic effect due to task type; the
average ratings on the oral and written tasks across problems were 2.96 and
2.98, respectively.  All the tasks tended to have means near 3.00, with the
exception of Task 9 (opening statement) which had a mean of 2.22 and Task 1
(client interview) which had a mean of 3.67.  The reader is cautioned not
to attach too much significance to these differences since they were based
on only 9 applicants per task.

Table 6.2

MEANS AND STANDARD DEVIATIONS FOR AC EVALUATORS
AND EXPERT PANELISTS (N = 18)

|  | AC Evaluators | Expert Panel | GBX |
|---|---|---|---|
| Average Score | 50.1 | 2.97 | 1043.6 |
| Standard Deviation | 3.7 | .84 | 111.4 |

The panelists' evaluations correlated .82 with the Assessment Center's graders' ratings and .68 with GBX scores. There was a .83 correlation between the Assessment Center graders' evaluations and GBX scores. Thus, all three measures rank ordered the 18 applicants in about the same way.

Figure 6.1 shows the relationship between an applicant's average score on an AC task (i.e., the score assigned by the actual grader) and the average of the panelists' consensus judgment on these same tasks. The numbers 1 through 6 in the figure refer to problems (1 = A-1, 2 = A-2, 3 = A-3, 4 = B-1, 5 = B-2, and 6 = B-3). Each problem number appears three times, corresponding to the three applicants that had their responses evaluated by the panel on that problem.

Figure 6.1 has two important features. First, it shows that the AC evaluators and panelists generally agreed with one another about the relative performance levels of the participants. For example, the two applicants with the lowest average AC task scores also received the lowest overall ratings by the panelists. The second important feature of Figure 6.1 is that it shows that this high correlation between the panelists and the AC graders was not due to the panelists just spreading their ratings around the midpoint of the five point scale. For example, if a team was given three applicants with average AC task scores above 50, the team tended to assign scores above 3.0 to all three applicants (e.g., Problem #4). In other words, the panelists' pass/fail judgments were not unduly influenced by whether they evaluated applicants whose performance was homogeneously high, homogeneously low, or spread out across the distribution of grades assigned by the AC's evaluators.

The foregoing findings indicate that the panelists' judgments as to where the pass/fail line should be drawn in the AC was consistent with where it was drawn on the GBX. In short, applicants were judged to be just as proficient in performing AC type tasks as they were in answering GBX type questions. However, because only 18 applicants were evaluated, the results obtained with them should be considered as a suggestive rather than as a definitive assessment of the degree of correspondence between performance levels on the two types of examinations.



Figure 6.1 - RELATIONSHIP BETWEEN SCORES ASSIGNED BY PANELISTS
AND ASSESSMENT CENTER EVALUATORS

Chapter 7

DISCUSSION OF RESULTS

OVERVIEW

The Assessment Center (AC) was conducted in order to answer the following questions:

- Is it feasible to construct measures of clinical legal skills that can be administered under standardized conditions and scored reliably?

- Do applicants who perform relatively well on the General Bar Examination (GBX) also perform well on clinical skills measures?

- Are applicants generally more or less proficient in clinical skills than they are in the skills measured by the GBX?

- Are AC scores related to an applicant's legal training and experience?

- Would the use of AC type tests on a bar examination narrow the difference in passing rates that currently exists between racial/ethnic groups?

The answers to these questions and the policy implications of these answers are discussed in the remainder of this chapter.


FEASIBILITY

One major finding of the AC was that it was possible to construct tests that appeared to assess important clinical skills. For instance, participants interviewed clients, presented oral arguments, negotiated an offer to settle, and prepared a trial brief. And, professors who taught clinical courses as well as practitioners who reviewed test materials generally concurred that the structure and nature of the AC tasks were such that they were measuring what they were designed to measure. This view was shared by most of the participants as well.

It also was apparent that the tests could be administered under reasonably standardized conditions. Scores were not affected by whether: the applicant took the AC in Los Angeles or Oakland; a plaintiff or defendant type problem was taken first; the applicant participated toward the beginning, middle, end of the two week period in which the AC was given; or the applicant did or did not take a problem previously (i.e., there was no warm-up effect).

Statistical analyses of the data indicated that the evaluators generally agreed with one another in their assessments of the overall relative quality of the applicants' responses. However, the scores on the separate aspects of a task were so highly correlated with one another as to render them useless for the purposes of providing information about different skills within that task.

The level of agreement between evaluators and the correlation between the scores on different tasks were somewhat related to the type of task. Written tasks tended to correlate more highly with one another than did oral tasks (see Table 4.7). Written tasks also tended to have higher levels of interevaluator agreement than oral tasks (see Table 4.5). And, while oral tasks tended to correlate slightly higher with scores on other oral tasks than they did with scores on a written tasks, there were numerous exceptions to this trend.

The foregoing pattern did not appear to be due to some oral tasks measuring one type of skill and other oral tasks measuring a different skill. For example, although Tasks 1 and 7 both involved interviewing, scores on these tasks had relatively low correlations with each other and with scores on the other oral tasks (see Table 4.6). Similarly, Tasks 5 (Closing Argument) and 9 (Opening Statement) did not correlate particularly highly with each other even though both involved speaking to a hypothetical jury. Task 5 also had the highest average correlation with the other tasks while Task 9 had a relatively low average correlation with the other tasks. In addition, the amount or nature of the interaction with an actor did not appear to be systematically related to an oral task's correlation with other tasks or its interevaluator consistency indices.

Written tasks, on the other hand, tended to have much higher intertask correlations; e.g., five written tasks had a higher overall reliability than six oral tasks. The only major problem with the written tasks was that 80% of the applicants complained that they did not have enough time to complete them. Increasing the time allowed on these tasks (or shortening the task requirements) might lead to even more reliable scores and higher correlations with GBX scores.

One implication of the findings above is that a practical skills test would have to include several oral tasks in order to provide even a moderately reliable estimate of an applicant's performance on such tasks. This is an important consideration because oral tasks are far more costly and difficult to develop, administer, and score than written tasks. For instance, the AC used four times as many oral task evaluators as written task evaluators and even then, it took longer to score the oral than the written tasks. Moreover, oral tasks pose special test security and logistics problems when large numbers of applicants have to take them. While these factors would argue against the general use of oral tasks, it was observed that Task 5, Closing Argument, had the highest average correlation with all of the other tasks. Moreover, Task 5 did not require the use of an actor and therefore its costs and associated administrative problems were substantially less than those of the other oral tasks.

In summary, the relatively low reliability, administrative difficultities, and high costs associated with most (but not necessarily all) standardized oral tasks probably precludes even considering them as possible components of a general bar examination. Written tests of clinical skills, on the other hand, are relatively easy to construct, administer, and score. Further, unlike oral tasks, the scores on written tasks are moderately correlated with one another. Thus, if a bar examination were to be expanded to include a clinical skills section, there would be less concern about which written tasks were used than there would be about the choice of oral tasks.

RELATIONSHIPS AMONG AC AND GBX SCORES

When the observed correlations among tests and subtests are corrected for
the reliabilities of these measures (see Tables 5.2 and 5.3), the pattern
of relationships that emerges indicates that:

o AC oral and written scores are generally more highly correlated
  with each other (r = .73) than they are with total GBX scores.

o The correlation between AC oral and written tasks is about as
  strong as the correlation between the Essay and MBE sections of
  the GBX.

o The correlation between the total AC score and the total GBX
  score (r = .72) is about as strong as the correlation between the
  Essay and MBE sections of the GBX (r = .78).

o While all of the foregoing relationships are strong, none of them
  approach unity (r = 1.00). The corrected correlation between
  problems A and B (r = .93), on other hand, is very close to
  unity. This implies that they are measuring the same skills.

Taken together, these findings suggest that the set of 11 AC tasks measure
certain skills and abilities that are similar but not identical to those
measured by the GBX. And, the degree of similarity is about as strong as
it is between the Essay and MBE portions of the GBX. These findings along
with those in Table 5.5 also indicate that the inclusion of AC type tasks
on the GBX would make a small but noticeable change in who passed versus
failed the examination; i.e., adding AC type tasks would result in some
applicants going from a pass to a fail status while the reverse would be
true for other applicants.

The percentage of applicants that would have their pass/fail status
affected by adding AC tasks to the GBX would depend upon several factors,
including: (1) how much weight was given to the practical skills section of
the examination, (2) the reliability of scores in this section, (3) the
correlation of AC and GBX scores, and (4) the policies adopted regarding
combining scores across sections (e.g., whether an applicant had to pass
both the regular and AC sections in order to pass or whether a high score
on one section could offset a low score on the other). In general, the
most change would occur if the AC replaced the GBX (i.e., the GBX was given
no weight), if the AC scores were very unreliable and did not correlate
well with the GBX (e.g., if they placed a heavy emphasis on oral skills),
and if an applicant was not allowed to compensate for low scores on one
section with high scores on the other section.

If an Assessment Center replaced the GBX and if the percentage passing did
not change, less than 25% of the applicants would have their pass/fail
status affected. Less than 15% would be affected if the AC, MBE, and essay
were given equal weight because of the generally strong relationship among
these measures. Equal weights also would have little or no effect on the
current differences in passing rates among racial/ethnic groups (see Table
7.1). Allowing applicants to substitute an AC score for a GBX score (as
was done in order to conduct this research) would increase the pass rate
for all groups. The amount of increase would, of course, depend upon the
particular substitution rules adopted.

Table 7.1

PERCENTAGE PASSING IN EACH RACIAL/ETHNIC GROUP IF THE AC CARRIED
ALL, SOME, OR NONE OF THE WEIGHT IN DETERMINING WHO PASSED

| Pass/fail based on: | Anglo | Asian | Black | Hispanic |
|---|---|---|---|---|
| AC only | 45 | 27 | 21 | 18 |
| AC + MBE + Essay | 47 | 25 | 17 | 20 |
| MBE + Essay | 48 | 24 | 15 | 21 |

Another factor that could affect the impact of adding an AC section to a
regular bar examination is the evaluator's judgment about the absolute (as
distinct from relative) quality of performance on the AC tasks.  Two
methods for computing scores were used in this study.  One method involved
having the evaluators grade the relative quality of the applicants'
responses and then scale these scores to their GBX scores.  This procedure
was used with all AC participants in order to combine their AC scores with
their GBX scores (see Chapter 3).  One consequence of this method is that
the percentage passing the GBX would be about the same as the percentage
passing the AC.

The second method involved having an expert panel make absolute judgments
regarding how well 18 applicants performed in the AC; i.e., all 18 could
have passed (or failed) the AC regardless of their GBX scores.  The results
with this second method indicated that:

o The expert panel rank ordered the applicants in about the same
  way as did the AC evaluators (r = .82).

o The expert panel would pass about the same percentage as would
  be passed by the first method (scaling AC scores to the GBX).

The second of these two finding is particularly important because it
suggests that the overall quality of performance in the AC was comparable
to that on the GBX.  In other words, as a group, AC participants were just
as proficient in the skills measured by the AC as they were in the skills
measured by the GBX (see Figure 6.1).  However, California's standard for
passing the GBX is much higher than the standard used by most other states.
Thus, many of the applicants passing the bar in these other states probably
have less than minimally acceptable clinical skills.

The stability of the findings with the expert panel are, of course, open to
question.  Only 18 applicants had their AC responses graded by this panel.
Nevertheless, the data on the relationship between AC and GBX scores among
all AC participants lends support to the policy option of expanding the bar
examination to include the measurement of clinical skills.  These skills
are generally considered important by the legal profession, they are
measurable, and while the essay and MBE sections of the GBX provide a
fairly accurate estimates of an applicant's clinical skills, this
prediction is far from perfect (even after correcting for the reliability
of the measures).

RELATIONSHIP OF AC SCORES TO APPLICANT CHARACTERISTICS

The results presented in Chapter 5 indicated that the relationship of AC scores to various background characteristics almost always paralleled the relationship between these characteristics and GBX scores. For instance, applicants who graduated from American Bar Association (ABA) approved law schools tended to do better on both the GBX and the AC than graduates of non-ABA approved schools.

An important exception to this trend was that applicants with some prior clinical experience tended to do better on the AC tasks than applicants that did not have any experience. This relationship was statistically significant even when the AC scores were adjusted for differences in their average GBX scores (see Table 5.8). The fact that varying amounts of experience were not systematically related to AC scores was probably a result of two factors: (1) self reports of the amount of time actually spent in performing legal tasks were apparently inflated (perhaps as a result of some applicants believing a large number of hours would help them get selected for the AC) and (2) the study had no way of assessing and controlling for differences in the appropriateness of the clinical training and experience the applicants may have received. This latter factor may have accounted for the failure to find a relationship between AC scores and prior experience among those applicants who obtained this experience on actual cases as part of law school program. Providing applicants with a detailed set of instructions and scoring criteria in advance of the AC also may have tended to reduce the advantage that applicants with prior experience may of otherwise had over those without such experience.

The significant relationship between AC scores and prior experience tends to support the validity of the AC tasks as measures of clinical skill. Additional support came from an analysis of the relationships between AC scores and scores on a clinical test of research skills. This 195 minure test was taken by a random sample of applicants as part of an experiment conducted during the July 1980 administration of the GBX. The Research Test (RT) had two parts, A and B. Part A involved evaluating the degree to which each of several cases supported various legal propositions that were relevant to a client's case. Part B asked applicants to use the Part A cases and other materials, such as copies of statutes, to prepare a memorandum about their client's case, such as its strengths and weaknesses. Since applicants were given copies of all the cases to be evaluated, the test emphasized analytic skills rather than legal knowledge (see Klein, 1981b for a more complete description of the RT).

Table 7.2 contains the observed and corrected correlations among GBX, AC, and RT scores in the sample of 117 applicants that had scores on all three measures. These data show that RT scores correlated higher with AC than with GBX scores, especially when the scores were corrected for reliability. AC tasks 4 and 6 were particularly highly correlated with both parts A and B of the RT. These findings suggest that the AC and RT are measuring similar skills and these skills are somewhat different than those assessed by the GBX.

Table 7.2

OBSERVED AND CORRECTED CORRELATIONS AMONG GBX, AC, AND RT SCORES

|  | GBX | AC | RT |
|---|---|---|---|
| General Bar Exam (GBX) | (.91) | .59 | .46 |
| Assessment Center (AC) | .76 | (.67) | .55 |
| Research Test (RT) | .55 | .76 | (.78) |

Observed and corrected correlations appear
above and below the main diagonal.  The
reliabilities appear on the main diagonal
in parentheses.


RELATIONSHIP OF AC SCORES TO RACIAL/ETHNIC GROUP

An applicant's racial/ethnic group had a small and not statistically
significant effect on the relationship between GBX and AC scores.  Results
suggested that the passing rate for Asian and Black applicants would
increase slightly and the passing rate for Anglo and Hispanic applicants
would decrease slightly if the AC replaced the GBX as the method for
determining an applicant's pass/fail status (see Tables 5.4 and 7.1).

Differences in average oral scores among racial/ethnic groups were
slightly smaller and less consistent with the pattern of differences among
these groups on the written tasks and the GBX.  Since the oral scores were
not especially reliable, a substantial portion of their ability to reduce
differences was probably due to chance.  It is also possible that the oral
scores may have been influenced by the evaluators of these tasks being able
to observe an applicant's age, sex, and racial/ethnic group.

The interaction of racial/ethnic group with task type accounted for only 1%
of the variance in AC scores.  And, the relationships with AC scores in one
racial/ethnic group generally paralleled the relationships among measures
in the other groups.  Restricting the sample to just ABA graduates did not
change the pattern of relationships described above.


CONCLUSIONS AND RECOMMENDATIONS

The results presented in this report indicated that it is feasible to
construct, administer, and reliably score certain types of clinical skills
tests.  It also was apparent that while scores on such tests are correlated
with performance on the general bar examination, they still provide some
unique information about an applicant's legal skills.  And, while clinical
skills tests would not substantially or even uniformly narrow the gap in
passing rates between Anglo and minority groups, neither would they widen
this gap.  Thus, it is recommended that further consideration be given to
the inclusion of clinical skills tests in a bar examination.  If such tests
are included, they probably should be limited to tasks that do not require
oral performance because the oral tasks were far more costly to administer
and score, but usually less reliable and objective, than the written tasks.

REFERENCES

Alderman, D. L., Evans, F. R., and Wilder, G.  Assessing clinical skills
in legal education: Simulation exercises in client interviewing.
Princeton, NJ:  Educational Testing Service, 1980, RR-80-36.

Baird, L.  A survey of the relevance of legal training to law school
graduates.  Journal of Legal Education, 1978, 29, 264-294.

Baird, L., Carlson, A. B., and Reilly, R. R.  Defining competence in legal
practice:  The evaluation of lawyers in large firms and organizations.
Princeton, NJ:  Educational Testing Service, 1979, RR-79-18.

Erlich, O. and Shavelson, R. J.  The search for correlations between
measures of teacher behavior and student achievement: Measurement
problem, conceptualization problem, or both?  Journal of Educational
Measurement, 1978, 15, 77-89.

Klein, S. P.  An analysis of the relationships between bar examination
scores and an applicant's law school, admissions test scores, grades,
sex, and racial/ethnic group.  Paper presented at the American Bar
Association meetings, Dallas, Texas; August 14, 1979.  Reprinted in
The Bar Examiner, 1980, 49, 14-18.

Klein, S. P.  The effect of time limits, item sequence, and question format
on applicant performance on the California Bar Examination.  Report
prepared for the Committee of Bar Examiners of the State Bar of
California and the National Conference of Bar Examiners, 1981a.

Klein, S. P.  Testing research skills on the California Bar Examination.
Report prepared for the Committee of Bar Examiners of the State Bar of
California and the National Conference of Bar Examiners, 1981b.

O'Hara, J. F. and Klein, S. P.  Is the bar examination an adequate measure
of lawyer competence?  The Bar Examiner, 1981, 50, #3, 28-35.

APPENDIX A

DESCRIPTION OF THE MULTIPHASED GRADING PROCESS

The major steps in the multiphased grading process are listed below:

1) In Phase I, all three answers in one of the three essay sessions are graded (different applicants have different sessions read in this phase so that all reader teams can begin simultaneously). If the sum of an applicant's MBE and three essay scores is greater than 665, the applicant passes; i.e., there is no further reading of that applicant's answers. If the applicant's Phase I score is 665 or less, the applicant goes on to Phase II.

2) All the applicants in Phase II have their remaining six essay answers read once. Applicants with total scores (i.e., MBE + Essay) below 1010 are failed, those with scores above 1065 are passed, and those with scores between 1010 and 1065 are placed in Phase III.

3) All the applicants in Phase III have all nine of their essay answers read again. The second reader assigned to an answer is a different person than the first reader and the second reader does not know the grade given by the first reader. The Phase III applicants have their Phase II and III essay scores averaged. If the total of an applicant's MBE and average essay score is less than 1030, the applicant fails; if it is more than 1049, the applicant passes; and if it is between 1030 and 1049, the applicant is placed in Phase IV.

4) Phase IV is called "reappraisal." In this phase, all nine of an applicant's essay answers are evaluated as a set by a member of the Board of Reappraisers (i.e., a member of a panel of consultants who have extensive experience in developing and grading the essay portion of California's examination). The reappraiser is advised of all the grades assigned to the applicant (i.e., MBE and essay scores from Phases I - III) and is asked to review the essay answers again to see if enough points can be found to pass the applicant. If enough points cannot be found, the applicant fails.

A parallel procedure (but with different cutoff scores) is used to determine whether an applicant passed the essay section by itself.

Of the 7379 applicants who took the complete July 1980 GBX, 29% passed in Phase I. The percent passing as a result of Phases II, III, and IV were 11, 5, and 3, respectively. Another 1% passed as a result of having passed one portion of the GBX previously and having received in July 1980 a passing grade on the portion they had failed previously. Table A.1 shows how the 7379 applicants were distributed across pass/fail categories.

Table A.1

DISTRIBUTION OF JULY 1980 APPLICANTS ACROSS PASS/FAIL CATEGORIES

| Final Status | Basis for Pass/Fail Status | Number of Applicants | Percent of Applicants |
|---|---|---|---|
| Pass | Phase I Pass | 2141 | 29.0 |
| Pass | Phase II Pass | 783 | 10.6 |
| Pass | Phase III Pass | 380 | 5.1 |
| Pass | Phase IV (Reappraisal) Pass | 234 | 3.2 |
| Pass | Previous MBE Pass + Phase II Essay Pass | 34 | 0.5 |
| Pass | Previous MBE Pass + Phase III Essay Pass | 29 | 0.4 |
| Pass | Previous MBE Pass + Phase IV Essay Pass | 12 | 0.2 |
| Pass | Previous Essay Pass + Current MBE Pass | 10 | 0.1 |
| Fail | Phase II Fail | 1932 | 26.2 |
| Fail | Phase III Fail | 1476 | 20.0 |
| Fail | Phase IV Fail | 348 | 4.7 |
| | Total | 7379 | 100.0 |

APPENDIX B

ANNOUNCEMENT TO APPLICANTS REGARDING ASSESSMENT CENTER


Between August 4 and August 24, 1980, the Committee of Bar Examiners will
conduct an "Assessment Center" designed to examine the appropriateness and
feasibility of non-traditional measurement devices to assess relevant
qualities and skills of applicants for admissions to practice law.  The
Assessment Center will be conducted only in the Los Angeles and San
Francisco areas.  Participation in the Assessment Center will be limited to
approximately 500 applicants and, as indicated below, those wishing to
participate must file a special application to do so.


### 1. Eligibility for Assessment Center.

To be eligible to participate in the Assessment Center, an applicant must
have taken all other parts of the applicable July 1980 examination
(including the Special Session to which assigned) and completed and filed a
timely application for the "Assessment Center."  Applicants who apply to
take the general examination in a location other than Los Angeles or San
Francisco are eligible to apply for the Assessment Center but, if selected,
must provide for their own transportation to the Assessment Center location
to which assigned and their own "housing" while there.


### 2. Assessment Center Format.

The Assessment Center will require the participation of each selected
applicant for two days during each of which each applicant will take a
single problem.  The problems will be designed to simulate actual cases
with professional actors and actresses playing the parts of clients and
witnesses.

Each problem case will require the applicant to accomplish several tasks
each of which might be encountered in the handling of an actual case.  Some
of the tasks will be oral such as interviewing or consulting a client,
preparing to examine or examining or cross-examining a witness, making an
opening statement and making an oral argument.  Some tasks will require
participants to produce written materials or documents such as a file
memoranda, a trial brief, a memorandum of points and authorities, and
interrogatories.

Applicants' performances on the oral tasks will be videotaped for
subsequent evaluation and their written work will be evaluated by readers.


### 3. Use of Assessment Center Scores.

The scoring of the materials produced by each applicant on the various
Assessment Center tasks will be used to reach a scaled score for that
applicant's performance in the Assessment Center.  The Committee has
determined that, for each applicant who has not otherwise passed the
examination, the applicant's Assessment Center score will be substituted
for the lower of the applicant's grades on either the MBE or Essay part of
the examination in determining whether the applicant has passed the entire

examination at the July 1980 administration, provided that the applicant achieved a passing grade in the Assessment Center and a score of not less than 60% on each of the regular parts (MBE and Essay) of the July 1980 examination (Bar or Attorneys') which that applicant was taking.  Thus, an applicant's performance in the Assessment Center can substantially increase but cannot decrease the likelihood that the applicant will pass the examination.


        4. Applications for Assessment Center.

Applicants may apply to participate in the Assessment Center by completing the accompanying questionnaire and application (separate from the usual application for the General Bar or Attorneys' Examination) and returning it to reach either office of the Committee of Bar Examiners not later than June 16, 1980.

APPENDIX C

PRE-EXAMINATION QUESTIONNAIRE

Your answers to the questions below will assist the Committee of Bar
Examiners in its efforts to improve the bar examination. Your responses
will be kept strictly confidential and used solely for research purposes.
We are most appreciative of your cooperation.

1. Birthdate (   /   /   )

2. Which of the following jobs, if any, have you held for one or more months?
   Check all that apply:

   [ ] Attorney                    [ ] Legal Investigator
   [ ] Court Reporter              [ ] Legal Secretary
   [ ] Law Clerk                   [ ] Paralegal assistant
   [ ] Law Enforcement Officer     [ ] Other Law Related Employment

3. About what percentage of the time was English spoken in your home during
   your childhood? Please put your answer in the box below.

       [   ] Percent of time English spoken.

4. Circle the box corresponding to the language other than English that was
   spoken most often.

   [1] Chinese      [3] Spanish            [5] None of these or no
   [2] Japanese     [4] Taglog/Phillipino      language besides English

5. Circle the box corresponding to the highest grade in school completed by
   your MOTHER or female guardian. Leave blank if you do not know.

   [1] 1st to 5th    [4] High School Graduate
   [2] 6th to 8th    [5] College Graduate
   [3] 9th to 11th   [6] Graduate/Professional School Degree

6. Circle the box corresponding to the highest grade in school completed by
   your FATHER or male guardian. Leave blank if you do not know.

   [1] 1st to 5th    [4] High School Graduate
   [2] 6th to 8th    [5] College Graduate
   [3] 9th to 11th   [6] Graduate/Professional School Degree

7. Circle the box below that best describes your undergraduate major:

      [1] Economics, Business, Accounting
      [2] Physical Science, Engineering, Mathematics, Biology
      [3] Social Science (Anthropology, Psychology, Sociology)
      [4] History, Government, Political Science
      [5] English, Journalism, Classical Studies, Philosophy
      [6] Fine Arts
      [7] Education
      [8] Other

8. For each of the activities below, indicate the number of hours, if any, you have spent doing them for: SIMULATED cases, ACTUAL cases associated with supervised law school programs, and ACTUAL cases as part of paid and/or volunteer employment. Insert the number 99 in a box if you spent more than 100 hours doing the activity.

|  | SIMULATED CASES | ACTUAL CASES Supervised Law School Programs | ACTUAL CASES Paid or Volunteer Employment |
|---|---|---|---|
| a. Conduct legal research | [   ] | [   ] | [   ] |
| b. Prepare briefs, petitions, or motions | [   ] | [   ] | [   ] |
| c. Conduct direct examinations | [   ] | [   ] | [   ] |
| d. Conduct cross examinations | [   ] | [   ] | [   ] |
| e. Interview a client or witness for a hearing | [   ] | [   ] | [   ] |
| f. Interview a client on general legal matters; e.g., landlord-tenant dispute | [   ] | [   ] | [   ] |
| g. Present an oral argument in a legal proceeding | [   ] | [   ] | [   ] |

9. In the box next to each choice below, indicate the number of courses, if any, you have taken in:

[  ] Evidence
[  ] Clinical or Trial Practice involving your participation in simulated or actual hearings
[  ] Trial Practice NOT involving your participation in simulated or actual hearings; i.e., lecture only

10. If you have secured employment in California in a law related job commencing by September 15, please circle the box corresponding to how you will be employed.

[1] Attorney General's Office
[2] Public office, criminal prosecution (e.g., District Attorney)
[3] Public office, criminal defense (e.g., Public Defender)
[4] Legal aid office (e.g., neighborhood legal assistance)
[5] Public interest law firm
[6] Law clerk for a judge
[7] Private law firm, criminal defense
[8] Private law firm, general practice
[9] Law department of a corporation
[0] Other

11. Do you hereby apply to participate in the two day Assessment Center?

(1) No    (2) Yes

If selected as a participant in the Assessment Center, I will be available to participate in the location circled below on any date between August 4 and 24 (inclusive) except for the dates circled below.

| Circle one | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---|---|---|---|---|---|---|---|
| in (1) Los Angeles only | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| in (2) San Francisco only | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| in (3) either LA or SF | 18 | 19 | 20 | 21 | 22 | 23 | 24 |

(The likelihood of being selected may be improved by increased availability.)

APPENDIX G

GENERAL DIRECTIONS FOR EACH TASK

TASK:     A-1

TITLE:    Initial Client Interview

TIME:     35 minutes (5 preparation & 30 meeting)

MATERIALS: Memo from Legal Secretary


In this task, you will meet with your client for the first time.
The objectives of this interview are to:

    (1) Obtain basic facts about your client's problem and information
        on where to obtain additional information.

    (2) Obtain client's objectives and reasons for seeking legal advice.

    (3) Establish a harmonious relationship with your client.

A meeting that elicits facts but fails to respond to your client's
concerns will not be satisfactory.  Similiarly, a meeting that does
little more than establish rapport will not be sufficient.

Thus, in conducting the interview, you should:

    (1) Have client tell story in client's own words.

    (2) Be sensitive to ethical issues that may arise.

    (3) Communicate in terms that are likely to be understood by
        your client.

    (4) Discuss next steps to be taken by you and/or your client.

Assume that your law firm  has agreed to represent the client and that
arrangements for fees have been made.  You should not discuss your
fees with your client.

```
TASK:        A-2

TITLE:       Discovery Plan and Interrogatories

TIME:        2 hours

MATERIALS:   Copy of the Complaint and the Answer
             Notes from client interview
             Case related materials
             Mini-library
```

In this task, you will prepare two documents, namely: a discovery plan
for internal office use and a set of up to 20 interrogatories which will
be propounded to the defendant.  You will need to use the materials
listed above in this task.

The purpose of the discovery plan is to identify and discuss the
ultimate facts needed to establish the cause(s) of action alleged in
the Complaint.  The discussion of each ultimate fact should include:

   (1) Specification of the ultimate fact.

   (2) Evidence by which the fact may be established.

   (3) Potential sources of this evidence.

   (4) Formal and/or informal method(s) by which this evidence can be
      obtained; e.g., requests for admissions and interviews.

Please note that your discovery plan should not discuss any issues
raised by the Affirmative Defense in the Answer.

The second part of this task is to draft up to 20 interrogatories that
probe issues raised by the Affirmative Defense in the Answer.  These
interrogatories should seek information that is calculated to lead to
the discovery of admissible evidence.  This would include questions
whose answers were likely to help prove or disprove a vital fact
(directly or circumstantially) or lead to the discovery of other
important information.  The questions should be phrased in a way that
will lead to information that is useful.  Thus, your interrogatories
should be clear, precise, and difficult to evade.

For the purposes of this task, an interrogatory can include up to three
subparts so long as these subparts are directly related to the thrust of
the interrogatory.  For example, one interrogatory might be phrased as
follows: "Did you talk to the plaintiff on March 3, 1980?  If so, please
state (a) where the conversation occured, (b) was it by telephone or
in person, and (c) who else, if anyone, was present during this
conversation?"  Your interrogatories should not be accompanied by any
preamble, caption, definitions, or directions.

```
TASK:       A-3

TITLE:      Preparation of Client for Direct Examination

TIME:       75 minutes (45 planning & 30 meeting)

MATERIALS: Special Instruction Sheet
           Summary of client's deposition
           Case related materials
```

In this task, you are to prepare your client for direct examination. You may assume that you have had ongoing contact with your client since the initial interview. Such contact included your representing the client at a deposition taken at opposing counsel's office.

The primary purpose of this session is to prepare your client for direct examination on an aspect of the case specified on the Special Instruction Sheet and on one or more other aspects of your own choosing. This preparation session is designed to enhance the likelihood of your client providing effective testimony at trial.

The major portion of this office visit should, therefore, be spent in simulating the direct examination you plan to conduct at trial. In this simulated examination you should:

(1) Ask questions that allow the client to testify in client's own words.

(2) Ask questions in a systematic fashion (e.g., by case component, chronologically, etc.).

(3) Ask questions about material aspects of the case.

(4) If appropriate, ask questions about aspects of the case that may prove troublesome.

(5) Ask questions in a manner that is readily understandable to the client and to the factfinder.

(6) Respond to your client's concerns.

A small portion of your time should be spent in alerting your client to what might occur during cross-examination, including aspects of the case that may prove troublesome. Do not spend time preparing your client to respond to simple biographical questions unless the answers have particular importance to your case. Similiarly, do not instruct your client on general aspects of courtroom procedures and witness demeanor.

If during the simulation, the client responds in a manner that detracts from the client's effectiveness as a witness, then you should advise your client on how to testify more effectively (while still keeping within the bounds of professional responsibility).

TASK:        A-4

TITLE:       Trial Brief

TIME:        90 minutes

MATERIALS: Special Instruction Sheet
           Pleadings
           Deposition Summary
           Client interview notes
           Mini-library


In this task, you are to prepare a trial brief for submission prior to
trial.  This brief should be limited to the two issues specified on the
Special Instruction Sheet.

Your brief should:

   (1) Contain concise headings that relate the law and the facts
       to each other.

   (2) Contain persuasive arguments that relate legal principles
       and factual circumstances in a way that supports your
       position on each issue.

   (3) Resolve conflicts, if any, between legal authorities.

   (4) Draw analogies and make distinctions, as appropriate,
       between materials in the mini-library and the circumstances
       of your case.

   (5) Point out weaknesses in opposing counsel's likely positions.

   (6) Discuss policy and other implications, if any, of your
       and/or opposing counsel's positions.

   (7) Present ideas clearly and persuasively; be well organized
       and concise; and employ lawyer-like terms and style.

TASK:      A-5

TITLE:     Closing Argument

TIME:      90 minutes (60 preparation, 15 presentation, 10 observation,
           and 5 reply presentation)

MATERIALS: Special Instruction Sheet
           Summary of evidence
           Agreed upon jury instructions

In this task, you will prepare and present a closing argument on the
issue stated on the Special Instruction Sheet and on one other issue
of your own choosing.  You will then observe a videotape of a portion
of opposing counsel's closing argument.  Finally, you will present a
reply to this portion of opposing counsel's closing argument.

An effective closing argument in this task might include some of the
following (listed below in no particular order):

    (1) Stating the ultimate fact(s) that the court must find for
        your client to prevail.

    (2) Marshalling (organizing) the evidence in support of the
        ultimate fact(s).

    (3) Incorporating into your argument relevant portions of the
        jury instructions.

    (4) Discussing the sufficiency of the evidence.

    (5) Discussing the credibility of the evidence; e.g.,
        truthfulness of witnesses.

    (6) Drawing reasonable inferences from the evidence to support
        the positions you have taken.

    (7) Pointing out weaknesses in opposing counsel's case.

    (8) Indicating considerations, if any, that merit a finding in
        support of your client; e.g., equities and policies.

The issue you choose should be one that is important and likely to be
contested by opposing counsel.

Your reply should answer opposing counsel's contentions and correct any
misstatements.

Your argument and reply will be evaluated in terms of the above as well
as the extent to which you:

    (1) Manifest sincerity and fairness.

    (2) Do not rely excessively on notes.

    (3) Stay within the permissible confines of a closing argument;
        e.g., do not assert personal knowledge of the facts.

    (4) Present persuasive arguments.

CONTINUE ON NEXT PAGE

Assume for the purposes of this task that you and opposing counsel
submitted agreed-upon jury instructions to the court.  Although no one
else will be in the room with you when you make your presentations,
assume they are addressed to a jury.

You will have 60 minutes to prepare your closing argument.  You will
then have up to 15 minutes to present your argument.

Please note that you are not expected to argue all the issues you might
have discussed in a complete closing argument.  Discuss only the one
issue on the Special Instruction Sheet and the one issue of your choice.

Opposing counsel's closing argument will last up to 10 minutes.
Immediately upon the conclusion of that argument, you will have up to
five minutes to reply.

TASK:        B-1

TITLE:        Memorandum for the File

TIME:         2 Hours

MATERIALS:  Mini-library
            Summary of the facts
            Complaint
            Other case-specific materials


You are an attorney employed in a law office.  Your task is to
prepare a memorandum for the file, as is customary in your firm,
prior to meeting with a new client.  The purpose of this memo is to
help you organize your ideas about the case as it now appears and
to provide a guide and rationale for subsequent activities.

Your memo should contain:

    (1) an analysis of the relative strengths and weaknesses of
        each side of the case as revealed by the materials
        supplied (including the mini-library for the case).

    (2) a discussion of legal issues, factual matters, and
        other areas that need further exploration.

Your memo also may contain:

    (1) a discussion of alternatives (and their possible
        consequences), if any, that should be discussed with
        the client.

    (2) an indication of other significant factors, if any,
        which might help in planning and/or carrying out
        subsequent activities.

In preparing this memo, you should devote most of your attention to
the legal and factual issues that are likely to be in dispute.  A
memo that discusses issues without relating them to the evidence
and circumstances will not be very useful.  Your memo should be well
organized, clear, and concise.

TASK:      B-2

TITLE:     Client Interview and Counseling

TIME:      45 minutes (15 preparation & 30 meeting)

MATERIALS: Memo of legal and factual issues

In this task, you will meet with your client for the first time.
The purpose of this meeting is to interview and counsel your client.
Thus, you should:

    (1) obtain essential information regarding the case, including
        your client's version of the story, explore apparent
        inconsistencies, and obtain leads to other sources of
        information.

    (2) ascertain your client's objectives in this matter.

    (3) discuss with your client the advantages and
        disadvantages of the alternatives which have been
        suggested during your meeting with the client.

    (4) respond to your client's concerns.

    (5) review what you and your client will do prior to your
        next meeting.

    (6) be sensitive to ethical issues that may arise.


A meeting which elicits facts but fails to respond to your client's
concerns will not be satisfactory.  Similarly, a meeting that does
little more than establish rapport will not be sufficient.

Assume that arrangements for your fee have been made.  This matter
should not be discussed with your client during this session.

TASK:       B-3

TITLE:      Draft of Counter Proposal and Letter to Client

TIME:       60 minutes

MATERIALS:  Settlement offer
            Other case related information

In this task, you are to prepare two documents: (1) a draft of a
counter proposal in response to the offer of settlement sent to you by
opposing counsel and (2) a letter to your client explaining the
reasons for your draft counter proposal.  You will be given opposing
counsel's proposed settlement, and some additional information about
the case that has been gathered since your last interview.

The goal of your draft counter proposal is to advance your client's
case in anticipation of further negotiations and/or trial.  The draft
counter proposal should include, but need not be limited to:

   (1) your response to opposing counsel's offer.

   (2) potentially viable alternatives to that offer.

   (3) a rationale for your response to the offer of opposing counsel
       and for your proposed alternatives.

The letter to your client should:

   (1) set forth the reasons for including in the draft counter
       proposal those offers and arguments you made and for
       excluding those offers and arguments you considered, but
       chose not to make.  A number of these reasons may not have
       been expressed in your draft counter proposal; e.g, how
       your offers and arguments relate to your overall strategy
       in the case.

   (2) attempt to explain to your client why you advise that the
       client accept the draft counter proposal, in the event
       that it differs from your client's stated wishes.

Your draft counter proposal and letter to client should be well
organized, clear, and persuasive.

TITLE:       Opening Statement

TIME:        85 minutes (60 preparation, 10 observation, 15 presentation)

MATERIALS:   Summary of expected testimony of potential defense witnesses
             Videotape of opposing counsel's opening statement

In this task, you will prepare to make an opening statement, observe a
videotape of opposing counsel's statement, and then present your own
opening statement.

This case is being tried before a jury.  You and opposing counsel have
agreed to make your opening statements prior to the introduction of any
evidence.

You and your senior partner have decided to present an opening
statement that provides a cohesive overview of the defendant's case.

Your opening statement should:

   (1) prepare the jury to understand your theory of the case and to
       evaluate the evidence in a way that is favorable to your
       client.

   (2) set forth the key points upon which your theory of the case
       rests.

   (3) organize material systematically and in language that is
       understandable to a jury.

   (4) create a positive impression of yourself and your case by using
       a style that is personally comfortable and effective.

   (5) not be argumentative or otherwise go beyond the permissible
       confines of an opening statement.

   (6) state the potential evidence accurately.

In the context of this task, the phrase "theory of the case" refers
to your characterization of the evidence, which if accepted by the
factfinder, will result in an outcome favorable to your client, in
whole or in part.

You will have one hour to review the summaries and prepare your
opening statement.  At the end of one hour, you will have up to 10
minutes to observe opposing counsel's opening, and then you will have
up to 15 minutes to present your statement.  Although no one will be
in the room with you when your opening statement is videotaped, you
should present the statement as if you were speaking to a jury.

TASK:        B-5

TITLE:       Reply to a Points and Authorities Memorandum

TIME:        90 minutes

MATERIALS:   Summaries of plaintiff's case in chief and oral motion
             Opposing counsel's memo of Points and Authorities

During trial, you made a motion orally to the court.  Following
opposing counsel's oral opposition to your motion, the court asked
opposing counsel to write a memo of Points and Authorities in
opposition to your motion.  You have now received that memo and you
must prepare a memo in reply.

Your memorandum should:

  (1) identify and discuss relevant legal authorities and principles.

  (2) draw analogies and/or make distinctions as appropriate that
      support your position.

  (3) if appropriate, discuss weaknesses and errors in opposing
      counsel's memo.

  (4) if appropriate, point out policy and other implications of
      your position and/or opposing counsel's position.

  (5) present a coherent, well organized, and persuasive reply
      designed to convince the judge to rule favorably on your
      motion.

In preparing your memorandum, you should use the mini-library, the
materials listed above, other relevant case materials.

TASK:        B-6

TITLE:       Cross-Examination

TIME:        60 minutes (30 preparation & 30 examination)

MATERIALS:   Partial transcript of witness' testimony
             Other case related materials
             Special Instruction Sheet

In this task, you will prepare and conduct a cross-examination of
opposing counsel's key witness.

Your performance in this task will be evaluated in terms of whether:

(1) the areas explored in your cross-examination helped to
    develop your theory of the case and afforded reasonable
    opportunities for success.

(2) effective technique and style were used in examining the
    witness.

(3) the case against your client was discredited and/or
    favorable testimony was obtained.

(4) you adhered to rules of evidence and standards of
    professional conduct.

In the context of this task, the phrase "theory of the case" refers
to your characterization of the evidence, which if accepted by the
factfinder, will result in an outcome favorable to your client, in
whole or in part.

You may cross examine on as many areas and in whatever order you deem
to be most effective.  However, you must cover the area indicated on
the Special Instruction Sheet attached to the other materials provided
for this task.

Although only you and the witness will participate in this task, you
should conduct the cross-examination as if you were in an actual jury
trial.  Thus, you should adhere to standards of professional conduct.
For example, it is recognized that at times it is acceptable to ask
questions on cross that are technically objectionable; however, this
should not be done to excess.

APPENDIX H


ASSESSMENT CENTER

1980

GENERAL INSTRUCTIONS

1.    Time

There are four starting times for the Assessment Center,
8:00 a.m., 8:45 a.m., 9:30 a.m. and 10:15 a.m.  You are
being or will be notified of your starting time.  It is
suggested that you be at the Assessment Center 15 minutes
prior to your assigned time to begin the examination.  If
you are not at the Center and ready to begin the examination
at your assigned time you will not be allowed to participate
at all, and an alternate will take the examination in your
place.  Persons who do not take the examination on the first
day will not be allowed to take the examination on the
second day.

You must plan to spend nine hours at the assessment center
for each of the two days that you take the examination.
This includes a 45-minute break for lunch (see below).

2.    Smoking

Participants may not leave the school premises or use the
telephones for any reason during the examination.  Smoking
is not permitted in any of the examination rooms, but par-
ticipants may smoke in a designated area.

3.    Location

Northern California:

The Northern California Assessment Center will be adminis-
tered at Claremont Middle School, 5750 College Avenue,
Oakland.  Claremont Middle School is approximately three
blocks south of the intersection of Claremont and College
Avenues and right next to the Rockridge BART station.  A.C.
Transit stops one-half block from the school.  There is
ample parking in the area.  The Claremont Hotel is less than
one mile from the school.  Participants should enter the
school at the main entrance on College Avenue.

Southern California:

The Southern California Assessment Center will be administered
at Fairfax High School, 7850 Melrose Avenue, Los Angeles, at
the intersection of Fairfax and Melrose.  Fairfax is on or
near a Metro bus line.  Participants who drive to the school
may park in the school parking lot.  Participants should
enter the school at the main entrance on Melrose.

4.    Typists

If you are typing the written part of the examination, you
will be required to pick up materials for each such problem
task from the room set aside for those writing the examina-
tion.  This room may be some distance from the room designated
for those typing the examination.  However, those typing the
exam will not be allowed any extra time to obtain materials.
Please bear in mind that more than half of the tasks in this
examination are oral and will be videotaped (See separate
instructions regarding videotaping).

5.    Lunch

Lunch will be 45 minutes long and may begin as early as
11:45 or as late as 2:00 depending upon, among other things,
your starting time.  In general you can expect that if you
start early (e.g., 8:00 a.m.) you will have an early lunch
break and if you start late (e.g., 10:15 a.m.) you will have
a late lunch break.  Since you will not have completed the
examination at the time of your lunch break we require that
you eat lunch on the premises.  If you wish you may bring
your own lunch.  If you require a special diet you must
provide your own food.  There will not be a refrigerator available.

There will be a catering truck available at each site for
those who wish to purchase lunch.  Lunches must be eaten in
the designated lunch room.  Participants will not be allowed
to discuss the examination during the lunch break.

6.    Examination Materials

The answer books for the written tasks must be turned in at
the end of each task.  All other material including your
videotape, problem materials and notes must be turned in at
the end of each day.

7.    Confidentiality

In keeping with professional standards, it is your responsi-
bility not to discuss with anyone any aspect of the cases
used in the Assessment Center.

8.    Assessment Center Procedures

It is very important that you carefully read and become
familiar with the information set forth in the enclosure
entitled "Assessment Center Procedures."

## THE ASSESSMENT CENTER PROCEDURES

### 1.    Materials

On arrival at the Assessment Center you must identify yourself
then you will be directed to a room where you will be given
general instructions.  Among other things you will be given
a case file folder.  In that folder you will find the following
materials:

### a.    A floor plan

The floor plan will assist you in locating the rooms you
will use during the day.  Refer to the floor plan to locate
the "writing room".  You will use this room for all written
tasks and for preparing for video tasks.  This is the first
room you will use after receiving general instructions.

The next room you should locate on the plan is the control
room.  When you are ready to begin a video task you must
first go to the control room and hand in your video tape
before you can proceed to the video taping room

Video taping rooms are also shown on the floor plan.  Your
badge (see below) indicates which video room you must use
for video tasks.  Locate that room on the floor plan.

Other rooms you should make note of are the viewing room,
the lunch room and the restrooms.

### b.    Your Schedule

Review your schedule carefully.  It sets out the tasks you
will perform, where you must be for each task, the start
time and the length of time allocated for each task.
You must follow your schedule.  Because different groups of
participants are going through the center at different times
all schedules must be adhered to.  No one will be given extra
time for any reason.

It is suggested that you wear and consult a watch to stay on
schedule.

### c.    Your Video Tape

Each participant will use one video tape for all of his or
her video tasks for each day at the center.  Each folder
will contain a prelabled video tape.  You must immediately
check the video tape label and see if it is properly labeled
with your registration or application number and your video
room number.  The video room number is the same number which
appears on your badge.  If the video tape is not properly
labeled notify the proctor immediately so that the tape can
be relabeled.

You will use the video tape during your entire day at the
center.  You must hand your tape to the technician in the
control room just before you begin a video task.  You must
pick up your video tape from the control room immediately
upon full completion of a video task; at all other times you
must keep your video tape with you.

Other materials supplied include scratch paper on which you
may make notes during the day.  Paper clips, staplers and
staple removers will be provided so that you can organize
your materials in any fashion convenient to you.  You must
provide your own pens.

The case folder can be used by you to hold the materials you
obtain during the day.  No materials may be taken into rest
rooms or the lunch room..  When you do not have your materials
with you they must be left at your place in the writing
room.

2.  Video taping

As stated above, immediately before entering your assigned
video room you must hand your video tape to the control room
technician.  If you arrive at the control room before the
technican is ready to take your tape please wait until you
can hand the tape to the technician.  This is the only way
to assure that the video equipment for your room is operating
when you begin the video task.  After you have handed the
technician the tape you should proceed directly to your
video taping room (or viewing room, see below).  The equipment
will be operating when you enter the room.  Take a seat at
the table provided.  There will be a microphone taped to the
table at which you are to sit.  Do not attempt to move or
adjust the microphone.  The chair and table you will be
using have been positioned to be properly picked up by the
video camera.  There should be masking tape on the floor
which indicates where your chair should be positioned.  To
stay in camera range your chair must stay within the taped
area.  Due to equipment limitations you must remain seated
while delivering your opening statement or closing argument.

If for some reason it becomes necessary to adjust the equipment
in the video room a technician will enter the room quietly,
make the adjustment quickly and leave.  You should continue
the task.

For those tasks involving a client or a witness, the client
or witness will knock on the video room door and enter.  You
should greet the client or witness in any fashion you feel
appropriate and begin the task.

If for some reason the client or witness is in the video
room when you arrive you should greet him or her in any
fashion you feel appropriate and begin the task.  Remember

the video equipment is already operating when you enter the video room.

At the end of your interview, preparation, closing argument task, counselling session, opening statement task, or cross examining or the time allotted for each of these tasks, whichever occurs first, you should leave the video room and return to the control room to pick up your tape.  Make sure that the tape that you pick up has your number and video room number on it.

Please note:  since each video room is being used by more than one participant you must leave the video room when your time is up.  The video technician will stop the video tape recorder when the time for the task is over <u>whether or not</u> you have completed the task.

If you lose track of time and go over your allotted time a proctor will knock on the door and notify you that your time is up.  Please leave the room and proceed as indicated above.

<u>DO NOT FEEL COMPELLED TO FILL ALL OF THE TIME ALLOTTED FOR VIDEO TASKS</u>.

If you complete a video task in less time than that allotted, go to the control room, notify the technician that you have completed the task and retrieve your tape.

<u>Video taping and viewing opening statement and closing arguments</u>.

Opening statements:

After preparing your opening statement but before you deliver it you must observe your opponent's opening.

To do so proceed from the writing room, taking with you your video tape and any materials you feel you need to make your opening statement.

Then go to the viewing room (see floor plan).  In the viewing room take a seat at your viewing station (as designated on your schedule); put on the head phones supplied.  When all participants at your station are ready to view opponents opening the proctor will start the tape of opponent's opening.  You may make notes during opponent's opening.  When opponent's tape is finished, remove the head phones and then take your video tape to the control room.  You may have to wait at the control room for a few minutes until the technician takes your tape.  This is to insure that everyone starts his or her opening statement at the same time. When the technician takes your video tape you should go

immediately to your video taping room.  The video
equipment will be operating when you enter.  You should
make your opening and return to the control room
to pick up your tape.  Remember - when your time is up -
the technician will stop the video tape recorder whether
or not you have completed your opening.

Closing argument:

After preparing your closing argument you should go to
the control room with your video tape.  You should also
have with you all materials you will need to deliver
your closing argument and rebuttal.  When the technician
takes your tape you should go to your video room and
deliver your first closing.  When you finish your first
closing proceed directly to your viewing room and
station to observe opponents closing argument.  Take a
seat at your station, and put on the headphones provided.
The proctor at the viewing station will start the tape
of opponents closing as soon as all participants are
assembled at their respective viewing stations.  You
may wish to make notes during opponent's closing.  When
your opponent has completed his or her closing, remove
your headphones and proceed immediately to your video
room to make your rebuttal.

<u>DO NOT</u> GO TO THE CONTROL ROOM AFTER VIEWING OPPONENTS CLOSING
AND BEFORE MAKING YOUR REBUTTAL.

The video equipment will be operating when you enter the
video room.  When you complete your rebuttal go to the
control room and pick up your video tape.

ALWAYS MAKE SURE THAT THE TAPE YOU PICK UP AT THE CONTROL
ROOM IS YOURS.

3.   <u>Tasks</u>

You have already received a copy of the task instructions
for your review.  At the center you will be given instruc-
tions and the materials for each task at the beginning of
that task.  All task material will be distributed in the
writing room.  For written tasks you will also be given an
answer book.  If for some reason you do not have an answer
book for a written task, please notify the proctor immediately.
He or she will supply you with the proper answer book.  All
written answers must be written in the answer books provided.
At the completion of each written task <u>you must</u> turn in the
answer book for that task.

All other materials used and notes made during the day must
be turned in at the end of the day.

## 4.  Writing Room

All participants will use the same room for the written part of the examination.  Since the participants are on different schedules some participants will be entering or leaving the room while others are working on other parts of the examination.  Thus, those entering or leaving the room must do so as quietly as possible in order not to disturb others.  If you have questions you should ask those questions of a proctor in the hall not in the writing room.

## 5.  Breaks

It is expected that you will have time during your day at the Assessment Center for breaks.  If you wish you may take these breaks in the lunch room.  While in the lunch room you are not to discuss the examination with others.  It is your responsibility to return from a break in enough time to receive your materials for the next task.  It is also your responsibility to return to the writing room after your lunch break in enough time to begin the next task.  If you do not take all of the tasks for the problem your examination may not be evaluated.  Please do not stand around the control room or in the halls unnecessarily.

EVEN THOUGH THIS MATERIAL WILL BE GIVEN TO YOU AT THE ASSESS-MENT CENTER YOU SHOULD BE THROUGHLY FAMILIAR WITH THE MATERIAL BEFORE YOU COME TO THE CENTER.  There will not be enough time for you to read all of this material before you begin your first task.

REMEMBER - YOU MUST COME TO THE CENTER ON TWO CONSECUTIVE DAYS.  Although the examination procedure will be more familiar to you on the second day it is suggested that you refer to these materials from time to time to insure that your day goes smoothly.

APPENDIX K

TECHNICAL DISCUSSION OF FACTOR ANALYSIS RESULTS

Two principal axis factor analyses were conducted to determine whether there were tasks that tended to correlate more highly with each other than with other tasks.  In the context of this report, a cluster of tasks that tended to correlate with each other would be called a factor.  The degree to which a task belonged to a particular factor is indicated by its "loading" on that factor (i.e., the correlation between the task and the factor).

The first analysis had unities on the main diagonal while the second analysis had squared multiple correlations on the diagonal.  The results of both analyses suggested that there were no more than two clusters of tasks. The factor loadings in each analysis after varimax rotation are presented in Table K.1.  The pattern of these loadings generally corresponds to task type; i.e. one factor for the written (even numbered) tasks and a second factor for the oral (odd numbered) tasks.  Tasks 4, 6, and 10 had the highest loadings on the first factor while Tasks 1, 3, and 11 had the highest loadings on the second factor.  Task 9 was the only oral task that had a higher loading on Factor 1 than on Factor 2.  Task 8 had almost equal loadings on the two factors.

Table K.1

FACTOR LOADINGS AFTER VARIMAX ROTATION

| Task Number | 1's on Diagonal | | Squared Multiple R's on Diagonal | |
|---|---|---|---|---|
| | Factor 1 | Factor 2 | Factor 1 | Factor 2 |
| 1 | .03 | .62 | .10 | .39 |
| 2 | .55 | .12 | .39 | .18 |
| 3 | .20 | .61 | .19 | .46 |
| 4 | .67 | .08 | .49 | .16 |
| 5 | .35 | .54 | .30 | .44 |
| 6 | .63 | .11 | .47 | .18 |
| 7 | .08 | .38 | .12 | .21 |
| 8 | .39 | .33 | .30 | .29 |
| 9 | .40 | .20 | .29 | .20 |
| 10 | .69 | -.03 | .49 | .10 |
| 11 | .00 | .62 | .09 | .36 |
| Eigen Values | 2.68 | 1.17 | 1.83 | .32 |
| % of variance | 24 | 11 | 80 | 14 |

% of variance = eigen value divided by the sum of the eigen values greater than zero.

APPENDIX L

POST ASSESSMENT CENTER QUESTIONNAIRE AND
THE PERCENTAGE SELECTING EACH CHOICE

1. In what ways, if any, did you prepare for the Assessment Center?  Circle
   the number next to each choice that applies:

   43% Read a book on clinical practice.
   13% Observed trial proceedings.
   13% Practiced interviewing and/or oral presentation skills.
   23% Obtained the advice of a practicing attorney.
   00% Obtained the advice of someone who had already been through the Center
   19% Reviewed materials used to prepare for the regular bar examination.
   20% Other
   27% None of the above.

2. How helpful was it to have a copy of the directions for each Assessment
   Center task in advance of your participation in the Center?  Circle one
   choice below:

    3% No help at all
   47% Somewhat helpful
   42% Very helpful
    9% Did not receive a copy in advance

3. In terms of clarity and specificity, the directions for the Assessment
   Center tasks were generally (circle one choice below):

    1% Very poor
    4% Poor
   29% Fair
   47% Good
   19% Very Good

4. Circle the number on the line for each task to indicate the adequacy of
   the time limits for that task:

| | Too Short | About Right | More than enough |
|---|---|---|---|
| Written Tasks | 79% | 20% | 1% |
| Interviewing/Counseling | 8% | 83% | 9% |
| Oral Presentations (Opening statement & Closing argument) | 16% | 59% | 25% |
| Direct and Cross-examination of witnesses | 13% | 64% | 23% |

5. How good a measure of your legal skills and abilities were each of the tests listed below?  Circle one number for each test.

|  | Very Poor | Poor | Fair | Good | Very Good |
|---|---|---|---|---|---|
| Multistate Bar Examination (MBE) | 29% | 30% | 29% | 9% | 2% |
| Essay Examination | 7% | 16% | 47% | 28% | 3% |
| Assessment Center - Day #1 | 4% | 12% | 44% | 28% | 12% |
| Assessment Center - Day #2 | 3% | 9% | 40% | 35% | 14% |

6. In your opinion, how well did each task in the cases you were assigned measure the type of skill it was designed to assess?  In other words, did the nature of the problem, actors, materials, etc. give you the opportunity to do the things you were instructed to do by the directions? Circle one number for each task: (see Table 5.11 for results)

|  | Poor Measure | Adequate Measure | Good Measure |
|---|---|---|---|
| **Attorney for Plaintiff Tasks** | | | |
| Client Interview | 2% | 39% | 59% |
| Discovery Plan & Interrogatories | 35% | 45% | 20% |
| Preparation of Client for Direct Examination | 9% | 49% | 42% |
| Trial Brief | 46% | 37% | 17% |
| Closing Argument | 13% | 53% | 34% |
| **Attorney for Defendant Tasks** | | | |
| Memorandum for the File | 26% | 54% | 20% |
| Client Interview & Counseling | 4% | 49% | 47% |
| Draft of Counter Proposal & Letter to Client | 17% | 52% | 31% |
| Opening Statement | 15% | 52% | 34% |
| Reply to Points and Authorities Memorandum | 30% | 45% | 24% |
| Cross-Examination | 24% | 48% | 28% |

7. How well did the actors play their roles?  Circle one number for each type of role:

|  | Poor | Fair | Good |
|---|---|---|---|
| Your Client | 1% | 9% | 90% |
| Other Witness | 2% | 21% | 77% |

# FACTORS ASSOCIATED WITH THE DIFFERENCE IN PASSING RATE BETWEEN ANGLO AND HISPANIC APPLICANTS ON THE NEW MEXICO BAR EXAMINATION.

Stephen P. Klein, Ph.D.
January 12, 1981

## INTRODUCTION

An analysis of the background characteristics of Anglo and Hispanic applicants taking the New Mexico Bar Examination (NMBE) indicates that Anglo applicants tend to have higher law school grades and admission test scores. And, a higher percentage of Anglo than Hispanic applicants pass the NMBE. The research described in this report was undertaken to determine the extent to which the difference in passing rates between these groups can be explained by differences between them in their respective law school grades and admission scores versus explained by factors that are related solely to group affiliation. In other words, if the difference between groups on the NMBE is wider than what would be expected on the basis of performance level differences between them prior to taking the examination, then the NMBE can be said to be biased against Hispanic applicants.

## MEASURES

The following data were available for graduates of the University of New Mexico's School of Law who took one or more of the ten NMBE's that were administered between February, 1976 and July, 1980:

o Anglo/Hispanic Group Affiliation (AHGA). Applicants taking the NMBE were required to provide a set of their fingerprints. And, it is standard law enforcement procedure to indicate group affiliation on the card used for recording fingerprints. Thus, obtaining group affiliation data on the applicants was a serendipitious by-product of the fingerprint requirement.

o Law School Admission Test (LSAT) score. The LSAT is administered by the Educational Testing Service of Princeton, New Jersey. Almost all American Bar Association approved law schools use the LSAT as part of their admissions procedures because scores on this test generally contribute to the prediction of law school grades.

o Law School Grade Point Average (LGPA). The University of New Mexico indicated LGPA on a four point scale with a 4.0 being equivalent to an A, 3.0 to a B, etc.

o Multistate Bar Examination (MBE) score. The MBE is developed by the National Conference of Bar Examiners and administered by the Educational Testing Service. It is used as part of the bar examination in about 47 jurisdictions. The test consists of 200 multiple choice questions drawn from the following six content areas: constitutional law, contracts, criminal law, evidence, real property, and torts. MBE scores are scaled (i.e., adjusted) by ETS so as to control for possible differences in test difficulty across administrations.

o New Mexico Essay Examination (Essay) score.  The Essay portion of the NMBE consists of 24 essay questions.  Approximately 40 minutes is given to answer each question, but applicants are allowed some flexibility in how they allocate their time. Most of the questions are developed by New Mexico's Board of Bar Examiners.  The Board draws the remaining questions from the bank of questions maintained by the National Conference of Bar Examiners.  All the answers to a given question are graded under the direction of the Board by a single attorney.

## PRELIMINARY ANALYSES

Tables 1 and 2 contain statistical data for all the applicants who took one or more of the ten examinations.  An inspection of these tables indicates that the applicants taking the examination in July tended to do better on the MBE than those taking it February.  This is not surprising in that a larger proportion of the February takers than July takers were repeaters (i.e., applicants who failed the NMBE previously). The absence of a comparable difference in average essay scores between July and February takers coupled with the relatively strong correlation between MBE and Essay scores suggests that the essay portion of the examination tended to have easier questions and/or be graded more leniently in February than in July.  Variations in essay test difficulty also are apparent within the February and July examinations.  For example, although the average MBE scores on the July, 1977 and 1980 examinations were essentially the same, the average score on an essay question was almost six points lower on the 1980 examination.

The foregoing differences in essay grading standards precluded the pooling of essay scores across administrations; e.g., an essay score of 70 on one NMBE might not denote the same level of performance as a score of 70 on another NMBE.  And, such pooling is necessary in order to have a sufficiently large number of applicants on which to base conclusions. Since the MBE scores were already adjusted for possible differences in test difficulty across administrations and since MBE and Essay scores were highly correlated with one another, it was decided to correct the problem of variations in essay test difficulty by scaling the essay scores to the same mean and standard deviation as the MBE scores.  This scaling was done for each of the ten examinations.  In accordance with New Mexico's past policies, each applicant's Total score was computed using the following formula: Total = (.667)(Essay) + (.333)(MBE).

All the applicants taking a given NMBE were used for scaling that NMBE's essay scores.  All of the other analyses and tables presented in this report are limited to University of New Mexico (UNM) graduates.  This restriction was imposed because of the importance of LGPA to the study and the lack of LGPAs (or the ability to equate them to UNM's standards) for non-UNM graduates.  Moreover, if an applicant took the NMBE more than once, only the data from the first testing were used in these subsequent analyses.  This was done so that no applicant would have a disproportionately large effect on the results.

Table 1

MEANS, STANDARD DEVIATIONS, AND OTHER SUMMARY STATISTICS ON THE
FIVE FEBRUARY EXAMINATIONS GIVEN BETWEEN 1976 AND 1980.

| Summary Statistical Data | 1976 | 1977 | 1978 | 1979 | 1980 | Mean |
|---|---|---|---|---|---|---|
| MBE - Mean Scale Score | 137.4 | 140.2 | 137.0 | 135.1 | 135.1 | 137.0 |
| Standard Deviation | 15.6 | 14.6 | 14.9 | 15.6 | 18.9 | 15.9 |
| Essay - Mean Question Score | 70.3 | 69.7 | 68.0 | 66.1 | 63.0 | 67.4 |
| Standard Deviation | 5.4 | 5.8 | 5.9 | 7.6 | 8.7 | 6.7 |
| Essay Test Reliability | .78 | .81 | .79 | .86 | .87 | .83 |
| MBE/Essay Correlation | .77 | .72 | .66 | .66 | .82 | .73 |
| Percent Passing | 76 | 74 | 61 | 71 | 59 | 68 |
| Score Needed for Passing* | 127 | 131 | 133 | 127 | 131 | 130 |
| Number of Applicants | 89 | 112 | 104 | 107 | 95 | 101 |
| Percent Anglo | 73 | 79 | 61 | 64 | 67 | 68.8 |
| Percent Hispanic | 26 | 18 | 36 | 33 | 22 | 27.0 |

Table 2

MEANS, STANDARD DEVIATIONS, AND OTHER SUMMARY STATISTICS ON THE
FIVE JULY EXAMINATIONS GIVEN BETWEEN 1976 AND 1980.

| Summary Statistical Data | 1976 | 1977 | 1978 | 1979 | 1980 | Mean |
|---|---|---|---|---|---|---|
| MBE - Mean Scale Score | 146.4 | 140.9 | 142.7 | 141.7 | 141.2 | 142.6 |
| Standard Deviation | 16.6 | 15.9 | 17.5 | 16.1 | 15.4 | 16.3 |
| Essay - Mean Question Score | 68.0 | 70.0 | 65.5 | 70.9 | 64.2 | 67.7 |
| Standard Deviation | 5.5 | 7.5 | 6.3 | 6.6 | 7.3 | 6.6 |
| Essay Test Reliability | .78 | .87 | .85 | .85 | .82 | .84 |
| MBE/Essay Correlation | .77 | .77 | .76 | .75 | .77 | .76 |
| Percent Passing | 66 | 68 | 67 | 84 | 65 | 70 |
| Score Needed for Passing* | 144 | 136 | 136 | 126 | 134 | 135 |
| Number of Applicants | 137 | 221 | 197 | 183 | 196 | 186 |
| Percent Anglo | 80 | 75 | 71 | 73 | 82 | 76.2 |
| Percent Hispanic | 19 | 23 | 26 | 22 | 14 | 20.8 |

*Essay scores were scaled to the same mean and standard deviation as the
MBE scores. A Total score was computed for each applicant using the
following formula: (.667)(Essay) + (.333)(MBE). The "score needed for
passing" is the Total score that would have passed the same percent of
applicants as actually did pass; e.g., 66 percent of the applicants on
the July, 1976 examination had Total scores of 144 or higher.

ANALYSIS PLAN

If the NMBE is biased against Hispanic applicants, then the gap in
average performance level between Anglo and Hispanic applicants on the
NMBE would be greater then the differences between these two groups in
their average LSAT scores and LGPAs.  If this occurred, then knowledge
of an applicant's group would allow one to make a more accurate
prediction of that applicant's NMBE scores then could be made solely on
the basis of that applicant's law school grades and admission scores.
For example, if the NMBE tended to widen the gap, then one would predict
that an Anglo applicant would do better on the NMBE than an Hispanic
applicant even if they had comparable LSAT scores and LGPAs.  Thus, bias
can be measured by assessing the degree to which knowledge of an
applicant's group improves the prediction of NMBE scores over the level
of predictive accuracy achieved by the use of LSAT scores and/or LGPAs
alone.

A standard statistical technique that can be used for measuring
predictive accuracy is called regression analysis.  This procedure
provides an index of the degree to which score differences between
applicants on one variable (such as the MBE) can be explained by (i.e.,
correspond with) score differences between these same applicants on some
other variable (such as LSAT).  If no systematic relationship exists
between two variables, then the percent of variance explained is zero.
If knowledge of an applicant's score on one variable permits making a
perfect prediction of that applicant's score on another variable, then
100% of the variance in one variable is explained by the variance in the
other.  For example, if the applicants were rank ordered on the LSAT in
exactly the same way as they were ordered on the MBE (i.e., the
applicant with the highest LSAT also had the highest MBE, the applicant
with the second highest LSAT had the second highest MBE, etc.), then
100% of the variance in MBE scores would be explained by the variance in
LSAT scores.

Regression analysis also can be used to determine how well a combination
of measures (such as LSAT + LGPA or LSAT + LGPA + AHGA) predicts scores
on some other variable (such as the MBE).  However, because predictors
may share explanatory power, a combination of measures may account for
less variance then the sum of their separate abilities to predict.  For
example, although LGPA and LSAT scores may each explain about 45 percent
of the variance in MBE scores, the combination of LGPA and LSAT may only
explain a total of 50 percent because they share explanatory power.
This sharing comes about as a result of the correlation between LGPA and
LSAT; i.e., applicants who tend to get high LSAT scores also tend to get
high LGPAs.

In summary, the NMBE would be biased if the amount of variance in NMBE
scores that is explained by LSAT and LGPA could be increased by
consideration of an applicant's group.  The degree of bias is measured
by the amount of increase...the bigger the increase, the greater the
bias.  The practical consequence of any bias, however, is indicated by
its affect on the passing rate.  In other words, in order for any bias
that is detected to have policy relevance, it must explain a significant
portion of the difference in passing rates between groups.

RESULTS

Table 3 presents the percent of variance in MBE, Essay, and Total NMBE scores that is explained by each predictor singly and in combination with the other predictors.  An inspection of these data indicated that:

o LGPA provided a more accurate estimate of an applicant's likelihood of success on the NMBE then did LSAT which in turn provided a more accurate estimate then did knowledge of the applicant's AHGA.

o The differences in the relative accuracies of the predictors was most apparent on the MBE portion of the examination.

o More of the variance in MBE scores than in Essay scores could be explained by all three predictors.  Most, if not all, of this difference is due to the MBE being more reliable than the Essay.

o Adding AHGA to a prediction system that already contained LGPA and/or LSAT usually increased explanatory power by less than three percent.

o When LSAT scores were teamed with LGPA, predictive accuracy generally improved and the effect of AHGA all but disappeared. For example, the combination of LGPA and LSAT scores explained 57 percent of the variance in MBE scores while LGPA and AHGA explained only 51 percent.  LGPA alone explained just 48 percent of the MBE score variance.

Table 3

PERCENT OF VARIANCE IN NMBE SCORES THAT WAS EXPLAINED WHEN PREDICTORS WERE USED SINGLY AND IN COMBINATION WITH OTHER PREDICTORS.

| Variables Used to Predict NMBE Scores | Percent of Variance Explained | | |
|---|---|---|---|
| | MBE | Essay | Total |
| Law School Grade Point Average (LGPA) | 48 | 47 | 54 |
| Law School Admission Test Score (LSAT) | 36 | 18 | 27 |
| Anglo/Hispanic Group Affiliation (AHGA) | 20 | 13 | 18 |
| LGPA + AHGA | 51 | 47 | 56 |
| LSAT + AHGA | 38 | 21 | 30 |
| LGPA + LSAT | 57 | 48 | 58 |
| LGPA + LSAT + AHGA | 57 | 48 | 59 |

DISCUSSION

The largest incremental effect of AHGA (three percent) was obtained in
the prediction of MBE scores when the only other predictor was LGPA.  An
inspection of the summary statistics for each group that is presented in
Table 4 indicates that this increase corresponded to a slightly larger
gap in performance level between Anglo and Hispanic applicants on the
MBE (1.1 standard deviation units) then on LGPA (.9 standard deviation
units).

Table 4

MEANS, STANDARD DEVIATIONS, AND OTHER SUMMARY STATISTICS
FOR THE ANGLO, HISPANIC, AND TOTAL SAMPLES.

| Variable | | Total Sample | Group Anglo | Hispanic | Difference Between Groups* |
|---|---|---|---|---|---|
| LGPA | Mean | 2.81 | 2.90 | 2.51 | 0.9 |
| | SD | .44 | .42 | .38 | |
| LSAT | Mean | 594.4 | 619.9 | 503.9 | 1.6 |
| | SD | 85.7 | 70.2 | 73.9 | |
| MBE | Mean | 143.9 | 147.6 | 130.9 | 1.1 |
| | SD | 14.8 | 13.1 | 13.1 | |
| Essay | Mean | 141.7 | 144.4 | 131.9 | 1.0 |
| | SD | 13.7 | 12.6 | 12.8 | |
| Total | Mean | 142.4 | 145.5 | 131.5 | 1.1 |
| | SD | 13.1 | 11.8 | 11.5 | |
| Percent Passing | | 78 | 86 | 52 | 34 |
| Number of Applicants | | 441 | 344 | 97 | 247 |

*The differences in mean scores between groups are presented
in terms of standard deviation units.  The standard deviation
in the total sample was used for this purpose.

The addition of AHGA to LGPA increased the amount of explained variance
in MBE scores by three percent whereas the addition of LSAT increased it
by nine percent (see Table 3).  The inclusion of possible interactions
between the predictors failed to increase the amount of explained
variance.  Thus, AT MOST, only three percent of the variance in MBE
scores is due to the unique effect of group affiliation.  The rest is
attributable to the unique contribution of LSAT (i.e., that part of
LSAT's explanatory power that is not shared by either LGPA or AHGA);
LGPA itself; the less than perfect reliability of LGPA, LSAT, and NMBE
scores; and other factors not examined in this research.

The addition of AHGA to LGPA did not improve prediction of Essay scores. The addition of AHGA to LSAT increased the amount of variance explained by LSAT alone by three percent (i.e., from 18 to 21 percent). However, the combination of LSAT and AHGA explained less than one half of that accounted for by LGPA alone. Moreover, the combined unique contribution of LSAT and AHGA (i.e., after LGPA was already in the prediction system) was only one percent. It is apparent, therefore, that the differences between groups on the Essay portion of the examination are not due to any systematic bias that is related to group affiliation.

The pattern of results with Total NMBE score essentially reflected those obtained with the MBE and Essay components; i.e., group affiliation explains less than three percent of the variance in bar scores. It is important to note, however, that the variance explained in Total score (59 percent) is slightly more than that explained in MBE scores (57 percent) and substantially more than that accounted for in Essay scores (48 percent). These differences are largely attributable to the respective reliabilities of the three NMBE scores (.90 for MBE, .84 for Essay, and .92 for Total). In other words, it is more difficult to predict Essay scores because they are more affected by chance factors, such as those that are introduced by the subjective nature of essay grading procedures. In short, the Total score provides a more accurate indicator of an applicant's performance level with respect to the skills and knowledge measured by the NMBE than does either the MBE or Essay portions alone.

The unique contribution of AHGA to the prediction of NMBE scores can be translated into the number of points an Anglo applicant would, on the average, be expected to score higher than an Hispanic applicant if these two applicants had the same set of LGPA and LSAT scores. The results of this analysis indicated that the Anglo applicant would be expected to score 2.4 points higher on the MBE, 1.9 points higher on the Essay, and 2.1 points higher on Total score.* For example, if an Anglo applicant had an LSAT score of 600 and an LGPA of 2.85, then that applicant would be expected to have a Total NMBE score of 143. An Hispanic applicant with an LSAT of 600 and an LGPA of 2.85 would be expected to obtain a Total score of 141.

If the passing score was set at the usual February level of 130 and if two points were added to every Hispanic applicant's Total NMBE score, then the Hispanic pass rate would increase from 56 to 60 percent. If the passing score was set at the usual July level of 135, then adding two points to every Hispanic's score would increase the Hispanic passing rate from 38 to 42 percent. In short, correcting for the unique effect of AHGA on bar scores resulted in increasing the Hispanic pass rate by about four percent.

-----------------------------------------------------------------
* Statistical Note: A multiple regression equation was constructed for each NMBE score. The predictors in this equation and the order in which they were entered were as follows: LGPA, LSAT, and AHGA. The latter variable was constructed by assigning Hispanics a value of zero and Anglos a value of one. Thus, the unstandardized regression weight for AHGA indicated the number of points on the dependent variable that would be affected by the inclusion of AHGA. For example, the equation for predicting Total NMBE score was:

Total = (18.6828)(LGPA) + (.02966)(LSAT) + (2.0661)(AHGA) + 69.81

The preceeding analyses were repeated with UNM graduates who took the test for the first time in July. The results of this study were, with two exceptions, the same as those described above. One of these exceptions was that the amount of variance explained increased by two percent. The other exception was that AHGA's contribution to the total variance explained was cut in half. Some of the factors that may have produced these differences in the two sets of analyses are: (1) the July UNM first timers may have been qualitatively different than the February first timers in terms of courses taken, professors, etc...they certainly did not follow the typical pattern of completing law school in May and taking the NMBE two months later; (2) more sampling error may have been introduced by scaling the Essay scores in February than in July because of the fewer number of applicants on which to base the February scaling; and (3) including February takers doubled the number of tests but increased the number of applicants by only 15 percent which in turn may have reduced the comparability of scores across applicants. In short, the increase in the amount of variance explained and the reduction in the unique contribution of AHGA by limiting the sample to July takers probably came from decreasing the effect of extraneous factors.

A similiar study, conducted on one administration of the California bar examination, also found a large difference between Anglo and Hispanic passing rates. However, AHGA did not increase the percent of explained variance in MBE and/or California essay scores over that explained by differences between groups in their law school grades and LSAT scores.

An analysis of the relationship between NMBE scores and an applicant's sex group indicated that knowledge of an applicant's sex could not be used to increase the amount of variance explained over that already explained by LGPA and/or LSAT. It was noted, however, that on the average, female applicants tended to receive higher LGPAs than male applicants. Women also tended to slightly out perform men on LSAT and on the bar examination.

Finally, an inspection of the data in Table 4 indicated that the size of the gap in performance between Anglos and Hispanics was somewhat greater on LSAT then on LGPA. It was further observed that LSAT explained more of the variance in Anglo LGPAs (12 percent) then in Hispanic LGPAs (8 percent). In the total sample, 19 percent of the variance in LGPA corresponded with the variance in LSAT. These findings suggest that LSAT is not as good a predictor of Hispanic performance at UNM's law school as it is of Anglo performance. Some, but certainly not all, of the factors that could produce this pattern of results are: (1) LSAT underestimating the true performance level of Hispanic applicants in law school (such as might stem from differences in motivation, time spent studying, test-wiseness, and attitudes toward multiple choice tests), (2) differences in the difficulty of the courses taken by the two groups, (3) professors being reluctant to give grades below C even though there may be a difference in the average performance level of Anglo and Hispanic students who received C's (i.e., the fact that the average grade of UNM graduates is a B suggests that there might be an artificial "cellar" on LGPA and Hispanic applicants may be more likely to fall closer to the bottom of that cellar than Anglos), and (4) the lower reliability of LGPA (.85) as compared to LSAT (.90) and the less than perfect reliability of both of them. Some of these same factors as well as others also may have contributed to the small percent of variance in NMBE that was uniquely attributable to group affiliation.

## SUMMARY AND CONCLUSIONS

This study investigated whether New Mexico's bar examination exacerbated or merely mirrored the differences between Anglo and Hispanic applicants that are present in their average law school grades and admissions scores.  The applicants used in this analysis were graduates of the University of New Mexico's School of Law who took the bar examination for the first time between February, 1976 and July, 1980.

The analytic procedures employed in this research involved determining the degree to which knowledge of an applicant's group (i.e., Anglo versus Hispanic) permitted making a more accurate prediction of that applicant's bar scores than could be made solely on the basis of the applicant's law school grade point average (LGPA) and admissions test (LSAT) scores.

The initial results of these analyses indicated that slightly more of the differences between applicants in their bar scores could be predicted from knowledge of an applicant's group than could predicted solely on the basis of an applicant's LGPA and LSAT score.  If bonus points were awarded to Hispanic applicants to make up for this difference, then about four percent more Hispanic applicants would pass the examination than would otherwise be the case.

When the sample was restricted to University of New Mexico graduates who took the test for the first time in July, a slightly more accurate prediction of bar scores was obtained; and, even less of the gap between Anglos and Hispanics on the examination could be explained by group affiliation.  Moreover, a study conducted on the MBE and Essay portions of California's bar examination found that group affiliation did not provide any unique contribution to the prediction of bar scores.  These two sets of findings suggest that some of the variance in New Mexico's examination that was is uniquely associated with group affiliation in the combined sample (i.e., July plus February) probably came from extraneous factors, such as the particular samples used.  In other words, if any bias exists in the New Mexico examination, it probably does not affect the Hispanic passing rate by more than two percent.

It may be concluded, therefore, that at most, only a very small amount of the difference in passing rates between Anglo and Hispanic applicants (i.e., zero to four percent) is likely to be attributable to any bias in New Mexico's bar examination.  In contrast, a substantial portion of the difference between groups in their passing rates is associated with differences in their respective law school grades and admissions scores. The remaining portion of the difference in passing rates is due to the unreliability of the measures and to factors that are not correlated with law school grades, admission scores, or group affiliation.

Some of the other findings of this research were as follows: (1) female applicants tended to get higher scores than male applicants on all the variables, (2) the July administration of the examination was harder to pass (as indicated by the level of performance required for passing) than the February administration, (3) there has been variation in the standard of performance required for passing within both the February and July administrations, and (4) LSAT scores under predict the grade point average an Hispanic applicant is likely to receive at UNM's law school.  This latter finding, however, may be due as much if not more to problems with law school grades than to shortcomings of the LSAT.

REFERENCES

Carlson, A. B. and Werts, C. E.  Relationships among law school
predictors, law school performance, and bar examination results.
Princeton, N.J.:  Educational Testing Service, 1976.

Klein, S. P.  An investigation of possible item and grader biases in a
state bar examination.  Paper presented at the meetings of the Western
Psychological Association, Los Angeles, California; April 9, 1976.

Klein, S. P.  An analysis of the relationships between bar examination
scores and an applicant's law school, admissions test scores, grades, sex,
and racial/ethnic group.  Paper presented at the meetings of the American
Bar Association, Dallas, Texas; August, 1979.


GLOSSARY OF STATISTICAL TERMS

Variable
Any characteristic of persons on which they differ.  Law
school grade point average, LSAT, and the MBE and Essay
portions of a bar examination are all examples of variables.

Mean
The mean is the arithmetic average.  It is computed by
summing all the scores on a variable and then dividing by
the number of scores that entered that sum.

Standard Deviation (SD)
The standard deviation is an index of the degree to which
scores on a variable spread out on either side of the mean.
The larger the standard deviation, the greater the spread.  If
the shape of the score distribution is normal, then about 34
percent of the scores fall between the mean and one standard
deviation above it.  The standard deviation of a set of scores
is computed by taking the square root of its variance.

Variance
The variance of a set of scores is the average of the squared
difference between each score and the mean score.

Percent of Explained Variance
This is an indicator of the extent to which individuals
relative standing on one variable (i.e., how much their scores
deviate from the mean score on that variable) generally
corresponds with their relative standing on some other
variable (or set of variables).  In other words, the percent
of explained variance indicates the extent to which their
scores on one variable tends to be systematically related to
their scores on some other variable or set of variables.
The higher the percent of variance explained (up to a
theoretical maximum of 100), the stronger the relationship.

Regression Analysis
This is a statistical procedure that allows one to measure the
percent of variance in one variable that is explained by (i.e.,
corresponds with, is attributable to, or is systematically
associated with) the variance in some other variable or set of
variables.

Scaling
In the context of this report, scaling refers to converting
the scores on one variable to the same units of measurement
(in terms of mean and standard deviation) as the scores on
some other variable.

PR-94-03

# COMPARISONS OF EVENTUAL PASSING RATES
# IN THE 1990 AND 1991 COHORTS

Stephen P. Klein, Ph.D.

Roger Bolus, Ph.D.

GANSK & Associates

July 13, 1994

EVENTUAL PASSING RATES IN THE 1990 AND 1991 COHORTS

OVERVIEW

This report describes the initial and eventual passing rates of the applicants who took the bar exam for the first time in July 1990 or 1991. The report also examines eventual passing rates in various racial/ethnic groups and school types. Eventual passing rates in the 1990 and 1991 cohorts are contrasted with those of previous cohorts and with 1989 to 1993 cross-sectional estimates of eventual passing rates.

PROCEDURES

There were 4,957 applicants who took the bar exam for the first time in July 1990. There were 5,438 first timers in July 1991. These two groups (cohorts) of applicants had their pass/fail status tracked through the February 1994 exam. Thus, a July 1990 first timer could take the exam as many as seven times after the first attempt whereas a July 1991 first timer had only five more chances to take the exam.

In both cohorts, applicants were divided into four groups: initial pass (i.e., they passed on their first attempt), initial fail but eventually passed after one or more repeated attempts, subsequent fail despite one or more repeated attempts, and no attempt to repeat the exam after an initial fail. There were many variations in test taking pattern in the middle two categories, such as a candidate taking two exams in a row and then not taking the next two before trying again.

GENERAL RESULTS

The eventual passing rates in the 1990 and 1991 cohorts were 93 percent and 89 percent, respectively (Table 1). The 4 percentage point difference between these cohorts may in part be explained by the July 1990 cohort having two more opportunities to take the exam. Of the 1,963 applicants across the two cohorts who failed initially but

eventually passed, 78 percent passed on their second try and another 11
percent passed on their third try.  Overall, about 97 percent of the
9,422 applicants who eventually passed did so by their third attempt.

Table 1

PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY

| Pass/Fail Status | 1990 | 1991 |
|---|---|---|
| Initial Pass | 73 | 69 |
| Subsequent Pass | 18 | 20 |
| Total Pass | 93 | 89 |
| Subsequent Fail | 5 | 6 |
| Nonrepeating Fail | 4 | 5 |
| Total Fail | 9 | 11 |

Applicants who pass after failing on their first attempt scored about 80
points higher on that first attempt than did those who took the exam at
least twice but have yet to pass (Table 2).  Interestingly, the
non-repeating fails generally earned slightly higher scores on their
first attempt than did the subsequent fail group.

Table 2

MEAN TOTAL SCALE SCORE OF EACH GROUP ON THEIR FIRST ATTEMPT

| Pass/Fail Status | 1990 | 1991 |
|---|---|---|
| Initial Pass | 1555 | 1550 |
| Subsequent Pass | 1365 | 1368 |
| Subsequent Fail | 1285 | 1286 |
| Nonrepeating Fail | 1307 | 1314 |
| All First Timers | 1498 | 1487 |

Standard deviation of the total scale
scores was 121 in both cohorts.

ANALYSES BY RACIAL/ETHNIC GROUP

Over 90 percent of the Whites, about 85 percent of the Asians and
Latinos, and 70 percent of the African-Americans (Blacks) eventually
passed.  About half of the Blacks who eventually passed did so after
their first attempt (Table 3).  Because of rounding, some values in this
and other tables may not add up to the tabulated subtotals.

Table 3

PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY
BY RACIAL/ETHNIC GROUP

|  | White | | Asian | | Latino | | Black | |
|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 90 | 91 | 90 | 91 | 90 | 91 | 90 | 91 |
| Initial Pass | 78 | 74 | 60 | 58 | 59 | 57 | 35 | 39 |
| Subsequent Pass | 15 | 18 | 25 | 25 | 26 | 30 | 34 | 32 |
| Total Pass | 93 | 92 | 85 | 83 | 85 | 87 | 69 | 70 |
| Subsequent Fail | 4 | 4 | 10 | 11 | 9 | 11 | 20 | 20 |
| Nonrepeating Fail | 3 | 4 | 5 | 6 | 6 | 3 | 11 | 10 |
| Total Fail | 7 | 8 | 15 | 17 | 15 | 13 | 31 | 30 |
| Percent of cohort | 73 | 79 | 6 | 8 | 5 | 5 | 4 | 4 |

6 percent of the 1990 Cohort and 5 percent of the 1991 cohort
did not belong to one of these groups and/or did not provide
their racial/ethnic group.

As noted in previous reports on eventual passing rates in California,
there was a relatively large percentage of Blacks who took the exam
once, failed, and did not take it again.  Applicants in all racial
groups are less likely to repeat the exam if they had especially low
scores on their first attempt and Blacks tend to have lower bar exam
scores than other applicants.  Nevertheless, there are probably many
applicants in all racial groups who failed on their first attempt, but
who would pass eventually if they took the exam a few more times.

Minority group applicants (Asians, Blacks, and Latinos) comprised 16.6 percent of the 10,395 applicants represented in Table 3 and 14.8 percent of the eventual passers in this table. Their share of the passing group is therefore about 2 percentage points less than their share of the pool of first timers. This 2-point differential is consistent with the results of previous longitudinal and cross-sectional studies.


ANALYSES BY SCHOOL TYPE

Table 4 shows that just over 80 percent of the applicants in both cohorts graduated from an American Bar Association (ABA) approved law school. About another 8 percent came from schools accredited by California. Only 2 percent were from unaccredited schools. Almost all of the remaining 10 percent were not allocated to a school type because they did not take the exam within one year of their graduation from law school. The relatively large proportion of non-repeating fails in the latter group is probably composed of applicants who were not dedicated to practicing in California. The percentage of applicants in the 1990 and 1991 cohorts who are ABA school graduates is about 5 points higher than their share of the first timers in previous tracking study cohorts. The percent coming from California Accredited schools has declined.


TRENDS OVER TIME

Table 5 shows the percentages of ABA first timers in each pass/fail group in each of the eight longitudinal cohorts that have been studied to date. These data show that the eventual passing rates in the 1991 cohort is the same as in the 1977 cohort, but there has been a lot of variation in this rate over time.

Table 4

PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY BY SCHOOL TYPE

| Pass/Fail Status | ABA | | CalAc | | NonAcr | | Other | |
|---|---|---|---|---|---|---|---|---|
| | 90 | 91 | 90 | 91 | 90 | 91 | 90 | 91 |
| Initial Pass | 78 | 75 | 50 | 46 | 43 | 23 | 55 | 48 |
| Subsequent Pass | 16 | 18 | 28 | 33 | 34 | 42 | 17 | 19 |
| Total Pass | 95 | 93 | 78 | 79 | 77 | 65 | 72 | 68 |
| Subsequent Fail | 3 | 4 | 18 | 17 | 17 | 28 | 12 | 12 |
| Nonrepeating Fail | 2 | 3 | 4 | 4 | 5 | 7 | 16 | 20 |
| Total Fail | 5 | 7 | 22 | 21 | 23 | 35 | 28 | 32 |
| Percent of cohort | 81 | 81 | 7 | 8 | 3 | 3 | 10 | 8 |

Table 5

PERCENTAGE OF ABA GRADUATES IN EACH PASS/FAIL CATEGORY
IN THE EIGHT COHORTS THAT HAVE BEEN STUDIED TO DATE

| Pass/Fail Status | 1977 | 1981 | 1982 | 1984 | 1985 | 1986 | 1990 | 1991 | Mean |
|---|---|---|---|---|---|---|---|---|---|
| Initial Pass | 76 | 72 | 70 | 60 | 62 | 64 | 78 | 75 | 70 |
| Subsequent Pass | 17 | 14 | 14 | 26 | 26 | 25 | 16 | 18 | 20 |
| Total Pass | 93 | 85 | 84 | 86 | 88 | 89 | 95 | 93 | 89 |
| Subsequent Fail | 5 | 9 | 11 | 9 | 8 | 7 | 3 | 4 | 7 |
| Nonrepeating Fail | 2 | 6 | 6 | 4 | 3 | 4 | 2 | 3 | 4 |
| Total Fail | 7 | 15 | 16 | 14 | 12 | 11 | 5 | 7 | 11 |
| Maximum Attempts | 7 | 5 | 3 | 5 | 6 | 4 | 8 | 6 | 6 |

Some of the variation in eventual passing rates among cohorts can be
explained by differences in the number of exams over which they were
tracked.  In general, the longer the tracking period, the higher the
eventual passing rate (Figure 1)--there was a .83 correlation between
the number of possible attempts and eventual passing rate.



Figure 1: RELATIONSHIP BETWEEN NUMBER OF POSSIBLE ATTEMPTS AND
EVENTUAL PASSING RATE AMONG ABA FIRST TIMERS IN EIGHT COHORTS

## LIMITATIONS OF TRACKING (LONGITUDINAL) ANALYSES

Tracking was restricted to July first timer cohorts.  This may inflate
eventual passing rates slightly because July first timers have a higher
initial passing rate than February first timers.  This very small but
possible bias is offset somewhat by a few applicants who fail initially,
change identification numbers, and then pass.  These applicants are
counted among those who fail because tracking is based on initial
identification number.  Finally, eventual passing rates in tracking
studies are artificially restricted because applicants are followed
over only few exams in order to provide current data for policymakers.
Although this is not a major concern because almost all of the
applicants who eventually pass do so by their fifth or sixth try, there
are nevertheless some who pass after two dozen or more attempts.

CROSS-SECTIONAL ANALYSES

An alternative way of computing eventual passing rates is to compare the
number of applicants who pass (regardless of how many times they took
the exam) to the number of first timers.  This cross-sectional approach,
which is also called a "pipeline" analysis, works fine provided there
are no major changes over time in pass/fail standards or the number of
first timers taking the exam (an increase in the number of first timers
will tend to bias downwards the eventual passing rate that is computed
from a pipeline analysis--the reverse is true if the number of first
timers decreases over time).

A total of 32,255 applicants took the California Bar exam for the first
time during the five-year period between 1989 and 1993.  This count
includes February and July first timers.  There were 29,977 applicants
who passed the exam during this same five-year (10-exam) period.  Thus,
the pipeline analysis estimates that 93 percent of the first timers
eventually passed.  This is consistent with the overall rate in the 1990
cohort (where applicants had up to 8 opportunities to pass).

$$\text{Eventual Passing Rate} = (29,977/32,255) \times 100 = 93\%$$

The number of first timers during the first two years of this five-year
study period (12,509) was slightly higher than during the last two years
of this period (13,066).  Thus, the pipeline approach may have slightly
underestimated the eventual passing rate (provided, of course, that
pass/fail standards did not change during this period).


SUMMARY OF FINDINGS

The research described in this report examined the initial and eventual
passing rates of applicants who took the bar exam for the first time in
July 1990 or 1991.  It also reviewed data from previous tracking and
cross-sectional analyses.  The major findings of this research are:

   o The eventual passing rates in the 1990 cohort (93%) was 4
     percentage points higher than in the 1991 cohort.   A portion

of this disparity was probably due to the 1990 cohort being
tracked over 2 more exams than the 1991 cohort.

o About 3 percent of the 9,422 applicants who eventually passed
did so as a result of taking the exam more than three times.

o About 70 percent of the Blacks and 85 percent of the Latinos
and Asians eventually passed compared to a 93 percent rate
for whites.  Minority group representation among those who
eventually passed was only 2 percentage points less than
their percentage share of the total pool of first timers.

o Applicants from ABA schools had higher initial and eventual
passing rates than other applicants.  And, applicants from
California accredited schools had a higher eventual passing
rates than did applicants from unaccredited schools.

o Only 2.2 percent of the first timers came from unaccredited
schools and only 1.7 percent percent of those who eventually
passed came from these schools.

o A relatively large percentage of the applicants who were not
allocated to a school type did not retake the exam after an
initial failure on it.  This may be due to these applicants
being less committed to practicing in California.

o A cross-sectional ("pipeline") analysis estimated that 93
percent of the first timers eventually pass.  This estimate
is consistent with the 1990 tracking results (i.e., where
applicants were followed over as many as 8 exams).

o Eventual passing rates in the 1990 and 1991 cohorts are
comparable to eventual rates in previously studied cohorts
given the variation among these cohorts in the number of
times an applicant had the opportunity to retake the exam
during the follow-up period.

PR-06-02

# EFFECT OF CHANGING THE WEIGHT ATTACHED TO THE MBE ON MALE AND FEMALE PASSING RATES ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.
GANSK & Associates
July 5, 2006

## Background

California's General Bar Examination (GBX) consists of the MBE (a one-day 200-item multiple choice test) and a two-day written section that contains six essay questions and two performance test problems. Under the current rules, the MBE carries 35 percent of the weight in determining an applicant's total GBX score. The written section carries the remaining 65 percent. Applicants must earn a total weighted scale score of 1440 or higher in order to pass.

The Technical Report prepared for each exam shows that on the average, males have higher MBE scores than females. The reverse is true on the written section. There is no systematic relationship between racial/ethnic group and test type. For example, the Hispanics' mean MBE scale score is usually nearly identical to their mean written scale score. The same is true for other racial and ethnic groups. Thus, changing the relative weights of the MBE and written sections could only affect differences in passing rates between males and females. However, MBE scores are more reliable (less subject to the effects of chance) than are written scores. Consequently, all other things being equal, increasing the weight attached to the MBE tends to increase the reliability and validity of the total scores.

## Purpose

This report describes the procedures we used and the results obtained in our analysis of the likely effects on male and female passing rates of assigning equal weight to the MBE and written portions of the exam in computing an applicant's total score (i.e., rather than the current 35/65 weighting).

1

Our specific research questions were as follows:

- What would be the effect on the number and percentage of male and female applicants passing the exam if the MBE carried 50 percent of the weight in determining an applicant's total score rather than the current 35 percent?

- How many applicants would have their pass/fail status affected (i.e., changed from a pass to a fail or vice versa) if the weight attached to the MBE changed from 35 to 50 percent?

## Study Design

The sample for this study consisted of all the GBX first timers who reported their gender and took the exam between February 2001 and July 2005 exams; i.e., a total of ten exams. For each of these exams, we computed the male and female passing rates under the current 35/65 weighting system as well as under a 50/50 system. To insure the fairness of the comparison, these analyses were based on the applicants' written scale scores that were assigned prior to any rereading or reappraisal of the answers. Thus, for the purposes of this study, a total scale score of 1440 after the first reading of the written answers was designated as "passing" the exam.

Table 1 shows that the 33,469 first timers in the analysis sample were split almost exactly evenly between males and females.

Table 1
Number of Male and Female First Timers in the Study Sample by Exam Month

| Exam | Males | Females | Total |
|------|-------|---------|-------|
| February | 3,450 | 3,159 | 6,609 |
| July | 13,389 | 13,471 | 26,860 |
| Total | 16,839 | 16,630 | 33,469 |
| Percent | 50.3% | 49.7% | 100% |

Table 2 shows that switching from the 35/65 weighting to a 50/50 weighting had very little effect on passing rates within or between gender groups. For example, as a result of switching from the 35/65 plan to the 50/50 plan, the overall passing rate for males increased by only two percentage points and decreased for females by 0.4 percentage points.

2

Table 2
Passing Rates Under Two Weighting Plans by Gender and Exam Month

|  | Males | | Females | |
|---|---|---|---|---|
| Exam | 35/65 | 50/50 | 35/65 | 50/50 |
| February | 49.3 | 50.8 | 50.5 | 49.6 |
| July | 62.9 | 65.0 | 64.1 | 63.8 |
| Total | 60.1 | 62.1 | 61.5 | 61.1 |
| Difference | +2.0 | | -0.4 | |

The net effect of changing the weighting from 35/65 to 50/50 was to increase the overall passing rate from 60.8 percent to 61.6 percent; i.e., a net increase of slightly less than one percent.

Table 3 shows that changing the weighting plan from 35/65 to 50/50 resulted in 850 applicants going from a failing to a passing status whereas 581 went in the opposite direction. Overall, there were 1431 applicants (roughly 4 percent of the 33,469 takers studied) whose pass/fail status under the 35/65 plan was different than their status under the 50/50 plan. Table 4 shows that the percentage of males that had a change in pass/fail status (4.4 percent) was almost the same as the percentage of females that had a change in status (4.0 percent).

To put these numbers in perspective, about 14 percent of the applicants would have a different pass/fail status if they had simply taken a different form of the exam (i.e., a different set of 200 MBE items, 6 essay questions, and 2 performance test tasks). In short, the changes in pass/fail status that occurred as a result of changing the weights are well within the range expected by chance.

Table 3
Number of Male and Female First Timers Passing and Failing Under Two Weighting Plans

| Group | Males | Females | Total |
|---|---|---|---|
| Pass under both plans | 9,918 | 9,865 | 19,783 |
| Fail under both plans | 6,167 | 6,088 | 12,255 |
| Pass if 35/65, Fail if 50/50 | 210 | 371 | 581 |
| Pass if 50/50, Fail if 35/65 | 544 | 306 | 850 |
| Total | 16,839 | 16,630 | 33,469 |

3

<u>Table 4</u>
Percentage of Male and Female First Timers Passing and Failing Under Two Weighting Plans

| Group | Males | Females | Total |
|---|---|---|---|
| Pass under both plans | 58.9 | 59.3 | 59.1 |
| Fail under both plans | 36.6 | 36.6 | 36.6 |
| Pass if 35/65, Fail if 50/50 | 1.2 | 2.2 | 1.7 |
| Pass if 50/50, Fail if 35/65 | 3.2 | 1.8 | 2.5 |
| Total | 100% | 100% | 100% |

## Conclusions

Our analyses of 10 recent California bar exams found that increasing the weight attached to the MBE from 35 percent to 50 percent is unlikely to have much effect on the male or female passing rate or on the overall passing rate. Specifically, our modeling found that the male rate would increase by about two percentage points, the female rate would decrease by about one half of one percent, and the overall rate would increase by about one percent (Table 2).

We also found that less than five percent of both the males and females would have their pass/fail status affected by changing the weight attached to the MBE and written portions of the exam. Overall, increasing the weight attached to the MBE from 35 to 50 percent would result in about 2.5 percent of all the applicants going from a fail to a pass status whereas about 1.7 percent would go in the opposite direction (Table 4). These changes are quite small, especially in comparison to the percentage of applicants who would most likely have a different pass/fail status if they just took another form of the exam.

Previous research on California's bar exam found that a two-day exam in which the sections are weighted equally would yield a total score that was just as reliable as the one produced by the current three-day exam *provided* the two-day exam weighted the MBE and written sections equally (see PR-01-01 for details). In our professional opinion, the research described in this report indicates that such a change would not materially affect male or female passing rates.

4

PR-88-3

# FACTORS RELATED TO ATTORNEY APPLICANT
# SCORES ON THE CALIFORNIA BAR EXAM

Stephen P. Klein, Ph.D.

Roger Bolus, Ph.D.

GANSK & Associates

August 31, 1988

FACTORS RELATED TO ATTORNEY APPLICANT SCORES
ON THE CALIFORNIA BAR EXAM

BACKGROUND

In July 1983, California's general bar examination was expanded to
include a Performance Test (PT).  The purpose of the PT is to assess an
applicant's ability to carry out some of the tasks that a newly licensed
lawyer would be expected to perform in practice.  For example, a typical
PT problem asks the applicant to prepare a memo to a senior partner
regarding how to proceed in a particular client's case.  In this type of
problem, the applicant receives a case file that includes facts about
that client's case (such as in the form of a will or an arrest report),
court decisions in other cases, and copies of statutes.

There are two PT problems per exam.  Each exam also includes a
six-question Essay test and a 200-item multiple choice test (called the
Multistate Bar Examination or MBE).  One day (six hours) of testing time
is devoted to each of these three test sections.

Applicants who have practiced law for at least five years prior to
sitting for the California exam may take the whole exam or just the
Essay and PT portions of it.  All other applicants must take all three
sections.

PURPOSE

The analyses described in this report examined whether applicants who
were licensed to practice in another jurisdiction before taking the
California exam scored higher on the PT than would be expected given
their MBE and Essay scores.  In other words, does actual practice
experience contribute to PT scores?  And, if attorney applicants do
score relatively higher on the PT than would be expected, is this
difference related to: the amount of time they practiced law before
taking the California exam, the number of states in which they were
licensed prior to taking this exam, whether they took the whole exam or

**RESULTS**

Table 1 summarizes the data across the five exams for three groups of
applicants who were licensed in another state.  These groups were: (1)
those who had to take all three parts of the exam because they had been
licensed outside of California for less than five years, (2) those who
were eligible to take just the Essay and PT but who nevertheless sat for
the whole exam, and (3) those who took just the Essay and PT.

Table 1

MEAN SCORES BY GROUP OVER FIVE EXAMS FOR APPLICANTS
LICENSED IN AT LEAST ONE OTHER STATE

| Test Section | Had to take MBE | Did not opt out of MBE | Opted out of MBE |
|---|---|---|---|
| Essay | 145.4 | 142.6 | 143.3 |
| MBE | 146.3 | 144.7 | ----- |
| PT | 147.4 | 145.6 | 146.7 |
| PT - Essay | 2.0 | 3.0 | 3.4 |
| PT - MBE | 1.1 | 0.9 | --- |
| Years licensed | 2.2 | 7.8 | 8.4 |
| Number of applicants | 1175 | 914 | 463 |
| Percent minority | 11.0% | 16.7% | 8.3% |

The data in Table 1 show that attorneys tended to do relatively better
on the PT than they did on the other two sections of the exam.  This
pattern held for all five of the exams studied (see Appendix A for
the means on each exam).  And, the difference between the PT and Essay
within a group was consistently greater than it was between the PT and
MBE.

The difference between PT and Essay means was positively correlated with
the length of time the attorney had been licensed.  In general, <u>the</u>

The foregoing findings suggest that the slightly higher Essay and PT
scores among the applicants who only took these sections than among
those who opted to take the whole exam probably did not stem from the
former group being able to concentrate their bar exam preparation time
on the Essay and PT.  Moreover, because attorneys who take all three
sections generally score higher on the MBE than the Essay, they probably
would not improve their chances of passing the whole exam by opting to
take just the Essay and PT.

After controlling on time between graduation and taking the California
exam, there was no relationship between bar scores and the number of
states in which an attorney was licensed.  Attorneys who were licensed
in just one state did just as well on the exam as those who had been
licensed in several.  This finding held for all three parts of the test.


CONCLUSIONS

The major findings that emerge from the analysis of the scores of the
2,552 applicants who took the California Bar Exam for the first time
between July 1984 and July 1986 and who had already been licensed in at
least one other jurisdiction were as follows:

  1) They had slightly higher scores on the practice oriented PT
     portions of the exam than they did on the MBE or Essay sections.
     This trend held for each of the five exams studied.

  2) The difference between their PT and Essay means increased with
     years since initial licensure; i.e., the longer the time since
     licensure, the greater the difference.  Attorneys who had been
     licensed for about 8 years before taking the California exam
     scored about 9 percentile points higher on the PT than on the
     Essay section of thes exam.

  3) The longer the time between graduation and taking the California
     exam, the lower the scores on that exam.  This trend held for
     all three sections and is probably a function of several factors,

Appendix A

### ATTORNEYS WHO HAD TO TAKE ALL THREE SECTIONS

| Test section | Exam Date | | | | | Total |
|---|---|---|---|---|---|---|
| | 7/84 | 2/85 | 7/85 | 2/86 | 7/86 | |
| Essay | 142.3 | 147.4 | 144.5 | 146.7 | 145.7 | 145.4 |
| MBE | 142.9 | 149.2 | 146.0 | 146.5 | 147.5 | 146.3 |
| PT | 143.5 | 147.7 | 147.1 | 149.0 | 150.7 | 147.4 |
| Number of applicants | 269 | 249 | 198 | 267 | 192 | 1175 |

### ATTORNEYS WHO TOOK ALL THREE SECTIONS BUT COULD HAVE TAKEN JUST THE ESSAY AND PT

| Test section | Exam Date | | | | | Total |
|---|---|---|---|---|---|---|
| | 7/84 | 2/85 | 7/85 | 2/86 | 7/86 | |
| Essay | 140.6 | 144.5 | 141.8 | 144.4 | 142.4 | 142.6 |
| MBE | 142.6 | 145.2 | 142.9 | 148.1 | 145.2 | 144.7 |
| PT | 142.5 | 144.9 | 146.9 | 147.7 | 146.3 | 145.6 |
| Number of applicants | 200 | 154 | 182 | 171 | 207 | 914 |

### ATTORNEYS WHO DID NOT TAKE THE MBE

| Test section | Exam Date | | | | | Total |
|---|---|---|---|---|---|---|
| | 7/84 | 2/85 | 7/85 | 2/86 | 7/86 | |
| Essay | 139.5 | 146.9 | 141.7 | 146.5 | 142.7 | 143.3 |
| PT | 143.2 | 146.9 | 144.9 | 149.4 | 150.2 | 146.7 |
| Number of applicants | 118 | 99 | 76 | 84 | 86 | 463 |

PR 93-02

ANALYSIS OF THE JULY 1992 EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

GANSK & ASSOCIATES

January 18, 1992

SUMMARY

The July 1992 exam had two sections: the Multistate Bar Examination
(MBE), a 200-item multiple choice test; and a Written Examination
composed of six essay questions and two Performance Test (PT) problems.
There were 7,108 applicants who completed both sections, 26 percent of
whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted
to scale scores that controlled for possible differences in average item
difficulty from one administration of the exam to the next. Essay and
PT answers were graded on a 40 to 100 point scale. Scores on this scale
were assigned in 5-point intervals. Each PT score was then multiplied
by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as
was used on the MBE. This was done to adjust for possible differences
over time in the difficulty of the questions asked and the leniency with
which the answers to them are graded. An applicant's total score was
computed using the formula below:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Essay Scale})$$

A three phased grading process was used to determine an applicant's
pass/fail status. In Phase 1, applicants were: failed if their Total
score was less than 1391, passed if their Total was greater than 1465,
and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT
answers read a second time. At the end of this phase, applicants were:
failed if their Total scores were below 1412, passed if their scores
were above 1439, and placed in reappraisal if their scores were in the
1412 - 1439 range. Applicants also were placed in reappraisal if their
Total score after the first reading was greater than 1439 (i.e., even if
their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and
scores reviewed as a set by a member of the Board of Reappraisers who
then made a final pass/fail decision. Thus, an applicant's answers were
read once, twice, or three times depending upon how close that applicant
came to the pass/fail line of 1440.

The major findings with the applicants who had all of their answers read
at least once and the group of 1364 applicants who had them read at
least twice were as follows:

- ii -

o After the first reading of all answers, 29 percent of the
  applicants failed and 51 percent passed. The total percent
  passing after the second reading and the reappraisal process
  were 58 and 60 percent, respectively.

o California applicants scored higher than the national average
  on all of the six MBE subjects.

o The degree of agreement between readers in their evaluations of
  the relative quality of the written answers was about the same
  on an essay question as it was on a PT problem. However, because
  reader assigned PT scores were multiplied by 2, differences in
  final scores between the first and second reading on an answer
  were larger on a PT than on an essay answer.

o The reliability of the Written and Total scores (.71 and .86,
  respectively) was comparable to that of previous exams.

o The correlation between MBE and Written scores (.64) was in
  the normal range.

o The phased grading cutoff scores led to rereading and
  reappraising the answers of the applicants who were most
  likely to benefit from these additional reviews.

o Males tended to earn higher scale scores on the MBE than on
  the Written section. The reverse was true for females.

# ANALYSIS OF THE JULY 1992 EXAM

## TEST SECTIONS

The July 1992 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six essay questions and two Performance Test (PT) problems. The exam was administered over three consecutive days, with two 3-hour sessions per day. Day 1 consisted of essay questions 1 - 3 and PT problem A. Day 2 was devoted to the MBE. Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores and then multiplied by 10 using the formula below. This procedure adjusts the raw scores for possible differences in mean question difficulty from one administration of the MBE to the next.

$$\text{MBE Scale} = (8.9130)(\text{MBE Raw}) + 269.8348$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale. The same procedure was used to grade each PT answer. PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200 points each). Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores (see Appendix F). This scaling was done using the MBE and Written scores of the random sample of about 1,000 applicants who had their Written answers graded first. The formula used to convert written raw scores to scale scores was:

$$\text{Written Scale Score} = 3.5694 (\text{Written Raw Score}) - 946.5505$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores. The formula for computing Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants were: failed if their Total score was less than 1391, passed if their Total was greater than 1465, and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time.  The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader.

The scores assigned on the first and second readings were averaged and new Total scale scores were computed using the formulas above.  At the end of Phase 2, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal if their scores were in the 1412 - 1439 range.  Applicants also were placed in reappraisal if their Total score on the first reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision.  Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.


SAMPLE

The analyses of the July 1992 exam were conducted with the 7108 applicants who had both an MBE and a Written score.  This sample contained 5288 applicants who were taking the exam for the first time and 1820 repeaters.  The percentage of applicants from ABA approved, California Accredited, and Nonaccredited schools were 69, 15, and 4, respectively.  The remaining 12 percent were not assigned to a school.


MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows that California applicants scored higher than the national average on all six MBE subtests.  California's average total raw score (the average number of questions answered correctly) was 3.8 points higher than the national average (which included California scores).


WRITTEN SECTION

Table 2 presents the means and standard deviations on each question after all readings of all answers.

Applicants who came close to the examination's pass/fail line after one reading of their answers had all of their answers read again by readers who had not graded them previously.

- 3 -

Table 1

NATIONAL AND CALIFORNIA AVERAGE MBE SCORES AND THE
DIFFERENCE BETWEEN THESE AVERAGE SCORES

| Test Score | Number of Items | National Mean | CA Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 30 | 22.6 | 22.7 | 0.1 |
| Contracts | 40 | 25.2 | 26.0 | 0.8 |
| Criminal Law | 30 | 17.8 | 18.7 | 0.9 |
| Evidence | 30 | 20.6 | 20.9 | 0.3 |
| Real Property | 30 | 17.8 | 18.4 | 0.6 |
| Torts | 40 | 26.1 | 27.2 | 1.1 |
| Total Raw Score | 200 | 130.1 | 133.9 | 3.8 |
| NCBE/ACT Scale | 200 | 143.0 | 146.4 | 3.4 |

Table 2

SUMMARY STATISTICAL DATA AFTER ALL READINGS
OF THE ESSAY AND PT ANSWERS (N = 7108)

| Question Number | Subject Matter Area | Mean Score | Standard Deviation |
|---|---|---|---|
| 1 | Community Property | 68.3 | 8.57 |
| 2 | Torts/Constitutional Law | 68.1 | 6.36 |
| 3 | Evidence | 65.3 | 8.12 |
| 4 | Wills/Trusts | 68.4 | 7.38 |
| 5 | Criminal Law | 66.6 | 6.26 |
| 6 | Remedies | 66.7 | 6.94 |
| PT-A | Professional Responsibility | 135.9 | 14.45 |
| PT-B | Real Property | 135.0 | 12.78 |

- 4 -

Table 3 contrasts the applicants' scores on the first reading with their
scores on the second reading. The last row shows that as on past exams,
the mean total written score after the first set of readings (664) was
higher than it was on the second set (660). There was a .38 correlation
between the total written raw scores on the first and second set of
readings. And, on the average, the total score on the first set of
readings differed by 4 points from the total on the second set.

The upper portion of the next to last column of Table 3 shows that the
two readers who graded an answer usually assigned scores to that answer
that were within 4 points of each other (before multiplying PT scores by
2). The correlation coefficients in the last column indicate that on a
typical question, the relative standings of the applicants on the first
reading were generally consistent with their relative standings on the
second reading. The average of the eight coefficients was .55.

Table 3's data underestimate the true degree of agreement among readers
because: (1) there is a much narrower range of ability in the reread
sample than in the total applicant pool and (2) the method used to
assign the second reader is designed to offset systematic differences
among readers in their tendency to give relatively high or low grades.

Table 3

INDICES OF AGREEMENT BETWEEN THE FIRST AND SECOND READINGS (N = 1364)

| Question Number | Mean on First Reading | Mean on Second Reading | Difference Between Means | Mean Absolute Difference | Correlation Between Readings |
|---|---|---|---|---|---|
| 1 | 66.7 | 66.3 | 0.4 | 4.1 | .62 |
| 2 | 66.9 | 66.8 | 0.1 | 3.3 | .55 |
| 3 | 63.7 | 63.4 | 0.3 | 4.1 | .58 |
| 4 | 67.5 | 66.5 | 1.0 | 4.4 | .58 |
| 5 | 65.8 | 65.7 | 0.1 | 3.9 | .44 |
| 6 | 65.7 | 65.6 | 0.1 | 3.6 | .59 |
| PT-A | 133.7 | 132.9 | 0.8 | 7.7 | .55 |
| PT-B | 133.8 | 132.5 | 1.3 | 7.5 | .50 |
| Total | 663.8 | 659.7 | 4.1 | 16.4 | .38 |

Reader assigned PT scores are multiplied by 2.0.

- 5 -

## RELATIONSHIPS AMONG SECTIONS

Table 4 presents summary statistical data on each section after all
readings.  Table 5 shows the correlations among sections and the LSAT.

Appendix E shows that MBE and Written scores correlated about as highly
with each other (.64) on the July 1992 exam as they did on previous
July exams.  About 75 percent of the applicants had the same pass/fail
status on the MBE as they had on the Written section (where a scale
score of 1440 on a section was considered passing).

Table 4

SUMMARY STATISTICAL DATA AFTER ALL READINGS (N = 7108)

| Test Statistic | MBE Scale | Written Raw Score | Total Scale |
|---|---|---|---|
| Average Score | 1464.2 | 674.1 | 1462.2 |
| Standard Deviation | 154.8 | 42.9 | 140.4 |
| Internal Consistency | .874* | .711 | .864 |

* Computed by ACT using national data.

Table 5

CORRELATIONS AMONG SECTIONS AND LSAT AFTER ALL READINGS

| | LSAT* | MBE | Written |
|---|---|---|---|
| MBE | .60 | | |
| Written | .49 | .64 | |
| Total | .59 | .84 | .95 |

*LSAT (Law School Admissions Test) scores
were available for 6005 applicants.

- 6 -

SUBGROUP ANALYSES

Table 6 shows that on the average, women scored 32 points higher on the Written section than on the MBE whereas there was a 33 point average differential in the opposite direction for male applicants. This table also shows that Anglos had higher MBE scores than others. However, because the sample of 1,000 candidates on which the formula for scaling Written scores was not perfectly representative of all 7,108 candidates, Written scale scores tended to run somewhat lower than the MBE scale scores. After adjusting for this difference, only Asians had higher Written scores than MBE scores. Moreover, the size of the differences that remained were far less than they were between gender groups and quite small relative to the variation around these means.

Table 6

MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND SEX GROUPS AND THE
NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
| | Anglo | Asian | Black | Hispanic | Female | Male |
|---|---|---|---|---|---|---|
| MBE | 1491 | 1405 | 1350 | 1394 | 1450 | 1475 |
| Written | 1483 | 1414 | 1350 | 1396 | 1482 | 1442 |
| Total | 1486 | 1411 | 1350 | 1395 | 1471 | 1454 |
| Number of Applicants | 5239 | 655 | 486 | 477 | 2995 | 4005 |
| % Male | 57% | 60% | 48% | 60% | - 0 - | 100% |

* There were 143 applicants who did not fall in one of the
  four largest racial/ethnic groups and 108 applicants who
  did not indicate their racial/ethnic or gender group.

- 7 -

PHASED GRADING

As noted previously, a three-phased grading process was used to focus reader time on the applicants who were near the pass/fail line.  Table 7 presents the number and percentage of applicants in each of the exam's pass/fail categories.  These data indicate that 2090 (60%) passed.

Table 7

NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED
IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Pass/Fail Category | Number | Percent |
|---|---|---|
| Fail - Phase 1 | 2090 | 29.4 |
| Fail - Phase 2 | 466 | 6.6 |
| Fail - Phase 3 | 318 | 4.5 |
| Total Fail | 2874 | 40.4 |
| | | |
| Pass - Phase 1 | 3654 | 51.4 |
| Pass - Phase 2 | 433 | 6.1 |
| Pass - Phase 3 | 147 | 2.1 |
| Total Pass | 4234 | 59.6 |
| | | |
| Phase 1 = 1st reading | 5744 | 80.8 |
| Phase 2 = Reread | 899 | 12.6 |
| Phase 3 = Reappraisal | 465 | 6.5 |

Table 8 shows the number of Phase 2 applicants who passed and failed after all readings relative to their Phase 1 scores.  This table illustrates the strong, but far from perfect relationship between Phase 1 scores and final pass/fail status.  These data also indicate that the width of the Phase 2 reread band (1389.5 - 1465.0) was about right in that almost all the applicants with relatively high scores on the first reading passed and almost all with low initial scores failed.

Similarly, Table 9 shows that the higher an applicant's score at the end of Phase 2, the greater the likelihood that applicant passed as a result of reappraisal.  The lower limit of the reappraisal band (1412) also appears to be appropriate in that only 2 of the 76 applicants with Phase 2 Total scores below 1415 passed as a result of reappriasal.

- 8 -

Table 8

NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE
TO THEIR TOTAL SCORES AFTER THE FIRST READING

| Score After 1st Reading | Number of Applicants | | | Percent Passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1450 - 1465 | 56 | 254 | 310 | 82 |
| 1435 - 1449 | 108 | 163 | 271 | 60 |
| 1420 - 1434 | 159 | 91 | 250 | 36 |
| 1405 - 1419 | 211 | 52 | 263 | 20 |
| 1390 - 1404 | 250 | 20 | 270 | 7 |
| Total | 784 | 580 | 1364 | 43 |

Table 9

NUMBER OF REAPPRAISED APPLICANTS WHO PASSED AND FAILED
RELATIVE TO THEIR TOTAL SCORES AFTER REREAD

| Total Score After Reread | Number of Applicants | | | Percent Passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1435 - 1439 | 8 | 57 | 65 | 88 |
| 1430 - 1434 | 37 | 53 | 90 | 59 |
| 1425 - 1429 | 59 | 21 | 80 | 26 |
| 1420 - 1424 | 64 | 12 | 76 | 16 |
| 1415 - 1419 | 76 | 2 | 78 | 3 |
| <1415 | 74 | 2 | 76 | 3 |
| Total | 318 | 147 | 465 | 32 |

Appendix A: HISTORICAL EXAM RESULTS

| | FEBRUARY | | | | JULY | | | |
|------|-------------|---------------|------|--------------|-------------|---------------|------|--------------|
| Year | Mean MBE | Mean Essay | N | Pass Rate | Mean MBE | Mean Essay | N | Pass Rate |
| 1976 | 137 | 68 | 3088 | 38 | 145 | 69 | 6709 | 60 |
| 1977 | 139 | 68 | 3399 | 44 | 143 | 69 | 7191 | 55 |
| 1978 | 139 | NA | 4222 | 38 | 145 | 70 | 6835 | 55 |
| 1979 | 139 | 69 | 4166 | 45 | 144 | 70 | 7152 | 55 |
| 1980 | 137 | 67 | 3758 | 34 | 142 | 69 | 7379 | 49 |
| 1981 | 138 | 67 | 3837 | 33 | 142 | 69 | 7080 | 50 |
| 1982 | 137 | 66 | 4033 | 31 | 143 | 68 | 7038 | 49 |
| 1983 | 136 | 66 | 4200 | 28 | 144 | 68 | 7277 | 50 |
| 1984 | 137 | 66 | 3899 | 30 | 141 | 68 | 7201 | 42 |
| 1985 | 140 | 66 | 4661 | 33 | 142 | 68 | 7622 | 46 |
| 1986 | 140 | 66 | 4689 | 28 | 144 | 68 | 7780 | 45 |
| 1987 | 141 | 66 | 4682 | 43 | 144 | 67 | 7481 | 51 |
| 1988 | 142 | 67 | 4530 | 46 | 144 | 68 | 7146 | 53 |
| 1989 | 143 | 66 | 4230 | 50 | 146 | 68 | 6970 | 60 |
| 1990 | 141 | 67 | 3819 | 44 | 145 | 69 | 6963 | 58 |
| 1991 | 143 | 66 | 3685 | 51 | 145 | 67 | 7219 | 55 |
| 1992 | 143 | 66 | 3907 | 51 | 146 | 67 | 7108 | 60 |

Mean essay = mean score on a written answer after all readings across all answers, but before PT scores are multiplied by a constant).  The PT was introduced in July 1983.  Scaling the written scores to the MBE began with the February 1987 exam.

Appendix B: COMPARISON OF NATIONAL AND CALIFORNIA MEAN MBE SCORES

| | February | | | July | | |
|------|--------|--------|-------|--------|--------|-------|
| Year | Nation | Calif. | Diff. | Nation | Calif | Diff. |
| 1984 | 135.1 | 137.1 | 2.0 | 139.2 | 140.6 | 1.4 |
| 1985 | 136.4 | 140.2 | 3.8 | 140.5 | 141.9 | 1.4 |
| 1986 | 135.6 | 139.8 | 4.2 | 140.3 | 143.6 | 3.3 |
| 1987 | 136.4 | 140.6 | 4.2 | 140.3 | 143.9 | 3.6 |
| 1988 | 137.2 | 141.9 | 4.7 | 139.8 | 143.7 | 3.9 |
| 1989 | 137.8 | 142.9 | 5.1 | 142.0 | 146.3 | 4.3 |
| 1990 | 135.9 | 141.5 | 5.6* | 141.4 | 145.1 | 3.6 |
| 1991 | 137.8 | 143.0 | 5.2 | 142.1 | 145.4 | 3.3 |
| 1992 | 139.1 | 143.2 | 4.1 | 143.0 | 146.4 | 3.4 |

* California data not included in computation of national mean; California MBE scores imputed using AM scores.

Appendix C

INDICES OF READER AGREEMENT ACROSS EXAMS

| | Mean difference between | | Correlation between | |
|---|---|---|---|---|
| Exam | Readers on an answer | 1st-2nd set of readings | Readers on an answer | 1st&2nd set of readings |
| 2/85 | 4.7 | 5.3 | .64 | .55 |
| 2/86 | 4.7 | 9.3 | .60 | .60 |
| 2/87 | 4.5 | 3.8 | .59 | .45 |
| 2/88 | 4.4 | 3.1 | .54 | .34 |
| 2/89 | 4.7 | 3.5 | .54 | .41 |
| 2/90 | 4.0 | 4.0 | .59 | .43 |
| 2/91 | 4.1 | 2.7 | .59 | .37 |
| 2/92 | 3.8 | 3.9 | .59 | .40 |
| 7/85 | 4.4 | 5.5 | .58 | .62 |
| 7/86 | 4.5 | 5.4 | .61 | .58 |
| 7/87 | 4.3 | 3.8 | .56 | .42 |
| 7/88 | 5.6 | 6.4 | .54 | .46 |
| 7/89 | 4.3 | 2.9 | .54 | .34 |
| 7/90 | 3.7 | -1.9 | .56 | .41 |
| 7/91 | 3.9 | 3.1 | .57 | .43 |
| 7/92 | 3.9 | 4.1 | .55 | .38 |

Mean difference between readers on an answer = mean of the absolute differences between the scores assigned by the readers (i.e., before multiplying PT scores by a constant). The second column = difference between the mean total written raw score across all essay and PT questions on the first set of readings minus the mean on the second set of readings. Total written raw scores for columns 2 and 4 were computed for the pre-1987 exams using the current scoring rules.

- 11 -

Appendix D

PERCENTAGE OF ALL APPLICANTS WHO WENT TO REREAD AND REAPPRAISAL;
AND, THE PERCENTAGE OF THOSE IN THESE PHASES WHO PASSED THE EXAM

| Exam | Reread | | Reappraisal | |
|------|--------|--|-------------|--|
| | Percent of total | Percent passing | Percent of total | Percent passing |
| 2/85 | 22 | 29 | 8 | 36 |
| 2/86 | 22 | 36 | 7 | 34 |
| 2/87 | 24 | 42 | 8 | 34 |
| 2/88 | 26 | 42 | 9 | 31 |
| 2/89 | 26 | 41 | 9 | 29 |
| 2/90 | 25 | 41 | 9 | 25 |
| 2/91 | 24 | 44 | 9 | 25 |
| 2/92 | 24 | 44 | 9 | 33 |
| | | | | |
| 7/85 | 24 | 43 | 9 | 32 |
| 7/86 | 23 | 42 | 8 | 33 |
| 7/87 | 22 | 40 | 8 | 31 |
| 7/88 | 23 | 41 | 9 | 31 |
| 7/89 | 20 | 45 | 8 | 32 |
| 7/90 | 20 | 47 | 8 | 31 |
| 7/91 | 21 | 42 | 7 | 27 |
| 7/92 | 19 | 43 | 7 | 32 |
| Mean | 23 | 41 | 8 | 32 |

Appendix E: CORRELATION BETWEEN MBE AND WRITTEN SCORES

| Year | February | July | Year | February | July |
|------|----------|------|------|----------|------|
| 1976 | .62 | .70 | 1987 | .57 | .66 |
| 1977 | .65 | .70 | 1988 | .58 | .62 |
| 1980 | NA | .68 | 1989 | .60 | .65 |
| 1982 | .60 | .65 | 1990 | .55 | .67 |
| 1983 | NA | .73 | 1991 | .58 | .67 |
| 1984 | .59 | .63 | 1992 | .60 | .64 |
| 1985 | .61 | .60 | | | |
| 1986 | .58 | .66 | | | |

Data were not available for 1978, 1979, and 1981.  Correlation
between MBE and Essay through July 1986; after that, it is
between MBE and Written scale scores.

- 12 -

Appendix F

MBE raw scores are adjusted for possible differences in mean item difficulty from one exam to the next.  As a result of this step, a given MBE "scale" score indicates the same level of proficiency regardless of the administration of the exam on which it was earned (eg., February 1992 versus July 1992).  The adjustment procedure involves inserting into the current version of the test a set of items that have been used previously.  The scores of current and previous candidates on the repeated items are used to calibrate one exam to another.

Essay and PT scores cannot be adjusted in this way because test security considerations preclude repeating essay and PT questions across exams.  However, scaling the candidates' written scores to a score distribution that has the same mean and standard deviation as their MBE scores indirectly adjusts the written scores for possible differences among exams in the average difficulty of the questions asked (and the leniency with which the answers to them are graded).

The appropriateness of scaling to the MBE is supported by two factors.  First, there is a very strong relationship between MBE and essay scores among cohorts of candidates; i.e., groups with relatively high essay scores also tend to have high MBE scores.  Figure G-1 illustrates this relationship.  Each asterisk (*) is a law school.  The x-axis shows the school's mean MBE score and the y-axis shows its mean written scale score.  The data for this plot are the 39 law schools that had 30 or more candidates taking the July 1992 exam.  The correlation between the means is near perfect (r = .97 out of a possible 1.00).

The second reason for scaling to the MBE is that MBE scores reflect variations in the ability level of those taking different exams.  Figure G-2 illustrates this sensitivity by contrasting mean LSAT and MBE scores over 11 exams for those candidates who had both an LSAT and an MBE score.  The y-axis on the left shows mean MBE score for the solid trend line.  The y-axis on the right shows mean LSAT score for the dashed trend line.  These data show there is a strong relationship between a cohort's mean LSAT and MBE scores.  Moreover, on both tests, the mean score for repeaters was always lower than it was for first timers.  In short, the more able the cohort of candidates (as reflected by its mean LSAT score), the more likely it is to have a high mean MBE score.

Table G-1 presents mean LSAT, MBE, and essay raw scores (based on six questions) for those candidates who had scores on all three measures.  Tests are listed in descending order of mean LSAT score.  These data show that mean MBE scores are more sensitive than mean essay scores to differences in average ability level among cohorts.



Figure G-1: Relationship between mean MBE and written scores across law schools.



Figure G-2: Relationship between a cohort's mean MBE and LSAT scores.

Table G-1

| Exam | N | LSAT | MBE | Essay |
|------|------|-------|-------|-------|
| 2/90 | 2350 | 28.78 | 141.3 | 401.0 |
| 2/91 | 2207 | 28.93 | 143.1 | 396.3 |
| 2/88 | 3673 | 30.05 | 142.9 | 403.6 |
| 2/89 | 3414 | 30.32 | 143.9 | 395.6 |
| 2/92 | 3073 | 30.61 | 144.6 | 395.8 |
| | | | | |
| 7/87 | 6489 | 33.06 | 145.1 | 400.5 |
| 7/89 | 5977 | 33.17 | 147.5 | 405.3 |
| 7/88 | 6237 | 33.19 | 144.9 | 412.1 |
| 7/90 | 5593 | 33.35 | 146.3 | 415.9 |
| 7/91 | 5722 | 34.65 | 147.6 | 407.4 |
| 7/92 | 5909 | 34.87 | 148.5 | 407.4 |

PR-02-03

# ANALYSIS OF THE
# JULY 2002 CALIFORNIA BAR EXAMINATION

**Stephen P. Klein, Ph.D.**
**Roger Bolus, Ph.D.**

**GANSK & ASSOCIATES**

**December 16, 2002**

# SUMMARY

The July 2002 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written Examination composed of six essay questions and two Performance Test (PT) problems. There were 7477 applicants who completed both sections, 31% of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the exam to the next. Essay and PT answers were graded on a 40 to 100 point scale. Scores on this scale were assigned in 5-point intervals. Each PT score was then multiplied by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE. This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded. An applicant's total score was computed using the formula below:

Total Scale Score = (.35)(MBE Scale) + (.65)(Essay Scale)

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, the applicant was failed if the total scale score was less than 1390, passed if it was 1466 or higher, and placed in reread if it was at least 1390 but below 1466.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time. At the end of this phase, applicants were: failed if their Total scores were below 1412, passed if their scores were 1440 or higher, and placed in reappraisal if their scores were in the 1412 - 1439.9999 range. Applicants also were placed in reappraisal if their total scores after the first reading were 1440 or higher (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant came to the pass/fail line of 1440.

The major findings with the applicants who had all of their answers read at least once and the group of 1588 applicants who had them read at least twice were as follows:

- After the first reading of all answers, 37% of the applicants failed and 42% passed. The total percent passing after the second reading and the reappraisal process were 49% and 51%, respectively.

- California applicants scored higher than the national average on five of the six MBE subjects.

- The reliability of the Written and Total scores (.72 and .84, respectively) was comparable to that of previous July exams.

- The correlation between MBE and Written scores (.64) was in the normal range for a July exam.

- The phased grading cutoff scores led to rereading and reappraising the answers of the applicants who were most likely to benefit from these additional reviews.

- Males tended to earn higher scale scores on the MBE than on the Written section. The reverse was true for females. Racial and ethnic minority applicants tended to earn the same scale scores on the MBE as they did on the Written section.

- First timers had a higher passing rate than second timers who in turn had a higher rate than those taking the exam three or more times. The corresponding passing rates were 65%, 25%, and 18%.

# ANALYSIS OF THE JULY 2002 CALIFORNIA BAR EXAMINATION

## TEST SECTIONS

The July 2002 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six (1-hour) essay questions and two (3-hour) Performance Test (PT) problems.  The exam was administered over three consecutive days, with two 3-hour sessions per day.  Day 1 consisted of essay questions 1 - 3 and PT problem A.  Day 2 was devoted to the MBE.  Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES, FORMULAS, AND PHASED GRADING

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores and then multiplied by 10 using the formula below.  This procedure adjusts raw scores for possible differences in mean question difficulty from one administration of the MBE to another.

$$\text{MBE Scale} = (8.6013 \times \text{MBE Raw}) + 294.3741$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale.  The same procedure was used to grade each PT answer.  PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200 points each).  Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores.  This scaling was done using the MBE and Written scores of the random sample of about 1,000 applicants who had their Written answers graded first.  The formula used to convert written raw scores to scale scores was:

$$\text{Written Scale} = (3.0256 \times \text{Written Raw}) - 473.9788$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores.  The formula for computing Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status.  In Phase 1, applicants failed if their total scale score was less than 1390, passed if it was 1466 or higher, and placed in reread if it was at least 1390 but below 1466.0.  In Phase 2,  the applicants in reread had all of their essay and PT answers read a second time.  The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader.  The scores assigned on the first and second readings were averaged and a new total computed using the formulas above.  At the end of Phase 2, applicants failed if the new total was below 1412, passed if it was 1440 or higher, and placed in reappraisal if it was above 1411.9999 but below 1440.

3

Applicants also were placed in reappraisal if their total scale score on the first reading was 1440 or higher even if their mean total after two readings was below 1412. An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.

## SAMPLE

Analyses were conducted with the 7477 applicants who had both an MBE and a Written score. This sample contained 5159 applicants who were taking the exam for the first time and 2318 repeaters. The percentage of applicants from ABA approved, California Accredited, and Non-accredited schools were 73, 10, and 3, respectively. The remaining applicants took correspondence courses or were otherwise not assigned to a school.

## MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows California applicants scored higher than the national average on five of the six MBE subtests. California's mean total raw score (the average number of questions answered correctly) was about 3.5 points higher than the national average (which included California scores).

Table 1 - NATIONAL AND CALIFORNIA MEAN MBE SCORES
AND THE DIFFERENCE BETWEEN THESE MEANS

| Test Score | Number of Items | National Mean | California Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 33 | 24.7 | 20.4 | 4.3 |
| Contracts | 34 | 22.4 | 21.0 | -1.4 |
| Criminal Law | 33 | 19.7 | 22.8 | 3.1 |
| Evidence | 33 | 20.4 | 25.1 | 4.7 |
| Real Property | 33 | 20.5 | 21.0 | 0.5 |
| Torts | 34 | 22.6 | 23.6 | 1.0 |
| Total Raw | 200 | 130.3 | 133.8 | 3.5 |
| NCBE/ACT Scale | 200 | 141.2 | 144.5 | 3.3 |

4

## WRITTEN SECTION

There were 1588 applicants who had their answers read at least twice. On the average, an applicant's total written raw score on the first reading was 4 points higher than it was on the second reading. The correlation between these scores was .40. This value underestimates the true degree of agreement between readers because reread was limited to applicants near the pass/fail line. Table 2 shows the means and standard deviations on each question after all readings.

### Table 2 - SUMMARY STATISTICAL DATA ON THE WRITTEN SECTION AFTER ALL READINGS

| Question Number | Essay Content Area(s) and PT Tasks | Mean Score | Standard Deviation |
|---|---|---|---|
| 1 | Wills | 63.3 | 10.2 |
| 2 | Real Property | 63.5 | 6.8 |
| 3 | Professional Responsibility | 65.3 | 9.2 |
| 4 | Contracts | 62.4 | 8.2 |
| 5 | Torts | 61.2 | 8.3 |
| 6 | Community Property | 63.2 | 7.7 |
| PT-1 | Memo regarding constitutionality and changes | 60.8 | 8.8 |
| PT-2 | Analysis of criminal law statute and ethical issues | 65.8 | 7.4 |

## SUMMARY STATISTICS

Table 3 presents summary statistical data on each section after all readings. There was a .64 correlation between MBE and Written scores. Law School Admission Test (LSAT) scores correlated .61, .48, and .57 with MBE, Written, and Total Scale scores, respectively. There were 6764 applicants with useable LSAT scores.

### Table 3 - SUMMARY TEST STATISTICS AFTER ALL READINGS

| Test Statistic | MBE Scale | Written Raw | Total Scale |
|---|---|---|---|
| Mean Score | 1445.1 | 1438.3 | 1440.7 |
| Standard Deviation | 155.2 | 154.2 | 141.2 |
| Reliability | 0.89 | 0.72 | 0.84 |

The MBE's reliability was computed by ACT using national data.

## SUBGROUP ANALYSES

On the average, women scored 31points higher on the Written section than on the MBE whereas there was a 43 point average differential in the opposite direction for male applicants (Table 4).  On the average, racial and ethnic minority groups scored about as highly on the Written section as they did on the MBE.

Table 4 - MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND GENDER GROUPS AND THE NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
| | Anglo | Asian | Black | Hispanic | Female | Male |
|---|---|---|---|---|---|---|
| Written | 1461 | 1440 | 1351 | 1404 | 1464 | 1416 |
| MBE | 1475 | 1423 | 1359 | 1398 | 1433 | 1459 |
| Total | 1465 | 1434 | 1353 | 1402 | 1453 | 1431 |
| N | 4333 | 1112 | 535 | 717 | 3636 | 3766 |
| % Male | 52% | 46% | 46% | 50% | 0% | 100% |

  * There were 708 applicants who did not fall in one of the four largest racial/ethnic groups and 57 applicants who did not provide all demographic data.

## PHASED GRADING

A three-phased grading process was used to focus reader time on the applicants who were near the pass/fail line.  Table 5 presents the number and percentage of applicants in each of the exam's pass/fail categories.  Overall, 3793 (50.7%) of the applicants passed.

Table 5 -  NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| | Fail | | Pass | | Total | |
| Phase | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| 1 | 2739 | 36.6 | 3150 | 42.1 | 5889 | 78.8 |
| 2 | 544 | 7.3 | 492 | 6.6 | 1036 | 13.8 |
| 3 | 401 | 5.4 | 151 | 2.0 | 552 | 7.4 |
| Total | 3684 | 49.3 | 3793 | 50.7 | 7477 | 100.0 |

## APPENDIX A: SUMMARY TEST STATISTICS ON FEBRUARY EXAMS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|---|-----------------|----------------------|-------------------|-----------|----------------------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1991 | 3685 | 51 | 1430 | 667 | .68 | .58 |
| 1992 | 3907 | 51 | 1432 | 663 | .69 | .60 |
| 1993 | 3682 | 45 | 1418 | 666 | .73 | .59 |
| 1994 | 3638 | 44 | 1421 | 657 | .68 | .59 |
| 1995 | 3488 | 42 | 1412 | 653 | .74 | .60 |
| 1996 | 3834 | 44 | 1417 | 646 | .67 | .58 |
| 1997 | 4103 | 49 | 1434 | 651 | .66 | .59 |
| 1998 | 3871 | 40 | 1412 | 650 | .70 | .60 |
| 1999 | 4309 | 41 | 1416 | 642 | .65 | .55 |
| 2000 | 4447 | 40 | 1415 | 638 | .66 | .57 |
| 2001 | 4461 | 38 | 1405 | 640 | .72 | .58 |
| 2002 | 4030 | 34 | 1396 | 633 | .71 | .53 |

## APPENDIX B:  SUMMARY TEST STATISTICS ON JULY EXAMS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|---|-----------------|----------------------|-------------------|-----------|----------------------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1990 | 6963 | 58 | 1451 | 684 | .76 | .67 |
| 1991 | 7219 | 55 | 1454 | 674 | .75 | .67 |
| 1992 | 7108 | 60 | 1464 | 674 | .71 | .64 |
| 1993 | 7018 | 59 | 1465 | 671 | .77 | .68 |
| 1994 | 7027 | 64 | 1482 | 672 | .76 | .70 |
| 1995 | 7109 | 60 | 1471 | 660 | .75 | .68 |
| 1996 | 7445 | 56 | 1458 | 667 | .76 | .70 |
| 1997 | 7678 | 62 | 1478 | 655 | .75 | .68 |
| 1998 | 7548 | 53 | 1446 | 656 | .74 | .65 |
| 1999 | 7684 | 51 | 1449 | 644 | .75 | .66 |
| 2000 | 7603 | 56 | 1460 | 645 | .74 | .62 |
| 2001 | 7585 | 57 | 1468 | 637 | .77 | .64 |
| 2002 | 7477 | 51 | 1445 | 632 | .72 | .64 |

PR–88–6

# COMPARISONS OF EVENTUAL PASSING RATES
# IN THE 1985 AND 1986 COHORTS

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.


GANSK & Associates

October 30, 1988

COMPARISONS OF EVENTUAL PASSING RATES IN THE 1985 AND 1986 COHORTS

OVERVIEW

This report presents the initial and eventual passing rates of the
applicants who took the bar exam for the first time in July 1985 or
1986.  The number of applicants in these two cohorts were 4,894 and
4,777, respectively.  The report also examines what the eventual passing
rates were within various racial/ethnic groups and school types as well
as what they probably would have been if a lower pass/fail standard had
been used.

PROCEDURES

Test results were tracked through the February 1988 exam.  Thus, a July
1985 first timer could take the exam as many as five times after the
first attempt whereas a July 1986 first timer had only three more
chances (February 1987, July 1987, and February 1988) to take the exam.

In both cohorts, applicants were divided into four groups: initial pass
(i.e., they passed on their first attempt), initial fail but eventually
passing after one or more repeated attempts, subsequent fail despite one
or more repeated attempts, and no attempt to repeat the exam after an
initial fail.

There were many variations in test taking pattern in the middle two
categories.  For instance, in the July 1985 cohort, 559 applicants
failed on their first attempt, but passed in February 1986.  Another 61
of the July 1985 first timers also passed on their second try; i.e.,
they sat out one or more administrations before their second attempt.
In fact, in this cohort, there were 60 different test taking patterns
among those who failed initially but later retook the exam.

- 2 -

GENERAL RESULTS

Table 1 shows the actual initial and eventual passing rates in the two
cohorts.  These data indicate that in both cohorts, just under 85
percent of the applicants eventually passed.  The 1985 cohort's passing
rate is virtually identical to the 1986 cohort's rate despite the latter
group having two less opportunities to pass.  Moreover, 187 of the 4,894
applicants in the July 1985 cohort (4 percent) passed the exam as a
result of taking it more than two years after their initial attempt.
Thus, the July 1986 cohort's eventual passing rate probably would
increase somewhat if this cohort was tracked over as many exam
administrations as was the 1985 cohort.

Table 1

PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY

| Pass/Fail Status | 1985 | 1986 |
|---|---|---|
| Initial Pass | 58 | 59 |
| Subsequent Pass | 25 | 25 |
| Total Pass | 83 | 84 |
| Subsequent Fail | 12 | 10 |
| Nonrepeating Fail | 5 | 6 |
| Total Fail | 17 | 16 |

ANALYSES BY RACIAL/ETHNIC GROUP

Table 2 shows that about two-thirds of the Latinos and slightly more
than half of the Blacks eventually passed.  These rates are much higher
than their initial rates.  Because of rounding, some values in this and
the next table may not add up to the subtotals presented.

As has been noted in previous reports on eventual passing rates, there
was a relatively large percentage of Blacks who took the exam once,
failed, and did not take it again.  Some of this behavior may, of

- 3 -

course, be attributed to the tendency among applicants in all racial groups not to repeat the exam if they had especially low scores on their first attempt; and, Blacks tend to have lower bar exam scores than their classmates. Nevertheless, there are probably many applicants in all racial groups who failed on their first attempt, but would have passed eventually if they had taken the exam a few more times. It is not clear why there were so many "nonrepeating fails" among the Asians who took the 1986 exam.

Across the two cohorts, minority group applicants (i.e., all non-Whites) constituted about 15 percent of those tested and 12 percent of those who eventually passed. Thus, their representation in the passing group is only slightly below their representation in the applicant pool. This finding is consistent with estimates made from cross-sectional analyses of previous exams.

Table 2

PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY
BY RACIAL/ETHNIC GROUP

| | White | | Asian | | Latino | | Black | |
|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 85 | 86 | 85 | 86 | 85 | 86 | 85 | 86 |
| Initial Pass | 62 | 64 | 43 | 41 | 34 | 29 | 19 | 25 |
| Subsequent Pass | 24 | 23 | 33 | 32 | 34 | 39 | 36 | 29 |
| Total Pass | 86 | 87 | 76 | 72 | 67 | 68 | 55 | 54 |
| Subsequent Fail | 9 | 8 | 19 | 16 | 30 | 27 | 34 | 31 |
| Nonrepeating Fail | 5 | 5 | 5 | 12 | 3 | 5 | 11 | 14 |
| Total Fail | 14 | 13 | 24 | 28 | 33 | 32 | 45 | 46 |
| Percent of cohort | 86 | 85 | 5 | 5 | 5 | 5 | 3 | 4 |

One percent of the applicants in both cohorts did not belong to any of the four racial/groups listed in this table.

- 4 -

ANALYSES BY SCHOOL TYPE

Table 3 shows that just over 75 percent of the applicants in both cohorts graduated from an American Bar Association (ABA) approved law school.  About another 12 percent came from schools accredited by California.  Only 2 percent were from unaccredited schools.  Almost all of the remaining 10 percent were not allocated to a school type because they did not take the exam within one year of their graduation from law school.

The relatively large proportion of "nonrepeating fails" in the later group is probably composed of applicants who were not dedicated to practicing in California.

Table 3 also shows that the eventual passing rate among applicants from California accredited schools is significantly higher than the eventual passing rate among nonaccredited school graduates despite the fact that (averaged across cohorts) they had the same initial rate (37 percent).

Table 3

PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY BY SCHOOL TYPE

|  | ABA | | CalAc | | NonAcr | | Other | |
|---|---|---|---|---|---|---|---|---|
| Pass/Fail Status | 85 | 86 | 85 | 86 | 85 | 86 | 85 | 86 |
| Initial Pass | 62 | 64 | 35 | 39 | 38 | 36 | 54 | 51 |
| Subsequent Pass | 26 | 25 | 31 | 29 | 15 | 18 | 15 | 16 |
| Total Pass | 88 | 89 | 66 | 68 | 53 | 54 | 69 | 67 |
| Subsequent Fail | 8 | 7 | 28 | 24 | 41 | 41 | 13 | 13 |
| Nonrepeating Fail | 3 | 4 | 6 | 8 | 6 | 5 | 19 | 20 |
| Total Fail | 12 | 11 | 34 | 32 | 47 | 46 | 31 | 33 |
| Percent of cohort | 76 | 77 | 12 | 11 | 2 | 2 | 10 | 10 |

- 5 -

ESTIMATED EFFECT OF LOWER PASS/FAIL STANDARDS

Figure 1 shows what the eventual passing rates probably would have been
if the current pass/fail standard (of 1440) was lowered to 1420, 1400,
1380, or 1360.  For instance, if an applicant took the exam twice and if
on the first attempt the score earned was 1390 and on the second attempt
it was 1415, then this applicant would be classified as having "failed"
the exam on the second try if the passing score was 1420, but having
"passed" on this try if it was lowered to 1400.  These estimates should
be interpreted with caution because there is no way to adjust them for
all of the many things that might influence test preparation and taking
behavior if standards were lowered.

To conduct the analysis, we transformed the scores on each exam to the
same system that is now used.  In other words, scores on the written
(Essay plus PT) portion of the exam were scaled to the same mean and
standard deviation as the MBE scores; and, the two scores were combined
into a total score using the formula: (.35)(MBE) + (.65)(Written).

Because the results with the 1985 cohort were so similar to those with
the 1986 cohort, we averaged them to produce the plots in Figure 1.
These data indicate that with a 1360 pass/fail score (i.e., a standard
that is just slightly higher than the one used by Massachusetts and
Connecticut), the eventual passing rates for Whites, Asians, Latinos,
and Blacks would be about 94, 84, 85, and 72, respectively.

It is evident from this figure that lowering the score required for
passing would increase the minority passing rate more than it would
increase the White passing rate.  For instance, if the score required
for passing was lowered to 1360, the White rate would climb 7 percentage
points (from 87 to 94) whereas the Black rate would go up 16 points
(from 54 to 72).  However, because there are so many more whites than
Blacks in the applicant pool, the net effect of a lower standard would
be to further increase the imbalance between groups in the total number
of lawyers licensed.  For example, 633 more whites, but only 43 more
Blacks would pass if the pass/fail score was lowered to 1360.

- 6 -



Fig. 1: Eventual passing rates within racial/ethnic group under
actual and lower pass/fail standards.

- 7 -

The only surprise in the data relative to actual passing rates is that
Asians and Latinos would have about the same eventual passing rate with
a 1360 standard.  Analyses within cohort indicated that this finding did
not stem from the procedure used to estimate passing rates being overly
sensitive to the relatively large percentage of nonrepeating fails among
Asians in the 1986 cohort; e.g., in the 1985 cohort, eventual passing
rates for Asians and Latinos were 84 and 86 percent, respectively.


SUMMARY OF FINDINGS

The research presented in this report examined the initial and eventual
passing rates of applicants who took the bar exam for the first time in
July 1985 or 1986.  The major findings from this study were:

o The eventual passing rates in both groups were almost identical
  (i.e., about 85 percent) despite the fact that the 1985 cohort
  was tracked over a total of as many as six administrations and
  the 1986 cohort only over as many as four administrations.

o Just under four percent of the 1985 cohort passed as a result of
  taking the fifth or sixth administration.  Thus, the eventual
  passing rate in the 1986 cohort is likely to be somewhat higher
  if this cohort is tracked for another year (two administrations).

o About two thirds of the Latinos and just over 50 percent of the
  Blacks eventually passed the exam.  These rates were much higher
  their respective average initial rates (32 and 22 percent).

o Minority group representation among those who eventually passed
  (12 percent) was only slightly below their representation in the
  total applicant pool (15 percent).

o Applicants from ABA schools had higher initial and eventual
  passing rates (63 and 89 percent, respectively) than did other
  applicants.  And, applicants from California accredited schools
  had a higher eventual passing rate (67 percent) than did the

- 8 -

applicants from unaccredited schools (54 percent) even though
the applicants from both school types had identical initial
passing rates (37 percent).

o A relatively large percentage of the applicants who were not
allocated to a school type did not retake the exam after an
initial failure on it.

o Only 98 of the applicants from unaccredited schools eventually
passed.  Thus, these schools contributed only 1 percent of the
8,077 applicants from the two cohorts who eventually passed.

We also explored what would happen to eventual passing rates if the
score required for passing was lowered.  The results of this analysis
suggested that:

o Lowering the score required for passing would increase the
passing rate in all groups, but this increase would be
greater for minority groups than for Whites.  However, because
so many more Whites than non-Whites take the exam, the net
effect of a lower standard would be to increase the imbalance
between racial groups in the total number of lawyers licensed.

o If the pass/fail standard was lowered to 1360, then Asians and
Latinos would have comparable eventual passing rates even though
they had quite different eventual rates under the current rules.

These predictions should be treated with caution because there is no way
to forecast accurately all the effects of a lowered passing score.  For
instance, a lower standard might induce more (but less qualified)
applicants to take the California exam as well as encourage more
attempts to repeat it after an initial fail.  It also might lead to less
effort among applicants to prepare for the exam.  Nevertheless, the
estimation procedure does provide a rough guide as to what might happen
if the passing score was changed.

PR-03-06

# EVENTUAL PASSING RATES AMONG
# JULY 1997-2000 FIRST TIMERS

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.

June 22, 2003

## Summary

This report describes the initial and eventual passing rates of the 22,426 applicants who took California's General Bar Examination (GBX) for the first time in July 1997, 1998, 1999, or 2000. Although the pass/fail status of the applicants in these four cohorts was tracked through and including the February 2003 exam, none of those who failed on their first attempt passed after taking the test more than six times.

Overall, 86 percent of the applicants passed after taking the exam as many as six times. Specifically, 68 percent passed on their first attempt and 18 percent passed after two or more attempts. Another 9 percent repeated the exam one or more times but without success. The remaining 5 percent took the exam once, failed, and did not try again. Eventual passing rates have declined slightly over the last several years.

The higher an initially unsuccessful applicant's score on the first attempt, the greater the likelihood of that applicant trying again and eventually passing. If all of the initially unsuccessful candidates had persisted, then the overall eventual passing rate would increase from 86 to about 89 percent. Graduates of ABA schools had higher eventual passing rates than others. Males and females had nearly identical initial and eventual passing and persistence rates. Racial/ethnic minority group members (and especially Blacks) were not as likely to eventually pass as their classmates.

## Results by Cohort

Table 1 shows that while first timer passing rates varied somewhat across the four cohorts (from a low of 64 percent in 1999 to a high of 75 percent in 1997), their eventual passing rates were very close to the overall average of 86 percent. The four cohorts also had very similar percentages of applicants repeating the exam without success (i.e., the candidates in the "subsequent fail" category) and those who failed on their first attempt but did not try again (i.e., the applicants in the "non-repeating fail" category).

About 79 percent of the applicants in the "subsequent pass" category achieved their passing status on their second attempt.  Another 14 percent did so on their third try and 4 percent on their fourth attempt.  The remaining 3 percent needed five or six tries to pass.  None of the applicants who initially failed achieved a passing status after taking the exam more than six times. These results are fairly consistent across cohorts.

Table 1
Percentage of Applicants in Each Pass/Fail Category by Cohort

| Pass/Fail Category | 1997 | 1998 | 1999 | 2000 | Total |
|---|---|---|---|---|---|
| Initial Pass | 75 | 66 | 64 | 67 | 68 |
| Subsequent Pass | 13 | 19 | 21 | 17 | 18 |
| Subsequent Fail | 8 | 10 | 9 | 10 | 9 |
| Non-repeating Fail | 4 | 5 | 6 | 6 | 5 |
| TotalPercent Passing | 88 | 85 | 85 | 84 | 86 |
| Number of takers | 5,796 | 5,623 | 5,534 | 5,473 | 22,426 |

Eventual passing rates have declined somewhat over the last several years.  For example, a study of the July 1990 and 1991 cohorts of first timers found eventual passing rates of 93 and 89 percent, respectively (Klein, 1994).  The rates in the 1997 through 2000 cohorts were 88, 85, 85, and 84 percent, respectively.  The decline in eventual passing rates during the last several years parallels a gradual decrease in mean LSAT scores of first time takers in California over this same period (Klein & Bolus, 2003).

## Results by Law School Type

Table 2 shows that across the four cohorts, 90 percent of the graduates from ABA approved law schools eventually passed.  The applicants in this category are restricted to those who took the California exam for the first time within one year of graduating law school.  Most of the applicants in the "All Others" category also are graduates of ABA schools, but they did not take the California exam within one year of graduation.  Indeed, many of them began their legal careers by taking and passing the bar exam in other states.

2

Table 2
Percentage of Applicants in Each Pass/Fail Category by School Type

| Pass/Fail Category | ABA Approved | California Accredited | Unaccredited | All Others |
|---|---|---|---|---|
| Initial Pass | 73 | 38 | 35 | 55 |
| Subsequent Pass | 17 | 30 | 23 | 13 |
| Subsequent Fail | 6 | 26 | 36 | 14 |
| Non-repeating Fail | 4 | 6 | 7 | 18 |
| Total Percent Passing | 90 | 68 | 58 | 68 |
| Number of takers* | 18,049 | 1,858 | 312 | 2,121 |

*Of the 86 applicants missing a school code, 56 passed.

As in the past, a very large percentage of the graduates from California Accredited and Unaccredited schools who eventually pass do so as a result of taking the test two or more times. The applicants in the "All Others" category are much more likely than others to take the test once, fail, and not try again.

Eventual passing rates among ABA graduates have varied across the 12 cohorts of July first timers that have been studied since 1977. For example, the lowest eventual rate among ABA graduates (84 percent) occurred in the 1982 cohort whereas the highest eventual rate (95 percent) was in the 1990 cohort (see Klein, 1994). The average rate over the previous eight cohorts that were studied was 89 percent compared to the average of 90 percent in the 1997-2000 cohorts.

## Results by Racial/Ethnic Group and Gender

Table 3 shows that African-American (hereinafter referred to as Black) candidates had much lower initial and eventual passing rates than did their classmates.[1] In this respect, the results with the 1997-2000 cohorts exhibit the same pattern as those found with the 1990-91 cohorts. For example, there was a 23 percentage-point difference in eventual passing rates between Whites and Blacks in the 1990-91 cohorts and a 25-point difference between them across the four 1997-2000 cohorts. The one notable exception to this parallelism is that in the 1997-2000 cohorts, nearly three-quarters of the Blacks who eventually passed did so on their first try whereas in the past, only about half of the Blacks who eventually passed did so on their first attempt.

---

[1] Column totals in this and other tables may not sum to 100 percent because of rounding.

Table 3
Percentage of Applicants in Each Pass/Fail Category by Racial/Ethnic Group

| Pass/Fail Category | White | Asian | Hispanic | Black | Other |
|---|---|---|---|---|---|
| Initial Pass | 73 | 65 | 56 | 42 | 63 |
| Subsequent Pass | 16 | 21 | 25 | 22 | 20 |
| Subsequent Fail | 7 | 10 | 13 | 24 | 12 |
| Non-repeating Fail | 5 | 4 | 6 | 12 | 5 |
| Total Percent Passing | 89 | 86 | 81 | 64 | 83 |
| Number of takers | 14,968 | 3,068 | 1,714 | 1,086 | 1,590 |

Table 4 shows the distribution of the 19,212 applicants in the 1997-2000 cohorts that eventually passed by school type and racial/ethnic group. These data indicate that the vast majority of both the White and minority applicants who passed came from ABA approved schools. Only 15 of the 2,074 applicants of color who passed (11 Hispanics and 4 Blacks) were unaccredited school graduates. This is less than a handful per year.

Table 4
Number of Eventual Passers Within Each Racial/Ethnic Group from Each School Type

| School Type | Racial/Ethnic Group | | | | | Total |
|---|---|---|---|---|---|---|
| | White | Asian | Hispanic | Black | Other | Takers |
| ABA Approved | 11,017 | 2,324 | 1,225 | 588 | 1,111 | 18,049 |
| CA Accredited | 950 | 100 | 82 | 38 | 99 | 1,858 |
| Unaccredited | 134 | 21 | 11 | 4 | 10 | 312 |
| All Others* | 1,087 | 184 | 63 | 63 | 101 | 2,207 |
| Total Passers | 13,188 | 2,629 | 1,381 | 693 | 1,321 | |

* Includes the results with the 56 passers who were missing a school code.

Table 5 shows that men and women now have nearly identical percentages in each pass/fail category. In the past (when there were many more men than women taking the exam), the women tended to have higher initial and eventual passing rates than men.

4

Table 5
Percentage of Applicants in Each Pass/Fail Category by Gender

| Pass/Fail Category | Male | Female | Total |
|---|---|---|---|
| Initial Pass | 68 | 69 | 68 |
| Subsequent Pass | 17 | 18 | 18 |
| Subsequent Fail | 9 | 9 | 9 |
| Non-repeating Fail | 6 | 5 | 5 |
| Total Percent Passing | 85 | 87 | 86 |

## Relationship of Initial Score to Eventual Pass/Fail Status

Table 6 shows that applicants who came close to passing but failed on their first attempt were much more likely to retake the exam and pass than were those who did not come close to passing on their first try.   For example, 79 percent of the applicants who failed initially but had a total score over 1410 on their first attempt eventually passed compared to an eventual passing rate of only 11 percent for those with initial scores below 1250.

Table 6
Number and Percentage of Initially Unsuccessful Applicants Classified By Their Initial Total Score and Eventual Pass/Fail Status

| Initial Score | Number of Applicants | Did Not Retake Exam | Subsequent Fail | Subsequent Pass |
|---|---|---|---|---|
| > 1410 | 1,102 | 11 | 10 | 79 |
| 1385 – 1410 | 1,145 | 12 | 13 | 75 |
| 1365 – 1384 | 1,052 | 14 | 20 | 65 |
| 1340 – 1364 | 959 | 16 | 26 | 58 |
| 1300 – 1339 | 1,184 | 15 | 36 | 48 |
| 1250 – 1299 | 905 | 21 | 45 | 33 |
| < 1250 | 816 | 27 | 61 | 11 |
| Number of Applicants | | 1,161 | 2,053 | 3,949 |

Note: Row percentages may not sum to 100 percent due to rounding.

The values in Table 6 can be used to estimate the overall eventual passing rate if the 1161 applicants who failed initially and did not retake the test had in fact persisted in their efforts to pass. For example, 79 percent of the initially unsuccessful applicants with total scores over 1410 on their first attempt eventually passed while another 10 percent of them did try again but without success. Consequently, 79/(79 + 10) = .89 = the proportion passing of those who tried again. The remaining 11 percent of the 1102 applicants with initial scores over 1410 did not retake the test. Hence, the estimated number of additional passers at this score level would be .89 x .11 x 1102 = 108.

The following steps were used to estimate the additional percentage of applicants that would pass if all of those who initially failed had persisted: (1) compute the estimate for each score level using the procedures above, (2) sum these estimates across score levels, and (3) divide this sum by the total number of takers. The sum of the estimates across score levels is 659; which is about 3 percent of the 22,426 applicants studied. Thus, it appears that if all of the initially unsuccessful applicants had persisted, then the eventual passing rate would increase from 86 percent to about 89 percent.

When the estimates are generated separately for each racial/ethnic group, the increase in eventual passing rates for Whites, Asians, Hispanics, and Blacks are 3, 2, 3, and 6 percent, respectively. These data suggest that Black applicants in particular should be encouraged to persist, especially if they came close to passing on their first attempt.

## Cross-Sectional Analyses

Another way of computing eventual passing rates is to compare the number of applicants who pass (regardless of how many times they took the exam) to the number of first timers. This cross-sectional approach, which is also called a "pipeline" analysis, generally works fine provided there are no major changes over time in pass/fail standards or the number of first timers taking the exam (an increase in the number of first timers will tend to bias downwards the eventual passing rate that is computed from a pipeline analysis, but the reverse is true if the number of first timers decreases over time).

A total of 27,289 applicants took the California Bar exam for the first time during the four-year period between 1999 and 2002. This count includes February and July first timers. There were 22,924 applicants who passed the exam during this same four-year (8-exam) period. Thus, the pipeline analysis estimated that 22,924/27,289 = 84 percent of the first timers eventually passed. This is very close to the overall 86 percent rate in the four longitudinal July cohorts that were studied in this report. The small difference between these two rates could stem from several factors including the fact that July first timers tend to have a higher passing rate than February first timers.

6

Past Tracking Studies and References:

Klein, S. (1982). "An Analysis of the Relationship Between Initial Score and Eventual Pass/Fail Status on the California Bar Examination." A report prepared for the Committee of Bar Examiners of the State Bar of California. (81-9P)

Klein, S. and Bolus, R. (1987). "A Comparison of Initial and Eventual Passing Rates on the California Bar Examination." A report prepared for the Committee of Bar Examiners of the State Bar of California (PR-87-5).

Klein, S. and Bolus, R. (1988). "Comparisons of Eventual Passing Rates in the 1985 and 1986 Cohorts." A report prepared for the Committee of Bar Examiners of the State Bar of California. (PR-88-6)

Klein, S. and Bolus, R. (1994). "Comparisons of Eventual Passing Rates in the 1990 and 1991 Cohorts." A report prepared for the Committee of Bar Examiners of the State Bar of California. (PR-94-3)

Klein, S. and Bolus, R. (2003). "Analysis of Changes in Test Scores and Passing Rates on the California Bar Exam from 1997 to 2002." A report prepared for the Committee of Bar Examiners of the State Bar of California. (PR-03-05).

PR-88-1

ANALYSIS OF THE JULY 1987 EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

GANSK & ASSOCIATES

February 15, 1988

## SUMMARY

The July 1987 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written Examination composed of six essay questions and two Performance Test (PT) problems. There were 7,481 applicants who completed both sections, 35 percent of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the exam to the next. Essay and PT answers were graded on a 40 to 100 point scale. Scores on this scale were assigned in 5-point intervals. Each PT score was then multiplied by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE. This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded. An applicant's total score was computed using the formula below:

Total Scale Score = (.35)(MBE Scale) + (.65)(Essay Scale)

A three phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants were: failed if their Total score was less than 1391, passed if their Total was greater than 1465, and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time. At the end of this phase, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal if their scores were in the 1412 - 1439 range. Applicants also were place in reappraisal if their Total score after either the first or second reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant came to the pass/fail line of 1440.

The major findings with the 7,481 applicants who had all of their answers read at least once and the group of 1,659 applicants who had them read at least twice were as follows:

- ii -

o After the first reading of all answers, 36 percent of the applicants failed and 42 percent passed.  The total percent passing after the second reading and the reappraisal process were 48 and 51, respectively.

o California applicants scored higher than the national average on all of the six MBE subjects.  And, the mean California MBE scale score was higher on the July 1987 exam than on most of the 11 previous July California exams.

o The degree of agreement between readers in their evaluations of the <u>relative</u> quality of the written answers was higher on an essay question than it was on a PT problem.  Moreover, because reader assigned PT scores were multiplied by 2, differences in final scores between the first and second reading on a given answer were much larger on a PT than on an essay answer.

o The reliability of the Written score (.77) was comparable to the reliabilities of written scores on previous exams, and the correlation between MBE and Written scores (.66) also was about the same as it was on these previous tests.

o The reliability of the Total score was comparable to that of previous July exams.

o In general, an applicant's total score after the first reading was highly related to both that applicant's total score after two readings and final pass/fail status.

o The phased grading cutoff scores led to rereading and reappraising the answers of the applicants who were likely to benefit from these additional reviews.

o Males tended to earn higher scores on the MBE than on the Written section whereas the reverse was true for females. Anglos and Blacks tended to earn slightly higher MBE than Written scores whereas the reverse was true for Hispanic and Asian applicants.

# ANALYSIS OF THE JULY 1987 EXAM

## TEST SECTIONS

The July 1987 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six essay questions and two Performance Test (PT) problems. The exam was administered over three consecutive days, with two 3-hour sessions per day. Day 1 consisted of essay questions 1 - 3 and PT problem A. Day 2 was devoted to the MBE. Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores using the formula below. This procedure adjusts the raw scores for possible differences in average question difficulty from one administration of the MBE to the next.

$$MBE \text{ Scale} = (9.2877)(MBE \text{ Raw}) + 211.7518$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale. The same procedure was used to grade each PT answer. PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200 points each).

Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores. This scaling was done using the MBE and Written scores of the random sample of 1,000 applicants who had their Written answers graded first. The formula used to convert written raw scores to scale scores was:

$$Written \text{ Scale Score} = 2.7585 \text{ (Written Raw Score)} - 410.4324$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores. The formula for computing Total scale scores was:

$$Total \text{ Scale Score} = (.35)(MBE \text{ Scale}) + (.65)(Written \text{ Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants were: failed if their Total score was less than 1391, passed if their Total was greater than 1465, and placed in reread if their Total was in the 1391 to 1465 range.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time.  The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader.

The scores assigned on the first and second readings were averaged and new Total scale scores were computed using the formulas above.  At the end of Phase 2, applicants were: failed if their Total scores were below 1412, passed if their scores were above 1439, and placed in reappraisal (Phase 3) if their scores were in the 1412 - 1439 range.  Applicants also were placed in reappraisal if their Total score after either the first or second reading was greater than 1439 (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision.  Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.

SAMPLE

The analyses of the July 1987 exam were conducted with the 7,481 applicants who had an MBE and a Written score.  This sample contained 2,582 repeaters and 4,899 applicants who were taking the exam for the first time.  The percentage of applicants from ABA approved, California Accredited, and Nonaccredited schools were 66, 18, and 4, respectively.

MULTISTATE BAR EXAMINATION (MBE)

Table 1 shows that California applicants scored higher than the national average on all of the six MBE subtests.  California's average total raw score (the average number of questions answered correctly) was 3.83 points higher than the national average.  It also was relative high in comparison to most previous July exams in California (see Appendix A).

WRITTEN SECTION

Table 2 presents the means and standard deviations on each question after all readings of all answers.  The last column of this table shows the correlation between the scores on a question and the sum of the scores on the other seven questions.  The consistent size of these correlations suggests that no question stood out as measuring something quite different than the other questions.

- 3 -

Table 1

NATIONAL AND CALIFORNIA AVERAGE MBE SCORES AND THE
DIFFERENCE BETWEEN THESE AVERAGE SCORES

| Test Score | Number of Items | National Mean | CA Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 30 | 20.93 | 21.51 | 0.68 |
| Contracts | 40 | 25.72 | 26.20 | 0.48 |
| Criminal Law | 30 | 18.42 | 19.26 | 0.84 |
| Evidence | 30 | 19.91 | 20.85 | 0.94 |
| Real Property | 30 | 17.65 | 17.75 | 0.10 |
| Torts | 40 | 25.66 | 26.55 | 0.89 |
| Total Raw Score | 200 | 128.28 | 132.11 | 3.83 |
| NCBE/ACT Scale | 200 | 140.30 | 143.88 | 3.58 |

Table 2

SUMMARY STATISTICAL DATA AFTER ALL READINGS
OF THE ESSAY AND PT ANSWERS (N = 7481)

| Question Number | Subject Matter Area | Mean Score | Standard Deviation | Corrected Part-Whole Correlation |
|---|---|---|---|---|
| 1 | Evidence | 61.97 | 9.64 | .489 |
| 2 | Civil Procedure | 68.13 | 8.79 | .565 |
| 3 | Remedies | 65.21 | 8.84 | .411 |
| 4 | Trusts | 68.19 | 7.11 | .414 |
| 5 | Criminal Law | 66.72 | 8.25 | .514 |
| 6 | Community Property | 67.09 | 8.22 | .490 |
| PT-A | Torts | 137.42 | 14.14 | .519 |
| PT-B | Real Property | 133.92 | 14.66 | .511 |

- 4 -

READER AGREEMENT

Applicants who came close to the examination's pass/fail line after one
reading of their answers had all of their answers read again by readers
who had not graded them previously.  Readers were "paired" on an answer
to offset possible differences in leniency among them.  For instance, if
the first reader tended to give relatively low grades (on a substantial
number of first read answers), then the second reader was picked from
among those who had the opposite tendency.  This pairing practice tends
to increase observed differences between readers.

Table 3 contrasts the applicants' scores on the first reading with their
scores on the second reading.  As on past exams, the score assigned to
an answer on the first reading tended to be slightly higher than the
score assigned to that answer on the second reading.

The last column of Table 3 shows the correlation between the scores on
the first and second readings.  This coefficient reflects the degree to
which the relative standings of the applicants on the first reading were
consistent with their standings on the second reading.  The higher the
coefficient (up to a maximum of 1.00), the stronger the relationship.

The correlations in Table 3 show there was less agreement among readers
on PT answers than on essay answers.  There was only a .42 correlation
between the total written raw score on the first and second readings.
However, this correlation as well as those on the individual questions
underestimate the degree of agreement between readers because the second
readings were restricted to applicants whose total scores after the
first reading were in the reread zone.

Table 4 shows each question's distribution of absolute difference scores
and average absolute difference scores.  The absolute difference is the
difference in score assigned to an answer by the two readers who graded
it, regardless of the algebraic sign of that difference (e.g., if an
answer received scores of 65 and 70 from different readers, then the
absolute difference was 5, regardless of which reader graded it first).

Two readers usually differed by about 5 points in the score they
assigned to an essay or PT answer.  The largest absolute difference was
35 points.  This occurred once (on essay question 5).  Final absolute
differences were about twice as high on PT answers as they were on essay
answers because the reader assigned PT scores were multiplied by 2.


RELATIONSHIPS AMONG SECTIONS

Table 5 presents summary statistical data on each section after all
readings.  The internal consistency of the total score, .891, was based
on a formula developed by Gullickson for a weighted composite.

- 5 -

Table 3

AVERAGE ESSAY AND PT SCORES ON THE FIRST AND SECOND READINGS,
THE DIFFERENCE BETWEEN THESE AVERAGES, AND THE CORRELATION
BETWEEN SCORES ON THE FIRST AND SECOND READING (N = 1659)

| Question Number | Mean on First Reading | Mean on Second Reading | Difference in Means | Correlation Between Readings |
|---|---|---|---|---|
| 1 | 61.4 | 61.6 | -0.2 | .58 |
| 2 | 67.5 | 67.5 | 0.4 | .69 |
| 3 | 64.7 | 63.9 | 0.9 | .68 |
| 4 | 68.0 | 67.7 | 0.3 | .64 |
| 5 | 65.8 | 65.1 | 0.8 | .50 |
| 6 | 66.4 | 66.7 | -0.3 | .56 |
| PT-A | 137.2 | 135.9 | 1.3 | .52 |
| PT-B | 133.2 | 132.2 | 1.0 | .34 |
| Total | 664.4 | 660.6 | 3.8 | .42 |

Table 4

CUMULATIVE PERCENTAGE OF ANSWERS WITH DIFFERENT SIZED
ABSOLUTE DIFFERENCE SCORES (N = 1659)

| Mean Size of Absolute Difference | Essay Questions | | | | | | PT | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | A | B |
| 0 | 33 | 40 | 41 | 42 | 38 | 34 | 42 | 37 |
| 5 | 73 | 86 | 83 | 88 | 79 | 78 | | |
| 10 | 91 | 98 | 95 | 97 | 94 | 95 | 84 | 77 |
| 15 | 97 | 100 | 99 | 100 | 99 | 99 | | |
| 20 | 99 | * | 100 | * | 100 | 100 | 98 | 93 |
| 25 | 100 | | * | * | * | * | | |
| 30 | | | | * | | | 99 | 99 |
| >30 | | | | | | * | 100 | 100 |
| Average Difference | 5.3 | 3.8 | 4.1 | 3.7 | 4.5 | 4.7 | 7.7 | 9.5 |

* More than 0 but less than 0.5% of the applicants.
Differences are for essay answers on a 100-point
scale and PT answers on a 200-point scale.

- 6 -

Table 6 contains the correlations among sections and the LSAT.  These
correlations are biased downwards by the less than perfect reliability
of the measures; e.g., if all the measures were perfectly reliable, then
the correlation between MBE and Written scores would be .81.

MBE and Written scores correlated about as highly with each other on the
July 1987 exam as they did on previous exams.  About 75 percent of the
applicants had the same pass/fail status on the MBE as they had on the
Written section (where a scale score of 1440 on a section was considered
passing).

## SUBGROUP ANALYSES

Table 7 shows that on the average, women scored 30 points higher on the
Written section than on the MBE whereas there was a 28 point average
differential in the opposite direction for male applicants.  Anglos and
Blacks scored higher on the MBE than on the Written section whereas the
reverse was true for Asian and Hispanic applicants.  The true size of the
difference between sections for Black applicants is hidden somewhat by
the relatively smaller percentage of males in this group.

## PHASED GRADING

As noted previously, a three-phased grading process was used to focus
reader time on the applicants who came close to the pass/fail line.
Table 8 presents the number and percentage of applicants in each of the
exam's six pass/fail categories.  These data indicate that 3,780 (50.5
percent) passed.

Table 9 shows the number of Phase 2 applicants who passed and failed
after all readings relative to their Phase 1 scores.  This table
illustrates the strong, but far from perfect relationship between Phase
1 scores and final pass/fail status.  These data also indicate that the
width of the Phase 2 reread band (1391 - 1465) was about right in that
almost all applicants with high scores on the first reading passed and
almost all with low initial scores failed.  For instance, only 5 of the
117 applicants with first read scores below 1395 passed the exam.

Similarly, Table 10 shows that the higher an applicant's score at the
end of Phase 2, the greater the likelihood that applicant passed as a
result of reappraisal.  The lower limit of the reappraisal band (1412)
also appears to be appropriate in that only 1 of the 58 applicants with
Phase 2 Total scores below 1415 passed as a result of reappriasal.

- 7 -

Table 5

SUMMARY STATISTICAL DATA AFTER ALL READINGS  (N = 7481)

| Test Statistic | MBE Scale | Written Raw Score | Total Scale |
|---|---|---|---|
| Average Score | 1438.8 | 668.6 | 1435.8 |
| Standard Deviation | 153.6 | 51.1 | 133.5 |
| Internal Consistency | .866* | .771 | .891 |

* Computed by ACT using national data.

Table 6

CORRELATIONS AMONG SECTIONS AND LSAT
AFTER ALL READINGS  (N = 7481)

| | LSAT* | MBE | Written |
|---|---|---|---|
| MBE | .55 | | |
| Written | .53 | .66 | |
| Total | .59 | .86 | .95 |

*LSAT (Law School Admissions Test) scores
were available for 6515 applicants.

- 8 -

Table 7

MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND SEX GROUPS AND THE
NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Sex | |
|---|---|---|---|---|---|---|
| | Anglo | Asian | Black | Hispanic | Female | Male |
| MBE | 1459 | 1383 | 1331 | 1368 | 1421 | 1450 |
| Written | 1451 | 1396 | 1328 | 1378 | 1451 | 1422 |
| Total | 1454 | 1392 | 1330 | 1374 | 1440 | 1432 |
| Number of Applicants | 5895 | 462 | 481 | 513 | 3001 | 4443 |
| % Male | 60 | 63 | 49 | 63 | 0 | 100 |

* There were 93 applicants who did not fall in the four
  largest racial/ethnic groups and 37 applicants who did
  not provide data about their racial/ethnic or sex group.

Table 8

NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED
IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Pass/Fail Category | Number | Percent |
|---|---|---|
| Fail - Phase 1 | 2709 | 36.2 |
| Fail - Phase 2 | 566 | 7.6 |
| Fail - Phase 3 | 426 | 5.7 |
| Total Fail | 3701 | 49.5 |
| Pass - Phase 1 | 3113 | 41.6 |
| Pass - Phase 2 | 484 | 6.5 |
| Pass - Phase 3 | 183 | 2.4 |
| Total Pass | 3780 | 50.5 |
| Phase 1 = 1st reading | 5822 | 77.8 |
| Phase 2 = Reread | 1050 | 14.0 |
| Phase 3 = Reappraisal | 609 | 8.1 |

- 9 -

Table 9

NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE
TO THEIR TOTAL SCORES AFTER THE FIRST READING (N = 1659)

| Score After | Number of Applicants | | | Percent |
| 1st Reading | Fail | Pass | Total | Passing |
|---|---|---|---|---|
| 1450 - 1465 | 49 | 277 | 326 | 85 |
| 1435 - 1449 | 131 | 206 | 337 | 61 |
| 1420 - 1434 | 190 | 115 | 305 | 38 |
| 1405 - 1419 | 297 | 44 | 341 | 13 |
| 1390 - 1404 | 325 | 25 | 350 | 7 |
| Total | 992 | 667 | 1659 | 40 |

Table 10

NUMBER OF REAPPRAISED APPLICANTS WHO PASSED AND FAILED
RELATIVE TO THEIR TOTAL SCORES AFTER REREAD (N = 586)

| Total Score | Number of Applicants | | | Percent |
| After Reread | Fail | Pass | Total | Passing |
|---|---|---|---|---|
| 1435 - 1239 | 31 | 82 | 113 | 73 |
| 1430 - 1434 | 45 | 65 | 110 | 59 |
| 1425 - 1429 | 74 | 18 | 92 | 20 |
| 1420 - 1424 | 98 | 11 | 109 | 10 |
| 1415 - 1419 | 98 | 6 | 104 | 6 |
| <1415 | 57 | 1 | 38 | 2 |
| Total | 403 | 183 | 586 | 31 |

- 10 -

Appendix A: HISTORICAL EXAM RESULTS

| | FEBRUARY | | | JULY | | |
|------|------|------------|---------|------|------------|---------|
| Year | Mean MBE | Number of Applicants | Percent Passing | Mean MBE | Number of Applicants | Percent Passing |
| 1976 | 1367 | 3088 | 38 | 1453 | 6709 | 60 |
| 1977 | 1387 | 3399 | 44 | 1430 | 7191 | 55 |
| 1978 | ** | ** | ** | 1447 | 6835 | 55 |
| 1979 | 1390 | 4166 | 45 | 1440 | 7152 | 55 |
| 1980 | 1367 | 3758 | 34 | 1417 | 7379 | 49 |
| 1981 | 1380 | 3837 | 33 | 1420 | 7080 | 50 |
| 1982 | 1373 | 4033 | 31 | 1427 | 7038 | 49 |
| 1983 | 1360 | 4200 | 28 | 1437 | 7277 | 50 |
| 1984 | 1370 | 3899 | 30 | 1407 | 7201 | 42 |
| 1985 | 1403 | 4661 | 33 | 1417 | 7622 | 46 |
| 1986 | 1397 | 4689 | 28 | 1437 | 7780 | 45 |
| 1987 | 1406 | 4682 | 43 | 1439 | 7481 | 51 |

Data were not available for the February 1978 exam. The
February 1987 exam was the first one on which written scores
were scaled to the MBE.

PR-84-0

3/19/84

# EXPLANATION OF SCALING ON THE CALIFORNIA BAR EXAMINATION

## OVERVIEW

This paper describes how scores on the Multistate Bar Examination (MBE) are adjusted ("scaled") to control for possible variations in average question difficulty across different administrations of the exam, such as between July 1982 and July 1983. The paper further describes how the MBE scale scores are used to adjust scores on the multiple choice portions of the Performance Test (PT) so that the PT's scores also are not affected by possible variations in average PT item difficulty from one administration of the exam to the next. An understanding of the scaling of PT multiple choice scores therefore requires an understanding of the principles and rationale underlying the scaling of MBE scores.

## SCALING MBE SCORES

The MBE contains 200 multiple choice questions (or "items"). Most, but not all, of the items asked on one administration of the MBE (such as July 1983) have not been asked before. Thus, differences in average MBE raw scores (i.e., the number of items answered correctly) between two administrations of the exam could be due to two factors:

   1) differences in the average difficulty of their unique items; e.g., the questions that were only asked on the July 1983 exam were on the average more difficult than the those asked on the July 1982 exam.

   2) differences in the average ability level of the applicants taking each test, such as normally occurs between the July and February administrations of the exam

A standard statistical technique called "scaling" is used to make sure the MBE scores that are reported for applicants are not affected by either of these two factors. This process involves the following basic steps:

   1) Include in the batch of 200 items that are asked on a given administration of the MBE a large group of items called "equators." Equators are items that appeared on a previous version of the MBE and are highly representative of the other items that appeared on that previous version.

   2) Determine how well the applicants taking the current version of the MBE performed on the equators relative to how well the applicants who took the previous version also performed on these same items.

   3) Adjust the total raw scores on the current version so that a given total adjusted (scaled) score indicates the same level of skill and knowledge regardless of the particular version of the test that was taken.

The principles underlying the complex statistical procedures used for doing the scaling are illustrated by the following hypothetical example. Suppose the applicants taking the July 1983 MBE had an average score of 70 percent on the equators; i.e., on the average, 7 out of 10 July 1983 applicants answered an equator correctly.  The percentage of applicants answering an item correctly is an indication of its difficulty.

Suppose further that the applicants taking the July 1982 MBE also had an average score of 70 percent on these same items.  In other words, when the July 1982 and 1983 groups had a common set of items, they had the same average score on these items.  If this occurred, we would expect the two groups to do equally well on their respective sets of unique items (i.e., the items that appeared on only one administration of the exam); provided, of course, that the two sets of unique items were equally difficult.

Thus, if the July 1982 applicants had an average score of 75 percent on their unique items and the July 1983 applicants had an average score of only 70 percent on their unique items, we would have to infer that the July 1983 unique items were, on the average, more difficult than the July 1982 unique items.  After all, when the two groups were asked the same items (i.e., the equators), they performed equally well.  Thus, the difference between the groups in their average scores on their respective sets of unique items must have been due to differences in the average difficulty of those items.

If this hypothetical situation had actually occurred, it would not be fair to compare one applicant's score on the July 1982 version of the exam with another applicant's score on the July 1983 version because the items in the latter version were, on the average, more difficult than those asked on the July 1982 version.  To correct for this unfairness when MBE scores are used to make pass/fail decisions, the July 1983 scores would have to be scaled up relative to the July 1982 scores.

The July 1982 test also could have been more or less difficult than the February 1982 exam, the July 1981 exam, and so on back to the base year of July 1972.  Because of this, the scores on each exam are adjusted relative to the base year.  Thus, if an applicant answered 122 items correctly on a test that was easier than the July 1983 exam but harder than the base test, that applicant might be assigned a California scale score of 390 whereas 122 items correct on the July 1983 exam was assigned a California scale score of 407.  The formula used for converting July 1983 raw scores to California scale scores was:

California MBE scale score = 2.6460 (MBE raw score) + 83.9841

Inserting various values of raw score into the equation above reveals that all applicants benefited from the scaling.  For example, if an applicant's MBE score was based on just the percentage of items answered correctly, then a 122 would convert to a 366 out of a possible 600 points (122/200 x 600 = 366).  Thus, an applicant with a 122 raw score earned 41 more total score points than this applicant would have earned if his or her MBE score was based on the percentage of questions answered correctly.

The basic statistical formulas for converting raw scores to scale scores through a series of linked equators are described by William Angoff in Chapter 15 of Educational Measurement (2nd edition).  R. L. Thorndike (editor). Washington DC: American Council on Education, 1971.

The scaling procedures for the MBE assume that the applicants who take a given version of the exam have not had prior access to that exam's set of equators. For example, if the July 1983 exam had used equators from the July 1982 test, then it is assumed that the July 1983 applicants have not had an opportunity to study the equating items (and learn the answers to them) prior to their taking the July 1983 exam. This assumption requires that a given version of the MBE be released to the public only after it has been determined that none of its items will be used for equating future versions of the exam. A breach in the equators' security would have the effect of increasing the scale scores on the most recent version of the exam.

## SCALING THE PT MULTIPLE CHOICE SECTIONS

The purpose of scaling the multiple choice scores on the PT is the same as the purpose for scaling MBE scores, namely: to control for possible variations in average item difficulty from one exam to the next. However, the method used for scaling MBE scores cannot be used with the PT because PT items from a previous version of the exam cannot be repeated on the current version. Thus, some other method for scaling PT multiple choice scores had to be used.

The method selected for scaling the July 1983 PT multiple choice scores is analogous to converting meters to yards and involved the following steps:

1) Compute the average score (mean) and standard deviation (SD) for each of the following three measures: a) raw score on the multiple choice portion of the morning PT, b) raw score on the multiple choice portion of the afternoon PT, and c) California MBE scale scores.

2) Convert all the scores on the multiple choice portion of the morning PT to a distribution that had a mean and standard deviation that were equal to one sixth the size of these parameters in the distribution of California MBE scale scores (because each PT multiple choice section was assigned 100 points and the MBE was assigned 600 points).

3) Repeat step 2 for the afternoon PT.

The simplified form of the formulas that were used to convert PT raw scores to scale scores appear below. Note that a given applicant's PT score was not adjusted in terms of that applicant's MBE score, but rather, in terms of the total distribution of California MBE scale scores among all the applicants that took both the MBE and the PT.

PT-AM Scale Score = (4.5088 x AM raw score) + 20.9988

PT-PM Scale Score = (3.4692 x PM raw score) + 32.4314

The decision was made to adjust scores on the PT's multiple choice sections to a score distribution that was based on the MBE because:

1) There was no way of knowing in advance of the exam whether the PT multiple choice items were unduly easy or difficult and, with only a total of 30 items, a few of them could have a large affect on the passing rate. If the items turned out to be unusually difficult and if no scaling method was employed to control for this problem, then the passing rate on the exam would have been reduced significantly.

2) The distribution of MBE scale scores provided an objective and independent basis for determining the difficulty of the PT items because its scale scores were already adjusted for possible variations in average question difficulty from one exam to the next.

3) The procedures for scoring the multiple choice sections could be announced in advance of the administration of the exam and thereby avoid any suspicion that the Committee adversely influenced the percent passing.

4) Previous research had indicated that applicants who had high scores on the machine scorable portion of the PT's prototype also tended to have high MBE scores.

5) Scaling to the MBE rather than to the Essay was expected to increase the percent passing the whole exam because studies of past exams indicated that about 21 percent more applicants passed the MBE than passed the Essay and the mean written scores on prototype versions of the PT were no higher than mean Essay scores.

An analysis of the July 1983 data confirmed the assumptions on which the PT scaling was based. These analyses demonstrated that there was a highly statistically significant correlation between MBE scores and raw scores on the multiple choice portion of both PTs. Applicants who did well on the MBE also tended to do well on a PT multiple choice section. These analyses also revealed that scaling to the MBE (rather than to the Essay or the PT's written score) maximized the percent passing because the MBE was much easier than either the Essay or the PT written sections.

## CONCLUSION

The purpose of scaling raw multiple choice scores is to adjust these scores for possible variations in average question difficulty from one exam to the next because most of the questions asked on one exam are not the same as those asked on a prior exam.

The net effect of scaling the July 1983 MBE and PT multiple choice scores was to increase the percent passing. For example, an applicant who had raw scores on the morning and afternoon PT multiple sections of 14 and 13, respectively, and an MBE raw score of 122 would earn a total of 569 points on these three sections. If this applicant's score had been based on the percentage of questions answered correctly, he or she would have received a score of 546 on these sections; i.e., 23 points less than the score assigned by the Committee of Bar Examiners. It also was discovered that scaling the PT multiple choice scores to the MBE produced a higher pass rate than would have been produced if the PT multiple choice scores had been scaled to either the Essay or PT written sections.

PR-88-2

# ARE BAR EXAM SCORES AFFECTED BY LAW SCHOOL

# ADMISSIONS PRACTICES?

**Stephen P. Klein, Ph.D.**

**Roger Bolus, Ph.D.**

**GANSK & Associates**

**October 17, 1988**

- ii -

Most Black and Latino applicants had LSAT scores that placed them in the
lowest quartile of the distribution of LSAT scores.  And, for the Blacks
and Latinos in this quartile, there was virtually no difference in bar
passage rates between the middle and low ZLSAT groups.  The same was
true for the bulk of the remaining Blacks and Latinos; i.e., those in
the second quartile of LSAT scores.  Thus, <u>a Black or Latino applicant
with a given LSAT score did not have a higher or lower probability of
passing the bar exam by going to a school with others whose LSAT scores
were substantially higher than his or her own score.</u>

Of the Asian applicants in the first quartile of LSAT, the bar exam
passing rate for those in the low ZLSAT group was 22 percentage points
lower than those in the middle group (14% versus 36%, respectively).
This finding suggests that Asian applicants in the bottom LSAT quartile
are likely to fair better on the bar exam by attending schools with
students whose LSAT scores are more similar to their own scores.
However, the 22 percentage point difference could be due in part to
chance and the low group having a somewhat lower mean LSAT score than
the middle group.  Almost all of the Asian applicants above the first
LSAT quartile were in the middle ZLSAT group.

The passing rate for Anglos within a quartile was virtually the same
across ZLSAT groups.  Thus, Anglos with especially high or low LSAT
scores relative to their classmates did not have any higher or lower bar
exam passage rates than would have been expected on the basis of their
LSAT scores alone.  For instance, among the Anglos in the top quartile,
the passing rates in the middle and high ZLSAT groups were 87 and 85
percent, respectively.

ARE BAR EXAM SCORES AFFECTED BY LAW SCHOOL ADMISSIONS PRACTICES?

BACKGROUND

Racial/ethnic minority group students, and especially Blacks and
Latinos, tend to earn much lower Law School Admission Test (LSAT) scores
than white applicants.  National enrollment figures for 1986-87 show
that the mean LSAT scores for the Anglos, Latinos, and Blacks enrolled
in law school were 32.5, 27.2, and 22.6, respectively.

Law schools try to select the best minority students that apply.  And,
the most able minority students (in terms of LSAT score) tend to apply
to the "best" (i.e., most selective and prestigious) law schools, the
next most able students tend to apply to the next best schools, etc.
Thus, the large difference in mean LSAT score between minority and
nonminority students in the pool of students applying for admission to
law school is usually carried over into each school's admitted class.

One consequence of this admissions process is that in California, over
50 percent of the minority students are concentrated in the most
selective schools in the state compared to only 30 percent for
nonminority students (Klein and Bolus, 1987).  A second consequence is
that Blacks and Latinos are usually in the bottom quarter of their class
on LSAT.  In fact, as a result of special admissions programs, 90
percent of the Black and Latino graduates from a given law school are
likely to have LSAT scores that are lower than the LSAT scores of 75
percent of their Anglo classmates.  Moreover, because LSAT is a good
predictor of LGPA regardless of race, minority students also tend to
earn LGPAs that place them in the bottom quarter of their class.

This situation led several law school deans to ask whether minority
students would do better on the bar exam if they went to schools where
their classmates' LSAT scores were more similar to their own LSAT
scores.  In other words, did being at the bottom of their class in terms
of LSAT compound the problem of their generally low LSAT scores?  There

- 3 -

Specifically, is <u>relative standing within school</u> related to passing the bar exam after controlling for the general relationship between LSAT and bar exam scores among all candidates?

This research was undertaken to assist law school applicants, admission officers, and other policymakers regarding two related issues, namely: (1) would minority (and especially Black and Latino) students tend to earn higher or lower bar exam scores if they attended law schools where their classmates' LSAT scores were more similar to their own scores versus the typical case where, because of special admissions programs, they usually have much lower LSAT scores than their classmates; and (2) is success on the bar exam related to whether applicants attend law schools where they are expected (on the basis of LSAT score) to earn relatively low, middle, or high LGPAs?

SAMPLE

The sample for this research consisted of law school graduates who had all of the following characteristics: (1) they took the California bar exam for the first time in either July 1985 or July 1986, (2) they had an LSAT score, (3) they graduated from a law school within one year of taking the exam, and (4) their graduating class had at least 30 first time takers. The total number of applicants meeting these criteria for the 1985 and 1986 exams were 3,383 and 3,282, respectively.

VARIABLES

The California bar exam has three parts: six essay questions, two performance test (PT) problems, and the Multistate Bar Examination (MBE). The MBE is a 200-item multiple choice test. One day of testing time is devoted to each section. For the purposes of this research, raw essay and PT scores within an exam were converted to a distribution that had the same mean and standard deviation as the applicants' MBE scores. The total score was defined as the mean of these three scale scores.

Table 1

MEANS, STANDARD DEVIATIONS, AND OTHER SUMMARY
STATISTICS BY RACIAL/ETHNIC GROUP

|  |  | Anglo | Asian | Latino | Black | Total |
|---|---|---|---|---|---|---|
| LSAT | Mean | 35.79 | 34.42 | 30.57 | 30.87 | 35.28 |
|  | SD | (5.52) | (5.91) | (6.33) | (5.99) | (5.78) |
| ZLSAT | Mean | 0.15 | -0.43 | -1.24 | -1.34 | 0.00 |
|  | SD | (0.88) | (1.02) | (1.14) | (1.04) | (1.00) |
| Total | Mean | 148.39 | 144.49 | 140.03 | 137.88 | 147.41 |
|  | SD | (10.97) | (11.18) | (10.87) | (10.36) | (11.28) |
| LSAT/Total Correlation |  | .47 | .51 | .47 | .39 | .50 |
| Number of Applicants |  | 5763 | 328 | 359 | 215 | 6665 |
| Percent Passing |  | 67.0% | 50.3% | 36.5% | 27.0% | 63.2% |

Table 2

PERCENTAGE OF APPLICANTS IN THE LOW, MIDDLE, AND HIGH GROUPS
AS DEFINED BY ZLSAT SCORE AND THE TOTAL NUMBER OF APPLICANTS
IN EACH ZLSAT AND RACIAL/ETHNIC GROUP

| ZLSAT Group | Racial/ethnic Group | | | | Total |
|---|---|---|---|---|---|
|  | Anglo | Asian | Latino | Black |  |
| Low | 4% | 14% | 42% | 42% | 511 |
| Middle | 92% | 84% | 58% | 58% | 5885 |
| High | 5% | 2% | 0% | 0% | 269 |
| Total | 5763 | 328 | 359 | 215 | 6665 |

The low, middle, and high groups had ZLSAT scores
of < -1.5, -1.5 to 1.5, and > 1.5; respectively.
Column totals may not sum to 100% due to rounding.

rate between racial/ethnic groups within a given combination of LSAT
quartile and ZLSAT group occurred despite only very small differences in
their mean LSAT scores.


Multivariate Regression Analyses

Combinations of Exam Year (1985 or 1986), LSAT, ZLSAT, and membership in
the low, middle, or high ZLSAT group were used (in multiple regression
equations) to predict total bar exam scores as well as scores on the
essay, PT, and MBE.  These equations were computed for each racial group
separately as well as for all groups combined.  The rationale underlying
this approach is that if relative standing on LSAT within school (by
itself) affects bar scores, then including ZLSAT score and/or group in
the regression equation should increase the accuracy of predicting bar
scores over that already achieved by LSAT alone.  Exam Year was used as
a control variable in the analyses that combined data across exams.

The regression analyses indicated that ZLSAT score or group did not
increase the prediction of bar exam scores over that achieved by LSAT
alone.  This finding held for all four bar exam scores (MBE, essay, PT,
and total score), for both the 1985 and 1986 cohorts, and for each
racial/ethnic group.

On both exams, LSAT explained 25 percent of the variance in total bar
scores in the sample of 6,665 applicants.  This means that LSAT (by
itself) would be right about 75 percent of the time in predicting
whether an applicant would earn a total bar exam score that was above or
below the median total score for all applicants.  Adding ZLSAT score,
ZLSAT group, or combinations of these variables to the prediction
equation did not increase forecasting accuracy.


DISCUSSION

The results presented above suggest that an applicant's likelihood of
passing the bar exam is neither positively or negatively affected by
that applicant attending a law school with students whose LSAT scores

- 11 -

0.35. Thus, the size of the difference between groups in mean LSAT score corresponds to the differences between them in mean total bar scores. This finding is consistent with past research which has shown that the bar exam does not systematically widen or narrow the gap in mean scores between groups that is present in the LSAT.

CONCLUSIONS

Our research suggest that there would not be a significant increase in minority passing rates if minority applicants were more likely to attend lower or middle ranked schools (in terms of these schools' selectivity and prestige) than if there was a continuation of the current practices which result in minorities tending to graduate from the most selective schools in the state. Similarly, students with especially high LSAT scores probably would not diminish or enhance their chances of passing the bar exam by attending a school with others whose LSAT scores were more or less similar to their own scores.

- 13 -

Appendix A

NUMBER OF APPLICANTS PER GROUP

| LSAT Quartile | ZLSAT Group | Anglo | Asian | Latino | Black |
|---|---|---|---|---|---|
| 1st | Low | 195 | 44 | 119 | 67 |
|  | Middle | 1059 | 53 | 76 | 42 |
|  | High | 0 | 0 | 0 | 0 |
| 2nd | Low | 20 | 3 | 27 | 23 |
|  | Middle | 1339 | 85 | 54 | 26 |
|  | High | 1 | 0 | 0 | 0 |
| 3rd | Low | 7 | 0 | 5 | 1 |
|  | Middle | 1486 | 77 | 50 | 47 |
|  | High | 47 | 1 | 0 | 0 |
| 4th | Low | 0 | 0 | 0 | 0 |
|  | Middle | 1395 | 60 | 27 | 9 |
|  | High | 214 | 5 | 1 | 0 |
| Total |  | 5763 | 328 | 359 | 215 |

PR 97–02

# ANALYSIS OF THE JULY 1997 EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

**GANSK & ASSOCIATES**

December 15, 1997

# SUMMARY

The July 1997 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written Examination composed of six essay questions and two Performance Test (PT) problems. There were 7678 applicants who completed both sections, 25% of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the exam to the next. Essay and PT answers were graded on a 40 to 100 point scale. Scores on this scale were assigned in 5-point intervals. Each PT score was then multiplied by 2 so that the maximum possible Written raw score was 1,000 points.

Written raw scores were converted to the same scale of measurement as was used on the MBE. This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded. An applicant's total score was computed using the formula below:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Essay Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, the applicant was failed if the total scale score was less than 1390, passed if it was 1466 or higher, and placed in reread if it was at least 1390 but below 1466.

In Phase 2, applicants in the reread group had all of their essay and PT answers read a second time. At the end of this phase, applicants were: failed if their Total scores were below 1412, passed if their scores were 1440 or higher, and placed in reappraisal if their scores were in the 1412 - 1439.9999 range. Applicants also were placed in reappraisal if their Total score after the first reading was 1440 or higher (i.e., even if their average was less than 1412).

An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant came to the pass/fail line of 1440.

The major findings with the applicants who had all of their answers read at least once and the group of 1505 applicants who had them read at least twice were as follows:

- After the first reading of all answers, 26% of the applicants failed and 54% passed. The total percent passing after the second reading and the reappraisal process were 61% and 63%, respectively.

- California applicants scored higher than the national average on all of the six MBE subjects.

i

- The reliability of the Written and Total scores (.75 and .89, respectively) was comparable to that of previous July exams.

- The correlation between MBE and Written scores (.68) was in the normal range for a July exam.

- The phased grading cutoff scores led to rereading and reappraising the answers of the applicants who were most likely to benefit from these additional reviews.

- Males tended to earn higher scale scores on the MBE than on the Written section. The reverse was true for females. Racial and ethnic minority applicants tended to earn the same scale scores on the MBE as they did on the Written section.

# ANALYSIS OF THE JULY 1997 EXAM

## TEST SECTIONS

The July 1997 exam had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six (1-hour) essay questions and two (3-hour) Performance Test (PT) problems. The exam was administered over three consecutive days, with two 3-hour sessions per day. Day 1 consisted of essay questions 1 - 3 and PT problem A. Day 2 was devoted to the MBE. Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES, FORMULAS, AND PHASED GRADING

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores and then multiplied by 10 using the formula below. This procedure adjusts raw scores for possible differences in mean question difficulty from one administration of the MBE to another.

$$\text{MBE Scale} = (9.1263)(\text{MBE Raw}) + 293.3129$$

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale. The same procedure was used to grade each PT answer. PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1,000 points (6 essays at 100 points each plus 2 PT problems at 200 points each). Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores. This scaling was done using the MBE and Written scores of the random sample of about 1,000 applicants who had their Written answers graded first. The formula used to convert written raw scores to scale scores was:

$$\text{Written Scale} = [154.265][(\text{Written Raw} - 658.26)/52.91] + 1487.0409$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores. The formula for computing Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants failed if their total scale score was less than 1390, passed if it was 1466 or higher, and placed in reread if it was at least 1390 but below 1466.0. In Phase 2, the applicants in reread had all of their essay and PT answers read a second time. The second reader on an answer was a different grader than the first reader and the second reader did not know the score assigned by the first reader. The scores assigned on the first and second readings were averaged and a new total computed using the formulas above. At the end of Phase 2, applicants failed if the new total was below 1412, passed if it was 1440 or higher, and placed in reappraisal if it was above 1411.9999 but below 1440.

Applicants also were placed in reappraisal if their total scale score on the first reading was 1440 or higher even if their mean total after two readings was below 1412. An applicant in the reappraisal group had all of his or her answers and scores reviewed as a set by a member of the Board of Reappraisers who then made a final pass/fail decision. Thus, an applicant's answers were read once, twice, or three times depending upon how close that applicant was to the pass/fail line of 1440.

**SAMPLE**

Analyses were conducted with the 7678 applicants who had both an MBE and a Written score. This sample contained 5796 applicants who were taking the exam for the first time and 1882 repeaters. The percentage of applicants from ABA approved, California Accredited, and Nonaccredited schools were 71, 15, and 4, respectively. The remaining applicants were not assigned to a school.

**MULTISTATE BAR EXAMINATION (MBE)**

Table 1 shows California applicants scored higher than the national average on all six MBE subtests. California's mean total raw score (the average number of questions answered correctly) was about 4 points higher than the national average (which included California scores).

Table 1 - NATIONAL AND CALIFORNIA MEAN MBE SCORES
AND THE DIFFERENCE BETWEEN THESE MEANS

| Test Score | Number of Items | National Mean | California Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 33 | 23.25 | 23.98 | 0.63 |
| Contracts | 34 | 20.66 | 21.64 | 0.98 |
| Criminal Law | 33 | 19.69 | 20.45 | 0.76 |
| Evidence | 33 | 20.27 | 20.74 | 0.47 |
| Real Property | 33 | 19.78 | 20.28 | 0.50 |
| Torts | 34 | 21.93 | 22.75 | 0.82 |
| Total Raw | 200 | 125.57 | 129.84 | 4.16 |
| NCBE/ACT Scale | 200 | 143.92 | 147.84 | 3.92 |

2

**WRITTEN SECTION**

There were 1505 applicants who had their answers read at least twice. On the average, an applicant's total written raw score on the first reading was 1.2 points higher than it was on the second reading. The correlation between these scores was .42. This value underestimates the true degree of agreement between readers because reread was limited to applicants near the pass/fail line. Table 2 shows the means and standard deviations on each question after all readings.

Table 2 - SUMMARY STATISTICAL DATA ON THE
WRITTEN SECTION AFTER ALL READINGS

| Question Number | Essay Content Area(s) and PT Tasks | Mean Score | Standard Deviation |
|---|---|---|---|
| 1 | Evidence | 66.78 | 11.06 |
| 2 | Constitutional Law | 66.29 | 7.94 |
| 3 | Professional Responsibility | 65.49 | 9.07 |
| 4 | Civil Procedure | 63.84 | 8.46 |
| 5 | Corporations | 64.36 | 7.88 |
| 6 | Criminal Law | 65.68 | 6.36 |
| PT-1 | Draft memo to partner | 132.50 | 13.88 |
| PT-2 | Draft persuasive arbitration brief and memo explaining settlement agreement | 130.46 | 15.31 |

**SUMMARY STATISTICS**

Table 3 presents summary statistical data on each section after all readings. There was a .68 correlation between MBE and Written scores. Law School Admission Test (LSAT) scores correlated .57, .56, and .61 with MBE, Written, and Total Scale scores, respectively. There were 7158 applicants with useable LSAT scores.

Table 3 - SUMMARY TEST STATISTICS AFTER ALL READINGS

| Test Statistic | MBE Scale | Written Raw | Total Scale |
|---|---|---|---|
| Mean Score | 1478.37 | 655.44 | 1478.63 |
| Standard Deviation | 150.99 | 50.41 | 137.09 |
| Reliability | .87 | .75 | .89 |

The MBE's reliability was computed by ACT using national data.

3

## SUBGROUP ANALYSES

On the average, women scored 23 points higher on the Written section than on the MBE whereas there was a 28 point average differential in the opposite direction for male applicants (Table 4). On the average, racial and ethnic minority groups scored about as highly on the Written section as they did on the MBE.

Table 4 - MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND GENDER GROUPS AND THE NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
| | Anglo | Asian | Black | Hispanic | Female | Male |
|---|---|---|---|---|---|---|
| Written | 1498 | 1469 | 1379 | 1439 | 1496 | 1465 |
| MBE | 1499 | 1467 | 1384 | 1436 | 1463 | 1492 |
| Total | 1498 | 1468 | 1381 | 1438 | 1484 | 1474 |
| N | 4790 | 1020 | 511 | 620 | 3468 | 4147 |
| % Male | 56% | 49% | 48% | 54% | 0% | 100% |

\* There were 674 applicants who did not fall in one of the four largest racial/ethnic groups and 63 applicants who did not provide all demographic data.

## PHASED GRADING

A three-phased grading process was used to focus reader time on the applicants who were near the pass/fail line. Table 5 presents the number and percentage of applicants in each of the exam's pass/fail categories. Overall, 4852 (63.2%) of the applicants passed.

Table 5 - NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Phase | Fail | | Pass | | Total | |
| | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| 1 | 2014 | 26.2 | 4159 | 54.2 | 6173 | 80.4 |
| 2 | 435 | 5.7 | 563 | 7.3 | 998 | 13.0 |
| 3 | 377 | 4.9 | 130 | 1.7 | 507 | 6.6 |
| Total | 2826 | 36.8 | 4852 | 63.2 | 7678 | 100.0 |

Table 6 shows the number of Phase 2 applicants who passed and failed relative to their Phase 1 scores. This table illustrates the strong relationship between Phase 1 scores and final pass/fail status. These data also indicate that the width of the Phase 2 reread band (1390 - 1466) was about right in that almost all the applicants with relatively high scores on the first reading passed and almost all with low initial scores failed.

Table 6 - NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE TO THEIR TOTAL SCORES AFTER THE FIRST READING

| Score After the First Reading | Number of Applicants | | | Percent Passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1450 - 1466 | 52 | 324 | 376 | 86 |
| 1435 - 1449 | 96 | 188 | 284 | 66 |
| 1420 - 1434 | 197 | 115 | 312 | 37 |
| 1405 - 1419 | 244 | 48 | 292 | 16 |
| 1390 - 1404 | 223 | 18 | 241 | 7 |
| Total | 812 | 693 | 1505 | 46 |

The higher an applicant's score at the end of Phase 2, the greater the likelihood that applicant passed as a result of reappraisal (Table 7). The lower limit of the reappraisal band (1412) appears to be appropriate because none of the applicants with Phase 2 Total scores below 1415 passed as a result of reappraisal.

Table 7 - NUMBER OF APPLICANTS IN REAPPRAISAL WHO PASSED AND FAILED RELATIVE TO THEIR TOTAL SCORES AFTER REREAD

| Total Score After Reread | Number of Applicants | | | Percent Passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1435 - 1439 | 30 | 57 | 87 | 66 |
| 1430 - 1434 | 53 | 34 | 87 | 39 |
| 1425 - 1429 | 90 | 25 | 115 | 22 |
| 1420 - 1424 | 81 | 10 | 91 | 11 |
| 1415 - 1419 | 72 | 4 | 76 | 5 |
| < 1415 | 51 | 0 | 51 | 0 |
| Total | 377 | 130 | 507 | 26 |

5

### APPENDIX A:  SUMMARY TEST STATISTICS ON FEBRUARY EXAMS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|---|-----------------|----------------------|------|-------------|-------------------------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1991 | 3685 | 51 | 1430 | 667 | .68 | .58 |
| 1992 | 3907 | 51 | 1432 | 663 | .69 | .60 |
| 1993 | 3682 | 45 | 1418 | 666 | .73 | .59 |
| 1994 | 3638 | 44 | 1421 | 657 | .68 | .59 |
| 1995 | 3488 | 42 | 1412 | 653 | .74 | .60 |
| 1996 | 3834 | 44 | 1417 | 646 | .67 | .58 |
| 1997 | 4103 | 49 | 1434 | 651 | .66 | .59 |

### APPENDIX B:  SUMMARY TEST STATISTICS ON JULY EXAMS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|------|---|-----------------|----------------------|------|-------------|-------------------------|
| | | | | Mean | Reliability | Correlation with MBE |
| 1990 | 6963 | 58 | 1451 | 684 | .76 | .67 |
| 1991 | 7219 | 55 | 1454 | 674 | .75 | .67 |
| 1992 | 7108 | 60 | 1464 | 674 | .71 | .64 |
| 1993 | 7018 | 59 | 1465 | 671 | .77 | .68 |
| 1994 | 7027 | 64 | 1482 | 672 | .76 | .70 |
| 1995 | 7109 | 60 | 1471 | 660 | .75 | .68 |
| 1996 | 7445 | 56 | 1458 | 667 | .76 | .70 |
| 1997 | 7678 | 62 | 1478 | 655 | .75 | .68 |

PR-07-02

# ANALYSIS OF THE
# JULY 2007 GENERAL BAR EXAMINATION

**Stephen P. Klein, Ph.D.**
**Roger Bolus, Ph.D.**

**GANSK & ASSOCIATES**

**January 17, 2008**

# SUMMARY

The July 2007 General Bar Examination (GBX) had two sections: the Multistate Bar Examination (MBE), a 190-item multiple choice test; and a Written examination composed of six essay questions and two Performance Test (PT) problems. There were 8115 applicants who completed both sections, 26% of whom had taken the GBX at least once before.

MBE raw scores (the number of questions answered correctly) were converted to scale scores that controlled for possible differences in average item difficulty from one administration of the examination to the next. The maximum possible MBE scale score was 2000 points. Essay and PT answers were graded on a 40 to 100 point scale. Scores on this scale were assigned in 5-point intervals. PT scores were multiplied by two (2) so that the maximum possible Written raw score was 1000 points.

Written raw scores were converted to the MBE's 2000 point scale. This was done to adjust for possible differences over time in the difficulty of the questions asked and the leniency with which the answers to them are graded. An applicant's Total score was computed using the formula below:

Total Scale Score = (.35 x MBE Scale) + (.65 x Written Scale)

A three-phased grading process was used to determine an applicant's pass/fail status. In Phase 1, applicants were passed if their Total scale scores were at least 1440 and failed if they were less than 1390. All the remaining applicants (i.e., those with total scores between 1390 and 1439) went to Phase 2 where they had all their essay and PT answers read again. The second grader on an answer was a different person than the first grader, and the second grader did not have access to the grade assigned by the first grader.

If the scores assigned by the Phase 1 and 2 graders on an answer were no more than 10 points apart, then the final score on the answer was the average of the two graders' scores. However, if the scores assigned to an answer by the Phase 1 and 2 graders differed by more than 10 points and the applicant would fail based on these scores, the answer went to Phase 3 where the team leader for the question reviewed the answer and the Phase 1 and 2 scores, and then assigned a final grade to it. That grade could be higher but not lower than the one assigned by either regular grader.

All the applicants in Phases 2 and 3 had their total scale scores recomputed based on the final scores on their essay and PT answers. Applicants with total scores of 1440 or higher passed. Those with scores of 1439 or less failed.

The major findings with the applicants who had all of their answers read at least once and the group of 1079 applicants who had them read at least twice were as follows:

- After the first reading of all answers, 32.2% of the applicants failed and 54.5% passed.  A total of 56.3% passed after the second reading and the grade resolution process.

- California applicants scored higher than the national average on four of the six MBE subjects.

- The reliability of the Written and Total scores (.79 and .88, respectively) was slightly higher (i.e., better) than normal for a July examination.

- The correlation between MBE and Written scores (.67) was in the normal range for a July examination.

- The phased grading cut off scores led to rereading the answers of the applicants who were most likely to benefit from this additional review.

- Males tended to earn higher scale scores on the MBE than on the Written section.   The reverse was true for females.   Racial and ethnic minority applicants tended to earn the same scale scores on the MBE as they did on the Written section.

- First-timers had a higher passing rate than second-timers who in turn had a higher rate than those taking the examination three or more times.   The corresponding passing rates were 69%, 26%, and 16%.

ii

# ANALYSIS OF THE
# JULY 2007 GENERAL BAR EXAMINATION

## TEST SECTIONS

The examination had two sections: the Multistate Bar Examination (MBE), a 200-item multiple choice test; and a Written section composed of six (1-hour) essay questions and two (3-hour) Performance Test (PT) problems.  The examination was administered over three consecutive days, with two 3-hour sessions per day.  Day 1 consisted of essay questions 1 - 3 and PT problem A.  Day 2 was devoted to the MBE.  Day 3 consisted of essay questions 4 - 6 and PT problem B.

## SCORING RULES, FORMULAS, AND PHASED GRADING

MBE raw scores (the number of MBE questions answered correctly) were converted by the American College Testing Program (ACT) to equated ("scaled") scores using an IRT methodology.  This procedure adjusts the raw scores for possible differences in mean question difficulty from one administration of the MBE to another.  California multiplied the scale scores by 10.

Each essay answer was graded in 5-point intervals on a 40 to 100-point scale.  The same procedure was used to grade each PT answer.  PT scores were then multiplied by 2 so that the maximum possible Written raw score was 1000 points (6 essays at 100 points each plus 2 PT problems at 200 points each).  Written raw scores were converted to a score distribution that had the same mean and standard deviation as the applicants' MBE scores.  This scaling was done using the MBE and Written scores of a random sample of over 1,000 applicants from among those who had their Written answers graded first.  The formula used to convert Written raw scores to scale scores was:

$$\text{Written Scale} = (3.2097 \times \text{Written Raw}) - 568.7649$$

An applicant's Total scale score was a weighted combination of that applicant's MBE and Written scale scores.  The formula for computing Total scale scores was:

$$\text{Total Scale Score} = (.35)(\text{MBE Scale}) + (.65)(\text{Written Scale})$$

A three-phased grading process was used to determine an applicant's pass/fail status.  In Phase 1, applicants passed if their Total scale score was 1440 or higher and failed if it was less than 1390.  The remaining applicants, i.e., those with total scale scores of 1390 to 1439, had their essay and PT answers read again.  The second grader on an answer was a different grader than the first grader and the second grader did not know the score assigned by the first grader. If the scores assigned by the Phase 1 and 2 graders were no more than 10 points apart, then the final score on the answer was the average of the two graders' scores.  However, if the scores differed by more than 10 points and the applicant would fail based on these scores, then the answer went to Phase 3 where the reading team leader for the question reviewed the answer and its Phase 1 and 2 scores, and then assigned a final grade to it.  That grade could be higher but not lower than the one assigned by either regular grader.

1

All the applicants who had their answers reread had their total scale scores recomputed based on the final scores on their essay and PT answers. Applicants with total scores of 1440 or higher passed. Those with scores of 1439 or less failed.

**SAMPLE**

Analyses were conducted with the 8115 applicants who had both an MBE and a Written score. This sample contained 6028 applicants who were taking the examination for the first time and 2087 repeaters. The General Statistics Report contains data on the number of first timers and repeaters by school type.

**MULTISTATE BAR EXAMINATION (MBE)**

Table 1 shows California applicants scored higher than the national average on four of the six MBE subtests. California's mean Total scale score (on the MBE's 200-point scale) was almost 2 points higher than the national average (which included California scores).

Table 1 - NATIONAL AND CALIFORNIA MEAN MBE SCORES AND THE DIFFERENCE BETWEEN THESE MEANS

| Test Score | Number Of Items | National Mean | California Mean | Difference |
|---|---|---|---|---|
| Constitutional Law | 31 | 21.23 | 21.23 | 0.00 |
| Contracts | 33 | 21.27 | 18.57 | -2.70 |
| Criminal Law | 31 | 20.59 | 21.83 | 1.24 |
| Evidence | 31 | 18.77 | 21.54 | 2.77 |
| Real Property | 31 | 20.69 | 21.10 | 0.41 |
| Torts | 33 | 23.71 | 24.54 | 0.83 |
| NCBE/ACT Scale | 190* | 143.73 | 145.87 | 2.14 |

* Applicants also answered 10 items that were being pre-tested for future forms of the test. The applicants' responses to these items did not affect their MBE scores.

2

**WRITTEN SECTION**

There were 1079 applicants who had their answers read at least twice. On the average, an applicant's total Written raw score on the first reading was 5.5 points higher than it was on the second reading.

**SUMMARY STATISTICS**

Table 2 provides summary statistical data on each section after all readings. There was a .673 correlation between MBE and Written scores. The mean and standard deviation of Law School Admission Test (LSAT) scores among the 5126 ABA first timers were 160.2 and 6.78, respectively; and 160.8 and 6.62 when the school was the unit. The correlation between LSAT and GBX total scores was .41 when the applicant was the unit and .94 when the school was the unit.

Table 2 - SUMMARY TEST STATISTICS AFTER ALL READINGS

| Test Statistic | MBE Scale | Written Raw | Total Scale |
|---|---|---|---|
| Mean Score | 1458.68 | 630.39 | 1455.22 |
| Standard Deviation | 157.98 | 49.08 | 145.43 |
| Reliability | .900 | .785 | .875 |

The MBE's reliability was computed by ACT using national data.

**SUBGROUP ANALYSES**

On the average, women scored 28 points higher on the Written section than on the MBE whereas there was a 37 point mean difference in the opposite direction for male applicants (Table 3). On the average, racial and ethnic minority groups scored about as well on the Written section as they did on the MBE.

Table 3 - MEAN SCALE SCORES WITHIN RACIAL/ETHNIC AND GENDER GROUPS AND THE NUMBER OF APPLICANTS AND PERCENTAGE OF MALES WITHIN EACH GROUP*

| Test | Racial/Ethnic Group | | | | Gender | |
| | Anglo | Asian | Black | Hispanic | Female | Male |
|---|---|---|---|---|---|---|
| Written | 1477 | 1444 | 1336 | 1406 | 1468 | 1440 |
| MBE | 1489 | 1432 | 1350 | 1406 | 1439 | 1476 |
| Total | 1481 | 1439 | 1341 | 1406 | 1458 | 1453 |
| N | 4622 | 1491 | 459 | 776 | 3847 | 4255 |
| % Male | 54 | 47 | 47 | 51 | 0% | 100% |

* There were 757 applicants who did not fall in one of the four largest racial/ethnic groups or were missing demographic data.

**PHASED GRADING**

A three-phased grading process was used to focus grader time on the applicants who were just below passing. Table 4 presents the number and percentage of applicants in each pass/fail category at each phase. Overall, 4571 (56.3%) of the applicants passed. There were 230 applicants who had their final scores on one or more answers resolved by a team leader for a question and 16 of them passed; i.e., they would have failed were it not for the resolution process.

Table 4 - NUMBER AND PERCENTAGE OF APPLICANTS WHO PASSED AND FAILED IN EACH PHASE OF THE MULTIPHASED GRADING PROCESS

| Phase | Fail | | Pass | | Total | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| 1 | 2612 | 32.2 | 4424 | 54.5 | 7036 | 86.7 |
| 2 | 718 | 8.8 | 131 | 1.6 | 849 | 10.5 |
| 3 | 214 | 2.6 | 16 | 0.2 | 230 | 2.8 |
| Total | 3544 | 43.7 | 4571 | 56.3 | 8115 | 100.0 |

Table 5 shows the strong relationship between Phase 1 scores and final pass/fail status. These data also indicate that the width of the reread band (1390 - 1439) was about right in that only a very small percentage of the applicants with relatively low initial total scores passed as a result of reread.

Table 5 - NUMBER OF REREAD APPLICANTS WHO PASSED AND FAILED RELATIVE TO THEIR TOTAL SCORES AFTER THE FIRST READING

| Score after the first reading | Number of Applicants | | | Percent passing |
|---|---|---|---|---|
| | Fail | Pass | Total | |
| 1430 – 1439 | 150 | 89 | 239 | 37 |
| 1420 – 1429 | 192 | 29 | 221 | 13 |
| 1410 – 1419 | 172 | 16 | 188 | 9 |
| 1400 – 1409 | 216 | 7 | 223 | 3 |
| 1390 – 1399 | 202 | 6 | 208 | 3 |
| Total | 932 | 147 | 1079 | 14 |

Table 6 provides information about the answers that had more than a 10-point difference between the first and second grader's scores. These data indicate that the number of answers going to resolution varied somewhat by question and that the resolution score usually fell about halfway between the scores assigned by the first and second grader. Moreover, only 251 (3%) of the 8632 answers that were read twice needed to go to Phase 3.

Table 6 – DATA ON ANSWERS GOING TO RESOLUTION GRADING

| Question | Number of answers | Mean on 1st Reading | Mean on 2nd reading | Mean after resolution |
|---|---|---|---|---|
| 1 | 26 | 69 | 64 | 66 |
| 2 | 40 | 69 | 60 | 65 |
| 3 | 29 | 70 | 62 | 68 |
| 4 | 17 | 71 | 61 | 64 |
| 5 | 38 | 65 | 64 | 63 |
| 6 | 53 | 70 | 58 | 64 |
| PT-A | 25 | 64 | 57 | 60 |
| PT-B | 23 | 69 | 63 | 66 |

APPENDIX A: SUMMARY TEST STATISTICS ON JULY EXAMINATIONS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|---|---|---|---|---|---|---|
| | | | | Mean | Reliability | Correlation with MBE |
| 1991 | 3685 | 51 | 1430 | 667 | .68 | .58 |
| 1992 | 3907 | 51 | 1432 | 663 | .69 | .60 |
| 1993 | 3682 | 45 | 1418 | 666 | .73 | .59 |
| 1994 | 3638 | 44 | 1421 | 657 | .68 | .59 |
| 1995 | 3488 | 42 | 1412 | 653 | .74 | .60 |
| 1996 | 3834 | 44 | 1417 | 646 | .67 | .58 |
| 1997 | 4103 | 49 | 1434 | 651 | .66 | .59 |
| 1998 | 3871 | 40 | 1412 | 650 | .70 | .60 |
| 1999 | 4309 | 41 | 1416 | 642 | .65 | .55 |
| 2000 | 4447 | 40 | 1415 | 638 | .66 | .57 |
| 2001 | 4461 | 38 | 1405 | 640 | .72 | .58 |
| 2002 | 4030 | 34 | 1396 | 633 | .71 | .53 |
| 2003 | 4162 | 38 | 1398 | 611 | .68 | .58 |
| 2004 | 4363 | 36 | 1392 | 625 | .72 | .50 |
| 2005 | 4458 | 41 | 1407 | 607 | .72 | .62 |
| 2006 | 4758 | 39 | 1402 | 621 | .77 | .58 |
| 2007 | 5109 | 37 | 1398 | 611 | .75 | .59 |

APPENDIX B:  SUMMARY TEST STATISTICS ON JULY EXAMINATIONS

| Exam | N | Percent Passing | Mean MBE Scale Score | Written Raw Score | | |
|---|---|---|---|---|---|---|
| | | | | Mean | Reliability | Correlation with MBE |
| 1990 | 6963 | 58 | 1451 | 684 | .76 | .67 |
| 1991 | 7219 | 55 | 1454 | 674 | .75 | .67 |
| 1992 | 7108 | 60 | 1464 | 674 | .71 | .64 |
| 1993 | 7018 | 59 | 1465 | 671 | .77 | .68 |
| 1994 | 7027 | 64 | 1482 | 672 | .76 | .70 |
| 1995 | 7109 | 60 | 1471 | 660 | .75 | .68 |
| 1996 | 7445 | 56 | 1458 | 667 | .76 | .70 |
| 1997 | 7678 | 62 | 1478 | 655 | .75 | .68 |
| 1998 | 7548 | 53 | 1446 | 656 | .74 | .65 |
| 1999 | 7684 | 51 | 1449 | 644 | .75 | .66 |
| 2000 | 7603 | 56 | 1460 | 645 | .74 | .62 |
| 2001 | 7585 | 57 | 1468 | 637 | .77 | .64 |
| 2002 | 7477 | 51 | 1445 | 632 | .72 | .64 |
| 2003 | 7732 | 50 | 1443 | 634 | .73 | .67 |
| 2004 | 8020 | 49 | 1434 | 621 | .75 | .67 |
| 2005 | 8310 | 49 | 1437 | 630 | .79 | .68 |
| 2006 | 8858 | 52 | 1452 | 630 | .80 | .65 |
| 2007 | 8115 | 56 | 1459 | 630 | .79 | .67 |

PR-05-02

HISTORY OF STRUCTURE AND PASS/FAIL RULES
FOR THE CALIFORNIA GENERAL BAR EXAMINATION

Stephen Klein, Ph.D.
June 18, 2005

This report summarizes the features of California's General Bar Examination (GBX)[1] during the past 75 years.

1) Between 1932 and 1972, the GBX consisted of about 20 essay questions. In order to pass, an applicant had to have an average score of at least "70% of the highest possible grade." There is no record of what reread or reappraisal practices may have been used.

2) The Multistate Bar Examination (MBE), a 200-item multiple choice test, was added in July 1972. Under the July 1972 rules, an applicant could earn up to 1714 points; 514 on the MBE (2.57 times the applicant's MBE scale score) and 1200 on the essay (with 100 points for each of 12 questions). Thus, the nominal weights attached to the MBE and Essay were 30% and 70%, respectively.

The essay test had three sections with five questions per section. Applicants were told to answer four of the five questions in a section in 3.5 hours (i.e., 52.5 minutes per question). Thus, applicants had some choice in which questions they answered and there was wide variation in the number of applicants answering each question. On the average, there were 4 to 5 readers per question.

The passing score was 1200 points (i.e., 70% of the maximum possible total). Applicants with total scores were between 1140 and 1199 (i.e., between 66.5% and 69.9% of the maximum possible) were placed in reappraisal. The applicants in this group had all of their essay answers and all of their scores (including their MBE score) independently reviewed by two Reappraisers. Each Reappraiser made an overall pass/fail decision. If they disagreed, the applicant's answers and scores were reviewed by a third Reappraiser who broke the tie.

The passing score of 1200 was chosen, in part, because it allowed an applicant to pass by earning a perfect score on the essay section (i.e., even with a "0" on the MBE).

3) Several changes were made in July 1978. The number of essay questions an applicant had to answer was reduced from 12 to 9, the time allocated to answer a question was

---

[1] The Attorneys' Examinations consists of the written portions of the General Bar Examination, which are administered on Tuesday and Thursday of each general administration of the examination. Both examinations: General Bar Examination and Attorneys' Examination are considered collectively as the California Bar Examination.

increased to 60 minutes, applicants no longer had a choice in which questions they answered, MBE scale scores were multiplied by 3.0, the maximum possible score on the test became 1500 points (600 on the MBE and 900 on the Essay – which also changed the nominal weights assigned to each section), and a phased grading system was introduced to focus reader resources on applicants who were near the pass/fail line (i.e., those whose pass/fail status might be affected by a reread process).

The first step in the phased grading system involved passing applicants if their scores on one randomly selected essay test session (i.e., three essay answers) plus their MBE score was high enough to virtually assure they would pass if all their essay answers were read. The applicants who did not pass at this step had the rest of their answers graded. After this reading, applicants were passed if their total score was above 71% of the maximum possible score on the examination. They were failed if this score was below 67.3% of the maximum possible and they went to reread if it was between 67.3% and 71%.

The applicants in reread had all of their essay answers scored again by different graders who did not know the scores assigned by the first set of readers. The average of the two sets of essay scores became the applicant's total essay score and this score was combined with the MBE score. An applicant passed if this new total was 1050 or higher (i.e., 70% or more of the theoretical maximum possible score), failed if it was below 68.7%, and went to reappraisal if it was between 68.7% and 69.9%.

Applicants in reappraisal had all of their scores (including their MBE score) and essay answers reviewed by one Reappraiser who made the final pass/fail decision. As in the past, if the applicant failed after reappraisal, the score reported was the one the applicant received prior to reappraisal.

The score levels required to pass at each step and to get into reread and reappraisal were established on the basis of empirical analyses of past examinations (see report by Klein entitled "A Comparison of the Effectiveness of a Single versus a Multiphased Grading System" May, 1980). For instance, the bottom end of the reread zone was set in a way that assured inclusion of virtually all the applicants who had even a small chance of having their initial fail status converted to a pass as a result of the reread process.

Starting with the July 1984 examination, the first step of the phased grading process (i.e., passing some applicants without reading all of their answers at least once) was discontinued because it was found that it was no more expensive to grade every applicant's answers at least once.

The changes above increased the *nominal* weight given to the MBE from 30% to 40%, but they increased its a*ctual* weight to about 45%. This occurred because the actual weight is determined by the size of the MBE's standard deviation relative to the size of Essay section's standard.

4) The so called "bifurcation" rule was added in July 1981 to provide applicants with another means of passing. Under this rule, applicants could pass by having a combined MBE + Essay score of 1050 or higher (i.e., 70% of the maximum possible) and/or by passing the MBE on one administration of the examination and the Essay on another administration. Applicants who failed overall but "passed" one section (where passing was defined as 70% of the maximum possible score on that section) could repeat the entire examination or just the part failed previously. They did not risk losing their passing status on a section by repeating it.

Because the bifurcation rule only affected repeaters, no one passed as a result of it until February 1982. The rule was discontinued in July 1983 primarily because it had the opposite of its intended effect; i.e., it tended to lower rather than raise passing rates (see report by Klein "How the Bifurcation Rule Affected the Percent Passing California's General Bar Examination"). The rule also was too cumbersome to implement along with the planned use of the Performance Test because it would have meant "trifurcating" the examination. Because of the rule's provisions, some applicants were eligible to pass the GBX as late as July 1985 (i.e., by having earned a passing status on a July 1983 section).

5) On three examinations (February 1982, July 1982, and February 1983), applicants were given 90 minutes to answer two of the nine essay questions. The two questions appeared in a single, 180-minute test session. This addition increased total testing time from 2.5 to 3 days.

The questions allocated the extra time were graded in the same way as the other questions; i.e., with a 100 point maximum. No change was made in the pass/fail rules. Statistical studies of these three examinations indicated that the additional time did not affect passing rates. All subsequent examinations have allocated 60 minutes per essay question.

6) The Performance Test (PT) section was added to the examination in July 1983. On the first three administrations of this section, each PT problem included a set of multiple-choice questions. The scores on the multiple-choice portion of a PT problem were scaled to the MBE. An applicant could theoretically earn 1800 points on the examination -- 600 on the MBE (three times the MBE scale score), 600 on the essay (6 questions at 100 points each), and 600 on the PT (300 points per problem, 200 for the written response and 100 for the multiple choice portion). The passing score was 1260 (i.e., 70% of 1800).

The multiple-choice portion of the PT was discontinued after the July 1984 examination. Starting with the February 1985 examination, all 300 points per PT problem were given to the written answer.

The pass/fail decision rules adopted in 1978 were converted to the new examination structure and point system. Specifically, after the first reading of all answers, applicants were passed if their total scores were over 1278, failed if they were under 1225, and sent to reread if they were between 1225 and 1278. Based on their total scores after reread,

3

applicants were passed if their total was over 1259, failed if it was less than 1240, and sent to reappraisal if it was between 1240 and 1259.

7) Under the present rules, which were implemented beginning with the February 1987 examination, MBE scale scores are multiplied by 10 (so that the maximum possible MBE score is 2,000 points) and the written portion of the examination is structured so that an applicant can earn up to 600 raw score points on the essay (100 points per question) and 400 on the PT (200 points per problem).

Total written raw scores (i.e., Essay plus PT) on a given administration are scaled to a score distribution that has the same mean and standard deviation as these applicants' MBE scores. The formula used to compute total scores gives 65% of the weight to the Written portion of the examination and 35% to the MBE. This formula is: Total Scale = (.65 x Written Scale Score) + (.35 x MBE Scale Score)

The score required for passing is 1440. This score reflects the average of the pass/fail standards that were used on the all the examinations that were given between 1977 and 1986. This average was computed by using the procedures above to calculate total scale score on each of these 20 previous examinations, finding the total score on each examination that would have produced the same passing rates as actually occurred on that examination, and then determining the average of these standards. The use of 1440 also reflects a small adjustment that was made to accommodate the applicants who would pass as a result of the reappraisal process. In addition, the reread and reappraisal bands were set in a way that insured including about the same percentage of applicants as had been in these groups on previous administrations of the examination.

There have been many changes in the GBX's pass/fail rules, structure, format, the weights attached to its sections, and the number of readers grading the answers to the written questions. For example, there are now more than twice as many readers per question as there were 25 years ago. Nevertheless, GBX passing rates have generally risen and fallen in close harmony with variations in the candidates' mean LSAT and MBE scores (and the scores on those tests are adjusted for possible differences in average question difficulty from one examination to the next). Thus, the standards for passing have remained fairly stable over time.

CHRONOLOGY OF CHANGES

| | |
|---|---|
| July 1972 | MBE added with a nominal weight of 30% |
| July 1978 | Number of essay questions reduced from 12 to 9<br>All applicants had to answer all questions<br>Time per question increased from 52.5 to 60 minutes<br>Beginning of phased grading and automatic reread<br>Reappraisers per applicant reduced from 2 or 3 to 1<br>Nominal weight given to MBE increased to 40% |
| July 1980 | Experimental test sections and Assessment Center<br>Special one time only pass/fail rules |
| July 1981 | Bifurcation rule added (affected pass/fail in 2/82) |
| February 1982 | 90 minutes allocated to each of two essay questions<br>Examination length increased from 2.5 to 3 days |
| July 1983 | 90 minute questions eliminated<br>PT section added to the examination with a multiple choice part<br>Essay, PT, and MBE each carry one-third of nominal weight<br>Bifurcation rule dropped, but affected pass/fail to 7/85 |
| July 1984 | All written answers read at least once for all applicants |
| February 1985 | Multiple choice portion of PT eliminated |
| February 1987 | Essay and PT combined into a single Written score<br>Weight attached to PT reduced to 40% of Written score<br>Written scores (Essay + PT) scaled to MBE distribution<br>Weight attached to MBE set at 35% of total |

PR-88-7

# ESTIMATED EFFECTS OF VARIOUS PASS/FAIL RULES

Stephen P. Klein, Ph.D.

Roger Bolus, Ph.D.

GANSK & Associates

November 2, 1988

ESTIMATED EFFECTS OF VARIOUS PASS/FAIL RULES

## PURPOSES

This report describes how the passing rate on California's General Bar
Examination (GBX) would probably be affected by various changes in its
current pass/fail <u>rules</u>.  For instance, what is the effect of requiring
applicants to pass both the multiple choice and written portions of the
exam rather than making pass/fail decisions on a combined total score?

The report contrasts these effects while holding passing <u>standards</u>
constant (i.e., rules and passing scores are not varied simultaneously).
The report also examines whether the relative effect of a given rule is
related to an applicant's racial/ethnic or sex group, school type, or
repeater status (i.e., whether or not the applicant is taking the exam
for the first time).

## DATABASE

The analyses described below use data from the six GBXs given between
July 1985 and February 1988.  The total number of separate sets of GBX
scores (observations) in this database was 36,784.  However, this count
overstates the number of separate individuals because many applicants
took more than one of the six exams studied.  Thus, unless specifically
noted otherwise, the tables that follow are based on just the 18,488
first time takers in the database.  This group is composed of 14,570
July applicants and 3,918 February applicants.

## VARIABLES

The GBX consists of a 200-item multiple choice test, called the
Multistate Bar Examination (MBE), a six-question essay test, and a
two-problem Performance Test (PT).  One day of testing time is
allocated to each of these three sections.

MBE raw scores (i.e., the number of items answered correctly) are
converted to "scaled" (equated) scores by the American College Testing
Program to control for possible variations in average item difficulty
across administrations.  Each essay and PT answer is graded on a 40 to
100 scale.  On this scale, a score of 70 is considered just passing.

## PASS/FAIL RULES

Under the present pass/fail rule, an applicant's two PT scores are
multiplied by 2.0 and added to the six essay scores to form a Written
raw score.  The maximum possible Written raw score is therefore 1,000
points (6 essays at 100 points each plus 2 PTs at 200 points each).

Written raw scores are converted to a score distribution that has the
same mean and standard deviation as the applicants' MBE scale scores.
For instance, if the mean MBE scale score is 145, then the mean Written
scale score also will be 145.  An applicant's Written score is not
converted to a scale score in terms of that applicant's MBE score.

MBE and Written scale scores are then multiplied by 10.  Total GBX
scores are computed using the formula below.  Under the current rules,
applicants pass if their total score is greater or equal to ($\geq$) 1440.

$$Total = (.35)(MBE\ scale) + (.65)(Written\ scale)$$

Applicants who come close to passing but fail under this formula have
all of their answers reviewed by a member of the Board of Reappraisors
to determine if enough points can be found to pass the applicant.  This
process lowers the effective passing score by about 5 to 10 points on
the 2,000 point maximum scale.

Table 1 summarizes the 10 rules we studied.  Rule A is numerically
equivalent to the current rule.  However, no adjustment was made in it
to account for the reappraisal process.  This was done to allow more
direct comparisons between rule A and the other rules discussed below.

Table 1

PASSING RULES

---

A. $(3.5)$(MBE Scale) + $(6.5)$(Written Scale) $\geq 1440$

B. $(2.5)$(MBE scale) + Written Raw $\geq 1050$

C. MBE $\geq 140$ AND Written Scale $\geq 140$

D. MBE $\geq 140$ AND Written raw $\geq 700$

E. Rule A pass AND Written raw $\geq 700$

F. Rule A pass AND pass at least 2 essay questions

G. Rule A pass AND pass at least 3 essay questions

H. Rule A pass AND pass at least 4 essay questions

I. $(.35)$(MBE scaled to Written) + $(.65)$(Written) $\geq 700$

J. Rule A score $\geq$ Dragging Anchor score

---

Rule B is the one that was used just before the Committee began scaling Written raw scores to the MBE. Under this rule, an applicant can earn up to 500 points on the MBE and 1000 points on the Written section for a total of 1500 points. Passing is a score of 1050 (70 percent of 1500).

Rules C and D say that the applicant must pass both the MBE and the Written section in order to pass overall. There is no total score. And, in accordance with past policies, a pass on a section is earning 70 percent of the maximum possible score on that section. Under rule C, an applicant's passing status on the Written section is based on scale scores whereas under rule D, it is based on raw scores. This is the only difference between these two rules.

Rule E says that in order to pass, an applicant must have a passing status on the Written section as well as on the exam as a whole. Rules F-H are self explanatory.

Rule I parallels Rule A except that MBE scores are scaled to the Written section rather than vice versa. Rule J is a hybrid of Rules A and I. It involves computing each applicant's total score as per Rule A, the percent passing under rule I on each of the four previous exams, finding the scale score under rule A that would produce that same passing rate, computing the average of these scale scores, and then using that average as the pass/fail line for the next exam. For example, under this rule, July 1985 - February 1987 data were used to establish the passing score for the July 1987 exam. This rule is called "dragging anchor" because the pass/fail standard for the next exam is based on a moving average, i.e., the mean of the standards used on the four previous exams.

## RELATIVE EFFECT OF RULES

Table 2 shows the passing rate for first timers and repeaters under each rule. The rules in this table are listed in the order of their overall first timer passing rates (from highest to lowest). These data show that the current rule (rule A) produces the highest passing rate for both first timers and repeaters. Imposing the additional requirement that an applicant pass at least two essay questions (rule F) lowers the passing rate in both groups by 2 percentage points whereas requiring passing at least three of the six questions (rule G) lowers it 10 percentage points for first timers and 7 points for repeaters.

Rule B corresponds to the old pass/fail rule; i.e., the one used just prior to the current procedure of scaling the written scores to the same distribution as the MBE scores. The passing rate under this rule is 6 percentage points less than it is under Rule A. This differential probably stems from the gradual increase in MBE scores relative to essay scores that has been observed over the past ten years (an applicant with a given MBE score tended to earn a slightly higher written score on past exams than on recent exams). Only 21 of the 22,883 July examinees (one tenth of one percent) passed under Rule B but failed under rule A.

Table 2

**FIRST TIMER AND REPEATER PASSING RATES UNDER VARIOUS RULES**

| First Timer | Repeater | Pass/Fail Rules |
|---|---|---|
| 60 | 30 | A. (3.5)(MBE Scale) + (6.5)(Written Scale) $\geq$ 1440 |
| 59 | 29 | C. MBE $\geq$ 140 AND Written Scale $\geq$ 140 |
| 58 | 28 | F. Rule A pass AND pass at least 2 essay questions |
| 54 | 23 | B. (2.5)(MBE scale) + Written Raw $\geq$ 1050 |
| 50 | 23 | G. Rule A pass AND pass at least 3 essay questions |
| 42 | 11 | J. Rule A score $\geq$ Dragging Anchor score |
| 40 | 14 | E. Rule A pass AND Written raw $\geq$ 700 |
| 39 | 11 | I. (.35)(MBE scaled to Written) + (.65)(Written) $\geq$ 700 |
| 37 | 15 | H. Rule A pass AND pass at least 4 essay questions |
| 37 | 12 | D. MBE $\geq$ 140 AND Written raw $\geq$ 700 |

Rule C, which requires applicants to "pass" both the MBE and the Written section in order to pass overall, lowered the passing rate by only 1 percentage point compared to the current rule. Note, however, that the standard for passing each section under this rule (a scale score of 140) is lower than the current overall standard (144 x 10 or 1440).

A cross-tabulation of the results with rules A and C among all July takers indicated that the two rules would make the same pass/fail decision for 92 percent of the applicants; i.e., about 4 percent who would fail under rule A would pass under rule C while 4 percent who would fail under rule C would pass under rule A. Thus, even though the two rules yield almost identical overall passing rates, they produce somewhat different decisions as to who would pass.

Most of the difference in passing rates among rules stems from it being harder to achieve the "70 percent" level with Written <u>raw</u> scores than with <u>scale</u> scores. This is most clearly seen in the large difference in passing rates between rules C and D. The only difference in these rules is in how they determine a passing status on the Written section. Under rule C, Written scores are scaled to the MBE (and thereby forced to have the same mean as the MBE) whereas under rule D, pass/fail decisions on the Written section are based on raw scores.

The rank ordering of the rules in terms of passing rates differed only slightly between first timers and repeaters. The largest difference was on rule J (Dragging Anchor). This rule produced the sixth highest passing rate among first timers and the lowest rate among repeaters.

Table 3 shows the passing rate for first timers within each sex and racial/ethnic group. The ordering of the rules in this table is the same as in Table 2 (i.e., by first timer passing rate). These data indicate that the rank ordering of the rules within one group is generally consistent with the ordering in another group.

Table 3

FIRST TIMER PASSING RATES WITHIN RACIAL/ETHNIC AND SEX GROUPS

| Rule | All 1st Timers | White | Asian | Latino | Black | Females | Males |
|------|----------------|-------|-------|--------|-------|---------|-------|
| A | 60 | 64 | 45 | 35 | 23 | 60 | 60 |
| C | 59 | 63 | 42 | 34 | 24 | 57 | 60 |
| F | 58 | 62 | 42 | 34 | 20 | 57 | 57 |
| B | 54 | 58 | 38 | 29 | 17 | 53 | 55 |
| G | 50 | 54 | 37 | 29 | 17 | 51 | 50 |
| J | 42 | 45 | 31 | 20 | 10 | 42 | 41 |
| E | 40 | 43 | 28 | 21 | 11 | 43 | 38 |
| I | 39 | 42 | 24 | 18 | 10 | 38 | 39 |
| H | 37 | 40 | 26 | 20 | 12 | 38 | 36 |
| D | 37 | 40 | 25 | 18 | 10 | 39 | 36 |

One exception to this trend is that rule C yields a slightly higher passing rate for men than women.  This finding is counter to that observed under most other rules; i.e., women usually do as well as or better than men.  The most likely reason for this difference is that Rule C gives the two sections equal weight (rather than emphasizing the written portion) in computing total scores; and, men tend to do better on the MBE than on the essay whereas the reverse is true for women.

Table 4 shows the first timer passing rate by school type.  These data indicate that the rank ordering of the rules for graduates from ABA schools corresponds fairly well with the rank ordering of the rules for graduates from California accredited schools and from non-accredited schools.  About ten percent of the applicants were not assigned to a school (and thereby a school type) because more than one year elasped between their graduation from law school and their taking the California GBX for the first time.

Passing rates on July exams were 8 to 15 percentage points higher than they were in February.  For instance, the passing rate for ABA first timers under rule A was 67 percent in July and 53 percent in February.  But again, there was no interaction between rule type and exam date.

Table 4

FIRST TIMER PASSING RATES WITHIN SCHOOL TYPE

| Rule | All 1st Timers | ABA | Calif. Accred | Non-Accred | Other |
|------|------|------|------|------|------|
| A | 60 | 65 | 40 | 34 | 58 |
| C | 59 | 64 | 40 | 33 | 56 |
| F | 58 | 63 | 38 | 33 | 55 |
| B | 54 | 59 | 34 | 28 | 52 |
| G | 50 | 55 | 33 | 28 | 48 |
| J | 42 | 47 | 21 | 17 | 40 |
| E | 40 | 44 | 23 | 19 | 38 |
| I | 39 | 43 | 21 | 17 | 38 |
| H | 37 | 40 | 24 | 18 | 35 |
| D | 37 | 41 | 21 | 16 | 36 |

CONCLUSIONS

The tables in this report show that the present pass/fail rule produces
a higher and sometimes much higher passing rate than the other rules
that were investigated.  We also found that even when two rules, such as
A and C, produce very similar passing rates, they may differ in who they
pass.  Nevertheless, the relative effect of a given rule on the passing
rate tends to be very similar across school types, racial/ethnic and sex
groups, and applicants who have and have not taken the exam previously.
In short, if a given rule produces a higher passing rate than another
rule for one group then it also tends to produce a somewhat higher rate
for a different group.

A difference in passing rates between rules is, of course, a function
of the score(s) required for passing under those rules.  In this report,
we used passing scores that coincided with the standards that were used
in the past; e.g., passing a question corresponds to a raw score of 70
and passing a section corresponds to earning 70 percent of the maximum
possible score on that section.  Lowering these standards would, of
course, increase passing rates whereas raising them would have the
opposite effect.

Most of the rules investigated in this report produced lower passing
rates than the current rule because the traditional standard for passing
an essay question or the written section is harder to achieve than is
the traditional pass/fail standard on the MBE (140 scale score points).
This is most clearly seen in the difference in passing rates between
rules C and D.  Thus, in general, the greater the weight a rule placed
on Written raw scores, the lower its passing rate.

PR-88-5

# TEMPORAL TRENDS IN LSAT, MBE, AND ESSAY SCORES

Stephen P. Klein, Ph.D.

Roger Bolus, Ph.D.


GANSK & Associates

October 27, 1988

## TEMPORAL TRENDS IN LSAT, MBE, AND ESSAY SCORES

The research described in this report investigated whether an applicant with a given Law School Aptitude Test (LSAT) score was likely to earn a higher (or lower) Multistate Bar Examination (MBE) score on a recent administration of the MBE versus one given a few years ago. In short, are MBE scores drifting upwards (or downwards) over time relative to LSAT scores?

This research also examined whether Essay scores have changed over time and whether the relationship between Essay and MBE scores has changed. These issues were investigated to provide benchmarks for interpreting possible changes in the LSAT/MBE relationship.

If an upward drift in MBE scores is observed relative to LSAT, it could be due to improved legal education, increased effectiveness of bar review courses, a breach in the MBE's security, a change in the LSAT's psychometric properties, or some combination of these and other factors.

### SAMPLES

The samples for this research consisted of applicants who had a two-digit LSAT score and who also took the bar exam for the first time between July 1985 and February 1988 (i.e., a total of six exams). The February 1986 sample was curtailed because many of the first timers on this exam had a three-digit rather than a two-digit LSAT score.

### VARIABLES

The variables used in this research were LSAT score, MBE score, and average raw score on an essay question. The latter variable was the the mean of an applicant's six essay scores. A raw score of 70 is considered just passing by the essay graders. We also examined the average raw Performance Test (PT) score on each exam.

RESULTS

Table 1 shows that after controlling for exam date (February versus July), the mean score on all variables has generally increased slightly over time.  The three exceptions are: the 2/88 LSAT score which was very slightly lower than the 2/87 LSAT; the 7/87 Essay was slightly lower than the 7/86 Essay; and the highest PT score was on the 7/85 exam.

Table 1

SUMMARY STATISTICS BY EXAM

| Exam | Number of applicants | LSAT | MBE | Raw Essay | Raw PT |
|------|----------|------|-----|-----------|--------|
| 2/86 | 708  | 30.6 | 138.7 | 65.5 | 66.2 |
| 2/87 | 1054 | 32.7 | 144.7 | 67.9 | 67.0 |
| 2/88 | 1148 | 32.4 | 146.8 | 68.3 | 68.4 |
| 7/85 | 4446 | 34.6 | 146.0 | 67.7 | 70.6 |
| 7/86 | 4362 | 35.2 | 148.1 | 68.8 | 69.1 |
| 7/87 | 4590 | 35.3 | 148.3 | 68.0 | 69.6 |

Table 2 shows the typical MBE score at various LSAT score levels.  For example, on the average, applicants with an LSAT of 35 earned an MBE of 147 on the July 1985 exam and a 144 on the February 1986 exam.

The data in Table 2, which are based on the linear regression equation between LSAT and MBE, suggest that there has been a very slight (albeit inconsistent) increase in MBE scores over time relative to LSAT.  For instance, the average of the 7/85 and 2/86 exams for applicants with an LSAT of 35 was about 146.  On the next two exams (7/86 and 2/87), their average rose to 148.  And, it went to 149 on the last two exams studied.

Table 2

AVERAGE MBE SCORES AT VARIOUS LSAT SCORE LEVELS

| Exam | 20 | 25 | 30 | 35 | 40 | 45 |
|------|----|----|----|----|----|----|
| 7/85 | 127 | 134 | 140 | 147 | 153 | 159 |
| 2/86 | 126 | 132 | 138 | 144 | 150 | 156 |
| 7/86 | 129 | 135 | 142 | 148 | 154 | 161 |
| 2/87 | 128 | 135 | 141 | 148 | 154 | 161 |
| 7/87 | 130 | 136 | 142 | 148 | 154 | 160 |
| 2/88 | 132 | 138 | 144 | 150 | 156 | 162 |

Table 3 shows that after holding LSAT constant, there has not been a gradual rise or fall over time in average Essay scores. For instance, an applicant with an LSAT of 35 would earn, on the average, a raw Essay question score of about 68 or 69 regardless of which test was taken.

Table 3

AVERAGE ESSAY SCORE AT VARIOUS LSAT SCORE LEVELS

| Exam | 20 | 25 | 30 | 35 | 40 | 45 |
|------|----|----|----|----|----|----|
| 7/85 | 63 | 65 | 66 | 68 | 69 | 71 |
| 2/86 | 63 | 64 | 65 | 67 | 68 | 69 |
| 7/86 | 64 | 65 | 67 | 69 | 70 | 72 |
| 2/87 | 64 | 65 | 67 | 69 | 70 | 72 |
| 7/87 | 62 | 64 | 66 | 68 | 70 | 72 |
| 2/88 | 65 | 66 | 68 | 69 | 71 | 72 |

Table 4 shows that the correlation between LSAT and MBE scores has
remained virtually unchanged over time.  The correlation between LSAT
and Essay scores has varied slightly over time, but not in a consistent
manner.  For instance, it has not been steadily rising or falling nor is
it always greater at one time of the year than at another.  The same can
be said about the MBE/Essay relationship.  However, this relationship is
always stronger than the other two relationships.

Table 4

CORRELATIONS AMONG MEASURES

| Exam | LSAT -MBE | LSAT- Essay | MBE- Essay |
|------|-----------|-------------|------------|
| 7/85 | .55 | .37 | .59 |
| 2/86 | .55 | .37 | .60 |
| 7/86 | .55 | .38 | .63 |
| 2/87 | .56 | .41 | .67 |
| 7/87 | .53 | .43 | .65 |
| 2/88 | .55 | .40 | .65 |

DISCUSSION AND CONCLUSIONS

There has been a small increase in MBE scores during the past three
years.  However, most (but not all) of this increase can be accounted
for by a corresponding increase in LSAT scores.  Moreover, the
inconsistencies in this MBE trend suggest that it could be due to
chance.  And, Essay and PT scores also have tended to increase during
the same period that the MBE scores rose.

The strength of the relationship between LSAT scores and the MBE was
virtually the same on the six exams studied (r = .55).  And, although
there has been some variation in the strength of the relationship
between MBE and Essay scores over time, this variation is not related to
when the test was given.  For example, the relationship has not gotten

consistently weaker over time (such as would likely occur if the MBE's security was being gradually breached).

The stability of the Essay results across exams relative to LSAT scores suggests that the Committee's Board of Reappriasors continues to be very effective in maintaining consistent grading standards.  An applicant with a given level of academic ability (as measured by LSAT) earns about the same Essay score regardless of when that applicant took the exam.

Taken together, the statistical evidence presented in this report suggests that nothing has happened recently to affect the bar exam scores of large numbers of applicants.  Thus, the interpretation of an MBE or Essay score (in terms of the level of proficiency to which it refers) appears to be about the same today as it was three years ago. Nevertheless, the next few exams should be monitored to see if there is a continuation of the slight upward spiral in MBE scores relative to LSAT.  If there is, then this matter should be revisited.

SOURCES OF VARIATION IN PASSING RATES
ON CALIFORNIA BAR EXAMINATIONS

Stephen P. Klein, Ph.D.
July 25, 1983

The analyses presented in this report were conducted to investigate
possible sources of the generally declining passing rate on the California
Bar exam.  The data presented in this report are an updated version of
those presented in a study of the 1976 to 1980 exams.

The first portion of the report summarizes the procedures used to determine
whether the variation in passing rate was due to changes in the exam's
difficulty (standard for passing) versus changes in the average ability
level of those taking it.  The remaining sections discuss the results of
these analyses relative to other data about the applicant pool.

The statistics presented in the attached tables differ slightly from those
reported by the State Bar of California because the data in the tables are
based on just the applicants who sat for both the essay and MBE portions of
the exam.

PROCEDURES

The following procedures were used to construct a Difficulty Index (DI) for
each exam given between February 1976 and 1983:

1) Identify the sample of applicants who took both the essay and MBE
   portions of the exam.  Run all analyses, including the computation
   of average scores, on this sample.

2) Convert California's MBE scores to the same units of measurement
   as used by National Conference of Bar Examiners for reporting MBE
   scale scores.  Note that NCBE scale scores are adjusted for the
   difficulty of the MBE questions asked on one administration
   relative to those asked on other administrations.  Thus, a scale
   score on one administration indicates the same performance level
   as that same score on another administration regardless of any
   differences between administrations in the average difficulty of
   their questions.

3) Compute an essay score for each applicant by obtaining his/her
   average score on an essay answer across all the answers graded for
   that applicant (including those read twice) and then multiply this
   score by 9 (the number of essay questions on the exam).

4) Convert the essay scores to a distribution having the same mean
   and standard deviation as the applicants' NCBE/MBE scale scores.
   This step converts essay raw scores to scale scores in order to
   adjust for any variations in the difficulty of the essay section
   across administrations.  It does not change an applicant's
   relative standing on the on essay.

5) Compute each applicant's Total Adjusted Score as follows: Total
   Adjusted Score = (.4)(MBE Scale Score) + (.6)(Essay Scale Score)

6) Inspect the distribution of Total Adjusted Scores to determine the score that would pass the same percentage of applicants as actually passed, including those who passed by reappraisal. This score is the exam's DI. The higher the DI, the more difficult the exam.

RESULTS

Tables 1 and 2 show that prior to 1981, the February exams tended to be slightly easier to pass than the July exams even though February's passing rate was much lower than July's rate. Since 1981, the February DI (142-143) has been about the same as the July DI. Thus, the recent decline in the percent passing the February exam is attributable mainly to a drop in the average performance level of those taking it rather than to an increase in standards. The July decline in passing rate is almost entirely due to a decline in average performance level. The increased time limits on some of the February and July 1982 essay questions apparently did not affect the passing standards on these two exams.

Tables 3 and 4 show that the declines in passing percentage generally parallel drops in the percent of first timers and ABA graduates taking the examination. The average NCBE/MBE scale scores of February but not July ABA graduates also has been declining. Average MBE scores and passing rates of July ABA first timers have remained relatively stable.

Most applicants who failed the exam did so because of low essay scores or low scores on both the essay and the MBE. Less than 4% of those taking the exam failed the MBE but passed the essay (see Tables 5 and 6). The percent passing the MBE was 22.4% higher than the percent passing the essay on the July 1982 exam and 20% higher on the February 1983 exam. Thus, the passing rate in California would have been much lower than what was obtained had pass/fail status been based solely on the essay portion of the exam.

The decline in California's average February MBE scores since 1979 has not been paralleled by a decline in average MBE scores in other states (see Tables 7 and 8). For instance, the NonCalifornia February average has remained at about 134 even though the California average slipped from its 1977-1979 average of 139 to a 136 in 1983.

DISCUSSION AND CONCLUSIONS

The decline in July's passing rate is not due to an increase in standards whereas February's decline is due partly to a slight increase in standards. As a result of this increase, the February standard is now comparable to the July standard.

A large portion of the February decline and all of the July drop are highly related to a decrease in the percentage of first timers and ABA graduates taking the exam. The February but not the July decline appears to be exacerbated by a drop in the average MBE scores of ABA graduates; even the typically more able applicant is now performing less well in February.

Possible explanations for the declining passing rate include changes in: law school admissions policies, testing practices, educational programs, academic standards; applicant study habits or motivation; the effectiveness of bar review courses; or a combination of these and other nonexam factors.

Table 1

DIFFICULTY INDEXES FOR FEBRUARY EXAMS

| Year | Number of applicants | Percent passing | Difficulty Index (DI) |
|------|---------------------|-----------------|----------------------|
| 1976 | 3088 | 38 | 141 |
| 1977 | 3399 | 44 | 141 |
| 1979 | 4166 | 45 | 141 |
| 1980 | 3758 | 34 | 141 |
| 1981 | 3837 | 33 | 142 |
| 1982 | 4033 | 31 | 143 |
| 1983 | 4200 | 28 | 142 |

Table 2

DIFFICULTY INDEXES FOR JULY EXAMS

| Year | Number of applicants | Percent passing | Difficulty Index (DI) |
|------|---------------------|-----------------|----------------------|
| 1976 | 6709 | 60 | 143 |
| 1977 | 7191 | 55 | 142 |
| 1978 | 6835 | 55 | 142 |
| 1979 | 7152 | 55 | 142 |
| 1980 | 7379 | 49 | 142 |
| 1981 | 7080 | 50 | 142 |
| 1982 | 7038 | 49 | 143 |

The higher the DI, the harder the exam was to pass.  Variation in essay
grading standards is the primary source of any variation in DI's across
administrations of the California Bar Exam.  The DI is not affected by
possible variations in the difficulty of MBE or essay questions from one
exam to the next.  The DI does not correspond to the number of MBE items
an applicant needs to answer correctly in order to pass.

- 4 -

Table 3

SUMMARY STATISTICS FOR FEBRUARY TESTS

| | | All Applicants | | | | ABA Graduates | | |
|---|---|---|---|---|---|---|---|---|
| Year | Total Number | % pass | % 1st timers | Mean MBE | DI | % of total | % 1st timers | Mean MBE |
| 1976 | 3088 | 38 | 38 | 137 | 141 | 49 | 16 | 144 |
| 1977 | 3399 | 44 | 35 | 139 | 141 | 43 | 14 | 146 |
| 1979 | 4166 | 45 | 32 | 139 | 141 | 43 | 13 | 146 |
| 1980 | 3758 | 34 | 36 | 136 | 141 | 42 | 14 | 145 |
| 1981 | 3837 | 33 | 34 | 138 | 142 | 41 | 13 | 146 |
| 1982 | 4033 | 31 | 32 | 137 | 143 | 40 | 11 | 143 |
| 1983 | 4200 | 28 | 30 | 136 | 142 | 39 | 10 | 140 |

Mean MBE = (Average California MBE score)/(3.0); percentages are percentage of the total number of all applicants.

Table 4

SUMMARY STATISTICS FOR JULY TESTS

| | | All Applicants | | | | ABA Graduates | | |
|---|---|---|---|---|---|---|---|---|
| Year | Total Number | % pass | % 1st timers | Mean MBE | DI | % of total | % 1st timers | Mean MBE |
| 1976 | 6709 | 60 | 77 | 145 | 143 | 64 | 54 | 152 |
| 1977 | 7191 | 55 | 77 | 143 | 142 | 61 | 52 | 150 |
| 1978 | 6835 | 55 | 80 | 145 | 142 | 62 | 55 | 151 |
| 1979 | 7152 | 55 | 74 | 144 | 142 | 62 | 53 | 150 |
| 1980 | 7379 | 49 | 69 | 141 | 142 | 62 | 50 | 148 |
| 1981 | 7080 | 50 | 68 | 142 | 142 | 55 | 45 | 149 |
| 1982 | 7038 | 49 | 66 | 142 | 143 | 55 | 44 | 149 |

Mean MBE = (Average California MBE score)/(3.0); percentages are percentage of the total number of all applicants.

Table 5

PERCENTAGE OF APPLICANTS IN EACH PASS/FAIL
CATEGORY ON THE JULY 1982 EXAMINATION

Essay

|     |      | Fail | Pass | Total |
|-----|------|------|------|-------|
| M   | Fail | 38.1 | 3.5  | 41.6  |
| B   |      |      |      |       |
| E   | Pass | 25.9 | 32.5 | 58.4  |
|     | Total| 64.0 | 36.0 | 100.0 |

Table 6

PERCENTAGE OF APPLICANTS IN EACH PASS/FAIL
CATEGORY ON THE FEBRUARY 1983 EXAMINATION

Essay

|     |      | Fail | Pass | Total |
|-----|------|------|------|-------|
| M   | Fail | 55.5 | 3.5  | 60.0  |
| B   |      |      |      |       |
| E   | Pass | 24.5 | 16.5 | 40.0  |
|     | Total| 80.0 | 20.0 | 100.0 |

- 6 -

Table 7

NATIONAL AVERAGE MBE SCORE AND THE NUMBER OF
EXAMINEES TAKING THE MBE FROM 1975 TO 1983

| | Average MBE | | No. of Examinees | |
|------|-------|-------|--------|--------|
| Year | Feb | Jul | Feb | Jul |
| 1975 | 136.0 | 143.5 | 10,963 | 24,835 |
| 1976 | 134.5 | 142.4 | 12,610 | 28,381 |
| 1977 | 135.3 | 140.7 | 13,738 | 28,608 |
| 1978 | 135.5 | 141.4 | 13,715 | 29,171 |
| 1979 | 135.4 | 141.0 | 15,341 | 34,818 |
| 1980 | 134.3 | 140.6 | 16,948 | 36,368 |
| 1981 | 135.8 | 140.8 | 17,289 | 36,846 |
| 1982 | 134.8 | 139.7 | 18,150 | 36,995 |
| 1983 | 134.2 | | 17,964 | |

Table 8

CALIFORNIA AND NONCALIFORNIA AVERAGE MBE SCORES

| | February | | July | |
|------|-----|-------|-----|-------|
| Year | CA | NonCA | CA | NonCA |
| 1976 | 137 | 134 | 145 | 142 |
| 1977 | 139 | 134 | 143 | 140 |
| 1978 | 139 | 134 | 145 | 141 |
| 1979 | 139 | 134 | 144 | 140 |
| 1980 | 136 | 134 | 141 | 140 |
| 1981 | 138 | 134 | 142 | 141 |
| 1982 | 137 | 134 | 142 | 140 |
| 1983 | 136 | 134 | | |

RESEARCH ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
September 9, 1987

This report summarizes the major findings of studies conducted on the California bar examination during the past 12 years. These studies investigated various characteristics of the exam (such as the adequacy of its time limits), essay grading practices, the stability of pass/fail standards, possible racial/ethnic and sex biases, and the relationship between traditional and non-traditional measures of lawyering skills.

## A. ESSAY SECTION

1) The more questions an applicant answers, the more reliable the total essay score; i.e., the less likely the total essay score will be influenced by chance, such as an applicant's knowledge or ignorance of a particular facet of the law.

2) Total essay scores, by themselves, are not sufficiently reliable for making pass/fail decisions on individual applicants. This is true even if the essay section contains 12 questions.

3) Essay scores on different questions in the same content area usually correlate no more highly with each other than they do with scores on essay questions in other content areas. This finding suggests that differences in total essay scores among applicants are more a function of general legal knowledge and ability than they are of differences in the mastery of specific subjects.

4) Increasing the time applicants have to answer a question from 55 to 90 minutes usually resulted in only a slight improvement in score. It did not systematically change the relative standings of various groups. For instance, applicants who earned low scores under the shorter time limit did not benefit any more or less from the increased time than did other applicants.

5) Analytic (scorecard) grading is not as cost effective as holistic grading. The small increase in reliability gained through scorecard grading is more than offset by the subtantially longer time it takes readers to grade papers using this approach.

6) Applicants who type (versus handwrite) their answers earn about the same essay scores as would be expected on the basis of their MBE scores; i.e., typing does not tend to raise or lower essay scores. We do not know whether applicants would earn the essay same scores if they were required to change from their preferred response mode.

## B. PERFORMANCE TEST (PT)

1) PT answers are graded just as reliably as essay answers.  And, the score on a PT problem is about as reliable as the score on an essay question.

2) Two PT problems usually correlate about as highly with each other as each one does with a typical essay question.  This finding was considered in the decision to combine essay and PT scores into a single written score starting with the February 1987 exam.

3) Applicants who have been admitted to practice in other states generally score no higher or lower on the PT than would be expected on the basis of their scores on the other sections of the exam. This finding holds up even after controlling for length of time in practice and for attorneys who take just the PT and essay as well as for those who take all three sections.

4) Applicants believe the PT is a more valid measure of their ability to practice law than is either the Essay or MBE.

## C. MULTISTATE BAR EXAMINATION (MBE)

1) There is a high correlation between MBE and essay scores.  If the percent passing both sections was the same, the MBE and essay would make the same pass/fail decision for about 70 to 80 percent of the applicants.  The rank ordering of law schools in terms of average MBE score is essentially identical to their rank ordering in terms of average essay score.

2) Similarity of content coverage does not appear to be the source of the close relationship between MBE and essay scores.  For instance, scores on the MBE Contracts subtest usually correlate no more highly with scores on an essay question in Contracts than they do with scores on an essay question in Evidence.  And, when an essay question is converted to a set of multiple choice questions, applicant scores on these items correlate more highly with MBE scores than they do with essay scores.

3) Differences in an applicant's grades among courses in law school do not necessarily coincide with differences in that applicant's scores on MBE subtests; e.g., doing especially well in contracts in law school relative to other subjects may or may not result in an elevated score on the MBE contracts section.  The same finding also holds for the essay section.

4) MBE scores are very reliable.  For example, an applicant's score on the first 100 questions provides a very accurate prediction of that applicant's score on the next 100 questions.  Thus, even though applicants are allowed to guess, their scores are not due to chance.

5) Lengthening the time applicants are given to answer a set of MBE
   questions tends to increase scores slightly for all groups.  For
   instance, all of the four most populous racial/ethnic groups who
   take the exam (Anglo, Asian, Black, and Hispanic) had about a 5
   percent increase in average MBE score after being given more than
   a 50 percent increase in time limits.

## D. REREADING AND REAPPRAISAL

1) The degree of agreement between readers in the scores they assign to
   the same essay answer is almost as high as when a single reader
   grades the same answer twice.

2) The average of two readers' grades on the same essay answer produces
   a more reliable score than does a single reading of that answer.

3) It is rare for two readers to assign substantially different grades
   to the same answer.  When large differences do occur, they are
   almost always a function of chance variation around the applicant's
   true score rather than one reader making a clear mistake in grading.

4) Consistently using the higher (or lower) of the two scores assigned
   to an answer results in lower test reliability than does using the
   average of the two scores.

5) The scores assigned to an answer on the second reading tend to be
   slightly lower than those assigned on the first reading.

6) The reread and reappraisal bands have been set at about the right
   place in that they include essentially all of the applicants whose
   pass/fail status might be affected by reread and reappraisal.

7) The degree of agreement between reappraisers is comparable to the
   degree of agreement between readers (when the reappraisers do not
   see the grades assigned by the readers).

8) The reappraisal process does not increase test reliabiltiy, but it
   does increase the percent passing the exam.  It also widens the gap
   in score between those who do and do not pass; i.e., as a result of
   reappraisal, only a handful of applicants fail by a few points.

## E. TOTAL SCORES AND PASS/FAIL STANDARDS

1) The Total bar exam score (after all readings) provides a
   sufficiently reliable index for making pass/fail decisions about
   individual applicants.

2) The score required for passing in California is similiar to that
   used by Oregon, but higher than the one used by most other states.
   For instance, California's passing rate for first timers would

increase substantially if it used New York's or Massachusetts' passing score.

3) There is a strong correlation between total bar exam scores and performance on legal problems that mirror closely several of the tasks that newly licensed attorneys would be expected to perform. And, the standard for passing these practice oriented problems was identical to the one used on the bar exam even though it was set without knowledge of the bar exam's standard.

4) In the past, the actual standard for passing in California was slightly lower in February than in July (as indicated by the MBE score that was required to produce the same passing rate as was actually observed on each exam). And, the standard for passing on both the February and July exams rose slightly during the last few years. These differences should disappear with the use of scaling.

5) First time takers are much more likely to pass than are repeaters. And, the higher the initial score, the greater the likelihood of eventually passing and doing so with just one or two more attempts. However, some repeaters eventually pass even though they had very low initial scores and/or made several previous attempts to pass.

6) Studies of first time takers on two recent exams reveal that about 70 percent of them eventually pass (i.e., after as many as five subsequent attempts). Almost 85 percent of all first time ABA takers eventually pass and about 63 percent of all minority ABA first timers eventually pass.

7) Most of the repeaters who eventually pass do so after their second or third attempt. The likelihood of passing after the third attempt is quite low.

## F. CHANGES IN BAR EXAM PROCEDURES AND RULES

During the past 15 years, several procedures and rules were changed in an effort to improve the exam. Some of these changes, such as the use of multiple readers for applicants near the pass/fail line and greater emphasis on reader calibration, have had their anticipated beneficial effects on overall exam quality.

Other procedures did not have their intended impacts and were later discontinued. This latter category includes: (1) the use of extra long essay time limits, (2) giving applicants some choice in which essay questions they answered, and (3) allowing repeaters to pass the exam in sections (the so called "bifurcation" rule). For example, the repeaters' passing rate dropped when this rule was introduced and rose after it could no longer influence their success rate.

In February 1987, scores on the essay and PT were combined into one total score and this score was then converted ("scaled") to the same score distribution as that used on the MBE. The standard for passing

was set at the average of the standards used on the previous 20 exams.
The February 1987 passing rate was the highest February rate in the last
10 years, thus "scaling" (and its associated pass/fail rules) did not
lower the passing rate.

## G. CORRELATES OF SUCCESS ON THE BAR EXAM

1) Law School Admission Test (LSAT) scores and law school grade point
   average (LGPA) are highly correlated with scores on all three parts
   of the bar exam (MBE, Essay, and PT). However, even when used
   together, LSAT and LGPA provide less than a perfect prediction of
   an applicant's pass/fail status on the exam.

2) School type (ABA, California Accredited, or Unaccredited) is not
   correlated with success on the bar exam after factoring out each
   type's average LSAT score. In other words, the generally higher bar
   exam passing rates of ABA schools is closely associated with these
   schools having students with relatively high LSAT scores.

3) The rank ordering of law schools in terms of the average LSAT
   scores of their graduates produces an almost perfect prediction of
   these schools' bar exam passing rates. It also provides a very good
   prediction of their average scores on the various sections of the
   exam. These findings may not apply to the many unaccredited schools
   that do not provide their graduates' LSAT scores.

4) Scores on the first year law student's exam are highly correlated
   with bar exam scores. An applicant who just passes the first year
   test is likely to fail the bar exam on the first attempt but pass
   on a subsequent attempt. Thus, the passing score on this test
   appears to be set at about the right place in that it tends to
   pass those students who have a reasonable chance of eventually
   passing the bar exam.

5) Applicants whose LSAT scores are well below the average of their
   classmates' LSAT scores (such as those who enter law school via
   special admissions programs) do about as well in law school and
   on the bar exam as would be expected on the basis of their LSAT
   scores. In other words, attending a school where most of the
   other students have substantially higher LGPAs and LSAT scores
   does not reduce or enhance an applicant's chances of passing the
   bar exam.

6) Applicants whose undergraduate major was English, Journalism, or
   Philosophy tended to earn slightly higher bar exam scores and
   especially essay scores than other applicants. However,
   undergraduate major was only a very weak predictor of bar scores.
   The pattern of undergraduate majors was quite similar across all
   racial/ethnic groups; e.g., about one third of the applicants in
   each group majored in History, Government, or Political Science.

## H. ANALYSES BY SEX AND RACIAL/ETHNIC GROUP

1) After controlling for differences in overall difficulty across test sections, men tend to earn slightly higher MBE scores than essay or PT scores while the reverse is true for women. This trend even held for women who had an undergraduate major in the hard sciences.

2) In the past, women used to have higher average scores than men. However, this difference has been declining rapidly. This decline parallels the increasing percentage of applicants who are women.

3) Applicant sex does not predict bar exam scores after controlling on LGPA; i.e., overall, the exam does not tend to favor one group.

4) There are large differences in average scores among racial/ethnic groups. However, there also is considerable overlap of score distributions. Because of this overlap, racial/ethnic group is only a very weak predictor of an applicant's pass/fail status.

5) The small correlation between bar scores and racial/ethnic group disappears when there is control for the applicant's LGPA. In other words, the differences in passing rates among groups on the bar exam is comparable to the differences among them in law school grades. The bar exam neither widens or narrows this gap.

6) The foregoing findings hold for all three types of exam questions (MBE, essay, and PT). Thus, no section tends to favor a given group (after controlling for differences in reliability among sections).

7) None of the MBE, essay, or PT subtests tend to widen or narrow the differences in average score among groups. For instance, MBE Torts questions are not especially difficult for a given group relative to this group's performance on other MBE questions.

8) The grades assigned to an essay answer are not affected by whether the reader's racial/ethnic group is the same or different than that of the applicant who wrote the answer.

9) During each of the past 10 years, one person in 10 who passes the California bar exam belongs to a racial/ethnic minority group. About one applicant in seven who takes the exam for the first time is a member of a racial/ethnic minority group.

10) Minority applicants are more likely to come from the most selective law schools in the state (as reflected by their school's average LSAT score) than are Anglo applicants.

11) The eventual passing rates among minority group members is much higher than their initial rates. As a result, most minority applicants eventually pass the exam (although they are likely to require more attempts to do so than their Anglo classmates).

## I. NOVICE/GRADUATE STUDY

Sections of the July 1985 bar exam were given to students at four ABA schools shortly after they began law school. Their scores were then compared with those of 1985 graduates from these same schools. The major findings of this study were:

1) The graduates scored substantially higher than the novices. In fact, none of the novices passed any section. And, the chances are essentially nil that any novice would even come close to passing the general bar exam.

2) LSAT scores were not related to the novices' bar scores, but were related to the graduates' bar scores.

3) Although there were large differences in average LSAT scores among racial/ethnic groups within the novice sample, there was no difference in their average bar exam scores.

4) The more reliable the bar exam test section, the greater the difference in average score between novices and graduates.

Taken together, these findings debunk various criticisms of the bar exam. They show that bar scores are not just a function of guessing, chance, or being adept at taking certain types of tests. Similarly, scores on essays and PT problems are not primarily a function of general writing or reasoning skills as distinct from the abilities developed in law school. And finally, although the PT provides applicants with all of the law, case materials, and facts on which to base their answers, applicants still need a legal education to do well on these problems.

## J. ASSESSMENT CENTER AND SPECIAL SESSION STUDIES

Several studies were conducted in conjunction with the July 1980 exam. These studies examined how well the MBE and essay sections correlated with more practice oriented measures of lawyering skills. These measures included tests of trial practice skills, legal research skills, interviewing and counseling clients, examining witnesses, making opening statements and closing arguments, preparing legal memos, etc. Some of these tasks were oral whereas others were written and/or observational. The major findings of this research were that:

1) Applicants who had the abilities needed to do well on these tasks also tended to have the skills and knowledge that were required to do well on the bar exam. This conclusion stems from the finding that scores on the special observational, oral, and written tasks correlated highly with regular bar exam scores (and to about the same degree as the MBE and essay correlated with each other).

2) Although an applicant's responses on an experimental tasks usually took longer to grade than a typical essay answer, the scores on these tasks were just as reliable as they were on an essay answer.

8

3) After controlling for differences in reliability among measures, scores on the practice oriented tests did not widen or narrow the the gap in average performance level among racial/ethnic groups

4) Most applicants thought the practice oriented tasks were a better indicator of their ability to function as an attorney than were either the MBE or the essay.

5) The pass/fail standards established by an independent panel for the practice oriented tasks coincided with the pass/fail standard for the bar exam even though the panel did not know the applicants' bar exam scores.

## REFERENCES

Two reports are prepared for each administration of the California bar exam: Summary Statistics (prepared by Philip Schoner) and Technical Report (by Stephen Klein). The American College Testing Program (ACT) provides a report on each administration of the MBE (the Educational Testing Service prepared similar reports on the MBEs given prior to the July 1984 exam).

Except as noted otherwise, all the references below were prepared by Stephen Klein as reports for the Committee of Bar Examiners.

A. Essay Section

An analysis of grading practices on the California Bar Examination (1977).

Summary of studies conducted for the Committee of Bar Examiners and the statistical rationale underlying proposed changes (1978).

Comparison of an 8, 9, and 12 answer essay test in a multiphased pass/fail decision model (1978).

The effect of time limits, item sequence, and question format on applicant performance on the California Bar Examination (1981). (PR-81-7).

Essay grading: Fictions, facts, and forecasts. The Bar Examiner, 1985, 54, 23-29.

Relationship between MBE and essay scores among applicants who did and did not type their answers (Memo of February 28, 1987).

B. PERFORMANCE TEST

An analysis of the Performance Test on the July 1983 California Bar
Examination (1984).

See also the Technical Report on each exam since July 1983.


C. MULTISTATE BAR EXAMINATION

Carlson, A. B. and C. Werts (1976).  Relationships among law school
predictors, law school performance, and bar examination results.
Princeton, NJ: Educational Testing Service.

The effect of time limits, item sequence, and question format on
applicant performance on the California Bar Examination (1981).

An evaluation of the Multistate Bar Examination.  National Conference of
Bar Examiners, Chicago (1982).

Summary of research on the Multistate Bar Examination.  The Bar
Examiner, 1983, 52, 10-15.

See also the Technical Report on each exam and the reports prepared by
ACT and ETS on each administration of the MBE.


D. REREADING AND REAPPRAISAL

Intra- and inter-reader agreement on the essay section of the California
Bar Examination (1980).

A comparison of the effectiveness of a single versus multiphased grading
system (1980).

Large discrepancies between readers: Their source and policy
implications (1985).

Schoner, Philip G. and Alex Millar (1987).  The relationship between
tentative/calibration grades and general bar examination grades.

See also the Technical Report on each exam.


E. TOTAL SCORES

Summary of studies conducted for the Committee of Bar Examiners and the
statistical rationale underlying proposed changes (1978).

An analysis of possible variations in pass/fail standards on the
California Bar Examination (1981). (PR-81-1)

An analysis of the relationship between clinical skills and bar examination results (1982).

An analysis of the relationship between initial score and eventual pass/fail status on the California Bar Examination (1982). (PR-81-9)

Results of the July 1982 and July 1984 Tracking Studies (DR-87-5 in preparation).

See also the Summary Statistics and Technical Report on each exam.


F. CHANGES IN BAR EXAM PROCEDURES AND RULES

How the bifurcation rule affected the percent passing California's General Bar Examination (1985). (PR-85-5)

Minority group performance on the California bar examination (in preparation DR-87-2).

See also the Technical Reports on each exam.


G. CORRELATES OF SUCCESS ON THE BAR EXAM

An analysis of possible sex and racial/ethnic biases in the July, 1976 California State Bar Examination (1978).

An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group (1979).  Summary reprinted in The Bar Examiner, 1980, 49, 14-18.

Preliminary report on the relationship between undergraduate major and bar examination scores (1982).

Minority group performance on the California bar examination (in preparation DR-87-2).


H. ANALYSES BY SEX AND RACIAL/ETHNIC GROUP

An investigation of possible item and grader biases in a state bar examination.  Paper presented at the meetings of the Western Psychological Association, Los Angeles, California, April 9, 1976.

Summary of studies conducted for the Committee of Bar Examiners and the statistical rationale underlying proposed changes (1978).

An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group (1979).  Summary reprinted in The Bar Examiner, 1980, 49, 14-18.

An analysis of the relationship between initial score and eventual pass/fail status on the California Bar Examination (1982).

Minority group performance on the California bar examination (in preparation DR-87-2).

See also the Summary Statistics and Technical Report on each exam.


I. NOVICE/GRADUATE STUDY

The performance of novice law students and law school graduates on the bar exam (1986).


J. ASSESSMENT CENTER AND SPECIAL SESSION STUDIES

Testing research skills on the California Bar Examination (1981).

An analysis of the relationship between clinical skills and bar examination results (1982).

An analysis of the relationship between trial practice skills and bar examination results (1982).

PR–88–8

# RELIABILITY AND VALIDITY OF THE FIRST YEAR
# LAW STUDENTS EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.


GANSK & Associates

December 27, 1988

RELIABILITY AND VALIDITY OF THE FIRST YEAR LAW STUDENTS EXAM

BACKGROUND

Students at unaccredited (but not ABA or California accredited) law schools must pass the First Year Law Students Exam (FYLX) to receive state bar credit for their first year of law studies. And, receipt of this credit is a prerequisite for taking the General Bar Examination (GBX) if the applicant graduates from an unaccredited school. However, some graduates of unaccredited schools are exempt from this requirement because they successfully completed their first year at an accredited or ABA school. Conversely, some applicants may have taken the FYLX and later transferred to an ABA or California accredited school.

The FYLX is a one day exam that is given twice per year (in June and October). It consists of 100 multiple choice questions and four essay questions, hereafter referred to as the FYLX-MC and FYLX-Essay. FYLX-MC raw scores (the number of questions answered correctly) are equated so that a given FYLX-MC scale score indicates the same level of proficiency regardless of the exam on which it was earned. Each essay answer is graded on a 0 to 100 scale so that the maximum possible total essay score is 400 points. The total FYLX score is the sum of the FYLX-MC scale and FYLX-Essay scores.

FYLX TEST CHARACTERISTICS

Table 1 shows the mean, standard deviation, and reliability of each of the FYLX's three scores on the June 1988 administration of this test. This exam was taken by 481 applicants, 36 percent of whom passed it (i.e., received a score of 560 or higher after reappraisal).

Table 1

SUMMARY STATISTICS ON THE JUNE 1988 FYLX

| FYLX Score | Mean | Standard deviation | Reliability |
|---|---|---|---|
| Multiple Choice | 256.04 | 44.53 | .864 |
| Essay | 267.30 | 26.55 | .665 |
| Total | 523.34 | 63.35 | .874 |

There was a .56 correlation between the FYLX multiple choice and essay scores on this exam. Standard statistical formulas estimate that this correlation would be about .74 if both measures were perfectly reliable. These statistics indicate that the applicants who earn relatively high scores on the FYLX-MC also tend to earn high FYLX-Essay scores, but this relationship is far from perfect even when both measures are corrected for reliability.

The reliability of the FYLX-MC, .864, compares favorably with the reliability of the 200-item multiple choice section on the GBX; i.e., the Multistate Bar Examination (MBE). For instance, the MBE usually has a reliability of about .88. If the FYLX-MC section was expanded to 200 items, its reliability would be about .93.

The reliability of the FYLX-Essay section, .665, is somewhat better than what would be expected given the reliability of the six-question essay section on the GBX. For example, if the FYLX-Essay section was expanded to six questions, its projected reliability (.75) would be higher than the .67 that is typically found with six GBX essay questions.

The reliability of the total FYLX score (.874) is comparable to that of the total GBX score (.849 in July 1985 and .871 in July 1986). And, it is high enough for the purposes of making pass/fail decisions about individual applicants.

The reason the total score is so reliable is that the FYLX-MC section is more reliable than the FYLX-Essay and the FYLX-MC carries substantially

more weight than the essay in determining whether one applicant has a
higher FYLX total score than another applicant.  This occurs because the
FYLX-MC's standard deviation is 1.68 times as large as the essay's
standard deviation (and when scores are simply added together to form a
total score, their relative weights are affected by the relative sizes
of their standard deviations).

One consequence of the FYLX-MC carrying more weight than the essay is
that the FYLX-MC accounts for 88 percent of the variance in total FYLX
scores whereas the essay accounts for only 66 percent.  In short, an
applicant's FYLX-MC score is an extremely good predictor of that
applicant's total FYLX score.

This strong relationship between FYLX-MC and total scores is illustrated
by the fact that if the passing score on the FYLX-MC was set so that it
passed the same number of applicants as actually passed the FYLX (i.e.,
36 percent), then the two measures would agree on the pass/fail status
for 85 percent of the applicants.


RELATIONSHIP BETWEEN FYLX AND GBX SCORES

State bar records were searched back to 1980 to find all the applicants
who had an FYLX score and who also took the GBX for the first time in
either July 1985 or July 1986.  This search found 244 applicants (130
from the 1985 exam and 114 from the 1986 exam).  If an applicant took
the FYLX more than once, we used the last and thereby the highest score
earned.  Only 7 of the 244 applicants (3%) took the FYLX in 1980.  Thus,
it appears our search went back far enough in time to capture virtually
all of the July 1985 and 1986 first timers who had an FYLX score.


Sample Characteristics

Only 123 of the 244 applicants (50 percent) graduated from an
unaccredited school.  The percent graduating from ABA and California
accredited schools were 7 percent and 36 percent, respectively.  The

remaining 7 percent were not assigned to a school (primarily because they took the GBX more than one year after graduation).

These data suggest that passing the FYLX may encourage some applicants to apply (or reapply) to accredited schools. It also may increase their chances of being admitted to these schools. However, the 89 applicants who graduated from California accredited schools tended to have slightly lower FYLX scores than the other 155 applicants in the sample (there was a -.19 biserial correlation between FYLX total score and graduating from a California Accredited school).

Table 2 presents summary statistical data on the 244 applicants for whom we could find both FYLX and GBX scores (the GBX-Written score was before scaling to MBE score distribution).

Table 2

SUMMARY STATISTICAL DATA FOR APPLICANTS WHO HAD
BOTH FYLX AND GBX SCORES (N = 244)

| Score | Mean | Standard deviation |
|---|---|---|
| FYLX-MC | 297.39 | 25.86 |
| FYLX-Essay | 284.36 | 17.74 |
| FYLX-Total | 581.76 | 32.26 |
| | | |
| GBX-MC (MBE) | 143.23 | 14.68 |
| GBX-Written | 673.36 | 50.38 |
| GBX-Total | 1425.65 | 138.79 |

Unaccredited School Graduates Without FYLX Scores

There were 54 applicants who did not take the FYLX but did take the GBX for the first time in July 1985 or July 1986. These applicants may have been exempted from the FYLX requirement because they successfully completed their first year of law studies at an ABA or California accredited school and then transfered to an unaccredited school.

The mean total GBX score in this group of 54 applicants (1224) was 200
points lower than the mean for the 224 applicants who were found (1426).
And, only 9 of the 54 applicants (17%) passed the GBX.  Thus, the
current policies for exempting applicants from the FYLX requirement err
on the side of leniency.  Moreover, these policies benefitted a large
share of the unaccredited school graduates (the 54 applicants without
FYLX scores constituted 31 percent of all the 177 unaccredited school
first timers from the July 1985 and 1986 cohorts).

Prediction of First Timer Scores

Table 3-A shows that the FYLX is a good predictor of GBX scores.  It
also shows that the combination of FYLX-MC and FYLX-Essay scores (i.e.,
FYLX-Total) is a better predictor of GBX-Total than is either measure by
itself.  We found that giving the FYLX-MC substantially more or less
weight than it now carries relative to the FYLX-Essay did not improve
the FYLX-Total's ability to predict total GBX scores.

Table 3-B shows what these correlations would have been if all the
applicants who took the FYLX also took the GBX (rather than just the
ones who passed the FYLX).  Thus, the values in Table 3-B are estimates
of the FYLX's ability to predict GBX scores.

The .70 validity coefficient for the FYLX total score would be
considered quite high relative to the validity coefficients of other
tests (such as the LSAT); and, it is comparable to how well law school
grade point average predicts GBX scores.  However, as with grade point
average, there is no single FYLX score that clearly distinguishes
between those who will versus will not pass the GBX.

Table 3-A

OBSERVED CORRELATIONS BETWEEN FYLX AND GBX SCORES

|  | FYLX-MC | FYLX-Essay | FYLX-Total |
|---|---|---|---|
| GBX-MC (MBE) | .46 | .17 | .46 |
| GBX-Written | .25 | .32 | .38 |
| GBX-Total | .35 | .30 | .45 |

Table 3-B

CORRELATIONS BETWEEN FYLX AND GBX SCORES AFTER
ADJUSTING FYLX SCORES FOR RESTRICTION IN RANGE

|  | FYLX-MC | FYLX-Essay | FYLX-Total |
|---|---|---|---|
| GBX-MC (MBE) | .67 | .25 | .71 |
| GBX-Written | .40 | .45 | .63 |
| GBX-Total | .54 | .43 | .70 |

The correction procedure used the standard
deviations from tables 1 and 2 to estimate
the variance in the unrestricted and
restricted samples, respectively.

Initial versus Eventual Pass/Fail Status

Overall, 43.4 percent of the sample of 244 applicants passed the GBX on
their first attempt. Another 25.4 percent passed after as many as five
subsequent attempts, which brought the total eventually passing to 68.8
percent. In short, an applicant who passes the FYLX has a slightly less
than a 50/50 chance of passing the GBX on the first try, but about a
two-thirds chance of eventually passing the GBX.

Table 4 shows that in general, the higher the FYLX score, the higher the
initial and eventual passing rates. The initial passing rate was more
closely associated with the FYLX score than was the eventual rate. And,
although 50 of the 51 applicants with an FYLX score over 607 eventually
passed the GBX, there were many applicants with scores below 607 who

also passed the GBX. Similarly, there was no minimum FYLX score that distinguished well between the applicants who did versus did not pass the GBX either on their first attempt or eventually.

Table 4

MEAN GBX SCORES AND PASSING RATES AS A FUNCTION OF FYLX SCORE

| FYLX Total | Number of applicants | Initial mean GBX total | Percent Passing GBX | |
|---|---|---|---|---|
| | | | Initially | Eventually |
| < 559 | 44 | 1380 | 25 | 48 |
| 559-569 | 47 | 1375 | 28 | 64 |
| 570-579 | 27 | 1375 | 26 | 56 |
| 580-589 | 32 | 1419 | 44 | 72 |
| 590-599 | 26 | 1419 | 42 | 65 |
| 600-609 | 20 | 1437 | 45 | 75 |
| 610-619 | 18 | 1544 | 89 | 100 |
| > 619 | 30 | 1554 | 83 | 96 |
| Total | 244 | 1426 | 43 | 69 |

## Correlations with Sex

Research on the GBX has shown that men tend to earn relatively higher MBE than essay scores whereas the reverse is true for women. The same trends were present for both the FYLX and GBX scores in the sample of 244 applicants (49 percent of whom were men). The biserial correlations between being male and FYLX-MC and FYLX-Essay scores were .15 and -.11, respectively. The corresponding correlations with MBE and GBX written scores were .14 and -.10.

## Correlations with Race

Past research also has shown that Anglos tend to earn higher GBX scores than non-Anglos. This trend also was found for GBX scores in the sample of 244 applicants (89 percent of whom were Anglos). The correlation between being Anglo and MBE, Written, and GBX total scores were .25, .15,

and .20, respectively. All of these coefficients were statistically significantly different than what would be expected by chance.

In contrast, race was not significantly correlated with any of the three FYLX scores (the correlations between race and FYLX-MC, FYLX-Essay, and FYLX-total scores were .06, .09, and .09, respectively).

It is not evident why in our sample of 244 applicants the FYLX scores were less sensitive to race than were the GBX scores. FYLX and GBX scores have comparable reliabilities and the disparity in race effects between the two exams was observed on both their essay and multiple choice sections.

Because of the potential importance of this finding for developing a better understanding of the source of racial disparities in bar scores, we also computed the correlations between FYLX scores and race for the 226 applicants who had such scores and who also had taken the GBX at least once before July 1985. In this group of repeaters (27% of whom were minority group members), the correlation between race and FYLX-MC, FYLX-Essay, and FYLX-total scores were .27, .01, and .23, respectively. Thus, only the FYLX-Essay remained racially neutral. However, the correlations of GBX scores with race in this sample did not follow the normal pattern (e.g., it was only .06 with the GBX written score).

The number of minority group members in the sample of 244 applicants (27) and in the latter sample (61) were too small to conduct analyses separately by racial group. Indeed, these small sample sizes, the potential selection effects in the repeater sample, and the differences in the mix of minority applicants across samples may have influenced the observed pattern of correlations. Thus, it is premature to draw any conclusions about the relationship of race to FYLX scores.

INTRA- AND INTER-READER AGREEMENT ON THE ESSAY

SECTION OF THE CALIFORNIA STATE BAR EXAMINATION.

A Report Submitted to the
Committee of Bar Examiners
of the State Bar of California

Prepared by
Stephen P. Klein, Ph.D.

June 10, 1980

PURPOSE

This study was conducted to determine the degree to which readers
agreed with themselves and each other in the grades they assigned
to essay anwers on the California State Bar Examination. This
study also investigated whether there was any systematic relation-
ship between the number of readers assigned to a question and the
degree of agreement between these readers.


PROCEDURES

The essay section on the July, 1979 California State Bar
Examination had three sessions. In each session, an applicant was
required to answer three of the four questions presented.

Each reader was assigned to grade the answers to one and only one
question. Because of the large number of applicants taking the
examination, each question had 7 to 15 readers (depending upon the
number of applicants who answered it). A total of 145 readers
participated in the grading process.

The score assigned to an answer could theoretically range from 0
to 100 points in five point increments. A score of 70 or higher
was considered as "passing" the question.

Five answers per question were selected from among the first batch
of answers that were graded on each question. The grades assigned
to these answers were: 60, 65, 70, 75, and 80. Copies of these
answers were then distributed among the remaining set of answers
each reader was supposed to grade; i.e., all the readers assigned
to a given question independently read the same set of five
answers. The answers in this common set were disguised so that
the readers could not distinguish them from the other answers they
graded or know the scores other readers assigned to them.


RESULTS

The results of this study are presented in Table 1. This table is
divided into three sections: inter-reader agreement, intra-reader
agreement, and agreement between the average and actual grade
assigned.

An inspection of the inter-reader data indicated the following:

   o The readers agreed with each other about 82 percent of the
     time as to the pass/fail status of any given answer; i.e.,
     whether or not it deserved a score of 70 or higher.

   o On the average, the grade assigned by one reader to an
     answer deviated 4 points from the grade assigned to that
     same answer by another reader. The largest deviation
     between any two readers of the same answer was 30 points.

Table 1

INDICIES OF INTER- AND INTRA-READER
AGREEMENT ON THE JULY, 1979 EXAMINATION.

| Quest. | No. of Readers | Inter-Reader Agreement | | | | Intra-Reader Agreement | | Average vs. Actual Score | |
|--------|----------------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|
| | | Pass Fail | Mean Dev. | Stan Dev. | Corr Coef | Pass Fail | Mean Dev. | Pass Fail | Mean Dev. |
| 1 | 10 | 88.0 | 3.7* | 4.9 | .35 | 80 | 6.0 | 80 | 6.1 |
| 2 | 15 | 90.7 | 3.5* | 5.2 | .61 | 100 | 4.0 | 100 | 3.7 |
| 3 | 13 | 76.9 | 4.3 | 5.1 | .43 | 80 | 4.0 | 60 | 4.2 |
| 4 | 10 | 72.0 | 4.0 | 5.4 | .26 | 80 | 4.0 | 60 | 4.2 |
| 5 | 7 | 82.8 | 5.4 | 6.6 | .52 | 80 | 5.0 | 80 | 5.1 |
| 6 | 15 | 78.7 | 4.5* | 6.0 | .43 | 100 | 4.0 | 40 | 5.6 |
| 7 | 15 | 82.7 | 3.8* | 5.3 | .45 | 100 | 5.0 | 60 | 4.6 |
| 8 | 11 | 83.6 | 3.6* | 5.0 | .48 | 80 | 7.0 | 60 | 5.5 |
| 9 | 15 | 77.5 | 5.2* | 6.6 | .51 | 80 | 5.0 | 80 | 2.9 |
| 10 | 7 | 88.6 | 2.4 | 3.2 | .70 | 60 | 5.0 | 100 | 4.4 |
| 11 | 15 | 82.7 | 3.6 | 5.1 | .46 | 80 | 5.0 | 80 | 3.1 |
| 12 | 12 | 76.7 | 3.4* | 4.3 | .51 | 80 | 6.0 | 80 | 4.1 |
| Average | 12 | 81.7 | 4.0 | 5.2 | .48 | 83 | 5.3 | 77 | 4.5 |

Pass/Fail = This the average percent of applicants whose pass/fail status was classified the same way by two readers.

Mean Dev. = The average number of points that the grade assigned to an answer by one reader deviated from the grade assigned to that same answer by another reader (in the case of intra-reader agreement, this is the average difference in the grade assigned to the same answer by the same reader on two different occasions).

The differences in average scores between readers on the questions marked by an asterisk (*) were not random; i.e., one or more readers was systematically more or less lenient than one or more other readers.  The probability that a difference marked by an asterisk was due to chance is less than 1 in 100.

o About two-thirds of the scores assigned to a given answer fell within 5.2 points of the average score assigned to that answer.

- o The grades assigned by one reader to a given set of five answers correlated about .48 with the grades assigned by another reader to these same answers. In other words, there was a moderate positive relationship in how any two readers rank ordered the answers.

- o There did not appear to be any systematic relationship between the number of readers assigned to a question and the degree of agreement between them. For example, even though question #5 had the highest average deviation (5.4) and question #10 had the lowest average deviation, they both had the same number of readers.

- o On seven of the 12 questions, there were statistically significant differences between readers in the scores they assigned; i.e., one or more readers was systematically more or less lenient than one or more of the other readers.

The second section of Table 1 provides information about the degree of intra-reader agreement. This information was gathered when a reader encountered in the common set one of the answers that reader had graded previously. The results of this analysis indicated the following:

- o A reader agreed with himself (or herself) about 83.3 percent of the time on the pass/fail status of an answer.

- o The score assigned by a reader on one ocassion usually deviated about 5 points from the score that same reader assigned to this answer on another ocassion.

The final section of Table 1 provides information with respect to the degree of agreement between the average grade assigned to an answer (i.e., across all the readers who scored it) and the actual grade on that answer (i.e., the one that was used in computing the applicant's pass/fail status). These data indicate the following:

- o The average percent agreement on the pass/fail status of an answer across all 60 answers was 76.7 percent. It was noted, however, that this overall rate was markedly affected by the unusually low degree of agreement on question #6.

- o The average degree of discrepancy between the actual and average score on an answer was 4.5 points; i.e., the actual grade usually deviated less than five points from the best estimate of that answer's quality.

CONCLUSIONS

This study investigated the extent to which readers agreed with themselves and each other in how they graded the answers on the essay portion of the California State Bar Examination. One major finding of this research was that readers agreed with themselves to about the same degree as they agreed with each other in terms of both the average score assigned to an answer and their evaluations of the relative quality of the answers. For example, the average agreement rate on the pass/fail decision was 83 percent within readers and 82 percent between readers. And, the usual discrepancy between two readers on an answer (or between two grades assigned by the same reader) was only four to five points. It was further observed that the degree of agreement on a question was not systematically related to the number of readers assigned to grade the answers to it.

In a previous study of essay grading practices on the California examination (Klein, 1977), it was found that two readers agreed with one other about 67 percent of the time on the pass/fail status of an answer as compared to the 82 percent in the present study. Thus, there has been a substantial increase in the overall consistency with which grades are assigned. This improvement is most probably attributable to the extra effort that is now taken to establish and maintain reader agreement through the use of benchmark answers, periodic calibration sessions, etc.

It should be noted, however, that there is still not perfect agreement between (or even within) readers in the grades they assign. Thus, on any given question, an applicant might receive a slightly higher or lower score than the applicant deserves. Nevertheless, such discrepancies are usually quite small and are likely to get balanced out since an applicant's essay score is based on the sum of the scores on nine questions.

As a result of this balancing process, the total essay score provides a reasonably reliable estimate of an applicant's true performance level. This is especially so for those applicants who fall near the pass/fail line since their answers are read twice by different sets of readers. In other words, the double reading essentially eliminates the effect of an applicant having drawn a particular group of readers for the first grading of his/her answers. Moreover, a failing applicant, who after the second reading is still close to passing, has his/her answers read again (as a set) by a member of the Board of Reappraisors.

Finally, the overall pass/fail decision on an applicant is made on the basis of a combined score (i.e., Essay plus Multistate Bar Examination). Data from the July, 1979 examination (Klein, 1980) indicates that this total score is sufficiently reliable for making pass/fail decisions about individual applicants. Thus, although two readers may not always agree on the score that should be assigned to a given answer, there are enough answers per applicant to be graded, enough rereadings of answers, and enough additional information (through the MBE) about an applicant's legal skills and knowledge to be certain that the final total score is an accurate indicator of an applicant's overall performance level.

REFERENCES

Klein, Stephen P. An Analysis of Grading Practices on the California Bar Examination. A report submitted to the Committee of Bar Examiners of the State Bar of California, December 15, 1977.

Klein, Stephen P. A Comparison of the Effectiveness of a Single Versus a Multiphased Grading System. A report submitted to the Committee of Bar Examiners of the State Bar of California, May 14, 1980.

SUMMARY OF STUDIES CONDUCTED FOR
THE COMMITTEE OF BAR EXAMINERS
AND THE STATISTICAL RATIONALE
UNDERLYING PROPOSED CHANGES

Prepared by
Stephen P. Klein
August 25, 1978

This report summarizes the results of a series of studies conducted on the State of California General Bar Examination. These studies have provided information regarding the statistical properties of the present examination process and the effects of certain modifications that might be made to improve this process. A summary of the changes that have been adopted and the rationale for them also are discussed.

BACKGROUND

The General Bar Examination has two sections. The Essay portion consists of three sets of five questions each. An applicant is instructed to select four questions per set to answer in the three-and-one-half hours allocated to each Essay test session. A given question involves several issues from one or more content areas, so that the Essay Test as a whole covers the major subject areas taught in law school. These questions are designed to assess an applicant's ability to analyze legal problems and are usually initially developed by non-California law professors. The questions are then revised and edited by the Committee of Bar Examiners, its staff, and the Board of Reappraisers.*/

During the past few years, four to five readers (all of whom are attorneys who have passed the examination) are assigned to each essay question. This team, under the direction of a

---

*/ The Board of Reappraisers is composed of nine attorneys who have had extensive experience as readers.

member of the Board of Reappraisers, researches the appropriate
ways of responding to the question, reviews an analysis of it
that was prepared by the professor who wrote it initially, and
reads a small sample of the answers that were written to it.  In
this way, the team develops mutually agreed upon scoring criteria
and standards.  The answers written by a group of 75 applicants
are then independently graded by all the members of the team in
order to assess the extent to which they are indeed calibrated to
one another.  Discrepancies in the interpretation of grading
procedures identified by this process are resolved via a conference
with the Committee of Bar Examiners, its staff, and the Board of
Reappraisers.  Once these steps are completed, all the answers to
the question are divided among the team members assigned to it,
although periodically certain answers are graded and discussed by
all the members of the team in order to help maintain interreader
consistency.

The second section of the examination consists of a six-hour
multiple choice test, called the Multistate Bar Examination
(MBE).  This test contains 200 questions that are divided among
six content areas:  Constitutional Law, Contracts, Criminal Law,
Evidence, Real Property, and Torts.  The MBE is developed by the
National Conference of Bar Examiners and is scored by the Educational
Testing Service of Princeton, New Jersey.

Each of the 12 essay questions answered by an applicant
is worth up to 100 points.  Scores on the MBE are weighted to
a maximum of 514 points so as to reflect the Committe of Bar

Examiner's policy that this section account for 30% of an appli-
cant's total score (i.e., the maximum total score is 1714 points).

An applicant may pass the examination in one of two ways.
The first method is by receiving a combined Essay and MBE score
of 70% (1200 points) or higher.  The second method is by passing
each section of the examination separately with minimum scores
of 840 and 360 for the Essay and MBE, respectively.  In other
words, an applicant may pass one portion on one administration
of the examination and the other portion on a different adminis-
tration.  Since an applicant's passing status on one section
cannot be reversed by subsequently failing that section, it is
clearly in an applicant's best interests to take both portions
each time he or she attempts to pass the examination as a whole.
In that way, the applicant may be able to pass by either of the
two methods.

In the past, if an applicant came close to passing but still
failed the examination (or the Essay portion of it), that appli-
cant's Essay answers were turned over to the Board of Reappraisers.
The reappraisers assigned to a particular applicant reviewed all
12 of the applicant's answers as a set so as to make an overall
pass/fail decision.  This meant that an applicant's efforts were
evaluated as a whole by readers who had extensive experience in
grading bar examinations and who had also been intimately
involved in the question development and scorer calibration
processes.

COMPARISON OF MBE AND ESSAY TEST CHARACTERISTICS

Test Difficulty

Using the criterion that 70% or higher of the total possible score on a test constitutes passing, then an applicant has about a 16% better chance of passing the MBE than the Essay. In other words, about 16% more applicants pass the MBE than pass the Essay section of the examination. And, this differential remains relatively constant across racial/ethnic groups.

Weighting

Relative to the total possible points an applicant can earn on each section of the examination, MBE scores spread out somewhat more from the average MBE score than Essay scores spread out from their average. The effect of this difference in the shapes of the two distributions of scores has been to let the MBE have about a 35%, rather than just a 30% influence on determining an applicant's performance level on the examination as a whole. Since the two tests differ in difficulty, assigning more weight to the MBE than intended has resulted in a slightly higher passing rate than would have occurred if the 70:30 policy was strictly enforced.

Reliability

The term "reliability" in the present context refers to the degree to which an applicant performed in a consistent manner

-4-

across the questions asked within each test. Two requirements have to be met in order for such consistency to occur. First, the general skills and knowledge that are needed to answer one question are also needed to answer the other questions on the test. And second, the applicant's performance on these questions is not influenced by chance events, such as being asked a question related to an esoteric aspect of the law with which the applicant was particularly familiar. In short, the more a score on a question is influenced by isolated skills, highly unique knowledge, scoring inconsistencies, and random factors (such as luck), the lower the reliability of a test containing such questions.

The MBE portion of the examination has a reliability that meets the generally accepted minimum standards for a test that is used in making important decisions about individuals. Although the Essay test by itself falls short of this criterion, the total examination score (i.e., MBE plus Essay) is consistently able to achieve the necessary level of reliability. Analyses of the past several examinations have further indicated that this standard would not be met if there was a reduction in the number of Essay questions answered per applicant unless other changes were made in the examination process, such as having more than one reader grade each answer.


Abilities Assessed

There is a strong positive correlation between an applicant's performance on the MBE and Essay sections of the test. In other

-5-

words, applicants who tend to do well on the MBE also do well on
the Essay and vice versa.  For example, one can predict with about
75% accuracy an applicant's pass/fail status on the Essay from
knowledge of that applicant's MBE score.  An even higher level
of predictive accuracy probably would be obtained if the Essay
scores were as reliable as the MBE.  It appears, therefore, that
the two tests are measuring very similar or at least highly
related skills and knowledge even though their formats (multiple
choice and essay) are quite different.

    It is also evident that these skills and knowledge are
closely associated with the abilities required to perform well in
law school.  This conclusion is based on the strong relationship
between bar scores and law school grade point averages.  For
example, after adjusting law school grade point averages for
variations in the general ability levels of students attending
different schools, these averages are able to predict bar scores
about four times better than the combination of undergraduate
grades and law school admissions test scores are able to
predict first year grades in law school.  In other words, the
relative performance levels of students in law school corres-
pond closely with their performance on the bar examination,
especially when one takes into consideration the marked differences
in the overall caliber of the students attending different
schools.

## Equivalency of Examinations Across Administrations

The procedure used to equate scores on different administrations of the MBE involves embedding in each new form of the test several questions that have been used in previous forms. An analysis of how applicants taking the new form perform on these questions relative to how well applicants taking previous forms did on them is then used in scaling the total MBE scores. For instance, if the applicants taking a new form of the MBE do better on the scaling questions than applicants taking previous forms of the test, then it is assumed that those taking the new form are a more able group, and their scores on the new form are adjusted accordingly.

The foregoing procedures cannot be employed in assessing the equivalency of different administrations of the Essay test because none of its questions are ever used twice. However, the strong correlation between the Essay and MBE, as well as the equivalency of the MBE scores across administrations, permitted using this test to examine whether applicants earning similar MBE scores on different administrations were indeed exhibiting comparable levels of Essay performance. The results of this analysis indicated that about the same Essay score was assigned across test administrations for a given level of performance on the MBE. For example, applicants with MBE scores of 351 to 375 had average Essay scores of 820, 811, 818, 824, and 820 on

the six bar examinations administered between February 1975 and
July 1977.  It appears, therefore, that scoring standards have
remained pretty much the same across different administrations
of the test.  This means that an applicant's chances of passing
the examination are not appreciably influenced by taking it on
any particular occasion.

The foregoing findings also indicate that the higher
average scores and correspondingly higher passing rates on
the July versus the February examinations are due to differences
in the general level of ability of the applicants on these two
testing dates rather than any variation in grading standards.
This conclusion is supported further by the substantially larger
percentage of applicants who take the examination for the first
time during its July administration.


RESULTS OF RECENT RESEARCH ON BAR EXAMINATION PRACTICES


Differences in Passing Rates Between Groups

Various studies have been conducted on the bar examination
to investigate whether the scores on it are related to an appli-
cant's sex or racial/ethnic group.  While some of these studies
are still underway, the initial results are as follows:

  1.    The magnitude of the difference in average performance
        levels between racial/ethnic groups remains relatively
        constant across the examination's essay questions.

-8-

The same is true for the multiple choice questions and subtests. Thus, certain questions or subject matter areas are not especially more or less difficult for a given group relative to the performance of other groups taking the test. These results indicate that individual questions or subtests do not differentially favor or discriminate against a particular group.

2. The magnitude of the difference in average Essay scores between groups does not change when applicants have their answers graded by readers whose racial/ethnic group is the same versus different than their own. Thus, the racial/ethnic group of the reader does not diminish or enhance a minority or majority group applicant's chances of passing the examination.

3. Controlling for potentially relevant attitudinal and background characteristics of the applicants, such as their socioeconomic status and whether they took an in-depth bar review course, does not change the between-group disparities in their respective passing rates. For instance, the passing rates for minority and majority applicants who feel that the examination is "not a fair test" of their legal skills and knowledge are essentially the same as the passing rates for all the members of their respective groups.

-9-

4.   Controlling for an applicant's performance in law school as well as the overall caliber of the students attending different schools substantially reduces between-group differences in their passing rates. This is especially true for those minority applicants who have above-average law school grades.  In other words, the overall differences in the passing rates between groups appears to be primarily a function of differences in their relative academic achievement levels in law school.  And, the differences in passing rates that still remain after this factor has been controlled are due to some factor or set of factors that is not applicable to all minority group applicants.

## Effect of Time Limits on the Essay Test

While no study has been done on the bar examination's time limits per se, an experiment has been conducted with the same type of question that is used on its Essay test.  This study involved varying the time allowed to answer essay questions that were administered as part of the First Year Law Students Examination.  This test was chosen in part because it was felt that the performance of those taking it would be especially sensitive to any benefit that might be derived from an increased time allocation.

The study's design varied the time limits by giving one half of the examinees 65, rather than the regular 52 1/2 minutes

-10-

to answer one question and then giving the other one half of
the applicants the additional 12 1/2 minutes to answer another
question.  The two sets of answers to each question were inter-
mixed prior to scoring so that the graders did not know which ones
had been written under the expanded time limit.

The results of this investigation indicated that, on the
average, an examinee's score on a question improved only about
one point with the additional time allocation.  Moreover, the
relative performance of the examinees across questions was
unaffected by how much time they had to answer them.  It appears,
therefore, that increasing the Essay test's time limits would
not appreciably affect the quality of the answers written or who
was able to write a passing answer.


Essay Grading Process

It was noted above that the reliability of the Essay test
has not been as high as the MBE even though far more applicant
time and a great deal more of the bar's financial and personnel
resources have been devoted to it.  The Essay test also carries
substantially more weight in determining an applicant's pass/fail
status than does the MBE.  This situation led to a series of
studies that were designed to determine the cause of this
discrepancy in reliability and the efficacy of alternative
means of dealing with it.

-11-

<u>Scorer Reliability</u>.  The first of these studies involved an analysis of the extent to which readers agreed with themselves and with one another on the scores that should be assigned to a given answer.  Thirty answers to each of four essay questions appearing on the February 1977 examination were selected for this purpose.  These answers were then embedded into the total batch of answers that were graded by each reader during the normal scoring process; i.e., all four readers assigned to a given question graded the same set of thirty answers along with the several hundred other answers that each reader was separately responsible for scoring.  This insertion of the special set of thirty was done twice, once near the beginning of the six-week reading period and again near the end.

The results of this analysis indicated that a substantial portion of the variation in an applicant's scores across Essay questions was due to the grading process rather than to the uniqueness of the skills and knowledge required to answer different questions.  For example, two readers of the same answer usually only agreed with one another about 67% of the time as to whether that answer was or was not "passing" (i.e., deserving a score of 70 or higher).  The average intrareader agreement rate was slightly better (75%) but still low enough to indicate that systematic differences in grading standards or criteria between readers were not the only reasons for the disagreements between them in the scores they assigned.

The major implication of this finding was that it would be necessary to have the applicant answer several essay questions and/or have several independent readings per answer in order to balance out the effects of chance factors in the scoring process unless some means were found to increase the consistency with which the grades were assigned.

Scorecard Grading. It was thought that one way of improving the reliability of the grading process would be to have the readers grade the answers in terms of how well they addressed each of the major issues within a question as well as other general features of the applicants' answers, such as the quality of the logical analysis and reasoning that was exhibited. Each of the dimensions that was unique to a given question, as well as those that were common to all questions, was graded separately by an additional reader per question.

The analyses of the data obtained by this process indicated that this scorecard approach did not improve the reliability of the grading process enough to warrant the almost 100% increase in time it took to grade an answer with it. Further, the regular and the scorecard procedures tended to result in the same rank ordering of applicants in terms of the quality of their performance. In short, no new information about an applicant was obtained by means of employing scorecard grading, and it did not prove to be a cost effective means for increasing reader consistency.

-13-

<u>Analysis of Artifacts</u>.  The foregoing studies also provided an opportunity to examine whether Essay scores may have been influenced by certain systematic factors that were not associated with answer quality.  For instance, it was observed that there was no relationship between handwriting clarity and grades, although unedited typewritten answers received somewhat lower grades than handwritten versions of these same answers.  Whether an answer was graded toward the beginning, middle, or end of the six-week scoring process did not appear to affect the grades assigned.  It was noted, however, that longer answers tended to get somewhat higher grades than shorter ones.  While part of this relationship may stem from the more knowledgeable applicant writing more, this does not seem to be the whole story, in that answer length had absolutely no relationship to MBE scores even though the Essay and MBE scores were closely associated with one another.

<u>Reappraisal Process</u>

In the past, the reappraisal process involved having an applicant's answers (and the scores assigned to them by the initial readers) reviewed by two independent reappraisers if that applicant's total score fell between 1140 and 1199 points.  If the two reappraisers agreed on what the pass/fail decision should be for an applicant, then that decision stood.  If they disagreed, the applicant's set of 12 answers was

-14-

evaluated by a third reappraiser so that a final decision could be made.

An analysis of this process indicated that reappraisers assigned somewhat higher total Essay scores than did the regular readers when the reappraisers were aware of the grades assigned by the initial readers. Despite this difference in the level of the overall grades assigned, the reappraisers and the regular readers agreed quite closely in how they assessed the relative performance of the applicants. For instance, better than 85% of the applicants with initial total scores between 1190 and 1199 passed the examination as a result of the reappraisal process, whereas if an applicant's score was below 1190, the applicant had less than an 8% chance of passing. Essentially no applicant during the past two years with an initial total score below 1170 has passed as a result of reappraisal.


CONCLUSIONS


The results of the research studies presented in this report have indicated that California's State Bar Examination is achieving its objective of assessing applicant skills that are considered necessary (albeit not necessarily sufficient) for the practice of law. The examination scores correspond

closely to performance in law school, they are relatively free
from possible contaminating influences, and they are sufficiently
reliable for making pass/fail decisions about individual appli-
cants.  It is apparent, however, that the resources required to
maintain these procedures, especially in light of the large
number of applicants taking the examination, might be reallocated
so as to improve the appropriateness with which the pass/fail
decisions are made.  For instance, it does not make a great deal
of sense to have two reappraisers review the answers of applicants
with total scores below 1170 when experience has shown that these
applicants have essentially no chance of passing as a result of
the reappraisal process.  Further, the reappraisers just evaluate
the applicants who came close to passing but failed.  What about
the applicants who came close to failing but passed?  Isn't it
just as likely that the initial readers inadvertantly passed as
many applicants who should have failed as vice versa?

It is also apparent that changes might be made in the initial
reading process so as to improve the reliability of the scores
obtained and/or decrease the testing burden on the applicant.  For
instance, an eight-answer test in which each answer is indepen-
dently evaluated by two readers has about the same reliability
as a test in which there is only one reader for each of 12 answers.
However, eight answers may not provide a sufficiently broad
sample of legal issues to give an accurate and fair assessment
of the applicant's skills and knowledge.  Moreover, any change

-16-

in current practices must be weighed against their costs, impact on the speed of score reporting, logistical constraints, availability of skilled readers, test security, and related concerns.

The foregoing considerations and research results have led the Committee of Bar Examiners to divide the examination's scoring procedures into the following four phases:

1.  Applicants will be divided into two groups, "Pass" and "Questionable," on the basis of their total score on the MBE and one of the three Essay test sessions. This will be done by assigning applicants randomly to sessions after the test has been administered so that all 15 reader teams may begin grading simultaneously.

Previous research has indicated that which session is used for a particular applicant will not systematically affect his or her chances of passing in that the average scores across sessions rarely differ by more than a few points. An analysis of past examinations also has shown that a Phase I cutting score of 670 would have resulted in less than one half of one percent of the applicants unduly benefiting from the proposed procedures in the sense that they would have failed if all 12 of their answers had been graded. On the other hand, by using this cutting



Illustration of how the Pass, Fail, and Reappraisal Decisions
Would Have Been Made if the Proposed Procedures had Been Used
With the July, 1977 Examination.

score, over 35% of the applicants who take the
examination are passed with just one reading of each of
four answers.  This constitutes a savings of about
21,000 readings if 7,500 applicants take the examination
(i.e., .35 x 8 x 7,500 = 21,000).

2.    In Phase II of the new procedure, all the applicants
who were classified as "Questionables" have their
remaining eight answers read.  Their total score (MBE
plus Essay) is then used to place each of these applicants
into one of three categories:  "Pass," "Still Questionable,"
and "Fail."  The cutting scores for the "Still Questionable"
category, 1165 to 1217, represent 68 to 78% of the
total possible range.  It also will be noted that the
1164 fail line is well below the score level from which
applicants were likely to pass as a result of reappraisal.

3.    All the applicants who were classified as "Still
Questionable" in Phase II would have their 12 answers
reinserted into the regular reading process in Phase III.
In other words, all the applicants in this group (about
23% of the total taking the test) would have their 12
answers read twice.  The average of these two independent
sets of readings will then be combined with the MBE
score to make a pass/fail or reappraisal decision for

-19-

each applicant.  While this process essentially offsets the savings gained in Phase II in terms of the number of answers that have to be read (i.e., .23 x 12 x 7,500 = 20,700), it does increase the reliability with which the pass/fail decision is made for those applicants whose status is most in doubt.  For instance, an analysis of the data collected on the February 1977 examination indicated that doubling the number of readers per answer would have had the same effect on the Essay Test's reliability as increasing the length of the Essay Test to 20 answers per applicant.

4.    Applicants who at the end of Phase III had scores between 1175 and 1199 will be placed in reappraisal. Also placed in reappraisal will be those applicants whose total score on the first reading was between 1200 and 1217 but who dropped below 1175 as a result of the second reading.  Each reappraised applicant will have his or her full set of answers and scores reviewed by one reappraiser, who will make the final pass/fail decision.  Thus, although this process substantially reduces the number of booklets that have to be evaluated by the Board of Reappraisers, it still focuses on those applicants whose passing status might be affected by reappraisal, as well as preserves the procedure of having an applicant's efforts reviewed as a whole.

The foregoing procedures differ from past practices primarily in terms of focusing reader resources at the pass/fail decision point rather than spreading them out evenly across all the applicants taking the examination. On the other hand, the new procedures are still designed to provide added protection against the chances of failing an applicant who should pass. Although it is unlikely that these procedures will result in any major change in the total proportion passing, they will increase the accuracy with which the pass/fail decisions are made. Moreover, the total number of answers reappraised will be somewhat less than in the past, which will hopefully expedite the score reporting process. This savings in reappraiser time will most likely be channeled into greater use of their skills and knowledge in the test development and scorer calibration aspects of the examination process.

Finally, the changes described above are based on two years of research and analysis of bar examination practices. And, they do not encompass all the ways in which the bar examinations's procedures have been modified. For instance, as a result of the findings on Essay test grading practices, the Committee of Bar Examiners has revised its reader calibration procedures so as to devote more effort to establishing and maintaining a high level of scorer reliability. Additional research also is being conducted on the relationships between test performance and an applicant's racial/ethnic group, sex, and law school grades.

-21-

Other research studies, in progress and in the planning stages, are oriented toward gathering data regarding ways in which various aspects of the examination process might be improved, such as the nature and format of the questions asked.  In short, the changes in grading procedures presented in this report are only a few of the outcomes of the Committee's directive for continued research and improvement of bar examination practices.

-22-

A-1

BASIC TEST STATISTICS *

| MEASURE | TEST STATISTIC | February 1976 | July 1976 | February 1977 | July 1977 |
|---------|----------------|---------------|-----------|---------------|-----------|
| Essay | Mean | 809.71 | 828.46 | 815.53 | 826.44 |
| | Standard Deviation | 58.35 | 68.79 | 58.96 | 62.12 |
| | Standard Error | 27.37 | 27.52 | 28.28 | 26.34 |
| | Reliability | .78 | .84 | .77 | .82 |
| | Percent Passing | 30.80 | 47.60 | 36.40 | 44.20 |
| MBE | Mean | 351.52 | 373.32 | 356.42 | 367.84 |
| | Standard Deviation | 36.93 | 40.59 | 35.99 | 38.65 |
| | Standard Error | 11.68 | 12.83 | 11.38 | 12.22 |
| | Reliability | .90 | .90 | .90 | .91 |
| | Percent Passing | 43.20 | 66.40 | 46.60 | 60.00 |
| Total Score | Mean | 1161.23 | 1201.78 | 1171.94 | 1194.27 |
| | Standard Deviation | 86.37 | 101.36 | 86.86 | 93.34 |
| | Standard Error | 29.92 | 30.41 | 30.09 | 29.52 |
| | Reliability | .88 | .91 | .88 | .90 |
| | Percent Passing | 37.70 | 54.30 | 38.20 | 49.50 |
| MBE/Essay Correlation | | .62 | .70 | .65 | .70 |
| Total Number of Applicants | | 3089 | 6710 | 3399 | 7191 |

* Passing scores on the Essay, MBE, and Total examination were
840, 360, and 1200, respectively.  Reappraisal results were
not included in calculating percent passing.

The Essay test's reliability is based on the average interitem
correlation stepped-up to a 12 item test.

All test statistics are based on those applicants who answered
12 essay questions and who had an MBE score.

A-2

AVERAGE ESSAY SCORES FOR GIVEN LEVELS OF MBE SCORES

| MBE SCORE RANGE | Febr 1975 | July 1975 | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Average Score |
|---|---|---|---|---|---|---|---|
| Less than 351 | 777 | 766 | 777 | 767 | 780 | 777 | 774 |
| 351 to 375 | 820 | 811 | 818 | 819 | 824 | 820 | 819 |
| 376 to 395 | 838 | 836 | 838 | 842 | 842 | 847 | 841 |
| 396 to 415 | 861 | 863 | 857 | 867 | 866 | 869 | 864 |
| More than 415 | 900 | 888 | 889 | 892 | 894 | 893 | 893 |

A-3

NUMBER OF APPLICANTS REAPPRAISED AND PERCENT PASSING
RELATIVE TO INITIAL TOTAL SCORE: 1976 THROUGH 1977

| Initial Total | Percent Passing | | | | Number of |
| Score Range | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Applicants |
|---|---|---|---|---|---|
| 1190-1199 | 86 | 88 | 85 | 89 | 821 |
| 1180-1189 | 32 | 43 | 34 | 42 | 860 |
| 1170-1179 | 5 | 10 | 5 | 6 | 823 |
| 1160-1169 | 0 | * | 0 | 0 | 814 |
| 1150-1159 | 0 | * | 0 | 0 | 812 |
| 1140-1149 | 0 | * | 0 | 0 | 795 |
| Number of Applicants | 914 | 1332 | 991 | 1688 | 4925 |
| Percent Passing | 19 | 27 | 20 | 23 | 23 |

* In July of 1976, there was a problem in the typing room during
the first Essay test session in Los Angeles.  As a result, the
scores of certain applicants on this part of the examination
did not reflect accurately their true performance level.  This
situation led to a special reappraisal of the applicants
involved if they failed the examination which in turn led to
passing 11 applicants whose initial total score fell below 1170.
In July of 1977, one applicant with an initial total score
beteween 1165 and 1169 passed as a result of reappraisal.
In no other instance did an applicant with an initial total
score below 1170 pass as a result of reappraisal on these
four examinations.

A-4

AVERAGE TOTAL ESSAY SCORE BY TEST SESSION

| Essay<br>Test Session | Febr<br>1976 | July<br>1976 | Febr<br>1977 | July<br>1977 | Overall<br>Average |
|---|---|---|---|---|---|
| First | 264 | 275 | 271 | 274 | 271 |
| Second | 268 | 277 | 270 | 272 | 272 |
| Third | 277 | 277 | 274 | 280 | 277 |
| Average | 270 | 276 | 272 | 275 | 273 |

A-5

EFFECT OF VARIOUS PHASE I CUTTING SCORES ON PASS/FAIL DECISIONS

| Possible Cutting Score | % Passing At End of Phase I | | | | % Passing At End of Phase II Who Failed the Total Examination | | | |
|---|---|---|---|---|---|---|---|---|
| | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Febr 1976 | July 1976 | Febr 1977 | July 1977 |
| 660 | 22.3 | 46.3 | 27.0 | 40.5 | 0.8 | 0.8 | 0.6 | 0.7 |
| 665 | 19.4 | 43.0 | 23.7 | 37.6 | 0.4 | 0.5 | 0.3 | 0.5 |
| 670 | 17.0 | 39.7 | 20.8 | 34.5 | 0.3 | 0.2 | 0.1 | 0.3 |

* Based on final Pass/Fail decision; i.e., it includes reappraisal results.

A-6

NUMBER AND PERCENT OF APPLICANTS IN THE "STILL QUESTIONABLE"
CATEGORY AT THE END OF PHASE II OF THE PROPOSED PROCEDURES *

|  | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Total |
|---|---|---|---|---|---|
| Number of Applicants in the Category | 767 | 1306 | 866 | 1521 | 4460 |
| Percent of all Applicants | 25 | 20 | 26 | 21 | 22 |

* The "still questionable" category includes those applicants who
had initial total scores between 1165 and 1217 after a single
reading of all 12 of their Essay answers.

PR-85-4

LARGE DISCREPANCIES BETWEEN READERS:
THEIR SOURCE AND POLICY IMPLICATIONS

Stephen P. Klein, Ph.D.
GANSK & ASSOCIATES

September 25, 1985

SUMMARY

Applicants taking California's General Bar Examination (GBX) have all
of their Essay and Performance Test (PT) answers read a second time if
after the first reading, their total GBX scores come close to the
pass/fail line.  The first and second readings are done by different
graders.  The second reader does not know the score assigned by the
first reader.  Under the current rules, an applicant's final score on
an answer that is read twice is the average of these two scores.

Analyses of past examinations indicate there is generally a very high
degree of agreement between the scores two readers independently assign
to an answer.  The difference is usually no more than 10 points on 95
percent of the answers that are read twice.  The study described in this
report focused on the remaining 5 percent.  It investigated whether
large (15 points or more) discrepancies between the scores different
readers assign to an answer are most likely due to chance variation
around the score the answer really deserves (i.e. its true score) or
to one of the two readers making a mistake (such as the reader making a
clerical error in recording the score).

This issue was explored by having a third and fourth independent reading
of 269 answers.  These answers were drawn from those written to three
essay questions and one PT problem on the February 1985 exam.  On all
269 answers, there was a large (15 point or more) discrepancy between
the scores assigned by the first and second reader.

A "difference score" was computed for each answer.  This score was the
difference between the mean of the scores assigned to the answer on the
first two readings and the mean assigned to it on the next two readings.
For example, the difference score was -5 if the mean of the first and
second readers' scores was 65 and the mean of the third and fourth
readers' scores was 70.

        Difference Score = (Mean of 1st and 2nd) - (Mean on 3rd and 4th)

The "absolute value" of a difference score is that score without its
algebraic (+ or -) sign.  The "average absolute value" is the average
difference between the two means regardless of which one was larger.

If large discrepancies between the first two readers are due to chance
variation, then: (1) the average of the third and fourth reader's scores
will fall directly between the scores assigned by the first two readers;
(2) the distribution of the difference scores will take the form of a
normal, bell-shaped curve; (3) the average absolute value of the
difference scores will be small; and (4) the mean of the first two
scores assigned will be the best estimate of the answer's quality.

If large discrepancies between the first two readers are due to one of
them making a mistake, then: (1) a third and fourth reader's grades on
an answer will agree more with one of the first two reader's scores than
with the average of the first two reader's scores, (2) the distribution
of the difference scores will take the form of a U-shaped curve, (3) the
average absolute value of the difference scores will be large, and (4)
the best estimate of an answer's quality would not necessarily be the
average of the first two scores assigned to it.

Results from analyses of the four readings of each of the 269 answers
strongly support the chance variation hypothesis.  They show that:

1) The scores assigned by the third and fourth reader to an answer were
   far more likely to agree with the mean of the first two readers'
   grades than they were with the grade assigned by just one of the
   first two readers.

2) There was a bell-shaped (rather than U-shaped) distribution of the
   difference scores.  On 51 percent of the answers, there was a 2.5 or
   smaller difference between the means.  Only 14 percent of the answers
   had an absolute difference score that was greater than 7.5 points.

3) There was a strong correlation (r = .72) between how the first two
   and the last two readers rank ordered the 269 answers, especially
   given the large differences between the first two readers in the
   scores they assigned to these answers.

4) The average absolute difference on an answer was 4.5 points, which is
   about one half the size it would have been if the third and fourth
   readers had tended to agree with one of the first two readers rather
   than with the mean of the first two readers' scores.

In addition, the third and fourth readers' scores were not significantly
higher or lower than the mean of the first two readers' score.  Thus,
even if some of the discrepancies were due to one of the first two
readers making a mistake, such errors did not systematically increase or
decrease applicant scores.  Moreover, all of the findings above were
consistent across the three essay questions and one PT problem studied.
They also held when the discrepancy between the first two readers was 15
points and when it was more than 15 points.

Taken together, these findings demonstrate that large and even very
large discrepancies between the first two readers of an answer stem from
chance variation around that answer's true score.  There is no sign that
the discrepancies come from one of the first two readers making a clear
mistake.  Thus, even when there is a large discrepancy between the
grades assigned by different readers to an answer, the best estimate of
the score that answer really deserves is still the mean of the grades
assigned to it.

LARGE DISCREPANCIES BETWEEN READERS:
THEIR SOURCE AND POLICY IMPLICATIONS

INTRODUCTION

About 25 to 30 percent of the applicants who take California's General
Bar Examination (GBX) have all of their Essay and Performance Test (PT)
answers read twice. The applicants in this group came close to the
pass/fail line of 1260 after the scores on the first reading of all of
their answers were combined with their scores on the MBE (the multiple
choice portion of exam). For example, on the February 1985 exam,
applicants had their answers read twice if their total scores (Essay +
PT + MBE) fell between 1225 and 1278 after the first reading of their
Essay and PT answers.

The second reader knows the answer has been read once, but does not know
the score assigned to it by the first reader. Under the current rules,
readers assign grades in 5-point intervals and the final score on an
answer that is read twice is the average of the two grades. For
example, the final score on an answer would be 67.5 if one reader gave
it a 65 and another gave it a 70.

The assignment of the second reader to an answer is not random. If the
first reader tended to grade high or low (as indicated by the scores
that reader assigned during the calibration sessions), then a reader
with the opposite tendency was appointed as the second grader. This
procedure increases the fairness of the scoring process. However, it
also increases the likelihood of obtaining large differences between the
first and second reader's grades.

Analyses of past exams indicate that even with the bias introduced by
the procedures described above, the two readers on an answer generally
agree closely on the score they assign to it. For example, the score
assigned by one reader differed by no more than 10 points from the score
assigned by the other reader on over 95 percent of the answers that were
read twice on the July 1983, February 1984, and July 1984 exams. On the
average, the scores assigned by two readers to an answer differ by 4.5
points (this statistic is called the "average absolute difference"). A
study with a random sample of 865 applicants who took the July 1983 exam
also showed that the total essay score on the first reading correlated
0.91 with the total essay score on the second reading.

Despite the generally high degree of agreement between readers, there
are large differences (15 points or more) on about 3 to 5 percent of
answers that are read twice. It is not known whether these large
discrepancies represent chance variation around the true score the
answer deserves or whether they stem from one of the two readers making
a mistake that unduly lowers or raises the assigned score (such as the
reader recording the wrong grade, skipping a page·in the answer book
where an important issue was discussed, or giving an applicant credit
for discussing an issue that was not really covered by the answer).

POLICY IMPLICATIONS

If large discrepancies between the scores different readers assign to an answer stem from chance variation around the score that answer really deserves, then the Committee's policy of using the average of the two scores makes the most sense.  Chance errors tend to cancel each other out.  And when this happens, the average score of the first two readings is more likely to come closer to an answer's "true" score (i.e., the score it really deserves and would receive if there were no chance errors) than would either one of the first two scores by itself.

If large discrepancies between the first two readers are most likely due to one of them making a mistake, then the true score would correspond closer to one of the two grades assigned rather than to the average of these grades.  And, if large discrepancies usually stem from mistakes, the Committee might consider adopting special procedures for handling these discrepancies, such as having a third reader resolve them.


PURPOSE

The study described below investigated whether large (15 point or more) discrepancies between two readers in the scores they assign to an answer are most likely due to chance variation around an answer's true score or to a mistake made by one of the two readers.


RATIONALE FOR STUDY DESIGN

If the difference between two scores is just a chance error around its true score, then the best estimate of the true score is the mean of the first two scores.  In other words, if the answer was read again and again, then the third and subsequent scores assigned to it would tend to fall exactly half-way between the first two scores.  If this happened, (1) the difference between the mean of the first two scores and the mean of all subsequent scores would be small and (2) the distribution of these difference scores would form a normal, bell-shaped curve.

If, on other hand, large discrepancies stem from one of the first two readers making a mistake, then the mean of the scores on subsequent readings of an answer would fall close to one of the first two scores assigned to it rather than half-way between these scores.  And if this happened, (1) there would be large positive and negative differences between the average of the first two scores and the average of any subsequent scores and (2) the distribution of these difference scores would form a U-shaped rather than a bell-shaped curve.

In this context, a "difference score" between the average of the first two readings of Answer X and the next two readings of Answer X is defined by the formula below. Difference scores also can be computed for the difference between the average of the first two readings and the score on the third (or fourth) reading by itself.

Difference Score = (Mean of 1st and 2nd _ (Mean of 3rd and 4th
on Answer X          readings of Answer X)    readings on Answer X)

The study described below examined what happened when the score on a third and/or fourth independent reading of a answer was subtracted from the average of the scores on the first two readings. Would the resulting difference scores tend to be small and distributed normally in a bell-shaped curve as would be expected by the "chance variation" hypothesis OR would the difference scores be large and distributed in a U-shaped curve as would be expected by the "reader mistake" hypothesis?


PROCEDURES

The scores on the answers to three essay questions (2, 4, and 5) and one PT problem (Question 7) on the February 1985 exam were searched in order to identify all them that were read twice and had a "large" (15 points or more) discrepancy between the grades assigned by the first and second reader. This selection criterion identified 269 answers.

Each selected answer was read two more times. The third and fourth readers on an answer did not know each other's scores, the scores assigned by the first two readers, or that their grades would be compared to those assigned by other readers. The third and fourth readers were drawn from the same pool of readers that conducted the first and second readings. However, neither the third or fourth reader on an answer was one of that answer's original two readers.


RESULTS

Table 1 lists the number of answers with large discrepancies on each question and overall. It also presents the mean score on: each reading, the mean of first two readings, the mean of the last two readings, and the difference between the means of the first and last two readings. These data indicate that the third and fourth readers' average score (68.3) was almost the same as the first two readers' mean (67.7). Thus, differences between the score on the third (or fourth) reading of an answer and the average of the scores on the first two readings of that answer cannot be due to the third (or fourth) reader being generally more or less lenient than the first two readers.

Table 2 shows there was a very low and usually negative correlation between the scores assigned by the first two readers in the set of 269 answers. This is to be expected given the way these answers were selected; i.e., they were the ones on which the first two readers were

known to disagree.  Thus, the correlations between the first and second readings do not reflect the typical average correlations (of .64 to .77) between two readers on the thousands of answers that are read twice.

Table 2 also shows that the mean of the first two readers' scores on an answer correlated .72 with the mean of the scores assigned by the next two readers.  In other words, both sets of readings rank ordered the answers in about the same way, even though the first two readers differed markedly with each other in the scores they assigned to each answer.  In addition, the correlation between the two means was higher than the .52 correlation between the grades assigned by the third and fourth reader.

Table 1

MEAN SCORES ON EACH READING AND EACH PAIR OF READINGS

| Question Number | Number of Answers | Mean on Each Reading | | | | Mean of 1st and 2nd | Mean of 3rd and 4th | Mean of 1st & 2nd minus 3rd & 4th |
|---|---|---|---|---|---|---|---|---|
| | | 1st | 2nd | 3rd | 4th | | | |
| 2 | 104 | 70.4 | 64.9 | 68.6 | 69.4 | 67.6 | 69.0 | -1.35 |
| 4 | 46 | 73.6 | 67.0 | 68.5 | 69.9 | 70.3 | 69.2 | 1.09 |
| 5 | 78 | 68.8 | 62.9 | 66.8 | 66.3 | 65.9 | 66.6 | -0.71 |
| 7 | 41 | 68.0 | 68.9 | 68.2 | 68.9 | 68.5 | 68.5 | -0.06 |
| Combined | 269 | 70.1 | 65.3 | 68.2 | 68.3 | 67.7 | 68.3 | -0.55 |

Table 2

CORRELATIONS BETWEEN READINGS

| Question Number | 1st versus 2nd | 3rd versus 4th | 1st versus 3rd + 4th | 2nd versus 3rd + 4th | 1st + 2nd versus 3rd + 4th |
|---|---|---|---|---|---|
| 2 | .06 | .56 | .49 | .54 | .70 |
| 4 | -.30 | .40 | .59 | .39 | .84 |
| 5 | -.09 | .52 | .36 | .61 | .73 |
| 7 | -.17 | .36 | .35 | .47 | .64 |
| Combined | -.05 | .52 | .45 | .53 | .72 |

Table 3 shows that on 51 percent of all of the 269 answers, the average
score assigned by the first two readers was within 2.5 points of the
average of the third and fourth reader's scores on that answer.  This
table also shows that on every question, the difference scores had a
relatively normal, bell-shaped distribution.  In other words, most of
the difference scores clustered around 0 and larger differences tapered
off quickly and symmetrically from 0.

The foregoing pattern indicates that on a typical answer in the set of
269 answers, the grades assigned to it by both the third and fourth
readers agreed far more with the <u>average</u> of the first two readers'
grades than they did with the grade assigned by just one of the first
two readers.  In addition, even when there was a large difference
between the first and last two readers, the last two readers did not
give consistently higher or lower grades than the first two readers.
Thus, even if a few of the large differences were due to one of the
first two readers making a mistake, such errors increased applicant
scores about as often as they decreased scores.

An analysis of the absolute difference scores revealed that, on the
average, the mean of the first two scores on an answer differed by only
4.49 points from the mean of the second two scores on that answer (i.e.,
regardless of the algebraic sign of that difference).  This average
absolute difference is considered "small" because it is no larger than
the average absolute difference that is usually obtained between a pair
of readers on all of the thousands of answers that are graded twice.

If the third and/or fourth reader had tended to agree with just one of
the first two readers on an answer (as would have been predicted by the
"mistake" hypothesis), then the distribution of difference scores would
have been U-shaped rather than the bell-shaped curve that was observed
with all four of the questions studied.  The "mistake" hypothesis also
would have predicted an average absolute difference score that was
almost twice as large as the 4.49 that was actually obtained.

---

The mistake hypothesis predicts that the average of the third and fourth
readers' scores would coincide more closely with one of the first two
readers' scores than with the mean of their scores.  For example, if one
of the first two readers gave it a 50 and the other a 65, then the mean
of the third and fourth readings would be closer to 50 or 65 than it
would be to 57.5.  Thus, if there was a 15 point difference between the
first two readers, the expected value of the absolute difference between
their mean score and the mean of the third and fourth readers' scores
would be 7.5.  The expected average absolute difference score in the set
of 269 answers under the mistake hypothesis would be 8.47 as per the
following formula: $[(192)(7.5) + (54)(10) + (19)(12.5) + (4)(15)]/269$

Table 3

NUMBER OF ANSWERS ON EACH QUESTION WITH DIFFERENT SIZED DIFFERENCES
BETWEEN THE AVERAGE OF THE SCORE ON THE FIRST TWO READINGS AND THE
SCORE ON THE THIRD AND/OR FOURTH READING.

| Question Number | Reading Number | Difference Between the Mean Score on the 1st and 2nd Reading of an Answer and the Score on the 3rd and/or 4th Reading of That Answer | | | | | Number of Answers Read |
|---|---|---|---|---|---|---|---|
| | | <-7.5 | -7.5 to -2.6 | -2.5 to +2.5 | +2.6 to +7.5 | >7.5 | |
| 2 | 3 | 12 | 25 | 38 | 18 | 11 | 104 |
| 2 | 4 | 20 | 23 | 28 | 22 | 11 | 104 |
| 4 | 3 | 0 | 3 | 39 | 1 | 3 | 46 |
| 4 | 4 | 1 | 3 | 31 | 8 | 3 | 46 |
| 5 | 3 | 6 | 21 | 32 | 15 | 4 | 78 |
| 5 | 4 | 7 | 8 | 49 | 9 | 5 | 78 |
| 7 | 3 | 3 | 3 | 27 | 5 | 3 | 41 |
| 7 | 4 | 6 | 6 | 18 | 7 | 4 | 41 |
| Total | 3 or 4 | 55 | 92 | 262 | 85 | 44 | 538 |
| Percent | 3 or 4 | 10 | 17 | 49 | 16 | 8 | 100% |
| Mean of the 3rd and 4th | Number | 25 | 49 | 138 | 43 | 14 | 269 |
| | Percent | 9 | 18 | 51 | 16 | 5 | 100% |

The row labelled "Question 2, Reading 3" refers to the scores
assigned by the third reader to the 104 answers to Question 2. In
this row, the value of 12 in the "< -7.5" column indicates there
were 12 answers where the average of the first and second readers'
scores on these answers was more than 7.5 points lower than the
score assigned by the third reader. The value of 11 in this same
row indicates there were 11 answers where the mean of the scores
assigned by the first two readers was more than 7.5 points higher
than the score assigned the third reader.

Table 4 presents the distribution of difference scores relative to the
size of the initial discrepancy between readers.  These data show that
regardless of the size of the discrepancy between the first two readers,
the distribution of the differences between their average score on an
answer and the average of the third and fourth readers' scores on that
answer follow a normal, bell-shaped curve.  There are slightly more
cases in the categories corresponding to large negative difference than
large positive differences because the mean of the third and fourth
readers' grades was slightly larger than the mean of the first and second
readers' grades (see Table 1).

Table 4

NUMBER OF ANSWERS WITH DIFFERENT SIZED DIFFERENCES BETWEEN THE
MEAN OF THE SCORES ON THE FIRST AND SECOND READINGS AND THE MEAN
OF THE SCORES ON THE THIRD OR FOURTH READING RELATIVE TO THE
SIZE OF THE DISCREPANCY BETWEEN THE FIRST TWO READERS' SCORES.

| Size of the Discrepancy Between the Scores on the 1st and 2nd Reading | Number of Answers | Mean of the Scores on the 1st and 2nd Reading of an Answer Minus the Mean of the Scores on the 3rd and 4th Reading of that Same Answer | | | | |
|---|---|---|---|---|---|---|
| | | <-7.5 | -7.5 to -2.6 | -2.5 to +2.5 | +2.6 to +7.5 | >7.5 |
| 15 points | 192 | 17 | 30 | 108 | 27 | 10 |
| 20 points | 54 | 5 | 14 | 21 | 11 | 3 |
| >20 points | 23 | 3 | 5 | 9 | 5 | 1 |
| Combined | 269 | 25 | 49 | 138 | 43 | 14 |

CONCLUSION

Large discrepancies (15 points or more) between the scores assigned by
the first two readers of an answer stem from chance variation around
that answer's true score.  There is no sign that large or even very
large discrepancies come from one of the first two readers making a
clear mistake.  Thus, the best estimate of an answer's true score is
the mean of the grades assigned to it.  Having a third or fourth
reading would not produce a significant improvement in accuracy nor
would it tend to generally raise or lower grades.

PRELIMINARY REPORT ON THE RELATIONSHIP BETWEEN
UNDERGRADUATE MAJOR AND BAR EXAMINATION SCORES


Prepared for

The Committee of Bar Examiners
of the State Bar of California


Prepared by

Stephen P. Klein
GANSK & ASSOCIATES
Los Angeles, California


June 2, 1982

PURPOSE

The study described in this report investigated the relationship between
undergraduate major and general bar examination scores as well as whether
this relationship was the same across sex and racial/ethnic groups.


SAMPLE AND PROCEDURES

All those applying to take July 1980 General Bar Examination (GBX) in
California were asked to complete and return a questionnaire prior to its
administration.  This questionnaire asked applicants to indicate which one
of the categories listed below was the best description of their
undergraduate major.  An applicant that returned the questionnaire but did
not indicate a major was placed in category 9.


        1  Economics, Business, Accounting
        2  Physical Science, Engineering, Mathematics, Biology
        3  Social Science (Anthropology, Psychology, Sociology)
        4  History, Government, Political Science
        5  English, Journalism, Classical Studies, Philosophy
        6  Fine Arts
        7  Education
        8  Other
       (9) No response

Questionnaires were returned by 7,112 (96 percent) of the 7,349 applicants
that took both the Multistate Bar Examination (MBE) and essay portions of
the July 1980 GBX.  Within the group of 7,112 applicants, 79 applicants
were not in one of the four racial/ethnic groups studied in this research.
These groups were:  Anglo, Asian (including Philipino and Pacific
Islander), Black, and Hispanic.  Sex and/or racial/ethnic group data were
not available for another 18 applicants.  The remaining 7,015 applicants
served as the sample for the analyses described in this report.


RESULTS

Table 1 shows the percentage of applicants in each racial/ethnic and sex
group that were in each category of undergraduate major as well as the
total number in each group.  These data indicate that males were more
likely than females to have majored in the fields included in categories 1
and 4.  The reverse was true for categories 3, 5, and 8.  About one third
of all applicants majored in category 4.

Differences among racial/ethnic groups in the relative proportion in each
category were generally much smaller than they were among sex groups.  The
largest difference among racial/ethnic groups was in category 4.  This
category accounted for 40 percent of the Hispanic applicants, but only 32
percent of the Asian applicants.  The differences among racial/ethnic
groups in category 4 were not explained by systematic differences in the
relative percentages of males and females within each racial/ethnic group.
The percentage of Anglos, Asians, Blacks, and Hispanics that were female
were: 30, 29, 38, and 24.  The corresponding percentages of females in each
racial/ethnic group that were in category 4 were: 26, 32, 29, and 32.

Table 1

PERCENTAGE IN EACH SEX AND RACIAL/ETHNIC GROUP IN EACH CATEGORY OF
UNDERGRADUATE MAJOR AND THE TOTAL NUMBER IN EACH GROUP AND CATEGORY

|  | % in each undergraduate major category | | | | | | | | | % of Total | Total |
|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Male | 20 | 9 | 11 | 37 | 10 | 1 | 1 | 6 | 4 | 70 | 4923 |
| Female | 7 | 4 | 21 | 27 | 16 | 4 | 3 | 12 | 6 | 30 | 2092 |
| Anglo | 16 | 8 | 14 | 33 | 12 | 2 | 2 | 8 | 5 | 84 | 5916 |
| Asian | 19 | 9 | 16 | 32 | 8 | 1 | 0 | 10 | 4 | 4 | 300 |
| Black | 15 | 7 | 20 | 34 | 9 | 1 | 3 | 7 | 5 | 6 | 400 |
| Hispanic | 12 | 4 | 19 | 40 | 8 | 1 | 2 | 10 | 3 | 6 | 399 |
| % of Total | 16 | 8 | 14 | 34 | 12 | 2 | 2 | 8 | 5 | 100 | -- |
| Total N | 1129 | 550 | 1004 | 2365 | 830 | 138 | 112 | 565 | 322 | -- | 7015 |

Analyses of variance conducted on MBE, essay, and total GBX scores
indicated that differences in average scores among racial/ethnic and sex
groups were statistically significant. The same was true for undergraduate
major category. However, the combination of all three variables accounted
for less than 10 percent of the variance in scores. In other words, most
of the differences in scores among applicants could not be explained by
differences in their undergraduate major, sex, or racial/ethnic group.

Previous research (Klein, 1980 and 1981) has shown that almost all of the
variance attributable to racial/ethnic and sex group could be explained by
differences among each group's average Law School Admission Test (LSAT)
scores and law school grades (LGPA).

Undergraduate major by itself accounted for only 1 percent of the variance
in MBE, essay, and total GBX scores. Moreover, there were no significant
two way or three way interactions among race, sex, and undergraduate major
on any of the dependent variables. This finding indicates that the general
differences between racial/ethnic and sex groups were reflected within each
category of undergraduate major. Similarly, the differences in average
score among categories were maintained across racial/ethnic and sex groups.
Any deviations from these trends were therefore most likely due to chance.

Table 2 shows the average essay, MBE, and GBX scores for each category of
undergraduate major. Standard deviations within categories were quite
similar to the standard deviations in the total sample (54.8 for essay,
45.7 for MBE, and 92.0 for total GBX). If an applicant had only three
essay answers scored as a result of the multiphased grading process, then
that applicant's essay score was multiplied by 3.0 in order to place it on
a comparable scale of measurement with essay grades assigned to applicants
that had all nine answers graded.

Table 2

AVERAGE GBX SCORES IN EACH CATEGORY OF UNDERGRADUATE MAJOR

|   | Category | Average Score Essay | MBE | Total |
|---|---|---|---|---|
| 1 | Economics, Business, Accounting | 617 | 430 | 1047 |
| 2 | Phys Science, Engineering, Mathematics, Biology | 615 | 434 | 1049 |
| 3 | Social Science | 617 | 423 | 1039 |
| 4 | History, Government, Political Science | 619 | 423 | 1041 |
| 5 | English, Journalism, Classical Studies, Philosophy | 629 | 433 | 1062 |
| 6 | Fine Arts | 616 | 418 | 1034 |
| 7 | Education | 600 | 408 | 1008 |
| 8 | Other | 616 | 422 | 1038 |
| 9 | No response | 612 | 416 | 1028 |
| 0 | Total Sample | 618 | 425 | 1043 |

Table 3 shows the percentage passing in each category. Its also shows the difference in the percentage passing the MBE and essay in each category. For the purposes of this table, scores of 630, 420, and 1050 were needed for passing the essay, MBE, and total GBX.

Table 3

PERCENTAGE PASSING EACH GBX SECTION AND THE DIFFERENCE IN PERCENTAGE PASSING THE MBE AND ESSAY IN EACH CATEGORY OF UNDERGRADUATE MAJOR

|   | Category | Essay | MBE | Total | MBE - Essay |
|---|---|---|---|---|---|
| 1 | Economics, Business, Accounting | 42 | 57 | 49 | 15 |
| 2 | Phys Sci, Engineer, Math, Biol | 42 | 62 | 49 | 20 |
| 3 | Social Science | 42 | 53 | 45 | 11 |
| 4 | History, Gov't, Political Sci | 43 | 52 | 46 | 9 |
| 5 | English, Journ, Class, Phil | 50 | 61 | 55 | 11 |
| 6 | Fine Arts | 43 | 49 | 44 | 6 |
| 7 | Education | 27 | 37 | 30 | 10 |
| 8 | Other | 40 | 50 | 42 | 10 |
| 9 | No response | 39 | 50 | 41 | 11 |
| 0 | Total Sample | 42 | 54 | 46 | 12 |

The data in Tables 2 and 3 indicate that in general, a group's relative standing on one portion of the GBX was a good indicator of its standing on the other portion. For instance, applicants in category 5 (English, Journalism, Classical Studies, and Philosophy) had the highest average essay score and were within 1 point of the highest average MBE score while applicants in category 7 (Education) had the lowest average scores on both measures (see Table 2).

The one major exception to this trend occurred with the applicants in category 2 (Physical Science, Engineering, Mathematics, and Biology). These applicants had the highest average MBE score but a below average essay score. This led to the unusually large difference between MBE and essay passing rates in this category (see Table 3).

Table 4 shows the average scores and the percent passing on the essay and MBE in category 2, category 5, and the total sample by sex group. These data indicate that the anomaly observed in category 2 was due mainly to male applicants performing less well on the essay than would have been expected on the basis of their MBE scores. For instance, 21 percent fewer males in category 2 passed the essay than passed the MBE compared to the 15 percent difference in passing rates on these two parts in the total sample.

The female passing rate on the essay in category 2 was 16 percent higher than the male rate as compared to the 9 percent difference that would have been expected on the basis of the difference between males and females on the essay in the total sample. Female applicants in category 2 and 5 also performed slightly better on the MBE than would have been expected on the basis of total sample data. For example, the female applicants in these two categories had average MBE scores that were only 2 points rather than the usual 4 points below the average score for males.

The total sample columns in Table 4 show that female applicants tended to have higher essay scores than males while the reverse was true on the MBE. Mean scores and passing rates were not always parallel because of random perturbations in score distributions. For instance, females in category 5 had a higher essay average but a lower percent passing the essay than females in category 2.

Table 4

AVERAGE SCORE AND PERCENTAGE PASSING BY SEX GROUP FOR
TWO CATEGORIES OF UNDERGRADUATE MAJOR AND THE TOTAL SAMPLE

| Variable | Sex group | Essay Cat 2 | Cat 5 | Total | MBE Cat 2 | Cat 5 | Total |
|---|---|---|---|---|---|---|---|
| Average score | Male | 613 | 624 | 614 | 434 | 434 | 426 |
| | Female | 630 | 635 | 626 | 432 | 432 | 422 |
| Percent passing | Male | 40 | 47 | 40 | 61 | 61 | 55 |
| | Female | 56 | 55 | 49 | 59 | 61 | 51 |

The number of males and females in category 2 were 460 and 90, respectively. The corresponding numbers in category 5 were 495 and 335.

DISCUSSION

The foregoing finding suggest that an applicant's undergraduate major in
and of itself is unlikely to enhance or inhibit that applicant's score on
either section of the examination.  However, undergraduate major may
interact with other variables in affecting the relationship between MBE and
essay scores.  For example, males in category 5 had a 7 percent higher pass
rate on the essay than males in category 2 but there was no difference in
their pass rate on the MBE.  Although this might suggest that majoring in
the fields included in category 5 helped essay performance, no such trend
was found among female applicants in these two categories.  This led to the
highly statistically significant interaction between sex, undergraduate
major, and type of bar score (essay versus MBE) being investigated.

The effect of undergraduate major on the relationship between bar scores
and other variables may be of particular interest to law school admissions
officers.  Most law school selection systems ignore undergraduate major and
use first year (essay) grades to develop the prediction system.  Thus, they
may be screening out a group of applicants who might do especially well on
the MBE portion of the bar examination.  Law school counselors also might
use undergraduate major along with other measures in order to identify
students who might need additional help in developing their writing skills.

Most of the differences in passing rates among categories are probably due
to the general ability levels of the applicants in these categories.  For
instance, previous research has shown that the combination of law school
admissions test (LSAT) scores and law school grade point average (LGPA)
accounts for 50 percent of the variance in bar scores among applicants.  In
this study, undergraduate major by itself accounted for only 1 percent of
the variance.  It also is unlikely that the amount of variance accounted
for would be significantly increased by adding undergraduate major to a
prediction system that already included LSAT and LGPA (because major
category is probably already highly correlated with LSAT and LGPA).


SUMMARY

This study investigated the relationship between undergraduate major and an
applicant's sex and racial/ethnic group.  The results indicated that among
California applicants to the bar:

   o The choice of undergraduate major was related to an applicant's
     sex; males were more likely to have majored in business and hard
     science related fields whereas females were more likely to have
     majored in literary and social science fields.

   o Undergraduate major by itself accounted for about 1 percent of
     the variance in MBE, essay, and total GBX scores.  There were no
     significant interactions among undergraduate major, sex, and
     racial/ethnic group in predicting any one of these three types of
     bar scores.

   o There was a significant interaction between undergraduate major,
     sex, and the type of bar score (essay versus MBE) being measured.
     This was due primarily to males who majored in the hard sciences
     scoring higher on the MBE than would be expected on the basis of
     their essay scores.  This trend was not found for females.

PR-01-01

# RELATIONSHIP OF SCORE RELIABILITY TO ESSAY TEST LENGTH, QUESTION LENGTH, AND SECTION WEIGHTING

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.

GANSK & ASSOCIATES

October 1, 2001

# RELATIONSHIP OF SCORE RELIABILITY TO ESSAY TEST LENGTH, QUESTION LENGTH, AND SECTION WEIGHTING

California's General Bar Examination (GBX) has two parts. One part is the Multistate Bar Exam (MBE). This one-day test consists of 200 multiple-choice items. The other part of the GBX consists of a two-day written exam that contains six 60-minute essay questions and two 180-minute performance test (PT) problems. The written section carries about twice as much weight as the MBE in determining a candidate's total score and thereby pass/fail status. Licensed attorneys who have been admitted to practice for at least four years in another state are eligible for licensure in California if they just take and pass the written section. This alternate route to licensure is called the "Attorneys" exam.

We investigated the effects on score reliability of reducing the written portion of the California exam to six 30-minute questions plus two 90-minute Multistate Performance Test (MPT) problems. This change would keep the number of questions the same, but eliminate one full day of testing. The major findings of our research (which included analyzing one to three recent July bar exams in 20 other jurisdictions) were as follows:

- When question length is held constant, longer tests (i.e., those with more questions) generally have higher reliabilities and correlations with the MBE than shorter ones.

- When the number of essay questions is held constant, longer questions (as indicated by the amount of testing time that is allocated to them) generally produce more reliable scores than shorter questions.

- Essay and total score reliability varies across states and within states across administrations even when the number of questions asked and the time allocated to answer them is held constant. Several factors may account for this variation.

- Total score reliability on the California exam is about .85 under the current policy of weighting the written section twice as much as the MBE.

- Reducing the written section to one day would *not* reduce its total score reliability *provided* the written and MBE sections are weighted equally.

- Giving the written section twice as much weight as the MBE with a shortened test would reduce total score reliability, but only slightly (from about .85 to .80).

- Changing the weights given to MBE and written sections from 65/35 to 50/50 will increase the passing rate for males (by about 1.7 percentage points) but decrease it for females (by about 1.2 points). Changing the weights assigned to these sections will not systematically increase or decrease the passing rate within a racial/ethnic group.

- Reducing the written section to one day would lower the score reliability of California's Attorneys exam. This is likely to be an important concern.

1

## Overview

The next portion of this report provides background information regarding score reliability and how it interacts with a jurisdiction's bar passage rate. Understanding the principles discussed in this section is necessary to fully appreciate what follows. We then describe the procedures in our study and the results we obtained as well as some important caveats and some possible concomitant effects of shortening the written test.

## Score Reliability

The bar exam assesses a candidate's knowledge, skills, and abilities in various areas of the law. It is obviously not feasible to ask all the questions that could be posed to candidates in these areas on every administration. Hence, any given version (or "form") of the exam (such as July 2000) contains only a *sample* of these questions. Score reliability indicates the degree to which the scores on this sample are likely to be *representative* of the scores these candidates would earn if they answered other sets of questions from the same pool of questions that could have been asked.

Score reliability also can be thought of as a measure the confidence that can be placed in the likelihood that the scores the candidates earned on the test that was given would correspond to their scores on an equivalent test that could have been given (such as the one slated for the next administration of the exam). Thus, score reliability refers to the *consistency* or *stability* of a candidate's score across different samples of questions that could be asked. Put another way, score reliability indicates how confident we can be in *generalizing* from the results with the particular sample of questions that were asked to the larger domain of all the relevant questions that could have been asked.

Several factors affect score reliability. For example, most candidates have only partial knowledge of a subject. Consequently, some candidates will be able to answer certain questions but not others while the reverse is true for other candidates. Similarly, some candidates may be "morning" people while others may function better later in the day. On essay tests, there also is the problem that different readers (or the same reader on different occasions) may assign different scores to the same answer.

All of these and many other extraneous factors can affect a candidate's score. Hence, a candidate's score has two components: (1) the systematic and consistent part (which is called "*true*" variance) and (2) the noise or chance part (which is called "*error*" variance). The true part is estimated from the degree to which a candidate's performance is consistent across different questions, such as the extent to which their scores on the even numbered MBE items corresponds to their scores on the odd numbered items. The *total* variance (i.e., the true + error variance) is a function of the standard deviation of the total scores (i.e., how much they spread out around the mean total score).

The *reliability coefficient* equals the true variance's share of the total variance; i.e., score reliability equals true variance divided by total variance. Reliability coefficients can therefore range from 0.00 to 1.00. A 0 coefficient indicates that we would have no confidence in the score being indicative of how a candidate would perform relative to others if we had asked a different sample of comparable questions. A 1.00 coefficient indicates that the relative standings of the candidates on one form of the test would be identical to their standings on another form of it.

## Score Reliability and Passing Rates

Almost all jurisdictions base their overall pass/fail decisions on a weighted combination of a candidate's essay and MBE scores. The reliability of this total score is a function of the reliabilities of the MBE and essay scores plus the correlation between these scores. The higher this correlation and the higher the reliabilities of the MBE and essay sections, the higher the reliability of the total scores. Thus, when state boards consider changing the structure of the essay portions of their bar exams, they will need to consider the effects of these changes on the correlation between MBE and essay scores as well as on the reliability of the essay section itself. Unfortunately, a change that lowers the score reliability of the essay section will also tend to lower its correlation with the MBE.

To illustrate, suppose a state's essay test consisted of six 60-minute questions. Our data suggest this will likely lead to an essay score reliability of about .71 and about a .62 correlation between essay and MBE scores. The MBE's score reliability is typically about .88. If the MBE and essay were weighted equally in computing a candidate's total score, then the reliability of these total scores would be about .87. It would slip slightly to about .83 if the essay carried twice as much weight as the MBE.

Now suppose this state shortened its essay test to six 30-minute questions; i.e., from a six-hour test to a three-hour test. Our data indicate this will lower the reliability of the essay section from .71 to about .54. It also will reduce the essay's correlation with the MBE to about .55. Taken together, these changes will lower the reliability of the total scores to about .81 if the sections are weighted equally and to .73 if the essay carries twice as much weight as the MBE. However, this loss in total score reliability could be offset somewhat by using the three hours that were taken away from the essay to add two Multistate Performance Test (MPT) problems to the exam.

Whether a change in the reliability of the total scores is policy relevant or not depends heavily on a state's passing rate. Specifically, the closer that rate is to 50%, the more important it is to have high total score reliability. Conversely, if almost everyone passes (or everyone fails), score reliability becomes much less critical because it is unlikely that using a different form of the test would result in changing the pass/fail status of many candidates.

3

Table 1 shows the relationship between score reliability, passing rate, and the likelihood of changing a candidate's pass/fail status as a result of simply administering a different form of the test. For example, if the reliability of the total scores is .90 and 80% of the applicants pass, then about 10% of them would have a different pass/fail status if they took another form of the test. In other words, some would go from passing to failing while others would move in the opposite direction. In contrast, if reliability slips to .80 and only 60% pass, then 20% of the candidates would have their pass/fail status affected by just taking a different form of the test. Hence, whether a small or even a fairly large reduction in score reliability matters depends heavily on a jurisdiction's passing rate. The closer that rate is to 50% for all takers, the more important score reliability becomes.

The overall passing rates on the February and July 2000 California GBX were 40% and 55%, respectively. The corresponding rates on the Attorneys exam were 54% and 55%. Because these rates are so close to 50%, score reliability is an especially important consideration for California.

**Table 1**
Percentage of Candidates Who Would Have a Different Pass/Fail Status if They Took a Different Form of the Test as a Function of Passing Rate and Total Score Reliability

| Percent Passing | Score Reliability | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | .00 | .10 | .20 | .30 | .40 | .50 | .60 | .70 | .80 | .90 |
| 90 | 19 | 17 | 16 | 16 | 15 | 14 | 12 | 11 | 9 | 6 |
| 80 | 32 | 30 | 28 | 26 | 24 | 22 | 20 | 17 | 14 | 10 |
| 70 | 42 | 39 | 37 | 34 | 32 | 29 | 25 | 22 | 18 | 13 |
| 60 | 48 | 45 | 42 | 38 | 35 | 32 | 28 | 24 | 20 | 14 |
| 50 | 50 | 47 | 44 | 40 | 37 | 33 | 29 | 25 | 21 | 15 |
| 40 | 48 | 45 | 42 | 38 | 35 | 32 | 28 | 24 | 20 | 14 |
| 30 | 42 | 39 | 37 | 34 | 32 | 29 | 25 | 22 | 18 | 13 |
| 20 | 32 | 30 | 28 | 26 | 24 | 22 | 20 | 17 | 14 | 10 |
| 10 | 19 | 17 | 16 | 16 | 15 | 14 | 12 | 11 | 9 | 6 |

## Research Methods

We examined recent July bar exam results from 21 jurisdictions. These jurisdictions ranged from having only 65 to nearly 8,000 July candidates. Together, these jurisdictions account for roughly 70% of all the bar exam takers annually. We restricted our study to states whose exams yielded scores on six or more independently graded essay questions. Almost all the states from which we requested scores were able to provide these data.

4

Data were analyzed for one to three exams for each of the participating jurisdictions. All told, we examined data for 42 exams that together contained over 400 questions. The results with state developed essay questions did not appear to differ systematically from those obtained with Multistate Essay Exam (MEE) questions. Thus, we did not distinguish between them in this report.

Where possible, we examined the reliability of each jurisdiction's full test. We also created as many completely separate six-question and nine-question essay subtests as the data would allow. For example, we formed two subtests per exam administration for the states that asked 12 essay questions, but only one six-question subtest (usually the first six questions) for states that asked 8 questions. When we were able to create more than one subtest for a state's exam, we computed statistics separately for each subtest and then used the average of their values for that administration. Thus, the unit of analysis is an administration of an exam.

## Effects of Test and Question Length

Table 2 shows the average of the score reliabilities for various combinations of test and question length. It is evident from this table that if the number of questions asked is held constant, then longer questions (i.e., those to which more testing time is allocated) provide more reliable scores than shorter questions. Similarly, if the time to answer is held constant, then the tests with more questions generally provide more reliable scores. Note also that asking 12 essay questions in six hours yields a score reliability that is roughly the same as asking 6 essay questions in six hours (.67 and .71, respectively). There did not appear to be a systematic relationship between the number of candidates in a jurisdiction and the size of its reliability coefficients.

### Table 2
Mean Score Reliability for Different Combinations
of Test and Question Length

| Minutes per Question | Number of Essay Questions | | | |
|---|---|---|---|---|
| | 6 | 9 | 12 | >12 |
| 25-30 | .53 | .64 | .67 | .76 |
| 36-45 | .63 | .73 | | |
| 50-60 | .71 | | | |

Table 3 shows the correlation of MBE scores with tests of varying lengths. These data have the same general pattern as those in Table 2; i.e., increasing the number of questions and/or their length increases the correlation of their scores with MBE scores.

**Table 3**
Mean Correlation with the MBE for Different
Combinations of Test and Question Length

| Minutes per Question | Number of Essay Questions | | | |
|---|---|---|---|---|
| | 6 | 9 | 12 | >12 |
| 25-30 | .54 | .60 | .60 | .69 |
| 36-45 | .63 | .67 | | |
| 50-60 | .63 | | | |

## Other States' Experiences With the Proposed Structure

California's General Bar exam consists of the MBE, six 60-minute essay questions, and two 180-minute performance test problem. The score on a PT answer is nominally given twice as much weight as the score on an essay answer. The mean score reliability over the three July exams for its written (essay plus PT) section is .74. The mean correlation of this section with the MBE is .64. Total score reliability is .88 if the sections are weighted equally and .85 if the written section has twice as much weight as the MBE.

One of the other jurisdictions we studied ("State A") gave two 90-minute MPT problems and a dozen 30-minute essay questions. Analyses of its July 2000 data indicated that a written test composed of six 30-minute essay questions and two MPTs would have a written score reliability of .63. Such a test would have a .60 correlation with the MBE. These values would lead to a total score reliability of .85 if the sections are weighted equally and a .78 if the written section is weighted twice as much as the MBE.

Another jurisdiction ("State B") also gave two 90-minute MPTs and several essay questions. Averaging results over the last three July bar exams in this jurisdiction indicated that the combination of a three-hour essay test plus two 90-minute MPTs would have a written test score reliability of .65 and a correlation of .62 with the MBE. The reliability of this state's total scores would be .85 if the written and MBE sections were weighted equally and .80 if the written section had twice as much weight as the MBE.

A third jurisdiction ("State C") had exactly the same written test structure as California, but used half the testing time by giving six 30-minute essays and two 90-minute MPTs. By averaging data over the last two July exams (and giving each PT answer twice the nominal weight assigned to an essay answer) we found that State C's written section had a score reliability of .67 and a .61 correlation with the MBE. The reliability of the total scores was .86 when the sections were weighted equally and .81 when the written section was given twice as much weight as the MBE.

Table 4 contrasts the results in States A, B, and C with those in California. These data suggest that cutting the time California currently allocates to its written section in half would not affect total score reliability *provided* California gave the written and MBE sections equal weight. However, if California cut testing time in half and continued to give the written section twice as much weight as the MBE, then there would be slight (.05) drop in total score reliability (i.e., from about .85 to about .80).

**Table 4**

Estimated Total Score Reliability as a Function of Question Length
and the Weight Given to the Written Section Relative to the MBE

| State | Written Test Length | Written and MBE have equal weights | Written has twice the weight as the MBE |
|---|---|---|---|
| A | 6 Hours | .85 | .78 |
| B | 6 Hours | .85 | .80 |
| C | 6 Hours | .86 | .81 |
| California | 12 Hours | .88 | .85* |

\* California's current exam

## Concomitant Effects

It is conceivable that reducing the GBX's total score reliability from its present .85 to about .80 could have some very slight downstream consequences on other outcomes. Specifically, for reasons that go beyond the scope of this report, it will tend to slightly reduce the standard deviation of the total scores. This could, in turn, lead to a very small reduction in the February passing rate and a very slight increase in the July rate (because the passing score is above the mean in February but below the mean in July). Reducing total score reliability from .85 to .80 would very slightly reduce or have no effect on the differences in passing rates among gender and racial/ethnic groups.

As noted above, reducing the written section from a two-day test to a one-day test is likely to reduce the reliability of the written scores from about .74 to about .65. This may raise concerns about the stability of the pass/fail decisions on the Attorneys exam. Specifically, about 55% of the Attorney candidates pass this test. If score reliability is .74, then according to the data in Table 1, slightly more than one-out-of-five of the Attorney exam candidates would have their pass/fail status affected by simply taking another form of the test. If score reliability dropped to the expected .65 for a one-day written test, then about one-out-of-four candidates would experience a change in status just by taking another form of the test. In short, chance would play an even larger role in determining an Attorney candidate's pass/fail status.

There would be similar concerns in states that allow candidate's to "bank" their essay scores and/or require them to surpass a certain minimum score on each section of the exam. In short, written score reliability will be an issue when these scores are used by themselves to make pass/fail decisions (i.e., rather than in conjunction with MBE scores).

## Effect of Section Weighting

Changing the weight the MBE carries relative to the written section could have policy implications. To examine this issue, we recomputed every candidate's total scale score (prior to reread) on the last six July exams using a 50/50 written to MBE scale score weighting policy. We then contrasted the percent passing with these recomputed scores with the percent passing based on total scores (prior to reread) with the existing 65/35 weighting.

This analysis found that about 4.3% of the candidates who would pass under the current 65/35 weighting would fail if the weights were 50/50. Similarly, about 4.2% of those who would pass under a 50/50 weighting policy would fail under the current 65/35 policy. Thus, overall, about 8.5% of the candidates would have their pass/fail status affected by which set of weights was used, with about half of them going from a pass to a fail while the other half going in the opposite direction.

Which set of weights is used had almost no effect on the passing rates within racial/ethnic groups. For example, over the last six July exams, the passing rates prior to reread for Hispanics with the 65/35 rule and the 50/50 rule were 41.5% and 41.6%, respectively. The corresponding rates for African Americans were 27.9% and 27.8%. In short, weighting policy did not have much if any impact on a racial/ethnic group's passing rate.

The choice of weights did have a small effect on the passing rates within gender groups. Changing the weights from 65/35 to 50/50 would increase the passing rate for males by about 1.7 percentage points while decreasing it for females by about 1.2 points. These changes would occur because males generally earn higher scale scores on the MBE than on the written section while the reverse is true for females.

## Caveats

Several caveats should be kept in mind when considering the results presented above. First, the score reliability of an essay test depends on several factors, including the characteristics of those tested and those who grade their answers. Consequently, the reliability of essay scores varies across jurisdictions even when they ask the same questions, use the same time limits, and endorse the same grading standards as other jurisdictions. Thus, the experience in one jurisdiction may not coincide exactly with the experience in another.

Second, score reliability may be affected by the number of different subjects for which candidates had to prepare, the degree to which these subjects overlapped those on the MBE, what candidates were told and learned in their bar review courses, the diversity of the subjects covered by the questions that actually appeared on the test, the quality of the questions that were asked, and the procedures used in grading the answers to them.

Third, the number of questions asked may influence drafting, editing, and scoring practices. For example, a board that asks six questions may devote more time to writing and grading each of them than a board that asks 12 questions. Similarly, a state with relatively few candidates can devote more time to grading answers or even grading each answer twice. As a consequence, increasing test length from 6 to 12 questions may not increase score reliability as much as would otherwise be expected by standard statistical formulas.

Fourth, the analyses presented in this report are based solely on July exams. We did this in the interests of consistency because some of the states we wanted to include only give the test in July or had so few February takers as to render the results with their exams questionable. Our experience indicates that February exams tend to have slightly lower total score reliabilities than July exams.

Fifth, score reliability may vary across jurisdictions even when they ask the same questions and the same number of questions in the same amount of time and have ostensibly similar populations of candidates. For example, we found that score reliabilities ranged from .40 to .67 across the 22 exams for which we had data on one or more six-question essay tests with exactly 30 minutes per question. Thus, there was quite a lot of variation around the median value of .54 for an essay test of this length.

Sixth, our study focused on estimating how shortening the written section would affect score reliability. We did not examine whether shorter essay and PT questions would assess the same (or more or less appropriate) skills and abilities as longer ones.

Finally, some states, such as New York, consistently obtain a higher degree of score reliability per hour of essay testing time than other jurisdictions. And, score reliability may vary considerably within a state across administrations of its exam. It is not clear why such variation occurs (e.g., the standard deviation of MBE scores is generally quite comparable across states).

## Conclusions

The data in this report show that essay score reliability tends to increase as the number of questions asked increases. Increasing the amount of testing time per question (as a proxy for question length) also increases essay score reliability. Reducing test or question length will therefore tend to have the opposite effect. However, even a large reduction in question length is unlikely to have any practical effect on the reliability of total exam scores provided the MBE and written sections are weighted equally in the computation of those total scores. This outcome stems from the substantial correlation between MBE and written scores (and the MBE's high score reliability).

Nevertheless, there are some situations where a reduction in the written section's score reliability could be a serious concern. Specifically, this is likely to be a significant issue for any exam (including California's Attorneys exam) that bases pass/fail decisions on written test scores alone. This is an especially important concern when the passing rate is close to 50% (as it is on California's Attorneys exam).

Finally, how much weight is given to the written section relative to the MBE in computing a candidate's total scale score is likely to have some effect on the passing rates within gender groups. This will happen because males tend to earn higher MBE than written scores while the reverse is true for females.

**STATISTICAL NOTES**

Table 1 was created by conducting a Monte Carlo simulation with 10,000 replications. It assumes that both tests have equal means and variances, and that their scores are distributed normally. Deviations from these assumptions would tend to lower agreement.

The table below shows the number of tests that were used to calculate the mean values that appear in Tables 2 and 3. A given exam was often used to calculate the mean for more than one cell in these tables. For example, analyses of the data from states that asked a dozen 30-minute questions were used to estimate the reliability for tests with 6, 9, and 12 questions.

Number of Tests Used to Calculate Score Reliability and Correlation with MBE

| Minutes per Question | Number of Essay Questions | | | |
|---|---|---|---|---|
| | 6 | 9 | 12 | >12 |
| 25-30 | 27 | 21 | 9 | 4 |
| 36-45 | 5 | 5* | | |
| 50-60 | 8 | | | |

    * Three of the exams in this group contained 8 questions. The other two contained 10 questions apiece. However, the values in this cell were very similar across the five exams.

All the reliability coefficients in this report are unstandardized coefficient alphas. Calculations of total score reliability assumed that the MBE's reliability was .88 which is typical of that reported by ACT for July administrations.

The formula for estimating the reliability of the total scores of an equally weighted linear composite of MBE and essay (or written) scores is shown below where A = the reliability of the essay test, B = reliability of the MBE, and C = the correlation between them.

$$Rtt \text{ when weighted equally} = 1 - [(2 - A - B)/(2 + 2*C)]$$

The formula for estimating the reliability of the total scores of a differentially weighted linear composite of written and MBE scores is shown below where A, B, and C are the same as above, D = standard deviation of the essay, E = the square of this standard deviation, F = standard deviation of the MBE, and G = the square of this standard deviation.

$$Rtt \text{ when weights differ} = 1 - \{[(E + G) - (A*E) - (B*G)]/[(E + G) + 2(C*D*F)]\}$$

Sections are weighted by the relative sizes of their standard deviations. For example, for the analyses that gave the written section twice as much weight as the MBE, we set the written section's standard deviation at twice the size as the MBE's standard deviation.

11

RESEARCH ON THE CALIFORNIA BAR EXAMINATION:
A TEN YEAR RETROSPECTIVE

A report prepared for
The Committee of Bar Examiners
of the State Bar of California

Prepared by

Stephen P. Klein, Ph.D.
GANSK & ASSOCIATES

December 22, 1982

RESEARCH ON THE CALIFORNIA BAR EXAMINATION:
A TEN YEAR RETROSPECTIVE

This report summarizes the major findings of the studies conducted on
California's bar examination during the past 10 years.  These studies
investigated: various characteristics of the examination (such as the
appropriateness of its time limits), essay grading practices, the accuracy
of multiphased grading, the stability of pass/fail standards, correlates of
initial and eventual pass/fail status, possible racial/ethnic and sex
biases, and the relationship of traditional measures of legal skills and
knowledge to the ability to perform legal tasks.  A list of the studies
conducted is attached at the end of this report, and hereinafter the
studies are referred to by number as shown on the list, e.g. (4, 6).

CHARACTERISTICS OF THE BAR EXAMINATION

California's General Bar Examination (GBX) contains a one day multiple
choice section and a two day essay section.  The multiple choice section is
the Multistate Bar Examination (MBE).  The MBE consists of 200 items that
are drawn from 6 content areas.  The essay section currently contains 9
questions.    Applicants can pass the GBX by earning a combined total score
(i.e., MBE + essay) equivalent to 70% of the maximum possible total score
and/or by passing one section on one administration and the other section
on another administration.

Research on the GBX indicates: there is a strong correlation between essay
and MBE scores (e.g., applicants that pass one section are likely to pass
the other section whereas those who fail one section are likely to fail the
other section); about 16% more first timers pass the MBE as pass the essay;
even substantial increases in the time allowed to answer an MBE or essay
question does not change an applicant's relative standing any more than
would be expected by chance; and the sequence in which the questions are
asked does not affect an applicant's performance on these questions (4, 6,
11, 13).

ESSAY GRADING PRACTICES

Possible inconsistencies in grading an essay question were investigated by
having several readers independently score a common set of answers as well
having a reader grade the same set of answers on two or more occasions (2,
8, 11).  Results of this research indicate: readers agree with themselves
only slightly better than they agree with each other; using an analytic
(scorecard) grading system is not as cost effective as the traditional
(holistic) method; having applicants answer about 9 questions balances out
most of the inconsistencies that can be avoided by the use of multiple
questions; and using the average of two independent readings of an answer
also helps to balance out reader inconsistencies (but not as much as having
multiple questions).

The grading practices research and other studies (6, 9) show that the total
score on a 9 question essay test, by itself, is not reliable enough to make
pass/fail decisions about individual applicants if each answer is read only
once.  This would be so even if there was as many as 20 essay questions.
However, the current combination of 9 essay questions plus the MBE provides
a total score that is sufficiently reliable for making pass/fail decisions.

MULTIPHASED GRADING

The bar examination is used to make pass/fail decisions about individual
applicants rather than to determine by how much an applicant passed or
failed.  Research indicated these decisions could be made with greater
accuracy if reader resources were concentrated on those applicants whose
pass/fail status was most in doubt (2); and, such reallocation would not
introduce other errors (4, 5).  These findings led to a policy of passing
applicants if they had sufficiently high scores on a combination of the MBE
and 3 essay questions.  Pass/fail decisions on the remaining applicants are
made after reading all 9 of their essay answers at least once, and for
those near the pass/fail line, two or more times.

Tests of the multiphased grading system show that: it reduces the total
number of answers that have to be read; it increases the reliability of
pass/fail decisions; it increases the passing rate by about 0.5% (i.e.,
compared to the rate if all applicants had all of their answers read at
least once); and its accuracy is not affected by which 3 essay questions
are read in the first phase of the grading process (7, 11).


STABILITY OF PASS/FAIL STANDARDS

A different set of questions is asked each time the GBX is administered.
Thus, the percent passing a given administration could be affected by any
variation in the GBX's difficulty across administrations as well as by the
ability of the group taking that examination.

On the multiple choice portion of the GBX, raw scores (i.e., the number of
questions answered correctly) are converted to scale scores in order to
adjust for possible variations in average question difficulty across
administrations.  Empirical studies with the MBE have demonstrated the very
high degree of accuracy of the standard statistical procedures that are
used for this scaling (18).

It is not possible to adjust the essay scores in the same way the MBE
scores are adjusted.  Nevertheless, studies of past California examinations
indicate that essay scores have not been biased by possible variations in
question difficulty (and/or essay grading standards) across administrations
(4, 9, 11).  Thus, differences in percent passing from one examination to
another stem from differences in the applicants' legal skills and abilities
rather than from variations in test difficulty.


CORRELATES OF GBX SCORES

Applicants with English and science undergraduate majors have higher
average GBX scores than applicants who majored in the social sciences or
education (12).  The only exception to this trend is that male, but not
female, science majors score below average on the essay section.

GBX scores are highly correlated with law school admissions scores and law
school grades (1, 3, 6).  In fact, the correlation is about four times
stronger than it is between law school grades and the combination of
undergraduate grades and law school admissions scores.  The essay portion
of the GBX tends to be more highly correlated with law school grades than
with admissions scores while the opposite is true for the MBE.

The first year law student's examination (FYLSX) is a good predictor of an applicant's initial score and eventual pass/fail status on the GBX (10). Applicants who score at the pass/fail line on the FYLSX are likely to fail on their first attempt to pass the GBX. However, they have a slightly better than 50/50 chance of eventually passing the GBX.

In general, applicants from American Bar Association (ABA) approved law schools earn higher GBX scores than applicants from schools that are only accredited by California who in turn receive higher scores than applicants from unaccredited schools (6, 11, 13). However, there are numerous exceptions to these trends. In fact, from time to time, an unaccredited school will have a higher pass rate than an ABA approved school. And, there is less difference among school types in eventual passing rates than there is among them on any given examination (10).

Applicants of a given ability level (as indicated by their law school admissions scores) are more likely to pass the GBX if they graduated from an ABA school than if they graduated from some other type of law school. A few ABA schools have especially high passing rates relative to the ability level of their graduates (3, 6).

First time takers have a much higher passing rate than repeaters (6, 13). Repeaters who came close to passing on their first attempt are far more likely to eventually pass (and in fewer attempts) than are repeaters who score well below passing on their first try (10). However, there is no initial score that clearly distinguishes between the repeaters who will versus will not eventually pass. About 5% of the repeaters (or 1% of all applicants) pass the GBX as a result of the rule that permits passing the GBX by passing one section on one administration and the other section on another administration. However, far more than 5% of the repeaters fail because they try to pass solely on the basis of this bifurcation rule.


RACIAL/ETHNIC BIAS

The percentage of minority applicants that pass the GBX is well below the percentage of Anglo applicants that pass. This gap has occurred despite the fact that about 43% of all the minority applicants taking the GBX graduated from the 5 ABA schools with the highest average admissions scores (6). Only 23% of the Anglo applicants graduated from these 5 schools.

Three types of studies were conducted to determine whether the differences in passing rates among four racial/ethnic groups (Anglo, Asian, Black, and Hispanic) were attributable to certain characteristics of the examination or to differences in the average academic ability level of the groups. The three types of studies were: grader bias, item bias, and test bias.

The grader bias study (1) showed that an applicant's score on an essay answer was not affected by whether or not the reader of that answer was a member of the same racial/ethnic group as the applicant.

The item bias studies (1, 17) found that various types of multiple choice or essay questions were not especially difficult or easy for minority groups. In other words, the relative differences between groups were not affected by the type of question asked or the content area covered by a question.

The test bias studies (1, 3, 6) indicate that the differences in average
score between groups on both the essay and multiple choice portions of the
GBX are consistent with the differences in their law school admissions
scores and law school grades. Thus, the GBX does not widen or narrow the
gap in performance level between groups. The gap also would not change if
the GBX's time limits were substantially increased (11, 13) or if the GBX
were expanded to include oral and written clinical skills tests (14, 15).


SEX BIAS

Women generally have higher GBX scores then men. They also tend to have
higher law school admissions scores and grades. The sex bias studies (3,
6) show that after controlling for differences in law school admissions
scores and grades, women tend to do slightly better than men on the essay
portion of the GBX whereas men tend to do slightly better than women on the
multiple choice portion. However, these differences are not large enough
to appreciably affect the relative passing rates of the groups.


RELATIONSHIPS WITH PERFORMANCE TESTS OF LAWYERING SKILLS

Three performance tests were given in conjunction with the July 1980
administration of the GBX. One test assessed some of the skills that are
required for carrying out legal research, such as the ability to determine
whether and how decisions in the legal literature could be used to support
a client's case (14). Applicants taking the research test received copies
of the statutes, cases, and other relevant documents on which they were to
base their answers. Thus, it was similar to an open book examination.

The second performance test assessed certain trial practice skills (16).
In this test, applicants were given background materials about a case,
shown a brief segment of the legal proceedings via a videotape, and then
asked 1 to 3 questions about the segment, such as whether an objection that
was made should be granted. Applicants had 5 to 10 minutes to answer the
questions before the next segment in the proceedings appeared on the screen.

The third test was administered via an Assessment Center that was conducted
two weeks after the GBX (15). An applicant participated in the center for
two days. On one day, the applicant functioned as the attorney for the
plaintiff from the beginning to the end of a simulated case. On the other
day, the applicant served as defense counsel in a different case. Each
day, the applicant took several oral and written tasks. Specially trained
actors played the roles of clients and witnesses for the oral tasks.
Performance on an oral task was videotaped for later evaluation.

Analyses of the performance test data indicate they can be administered
under standardized conditions and scored reliably. Applicants report these
tests are better and more realistic measures of their legal skills than are
either the essay or MBE portions of the GBX. Applicants with some clinical
legal experience score higher on the performance tests then do applicants
without such experience. Research, Trial Practices, and Assessment Center
scores correlate about as well with GBX scores as MBE and essay scores
correlate with each other. Scores on the performance tests correlate
higher with each other than they do with GBX scores.

In summary, the performance tests measured a related group of skills; and, the skills in this group are similar to, but not exactly the same as, those measured by the GBX. Cost, test security, and other factors suggest that some of the machine scorable and essay portions of the performance tests, but not the oral portions, could be included in a bar examination.

REFERENCES

Reports prepared for the Committee of Bar Examiners:

1) An investigation of possible item and grader biases in a state bar examination. (1976)

2) An analysis of grading practices on the California Bar Examination. (1977)

3) An analysis of possible sex and racial/ethnic biases in the July 1976 California State Bar Examination. (1978)

4) Summary of studies conducted for the Committee of Bar Examiners and the statistical rationale underlying proposed changes. (1978)

5) Comparison of an 8, 9, and 12 answer essay test in a multiphased pass/fail decision model. (1978)

6) An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group. (1979)

7) A comparison of the effectiveness of a single versus multiphased grading system. (1980)

8) Intra- and inter-reader agreement on the essay section of the California State Bar Examination. (1980)

9) An analysis of possible variations in pass/fail standards on the California State Bar Examination. (1981)

10) The relationship between initial score and eventual pass/fail status on the California Bar Examination. (1982)

11) Analysis of the February 1982 bar examination. (1982)

12) The relationship between undergraduate major and bar examination scores. (1982)

Reports prepared for the Committee of Bar Examiners and the National
Conference of Bar Examiners:

13) The effect of time limits, item sequence, and question format on
    applicant performance on the California Bar Examination. (1981)

14) Testing research skills on the California Bar Examination. (1981)

15) The relationship between clinical skills and bar examination results.
    (1982)

16) The relationship between trial practice skills and bar examination
    results. (1982)


Reports prepared for the National Conference of Bar Examiners involving
California data:

17) An evaluation of the Multistate Bar Examination. (1982)

18) Technical Manual for the Multistate Bar Examination. (in preparation)

PR-08-02

# INITIAL AND EVENTUAL PASSING RATES ON THE CALIFORNIA BAR EXAMINATION BY SCHOOL AND SCHOOL TYPE FOR SIX COHORTS OF FIRST TIMERS

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.
GANSK & Associates

October 8, 2008

This report describes the procedures that were used and the results obtained in a longitudinal analysis of eventual passing rates on the California Bar Exam. Results are reported by school and school type for six cohorts of first time takers from 38 non-ABA approved law schools plus summary data across 20 California ABA approved schools. Each cohort was followed over six administrations of the exam. Appendices contain data by school, cohort, and school type.

## Procedures

We examined the initial (first timer) and eventual passing rates of candidates from California ABA approved, California Accredited, and three types of Unaccredited law schools, namely: Correspondence, Distance Learning, and Fixed-Facility. We did not track graduates of non-California ABA law schools or those who took the Attorneys' exam.

Candidates were defined as having eventually passed if they passed on their first attempt or if they retook the exam and passed by the fifth time it was offered following their initial attempt, i.e., a total of six opportunities to pass including their first one. For example, July 2005 first timers were deemed eventual passers if they passed by the time the February 2008 results were released. We used a six-exam window because cross-sectional data show that 99% of those who pass the California exam do so by their sixth try (there is no limit on the number of times a candidate may take the exam).

We tracked six cohorts of applicants. The first cohort began with those who took the exam for the first time in February 2003. This cohort was followed through and including the July 2005 exam. The most recent cohort consisted of those who took the exam for the first time in July 2005. To insure comparability, each cohort was tracked for six consecutive administrations of the exam, i.e., including the first one they took.

The analysis included candidates who took the exam once, failed, and did not try again. Candidates who were not successful on their first attempt did not necessarily sit for all the California exams they could have taken during their five exam follow-up period and a few probably took the exam again after their six exam window closed, but if they did, cross-sectional data indicate they had a very low likelihood of passing.

1

## Results

Table 1 combines data across the six cohorts to show the number and percentage of candidates who passed on their first attempt, passed after their first attempt, failed despite retaking the exam one or more times, and failed without trying again within their follow-up period.   These data indicate that when results are summed across schools, 88.2% of the graduates from California ABA approved law schools eventually passed the exam – 68.6% passed on their first try and another 19.7% passed after a total of two or more attempts.

Graduates of California Accredited schools and applicants from Unaccredited schools had eventual passing rates of 49.2% and 43.6%, respectively.   The Unaccredited schools had a lower eventual passing rate than the California Accredited schools because of the low eventual passing rate of graduates from Unaccredited Fixed-Facility schools. Table 2 shows that unaccredited Correspondence and Distance Learning schools had the same or even a higher eventual passing rate than California Accredited school graduates. A number of Unaccredited law schools had no first timers in the years included in this research and are therefore not included in the applicable tables.

Table 3 shows that following candidates for up to six exams rather than just three exams resulted in a small but significant increase in eventual passing rates.  This was especially true at the California Accredited schools where the eventual passing rate for the six exam window was 8.7% higher than the rate for the three exam window. Less than one in five applicants from an Unaccredited Fixed-Facility school passed within the three exam window.   The difference in eventual passing rates between the six and three exam windows was smaller at the California ABA schools because so many of their graduates passed on their first try.

Table 4 shows that about two-thirds of the 2,691 candidates who passed after taking the exam two or more times did so by their second attempt.  Only 6% of the successful repeaters passed as a result of taking the exam more than four times.

## Appendix A and B

Appendix A shows the initial and six exam eventual passing rates for each of the three cohorts that began with a February exam and the three that began with a July exam.  Each table also shows the results by the year in which the candidate sat for the exam for the first time.  There is a separate table for each school type.

The three cohorts that began in July had higher eventual passing rates than the three that began in February.  This difference most likely resulted from July first timers having higher average bar exam scores (and thereby having a higher first timer passing rate) than February first timers.  For example, there were 449 candidates from ABA approved schools who took the California bar exam for the first time in February of 2003.  Within this cohort, 256 candidates (57%) passed on their first try and 105 (23%) passed after taking the exam one or more additional times up to a total of six.   Thus, this cohort had a 57% + 23% = 80% eventual passing rate.  In contrast, the cohort of 3311 ABA first timers that took the exam for the first time in July 2003 had a first timer passing rate of 71% and an eventual rate of 89%.

2

Annual eventual passing rates were fairly stable across cohorts. For instance, eventual passing rates for the combined February and July exams for 2003, 2004, and 2005 at ABA schools were 88%, 86%, and 87%, respectively. The corresponding eventual passing rates at California Accredited schools were 50%, 50%, and 45%. Results for the three types of Unaccredited schools were less consistent across years, perhaps because they had fewer candidates per cohort (e.g., all six cohorts combined had only 133 Correspondence school candidates).

Appendix B shows the six exam eventual passing rate in each cohort and overall for each school studied. There is a separate table for each school type. A comparison of the far right hand column of each table shows that the eventual passing rates at ABA schools were almost always higher than they were at the California accredited schools, but the passing rates at the Accredited schools were not consistently higher than the rates at Unaccredited schools.[1] In fact, on the average, graduates of Unaccredited Correspondence and Distance Learning schools actually had a slightly higher eventual rate than did graduates of Accredited schools.

## Conclusions

At all of the five types of schools studied, eventual passing rates were significantly higher than initial rates. This was particularly true at the California Accredited and Unaccredited schools because these schools had much lower first timer passing rates than did the ABA approved schools. On the average, less than 50% of the graduates from the non-ABA approved schools passed the exam within three years of their first attempt. Findings were fairly stable across the six cohorts studied.

---

[1] Because of software constraints, the percentages in Appendix A and B were truncated rather than rounded (e.g., a value of 17.9 was set to 17). This had no material impact on results or conclusions. Exact percentages may be calculated from the applicant counts in the tables.

Table 1
Number and Percentage of Candidates Initially and Eventually Passing (after a total of 6 exams) by School Type

| | ABA | | CA Accredited | | All Unaccredited | | Total | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| Pass 1st Try | 8,142 | 68.6 | 277 | 25.0 | 143 | 26.9 | 8,562 | 63.4 |
| Pass >1 Try | 2,334 | 19.7 | 268 | 24.2 | 89 | 16.7 | 2,691 | 19.9 |
| Subtotal | 10,476 | 88.2 | 545 | 49.2 | 232 | 43.6 | 11,253 | 83.3 |
| Fail >1 Try | 1,025 | 8.6 | 469 | 42.3 | 239 | 44.9 | 1,733 | 12.8 |
| Fail only 1 Try | 375 | 3.2 | 93 | 8.4 | 61 | 11.5 | 529 | 3.9 |
| Subtotal | 1,500 | 11.8 | 562 | 50.8 | 300 | 56.4 | 2,262 | 16.7 |
| Grand total | 11,876 | 100.0 | 1,107 | 100.0 | 532 | 100.0 | 13,515 | 100.0 |

N = number of takers

4

Table 2
Number and Percentage of Candidates Initially and Eventually Passing (after a total of 6 exams) by Type of Unaccredited School

|  | Correspondence | | Distance Learning | | Fixed-Facility | | Total | |
|---|---|---|---|---|---|---|---|---|
|  | N | % | N | % | N | % | N | % |
| Pass 1st Try | 54 | 40.6 | 67 | 34.0 | 22 | 10.9 | 143 | 26.9 |
| Pass >1 Try | 21 | 15.8 | 33 | 16.8 | 35 | 17.3 | 89 | 16.7 |
| Subtotal | 75 | 56.5 | 100 | 50.8 | 57 | 28.2 | 232 | 43.6 |
| Fail >1 Try | 47 | 35.3 | 73 | 37.1 | 119 | 58.9 | 239 | 44.9 |
| Fail only 1 Try | 11 | 8.2 | 24 | 12.2 | 26 | 12.9 | 61 | 11.5 |
| Subtotal | 58 | 43.5 | 97 | 49.2 | 145 | 71.8 | 300 | 56.4 |
| Grand total | 133 | 100.0 | 197 | 100.0 | 202 | 100.0 | 532 | 100.0 |

5

Table 3
Eventual Passing Rates by School Type for a 3 and a 6 Exam Window

| School Type | 3 Exams | 6 Exams | Difference |
|---|---|---|---|
| ABA | 83.2 | 88.2 | 5.0 |
| CA Accredited | 40.5 | 49.2 | 8.7 |
| Unaccredited | 36.8 | 43.6 | 6.8 |
| All School Types | 77.9 | 83.3 | 5.4 |

Table 4
Number and Percentage of Repeaters Who Passed by Number of Exams Taken

| Number of exams taken to pass | ABA | CA Accredited | Correspondence | Distance Learning | Fixed-Facility | Total |
|---|---|---|---|---|---|---|
| 2 | 1,554 | 136 | 10 | 19 | 11 | 1,730 (64%) |
| 3 | 396 | 65 | 8 | 7 | 8 | 484 (18%) |
| 4 | 266 | 43 | 2 | 5 | 10 | 326 (12%) |
| 5 | 98 | 18 | 0 | 1 | 4 | 121 ( 5%) |
| 6 | 20 | 6 | 1 | 1 | 2 | 30 ( 1%) |
| Total | 2,334 | 268 | 21 | 33 | 35 | 2,691 (100%) |

6

APPENDIX A

Results by Cohort

Six Exam Window

| ABA SCHOOLS | Cohorts Beginning in February | | | | | | | | Cohorts Beginning in July | | | | | | | | All Cohorts | | | | | | | |
| | Year | | | | | | All Exams | | Year | | | | | | All Exams | | Year | | | | | | All Years | |
| | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| Pass 1st Try | 256 | 57% | 241 | 50% | 284 | 58% | 781 | 55% | 2370 | 71% | 2367 | 69% | 2624 | 70% | 7361 | 70% | 2626 | 69% | 2608 | 67% | 2908 | 68% | 8142 | 69% |
| Pass> 1 Try | 105 | 23% | 115 | 23% | 86 | 17% | 306 | 21% | 617 | 18% | 661 | 19% | 750 | 20% | 2028 | 19% | 722 | 19% | 776 | 19% | 836 | 19% | 2334 | 20% |
| Fail> 1 Try | 68 | 15% | 99 | 20% | 78 | 16% | 245 | 17% | 241 | 7% | 277 | 8% | 262 | 6% | 780 | 7% | 309 | 8% | 376 | 9% | 340 | 8% | 1025 | 9% |
| Fail only 1 Try | 20 | 4% | 27 | 5% | 35 | 7% | 82 | 5% | 83 | 2% | 101 | 2% | 109 | 2% | 293 | 2% | 103 | 2% | 128 | 3% | 144 | 3% | 375 | 3% |
| Total | 449 | 100% | 482 | 100% | 483 | 100% | 1414 | 100% | 3311 | 100% | 3406 | 100% | 3745 | 100% | 10462 | 100% | 3760 | 100% | 3888 | 100% | 4228 | 100% | 11876 | 100% |

A total of 9,882 applicants (83.2%) passed within the three exam window.

| CALIFORNIA ACCREDITED SCHOOLS | Cohorts Beginning in February | | | | | | | | Cohorts Beginning in July | | | | | | | | All Cohorts | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year | | | | | | All Exams | | Year | | | | | | All Exams | | Year | | | | | | All Years | |
| | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| Pass 1st Try | 21 | 20% | 30 | 28% | 22 | 21% | 73 | 23% | 67 | 24% | 70 | 26% | 67 | 25% | 204 | 25% | 88 | 23% | 100 | 27% | 89 | 24% | 277 | 25% |
| Pass > 1 Try | 24 | 22% | 20 | 19% | 16 | 15% | 60 | 19% | 78 | 28% | 66 | 25% | 64 | 24% | 208 | 26% | 102 | 27% | 86 | 23% | 80 | 21% | 268 | 24% |
| Fail > 1 Try | 58 | 55% | 46 | 44% | 52 | 51% | 156 | 50% | 105 | 38% | 103 | 39% | 105 | 39% | 313 | 39% | 163 | 43% | 149 | 40% | 157 | 43% | 469 | 42% |
| Fail only 1 Try | 2 | 1% | 8 | 7% | 11 | 10% | 21 | 6% | 20 | 7% | 25 | 9% | 27 | 10% | 72 | 9% | 22 | 5% | 33 | 8% | 38 | 10% | 93 | 8% |
| Total | 105 | 100% | 104 | 100% | 101 | 100% | 310 | 100% | 270 | 100% | 264 | 100% | 263 | 100% | 797 | 100% | 375 | 100% | 368 | 100% | 364 | 100% | 1107 | 100% |

A total of 448 applicants (40.5%) passed within the three exam window.

| UNACCREDITED: CORRESPONDENCE SCHOOLS | Cohorts Beginning in February | | | | | | | | Cohorts Beginning in July | | | | | | | | All Cohorts | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | | | | | | All Exams | | Year | | | | | | All Exams | | Year | | | | | | All Years | |
| | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| Pass 1st Try | 12 | 52 | 11 | 55% | 8 | 36% | 31 | 47% | 10 | 41% | 9 | 37% | 4 | 20% | 23 | 33% | 22 | 46% | 20 | 45% | 12 | 28% | 54 | 40% |
| Pass > 1 Try | 2 | 8% | 4 | 20% | 4 | 18% | 10 | 15% | 5 | 20% | 4 | 16% | 2 | 10% | 11 | 16% | 7 | 14% | 8 | 18% | 6 | 14% | 21 | 15% |
| Fail > 1 Try | 8 | 34% | 3 | 15% | 10 | 45% | 21 | 32% | 8 | 33% | 9 | 37% | 9 | 45% | 26 | 38% | 16 | 34% | 12 | 27% | 19 | 45% | 47 | 35% |
| Fail only 1 Try | 1 | 4% | 2 | 10% | | | 3 | 4% | 1 | 4% | 2 | 8% | 5 | 25% | 8 | 11% | 2 | 4% | 4 | 9% | 5 | 11% | 11 | 8% |
| Total | 23 | 100% | 20 | 100% | 22 | 100% | 65 | 100% | 24 | 100% | 24 | 100% | 20 | 100% | 68 | 100% | 47 | 100% | 44 | 100% | 42 | 100% | 133 | 100% |

A total of 69 applicants (51.9%) passed within the three exam window.

| UNACCREDITED: DISTANCE LEARNING SCHOOLS | Cohorts Beginning in February | | | | | | | | Cohorts Beginning in July | | | | | | | | All Cohorts | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | | | | | | All Exams | | Year | | | | | | All Exams | | Year | | | | | | All Years | |
| | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| Pass 1st Try | 9 | 42% | 8 | 33% | 24 | 45% | 41 | 41% | 3 | 21% | 11 | 36% | 12 | 21% | 26 | 26% | 12 | 34% | 19 | 35% | 36 | 33% | 67 | 34% |
| Pass > 1 Try | 3 | 14% | 7 | 29% | 5 | 9% | 15 | 15% | 3 | 21% | 2 | 6% | 13 | 23% | 18 | 18% | 6 | 17% | 9 | 16% | 18 | 16% | 33 | 16% |
| Fail > 1 Try | 6 | 28% | 8 | 33% | 19 | 35% | 33 | 33% | 6 | 42% | 13 | 43% | 21 | 38% | 40 | 40% | 12 | 34% | 21 | 38% | 40 | 37% | 73 | 37% |
| Fail only 1 Try | 3 | 14% | 1 | 4% | 5 | 9% | 9 | 9% | 2 | 14% | 4 | 13% | 9 | 16% | 15 | 15% | 5 | 14% | 5 | 9% | 14 | 12% | 24 | 12% |
| Total | 21 | 100% | 24 | 100% | 53 | 100% | 98 | 100% | 14 | 100% | 30 | 100% | 55 | 100% | 99 | 100% | 35 | 100% | 54 | 100% | 108 | 100% | 197 | 100% |

A total of 88 applicants (44.7%) passed within the three exam window.

| UNACCREDITED: FIXED-FACILITY SCHOOLS | Cohorts Beginning in February | | | | | | | | Cohorts Beginning in July | | | | | | | | All Cohorts | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year | | | | | | All Exams | | Year | | | | | | All Exams | | Year | | | | | | All Years | |
| | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | | 2003 | | 2004 | | 2005 | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| Pass 1st Try | 4 | 18% | 2 | 9% | 1 | 4% | 7 | 10% | 7 | 15% | 5 | 9% | 3 | 8% | 15 | 11% | 11 | 16% | 7 | 9% | 4 | 6% | 22 | 10% |
| Pass > 1 Try | 5 | 22% | 2 | 9% | 2 | 8% | 9 | 13% | 8 | 17% | 9 | 16% | 9 | 25% | 26 | 19% | 13 | 19% | 11 | 14% | 11 | 18% | 35 | 17% |
| Fail > 1 Try | 13 | 59% | 15 | 71% | 16 | 69% | 44 | 66% | 25 | 54% | 33 | 61% | 17 | 47% | 75 | 55% | 38 | 55% | 48 | 64% | 33 | 55% | 119 | 58% |
| Fail only 1 Try | | | 2 | 9% | 4 | 17% | 6 | 9% | 6 | 13% | 7 | 12% | 7 | 19% | 20 | 14% | 6 | 8% | 9 | 12% | 11 | 18% | 26 | 12% |
| Total | 22 | 100% | 21 | 100% | 23 | 100% | 66 | 100% | 46 | 100% | 54 | 100% | 36 | 100% | 136 | 100% | 68 | 100% | 75 | 100% | 59 | 100% | 202 | 100% |

A total of 39 applicants (19.3%) passed within the three exam window.

APPENDIX B

Results by School Within School Type

Six Exam Window

| CALIFORNIA ACCREDITED LAW SCHOOLS | Initial Exam | | | | | | | | | | | | All | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Feb 2003 | | Jul 2003 | | Feb 2004 | | Jul 2004 | | Feb 2005 | | Jul 2005 | | | |
| | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass |
| Cal Northern School Of Law | 1 | 0% | 11 | 54% | 2 | 50% | 5 | 40% | | | 15 | 53% | 34 | 50% |
| Empire College School Of Law | 5 | 60% | 15 | 60% | 4 | 75% | 20 | 65% | 2 | 50% | 16 | 50% | 62 | 59% |
| Glendale University College Of Law | 3 | 0% | 8 | 87% | 3 | 0% | 13 | 53% | 3 | 0% | 15 | 46% | 45 | 46% |
| Humphreys College Laurence Drivon Law School | | | 10 | 70% | | | 8 | 62% | 2 | 50% | 11 | 45% | 31 | 58% |
| John F. Kennedy University School Of Law | 17 | 35% | 28 | 32% | 17 | 47% | 16 | 43% | 23 | 30% | 11 | 54% | 112 | 38% |
| Lincoln Law School Of Sacramento | 1 | 0% | 34 | 61% | 3 | 33% | 38 | 71% | | | 28 | 53% | 104 | 61% |
| Lincoln Law School Of San Jose | 6 | 33% | 23 | 47% | 4 | 50% | 15 | 60% | 3 | 0% | 17 | 35% | 68 | 44% |
| Monterey College Of Law | | | 13 | 38% | 1 | 100% | 12 | 25% | 2 | 50% | 15 | 46% | 43 | 39% |
| New College of CA | | | 21 | 47% | 1 | 0% | 24 | 37% | 5 | 0% | 25 | 60% | 76 | 44% |
| San Francisco Law School | 1 | 0% | 15 | 40% | 5 | 40% | 18 | 27% | 1 | 0% | 11 | 27% | 51 | 31% |
| San Joaquin College Of Law | | | 28 | 64% | 2 | 0% | 26 | 61% | 6 | 50% | 36 | 69% | 98 | 63% |
| Santa Barbara College Of Law | 9 | 77% | 4 | 75% | 12 | 83% | 7 | 42% | 11 | 72% | 9 | 55% | 52 | 69% |
| Southern California Institute Of Law–SB | 2 | 50% | 2 | 100% | 1 | 0% | 2 | 0% | 1 | 0% | 3 | 0% | 11 | 27% |
| Southern California Institute Of Law–Ventura | 4 | 25% | 6 | 50% | 1 | 0% | 2 | 50% | 2 | 0% | 3 | 50% | 17 | 35% |
| Trinity Law School | 19 | 26% | 14 | 21% | 15 | 26% | 14 | 21% | 14 | 21% | 12 | 33% | 88 | 25% |

| CALIFORNIA ACCREDITED LAW SCHOOLS | Initial Exam | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Feb 2003 | | Jul 2003 | | Feb 2004 | | Jul 2004 | | Feb 2005 | | Jul 2005 | | All | |
| | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass |
| University Of West La San Fernando Valley | 9 | 66% | 9 | 77% | 6 | 66% | 6 | 83% | 5 | 40% | 3 | 33% | 38 | 65% |
| University Of West Los Angeles Law School | 20 | 40% | 26 | 65% | 15 | 33% | 26 | 53% | 12 | 50% | 28 | 42% | 127 | 48% |
| Ventura College Of Law | 8 | 75% | 3 | 33% | 12 | 75% | 12 | 58% | 9 | 66% | 6 | 50% | 50 | 64% |
| All | 105 | 42% | 270 | 53% | 104 | 48% | 264 | 51% | 101 | 37% | 263 | 49% | 1107 | 49% |

| UNACCREDITED CORRESPONDENCE LAW SCHOOLS | Initial Exam | | | | | | | | | | | | | All | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Feb 2003 | | Jul 2003 | | Feb 2004 | | Jul 2004 | | Feb 2005 | | Jul 2005 | | | All | |
| | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | | N | % pass |
| California Southern University | | | 3 | 33% | | | | | 1 | 100% | 2 | 0% | | 6 | 33% |
| Newport University School Of Law | 3 | 33% | 1 | 0% | 1 | 100% | | | 1 | 100% | | | | 6 | 50% |
| Northwestern California University | 6 | 33% | 4 | 75% | 2 | 0% | 2 | 100% | 2 | 50% | 5 | 20% | | 21 | 42% |
| Oak Brook College Of Law And Gov. Policy | 11 | 90% | 8 | 75% | 11 | 81% | 14 | 57% | 6 | 66% | 11 | 45% | | 61 | 68% |
| Taft Law School | 3 | 33% | 8 | 62% | 6 | 83% | 7 | 28% | 11 | 45% | 2 | 0% | | 37 | 48% |
| University Of Honolulu School Of Law | | | | | | | | | 1 | 0% | | | | 1 | 0% |
| West Coast School Of Law | | | | | | | 1 | 100% | | | | | | 1 | 100% |
| All | 23 | 60% | 24 | 62% | 20 | 75% | 24 | 54% | 22 | 54% | 20 | 30% | | 133 | 56% |

| UNACCREDITED DISTANCE LEARNING LAW SCHOOLS | Initial Exam | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Feb 2003 | | Jul 2003 | | Feb 2004 | | Jul 2004 | | Feb 2005 | | Jul 2005 | | All | |
| | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass |
| Abraham Lincoln University | 11 | 54% | 10 | 30% | 10 | 60% | 10 | 20% | 13 | 38% | 11 | 36% | 65 | 40% |
| Concord Law School | 10 | 60% | 4 | 75% | 14 | 64% | 20 | 55% | 40 | 60% | 43 | 46% | 131 | 55% |
| West Haven University School Of Law | | | | | | | | | | | 1 | 100% | 1 | 100% |
| All | 21 | 57% | 14 | 42% | 24 | 62% | 30 | 43% | 53 | 54% | 55 | 45% | 197 | 50% |

| UNACCREDITED FIXED-FACILITY LAW SCHOOLS | Initial Exam | | | | | | | | | | | | |
| | Feb 2003 | | Jul 2003 | | Feb 2004 | | Jul 2004 | | Feb 2005 | | Jul 2005 | | All |
| | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass | N | % pass |
| American College Of Law | 2 | 0% | 18 | 16% | 6 | 0% | 3 | 0% | | | | | 29 | 10% |
| California Southern Law School | 8 | 50% | 7 | 71% | 6 | 33% | 9 | 33% | 9 | 22% | 9 | 55% | 48 | 43% |
| Irvine University College Of Law | 1 | 0% | | | | | | | 1 | 0% | | | 2 | 0% |
| Larry H. Layton School Of Law | | | | | | | 1 | 100% | 2 | 0% | 1 | 0% | 4 | 25% |
| Pacific Coast University School Of Law | | | 5 | 60% | 3 | 33% | 9 | 55% | 2 | 0% | 9 | 22% | 28 | 39% |
| Pacific West College Of Law | 1 | 0% | 2 | 0% | 2 | 0% | 2 | 0% | 3 | 33% | 5 | 20% | 15 | 13% |
| People's College Of Law | 1 | 0% | | | | | 3 | 33% | 1 | 0% | | | 5 | 20% |
| University Of Northern California | 2 | 0% | 10 | 20% | 2 | 0% | 20 | 20% | 2 | 0% | 5 | 20% | 41 | 17% |
| University Of San Luis Obispo | 6 | 83% | 1 | 100% | | | | | 1 | 0% | 4 | 50% | 12 | 66% |
| Western Sierra Law School | 1 | 0% | 3 | 33% | 2 | 50% | 7 | 0% | 2 | 0% | 3 | 33% | 18 | 16% |
| All | 22 | 40% | 46 | 32% | 21 | 19% | 54 | 25% | 23 | 13% | 36 | 33% | 202 | 28% |

PR-87-2

# MINORITY GROUP PERFORMANCE ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

December 3, 1987

## EXECUTIVE SUMMARY

There are large differences in passing rates among racial/ethnic groups on the bar exam. The passing rate of white first time takers is usually about twice as high as the rate of black first timers. Over 90 percent of the whites would pass if the standard for passing was lowered to a point that would result in 50 percent of the blacks passing. The Asian applicant pass rate is slightly below the white rate and the Latino rate is between the Asian and black rates.

Over 50,000 applicants passed the California exam in the ten-year period between 1977 and 1986. Ten percent of these lawyers were members of a minority group. Minority group members make up about 14 percent of all first timers. Thus, there is about 4 percent difference between the minority applicant share of the examinee population and their representation in the group that is eventually licensed to practice.

During the past 10 years, the Committee of Bar Examiners has examined several possible sources of the differences in passing rates among racial/etnic groups. This research has shown that bar exam scores are closely related to an applicant's academic ability as indicated by that applicant's law school grades and admission test scores. In fact, the combination of academic ability and law school attended can explain virtually all of the differences in passing rates among groups. For instance, when used together, these factors can predict an applicant's pass/fail status with 80 percent accuracy.

Adding race to this set of predictors does not improve accuracy by even one percent. And, racial/ethnic group, by itself, is only a very weak predictor of whether an applicant will pass because a significant percentage of minority applicants earn higher bar scores than many of their white classmates.

- ii -

Research also has shown that:

o A larger percentage of minority than white applicants graduate
from the most selective schools in the state and a larger
percentage of minority than white applicants graduate from
American Bar Association (AB) approved schools.  Thus,
relatively low minority passing rates do not stem from minority
applicants being denied access to the better schools.

o Minority and white readers agree with each other on the
grades that should be assigned to essay answers written by
both minority and white applicants.  Thus, the reader's race
does not affect the score assigned.

o Substantially increasing the time applicants are given to
answer multiple choice and essay questions does not narrow
the differences in average scores among racial/ethnic groups.

o Differences among racial/ethnic groups are just as large on
the MBE (multiple choice) section as they are on the essay
and Performance Test sections of the exam.  The same result
was obtained with an experimental oral version of the exam.

o The differences among groups are essentially the same across
all the subject matter areas covered by the exam.

o Differences in performance level between white and minority
students are not due to some general skill in taking multiple
choice or essay tests.  This was demonstrated by a study that
showed that minority and white students earned equally low
scores on the bar exam when they took it during their first
few weeks of law school.

- iii -

> o Rule changes governing the exam have not differentially
>   affected minority passing rates. These rule changes include:
>   (1) no longer allowing applicants some choice in which essay
>   questions they answer, (2) discontinuing the bifurcation rule
>   that allowed applicants to pass by passing one part of the
>   exam on one administration and another part on a subsequent
>   administration, and (3) converting the written scores to the
>   same score distribution as the applicants' MBE scores.

The eventual passing rate (i.e., the percentage who pass after several
attempts) is much higher than the initial rate. Although this is true
for all groups, it is especially true for minority applicants. For
instance, about two-thirds of the minority applicants from ABA schools
eventually pass. However, there is no first attempt bar exam score that
distinguishes well between those who will and will not eventually pass.

An analysis of Law School Admission Test (LSAT) scores at ABA schools
suggests that most black and Latino applicants would not have been
accepted at their school were it not for special admissions programs.
In other words, their LSAT scores are almost always well below those of
their white classmates. And, the LSAT is a good predictor of law school
grades (and bar scores) for both white and minority students.

The minority applicants' lower average LSAT scores and thereby predicted
law school grades probably reflects an educational disadvantage that
accumulated over the 20+ years prior to admission. This disadvantage is
not eliminated during law school as evidence by the large difference in
average law school grades between white and minority students. However,
most minority applicants do eventually pass. Thus, they may simply need
more time to prepare for the exam than their white classmates. It also
appears that special admissions programs are effective in that they
bring into law schools many minority students who do not meet their
school's normal selection standards, but who nevertheless ultimately
become licensed to practice.

PR-87-2

MINORITY GROUP PERFORMANCE ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

During the past 10 years, the Committee of Bar Examiners has examined several possible sources of the differences in passing rates among racial/ethnic groups on the California Bar Exam. This report summarizes the results of that research.

Part 1 of the report presents data on the size of the disparities in bar passing rates and scores among four groups: whites, Asians, Latinos, and blacks. Part 2 describes the results of studies that have sought to identify the sources of these differences. Part 3 shows how the disparities in bar scores among groups are associated with differences in their law school grades and admissions test scores. Part 4 contrasts a group's initial with its eventual passing rate. The last section summarizes these findings and discusses their implications. The reference section lists all the studies that report racial/ethnic data.

The following abbreviations are used throughout:

    ABA  = American Bar Association
    LSAT = Law School Admissions Test
    LGPA = Law school grade point average
    MBE  = Multistate Bar Examination (200 multiple choice questions)
    PT   = Performance Test of clinical legal skills

From 1977 to 1983, the California exam consisted of the MBE and from 9 to 15 essay questions. In July 1983, the exam was changed to its present structure of the MBE, six essay questions, and a two-problem PT. Six hours (1 day) is currently devoted to each of these three sections.

## DIFFERENCES AMONG GROUPS

In 1977, the Committee of Bar Examiners began collecting data on the racial/ethnic composition of the applicants to the bar. These data were gathered by means of a mailed questionnaire that applicants were asked to complete and return to the Committee before they took the exam. The questionnaire asked applicants to indicate the racial/ethnic group to which they belonged; and, they were given assurance that their answers would be used solely for research purposes.

Figure 1 shows the passing rate of July first time takers from California law schools that are accredited by the ABA. These data indicate relatively large and consistent differences among groups over time. Moreover, all groups show a general decline in passing rates since 1980.

Fluctuations in passing rates over time are most likely due to variations in the difficulty of the exam from one year to the next and to changes in the average ability level of the applicants taking the exam. In addition, on a given exam, there is often less than 200 California ABA first timers in any one minority group. Thus, some of the variation also may be due to chance.

The differences in passing rates among groups is mirrored in their total bar exam scores. Figure 2 presents data about the performance of all July 1984 first timers (i.e., regardless of the type of school from which they graduated). There are four arrays of data in this figure, one for each racial group. Each array has five vertical bars. Reading from left to right, these vertical bars correspond to the 10th, 25th, 50th (with an asterisk), 75th, and 90th percentile points in the distribution of scores. For instance, 50 percent of the blacks and 90 percent of the whites had total scores of 1160 or higher.

A score of 1260 or higher was required for passing the July 1984 exam. An inspection of Figure 2 reveals that minority applicants were not clustered just beneath the passing score. In fact, the passing score would have to be lowered by 100 points to produce a 50 percent passing

rate among blacks.  Such a decrease would result in about 90 percent of
the whites passing.  Because of the large differences in the number of
applicants in each racial group, lowering the passing score will result
in far more white than Latino or black applicants passing the exam.

Figure 2 also shows that several minority applicants earn much higher
bar exam scores than some white applicants.  For example, the top 10
percent of the blacks had higher scores than 50 percent of the whites.
And, the top 10 percent of the Asians did as well as the top 25 percent
of the whites.  Because of this overlap, racial/ethnic group is only a
weak predictor of total bar exam scores (e.g., these scores can be
predicted six times more accurately with LGPA than with applicant race).


### SOURCE OF DISPARITIES STUDIES

Several studies have examined whether the differences in passing rates
and average scores among racial/ethnic groups can be explained by a
variety of factors, such as the exam's time limits and content coverage.
This section summarizes the results of that research.


#### Type of Law School

A study of the July 1977 exam revealed that minority group first timers
are more likely than white first timers to come from the more
prestigious law schools in the state.  For instance, 30 percent of the
whites, but less than 20 percent of the minority applicants graduated
from a non-ABA approved law school.  Of those who did graduate from an
ABA school, minority applicants were much more likely to come from the
most selective schools (as indicated by the average LSAT scores of their
graduates).  For instance, only 23 percent of the whites graduated from
the top five schools compared to 44 percent of the Asians, 38 percent of
the Latinos, and 48 percent of the blacks.

An analysis of the July 1984 data revealed the same pattern.  This
analysis classified the 33 schools with at least 18 applicants into
three groups on the basis of the average LSAT scores of their white

graduates who took the bar exam for the first time.  Figure 3 shows that over 50 percent of the minority applicants, but only 31 percent of the whites, graduated from the most selective schools.

There is an almost perfect relationship between a school's mean LSAT score and its bar exam passing rate.  The higher the average LSAT score, the higher the passing rate.  Thus, the relatively low passing rates of minority applicants does not stem from their being denied access to what are generally considered to be the better law schools and the ones that have the highest overall passing rates.

Test Taking Ability

It has been hypothesized that whites tend to do better on exams than nonwhites because they are just better at taking tests.  In other words, whites earn higher bar exam scores because they are supposedly better test takers rather than their actually attaining a greater mastery of the legal skills and knowledge that are tested.

This hypothesis was examined by administering the bar exam to novice law students at four ABA approved schools.  These students took various portions of the July 1985 exam within a few weeks of their starting law school.  And, their answers were graded along with those of all of the regular applicants (and in way that prevented the readers from knowing which answers were written by the novices).

This study indicated that: (1) white and nonwhite novices earned equally low scores on all three sections of the bar exam (MBE, PT, and Essay), (2) white novices tended to have higher LSAT scores than nonwhite novices, and (3) there was almost no correlation between LSAT and bar exam scores among novices, but a strong correlation between these measures among graduates.  Taken together, these findings suggest that some general skill in taking tests is not the source of differences between racial groups on the bar exam.  They also show that the LSAT predicts bar exam scores only after the applicant has had the benefit of a legal education.

- 5 -

Reader Characteristics

In the early 1970's, it was suggested that low minority passing rates stemmed in part from almost all of the essay readers being white.  It was hypothesized that minority applicants were not receiving the grades they deserved because the way they answered a question was qualitatively different (not better or worse) than the way in which whites organized and explained the same information.

This hypothesis was tested by having white, black, and Latino lawyers grade the answers written by white, black, and Latino applicants to two essay questions on the July 1974 exam.  The readers in this study only saw the question and the answer.  They did not know the race of the person who wrote the answer or the grade assigned to it by the state bar's regular reader.  The special readers also could use whatever grading criteria they felt were appropriate.

On both questions, there was no systematic relationship between an applicant's and a reader's race.  In other words, white, black, and Latino readers rank ordered the quality of the answers in about the same way.  White readers did not give the answers written by white applicants any higher grades than did the black or Latino readers.  And, the readers who belonged to the same race agreed with each other regarding the relative quality of the answers to the same degree that they agreed with the readers who belonged to a different race.

These findings suggest that the score on an essay answer is not affected by whether the race of the reader who graded it is the same or different than the race of the applicant who wrote it.  The Committee of Bar Examiners has nevertheless adopted the practice of insuring minority representation on the team of readers assigned to each essay question and PT problem.

- 6 -

Time Limits

Two experiments that were conducted in conjunction with the July 1980 examination show that differences in passing rates among groups do not stem from the exam's time limits.

In the Essay Time Limits Study, one group of applicants was given 55 minutes to answer a typical bar exam essay question and then 90 minutes to answer a different question.  A second group was given the same sequence of time limits, but the opposite order of questions.  Thus, both questions were answered under both time limits.

Applicants were assigned randomly to groups.  All the answers to a question were merged into one batch so that readers did not know the time limit under which an answer was written.  The answers were then graded in the normal manner; e.g., points were assigned in 5-point intervals on a 0 to 100-point scale.  These procedures were replicated several times with different groups so that we could measure the effect of time limits on four separate questions.

Applicants who had 90 minutes to answer a question earned an average of four more points on that question than did those who had only 55 minutes to answer it.  However, one third of the applicants received a higher score on the 55-minute than on the 90-minute question.  Further analyses revealed that the amount an applicant benefited from the extra time was not related to race.  In other words, minority applicants did not gain any more points on the average than did white applicants as a result of having an extra 35 minutes to answer.  The size of the benefit derived from the extra time also was unrelated to an applicant's assessment of the adequacy of the essay test's time limits.

The same type of study was conducted with the MBE.  Some applicants had 55 minutes whereas others had 90 minutes to answer the same set of 30 MBE items.  And, the experiment was replicated with a second set of 30 items so that each applicant answered one set under the 55 minute time limit and another set under the 90 minute limit.

The results of the MBE Time Limits Study were consistent with those from the Essay Time Limits Study.  There was a slight increase in average score as a result of the extra time (0.87 points per 30 items), some applicants scored higher under the shorter time limit than under the longer one, and there was no relationship between an applicant's race (or attitude regarding the adequacy of the MBE's time limits) and how much that applicant benefited from the extra time.

It is evident from these two studies that even a substantial increase in the time applicants are given to answer examination questions would not reduce the differences in scores and passing rates among racial groups.

Test Format

Minority applicants do about as well on one section of the exam (MBE, Essay, or PT) as they do on any other section.  In other words, once differences in the overall difficulty and reliability of the sections are controlled, a minority group's average score on one section is about the same as it is on any other section.

Figure 4 illustrates this pattern by showing where the median July 1984 minority applicant falls in the distribution of white applicant scores. For instance, the average MBE score among Latino applicants is at the 25th percentile in the distribution of white applicant MBE scores.

Figure 4 also shows that the gap between white and minority applicants tends to be slightly greater on the MBE than on the other sections. Analyses of previous and subsequent exams show the same trend.  This small, but consistent deviation is most likely due to the MBE's greater reliability (differences in average scores between groups automatically get smaller as the reliability of the test decreases...there would be no difference between groups if the scores were based solely on chance).

The Committee also explored what would happen to minority passing rates if the exam included oral and written problems that simulated closely the types of tasks lawyers are often required to perform or problems

that measured certain trial practice skills.  These studies found the
same general rank ordering of groups as in Figures 1 and 2.

The only exception to this trend is that on the oral tasks, blacks
earned about the same average score as Asians and Latinos (but still
well below the white average).  However, oral task scores were less
reliable (i.e., more subject to chance) than the written scores; and,
the more scores are affected by chance, the greater the likelihood that
different groups will receive the same average score.  Thus, the large
difference in passing rates between white and nonwhites would not be
reduced appreciably by adding reliably scored oral tasks to an exam that
already included the Essay and MBE.

It also is academic to consider the use of oral tasks on the California
bar exam because of costs and other considerations.  They compromise
test security, standardized administration procedures, and timely score
reporting.  In addition, they provide an opportunity for bias because
graders would observe an applicant's race, sex, age, and other
irrelevant characteristics.


Test Content

The differences among racial groups in total MBE score that are
illustrated in Figure 4 also are present in each of the six content
areas measured by this exam.  This trend is shown in Figure 5.  If
the questions in one content area tend to be relatively easier than in
another content area, then this difference is true for all groups.  No
one area is particularly difficult or easy for a given group.

Studies of the July 1974 and July 1980 MBE further indicated that none
of the questions on this test were especially difficult for one group.
If a question is relatively difficult for one group compared to its
average score, then it also is relatively difficult for another group
compared to its average.  And, within a given range of total MBE scores
(such as all applicants with scores between 135 and 145), there was no

difference among racial groups in their likelihood of answering a given question correctly.

Comparable analyses of essay questions yielded the same result. Thus, whatever is producing the disparities in passing rates between racial groups, its effect is felt equally across all the content areas that are tested.

Bar Exam Rules

The bar exam was changed in several ways during the past 10 years. We examined the possible effect of three of these changes on minority passing rates by comparing these rates before and after the changes were implemented. The three changes we investigated were: (1) elimination of optional questions, (2) introduction of the PT, and (3) adoption and later cancellation of the so called "bifurcation" rule.

Prior to the July 1980 exam, the Essay test consisted of three sections. Each section had five questions and an applicant was instructed to answer four of them. Thus, applicants could exercise some choice in which questions they chose to answer. As of the July 1980 exam, the Essay test was shortened to 9 questions and applicants were instructed to answer all of them. The time allocated to answer a question also was increased from 52 to 60 minutes.

Figure 1 shows that eliminating the optional questions had no adverse effect on performance. In fact, most groups performed better on the July 1980 exam than they did on any exam before or since even though this exam is the one on which the change presumably would have been felt the strongest. Figure 1 also shows there was no sudden or consistent decline in the passing rate corresponding to the introduction of the PT in July 1983. In most groups, the July 1983 passing rate was higher than it was a year later.

In April 1977, the Committee offered applicants two ways of passing the exam. One method involved achieving a combined MBE plus Essay score

- 10 -

that was above the pass/fail line for the total exam.  The other method
involved passing the Essay on one test date and the MBE on a different
administration.  Applicants could pass the exam by means of the latter
method beginning with the February 1978 exam.

For a variety of reasons, this so called "bifurcation" rule did not
produce a general increase in passing rates.  This situation and other
administrative considerations led to its discontinuation in July 1983.
However, applicants who passed only one part of the exams given between
February 1982 and February 1983 could still use the rule through July
1984.

Because repeaters are the only applicants whose pass/fail status could
be affected by the bifurcation rule, we examined their success rate on
the exams before this rule took effect (2/77 through 7/77), while it was
operative (2/78 through 7/84), and after it was fully rescinded (2/85
through 7/86).  Figure 6 shows that repeaters in all four racial groups
had a slightly <u>higher</u> passing rate before the rule was implemented
than when it was in force.  Blacks were the only group whose passing
rate fell by more than one percentage point after the rule was
eliminated.

In short, neither the bifurcation rule nor the other changes discussed
above had any appreciable effect on the large differences in passing
rates between racial groups.  These differences were present before and
after the changes were made.


ACADEMIC ABILITY

Bar exam scores are closely related to an applicant's academic ability
as measured by that applicant's law school grades and admission scores.
And, differences in academic ability between racial groups can explain
essentially all of the differences in their average bar exam scores and
passing rates.

This pattern of results was demonstrated in a study of the July 1977 exam. That study found no systematic relationship between race and bar exam scores after an an applicant's law school grades, admission test scores, and law school were accounted for. This finding held for both the MBE and Essay sections of the exam as well as the total score.

Our analysis July 1984 data shows the same pattern of results. In this analysis, we compared how well various sets of variables, such as LGPA and LSAT, were able to predict an applicant's pass/fail status. We then examined whether adding applicant race to the prediction system improved out ability to forecast an applicant's bar scores. If it did, then it would suggest that race was influencing these scores.

For the purposes of this analysis, "passing" a section was defined as earning a score that was 70 percent of the maximum possible score on that section. We defined the effect of "school" as the degree to which the applicants at a school (as a group) tended to do better or worse on the exam than would be predicted on the basis of their average LSAT score. Graduates of the same school therefore received the same "score" on the school variable. And, in order to combine data across schools, we converted the LGPAs at a school to a score distribution that had the same mean and standard deviation as that school's LSAT scores.

Table 1 shows that applicant race had little or no impact on predictive accuracy once we controlled for LGPA, LSAT score, and school. This was true on each section and the exam as a whole. For instance, we predicted correctly the pass/fail status on the entire exam of 79.1 percent of the applicants on the basis their LGPAs alone. Adding LSAT to the prediction system increased accuracy by 0.4 percent and adding school increased it another 0.5 percent. Once these variables were accounted for, adding race did not increase predictive accuracy.

These results are consistent with those obtained in a comparison of white and Latino graduates from the University of New Mexico law school on that state's bar exam. LGPA's at this school were highly correlated with bar exam scores, and once there was a control for LGPA and LSAT,

- 12 -

including applicant race in the prediction equation increased the
accuracy of forecasting pass/fail status by less than 2 percent.

The close relationship between LGPA, race, and bar exam success rates
are illustrated in Figure 7.  This figure presents the data for two
highly respected ABA schools in California that had relatively large
numbers of minority group applicants taking the July 1984 exam.  The
data for each group are presented in the same form as was used in Figure
2; i.e., the left hand vertical bar corresponds to the 10th percentile
in the group, the next bar corresponds to the 25th percentile, etc.
The number in the box shows the percentage of applicants in the group
who passed the exam.

Two important findings are evident in this figure.  At both schools, the
grades of 75 percent of the black and Latino applicants place them in
the bottom quarter of their class; and, 50 percent of these applicants
are in the bottom 15 percent.  Secondly, the rank ordering of the groups
in terms of passing rate is generally consistent with their LGPAs.  This
latter finding is illustrated clearly in Table 2.  This table presents
data on all July first timers and shows that in each racial group, there
is a close association between academic ability and bar exam success
rate.  The higher the ability level, the higher the passing rate.

## EVENTUAL SUCCESS RATE

Over 50,000 applicants passed the California exam in the ten-year period
between 1977 and 1986.  Table 3 shows that one in ten of these lawyers
is a member of a minority group.  This rate was obtained in every year
studied.  Minority group members make up about 14 percent of all first
timers.  Thus, there is about 4 percent difference between their share
of the examinee population and their representation in the population of
those licensed to practice.

Eventual passing rates (i.e., the percentage who pass after several
attempts) among minority applicants are much higher than their initial
rates.  Table 4 illustrates this finding with applicants who took the

- 13 -

exam for the first time in 1977, 1981, 1982, or 1984. For instance, 39
percent of the Latinos passed on their first attempt and 29 percent
passed after one or more subsequent attempts. Thus, Hispanics had an
eventual passing rate of 66 percent.

Another 8 percent of the Latinos failed on their first attempt and did
not repeat the exam. However, their LGPAs and LSAT scores suggested
that the Latino eventual passing rate would have risen another 2 or 3
percent if this 8 percent had tried a few more times. A similar
increase in eventual passing rates probably would be obtained in the
other minority groups if their nonrepeating initial fails had made more
than just one attempt to pass.

In recent years, about two-thirds of all the minority applicants from
ABA schools eventually pass the exam. And, while there is a moderate
correlation between initial score and eventual pass/fail status, there
is no initial score that clearly differentiates between those who do
and do not eventually pass.

### SUMMARY AND CONCLUSIONS

This report summarizes ten years of research on the performance of
Asians, blacks, Latinos, and whites on the California bar exam. These
studies indicate there are very large and consistent differences among
these groups in both passing rates and bar exam scores.

These differences are similar to those observed among law schools. For
instance, Figure 8 shows the passing rate at one ABA school is more
than double the rate at another ABA school. These differences probably
stem from some schools attracting more able students than others.
Differences in passing rates among racial groups also appear to be due
to differences in the average academic ability levels of these groups.

However, several studies have examined whether there are other
empirically supported explanations for the observed disparities. These
studies have found that the differences do not stem from the type of law

- 14 -

school attended.  In fact, minority applicants are more likely to have
graduated from the most prestigious law schools (as indicated by the
average LSAT scores of their graduates) than are white applicants.

Research also has shown that the differences in passing rates among
groups are not related to some general or abstract ability to take
tests; the racial composition of the readers who grade the answers; the
time limits imposed; the test formats used (multiple choice, essay, or
PT); the subject matter areas covered by the exam; whether applicants
are given some choice in which questions to answer; or whether they are
allowed to pass the exam in sections.

Differences in passing rates among groups do correspond closely with
differences in their law school grades and admission scores which in
turn are highly related to bar exam scores.  In other words, minority
applicants tend to have lower LGPAs and LSAT scores than their white
classmates.  For instance, at two California ABA law schools with large
minority enrollments, 75 percent of the black and Latino applicants had
grades that placed them in the bottom quarter of their class.

The differences in bar passage rates among groups disappear once we
control for LGPA, LSAT, and the general effect of the applicant's
school.  This finding was illustrated on the July 1984 exam where these
three variables predicted overall bar success rate with 80 percent
accuracy.  Adding race to the prediction system did not increase
accuracy by even one tenth of one percent.

Large differences in passing rates among racial groups are deceptive.
They hide the fact many minority applicants earn higher bar exam scores
than their white classmates, that over 5,000 minority applicants passed
the California exam in the last 10 years, and that one person in ten who
passes this exam is a racial/ethnic minority group member.  Moreover,
most minority applicants eventually pass the exam and two out of three
of the ABA minority first timers eventually pass.

These are important and encouraging statistics for those minority
applicants who do not pass on their first or second attempt.   We also

know that applicants who come close to passing but fail on their first attempt are likely to succeed after one or more subsequent tries.

This situation has led some to suggest that the gap between minority and white passing rates would be narrowed by simply lowering slightly the score required for passing. However, plots of score distributions show that this strategy would not be effective because minority applicants (and particularly blacks and Latinos) are not bunched just beneath the pass/fail line whereas there is a large group of white applicants in this zone. And, there is no initial bar exam score that distinguishes well between those who do and do not eventually pass.

A comparison of LSAT scores suggests that many if not most of the successful black and Latino applicants would not have attended an ABA or California accredited law school (let alone taken the bar exam) were it not for special admissions programs. In other words, their average LSAT scores and undergraduate grades are well below those of their white classmates. The same pattern holds for their law school grades.

Given this situation, we should not expect a large percentage of minority students to overcome an educational disadvantage in three years of law school that accumulated over the 20+ years prior to law school. Many minority applicants will simply need more time to prepare for the exam than will white applicants. However, a large number of minority applicants do eventually pass. Thus, special admissions programs are bringing into law schools many minority students who do not meet normal admissions standards, but who nevertheless do get licensed to practice.

- 16 -

## REFERENCES

The reports listed below were prepared by the authors.  The Committee of Bar Examiners and the authors also prepare summary reports on each exam that contain data about the performance of racial groups.

An investigation of possible item and grader biases in a state bar examination.  Paper presented at the meetings of the Western Psychological Association, Los Angeles, California, April 9, 1976.

An analysis of possible sex and racial/ethnic biases in the July, 1976 California State Bar Examination (1978).

An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group (1979).  Summary reprinted in The Bar Examiner, 1980, 49, 14-18.

An analysis of possible variations in pass/fail standards on the California Bar Examination (1981). (PR-81-1)

Testing research skills on the California Bar Examination (1981). (PR-81-8)

The effect of time limits, item sequence, and question format on applicant performance on the California Bar Examination (1981). (PR-81-7)

An analysis of the relationship between initial score and eventual pass/fail status on the California Bar Examination (1982). (PR-81-9)

An evaluation of the Multistate Bar Examination.  National Conference of Bar Examiners, Chicago (1982).

An analysis of the relationship between clinical legal skills and bar examination results (1982). (PR-82-1)

An analysis of the relationship between trial practice skills and bar examination results (1982). (PR-82-6)

An analysis of the Performance Test on the July 1983 California Bar Examination (1984). (PR-84-2)

How the bifurcation rule affected the percent passing California's General Bar Examination (1985). (PR-85-5)

The performance of novice law students and law school graduates on the bar exam (1986). (PR-86-2)

A comparison of initial and eventual passing rates on the California Bar Examination (1987) (PR-87-5).

List of Figures and Tables

Figure 1 - July first timer passing rates by race

Figure 2 - July 1984 score distributions by race

Figure 3 - Percent minority by level of school's mean white LSAT score

Figure 4 - Percentile of the median minority applicant in the distribution of white applicants

Figure 5 - Percentile of the median applicant by MBE content area

Figure 6 - Percent passing before, during, and after the bifurcation rule was in effect

Figure 7 - LGPA distributions and percent passing by race at two schools

Figure 8 - Schools consistency differ in passing rate


Table 1 - Accuracy in predicting July 1984 pass/fail status

Table 2 - Percent passing by quartile of academic ability

Table 3 - Racial/ethnic composition of passing applicants

Table 4 - Eventual passing rates by racial/ethnic group



JULY PASSING RATES FOR FIRST TIME TAKERS FROM CALIFORNIA ABA SCHOOLS

(White X̄ = 73%)

Asian X̄ = 57%

Latino X̄ = 40%

Black X̄ = 31%

Percent passing

Examination date

1977  78  79  80  81  82  83  84  85  86

85  80  75  70  65  60  55  50  45  40  35  30  25  20



MINORITY FIRST TIMERS EARN MUCH LOWER
TOTAL SCORES THAN WHITE FIRST TIMERS



MINORITY APPLICANTS ARE MORE LIKELY TO GRADUATE FROM
THE MORE SELECTIVE SCHOOLS THAN WHITE APPLICANTS

Percent of July 1984 first timers from schools with
high, medium, and low average white LSAT scores



SIMILAR DIFFERENCES AMONG GROUPS
ACROSS TEST TYPES



DIFFERENCES AMONG GROUPS ARE CONSISTENT ACROSS MBE SUBJECT MATTER AREAS



REPEATER PASSING RATE NOT AFFECTED BY BIFURCATION RULE



LAW SCHOOL GRADES AND JULY 1984
FIRST TIMER PASSING RATES

School A

White = 77%
Asian = 53%
Latino = 23%
Black = 19%

Percentile of Law School Grade Point Average

School B

White = 78%
Asian = 44%
Latino = 29%
Black = 9%

Percentile of Law School Grade Point Average



LARGE DIFFERENCES IN PASSING RATES AMONG ABA SCHOOLS

# ADDING RACE DOES NOT IMPROVE THE PREDICTION OF PASS/FAIL STATES

|  | Percent classified correctly | | | |
|---|---|---|---|---|
| **Predictors** | **MBE** | **Essay** | **PT** | **Total** |
| LGPA | 74.9 | 75.5 | 69.5 | 79.1 |
| LGPA & LSAT | 75.8 | 75.5 | 70.0 | 79.5 |
| LGPA & LSAT & school | 75.9 | 76.5 | 71.1 | 80.0 |
| LGPA & LSAT & school & race | 75.9 | 76.8 | 71.6 | 80.0 |

# JULY 1984 FIRST TIMERS WITH SIMILAR LEVELS OF ACADEMIC ABILITY HAD SIMILAR PASSING RATES

| Relative standing on combined measure of academic ability | Percent Passing | | | |
|---|---|---|---|---|
| | White | Asian | Latino | Black |
| Lowest 25% | 9 | 3 | 4 | 3 |
| Next 25% | 35 | 26 | 36 | 28 |
| Next 25% | 66 | 60 | 63 | * |
| Highest 25% | 92 | 89 | * | * |

Combined measure of academic ability = LGPA + LSAT

*Not enough applicants to obtain a reliable rate.

Table 3

RACIAL/ETHNIC COMPOSITION OF PASSING APPLICANTS

| Year | Number of applicants who passed | Percent from each group | | | | |
|------|------|------|------|------|------|------|
| | | White | Asian | Latino | Black | Other |
| 1977 | 5,341 | 91 | 2 | 3 | 2 | 1 |
| 1978 | 5,528 | 91 | 3 | 3 | 2 | 1 |
| 1979 | 6,210 | 90 | 3 | 3 | 3 | 1 |
| 1980 | 5,517 | 90 | 3 | 4 | 2 | 1 |
| 1981 | 5,112 | 90 | 3 | 3 | 3 | 1 |
| 1982 | 5,116 | 89 | 3 | 4 | 3 | 1 |
| 1983 | 5,105 | 89 | 4 | 4 | 2 | 1 |
| 1984 | 4,236 | 89 | 4 | 3 | 3 | 1 |
| 1985 | 4,997 | 89 | 4 | 4 | 2 | 1 |
| 1986 | 4,763 | 89 | 4 | 4 | 3 | 1 |
| Total | 51,928 | 89.7 | 3.2 | 3.5 | 2.5 | 1.1 |

# EVENTUAL PASSING RATES BY
## RACIAL/ETHNIC GROUP

| Group | White | Asian | Latino | Black |
|---|---|---|---|---|
| Passed on first try | 67 | 49 | 37 | 25 |
| Passed after > 1 try | 17 | 24 | 29 | 23 |
| Eventual pass | 84 | 73 | 66 | 48 |
| Failed on only try | 5 | 9 | 8 | 13 |
| Failed after > 1 try | 11 | 18 | 26 | 39 |
| Eventual fail | 16 | 27 | 34 | 52 |

Entries are the average percentages for four cohorts of
July first time takers: 1977, 1981, 1982, and 1984.

83-OPR

MEASURING LEGAL RESEARCH SKILLS ON A BAR EXAMINATION

Stephen P. Klein

May 1983

P-6879

MEASURING LEGAL RESEARCH SKILLS ON A BAR EXAMINATION

Stephen P. Klein

The Rand Corporation

1700 Main Street

Santa Monica, CA 90406

BACKGROUND

Most bar examinations consist of a nationally administered, 200 item, multiple choice test, called the Multistate Bar Examination (MBE), and a state developed essay test containing about 6 to 15 questions. Both the MBE and essay assess an applicant to the bar's knowledge of the law and the ability to analyze legal problems. The essay further measures the ability to identify legal issues and express ideas in a "lawyer like" fashion.

State bar examinations have been criticized for measuring only a few of the important skills and abilities that are needed for the practice of law. For instance, a typical essay question provides several facts that are material to a case and then asks the applicant to determine how the case should be resolved relative to the applicant's knowledge of general legal principles. The exam does not assess interviewing, negotiating, or oral advocacy skills; the ability to draft or evaluate legal documents; or the ability to conduct legal research. This last skill is particularly important for newly licensed attorneys because they are often required to analyze legal documents, interview notes, transcripts, state and federal laws, and legal precedents in order to provide an objective assessment of the strengths and weaknesses of a client's case.

---

Presented at the 91st Annual Convention of the American Psychological Association at Anaheim, CA, August 27, 1983.

State bar examinations also have been criticized for their dispro-
portionate negative impact on minority groups.  In California, for example,
the percentage of Anglos that pass is twice as great as the percentage of
Blacks that pass.  Although differences in passing rates among groups
parallels their relative performance levels in law school, it has been
argued these differences would be substantially reduced if the exam
measured practical (as distinct from academic) legal skills.

PURPOSE

The foregoing considerations led to an investigation of whether MBE
and essay scores were good predictors of how well applicants could perform
some of the day-to-day tasks that are required of practicing attorneys.
One part of this study involved assessing the relationship between bar exam
scores and scores on a test that was designed to measure certain important
legal research skills.  The study also investigated whether differences in
performance level among racial groups on the Research Test paralleled
differences among these groups on the bar exam and whether Research Test
scores were related to an applicant's legal training and experience.

SUBJECTS

About 20 percent of all bar examinees in the country take the exam in
California.  About 7500 persons applied to take the July 1980 version of
it.  These applicants were advised: the exam would contain several
experimental sections in addition to the regular essay and MBE, they would
be assigned randomly to one of the experimental sections in advance of the
exam, earning a high score in their assigned section could increase their
chances of passing the entire exam, and earning a low score on the
experimental section would not decrease their chances of passing.

A stratified random sampling procedure was used to assign subjects to sections. The sampling variables included law school (as a proxy for general academic ability), repeater status (i.e., whether they had failed the exam on a previous attempt), and racial/ethnic group (Anglo, Asian, Black, and Hispanic).

A total of 1785 applicants participated in the study presented in this paper (over 98 percent of those assigned to it). These applicants had essentially the same average MBE and essay scores as the population of all July 1980 California applicants.

PROCEDURES

The 1785 applicants were assigned randomly to one of three research problems, 1, 2, or 3. The three groups had essentially identical average MBE and essay scores.

Applicants were given 195 minutes to complete the problem to which they were assigned. Each problem had two parts, A and B. Part A consisted of a set of legal propositions and a mini-library of cases. Applicants were instructed to indicate the degree to which each case tended to support versus contradict each proposition. In part B, they were instructed to use the mini-library, interview notes, police reports, and other documents in order to prepare a written statement summarizing the strengths and weaknesses of their client's case. Thus, the test focused on the ability to integrate information in the context of a realistic case situation.

Part A was the same on Problems 1 and 3. Part B on Problem 1 required applicants to answer five separate questions about their client's case whereas on Problem 3, Part B required them to prepare on long memo to a senior partner. The case materials and questions used in Problem 2 were different than those used in Problems 1 or 3.

There were two readers per problem for Part B. After a calibration session, each reader graded about 50 percent of the answers to the problem he/she was assigned. Both readers also independently graded a common set of 20 answers that was embedded throughout the batch of answers they were assigned to grade.

RESULTS

Coefficient alphas on Part A ranged from .87 to .89 (for 42 case-proposition pairs). Coefficient alpha on Part B on Problem 1 was .62. Interreader correlations were .66, .75, and .65 for Part B on problems 1, 2, and 3, respectively. This degree of agreement between readers was about as high as it was on a typical bar exam essay question. The reliability of the total score on the Research Test, .78, was estimated using a procedure described by Gullicksen. This is about as high as the reliability of California's full 9 question (9 hour) essay test.

The correlation between Parts A and B was .35 on Problems 1 and 3, and .33 on Problem 2. Part A had an average correlation of .43 and .35 with the MBE and essay, respectively. The corresponding correlations for Part B were .43 and .48. The correlation between the total score on the Research Test (Parts A + B) and the total score on the regular bar exam (MBE + essay) were .62 and .58 for Problems 1+3 and 2, respectively. These coefficients rose to .74 and .69 after they were corrected for attenuation. These relationships were almost as strong as the correlation between the MBE and essay portions of the regular exam (r = .68 and .81, before and after correcting for attenuation, respectively).

-5-

The difference in average score among racial/ethnic groups on the Research Test were almost identical to the differences among these groups on the regular bar exam.  However, applicants who had had some prior experience practicing law (in actual or simulated cases) scored higher on the Research Test than those who had not had such experience (even after controlling for difference in average MBE and essay scores among groups). And, scores on a two day test of practical legal skills (that was taken two weeks after the regular bar exam by a subset of those participating in this study) were more highly correlated with Research Test scores than they were with MBE or essay scores.

Applicants reported on a post examination questionnaire that the Research Test was a far better and more realistic measure of their ability to practice law than was either the MBE or essay portions of the regular bar examination.


CONCLUSIONS

Even after controlling for reliability, there was still a large percentage variance in Research Test scores that was not accounted for by the variance in regular bar exam scores.  In fact, the correlation between Research Test scores and total scores on the regular exam was only about as strong as the correlation between MBE and essay scores.  These findings along with the pattern of other correlations indicates the Research Test is measuring a somewhat different set of skills than those assessed by the traditional bar exam.  It also is apparent that these skills are more closely associated with those required for legal practice than the more academically oriented abilities assessed by the MBE and essay.

-6-

The foregoing findings indicate that the inclusion of a Research Test on the bar exam could make a small but important difference in who passes. And, while the use of a Research Test would not narrow the gaps in average performance level among racial groups, neither would it increase the differences among these groups. The very strong similarity in the pattern of correlations with the Research Test across forms suggests that additional forms can be developed in accordance with the needs of a licensing program.

As a result of this study, California (with the assistance of the National Conference of Bar Examiners) has changed its bar examination. One third of the exam now contains two Research Tests of the type described in this paper. It also is anticipated that several other states will begin using a version of the Research Test in 1984.

––––––––––––––––––

The views expressed in this paper do not necessarily represent those of The Rand Corporation, the Committee of Bar Examiners of the State Bar of California, or the National Conference of Bar Examiners.

PR-85-5

HOW THE BIFURCATION RULE AFFECTED THE PERCENT PASSING

CALIFORNIA'S GENERAL BAR EXAMINATION

Stephen P. Klein, Ph.D.

September 25, 1985

ABSTRACT

Prior to July 1983, California's General Bar Exam (GBX) had an essay and
a multiple choice (MBE) section.  Applicants could pass the GBX in two
ways.  The compensatory rule passed those who on a given adminstration
had an MBE plus Essay score that was at least 70 percent of the
theoretical maximum possible total score.  The bifurcation rule passed
those who passed the MBE on one administration of the GBX and the Essay
on a prior or subsequent administration.  Thus, applicants could pass
overall by combining the passing statuses (but not the scores) earned on
different administrations of the exam.  There was no penalty for
retaking and failing a part passed previously, and applicants who became
bifurcation rule were strongly encouraged to retake both parts.

This report describes what happened to the 731 applicants who failed the
July 1981 exam but because of their scores on that exam, became eligible
to pass a subsequent exam by means of the bifurcation rule.

There were 491 applicants with a July 1981 MBE pass who retook at least
one part of the February 1982 exam.  Within this group, the passing rate
was 16 percent for the 110 who retook just the Essay and 57 percent for
the 381 who retook both parts.  There were 127 applicants with a July
1981 Essay pass who retook at least one part of the February 1982 exam.
Within this group, the February 1982 passing rates were 43 percent for
the 14 applicants who retook both parts and 59 percent for the 113 who
retook just the MBE.  Almost all of those who passed after retaking both
parts did so as a result of the compensatory rule.

In general, the higher an applicant's July 1981 total score, the greater
the likelihood that applicant was to pass a subsequent exam.  Applicants
who retook both parts tended to have lower July 1981 total scores than
those who retook just the part they failed previously.  However,
contrary to these trends, applicants who retook both parts had a 20
percent higher passing rate than those who retook only one part.  Taken
together, these finding suggest that the relative advantage of retaking
both parts was actually much greater than the 20 percent difference in
passing rates that was observed.

The foregoing results along with analyses of the July 1982 data
indicated that the bifurcation rule had a very slight, but negative
overall impact on the passing rate.  Specifically, if the bifurcation
rule had been eliminated so that all repeaters were required to retake
both parts and pass by the compensatory rule alone, then about 20 more
of the over 7,000 applicants taking a July GBX would have passed after
as many as two subsequent attempts.  These findings and the tremendous
costs associated with implementing and operating a bifurcation policy
argue strongly against its adoption.

SUMMARY

California's compensatory rule passed applicants if their total scores
(MBE + Essay) were at or above the pass/fail line.  This rule applied to
both first timers and repeaters.  California's bifurcation rule passed
repeaters if they passed the MBE on one administration and the Essay on
a previous or subsequent administration.  A repeater could retake a part
passed previously without jeopardizing the passing status on that part.

This report describes analyses with the 731 applicants who failed the
July 1981 exam but became eligible to pass a subsequent exam by means of
the bifurcation rule.  Within this sample, 594 applicants passed the MBE
and 137 passed the Essay portion of the July 1981 exam.  The test taking
strategies and success rates of these two subgroups were monitored on
the next two exams (February 1982 and July 1982).

The major findings of this study were as follows:

    o The higher an applicant's July 1981 total score, the greater the
      likelihood the applicant would pass a subsequent exam (and with
      fewer attempts).  This pattern held regardless of test taking
      strategy.  For example, within the group of 395 applicants who
      took both parts of the February 1982 exam, the July 1981 total
      scores of the applicants that passed and failed were 1024 and
      1015, respectively.

    o Applicants who retook only one part of a subsequent exam had a
      higher average July 1981 total score than applicants who retook
      both parts.  This pattern held regardless of whether the
      applicant had a July 1981 MBE or Essay pass.

    o Contrary to what was expected by the first two findings and other
      considerations, applicants who retook only one part had a lower
      average score on that part than the applicants who retook both
      parts.  For instance, on the February 1982 exam, the applicants
      who retook just the MBE had an average MBE score of 427 whereas
      the applicants who retook both parts had an average MBE score of
      435 (i.e., despite the latter group being generally less able as
      indicated by their 6-point lower July 1981 total score).

    o Even though retaking both parts did not jeopardize a passing
      status on the part passed previously, over one-third of the
      bifurcation eligible applicants who retook any part, only retook
      the part failed previously.  About the same number of applicants
      choose to retake only the MBE as choose to retake only the Essay.

    o Retaking just the Essay section greatly reduced an applicant's
      chances of passing the entire exam.  For instance, 58 percent
      passed among those who retook both parts of the February 1982
      exam, but only 16 percent passed among those who retook just the
      Essay section.

- ii -

If the bifurcation rule had been eliminated prior to the July 1981 exam, then about 20 more of the over 7,000 examinees who took this exam would have eventually passed.  In other words, the net effect of the rule was to fail about 3 percent of the applicants who became eligible to use it (20 out of 731).  The negative net effect of bifurcation was due mainly to the large number of applicants with a prior MBE pass who retook just the Essay portion of the exam and the especially low success rate within this group compared to the success rate among those with comparable (or less) ability who also had a prior MBE pass, but retook both parts.

On a typical July exam, about 10 percent of the applicants became eligible to use the bifurcation rule on a subsequent exam.  However, the presence of this rule affected the success rate of less than three tenths of one percent of the over 7,000 applicants taking it.  Thus, the rule had an extremely small, but negative, impact on the total percent passing the California bar exam.

# HOW THE BIFURCATION RULE AFFECTED THE PERCENT PASSING CALIFORNIA'S GENERAL BAR EXAMINATION

Stephen P. Klein, Ph.D.

## BACKGROUND

California's July 1981 General Bar Examination (GBX) and the following two GBX's contained 9 essay questions, each of which had a maximum score of 100 points, and the Multistate Bar Examination (MBE), which had a maximum score of 600 points. Applicants who failed the July 1981 exam could pass a subsequent exam by means of the Compensatory and/or Bifurcation rules.

The compensatory rule passed repeaters as well as first timers if they had total scores (MBE + Essay) of 1050 or higher. This rule also passed applicants in Phase 1 of a multiphased grading process if they completed both parts of the exam and the sum of their scores on the MBE and the first three of their Essay answers that were graded was 666 or higher.

The bifurcation rule only applied to repeaters. This rule passed applicants if they passed the MBE on one administration of the exam and passed the Essay on a previous or subsequent administration. The MBE and Essay passing scores were 420 and 630, respectively. Applicants could retain a passing status on a part for 23 months; i.e., three more administrations of the exam. They also could retake a part passed previously without jeopardizing a passing status on that part. Applicants could not combine the score earned on the MBE on one administration with the score earned on the Essay on another exam. They could only combine passing statuses across administrations.

California's rules differed from those on certain other licensing exams in that bifurcation eligible repeaters could pass by either or both rules rather than having to pass by just the bifurcation or compensatory rule alone. They could retake just the part failed previously or retake both parts. Those who retook both parts could pass in three ways: (1) having a Phase 1 score that was 666 or higher, (2) having a total score (MBE + Essay) that was 1050 or higher, or (3) passing just the part failed previously. Those who retook just the part failed previously could only pass by the latter method.

The Committee of Bar Examiners' announcements encouraged repeaters to retake both parts because this strategy offered more ways of passing the exam. Moreover, the fee for retaking the exam was not affected by the number of parts taken. Nevertheless, about one third of the bifurcation eligible repeaters who retook any part of the exam only retook the part failed previously.

2

PURPOSE

The analyses described below investigated what would have happened if
California had not had the bifurcation rule.  In other words, how many
more or fewer repeaters would have eventually passed the GBX if all
repeaters were required to retake both parts and pass by means of their
total scores.  The study also examined whether the source of an
applicant's bifurcation eligibility (i.e., a prior MBE or Essay pass)
was related to that applicant's decision to retake one or both parts as
well as to eventual pass/fail status.

JULY 1981 RESULTS

The population for this study consisted of the 7082 applicants (first
timers and repeaters) who had scores on both parts of the July 1981
exam.  These applicants were classified into the groups listed in Table
1.  The bifurcated pass group in this table does not include 12
applicants who took both parts of the July 1981 exam but were passed
without reading their Essay answers.  These applicants passed the MBE
portion of the exam and therefore passed overall because they passed the
Essay on a previous administration.

Table 1

NUMBER AND PERCENT OF APPLICANTS IN EACH PASS/FAIL CATEGORY
ON THE JULY 1981 EXAMINATION

| Pass/Fail Categories | Number | Percent |
|---|---|---|
| Phase 1 Pass | 2162 | 30.5 |
| Pass MBE and Essay | 625 | 8.8 |
| Pass MBE, Fail Essay, Pass Overall | 481 | 6.8 |
| Fail MBE, Pass Essay, Pass Overall | 205 | 2.9 |
| Bifurcated Pass | 60 | 0.8 |
|    Total That Took Both and Passed | 3533 | 49.9 |
| Failed Both | 2818 | 39.8 |
| Pass MBE, Fail Essay, Fail Overall | 594 | 8.4 |
| Fail MBE, Pass Essay, Fail Overall | 137 | 1.9 |
|    Total Became Bifurcation Eligible | 731 | 10.3 |
|    Total | 7082 | 100.0 |

STUDY SAMPLE

The sample for the analyses described below consisted of the 731 applicants who became bifurcation eligible as a result of their July 1981 scores.  Within this group, 58 percent took the GBX for the first time in July 1981.

FEBRUARY 1982 RESULTS

Table 2 shows the number and percent of the 731 applicants who took each part of the February 1982 exam, the percent passing in each group, and the group's average total scores on the July 1981 exam.

Taken together, Tables 1 and 2 indicate that an applicant's decision to retake one or both parts of the February exam was highly related to the source of that applicant's bifurcation eligibility.  Of the 137 applicants who became bifurcation eligible as a result of a prior Essay pass, 113 (82 percent) retook just the MBE.  Of the 594 applicants who became bifurcation eligible as a result of a prior MBE pass, only 110 (19 percent) retook just the Essay.  Almost all (91 percent) of the 113 bifurcation eligible applicants who did not take any part of the February exam had a prior MBE pass.

The passing rate in the group of 395 applicants who retook both parts was 58 percent.  Only 38 percent of the 223 applicants who retook just one part passed.

Table 2

NUMBER AND PERCENT OF APPLICANTS IN THE SAMPLE WHO TOOK
EACH PART OF THE FEBRUARY 1982 EXAM (N = 731)

| Part(s) Taken | Number of Applicants | Percent of the Total Sample | Percent Passing 2/82 Exam | Average Total GBX Score on 7/81 Exam |
|---|---|---|---|---|
| MBE | 113 | 15.5 | 59.3 | 1025 |
| Essay | 110 | 15.0 | 16.4 | 1017 |
| MBE and Essay | 395 | 54.0 | 57.7 | 1020 |
| None | 113 | 15.5 | 0.0 | 1012 |
| Total | 731 | 100.0 | 42.8 | 1019 |

- 4 -

Of the 91 applicants who passed because of the bifurcation rule, 73 (80 percent) combined a July 1981 Essay pass with a February 1982 MBE pass.

Table 3 shows that within each group using a given test taking strategy, the applicants who passed the February 1982 exam had a higher average July 1981 total score than the applicants who failed the February 1982 exam.  The difference was 9 points in the group that retook both parts, 10 points in the group that retook just the MBE, and 15 points in the group that retook just the Essay.  Thus, <u>initial total score was related to eventual success.</u>  This finding is consistent with the results of past studies and it has important implications for assessing the unique effects of bifurcation.

Table 3

DETAILED CATEGORIZATION OF SAMPLE ON FEBRUARY 1982 EXAMINATION

| Test Taking Behavior And The Resulting Pass/Fail Status | Number of Applicants | Percent of the Total Sample | Mean Total Score on 7/81 Exam |
|---|---|---|---|
| Did Not Take The 2/82 Exam | | | |
|     Had a Previous MBE Pass | 103 | 14.1 | 1010 |
|     Had a Previous Essay Pass | 10 | 1.4 | 1031 |
| | | | |
| Took Both Parts | | | |
|     Passed By Bifurcation Rule | 6 | 0.8 | 1031 |
|     Passed By Compensatory Rule | 106 | 14.5 | 1021 |
|     Passed By Both Rules | 116 | 15.9 | 1026 |
|     Failed | 167 | 22.8 | 1015 |
| | | | |
| Retook Only the MBE | | | |
|     Passed | 67 | 9.2 | 1029 |
|     Failed | 46 | 6.3 | 1019 |
| | | | |
| Retook Only the Essay | | | |
|     Passed | 18 | 2.5 | 1030 |
|     Failed | 92 | 12.6 | 1015 |

JULY 1982 RESULTS

Tables 4 and 5 show what happened to the sample of 731 applicants on the July 1982 exam relative to their test taking decisions and July 1981 total scores. These data indicate that the July 1982 applicants who retook only the Essay had a higher passing rate than those who retook both parts or just the MBE.

Table 4

NUMBER AND PERCENT OF APPLICANTS IN THE SAMPLE WHO TOOK
EACH PART OF THE JULY 1982 EXAM (N = 731)

| Part(s) Taken | Number of Applicants | Percent of the Total Sample | Percent Passing 7/82 Exam | Average Total GBX Score on 7/81 Exam |
|---|---|---|---|---|
| MBE | 45 | 6.2 | 35.6 | 1019 |
| Essay | 44 | 6.0 | 52.3 | 1019 |
| MBE and Essay | 177 | 24.2 | 43.5 | 1015 |
| None | 465 | 63.6 | 0.0 | 1019 |
| Total | 731 | 100.0 | 42.8 | 1019 |

EFFECTIVENESS OF DIFFERENT STRATEGIES

The relative effectiveness of different test taking strategies was investigated by determining an applicant's pass/fail status after that applicant had had the opportunity to take both the February and July 1982 exams. This analysis indicated that the eventual passing rates among those who adopted the strategy of retaking just the MBE, just the Essay, or both parts were 73, 37, and 77 percent, respectively.

The foregoing findings, by themselves, suggest that the strategy of retaking just the MBE was almost as effective as retaking both parts. However, the applicants who retook just the MBE had a higher average July 1981 total score than those who retook both. Thus, the applicants who retook just the MBE should have had a higher rather than a slightly lower eventual passing rate than the applicants who retook both parts.

The applicants who retook just the Essay obviously put themselves at a marked disadvantage (especially since their average July 1981 total score also was higher than that of those who took both).

Table 5

DETAILED CATEGORIZATION OF SAMPLE ON JULY 1982 EXAMINATION

| Test Taking Behavior And The Resulting Pass/Fail Status | Number of Applicants | Percent of the Total Sample | Mean Total Score on 7/81 Exam |
|---|---|---|---|
| Did Not Take The 7/82 Exam | | | |
|     Previous MBE Pass | 137 | 18.7 | 1012 |
|     Previous Essay Pass | 15 | 2.1 | 1024 |
|     Passed in 2/82 | 313 | 42.8 | 1025 |
| | | | |
| Took Both Parts Of 7/82 Exam | | | |
|     Passed By Bifurcation Rule | 5 | 0.7 | 1028 |
|     Passed By Compensatory Rule | 27 | 3.7 | 1016 |
|     Passed By Both Rules | 45 | 6.2 | 1023 |
|     Failed | 100 | 13.7 | 1010 |
| | | | |
| Retook Only the MBE | | | |
|     Passed | 16 | 2.2 | 1023 |
|     Failed | 29 | 4.0 | 1017 |
| | | | |
| Retook Only the Essay | | | |
|     Passed | 23 | 3.1 | 1023 |
|     Failed | 21 | 2.9 | 1015 |

UNIQUE EFFECTS OF BIFURCATION

Six of the February 1982 applicants and 5 of the July 1982 applicants
took both parts and passed solely because of the bifurcation rule. They
would not have passed if the bifurcation option was eliminated. By
themselves, these data suggest that the the bifurcation option slightly
increased the percentage of July 1981 applicants who eventually passed
(11/7082 = .0016).

Counting the number of applicants who passed solely because of
bifurcation does not provide an appropriate measure of the unique
effects of bifurcation. It does not address the policy question of what
the passing rate would have been if this option was eliminated and
passing was based on just the compensatory rule. The analyses of the
February and July 1982 data that are described in the remainder of this
section therefore investigated how many of the bifurcation eligible
applicants who retook only one part would have passed if they had
studied for and retaken both parts? Would their passing rate be higher
or lower if bifurcation was eliminated?

February 1982 Analyses

Analyses of the February 1982 data showed that 38 percent of the 223 applicants who took just one part passed by means of the bifurcation rule whereas 57 percent of the 395 applicants who retook both parts passed by the compensatory rule. However, the group that retook only one part had a 2 point higher average total GBX score on the July 1981 exam than the group that retook both parts. Taken together, these findings suggest that if the group of 223 had retaken both parts, they would have had a slightly higher passing rate with the compensatory rule than the group of 395 applicants who actually did retake both parts.

A more precise estimate of the unique effects of the bifurcation rule was obtained by contrasting the success rates of those who retook both versus only one part after their respective success rates were adjusted for whether they had a prior MBE or Essay pass. The procedures for making these calculations are summarized below:

o Of the 395 applicants who retook both parts, 381 had a prior MBE pass. Within this group, 216 (56.7 percent) passed the February 1982 exam by means of the compensatory rule.

o There were 110 applicants with a prior MBE pass who retook only the Essay. About 62 of these applicants would have passed the February 1982 exam by means of the compensatory rule if they had retaken both parts (.567 x 110 = 62.4).

o Of the 395 applicants who retook both parts, 14 had a prior Essay pass. Within this group, 6 (42.9 percent) passed the February 1982 exam by means of the compensatory rule.

o There were 114 applicants with a prior Essay pass who retook only the MBE. About 49 of these applicants would have passed the February 1982 exam by means of the compensatory rule if they had retaken both parts (.429 x 114 = 48.9).

The combination of the actual number that passed by the compensatory rule (216 + 6 = 222) with the number that would be expected to pass with this rule if they retook both parts (62.4 + 48.9 = 111) yielded a total of 333 applicants. This is 20 more than the 313 applicants that actually passed. Thus, by the completion of the February 1982 exam, the estimated net effect of the bifurcation rule was to fail 20 applicants who would have passed had they been required to pass by the compensatory rule alone.

The net effect of bifurcation was composed of about 8 applicants who only would have passed by the bifurcation rule and 28 who would have gone from a fail to a pass with its elimination. These values were estimated as follows:

- 8 -

o There were only 6 applicants who retook both parts and passed by bifurcation alone. All of these applicants had passed the MBE portion of the July 1981 exam. Within the group of 395 applicants who retook both parts, there were 381 applicants who had a prior MBE pass. Thus, the passing rate due solely to the bifurcation rule in this group was 1.6 percent (6/381 = .0157).

o Within the group of 223 applicants who retook just one part, there were 113 applicants who had a July 1981 MBE pass. If all 113 applicants had retaken both parts, then about 2 of them probably would have passed the February 1982 exam by means of the bifurcation rule alone (.0157 x 113 = 1.78).

o If all repeaters had been required to retake both parts, then about 8 of them (6 + 1.78) would have gone from a pass to a fail status. However, because the net effect of bifurcation was to fail 20 applicants, its elimination would have resulted in about 28 passing and 8 failing.

The foregoing calcalations probably underestimate the increase in passing rate that would be derived by eliminating the bifurcation rule. Applicants could retake the part passed previously without jeopardizing the passing status on that part. Some applicants who retook both parts may therefore have only tried their best on the part failed previously. This strategy would most likely lower their total scores and thereby reduce the number of applicants who passed as a result of the compensatory rule.

## July 1982 Analyses

It is not possible to obtain a precise estimate of the net effect of the bifurcation rule for the July 1982 exam. All of those from the original group of 731 applicants who retook both parts of this exam had a prior MBE pass. Thus, there is no empirical basis for estimating what the passing rate would have been if those with a prior Essay pass had taken both parts.

There are, however, two factors that suggest that the passing rate for bifurcation eligible repeaters would not have been affected if they were required to pass by the compensatory rule alone.

o Of the 177 applicants who retook both parts of the July 1982 exam, 41 percent passed by means of the compensatory rule. This passing rate is not significantly different than the 44 percent passing rate obtained with the 89 applicants who retook only one part.

o The 89 applicants who retook just one part had a 4 point higher average July 1981 total score than the 177 applicants who retook both parts. And, the higher the initial score, the greater the likelihood of eventually passing. Thus, the

group of 89 applicants would be expected to have a slightly
higher passing rate than the group of 177 applicants.

DISCUSSION OF RESULTS

The Committee of Bar Examiners encouraged applicants who became
bifurcation eligible as a result of their July 1981 scores to retake
both parts of the exam.  This strategy provided more ways of passing the
exam, it did not jeopardize a previous passing status on a part, and
there was no reduction in fees for taking only one part.  Nevertheless,
a significant percentage of bifurcation eligible applicants did not heed
the Committee's advice and retook just the part failed previously.  In
fact, 36 percent of the bifurcation eligible applicants who retook any
part of the February 1982 exam only retook the part failed previously.

The strategy of retaking just the part failed previously rather than
both parts decreased an applicant's chances for passing.  This was
especially true for the applicants who retook just the Essay part of the
exam.  For instance, on the February 1982 exam, there were 106
applicants who passed only as a result of taking both parts.  They would
not have passed if they had retaken just the part failed previously
because their February 1982 scores on that part were below the pass/fail
line.  On the July 1982 exam, there were 27 applicants who passed by the
compensatory rule alone.

Those who favor bifurcation may argue that the 133 applicants who passed
only because of the compensatory rule would have passed by bifurcation
if they had concentrated their exam preparation efforts on just the part
failed previously.  The empirical data do not support this hypothesis.

Table 6 shows that applicants who retook both parts of the exam had
consistently higher average scores on both the retaken MBE and Essay
parts than the applicants who retook only the part failed previously.
Moreover, this trend occurred despite the fact that the applicants who
retook only one part tended to be more able than those who took both
parts (as indicated by their generally higher average July 1981 total
scores).

Table 6

MEAN 1982 MBE AND ESSAY SCORES AND JULY 1981 TOTAL SCORES
FOR APPLICANTS WHO RETOOK ONE OR BOTH PARTS OF THE EXAM

| Exam Date | Parts Retaken | Number of Applicants | 1982 Means | | 7/81 Total |
|-----------|---------------|----------------------|------|-------|------------|
| | | | MBE | Essay | |
| Febr 1982 | Both | 395 | 435.4 | 612.2 | 1019 |
| | MBE | 113 | 426.8 | --- | 1025 |
| | Essay | 110 | --- | 594.0 | 1017 |
| July 1982 | Both | 177 | 430.6 | 606.2 | 1015 |
| | MBE | 44 | 416.7 | --- | 1019 |
| | Essay | 45 | --- | 602.2 | 1019 |

SUMMARY AND CONCLUSIONS

The net effect of the bifurcation rule was to decrease the percent
passing the exam.  If bifurcation had not been offered to the 7082
applicants who took the July 1981 exam, then at about 20 more of them
(0.3 percent) would have eventually passed.  The major reason the
bifurcation option reduced the percent passing was that a large
percentage of applicants only retook the part failed previously.  And,
taking only one part reduced the opportunities for passing and led to
lower rather than higher scores on the part retaken.

It is not clear why so many applicants relied on the bifurcation option
to pass and thereby reduced their chances of achieving this goal.  The
Committee of Bar Examiners' announcements and policies certainly
encouraged bifurcation eligible applicants to retake both parts.
However, for many applicants, the psychological appeal of having to
retake only one part seems to outweigh the desire to maximize one's
chances of passing.

An assessment of the implications of bifurcation would not be complete
without consideration of its costs and logistical consequences.  Even
with the aid of computers, it is very difficult and expensive to operate
a bifurcation system.  It also is likely to delay score reporting.
Thus, since bifurcation does not have a positive effect on the percent
passing but does have a substantial negative impact on costs, there does
not appear to be a compelling reason to use it.

PR-05-02

# HISTORY OF STRUCTURE AND PASS/FAIL RULES
## FOR THE CALIFORNIA GENERAL BAR EXAMINATION

Stephen Klein, Ph.D.
June 18, 2005

This report summarizes the features of California's General Bar Examination (GBX)[1] during the past 75 years.

1) Between 1932 and 1972, the GBX consisted of about 20 essay questions. In order to pass, an applicant had to have an average score of at least "70% of the highest possible grade." There is no record of what reread or reappraisal practices may have been used.

2) The Multistate Bar Examination (MBE), a 200-item multiple choice test, was added in July 1972. Under the July 1972 rules, an applicant could earn up to 1714 points; 514 on the MBE (2.57 times the applicant's MBE scale score) and 1200 on the essay (with 100 points for each of 12 questions). Thus, the nominal weights attached to the MBE and Essay were 30% and 70%, respectively.

The essay test had three sections with five questions per section. Applicants were told to answer four of the five questions in a section in 3.5 hours (i.e., 52.5 minutes per question). Thus, applicants had some choice in which questions they answered and there was wide variation in the number of applicants answering each question. On the average, there were 4 to 5 readers per question.

The passing score was 1200 points (i.e., 70% of the maximum possible total). Applicants with total scores were between 1140 and 1199 (i.e., between 66.5% and 69.9% of the maximum possible) were placed in reappraisal. The applicants in this group had all of their essay answers and all of their scores (including their MBE score) independently reviewed by two Reappraisers. Each Reappraiser made an overall pass/fail decision. If they disagreed, the applicant's answers and scores were reviewed by a third Reappraiser who broke the tie.

The passing score of 1200 was chosen, in part, because it allowed an applicant to pass by earning a perfect score on the essay section (i.e., even with a "0" on the MBE).

3) Several changes were made in July 1978. The number of essay questions an applicant had to answer was reduced from 12 to 9, the time allocated to answer a question was

---

[1] The Attorneys' Examinations consists of the written portions of the General Bar Examination, which are administered on Tuesday and Thursday of each general administration of the examination. Both examinations: General Bar Examination and Attorneys' Examination are considered collectively as the California Bar Examination.

increased to 60 minutes, applicants no longer had a choice in which questions they answered, MBE scale scores were multiplied by 3.0, the maximum possible score on the test became 1500 points (600 on the MBE and 900 on the Essay – which also changed the nominal weights assigned to each section), and a phased grading system was introduced to focus reader resources on applicants who were near the pass/fail line (i.e., those whose pass/fail status might be affected by a reread process).

The first step in the phased grading system involved passing applicants if their scores on one randomly selected essay test session (i.e., three essay answers) plus their MBE score was high enough to virtually assure they would pass if all their essay answers were read. The applicants who did not pass at this step had the rest of their answers graded. After this reading, applicants were passed if their total score was above 71% of the maximum possible score on the examination. They were failed if this score was below 67.3% of the maximum possible and they went to reread if it was between 67.3% and 71%.

The applicants in reread had all of their essay answers scored again by different graders who did not know the scores assigned by the first set of readers. The average of the two sets of essay scores became the applicant's total essay score and this score was combined with the MBE score. An applicant passed if this new total was 1050 or higher (i.e., 70% or more of the theoretical maximum possible score), failed if it was below 68.7%, and went to reappraisal if it was between 68.7% and 69.9%.

Applicants in reappraisal had all of their scores (including their MBE score) and essay answers reviewed by one Reappraiser who made the final pass/fail decision. As in the past, if the applicant failed after reappraisal, the score reported was the one the applicant received prior to reappraisal.

The score levels required to pass at each step and to get into reread and reappraisal were established on the basis of empirical analyses of past examinations (see report by Klein entitled "A Comparison of the Effectiveness of a Single versus a Multiphased Grading System" May, 1980). For instance, the bottom end of the reread zone was set in a way that assured inclusion of virtually all the applicants who had even a small chance of having their initial fail status converted to a pass as a result of the reread process.

Starting with the July 1984 examination, the first step of the phased grading process (i.e., passing some applicants without reading all of their answers at least once) was discontinued because it was found that it was no more expensive to grade every applicant's answers at least once.

The changes above increased the *nominal* weight given to the MBE from 30% to 40%, but they increased its *actual* weight to about 45%. This occurred because the actual weight is determined by the size of the MBE's standard deviation relative to the size of Essay section's standard.

4) The so called "bifurcation" rule was added in July 1981 to provide applicants with another means of passing. Under this rule, applicants could pass by having a combined MBE + Essay score of 1050 or higher (i.e., 70% of the maximum possible) and/or by passing the MBE on one administration of the examination and the Essay on another administration. Applicants who failed overall but "passed" one section (where passing was defined as 70% of the maximum possible score on that section) could repeat the entire examination or just the part failed previously. They did not risk losing their passing status on a section by repeating it.

Because the bifurcation rule only affected repeaters, no one passed as a result of it until February 1982. The rule was discontinued in July 1983 primarily because it had the opposite of its intended effect; i.e., it tended to lower rather than raise passing rates (see report by Klein "How the Bifurcation Rule Affected the Percent Passing California's General Bar Examination"). The rule also was too cumbersome to implement along with the planned use of the Performance Test because it would have meant "trifurcating" the examination. Because of the rule's provisions, some applicants were eligible to pass the GBX as late as July 1985 (i.e., by having earned a passing status on a July 1983 section).

5) On three examinations (February 1982, July 1982, and February 1983), applicants were given 90 minutes to answer two of the nine essay questions. The two questions appeared in a single, 180-minute test session. This addition increased total testing time from 2.5 to 3 days.

The questions allocated the extra time were graded in the same way as the other questions; i.e., with a 100 point maximum. No change was made in the pass/fail rules. Statistical studies of these three examinations indicated that the additional time did not affect passing rates. All subsequent examinations have allocated 60 minutes per essay question.

6) The Performance Test (PT) section was added to the examination in July 1983. On the first three administrations of this section, each PT problem included a set of multiple-choice questions. The scores on the multiple-choice portion of a PT problem were scaled to the MBE. An applicant could theoretically earn 1800 points on the examination -- 600 on the MBE (three times the MBE scale score), 600 on the essay (6 questions at 100 points each), and 600 on the PT (300 points per problem, 200 for the written response and 100 for the multiple choice portion). The passing score was 1260 (i.e., 70% of 1800).

The multiple-choice portion of the PT was discontinued after the July 1984 examination. Starting with the February 1985 examination, all 300 points per PT problem were given to the written answer.

The pass/fail decision rules adopted in 1978 were converted to the new examination structure and point system. Specifically, after the first reading of all answers, applicants were passed if their total scores were over 1278, failed if they were under 1225, and sent to reread if they were between 1225 and 1278. Based on their total scores after reread,

3

applicants were passed if their total was over 1259, failed if it was less than 1240, and sent to reappraisal if it was between 1240 and 1259.

7) Under the present rules, which were implemented beginning with the February 1987 examination, MBE scale scores are multiplied by 10 (so that the maximum possible MBE score is 2,000 points) and the written portion of the examination is structured so that an applicant can earn up to 600 raw score points on the essay (100 points per question) and 400 on the PT (200 points per problem).

Total written raw scores (i.e., Essay plus PT) on a given administration are scaled to a score distribution that has the same mean and standard deviation as these applicants' MBE scores. The formula used to compute total scores gives 65% of the weight to the Written portion of the examination and 35% to the MBE. This formula is: Total Scale = (.65 x Written Scale Score) + (.35 x MBE Scale Score)

The score required for passing is 1440. This score reflects the average of the pass/fail standards that were used on the all the examinations that were given between 1977 and 1986. This average was computed by using the procedures above to calculate total scale score on each of these 20 previous examinations, finding the total score on each examination that would have produced the same passing rates as actually occurred on that examination, and then determining the average of these standards. The use of 1440 also reflects a small adjustment that was made to accommodate the applicants who would pass as a result of the reappraisal process. In addition, the reread and reappraisal bands were set in a way that insured including about the same percentage of applicants as had been in these groups on previous administrations of the examination.

There have been many changes in the GBX's pass/fail rules, structure, format, the weights attached to its sections, and the number of readers grading the answers to the written questions. For example, there are now more than twice as many readers per question as there were 25 years ago. Nevertheless, GBX passing rates have generally risen and fallen in close harmony with variations in the candidates' mean LSAT and MBE scores (and the scores on those tests are adjusted for possible differences in average question difficulty from one examination to the next). Thus, the standards for passing have remained fairly stable over time.

CHRONOLOGY OF CHANGES

July 1972          MBE added with a nominal weight of 30%

July 1978          Number of essay questions reduced from 12 to 9
                   All applicants had to answer all questions
                   Time per question increased from 52.5 to 60 minutes
                   Beginning of phased grading and automatic reread
                   Reappraisers per applicant reduced from 2 or 3 to 1
                   Nominal weight given to MBE increased to 40%

July 1980          Experimental test sections and Assessment Center
                   Special one time only pass/fail rules

July 1981          Bifurcation rule added (affected pass/fail in 2/82)

February 1982      90 minutes allocated to each of two essay questions
                   Examination length increased from 2.5 to 3 days

July 1983          90 minute questions eliminated
                   PT section added to the examination with a multiple choice part
                   Essay, PT, and MBE each carry one-third of nominal weight
                   Bifurcation rule dropped, but affected pass/fail to 7/85

July 1984          All written answers read at least once for all applicants

February 1985      Multiple choice portion of PT eliminated

February 1987      Essay and PT combined into a single Written score
                   Weight attached to PT reduced to 40% of Written score
                   Written scores (Essay + PT) scaled to MBE distribution
                   Weight attached to MBE set at 35% of total

5

8/2/85

SCALING EXPLAINED

WHAT IS SCALING?

Scaling is a procedure that converts Essay and Performance Test (PT) scores to the same scale of measurement as that used on the Multistate Bar Examination (MBE). It is analogous to taking a set of temperatures measured on the centigrade scale and converting them to their corresponding values on the Fahrenheit scale.

The table below illustrates how Essay scores can be scaled. The data in this table came from the July 1984 exam. On that exam, the highest MBE and Essay scores were 540 and 515, respectively. The applicant who earned the 540 on the MBE was therefore at the 100th percentile point in the distribution of MBE scores. The applicant who earned the 515 on the Essay was at the 100th percentile point in the distribution of Essay raw scores.

To put the Essay scores on the same scale of measurement as the MBE, an Essay score of 515 is converted to a 540. Similarly, an applicant with a total Essay score of 400 (the mean of the Essay scores) is assigned an Essay scale score of 423 (the mean of the MBE scores on that same exam).

| Percentile Rank | MBE Score | Sum of Reader Assigned Essay Scores | Essay Scale Score |
|---|---|---|---|
| 100th | 540 | 515 | 540 |
| : | : | : | : |
| 84th | 468 | 431 | 468 |
| : | : | : | : |
| 50th | 423 | 400 | 423 |
| : | : | : | : |
| 16th | 375 | 369 | 375 |
| : | : | : | : |
| 0 | 225 | 225 | 225 |

An applicant's Essay score is adjusted in terms of the distribution of all of the Essay and MBE scores. It is not adjusted in terms of that applicant's particular MBE score.

The same procedure is used to convert PT scores to scale scores. Under the proposed plan, an applicant's Total exam score would be the sum of that applicant's three scale scores (MBE, Essay, and PT). The pass/fail line can be set in terms of a <u>Total Scale</u>

score.  For example, a Total Scale score of 1287 would pass about
the same percentage of applicants as actually did pass each of the
last 20 examinations.


WHY SCALE?

There are two reasons for scaling.  It assigns equal weight to the
MBE, Essay, and PT in making pass/fail decisions.  Scaling also
eliminates possible differences from one administration of the exam
to the next in the levels of skills and knowledge that are required
for passing.


Equal Weights Among Sections

Under the current rules, the total exam score is the sum of the
applicant's MBE, Essay, and PT scores.  A score of 1260 or higher
is needed for passing.  However, as will be illustrated below, this
policy does not insure that all three sections carry equal weight
in determining who passes.  In fact, because of certain statistical
properties of the three sections, the current rules give more
weight to the MBE than to the PT which in turn carries more weight
than the Essay.

This situation is illustrated in the following table.  Applicants
A and B have the same PT score (430).  Applicant A is at the 84th
percentile on the MBE and the 16th percentile on the Essay.  From
the previous table we see that the 84th percentile on the MBE
corresponds to a score of 468 and the 16th percentile on the Essay
corresponds to a reader assigned score of 369.  Applicant B has the
opposite pattern of percentiles (84th on the Essay and 16th on the
MBE).  However, instead of both applicants having the same total
score and pass/fail status, Applicant A passes and B fails.  In
short, doing relatively better on the MBE than on the Essay is more
likely to result in passing than the exact reverse pattern.

| Applicant | MBE Score | Reader Assigned | | Total Score | Pass/Fail |
| | | Essay | PT | | |
|---|---|---|---|---|---|
| A | 468 | 369 | 430 | 1267 | Pass |
| B | 375 | 431 | 430 | 1236 | Fail |

Scaling eliminates the problem of under weighting the Essay by converting Essay and PT scores to a scale of measurement that has the same score spread as the MBE. Scaling therefore permits all three sections to carry the same weight in determining an applicant's pass/fail status. The table below shows Applicants A and B in the example above would have the same total <u>scale</u> score.

| Applicant | MBE Score | Scale Scores | | |
|---|---|---|---|---|
| | | Essay | PT | Total |
| A | 468 | 375 | 450 | 1293 |
| B | 375 | 468 | 450 | 1293 |

## Equal Difficulty Across Administrations

MBE scores are already adjusted for possible differences in the average difficulty of the questions asked from one exam to the next. This is done through a complex but standard statistical procedure that includes inserting 60 questions into a current MBE that appeared on a prior administration (but which have not been released to the public).

Essay and PT scores are not adjusted. Thus, differences in Essay and PT average scores from one administration of the exam to the next are a function of variations in: the difficulty of the questions asked, the leniency with which the answers to them are graded, and the average ability level of the applicants. Because of the first two of these factors, it may be more difficult to pass the bar exam on one administration than on another administration.

Scaling eliminates this problem. If the Essay questions are unusually difficult and/or the readers especially strict on a given administration, it will have no affect on the percent passing because scaling pegs the average Essay score to the average MBE score.

The MBE is the best bench mark for this purpose. MBE scores are already adjusted for possible differences in average question difficulty across different administrations. Moreover, MBE, Essay, and PT scores are highly related to each other. For example, the rank ordering of California ABA approved law schools on one of these tests is essentially the same as their rank ordering on the other two tests. Thus, the MBE is a good barometer of changes in the general level of applicant ability across administrations.

WHY SCALE NOW?

There are four major reasons California is considering scaling now.

1) Scaling insures that all three sections will carry equal weight in determining who passes (versus the current situation in which the MBE carries more weight than the Essay or PT).

2) A sharp drop in average applicant ability is expected in 1988. Scaling can insure that the same standard for passing is maintained across administrations. If this standard is maintained and the passing rate shows the anticipated decline, it cannot be blamed on the examiners asking more difficult questions or grading more stringently because under scaling, these factors have no effect on the percent passing.

3) Scaling requires that the Committee alone set the standard for passing <u>before</u> the exam is given rather than sharing this responsibility with the reappraisers and readers <u>after</u> the exam is administered.

Under the current rules, applicants need a total score of 1260 or higher in order to pass. Each of the six Essay answers is graded on a 0 to 100 point scale with a score of 70 considered as just passing. The same is true for the PT answers. However, it is up to each reading team to decide what level of answer quality deserves a 60, 65, 70, etc. This is done after the team has seen a sample of answers.

Under scaling, the Committee sets the pass/fail standard in advance of administering the exam in terms of the total scale score required for passing. This means that the percent passing a given exam cannot be affected by whether Essay or PT answers are graded unusually leniently or strictly.

4) The state-of-the-art in bar examinations involves the use of scaling. About 20 states scale their Essay scores to the MBE, including Connecticut, Florida, Illinois, Massachusetts, New York, Pennsylvania, Texas, and the District of Columbia. Given the distinct advantages of scaling and the safe guards it provides to applicants, it is now considered inappropriate not to use this technique.

Scaling was recommended to the Committee of Bar Examiners by its Long-Range Planning committee. The Committee then explored the likely effects of scaling by conducting statistical analyses of data from 20 past examinations, gathering information from other jurisdictions about their experiences with scaling, obtaining the opinions of independent experts in the field, and having staff assess the costs and logistical implications of implementing it. Next steps will involve discussions of scaling with the Board of Governors, law school deans, and other interested parties.

**PR-85-2**

8/2/85

SCALING EXPLAINED

WHAT IS SCALING?

Scaling is a procedure that converts Essay and Performance Test
(PT) scores to the same scale of measurement as that used on the
Multistate Bar Examination (MBE).  It is analogous to taking a set
of temperatures measured on the centigrade scale and converting
them to their corresponding values on the Fahrenheit scale.

The table below illustrates how Essay scores can be scaled.  The
data in this table came from the July 1984 exam.  On that exam, the
highest MBE and Essay scores were 540 and 515, respectively.  The
applicant who earned the 540 on the MBE was therefore at the 100th
percentile point in the distribution of MBE scores.  The applicant
who earned the 515 on the Essay was at the 100th percentile point
in the distribution of Essay raw scores.

To put the Essay scores on the same scale of measurement as the
MBE, an Essay score of 515 is converted to a 540.  Similarly, an
applicant with a total Essay score of 400 (the mean of the Essay
scores) is assigned an Essay scale score of 423 (the mean of the
MBE scores on that same exam).

| Percentile Rank | MBE Score | Sum of Reader Assigned Essay Scores | Essay Scale Score |
|---|---|---|---|
| 100th | 540 | 515 | 540 |
| : | : | : | : |
| 84th | 468 | 431 | 468 |
| : | : | : | : |
| 50th | 423 | 400 | 423 |
| : | : | : | : |
| 16th | 375 | 369 | 375 |
| : | : | : | : |
| 0 | 225 | 225 | 225 |

An applicant's Essay score is adjusted in terms of the distribution
of all of the Essay and MBE scores.  It is not adjusted in terms of
that applicant's particular MBE score.

The same procedure is used to convert PT scores to scale scores.
Under the proposed plan, an applicant's Total exam score would be
the sum of that applicant's three scale scores (MBE, Essay, and
PT).  The pass/fail line can be set in terms of a <u>Total Scale</u>

score.  For example, a Total Scale score of 1287 would pass about
the same percentage of applicants as actually did pass each of the
last 20 examinations.


WHY SCALE?

There are two reasons for scaling.  It assigns equal weight to the
MBE, Essay, and PT in making pass/fail decisions.  Scaling also
eliminates possible differences from one administration of the exam
to the next in the levels of skills and knowledge that are required
for passing.


Equal Weights Among Sections

Under the current rules, the total exam score is the sum of the
applicant's MBE, Essay, and PT scores.  A score of 1260 or higher
is needed for passing.  However, as will be illustrated below, this
policy does not insure that all three sections carry equal weight
in determining who passes.  In fact, because of certain statistical
properties of the three sections, the current rules give more
weight to the MBE than to the PT which in turn carries more weight
than the Essay.

This situation is illustrated in the following table.  Applicants
A and B have the same PT score (430).  Applicant A is at the 84th
percentile on the MBE and the 16th percentile on the Essay.  From
the previous table we see that the 84th percentile on the MBE
corresponds to a score of 468 and the 16th percentile on the Essay
corresponds to a reader assigned score of 369.  Applicant B has the
opposite pattern of percentiles (84th on the Essay and 16th on the
MBE).  However, instead of both applicants having the same total
score and pass/fail status, Applicant A passes and B fails.  In
short, doing relatively better on the MBE than on the Essay is more
likely to result in passing than the exact reverse pattern.

| Applicant | MBE Score | Reader Assigned | | Total Score | Pass/Fail |
| | | Essay | PT | | |
| --- | --- | --- | --- | --- | --- |
| A | 468 | 369 | 430 | 1267 | Pass |
| B | 375 | 431 | 430 | 1236 | Fail |

Scaling eliminates the problem of under weighting the Essay by
converting Essay and PT scores to a scale of measurement that has
the same score spread as the MBE.  Scaling therefore permits all
three sections to carry the same weight in determining an
applicant's pass/fail status.  The table below shows Applicants A
and B in the example above would have the same total <u>scale</u> score.

| Applicant | MBE Score | Scale Scores | | |
|-----------|-----------|-------|-----|-------|
|           |           | Essay | PT  | Total |
| A         | 468       | 375   | 450 | 1293  |
| B         | 375       | 468   | 450 | 1293  |

## Equal Difficulty Across Administrations

MBE scores are already adjusted for possible differences in the
average difficulty of the questions asked from one exam to the
next.  This is done through a complex but standard statistical
procedure that includes inserting 60 questions into a current MBE
that appeared on a prior administration (but which have not been
released to the public).

Essay and PT scores are not adjusted.  Thus, differences in Essay
and PT average scores from one administration of the exam to the
next are a function of variations in:  the difficulty of the
questions asked, the leniency with which the answers to them are
graded, and the average ability level of the applicants.  Because
of the first two of these factors, it may be more difficult to pass
the bar exam on one administration than on another administration.

Scaling eliminates this problem.  If the Essay questions are
unusually difficult and/or the readers especially strict on a given
administration, it will have no affect on the percent passing
because scaling pegs the average Essay score to the average MBE
score.

The MBE is the best bench mark for this purpose.  MBE scores are
already adjusted for possible differences in average question
difficulty across different administrations.  Moreover, MBE, Essay,
and PT scores are highly related to each other.  For example, the
rank ordering of California ABA approved law schools on one of
these tests is essentially the same as their rank ordering on the
other two tests.  Thus, the MBE is a good barometer of changes in
the general level of applicant ability across administrations.

WHY SCALE NOW?

There are four major reasons California is considering scaling now.

1) Scaling insures that all three sections will carry equal weight in determining who passes (versus the current situation in which the MBE carries more weight than the Essay or PT).

2) A sharp drop in average applicant ability is expected in 1988. Scaling can insure that the same standard for passing is maintained across administrations. If this standard is maintained and the passing rate shows the anticipated decline, it cannot be blamed on the examiners asking more difficult questions or grading more stringently because under scaling, these factors have no effect on the percent passing.

3) Scaling requires that the Committee alone set the standard for passing _before_ the exam is given rather than sharing this responsibility with the reappraisers and readers _after_ the exam is administered.

Under the current rules, applicants need a total score of 1260 or higher in order to pass. Each of the six Essay answers is graded on a 0 to 100 point scale with a score of 70 considered as just passing. The same is true for the PT answers. However, it is up to each reading team to decide what level of answer quality deserves a 60, 65, 70, etc. This is done after the team has seen a sample of answers.

Under scaling, the Committee sets the pass/fail standard in advance of administering the exam in terms of the total scale score required for passing. This means that the percent passing a given exam cannot be affected by whether Essay or PT answers are graded unusually leniently or strictly.

4) The state-of-the-art in bar examinations involves the use of scaling. About 20 states scale their Essay scores to the MBE, including Connecticut, Florida, Illinois, Massachusetts, New York, Pennsylvania, Texas, and the District of Columbia. Given the distinct advantages of scaling and the safe guards it provides to applicants, it is now considered inappropriate not to use this technique.


Scaling was recommended to the Committee of Bar Examiners by its Long-Range Planning committee. The Committee then explored the likely effects of scaling by conducting statistical analyses of data from 20 past examinations, gathering information from other jurisdictions about their experiences with scaling, obtaining the opinions of independent experts in the field, and having staff assess the costs and logistical implications of implementing it. Next steps will involve discussions of scaling with the Board of Governors, law school deans, and other interested parties.

PR-88-8

# RELIABILITY AND VALIDITY OF THE FIRST YEAR
# LAW STUDENTS EXAM

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

GANSK & Associates

December 27, 1988

RELIABILITY AND VALIDITY OF THE FIRST YEAR LAW STUDENTS EXAM

BACKGROUND

Students at unaccredited (but not ABA or California accredited) law schools must pass the First Year Law Students Exam (FYLX) to receive state bar credit for their first year of law studies. And, receipt of this credit is a prerequisite for taking the General Bar Examination (GBX) if the applicant graduates from an unaccredited school. However, some graduates of unaccredited schools are exempt from this requirement because they successfully completed their first year at an accredited or ABA school. Conversely, some applicants may have taken the FYLX and later transferred to an ABA or California accredited school.

The FYLX is a one day exam that is given twice per year (in June and October). It consists of 100 multiple choice questions and four essay questions, hereafter referred to as the FYLX-MC and FYLX-Essay. FYLX-MC raw scores (the number of questions answered correctly) are equated so that a given FYLX-MC scale score indicates the same level of proficiency regardless of the exam on which it was earned. Each essay answer is graded on a 0 to 100 scale so that the maximum possible total essay score is 400 points. The total FYLX score is the sum of the FYLX-MC scale and FYLX-Essay scores.

FYLX TEST CHARACTERISTICS

Table 1 shows the mean, standard deviation, and reliability of each of the FYLX's three scores on the June 1988 administration of this test. This exam was taken by 481 applicants, 36 percent of whom passed it (i.e., received a score of 560 or higher after reappraisal).

Table 1

SUMMARY STATISTICS ON THE JUNE 1988 FYLX

| FYLX Score | Mean | Standard deviation | Reliability |
|---|---|---|---|
| Multiple Choice | 256.04 | 44.53 | .864 |
| Essay | 267.30 | 26.55 | .665 |
| Total | 523.34 | 63.35 | .874 |

There was a .56 correlation between the FYLX multiple choice and essay scores on this exam.  Standard statistical formulas estimate that this correlation would be about .74 if both measures were perfectly reliable. These statistics indicate that the applicants who earn relatively high scores on the FYLX-MC also tend to earn high FYLX-Essay scores, but this relationship is far from perfect even when both measures are corrected for reliability.

The reliability of the FYLX-MC, .864, compares favorably with the reliability of the 200-item multiple choice section on the GBX; i.e., the Multistate Bar Examination (MBE).  For instance, the MBE usually has a reliability of about .88.  If the FYLX-MC section was expanded to 200 items, its reliability would be about .93.

The reliability of the FYLX-Essay section, .665, is somewhat better than what would be expected given the reliability of the six-question essay section on the GBX.  For example, if the FYLX-Essay section was expanded to six questions, its projected reliability (.75) would be higher than the .67 that is typically found with six GBX essay questions.

The reliability of the total FYLX score (.874) is comparable to that of the total GBX score (.849 in July 1985 and .871 in July 1986).  And, it is high enough for the purposes of making pass/fail decisions about individual applicants.

The reason the total score is so reliable is that the FYLX-MC section is more reliable than the FYLX-Essay and the FYLX-MC carries substantially

more weight than the essay in determining whether one applicant has a
higher FYLX total score than another applicant. This occurs because the
FYLX-MC's standard deviation is 1.68 times as large as the essay's
standard deviation (and when scores are simply added together to form a
total score, their relative weights are affected by the relative sizes
of their standard deviations).

One consequence of the FYLX-MC carrying more weight than the essay is
that the FYLX-MC accounts for 88 percent of the variance in total FYLX
scores whereas the essay accounts for only 66 percent. In short, an
applicant's FYLX-MC score is an extremely good predictor of that
applicant's total FYLX score.

This strong relationship between FYLX-MC and total scores is illustrated
by the fact that if the passing score on the FYLX-MC was set so that it
passed the same number of applicants as actually passed the FYLX (i.e.,
36 percent), then the two measures would agree on the pass/fail status
for 85 percent of the applicants.


RELATIONSHIP BETWEEN FYLX AND GBX SCORES

State bar records were searched back to 1980 to find all the applicants
who had an FYLX score and who also took the GBX for the first time in
either July 1985 or July 1986. This search found 244 applicants (130
from the 1985 exam and 114 from the 1986 exam). If an applicant took
the FYLX more than once, we used the last and thereby the highest score
earned. Only 7 of the 244 applicants (3%) took the FYLX in 1980. Thus,
it appears our search went back far enough in time to capture virtually
all of the July 1985 and 1986 first timers who had an FYLX score.


Sample Characteristics

Only 123 of the 244 applicants (50 percent) graduated from an
unaccredited school. The percent graduating from ABA and California
accredited schools were 7 percent and 36 percent, respectively. The

remaining 7 percent were not assigned to a school (primarily because
they took the GBX more than one year after graduation).

These data suggest that passing the FYLX may encourage some applicants
to apply (or reapply) to accredited schools.  It also may increase their
chances of being admitted to these schools.  However, the 89 applicants
who graduated from California accredited schools tended to have slightly
lower FYLX scores than the other 155 applicants in the sample (there was
a -.19 biserial correlation between FYLX total score and graduating from a
California Accredited school).

Table 2 presents summary statistical data on the 244 applicants for whom
we could find both FYLX and GBX scores (the GBX-Written score was before
scaling to MBE score distribution).

Table 2

SUMMARY STATISTICAL DATA FOR APPLICANTS WHO HAD
BOTH FYLX AND GBX SCORES (N = 244)

| Score | Mean | Standard deviation |
|---|---|---|
| FYLX-MC | 297.39 | 25.86 |
| FYLX-Essay | 284.36 | 17.74 |
| FYLX-Total | 581.76 | 32.26 |
| GBX-MC (MBE) | 143.23 | 14.68 |
| GBX-Written | 673.36 | 50.38 |
| GBX-Total | 1425.65 | 138.79 |

Unaccredited School Graduates Without FYLX Scores

There were 54 applicants who did not take the FYLX but did take the GBX
for the first time in July 1985 or July 1986.  These applicants may have
been exempted from the FYLX requirement because they successfully
completed their first year of law studies at an ABA or California
accredited school and then transfered to an unaccredited school.

The mean total GBX score in this group of 54 applicants (1224) was 200 points lower than the mean for the 224 applicants who were found (1426). And, only 9 of the 54 applicants (17%) passed the GBX. Thus, the current policies for exempting applicants from the FYLX requirement err on the side of leniency. Moreover, these policies benefitted a large share of the unaccredited school graduates (the 54 applicants without FYLX scores constituted 31 percent of all the 177 unaccredited school first timers from the July 1985 and 1986 cohorts).

## Prediction of First Timer Scores

Table 3-A shows that the FYLX is a good predictor of GBX scores. It also shows that the combination of FYLX-MC and FYLX-Essay scores (i.e., FYLX-Total) is a better predictor of GBX-Total than is either measure by itself. We found that giving the FYLX-MC substantially more or less weight than it now carries relative to the FYLX-Essay did not improve the FYLX-Total's ability to predict total GBX scores.

Table 3-B shows what these correlations would have been if all the applicants who took the FYLX also took the GBX (rather than just the ones who passed the FYLX). Thus, the values in Table 3-B are estimates of the FYLX's ability to predict GBX scores.

The .70 validity coefficient for the FYLX total score would be considered quite high relative to the validity coefficients of other tests (such as the LSAT); and, it is comparable to how well law school grade point average predicts GBX scores. However, as with grade point average, there is no single FYLX score that clearly distinguishes between those who will versus will not pass the GBX.

Table 3-A

OBSERVED CORRELATIONS BETWEEN FYLX AND GBX SCORES

|  | FYLX-MC | FYLX-Essay | FYLX-Total |
|---|---|---|---|
| GBX-MC (MBE) | .46 | .17 | .46 |
| GBX-Written | .25 | .32 | .38 |
| GBX-Total | .35 | .30 | .45 |

Table 3-B

CORRELATIONS BETWEEN FYLX AND GBX SCORES AFTER
ADJUSTING FYLX SCORES FOR RESTRICTION IN RANGE

|  | FYLX-MC | FYLX-Essay | FYLX-Total |
|---|---|---|---|
| GBX-MC (MBE) | .67 | .25 | .71 |
| GBX-Written | .40 | .45 | .63 |
| GBX-Total | .54 | .43 | .70 |

The correction procedure used the standard
deviations from tables 1 and 2 to estimate
the variance in the unrestricted and
restricted samples, respectively.

## Initial versus Eventual Pass/Fail Status

Overall, 43.4 percent of the sample of 244 applicants passed the GBX on
their first attempt.   Another 25.4 percent passed after as many as five
subsequent attempts, which brought the total eventually passing to 68.8
percent.   In short, an applicant who passes the FYLX has a slightly less
than a 50/50 chance of passing the GBX on the first try, but about a
two-thirds chance of eventually passing the GBX.

Table 4 shows that in general, the higher the FYLX score, the higher the
initial and eventual passing rates.   The initial passing rate was more
closely associated with the FYLX score than was the eventual rate.   And,
although 50 of the 51 applicants with an FYLX score over 607 eventually
passed the GBX, there were many applicants with scores below 607 who

- 7 -

also passed the GBX. Similarly, there was no minimum FYLX score that
distinguished well between the applicants who did versus did not pass
the GBX either on their first attempt or eventually.

Table 4

MEAN GBX SCORES AND PASSING RATES AS A FUNCTION OF FYLX SCORE

| FYLX Total | Number of applicants | Initial mean GBX total | Percent Passing GBX | |
|---|---|---|---|---|
| | | | Initially | Eventually |
| < 559 | 44 | 1380 | 25 | 48 |
| 559-569 | 47 | 1375 | 28 | 64 |
| 570-579 | 27 | 1375 | 26 | 56 |
| 580-589 | 32 | 1419 | 44 | 72 |
| 590-599 | 26 | 1419 | 42 | 65 |
| 600-609 | 20 | 1437 | 45 | 75 |
| 610-619 | 18 | 1544 | 89 | 100 |
| > 619 | 30 | 1554 | 83 | 96 |
| Total | 244 | 1426 | 43 | 69 |

## Correlations with Sex

Research on the GBX has shown that men tend to earn relatively higher
MBE than essay scores whereas the reverse is true for women. The same
trends were present for both the FYLX and GBX scores in the sample of
244 applicants (49 percent of whom were men). The biserial correlations
between being male and FYLX-MC and FYLX-Essay scores were .15 and -.11,
respectively. The corresponding correlations with MBE and GBX written
scores were .14 and -.10.

## Correlations with Race

Past research also has shown that Anglos tend to earn higher GBX scores
than non-Anglos. This trend also was found for GBX scores in the sample
of 244 applicants (89 percent of whom were Anglos). The correlation
between being Anglo and MBE, Written, and GBX total scores were .25, .15,

and .20, respectively.  All of these coefficients were statistically significantly different than what would be expected by chance.

In contrast, race was not significantly correlated with any of the three FYLX scores (the correlations between race and FYLX-MC, FYLX-Essay, and FYLX-total scores were .06, .09, and .09, respectively).

It is not evident why in our sample of 244 applicants the FYLX scores were less sensitive to race than were the GBX scores.  FYLX and GBX scores have comparable reliabilities and the disparity in race effects between the two exams was observed on both their essay and multiple choice sections.

Because of the potential importance of this finding for developing a better understanding of the source of racial disparities in bar scores, we also computed the correlations between FYLX scores and race for the 226 applicants who had such scores and who also had taken the GBX at least once before July 1985.  In this group of repeaters (27% of whom were minority group members), the correlation between race and FYLX-MC, FYLX-Essay, and FYLX-total scores were .27, .01, and .23, respectively. Thus, only the FYLX-Essay remained racially neutral.  However, the correlations of GBX scores with race in this sample did not follow the normal pattern (e.g., it was only .06 with the GBX written score).

The number of minority group members in the sample of 244 applicants (27) and in the latter sample (61) were too small to conduct analyses separately by racial group.  Indeed, these small sample sizes, the potential selection effects in the repeater sample, and the differences in the mix of minority applicants across samples may have influenced the observed pattern of correlations.  Thus, it is premature to draw any conclusions about the relationship of race to FYLX scores.

Report #81-7

THE EFFECT OF TIME LIMITS, ITEM SEQUENCE, AND QUESTION FORMAT

ON APPLICANT PERFORMANCE ON THE CALIFORNIA BAR EXAMINATION

A Report Submitted to the
Committee of Bar Examiners of the State Bar of California
and the National Conference of Bar Examiners

Prepared by

Stephen P. Klein
GANSK & ASSOCIATES

October 15, 1981

PREFACE

This report describes a series of studies that was funded by the Committee
of Bar Examiners of the State Bar of California and the National Conference
of Bar Examiners.  These studies, which were conducted in conjunction with
the July 1980 administration of the California State Bar Examination,
investigated the effects on applicant performance of certain bar
examination procedures so as to assess the probable impacts of various
changes that might be made in these procedures.

Two other sets of studies also were conducted in conjunction with the July
1980 administration of the California examination.  These studies focused
on measuring the degree to which scores on the essay and multiple choice
portions of the bar examination corresponded with scores on tests of an
applicant's ability to perform various practice related tasks, such
as conducting legal research.  A description of these other studies has
been provided by O'Hara and Klein (1981).

SUMMARY

The July 1980 version of the California Bar Examination was divided into two parts. One part, called the General Bar Examination (GBX), had two sections; the Multistate Bar Examination (MBE) and the Essay Examination. The MBE had 200 multiple choice questions (items) and all the applicants participating in the research described in this report had MBE scores. The Essay section had nine questions, however, because of California's multi-phased grading process, about 30 percent of the applicants had only three of their essay answers graded.

The other part of the July 1980 examination was called the Special Session (SS). The SS was optional; i.e., an applicant could choose not to participate in it without jeopardizing his/her chances of passing the GBX. If an applicant participated and did well in the SS, it could increase that applicant's chances of passing. About 99 percent of the applicants who sat for the complete GBX also took the SS.

Applicants were assigned randomly to one of the SS's four sections. Since these sections were administered concurrently, a given applicant could take only one of them.

The results obtained with two of the SS's four sections are described in this report. These two sections were used to investigate the effects on applicant performance of certain bar examination procedures so as to assess the probable impacts of various changes that might be made in these procedures. The major questions addressed by this research were:

o Is performance on multiple choice questions affected by the order in which the questions are asked and/or the amount of time applicants are given to answer them?

o Is performance on essay questions affected by the amount of time applicants are given to answer them?

o When content coverage is held constant, is the relative standings of applicants affected by whether their legal skills and knowledge are measured by essay or multiple choice questions?

## MBE TIME LIMITS AND ITEM ORDER STUDIES

The MBE Time Limits and Item Order Studies involved four groups of applicants (with 705 to 750 applicants per group). Each group took two tests and each test consisted of 30 multiple choice questions (items). These items were drawn from previous, but still secure versions of the MBE. The applicants had 55 minutes to complete the first test (i.e., the regular time per item) and 90 minutes to complete the second test. There were two versions of each test (designated as 1 and 2). These versions differed solely in terms of the sequence in which blocks of items were asked. Test forms were assigned to groups so that each version of each set of 30 items was answered by one group under the 55 minute time limit and by another group under the 90 minute time limit.

Results with the MBE Time Limits portion of this research indicated that:

o The average score under the 90 minute time limit was 0.87 points higher than it was under the 55 minute time limit. This finding suggests that if applicants were given essentially unlimited time to answer the MBE's 200 items, their average raw score would increase by about 6 points.

o Applicants did not benefit equally from the extra time (only 58 percent had higher scores under the 90 minute time limit than they did under the 55 minute time limit). Some of the increase and decrease in scores was due to chance (e.g., guessing, the degree to which an applicant was familiar with the specific issues addressed by the items on each test, etc.); i.e., the scores were not perfectly reliable.

o When scores on the tests were corrected for unreliability, there was a near perfect correlation between them. Corrected correlations between scores on the full MBE and the 30 item tests were the same and near perfect under both time limits. These findings suggest that the differences in the relative standings of the applicants under the different time limits were due to their taking different MBE questions in each time limit rather than to the extra time per se.

o There were no statistically significant correlations between how much an applicant's score changed as a result of the extra time and that applicant's background characteristics (such as age, sex, race, type of law school attended, and repeater status).

o There were no statistically significant correlations between how much an applicant's score changed as a result of the extra time and that applicant's performance level on the full examination or that applicant's attitudes about the experimental and full examination (e.g., such as the adequacy of time limits and the efficacy the tests as measures of legal ability).

Raw scores on the MBE are adjusted through a scaling process in order to control for possible differences in average question difficulty across administrations of this test. In California, pass/fail decision on the MBE are based on the scale scores (rather than the raw scores). Thus, while allowing applicants more time on the MBE would generally result in slightly higher raw scores, it would not affect the scale scores. The percent passing the MBE in California (or any other jurisdiction that uses scale scores) would therefore not be increased by an increase in the time applicants had to answer. The analyses conducted in this study also indicated that giving applicants more time to answer MBE questions would have no significant impact on their relative standings; i.e., who passes versus fails this test.

Results with the Item Order portion of this research indicated that the ordinal position of an item in a test did not significantly affect the percentage of applicants answering it correctly or its correlation with other items. Variations in item order also did not affect the reliability of the test (there was only a .01 difference in reliability coefficients between versions under the regular time limit).

It may be inferred from these results that varying the sequence in which
MBE items are presented will not affect an applicant's chances of passing
this test. Thus, multiple forms of the MBE could be used on a given
administration of the examination so as to eliminate any benefit an
applicant might derive from observing another applicant's answers.


ESSAY TIME LIMITS STUDY

The Essay Time Limits Study involved eight groups of applicants (with 198
to 229 applicants per group). Four essay questions were used; two from
California's regular pool of essay questions and two that were specially
constructed from MBE fact patterns and items. Applicants were given one
question from each source. One of these questions dealt with Contracts or
Real Property while the other question dealt with Torts or Evidence.

The applicants had 55 minutes to answer the first question and 90 minutes
to answer the second question. Questions were assigned to groups so that
some groups answered a given question under the 55 minute time limit while
other groups answered this same question under the 90 minute time limit.
All the answers to a question were graded in a random order so that the
readers did not know under which time limit a given answer was written.

The major findings of the Essay Time Limits Study were as follows:

o The average score on a question under the 90 minute time limit
  was higher than it was under the 55 minute time limit on all
  four of the experimental questions. There was an average
  increase of 4 points per question, but performance on some
  questions was more affected by the extra time than it was on
  other questions.

o Attorneys with extensive experience in essay test construction
  and grading were not able to predict (either individually or
  collectively) on which questions scores would be most affected
  by the different time limits.

o Applicants did not benefit equally from the extra time (only 67
  percent had higher scores under the 90 minute time limit than
  under the 55 minute time limit). Some of the increase and
  decrease in scores was due to chance (e.g., grader unreliability
  and the degree to which an applicant was familiar with the
  issues addressed by each question). It also is possible that
  the extra time gave some applicants sufficient opportunity to
  demonstrate their true performance level (which in turn resulted
  in their not being given the benefit of any doubt that might
  have been created by a shorter answer).

o When essay scores were corrected for unreliability, there was a
  near perfect correlation between scores on an experimental
  question under the 55 minute time limit and Phase I essay scores
  (i.e., the total score on three essay questions given under the
  normal time limit). This correlation dipped only slightly when
  applicants were given 90 minutes to answer an experimental
  question. These findings suggest that the differences in the
  relative standings of the applicants under the different time
  limits were due to their answering different questions in each
  time limit rather than to the extra time per se.

-vii-

o There were no statistically significant correlations between how
  much an applicant's score changed as a result of the extra time
  and that applicant's background characteristics (such as age,
  sex, race, type of law school attended, and repeater status).

o There were no statistically significant correlations between how
  much an applicant's score changed as a result of the extra time
  and that applicant's performance level on the full examination
  or that applicant's attitudes about the experimental and full
  examination (e.g., such as the adequacy of time limits and the
  efficacy of the tests as measures of legal skill and knowledge).

It is evident from the foregoing results that giving applicants 64 percent
more time to answer essay questions would not affect their relative
standings any more than would just giving them a different set of essay
questions to answer under the regular time limits. However, giving all
applicants extra time might result in generally higher total essay scores
for most (but not necessarily all) applicants. If this increase was as
large as the one obtained in this research, it would substantially increase
the percent passing the California examination. Thus, in terms of policy
implications, the 4 point per question increase with the extra time is
potentially the most significant finding presented in this report.

There are several reasons why it is not certain that the 4 point per
question increase observed in this study would be maintained if all
applicants were given additional time. Some of the reasons for not being
able to predict what would occur include:

o If more time were allowed, the nature of the questions asked
  might change, such as their containing more issues and/or more
  difficult issues.

o Scores on some questions were much more affected by the extra
  time than were scores on other questions. Thus, the size of the
  increase would be affected by the nature of the question asked
  and there did not appear to be any way of determining in advance
  on which questions scores would be most affected by the time
  allowed to answer them.

o Grading criteria and standards may shift when readers score
  answers written under an expanded time limit. They may
  consciously or unconsciously place more weight on organization
  as well as expect a higher quality of answer for passing even if
  they are given instructions not to make such changes in their
  grading practices.

o It is not known whether the average increase in score was due to
  applicants identifying more issues, to discussing the issues
  better, or to their just writing more. Specifically, the
  answers written under the 90 minute time limit may have been
  longer (but not necessarily better) than those written under the
  55 minute time limit. Previous research has indicated that
  longer answers tend to receive higher grades than shorter ones.
  If all the answers are written under the same time limit, any
  affect of answer length on score probably would be reduced.

The foregoing issues are not raised to minimize the potential significance of the 4 point per question increase with the extra time. Rather, they indicate the need for additional studies to determine the source of the increase so that appropriate policy decisions can be made.

Giving applicants more time to answer essay questions could affect costs, test reliability, and validity. For example, if the total time devoted to the essay section was maintained (i.e., 9 hours) but the amount of time allocated per question increased, then there would be a reduction in the number of questions that could be asked which in turn would reduce scoring costs and probably reliability. It also would reduce the breadth of content that could be covered in any one administration of the examination. If the number of questions remained the same but the amount of time per question increased, readers might have to be paid more (because the answers would take longer to score) and there would be the additional costs associated with longer test administrations. Applicant fatigue also might become a factor affecting scores.

Finally, giving applicants more time to answer essay questions would not affect the percent passing in jurisdictions that scale their essay scores to the MBE. The reason for this is that such scaling removes the effect of any variations in essay test difficulty across administrations (whether this variation stems from differences in question difficulty, grader leniency, or the amount of time applicants had to answer the questions).


MBE/ESSAY CONGRUENCE STUDY

A 35 minute, 20 item, multiple choice test was administered to all the applicants who participated in the Essay Time Limits study. This test had one set of five items for each of the four essay questions used in that study. Each set of five items was designed to measure the same issues as were addressed in its corresponding essay question. Ten of the 20 items were constructed by the staff of the Committee of Bar Examiners to coincide with the two essay questions developed by the Committee. The other ten items, which were drawn from previous administrations of the MBE, served as the basis for the staff's construction of the other two experimental essay questions. Since a given applicant answered only two of the four essay questions used in the Essay Time Limits study, 10 of the multiple choice items dealt with issues an applicant had encountered in the essay study and 10 dealt with new issues. Four forms of the 20 item test were used (two groups per form). These forms differed in terms of the sequence in which the item sets appeared in the test booklet.

The major findings of the MBE/Essay Congruence Study were as follows:

o The sequence in which the 20 multiple choice items were asked did not affect performance on these items or test reliability. These findings are consistent with those obtained in the Item Order Study.

o Applicants did only very slightly better on the items sets corresponding to essay questions they answered previously than they did on item sets that dealt with essay questions they had not answered.

o Whether an applicant answered an essay question under the 55 or 90 minute time limit had no affect on that applicant's score on item set corresponding to that essay question.

o Total scores on an item set were generally no more highly correlated with scores on that item set's corresponding essay question than they were with any other essay question.

o Scores on essay questions in the same general area (e.g., contracts) correlated no more highly with each other than did scores on essay questions in different areas.  This finding could result from applicants balancing their preparation for the examination and/or the essay test measuring skills that are not highly content specific.

The foregoing findings suggest that MBE and California essay questions will not rank order applicants in _exactly_ the same way even when the content on these two types of questions is held constant.  Nevertheless, scores on the the two types of questions are highly related.  This means that applicants who have the skills and knowledge required to do well on MBE items also tend to have the abilities needed to do well on essay questions.

ACKNOWLEDGMENTS

The Committee of Bar Examiners of the State Bar of California provided the
advice and cooperation that were necessary for carrying out the studies
described in this report.  Two members of this committee, Armando M.
Menocal, III and Martin R. Glick, made especially important contributions
in the design, implementation, analysis, and report preparation phases of
this research.

The Committee's staff constructed, printed, and administered the tests and
questionnaires that were developed for the project.  This staff, along with
the Committee's Board of Reappraisers, also selected, trained, and
calibrated the cadre of lawyers who graded the essay questions.  Kenneth D.
McCloskey, the Committee's former Director of Testing, was in charge of and
participated actively in all of these activities.  The efficiency with
which these tasks were completed, the quality of the measures produced and
the data obtained from them, and the fact these activities were carried out
concurrently with testing and processing over 7,500 applicants on the
regular bar examination testify to the skills, energies, and unstinting
dedication that Ken provided.  Ken was ably assisted in these activities by
James B. Tippin, Jr., Suzanne M. Obermeier, and Philip Schoner.  Phil also
provided invaluable help in coordinating readers, data cleaning, and
records management.

John Bianchini and Andrew York of the Educational Testing Service developed
and implemented the computer systems that were used in assigning applicants
to experiments and in cleaning and linking diverse data files.  Randy
Onishi and Roger Bolus of GANSK & Associates also participated in the
computer data cleaning and file management activities.  Roger was further
responsible for conducting the statistical analyses presented in this
report.

Ralph Hoepfner of the System Development Corporation provided a thorough
and extremely helpful technical review of a draft of this report.

Finally, the project could not have been carried out without the
cooperation of the applicants who participated in it.  Their tolerance and
generally good nature in putting up with the many unique demands of the
research at a time when they were under great pressure were most
appreciated by all who were involved in this project.

CONTENTS

PREFACE..................................................................  iii

SUMMARY..................................................................  v

ACKNOWLEDGMENTS..........................................................  xi

LIST OF TABLES..........................................................  xiii

Chapter
    1. INTRODUCTION......................................................  1

    2. GENERAL PROCEDURES................................................  2
         Overview.......................................................  2
         General Bar Examination........................................  2
         Special Session................................................  5
         Background Characteristics.....................................  5

    3. MBE TIME LIMITS AND ITEM ORDER STUDIES............................  7
         Purposes.......................................................  7
         Procedures.....................................................  7
         Results........................................................  8
         Summary and Conclusions........................................  13

    4. ESSAY TIME LIMITS STUDY...........................................  15
         Purpose........................................................  15
         Procedures.....................................................  15
         Preliminary Analyses...........................................  16
         Results........................................................  17
         Summary and Conclusions........................................  21

    5. MBE/ESSAY CONGRUENCE STUDY........................................  24
         Purpose........................................................  24
         Procedures.....................................................  24
         Results........................................................  25
         Summary and Conclusions........................................  27

REFERENCES..............................................................  29

Appendix
    A. Glossary of Abbreviations and Technical Terms....................  30
    B. Policy Regarding the Assignment of Grades........................  31
    C. Description of the Multiphased Grading Process...................  32
    D. Excerpts from Notice to Applicants Regarding Special Session.....  34
    E. Pre-examination Questionnaire....................................  35
    F. Post-examination Questionnaire...................................  37
    G. Directions and Questions for Essay Time Limits and Essay/MBE.....  39
       Congruence Studies
    H. Test Administration Instructions for the Special Sessions........  44

LIST OF TABLES

2.2    Area(s) Covered by Each Essay Question..........................    3

2.2    Summary Statistical Data on the July 1980 GBX....................    4

3.1    Sequence of Items Within Forms...................................    8

3.2    Group Means and Standard Deviations on the MBE...................    9

3.3    Means and Standard Deviations by Group and Time Limit............    9

3.4    Percentage of Applicants Changing Score Relative to the Percentage    9
       that Would have Changed if the MBE's Time Limits had no Affect on
       Performance

3.5    Correlations with and Between Item Set Scores....................    10

3.6    Differences Between Version Means................................    11

3.7    Differences Between Version Standard Deviations..................    11

3.8    Differences Between Version Reliabilities........................    11

3.9    Correlation of Item Statistics Between Versions and Time Limits...    12

4.1    Assignment of Questions to Groups................................    15

4.2    Average Essay Question Score on the GBX..........................    16

4.3    Reader Reliability Statistics....................................    17

4.4    Average Score in Each Time Period by Group.......................    17

4.5    Average Score on Each Question Under Each Time Limit.............    18

4.6    Percentage of Applicants Changing Score Relative to the Percentage    19
       that Would have Changed if the Essay's Time Limits had no Affect
       on Performance

4.7    Correlations with Phase I Essay Scores Under Each Time Limit......    20

5.1    Sequence of Item Sets Within Forms...............................    25

5.2    Group Means on Item Sets and Total Test..........................    25

5.3    Correlations Between Item Sets...................................    26

5.4    Correlations Between Item Sets and Essay Questions...............    27

C.1    Distribution of July 1980 Applicants Across Pass/Fail Categories..    33

Chapter 1
INTRODUCTION

The studies described in this report were conducted to determine the effects on applicant performance of certain bar examination procedures so as to assess the probable impacts of various changes that might be made in these procedures. The major questions addressed by this research were as follows:

 o Is performance on multiple choice questions affected by the order in which the questions are asked and/or the amount of time applicants are given to answer them?

 o Is performance on essay questions affected by the amount of time applicants are given to answer them?

 o When content coverage is held constant, is the relative standings of applicants affected by whether their legal skills and knowledge are measured by essay or multiple choice questions?

In order to answer these questions, several experiments were conducted in conjunction with the July 1980 administration of the California bar examination. Chapter 2 of this report describes the major features of this examination and the background characteristics of the applicants who took it. The next three chapters correspond to the three questions above; i.e., for each question, there is a chapter that describes the procedures that were used to answer it and the results obtained. Throughout the report, special attention is given to determining whether general trends hold for applicants who differ with respect to such variables as racial /ethnic group, sex, type of law school from which they graduated, and whether they have taken (and failed) the examination previously.

A glossary has been provided in Appendix A for those readers who may not be familiar with some of the technical terms used in this report.

GENERAL PROCEDURES

OVERVIEW

The July 1980 version of the California Bar Examination was divided into
two parts.  One part, called the General Bar Examination (GBX), had two
sections; the Multistate Bar Examination (MBE) and the Essay examination.
Most of the applicants who took one section also took the other section.

The other part of the July 1980 examination was called the Special Session
(SS).  The SS was optional; i.e., applicants could choose not to take it
without jeopardizing their chances of passing the GBX.  However, if an
applicant participated and did well in the SS, it could increase that
applicant's chances of passing.  Thus, most applicants who sat for the GBX
also took the SS.

The SS had four sections that were administered concurrently.  A given
applicant could, therefore, take only one of these sections.  The results
obtained with two of the SS's four sections are the focus of the remaining
chapters of this report.  Information about the background characteristics
of the applicants who participated in the SS was obtained from state bar
records and questionnaires.


GENERAL BAR EXAMINATION (GBX)

The July 1980 General Bar Examination (GBX) was administered over a three
day period.  The first day and the afternoon of the second day were devoted
to the Essay.  The MBE was given on the third day.


Multistate Bar Examination

The Multistate Bar Examination (MBE) is developed by the National
Conference of Bar Examiners and is published and scored by the Educational
Testing Service.  About 45 states and the District of Columbia use the MBE
as part of their bar examinations.

The MBE consists of 200 multiple choice questions (or "items").  The six
areas covered by the MBE and the number of items in each area are as
follows:  Constitutional Law (30), Contracts (40), Criminal Law (30),
Evidence (30), Real Property (30), and Torts (40).  Some of the questions
relate to a common set of facts while other items stand by themselves.
Items are not grouped by area within the test.

The MBE is administered in two test sessions.  Each session has 100 items
(drawn proportionately from the six areas).  Applicants are given three
hours to complete each session and a break between sessions for lunch.

Each MBE item has four choices.  An applicant's raw score is the number of
questions answered correctly; i.e., there is no correction for guessing.
The raw scores are converted to "scale scores" by the Educational Testing
Service so that an applicant's final score is not affected by possible
differences in overall test difficulty across administrations of the test.
California multiplies these scale scores by 3.0 so that the theoretical
maximum score on the MBE in California is 600 points.

The Essay portion of the July 1980 GBX contained nine questions. These questions were developed by law professors teaching at non-California schools and by the California Committee of Bar Examiners and its staff. Some of the questions focused on only one subject matter area while others, called "cross-over questions," covered two areas. Table 2.1 lists the area(s) covered by each question.

Table 2.1
AREA(S) COVERED BY EACH ESSAY QUESTION

| Question | Area(s) Covered |
|----------|-----------------|
| 1 | Torts/Civil Procedure |
| 2 | Community Property |
| 3 | Constitutional Law |
| 4 | Remedies/Contracts |
| 5 | Wills & Succession/Trusts |
| 6 | Evidence |
| 7 | Remedies/Contracts |
| 8 | Corporations |
| 9 | Criminal Law/Constitutional Law |

The Essay section was divided into three test sessions of three hours each with three questions per session. Applicants were allowed to allocate the three hours in any way they wished across questions within a session.

The grading of the essay answers was done by a team of 12 lawyers per question (i.e., there were a total of 108 readers). Each reader was trained to use the same criteria and standards in evaluating the answers to his/her question. The answers were graded in five point increments on a scale of 0 to 100 points. A score of 70 was assigned to an answer if the reader was in doubt as to whether the answer was a minimally adequate response to the question (see Appendix B). The general criteria for grading are presented in The Bar Examiner's Handbook (Sprecher, 1968).


Pass/Fail Decisions

There are two ways an applicant can pass the GBX. Method 1 consists of receiving a combined Total score (i.e., MBE + Essay) of 1050 or greater. Method 2 involves receiving an MBE score of 420 or greater on one administration of the GBX and an Essay score of 630 or greater on another administration; i.e., in order to pass by the second method, an applicant must pass both sections of the examination. If an applicant fails the GBX because the applicant's score on one section was not high enough to compensate for a failing score on the other section, the applicant can retake the entire GBX (and thereby have the opportunity to pass under either method) without jeopardizing the passing status on the section passed previously.

Research on California bar examinations (Klein, 1979 and 1980a) has
indicated that final pass/fail decisions can be predicted with 99.5%
accuracy without evaluating all the essay answers written by many
applicants.  This finding along with other considerations led the Committee
of Bar Examiners to adopt a multiphased grading process.  This process
involves using the scores on three of the nine essay questions plus the MBE
to identify those applicants who are very likely to pass and then focusing
reader time on the applicants whose pass/fail status is most in doubt.  A
more complete description of this process appears in Appendix C.

One consequence of the multiphased system is that total Essay scores were
available for only 70 percent of the applicants taking this section.  The
group with complete data were not representative of the total applicant
pool.  Thus, for the purposes of this research, a total Essay score was
created for an applicant with only three answers graded by multiplying by
3.0 that applicant's total score on the three questions that were graded.
If an applicant did not have at least three essay questions graded, then no
Essay score was created for that applicant.

Summary Statistical Data

Table 2.2 presents summary statistical data on the July 1980 GBX for the
7379 applicants who took both the MBE and Essay portions of this test.  The
reliability of the MBE was computed by Dorans and Wright (1980).  The
reliability of the Essay portion was computed by using the Spearman-Brown
formula to step up the average inter-question correlation within sessions
($r = .32$).  Since the multiphased grading process resulted in only some of
the applicants having all of their essay answers read and since these
applicants were not representative of all the applicants who took the
examination, it was not possible to compute the average correlation across
all questions.  The reliability of the total examination score was
estimated using the procedures described by Gulliksen (1950) for a linear
composite.  There was a .68 correlation between the MBE and Essay sections.

Table 2.2

SUMMARY STATISTICAL DATA ON THE JULY 1980 GBX

| Statistic | MBE | Essay | Total |
|---|---|---|---|
| Average Score | 424.5 | 617.5 | 1042.0 |
| Standard Deviation | 46.0 | 54.4 | 92.2 |
| Reliability | .88 | .81 | .91 |

The average standard deviation of an essay question
in Phase I was 9.5.

-4-

Some of the other characteristics of the applicant pool were: 49 percent
passed the GBX, 69 percent took the GBX for the first time, and 62 percent
were graduates of American Bar Association approved law schools.  Within
this latter group, 81 percent took the GBX for the first time.  The passing
rate among these ABA first timers was 73 percent.  These results are very
consistent with those obtained with past administrations of the examination
(Klein, 1981a).


SPECIAL SESSION (SS)

Prior to the administration of the examination, applicants were advised
that there would be a Special Session (SS).  They were further advised that
(1) their scores in the SS would not be counted if they passed the regular
examination (i.e., based on the total of their Essay and MBE scores) and
(2) their scores in the SS would be counted as one-sixth of their total
grade if they failed the regular examination (see Appendix D).  Thus,
participating in the SS could increase but not decrease their chances of
passing.  Applicants also were informed that they had to take the MBE and
Essay portions of the GBX in order to derive any benefit from taking the SS
and that they would be assigned randomly to one of its four sections.

An applicant was assigned to one of SS's four concurrently administered
sections.  A stratified random sampling plan was used for this purpose.
The stratification variables were race, school type, and repeater status.
The number of applicants assigned to a section was based on how many would
be needed for statistical analyses of the data and the cost of scoring and
administering each section.

The SS was administered on the morning of the second day of examination.
Of the 7379 applicants who took the complete GBX, 98.5 percent elected to
participate in the SS.

The data used in this report came from two of the four SS sections.  One of
these sections involved giving applicants 55 minutes to answer one set of
30 multiple choice question and then 90 minutes to answer a different set
of 30 multiple choice questions.  Both sets of questions were drawn from
previous administrations of the MBE.  The other SS section involved giving
applicants 55 minutes to answer one essay question, 90 minutes to answer a
different essay question, and then 35 minutes to answer a set of 20
multiple choice questions.  Ten of these multiple choice questions covered
the same content areas and issues as were addressed by the essay questions
the applicants answered in the first two parts of the section.  A more
complete description of each section is presented in the subsequent
chapters of this report.


BACKGROUND CHARACTERISTICS

Law School Type and Repeater Status

All persons applying to take California's bar examination are required to
provide a transcript of their law school grades.  These transcripts made it
possible to determine the type of law school from which an applicant
graduated; i.e., American Bar Association (ABA) approved, California
Accredited (but not ABA approved), and Unaccredited.  State bar records
also were used to determine whether an applicant had taken and failed the
GBX previously; i.e., whether or not the applicant was a repeater.

-5-

All applicants taking the bar examination in California are requested to
complete a form on which they indicate their sex and racial/ethnic (R/E)
group affiliations.  This information, which is used solely for research
purposes, was provided by 99.6 percent of those taking the July 1980
examination.  The distribution of sex and racial/ethnic groups on this
examination was as follows: males (71%) and females (29%); Anglos (82%),
Asians (4%), Blacks (6%), and Hispanics (6%).  The Asian group is composed
mainly of Chinese and Japanese Americans, but it also includes those with
Philippino and Pacific Islander backgrounds.  The Hispanic group is largely
Mexican-American, although it contains small percentages of applicants with
Central American, South American, and Puerto Rican backgrounds.

Questionnaire Data

Applicants were advised that in order to derive any benefit from their
participation in the Special Session (i.e., in terms of passing the GBX),
they had to complete and return the questionnaire that appears in Appendix
E.  This questionnaire requested information about certain potentially
relevant background characteristics, such as the extent to which English
was spoken in the home, and data about an applicant's legal training and
experience.

All applicants who applied to take the July 1980 examination were mailed a
copy of the questionnaire prior to the examination.  Applicants who did not
return the questionnaire by early July were sent another copy of it.  They
also were advised again that it had to be completed in order for them to
derive any benefit from the Special Session and that they could turn it in
at the examination site.  Of the 7379 applicants taking the complete GBX
(and thereby eligible to benefit from the Special Session), 96 percent
returned questionnaires.  And, almost all of those who completed both the
full GBX and the Special Session returned questionnaires.

A questionnaire also was administered between the morning and afternoon
sessions on the third day of the examination.  This questionnaire inquired
about the applicants' preparation for the examination; assessment of the
adequacy of the time limits for the MBE, Essay, and Special Session; and
opinions about how well each of these sections measured their legal skills
and knowledge.  A copy of this questionnaire appears in Appendix F.  About
95 percent of the applicants who participated in the SS and took the
complete GBX turned in this questionnaire.

MBE TIME LIMITS AND ITEM ORDER STUDIES

PURPOSES

Although the MBE Time Limits and Item Order studies were conducted with the same groups of applicants and tests, their purposes were quite different.

The MBE Time Limits study investigated the validity of a frequent applicant complaint about this test, namely; "there is not enough time to answer the questions." The fact that 99.5 percent of the applicants answer every question has not quelled this concern since the 'no penalty for guessing' rule encourages applicants to mark one choice for every question. The specific issues addressed in the MBE Time Limits Study were as follows:

    o Would giving applicants substantially more time to answer MBE
      questions improve their level of performance on this test?

    o Would all applicants benefit equally from the extra time; i.e,
      would their relative standings be affected?

    o What are the characteristics of applicants who tend to benefit
      most versus least from the extra time?

The Item Order Study was conducted to determine whether performance on the MBE is affected by the order in which the questions are asked. If the sequence of questions does not affect scores, then different forms of the same test could be used during a given administration. And, the use of multiple forms would facilitate the task of proctoring the examination since there would be less temptation for an applicant to look at some other applicant's answer sheet.

PROCEDURES

This study used 60 multiple choice questions (items) that were drawn from previous but still secure versions of the MBE. The four content areas covered by these items were: Contracts, Criminal Law, Real Property, and Torts. The 60 items were divided into two 30 item sets, designated as Set A and Set B. Two versions of each set (designated as Versions 1 and 2) were constructed. These versions differed solely in terms of the sequence in which three blocks of 10 items were asked. Thus, there were four test forms; designated as Forms A-1, A-2, B-1, and B-2 (see Table 3.1).

Table 3.1

SEQUENCE OF ITEMS WITHIN TEST FORMS

| TEST FORM | | SEQUENCE | | |
|---|---|---|---|---|
| Set | Version | 1st | 2nd | 3rd |
| A | 1 | 1-10 | 11-20 | 21-30 |
| A | 2 | 21-30 | 11-20 | 1-10 |
| B | 1 | 31-40 | 41-50 | 51-60 |
| B | 2 | 51-60 | 41-50 | 31-40 |

-7-

The 2940 applicants that participated in this research were assigned
randomly to four groups. These groups had comparable means and standard
deviations on the MBE portion of the GBX (see Table 3.2).

Each group was given 55 minutes, the standard time per MBE item, to answer
item set A or B and then 90 minutes to answer the other set. Table 3.3
shows the assignment of forms to groups relative to the time given to
answer these forms.

RESULTS

Time Limit Effect on Level of Performance

Table 3.3 presents the mean and standard deviation in each group under each
time limit. An inspection of these data indicates that the average score
under the 55 and 90 minute time limits differed by slightly less than one
point (i.e., 21.19 versus 20.32 = .87). Moreover, almost all of the
applicants who participated in this experiment indicated they had more than
enough time to answer the items when they were given 90 minutes to do so.
These findings suggest that if applicants were given essentially unlimited
time to complete the MBE's 200 items, the mean raw score on this test would
increase by about six points.

The larger difference between means in Groups 1 and 3 than in Groups 2 and
4 was apparently due to item Set A being slightly more difficult than item
Set B. For example, the average Set A and B scores under the 55 minute
time limit were 20.00 and 20.64, respectively.

An analysis also was conducted to determine whether the slight average
increase in scores with the extra time was due to all applicants receiving
a small advantage or whether some profited more than others from the extra
time. This analysis involved subtracting an applicant's score on the 55
minute session from that applicant's score in the 90 minute session. The
distribution of these difference scores is presented in Table 3.4 along
with the percent who would have changed scores in each direction if the
time limits had no affect on performance; i.e., if all the observed
differences were due to answering a different set of items in each session
rather than to the time limits per se.*

The data in Table 3.4 indicate that while 58 percent of the applicants
benefited from the extra time, 42 percent had lower scores when they had
more time to answer the questions.

--------

*The procedures used to construct the chance distribution were as follows:
Two sets of 30 items, X and Y, were selected from the full MBE. The items
in each set covered the same four subject areas as the two experimental
sets used in this study. The two sets had about the same means (19.83),
standard deviations (3.90), and reliabilities (.65) as the experimental
sets. The scores on Form X correlated with the scores on Form Y to the
same degree (.63) as the scores in the 55 minute session correlated with
the scores in the 90 minute session. A random sample of 50 percent of all
the applicants who took the MBE had their score on Form X subtracted from
the their score on Form Y while the remaining 50 percent had their score on
Form Y subtracted from their score on Form X. The difference scores in
the two samples were combined to form the chance distribution.

-8-

Table 3.2

GROUP MEANS AND STANDARD DEVIATIONS ON THE MBE

|  | Group Number | | | |
|  | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Number of Applicants | 705 | 755 | 730 | 750 |
| Mean Scale Score | 430.4 | 428.8 | 430.4 | 428.8 |
| Standard Deviation | 44.7 | 49.6 | 47.3 | 45.9 |

Table 3.3

MEANS AND STANDARD DEVIATIONS BY GROUP AND TIME LIMIT

| Group | 55 MINUTE | | | 90 MINUTE | | | Difference Between Means |
|---|---|---|---|---|---|---|---|
|  | Form | Mean | SD | Form | Mean | SD | |
| 1 | A-1 | 20.01 | 3.79 | B-1 | 21.71 | 3.88 | 1.70 |
| 2 | B-1 | 20.70 | 4.14 | A-1 | 20.83 | 3.61 | .13 |
| 3 | A-2 | 20.00 | 3.74 | B-2 | 21.56 | 4.14 | 1.56 |
| 4 | B-2 | 20.58 | 4.18 | A-2 | 20.67 | 3.89 | .09 |
| Mean | | 20.32 | 3.96 | | 21.19 | 3.88 | .87 |

Table 3.4

PERCENTAGE OF APPLICANTS CHANGING SCORE RELATIVE TO THE PERCENTAGE THAT
WOULD HAVE CHANGED IF THE MBE'S TIME LIMITS HAD NO AFFECT ON PERFORMANCE

|  | Difference in Scores Between Time Limits | | | | | |
|---|---|---|---|---|---|---|
|  | <-4 | -4 to -3 | -2 to 0 | 0 to 2 | 3 to 4 | >4 |
| Observed % | 7.3 | 11.3 | 23.0 | 26.1 | 17.7 | 14.6 |
| Chance % | 9.0 | 14.0 | 27.0 | 27.0 | 14.0 | 9.0 |
| Difference | -1.7 | -2.7 | -4.0 | -0.9 | 3.7 | 5.6 |

Effect of Background Characteristics

An analysis was conducted to determine whether an applicant's background
characteristics were related to how much that applicant benefited from the
extra time.  This was done by computing the correlation between the
difference scores between sessions (see Table 3.4) and all of the back-
ground information on the applicants.  The results of this analysis (which
used dummy variables for categorical measures in a series of regression
equations) indicated that there was no systematic relationship between the
difference score and an applicant's sex, race, law school type, repeater
status, or GBX scores (all the correlations were less than .04).

The same result was obtained when the difference scores were correlated
with all the background characteristics and attitudes that were assessed
through the questionnaires completed before and after the examination,
including attitudes about the appropriateness of the time limits on the
full MBE and the experimental tests.


Time Limit Effect on Relative Standings

Table 3.5 contains the correlations between the MBE and item set scores
under each time limit.  When these correlations were corrected for the less
than perfect reliability of the measures, the average correlation of an
item set with the MBE under both time limits and the average correlation
between item sets increased to .94.  These data indicate that the observed
differences in the relative standings of the applicants were due to their
answering a different set of questions in each time period rather than to
differences in the amount of time they had to answer these questions.


Table 3.5

CORRELATIONS WITH AND BETWEEN ITEM SET SCORES

| | MBE PORTION OF GBX WITH | | Between | Corrected Correlation Between |
| Group | 55 Minute Item Set | 90 Minute Item Set | Item Sets | Item Sets |
|---|---|---|---|---|
| 1 | .71 | .74 | .61 | .96 |
| 2 | .67 | .62 | .58 | .92 |
| 3 | .69 | .74 | .62 | .96 |
| 4 | .74 | .72 | .62 | .93 |
| Mean | .70 | .71 | .61 | .94 |


Effect of Item Sequence on Test Statistics

The data in Tables 3.6, 3.7, and 3.8 indicate that the mean, standard
deviation, and reliability of an item set were not appreciably affected by
the sequence in which the questions were asked.  For example, the average
difference between version means, standard deviations, and reliabilities
across item sets and time limits were .11, .16, and .03 respectively.

Table 3.6

DIFFERENCES BETWEEN VERSION MEANS

|        | 55 MINUTES | | | 90 MINUTES | | | Mean |
|        | Ver 1 | Ver 2 | Diff. | Ver 1 | Ver 2 | Diff. | Diff. |
|--------|-------|-------|-------|-------|-------|-------|-------|
| Set A  | 20.01 | 20.00 | .01   | 20.70 | 20.58 | .12   | .06   |
| Set B  | 20.83 | 20.67 | .16   | 21.71 | 21.56 | .15   | .16   |

Table 3.7

DIFFERENCES BETWEEN VERSION STANDARD DEVIATIONS

|        | 55 MINUTES | | | 90 MINUTES | | | Mean |
|        | Ver 1 | Ver 2 | Diff. | Ver 1 | Ver 2 | Diff. | Diff. |
|--------|-------|-------|-------|-------|-------|-------|-------|
| Set A  | 3.79  | 3.74  | .05   | 4.14  | 4.18  | .04   | .05   |
| Set B  | 3.61  | 3.89  | .28   | 3.88  | 4.14  | .26   | .27   |

Table 3.8

DIFFERENCES BETWEEN VERSION RELIABILITIES

|        | 55 MINUTES | | | 90 MINUTES | | | Mean |
|        | Ver 1 | Ver 2 | Diff. | Ver 1 | Ver 2 | Diff. | Diff. |
|--------|-------|-------|-------|-------|-------|-------|-------|
| Set A  | .61   | .60   | .01   | .59   | .65   | .06   | .04   |
| Set B  | .68   | .69   | .01   | .66   | .70   | .04   | .03   |

Effect of Sequence on Item Statistics

Each applicant's data file was reorganized so that the applicant's response to a particular item within a set appeared in the same ordinal position in the file as all the other applicants who answered this question; i.e., regardless of whether they took version 1 or 2 of the set. An item analysis was then run on each test form under each time limit. This analysis yielded eight sets of item means and "corrected item-total score" correlations (i.e., the point biserial correlation between an item and the total score on the other 29 items). These statistics (and the ordinal position of the item in its own test form) were entered as variables in an intercorrelation matrix. A separate matrix was computed for each item set; i.e., there were 30 observations per variable.

Table 3.9 contains a summary of the correlations of interest from the two matrices. An inspection of these data indicates that the relative difficulty of an item was not affected by its ordinal position in the test or by the amount of time applicants had to answer it.

Table 3.9

CORRELATION OF ITEM STATISTICS BETWEEN VERSIONS AND TIME LIMITS

|  | 55 MINUTE | | 90 MINUTE | | 55 vs 90 MINUTE | | | |
|  | Set A | Set B | Set A | Set B | A-1 | A-2 | B-1 | B-2 |
|---|---|---|---|---|---|---|---|---|
| Item Means | .98 | .98 | .99 | .96 | .98 | .98 | .96 | .97 |
| Point Biserials | .69 | .87 | .64 | .81 | .52 | .71 | .89 | .89 |

The correlations among the point biserials were higher in item Set B than in Set A. This difference may have stemmed from the the average standard deviation of the Set B biserials (.098) being almost twice as large as the Set A biserials (.055). The standard deviations of the biserials were very homogeneous within sets across versions and time limits. It also was observed that Set B was slightly more reliable than Set A (see Table 3.8).

The average value of the biserials under each time limit was .173 and .178, respectively. And, the average correlation between the ordinal position of the items and their biserials were .10 and .02 for the 55 and 90 minute time limits, respectively. These findings strongly suggest that the time that is now allocated per item on the MBE (as represented by the 55 minute time limit) is not affecting an applicant's score. The reason for this conclusion is that if time were a factor, then the applicants would tend to be guessing more towards the end of the test (especially under the 55 minute time limit) which in turn would result in a large difference between the means of the biserials and a negative correlation between the biserials and item order.

Results with the MBE Time Limits portion of this research indicated that:

o The average score under the 90 minute time limit was 0.87 points higher than it was under the 55 minute time limit. This finding suggests that if applicants were given essentially unlimited time to answer the MBE's 200 items, their average _raw_ score would increase by about 6 points.

o Applicants did not benefit equally from the extra time (only 58 percent had higher scores under the 90 minute time limit than they did under the 55 minute time limit). Some of the increase and decrease in scores was due to chance (e.g., guessing, the degree to which an applicant was familiar with the specific issues addressed by the items on each test, etc.); i.e., the scores were not perfectly reliable.

o When scores on the tests were corrected for unreliability, there was a near perfect correlation between them. Corrected correlations between scores on the full MBE and the 30 item tests were the same and near perfect under both time limits. These findings suggest that the differences in the relative standings of the applicants under the different time limits were due to their taking different MBE questions in each time limit rather than to the extra time per se.

o There were no statistically significant correlations between how much an applicant's score changed as a result of the extra time and that applicant's background characteristics (such as age, sex, race, type of law school attended, and repeater status).

o There were no statistically significant correlations between how much an applicant's score changed as a result of the extra time and that applicant's performance level on the full examination or that applicant's attitudes about the experimental and full examination (e.g., such as the adequacy of time limits and efficacy as a test of legal skills and knowledge).

_Raw_ scores on the MBE are adjusted through a scaling process in order to control for possible differences in average question difficulty across administrations of this test. Pass/fail decision on the MBE are therefore based on the _scale_ scores (rather than the raw scores). While allowing applicants more time on the MBE would generally result in slightly higher raw scores, it would not affect the scale scores. Thus, the percent passing the MBE would not be increased by an increase in the time applicants had to answer. The analyses conducted in this study also indicated that giving applicants more time to answer MBE questions would have no significant impact on their _relative_ standings; i.e., who passes versus fails this test.

Results with the Item Order portion of this research indicated that the ordinal position of an item in a test did not significantly affect the percentage of applicants answering it correctly or its correlation with other items. Variations in item order also did not affect the reliability of the test (there was only a .01 difference in reliability coefficients between versions under the regular time limit).

It may be inferred from these results that varying the sequence in which
MBE items are presented will not affect an applicant's chances of passing
this test.  Thus, multiple forms of the MBE could be used on a given
administration of the examination so as to substantially reduce any benefit
an applicant might derive from observing another applicant's answers.

Chapter 4
ESSAY TIME LIMITS STUDY

PURPOSE

The essay time limits study was conducted to determine whether performance
on the bar examination's essay questions would be affected if applicants
were given substantially more than the usual time to answer these
questions. The major questions addressed by this study were as follows:

 o Would the extra time improve the general quality of the answers?

 o Would all applicants benefit equally from the extra time; i.e.,
   would their relative standings be affected?

 o Would the effect of the extra time be the same across questions?

 o What are the characteristics of applicants who tend to benefit
   most versus least from the extra time?


PROCEDURES

Four essay questions, numbered 21 through 24, were used in this study
(Appendix G contains a copy of each question). Question #21 (Contracts)
and #23 (Evidence) were constructed by the staff of the Committee of Bar
Examiners. These questions were based on sets of multiple choice questions
that were used in pre-1980, but still secure, versions of the MBE.
Question #22 (Real Property) and #24 (Torts) were drawn from the pool of
questions that were developed for the Essay portion of the GBX; i.e., they
went through all the regular developmental steps and the Committee of Bar
Examiners judged them to be eligible for inclusion in the GBX.

An applicant participating in this study was assigned randomly to one of
eight groups. Each group had 55 minutes to answer one essay question and
then 90 minutes to answer a second question. The test administration
instructions appear in Appendix H.

Within a group, an applicant was assigned one of the "business law" type
questions (i.e., contracts or real property) and one of the "trial law"
type questions (i.e., evidence or torts). The assignment of questions to
groups and the time the applicants had to answer these questions are
presented in Table 4.1.


Table 4.1

ASSIGNMENT OF QUESTIONS TO GROUPS

|            | Group Number | | | | | | | |
| Time Limit | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|------------|----|----|----|----|----|----|----|----|
| 55 minutes | 21 | 22 | 23 | 24 | 22 | 21 | 23 | 24 |
| 90 minutes | 23 | 24 | 21 | 22 | 23 | 24 | 22 | 21 |

-15-

All the answers to a question were numbered (i.e., regardless of group number and the time applicants had to answer the question).  The answers were then assigned randomly to the three readers who graded that question.  These readers were drawn from among those who graded the Essay portion of the GBX.

The readers assigned to a question participated in a one day calibration session that was similar to the type of session used for standardizing reader teams on the GBX.  They also were told to use the same grading criteria as was used on the GBX and to "give more credit to answers that deal with the issues in a concise and well-organized fashion than...to those that are merely longer."  Applicants were informed of these criteria and advised that when they had extra time, they should use it "to write a better answer, not just a lengthier one."

The readers assigned grades to answers on the same 100 point scale as is used with the GBX (i.e., 70 = passing).  However, unlike the GBX which requires readers to assign grades in five point intervals (e.g., 50, 55, etc.), they assigned them in one point intervals for this study.  This was done to determine whether the one point interval scale would lead to more or less reliable grades than the five point interval system.


PRELIMINARY ANALYSES

The number of applicants in each group and each group's mean and standard deviation on a question in the Essay portion of the GBX are presented in Table 4.2.  An inspection of these data (and a one-way analysis of variance) indicated that the groups had comparable Essay scores; i.e., the random assignment process was successful in producing equivalent groups.


Table 4.2

AVERAGE ESSAY QUESTION SCORE ON GBX

| Group | Number of Applicants | Mean | Standard Deviation |
|-------|----------------------|------|--------------------|
| 1     | 228                  | 68.0 | 6.0                |
| 2     | 211                  | 67.8 | 6.4                |
| 3     | 220                  | 67.5 | 6.9                |
| 4     | 229                  | 67.8 | 5.8                |
| 5     | 215                  | 67.7 | 6.7                |
| 6     | 213                  | 67.8 | 5.7                |
| 7     | 215                  | 68.2 | 6.1                |
| 8     | 198                  | 67.7 | 5.7                |
| Mean  | 216                  | 67.8 | 6.2                |


A check was made on the degree to which Questions #21 - #24 were scored reliably.  This check involved embedding in the group of answers that were graded by a reader a set of answers that also were graded by the other two readers assigned to the question.  Table 4.3 contains the results of this

check. These data indicate that on the average, there was a five point difference between two readers in the grades they assigned to an answer and that the average correlation between two readers over all the applicants they graded in common was .73. These levels of inter-reader agreement in evaluating the absolute and relative quality of the answers are adequate for the purposes of this research and about the same as that obtained in the grading of the Essay portion of GBX (Klein, 1980b). These findings also suggest that there would be no major increase in inter-reader agreement on the Essay portion of the GBX if grades were assigned in one rather than five point intervals on the 100 point scale.

Table 4.3

READER RELIABILITY STATISTICS

| Question Number | Number of Applicants | Average Deviation | Average Correlation |
|---|---|---|---|
| 21 | 15 | 5.5 | .64 |
| 22 | 20 | 6.6 | .77 |
| 23 | 30 | 2.7 | .88 |
| 24 | 32 | 7.0 | .63 |
| Average | 24 | 5.5 | .73 |

The average deviation is the average difference in score between two readers of the same answer. The average correlation is the average of the correlations between readers.

RESULTS

Time Limit's Effect on Level of Performance

Table 4.4 contains each group's average score on each question. An inspection of this table indicates that overall, there was a four point increase in average score with the expanded time limit.

Table 4.4

AVERAGE SCORE IN EACH TIME PERIOD BY GROUP

| Time Limit | Group Number | | | | | | | | Average |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| 55 minutes | 66 | 63 | 63 | 68 | 63 | 65 | 63 | 69 | 65 |
| 90 minutes | 70 | 73 | 68 | 67 | 68 | 74 | 64 | 68 | 69 |

Table 4.5 presents the average score on each question in each time period.
An inspection of this table indicates that Question #24 was easier (or
graded more leniently) than the other questions.  This difference was the
apparent source of Groups #4 and #8 having higher average scores on their
55 than on their 90 minute question.


Table 4.5

AVERAGE SCORE ON EACH QUESTION UNDER EACH TIME LIMIT

| Time Limit | #21 Contracts | #22 Real Prop. | #23 Evidence | #24 Torts | Average |
|---|---|---|---|---|---|
| 55 minutes | 65 | 63 | 63 | 69 | 65 |
| 90 minutes | 68 | 66 | 69 | 74 | 69 |
| Difference* | 3 | 3 | 6 | 5 | 4 |

*All the differences in average score between time limits were
statistically significant (alpha = .01).  The average standard
deviation under the 55 and 90 minute time limits were 8.6 and
8.3, respectively.


The data in Table 4.5 also indicate that the average increase in score
attributable to the extra time was about twice as great on the Evidence and
Torts questions as it was on the Contracts and Real Property questions.
This pattern was unrelated to the source of the questions (i.e., MBE versus
GBX), but it was related to the distinction between "business" and "trial"
law.  The possible source of this pattern was investigated further by
having a group of experts (the Committee of Bar Examiner's Board of
Reappraisers) estimate the probable impact of increased time on each
question.  While many interesting rationales were suggested, none of them
matched the observed pattern nor did the experts generally agree as to
which questions would be more or less influenced by the extra time.

An analysis was conducted to determine whether all applicants benefited
equally from having 64 percent more time to answer an essay question.  In
this analysis, an applicant's essay score in the 55 minutes session was
subtracted from that applicant's score in the 90 minute session.  The
distribution of these difference scores is presented in Table 4.6.

An inspection of the data in Table 4.6 indicates that 67 percent of the
applicants received a higher score as a result of the added time.  In other
words, 33 percent received lower scores when they had more time to answer!
The percent of applicants whose scores would have changed in each direction
solely as a result of their answering a different question (as distinct
from having more time to answer) is presented in the "Chance %" row of
Table 4.6.

-18-

PERCENTAGE OF APPLICANTS CHANGING SCORE RELATIVE TO THE PERCENTAGE THAT
WOULD HAVE CHANGED IF THE ESSAY'S TIME LIMITS HAD NO AFFECT ON PERFORMANCE

|  | Difference in Scores Between Time Limits | | | | | |
|---|---|---|---|---|---|---|
|  | <-10 | -10 to -6 | -5 to 0 | 0 to 5 | 6 to 10 | >10 |
| Observed % | 9.4 | 9.4 | 14.1 | 18.6 | 20.8 | 27.7 |
| Chance % | 13.5 | 11.5 | 25.0 | 25.0 | 11.5 | 13.5 |
| Difference | -4.1 | -2.1 | -10.9 | -6.4 | 9.3 | 14.2 |

The procedures used to construct the chance distribution in Table 4.6 were
as follows:  All the applicants taking the essay portion of the GBX were
assigned randomly to two groups, X and Y.  An applicant's score on each
essay question that was used to compute that applicant's Phase I score was
tabulated.  The following difference scores were computed among the three
questions in this session for all the applicants in Group X: 1st - 2nd,
1st - 3rd, and 2nd - 3rd.  For example, if the second session was used to
compute an applicant's Phase I score, then the difference scores between
questions would be computed as follows: #4 - #5, #4 - #6, and #5 - #6.  The
difference scores in Group Y were computed as follows: 2nd - 1st, 3rd -
1st, and 3rd - 2nd.  Thus, there were three difference scores for each
applicant.  The distribution of these difference scores across all
applicants constituted the chance distribution of difference scores.


Time Limit's Effect on Relative Standing

The correlation between scores on the 55 and 90 minute questions in Groups
1 through 8 were: .26, .30, .24, .22, .21, .08, .30, and .13, respectively.
The two unusually low correlations, .08 and .13, were between Questions #21
and #24 (see Table 4.1 for the pairings of questions across groups).  The
average of the eight correlations, .22, was lower than the .32 average
correlation among essay questions on the GBX.  This finding suggests that
the relative standings of the applicants on a question may have been
affected by the time they had to answer that question.

This matter was investigated further by computing the correlation between
the applicants' Phase I Essay scores on the GBX and their scores on
Questions #21 - #24 under both time limits.  These data are presented in
Table 4.7 and an inspection of them indicates that the correlations were
only slightly higher under the normal than under the expanded time limits
(average r's were .41 and .38, respectively).  When these correlations were
corrected for the less than perfect reliability of the measures, a strong
relationship emerged under both time limits between an applicant's relative
standing on an experimental question and that applicant's relative standing
on the Essay portion of the GBX (r's of .95 and .88 for the 55 and 90
minute time limits, respectively...based on a reliability of .32 for a
question under either time limit and .59 for the Phase I Essay score).

CORRELATIONS WITH PHASE I ESSAY SCORES UNDER EACH TIME LIMIT

| Time Limit | #21 Contracts | #22 Real Prop. | #23 Evidence | #24 Torts | Average | Corrected Average |
|---|---|---|---|---|---|---|
| 55 minutes | .29 | .48 | .48 | .39 | .41 | .95 |
| 90 minutes | .37 | .40 | .42 | .32 | .38 | .88 |
| Difference | -.08 | .08 | .06 | .07 | .03 | .07 |

These findings suggest that the observed differences in the relative
standings of the applicants on the 55 and 90 minute questions were typical
of the differences that occur on different questions under the same time
limit. They were not due to differences in the amount of time the appli-
cants had to answer the questions. The difference between the correlations
would have been greater were it not for Question #21's correlations
deviating from the general pattern of relationships (its correlation with
the Phase I essay score was higher under the expanded than under the normal
time limit). It also was observed that Question #21 had unusually low
correlations with Question #24 (.08 and .13 in groups 6 and 8, respectively).


Effect of Background Characteristics

An analysis was conducted to determine whether an applicant's background
characteristics were related to how much that applicant benefited from the
extra time. The first step in this analysis involved scaling the scores on
each of the experimental questions to the mean and standard deviation on
the Essay portion of the GBX of all the applicants who answered that
question. This scaling permitted combining applicants across groups into
one sample since it controlled for differences in question difficulty.

The second step in the analysis involved determining the extent to which an
applicant's background characteristics were correlated with the difference
between that applicant's scale score on the 55 and 90 minute questions.
The results of this analysis (which used dummy variables for categorical
measures in a series of regression equations) indicated that there was no
systematic relationship between the difference score and an applicant's
sex, R/E group, law school type, repeater status, or GBX scores (all the
correlations were less than .04).

The same result was obtained when the difference scores were correlated
with all the background characteristics and attitudes that were assessed
through the questionnaires completed before and during the examination,
including attitudes about the appropriateness of the time limits on the
essay questions.

SUMMARY AND CONCLUSIONS

The major findings of the Essay Time Limits Study were as follows:

o The average score on a question under the 90 minute time limit was higher than it was under the 55 minute time limit on all four of the experimental questions.

o There was an average increase of 4 points per question, but performance on some questions was more affected by the extra time than it was on other questions.

o A panel of attorneys with extensive experience in essay test construction and grading was not able to predict (either individually or collectively) on which questions scores would be most affected by the different time limits.

o Applicants did not benefit equally from the extra time (only 67 percent had higher scores under the 90 minute time limit than under the 55 minute time limit). Some of the increase and decrease in scores was due to chance (e.g., grader unreliability and the degree to which an applicant was familiar with the issues addressed by each question). It also is possible that the extra time gave some applicants sufficient opportunity to demonstrate their true performance level (which in turn resulted in their not being given the benefit of any doubt that might have been created by a shorter answer).

o When essay scores were corrected for unreliability, there was a near perfect correlation between scores on an experimental question under the 55 minute time limit and Phase I essay scores (i.e., the total score on three essay questions given under the normal time limit). This correlation dipped only slightly when applicants were given 90 minutes to answer an experimental question. These findings suggest that the differences in the relative standings of the applicants under the different time limits were due to their answering different questions in each time limit rather than to the extra time per se.

o There were no statistically significant correlations between how much an applicant's score changed as a result of the extra time and that applicant's background characteristics (such as age, sex, race, type of law school attended, and repeater status).

o There were no statistically significant correlations between how much an applicant's score changed as a result of the extra time and that applicant's performance level on the full examination or that applicant's attitudes about the experimental and full examination (e.g., such as the adequacy of time limits and the efficacy of the tests measures of legal skills and knowledge).

It is evident from the foregoing results that giving applicants 64 percent more time to answer essay questions would not affect their relative standings any more than would just giving them a different set of essay questions to answer under the regular time limits. However, giving all applicants extra time might result in generally higher total essay scores for most applicants.

-21-

If the average increase in essay scores is as large as the one obtained in this research, it would substantially increase the percent passing the California examination. Thus, in terms of policy implications, the 4 point per question increase with the extra time is potentially the most significant finding presented in this report.

There are several reasons why it is not certain that the 4 point per question increase observed in this study would be maintained if all applicants were given additional time. Some of the reasons for not being able to predict what would occur include:

o If more time were allowed, the nature of the questions asked might change, such as their containing more issues and/or more difficult issues.

o Scores on some questions were much more affected by the extra time than were scores on other questions. Thus, the size of the increase would be affected by the nature of the question asked and there did not appear to be any way of determining in advance on which questions scores would be most affected by the time allowed to answer them.

o Grading criteria and standards may shift when readers score answers written under an expanded time limit. They may consciously or unconsciously place more weight on organization as well as expect a higher quality of answer for passing even if they are given instructions not to make such changes in their grading practices.

o It is not known whether the average increase in score was due to applicants identifying more issues, to discussing the issues better, or to their just writing more. Specifically, the answers written under the 90 minute time limit may have been longer (but not necessarily better) than those written under the 55 minute time limit. Previous research has indicated that longer answers tend to receive higher grades than shorter ones. If all the answers are written under the same time limit, any affect of answer length on score probably would be reduced.

The foregoing issues are not raised to minimize the potential significance of the 4 point per question increase with the extra time. Rather, they indicate the need for additional studies to determine the source of the increase so that appropriate policy decisions can be made.

Giving applicants more time to answer essay questions could affect costs, test reliability, and validity. For example, if the total time devoted to the essay section was maintained (i.e., 9 hours) but the amount of time allocated per question increased, then there would be a reduction in the number of questions that could be asked which in turn would reduce scoring costs and probably reliability. It also would reduce the breadth of content that could be covered in any one administration of the examination. If the number of questions remained the same but the amount of time per question increased, readers might have to be paid more (because the answers would take longer to score) and there would be the additional costs associated with longer test administrations. Applicant fatigue also might become a factor affecting scores.

-22-

Finally, giving applicants more time to answer essay questions would not affect the percent passing in jurisdictions that scale their essay scores to the MBE.  The reason for this is that such scaling removes the effect of any variations in essay test difficulty across administrations (whether this variation stems from differences in question difficulty, grader leniency, or the amount of time applicants had to answer the questions). Thus, while the 4 point per question increase that was observed in this study could have major policy ramifications for California, it would not affect pass/fail decisions in many other jurisdictions because the increase in time had no systematic impact on the relative standings of the applicants.

MBE/ESSAY CONGRUENCE STUDY

PURPOSE

Several studies at the elementary school, high school, and college level
have sought to determine whether essay and multiple choice questions can be
used to test the same skills and knowledge.  The results of these studies
suggest that the two types of questions can be used interchangeably for
some subject areas, but not for others (Traub and Fisher, 1977).

Previous studies of California's bar examination (Klein, 1979) and the bar
examinations given in other states (Carlson and Werts, 1976; Klein, 1981b)
have generally found a strong correlation between MBE and Essay scores.
However, this correlation is still not perfect even after it has been
corrected for the unreliability of the measures (the average corrected r is
about .80).  One explanation for this finding is that there is only a
moderate degree of overlap between the content coverage of the MBE and the
Essay sections of the examination.  Another explanation is that the two
sections measure highly related but not identical skills and knowledge.

The MBE/Essay Congruence study was conducted to determine the extent to
which the less than perfect relationship between MBE and Essay scores is
due to differences in their subject matter coverage (e.g. the specific
issues addressed by a question) versus the types of analytic skills
measured by the two kinds of tests.


PROCEDURES

A 35 minute, 20 item, multiple choice test was administered to all the
applicants who participated in the Essay Time Limits study (see Chapter 4).
This test had one set of five items for each of the four essay questions
used in that study.  Each set of items was designed to measure the same
issues as were addressed in its corresponding essay question.  Ten of the
20 items were constructed by the staff of the Committee of Bar Examiners to
coincide with the two essay questions, #22 and #24, that developed by the
Committee.  The other 10 items, which were drawn from previous administra-
tions of the MBE, served as the basis for the staff's construction of essay
Questions #21 and #23.

The 20 item test was administered immediately after the completion of the
Essay Time Limits study.  Since an applicant answered only two of the four
essay questions in that study, 10 of the 20 items corresponded to essay
questions the applicant had seen previously while 10 were completely
novel.  For example, by the time they took the 20 item test, applicants in
Group 1 were exposed to the facts and issues that served as the basis for
the multiple choice items corresponding to Questions #21 and #23, but they
were not exposed to the facts and issues involved in Questions #22 and #24
(see Table 4.1).  Group 4 had just the opposite exposure pattern.

Four forms of the 20 item test were used to help insure the independence of
responses across applicants.  These forms differed in terms of the sequence
in which the item sets appeared in the test booklet.  The sequence used in
each form is presented in Table 5.1.

-24-

Table 5.1

SEQUENCE OF ITEM SETS WITHIN FORMS

| Form | 1st | 2nd | 3rd | 4th |
|------|-----|-----|-----|-----|
| A | 22 | 24 | 21 | 23 |
| B | 21 | 23 | 22 | 24 |
| C | 22 | 23 | 21 | 24 |
| D | 21 | 24 | 22 | 23 |

RESULTS

Table 5.2 contains each group's mean score on each item set and on the total test. An inspection of these data (and a one way analysis of variance) indicated that the eight groups had essentially equivalent total scores.

The item set corresponding to Question #21 had a lower average score than did the other three item sets. The standard deviations of the item sets ranged from 1.15 to 1.33.

The average reliability of the four forms was .53 (which when stepped up to a 200 item test yields a reliability of .92). There was no apparent reason for test Form D having a slightly lower internal consistency than the other three forms.

Table 5.2

GROUP MEANS ON ITEM SETS AND TOTAL TEST

| Test Form | Group | MEANS ON ITEM SETS #21 | #22 | #23 | #24 | TOTAL SCORE Mean | SD | Alpha |
|-----------|-------|------|-----|-----|-----|------|-----|-------|
| A | 1 | 3.1 | 3.2 | 3.3 | 3.1 | 12.8 | 2.9 | .53 |
| A | 3 | 3.1 | 3.3 | 3.4 | 3.2 | 12.9 | 2.9 | .55 |
| B | 2 | 2.7 | 3.3 | 3.4 | 3.2 | 12.6 | 3.0 | .56 |
| B | 4 | 2.8 | 3.5 | 3.4 | 3.2 | 13.0 | 2.9 | .52 |
| C | 5 | 2.8 | 3.5 | 3.2 | 3.1 | 12.7 | 3.1 | .56 |
| C | 7 | 2.8 | 3.4 | 3.3 | 3.1 | 12.6 | 3.1 | .59 |
| D | 6 | 3.1 | 3.3 | 3.3 | 3.2 | 12.9 | 2.7 | .45 |
| D | 8 | 3.2 | 3.2 | 3.3 | 3.1 | 12.8 | 2.8 | .47 |
| Total Sample | | 2.9 | 3.3 | 3.3 | 3.2 | 12.8 | 2.9 | .53 |

The correlations between the MBE portion of the GBX and the four item sets, regardless of test form, are presented in Table 5.3. An inspection of these data indicates that sets #21 and #24 had unusually low correlations with each other. This finding is consistent with the unusually low correlations between essay Questions #21 and #24 noted in Chapter 4. Item set #22, which was developed by the staff of the Committee of Bar Examiners, had an unusually high correlation with the MBE.

Table 5.3

CORRELATIONS BETWEEN ITEM SETS

| Item Set | #21 | #22 | #23 | #24 | MBE |
|----------|-----|-----|-----|-----|-----|
| #21 | - | .21 | .18 | .07 | .35 |
| #22 | .21 | - | .19 | .18 | .49 |
| #23 | .18 | .19 | - | .14 | .33 |
| #24 | .07 | .18 | .14 | - | .29 |

After adjusting the item set scores for differences in overall item difficulty, it was observed that the applicants did slightly better on the item sets corresponding to the essay questions they answered than they did on the item sets corresponding to the essays questions they did not answer. The mean scores on the two groups of items (10 items per group) were 6.48 and 6.22, respectively. This effect, while still very small, was most apparent with the applicants who answered essay Question #21.

There was no difference in average score on an item set corresponding to an essay question taken under the regular versus expanded time limit. Both sets had an average of 3.26 out of a possible five points. While the interaction effect described above was still present, it was not affected further by differences in time limits; i.e., applicants benefited more from having taken Question #21 (regardless of how much time they had to answer it) than they did from having taken other questions. It is important to emphasize, however, that the size of Question #21's unique effect on an applicant's score was quite small. For example, the average overall scores of the applicants who answered versus did not answer Question #21 during the essay portion of the session were 12.84 and 12.68, respectively.

Table 5.4 presents the correlations between item set and essay scores under the regular (55 minute) and expanded (90 minute) time limits. The average number of applicants used to compute each correlation coefficient was 432 (because all applicants did not answer all essay questions). If the relationship between scores on an item set and its corresponding essay question was stronger than it was between the item set and the other essay questions, then the underlined correlations in Table 5.4 would be higher than the off diagonal (not underlined) coefficients.

-26-

The data in Table 5.4 indicate that there were only two atypically high
diagonal coefficients; namely, the .49 and .50 correlations associated with
item set and essay question #22.  Thus, the correlation between essay and
multiple choice questions generally did not improve when the facts and
issues addressed by the two types of questions were held constant.

Table 5.4

CORRELATIONS BETWEEN ITEM SETS AND ESSAY QUESTIONS

| Multiple Choice Item Set | 55 MINUTE ESSAY | | | | 90 MINUTE ESSAY | | | |
|---|---|---|---|---|---|---|---|---|
| | #21 | #22 | #23 | #24 | #21 | #22 | #23 | #24 |
| #21 | .15 | .22 | .21 | .14 | .12 | .23 | .13 | .14 |
| #22 | .08 | .49 | .20 | .13 | .19 | .50 | .13 | .17 |
| #23 | .14 | .22 | .22 | .21 | .16 | .11 | .18 | .16 |
| #24 | .11 | .12 | .17 | .13 | .13 | .18 | .09 | .10 |

Correlations Among Essay Questions in the Same Area

Some of the experimental questions were in the same content area (such as
Evidence) as essay questions on the GBX (see Tables 2.1 and 4.5).  This
situation provided an opportunity to explore whether essay questions in the
same subject area correlated higher with each other than did questions in
general.  The results of this investigation did not reveal any systematic
relationship due to content when the experimental questions were answered
under the 55 or 90 minute time limits.

SUMMARY AND CONCLUSIONS

The major findings of the MBE/Essay Congruence Study were as follows:

  o The sequence in which the 20 multiple choice items were asked
    did not affect performance on these items or test reliability.
    These findings are consistent with those obtained in the Item
    Order Study discussed in Chapter 3.

  o Applicants did only very slightly better on the items sets
    corresponding to essay questions they answered previously than
    they did on item sets that dealt with essay questions they had
    not answered.

  o Whether an applicant answered an essay question under the 55 or
    90 minute time limit had no affect on that applicant's score on
    the item set corresponding to that essay question.

  o Total scores on an item set were generally no more highly
    correlated with scores on that item set's corresponding essay
    question than they were with any other essay question.

-27-

o Scores on essay questions in the same general area (e.g.,
   Evidence) correlated no more highly with each other than did
   scores on essay questions in different areas.  This finding
   could result from applicants balancing their preparation for the
   examination across areas and/or the essay test measuring skills
   that are not highly content specific.

The foregoing findings suggest that MBE and California essay questions will
not rank order applicants in <u>exactly</u> the same way even when the content on
these two types of questions is held constant.  Nevertheless, scores on the
the two types of questions are highly related.  This means that applicants
who have the skills and knowledge required to do well on MBE items also
tend to have the abilities needed to do well on essay questions.

REFERENCES

Carlson, A. B. and Werts, C. E.  Relationship among law school predictors, law school performance, and bar examination results.  Princeton, N.J.: Educational Testing Service, 1976.

Dorans, N. and Wright, R.  Test Analysis: Multistate Bar Examination, Forms 3CEB2 and S-3CEB2.  Unpublished Statistical Report, SR-80-117. Princeton, N.J.: Educational Testing Service, October, 1980.

Gulliksen, Harold  Theory of Mental Tests.  New York: Wiley, 1950.

Klein, S. P.  An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group.  Paper presented at the American Bar Association meetings, Dallas, Texas; August 14, 1979. Reprinted in The Bar Examiner, 1980, 49, 14-18.

Klein, S. P.  A comparison of the effectiveness of a single versus multiphased grading system.  Unpublished report submitted to the Committee of Bar Examiners of the State Bar of California, May, 1980a.

Klein, S. P.  Intra- and inter-reader agreement on the essay section of the California State Bar Examination.  Unpublished report submitted to the Committee of Bar Examiners of the State Bar of California, June, 1980b.

Klein, S. P.  An analysis of possible variations in pass/fail standards on the California State Bar Examination.  Unpublished report submitted to the Committee of Bar Examiners of the State Bar of California, January, 1981a.

Klein, S. P.  Factors associated with the difference in passing rate between Anglo and Hispanic applicants on the New Mexico Bar Examination.  Unpublished report submitted to the New Mexico Board of Bar Examiners, January, 1981b.

O'Hara, J. F. and Klein, S. P.  Is the bar examination an adequate measure of lawyer competence?  The Bar Examiner, 1981, 50, #3, 28-35.

Sprecher, R. A. (ed.). The Bar Examiner's Handbook.  Chicago, IL: National Conference of Bar Examiners, 1968.

Traub, R. E. and Fisher, C. W.  On the equivalence of constructed-response and multiple-choice tests.  Applied Psychological Measurement, 1977, 1, 355-369.

GLOSSARY OF ABBREVIATIONS AND TECHNICAL TERMS

Corrected
Correlation
Coefficient

This is the correlation coefficient that would be obtained between two variables if scores on both variables were perfectly reliable; i.e., it indicates the strength of the true underlying relationship between two variables. A formula, called the "correction for attenuation," is used to estimate the corrected correlation.

Correlation
Coefficient
(r)

The correlation coefficient is an index of the degree to which the relative performance of the applicants on one variable corresponds to their relative performance on another variable. A positive correlation indicates that applicants with high scores on one variable tend to have high scores on the other variable. A negative correlation indicates that applicants with high scores on one variable tend to have low scores on the other variable. Correlation coefficients range between $\pm1.00$; the larger the r, the stronger the relationship (regardless of algebraic sign). A 0.00 correlation means that there is no relationship between the variables.

GBX

General Bar Examination. This examination consists of the MBE and 9 essay questions.

Mean or
Average

The mean is the arithmetic average. It is computed by summing all the scores on a variable and then dividing that sum by the number of scores that entered it.

MBE

Multistate Bar Examination

Phase I
Essay Score

The sum of the scores assigned to three essay questions on the Essay portion of the GBX. The Phase I essay score is used in combination with the MBE to make the Phase I screening decision (see Appendix C).

Reliability

Reliability refers to the consistency with which a variable is measured; e.g., the degree to which two readers agree on the relative quality of different essay answers or how much an applicant's relative standing on the MBE would be affected if a different set of MBE questions were asked.

Scaling

In this report, scaling refers to converting the scores on a variable to a different unit of measurement (in terms of the mean and standard deviation of the scores).

Standard
Deviation
(SD)

The standard deviation is an index of the degree to which scores on a variable spread out on either side of the mean. The larger the standard deviation, the greater the spread. If the shape of the score distribution is normal, then 34% of the scores fall between the mean and one SD above it.

Variable

Any characteristic of persons on which they differ. Score level on the MBE is an example of a variable.

-30-

COMMITTEE OF BAR EXAMINERS'
POLICY REGARDING ASSIGNMENT OF GRADES

The passing grade on the bar examination is 70% of the highest possible grade. The grade range is from 0-100. Consequently a very bad answer can hurt the applicant more than two very good answers can help. The applicant could fall 70 points below passing on the one bad answer and could gain no more than 60 points above the required average on two outstanding answers.

It is the Committee's policy with regard to assigning grades that the readers' attention should first be focused upon the question whether, considering the overall quality of the answer, the applicant has exhibited sufficient judgment, analytical ability and knowledge of the subject matter involved in the particular question to merit a pass or a fail on that question. If, after careful consideration, the reader is unable to make up his mind whether the applicant deserves a pass or fail on the question, the reader shall assign a grade of 70.

If the reader is satisfied that the applicant has written a passing answer the reader shall enter a grade ranging from 75 to 100, depending on the quality of the answer:

| | | |
|---|---|---|
| A passing answer | - | 75 |
| A good passing answer | - | 80 |
| A very good to outstanding answer | - | 85-100 |

The score of 100 is not reserved for a perfect answer or for the single best answer which the reader may encounter on a particular examination. A grade of 100 shall be assigned when the reader believes the applicant has done as well as can be reasonably be expected of any applicant on that question. Therefore a grade of 100 may be assigned even if the applicant failed to develop fully the analysis of the issues discussed.

If the reader is satisfied that the applicant has failed the question, the grade must be between 0 and 65.

If the applicant has shown any understanding of the question and has made any serious attempt to grapple with it, the applicant should not receive a grade below 40. If the applicant has written an answer that is wholly, or almost wholly without redeeming quality the grade range is from 0 to 40.

If an answer contains matter that is irrelevant, the irrelevant matter must be disregarded and no credit may be deducted or added because of the inclusion of such matter.

Revised August 1977

APPENDIX C

DESCRIPTION OF THE MULTIPHASED GRADING PROCESS

The major steps in the multiphased grading process are listed below:

1) In Phase I, all three answers in one of the three essay sessions are graded (different applicants have different sessions read in this phase so that all reader teams can begin simultaneously). If the sum of an applicant's MBE and three essay scores is greater than 665, the applicant passes; i.e., there is no further reading of that applicant's answers. If the applicant's Phase I score is 665 or less, the applicant goes on to Phase II.

2) All the applicants in Phase II have their remaining six essay answers read once. Applicants with total scores (i.e., MBE + Essay) below 1010 are failed, those with scores above 1065 are passed, and those with scores between 1009 and 1066 are placed in Phase III.

3) All the applicants in Phase III have all nine of their essay answers read again. The second reader assigned to an answer is a different person than the first reader and the second reader does not know the grade given by the first reader. The Phase III applicants have their Phase II and III essay scores averaged. If the total of an applicant's MBE and average essay score is less than 1030, the applicant fails; if it is more than 1049, the applicant passes; and if it is between 1029 and 1050, the applicant is placed in Phase IV.

4) Phase IV is called "reappraisal." In this phase, all nine of an applicant's essay answers are evaluated as a set by a member of the Board of Reappriasers (i.e., a member of a panel of consultants who have extensive experience in developing and grading the essay portion of California's examination). The reappraiser is advised of all the grades assigned to the applicant (i.e., MBE and essay scores from Phases I - III) and is asked to review the essay answers again to see if enough points can be found to pass the applicant. If enough points cannot be found, the applicant fails.

A parallel procedure (but with different cutoff scores) is used to determine whether an applicant passed the essay section by itself.

Of the 7379 applicants who took the complete July 1980 GBX, 29% passed in Phase I. The percent passing as a result of Phases II, III, and IV were 11, 5, and 3, respectively. Another 1% passed as a result of having passed one portion of the GBX previously and having received in July 1980 a passing grade on the portion they had failed previously. Table C.1 shows how the 7379 applicants were distributed across pass/fail categories.

Table C.1

DISTRIBUTION OF JULY 1980 APPLICANTS ACROSS PASS/FAIL CATEGORIES

| Final Status | Basis for Pass/Fail Status | Number of Applicants | Percent of Applicants |
|---|---|---|---|
| Pass | Phase I Pass | 2141 | 29.0 |
| Pass | Phase II Pass | 783 | 10.6 |
| Pass | Phase III Pass | 380 | 5.1 |
| Pass | Phase IV (Reappraisal) Pass | 234 | 3.2 |
| Pass | Previous MBE Pass + Phase II Essay Pass | 34 | 0.5 |
| Pass | Previous MBE Pass + Phase III Essay Pass | 29 | 0.4 |
| Pass | Previous MBE Pass + Phase IV Essay Pass | 12 | 0.2 |
| Pass | Previous Essay Pass + Current MBE Pass | 10 | 0.1 |
| Fail | Phase II Fail | 1932 | 26.2 |
| Fail | Phase III Fail | 1476 | 20.0 |
| Fail | Phase IV Fail | 348 | 4.7 |
| | Total | 7379 | 100.0 |

-33-

EXCERPTS FROM NOTICE TO APPLICANTS REGARDING THE SPECIAL SESSION

In addition to the usual examination sessions, each applicant for the Fall 1980 Examination will be expected to participate in a one-half day Special Session to be administered either on Monday, July 28, 1980, or Tuesday, July 29, 1980.

The Special Session is designed to give applicants an opportunity to improve their scores by demonstrating their capabilities in other than the standard methods or procedures and to test alternative means of examining for the future.

To derive any benefit from the Special Session, applicants must complete and return designated questionnaires by specified deadlines and complete all other portions of the examination which they are taking.

There will be four types of problems given during the Special Session. For convenience, they will be referred to as...(c) Special Essay Questions, and (d) Special Multiple-Choice... Individual applicants will be assigned to the various types of problems by the Committee based on a statistical analysis of the composition of the entire examinee population. General descriptions of the four types of problems are:

(c)  Special Essay Questions

    The time for this session will be divided into three segments of 55, 90, and 35 minutes. Each applicant will receive two essay questions to answer - one during the 90-minute segment and the other during the 55-minute segment. The answers to these questions will be graded in the same manner as answers written during the regular essay portion of the examination. The readers will be instructed to give more credit to answers that deal with the issues in a concise and well-organized fashion than they give to those that are merely longer. In short, applicants should use the extra time to attempt to write a better answer, not just a lengthier one. During the 35-minute segment, each applicant will be given 20 multiple-choice questions to answer.

(d)  Special Multiple-Choice

    In the 90 and 55 minute segments (of this session), applicants will answer MBE type questions under conditions that might improve per-formance on this type of test (e.g., having more time to answer each question). (The 35-minute segment was used for another study.)

The scoring for the Special Session for the various groups of applicants will be scaled so that the Special Session would be equivalent to one session of a six-session examination. An applicant's score on the Special Session will then be utilized if and only if (a) the applicant did not pass the regular part of the examination based upon the usual scoring procedures and (b) the applicant's score on the Special Session is above passing. Thus, an applicant's performance on the Special Session can increase but cannot decrease the likelihood that the applicant will pass the examination. Since the score on the Special Session can count for one-sixth of an applicant's total grade, it can have a substantial beneficial impact for an applicant who scores well on it.

-34-

# THE COMMITTEE OF BAR EXAMINERS

### OF THE STATE BAR OF CALIFORNIA

555 FRANKLIN STREET
POST OFFICE BOX 7908
SAN FRANCISCO 94120
Telephone (415) 561-8300



FIFTH FLOOR
1230 WEST THIRD STREET
LOS ANGELES 90017
Telephone (213) 482-4040

APPLICATION - AUGUST 1980 ASSESSMENT CENTER AND QUESTIONNAIRE FOR ALL JULY, 1980 APPLICANTS

Your answers to the questions below will assist the Committee of Bar Examiners in its efforts to improve the bar examination. Your responses will be kept strictly confidential and used solely for statistical purposes. We are most appreciative of your cooperation.

LAST NAME _____    FIRST NAME _____    MID INITIAL _____

1. Birthdate [    /    /    ]
   Mo.   Day   Yr.

2. Which of the following jobs, if any, have you held for one or more months?  Check all that apply:

   [ ] Attorney                    [ ] Legal Investigator
   [ ] Court Reporter              [ ] Legal Secretary
   [ ] Law Clerk                   [ ] Paralegal Assistant
   [ ] Law Enforcement Officer     [ ] Other Law Related Employment (specify.....................)

3. About what percentage of the time was English spoken in your home during your childhood?  Please put your answer in the box below.

   [    ] Percent of time English spoken.

4. Circle the box corresponding to the language other than English that was spoken most often.

   [1] Chinese       [3] Spanish              [5] None of these or no
   [2] Japanese      [4] Taglog/Phillipino        language besides English

5. Circle the box corresponding to the highest grade in school completed by your MOTHER or female guard-ian.  Leave blank if you do not know.

   [1] 1st to 5th        [4] High School Graduate
   [2] 6th to 8th        [5] College Graduate
   [3] 9th to 11th       [6] Graduate/Professional School Degree

6. Circle the box corresponding to the highest grade in school completed by your FATHER or male guardian.  Leave blank if you do not know.

   [1] 1st to 5th        [4] High School Graduate
   [2] 6th to 8th        [5] College Graduate
   [3] 9th to 11th       [6] Graduate/Professional School Degree

                                    PLEASE CONTINUE ON THE REVERSE SIDE

7.  Circle the box below that best describes your undergraduate major:

    [1] Economics, Business, Accounting
    [2] Physical Sciences, Engineering, Mathematics, Biology
    [3] Social Sciences (Anthropology, Psychology, Sociology)
    [4] History, Government, Political Science
    [5] English, Journalism, Classical Studies, Philosophy
    [6] Fine Arts, Theater Arts, Music
    [7] Education
    [8] Other (specify . . . . . . . . . . . . . . . . . .)

8.  For each of the activities below, indicate the number of hours, if any, you have spent doing them for:
    SIMULATED cases, ACTUAL cases associated with supervised law school programs, and ACTUAL cases as
    part of paid and/or volunteer employment.  Insert the number 99 in a box if you spent 100 or more hours
    doing the activity.

| | | SIMULATED CASES | ACTUAL CASES Supervised Law School Programs | Paid or Volunteer Employment |
|---|---|---|---|---|
| a. | Conduct legal research. | [ ] | [ ] | [ ] |
| b. | Prepare briefs, petitions, or motions. | [ ] | [ ] | [ ] |
| c. | Conduct direct examinations. | [ ] | [ ] | [ ] |
| d. | Conduct cross examinations. | [ ] | [ ] | [ ] |
| e. | Interview a client or a witness for a hearing. | [ ] | [ ] | [ ] |
| f. | Interview a client on general legal matters; e.g. landlord- tenant dispute. | [ ] | [ ] | [ ] |
| g. | Present an oral argument in a legal proceeding. | [ ] | [ ] | [ ] |

9.  In the box next to each choice below, indicate the number of courses, if any, you have taken in:

    [ ] Evidence
    [ ] Clinical or Trial Practice involving your participation in simulated or actual hearings.
    [ ] Trial Practice NOT involving your participation in simulated or actual hearings; i.e., lecture only.

10. If you have secured employment in California in a law related job commencing by September 15, please
    circle the box corresponding to how you will be employed.

    [1] Attorney General's Office
    [2] Public office, criminal prosecution (e.g., District Attorney)
    [3] Public office, criminal defense (e.g.), Public Defender)
    [4] Legal aid office (e.g., neighborhood legal assistance)
    [5] Public interest law firm
    [6] Law clerk for a judge
    [7] Private law firm, criminal defense
    [8] Private law firm, general practice
    [9] Law department of a corporation
    [0] Other (specify . . . . . . . . . . . . . . . . . . .)

11. Do you hereby apply to participate in the two day Assessment Center?  (Circle your answer below.)

    (1) No        (2) Yes

If selected as a participant in the Assessment Center, I will be <u>available</u> to participate in the location circled
below on any date between August 4 and August 24 (inclusive) <u>except for the dates</u> circled below.

| Circle one | Mon | Tue | Wed | Thu | Fri | Sat | Sun | |
|---|---|---|---|---|---|---|---|---|
| in (1) Los Angeles only | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| in (2) San Francisco only | 11 | 12 | 13 | 14 | 15 | 16 | 17 | ____ |
| in (3) Either Los Angeles or San Francisco. | 18 | 19 | 20 | 21 | 22 | 23 | 24 | ____ |

(Note:  The likelihood of being selected may be improved by increased availability.)

Date: _____, 1980        Signature: _____

APPENDIX XII

POST EXAMINATION QUESTIONNAIRE


APPLICANTS MUST COMPLETE AND FILE THIS QUESTIONNAIRE BEFORE THE FINAL
SESSION OF THE GENERAL BAR EXAMINATION ON WEDNESDAY, JULY 30, 1980 IN
ORDER TO DERIVE ANY BENEFIT FROM THE SPECIAL SESSION OF THE JULY 1980
EXAMINATION OR TO PARTICIPATE IN THE AUGUST 1980 ASSESSMENT CENTER.

Your answers to the questions below will assist the Committee of Bar Examiners
in its efforts to improve the bar examination. Your responses will be kept
strictly confidential and used solely for statistical purposes. A completed
questionnaire is required of all applicants who participated in any one of the
special sessions and/or will be participating in the Assessment Center. We
are most appreciative of your cooperation in answering the questions below.

   Application # [     ]   Center Number [     ]   Birthdate [ / / ]

1. Which of the following methods, if any, did you use to prepare for
   the examination?  Check all that apply:

   [ ] Commercial bar review course of at least 5 weeks duration
       which met 4 or more times per week; e.g., BAR or BRC.
   [ ] Commercial bar review course of less than 5 weeks duration.
   [ ] Intensified commercial writing course; e.g., Beverly Rubens.
   [ ] Law school sponsored or administered bar review course.

2. About how many hours per week were you engaged in paid employment during
   the last five weeks?  Please put your answer in the box below.

        [    ] Hours per week Employed

3. About how many hours per week did you spend studying for the examination
   during the last five weeks?  Please put your answer in the box below.

        [    ] Hours per week Studied

4. Circle the number corresponding to the special session you took:

           1 Videotape of Arbitration and Court Room cases
           2 Case of Barelas v. Brown (Research Task)
           3 Case of State v. Dolan (Research Task)
           4 60 multiple choice questions and script with questions
           5 Two essay questions and 20 multiple choice questions
           9 Did not participate in a special session

5. In your opinion, how good a measure of your LEGAL KNOWLEDGE was each
   part of the examination?  Please circle one number for each part.

|  | Very Poor | Poor | Fair | Good | Very Good | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

6. In your opinion, how good a measure of your ABILITY TO PERFORM AS AN ATTORNEY was each part of the examination?  Please circle one number for each part.

|  | Very Poor | Poor | Fair | Good | Very Good | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

7. In your opinion, was the time allowed for each part the examination appropriate?  Please circle one number for each part.

|  | Less Than Enough | About Right | More Than Enough | Did Not Take |
|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 9 |

8. Please circle one number below for each part of the examination to indicate how much you agree or disagree with the statement: "The case situations were realistic."

|  | Strongly Disagree | Disagree | Neutral | Agree | Strongly Agree | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

9. In general, were the directions and questions in your special sessions clear or ambiguous?  Please circle one choice below.

    1-Clear    2-Mixed    3-Ambiguous    9-Did Not Take

10. What were your general reactions to the special session? How could it be improved?  Should it be included in future examinations?

_____

_____

_____

_____

DIRECTIONS AND QUESTIONS FOR ESSAY TIME LIMITS STUDY
AND DIRECTIONS FOR ESSAY/MBE CONGRUENCE STUDY


## SPECIFIC DIRECTIONS FOR PARTS I AND II - ESSAY QUESTIONS


An answer should demonstrate your ability to analyze the facts presented by
the question, to select the material from the immaterial facts, and to
discern the points upon which the case turns. It should show your know-
ledge and understanding of the pertinent principles and theories of law,
their relationship to each other, and their qualifications and limitations.
It should evidence your ability to apply the law to the facts given, and to
reason logically in a lawyer-like manner to a sound conclusion from the
premises adopted. Try to demonstrate your proficiency in using and
applying legal principles rather than mere memory of them.

An answer containing only a statement of your conclusions will receive
little credit. State fully the reasons that support them. All points
should be thoroughly discussed. Although your answer should be complete,
you should not volunteer information or discuss legal doctrines that are
not necessary or pertinent to the solution of the problem.

Unless a question expressly asks for California law, it should be answered
according to legal theories and principles of general application.


## SPECIFIC DIRECTIONS FOR PART III - MULTIPLE CHOICE QUESTIONS


Each of the questions or incomplete statements below is followed by four
suggested answers or completions. You are to choose the best of the stated
alternatives. Answer all questions according to the generally accepted view,
except where otherwise noted.

For the purposes of this test, you are to assume that the Uniform
Commercial Code Articles 1, 2, and the provisions of 9 relating to the
assignment of accounts receivable and contract rights have been adopted.
The Federal Rules of Evidence are controlling. You are also to assume that
there is no relevant comparative negligence rule, no relevant No-Fault
Insurance Act, and no applicable community property law unless the specific
question informs you to the contrary.

-39-

# QUESTION NO. 21

In early 1977 the XU Boosters Club, an incorporated group of State X University alumni, offered in a letter to Mr. Chops, a karate teacher at the largest high school in State X, to pay Chops a "commission" of $500 for each "quality" high school football player Chops might induce to enroll at State X University during a period of two years, commencing in September 1977. The letter concluded: "We emphasize that you must agree to solicit for us only foot-ballers who are large, fast, agile, and mean."

Chops promptly replied by mail: "I accept your proposal and promise to abide by the terms thereof." Before making the offer, the Club's officers knew that for several years Chops had directed dozens of his school's star football players to out-of-state universities, and mentioned their awareness of this fact in their letter to Chops. On receipt of Chop's reply, the Club pledg-ed $300,000 toward a stadium addition at State X University and induced the hiring of three additional assistant football coaches in anticipation of an upsurge in the University's football success.

Chops did not recruit or try to recruit any players for State X University during 1977, 1978, or 1979 but did recruit a football player named Runner for State Y University in 1978. In a lawsuit against Chops based on breach of contract and promissory estoppel, the XU Boosters Club alleged the foregoing facts plus damages allegedly sustained.

Chops has sought advice from the law firm for which you work. Chops says he believed that the letter from the Boosters Club sought only a non-binding "gentleman's agreement," and that his reply letter meant only that he would give State X University reasonable consideration in any recruiting efforts he might make.

Chops provides you with these additional facts: (a) between June 1977 and September 1979 no player who was large, fast, agile and mean had graduated from the high school where Chops was employed; (b) during that time, Runner was the only player Chops had solicited for any university; (c) Runner is a sensationally fast and agile kick return specialist and the smallest person to have played on his high school's football team since 1962; (d) Chops had received a "commission" of $5,000 from a group of State Y University alumni when Runner enrolled there; and (e) Chops has received no money from Boosters.

1.  Is the court likely to agree with Chops' interpretation of his exchange of correspondence with Boosters and, if it does not, what is the most likely interpretation? Discuss.

2.  Will the additional facts which Chops has provided support any good defenses to the suit if the court finds that there was a binding agreement? Discuss.

3.  Do the alleged facts support any theory upon which Boosters might recover judgment against Chops for the $300,000 Boosters had pledged for the stadium addition? Discuss.

# QUESTION NO. 22

Adam was the owner of record of Wildacre, a ten-acre tract of vacant, unimproved land located just beyond the city limits of an expanding industrial city. On June 1, 1980, he entered into a valid executory contract with Baxter for the sale of Wildacre to Baxter. June 30, 1980, was the date specified in the contract for Adam to deliver to Baxter a warranty deed to Wildacre and for Baxter to pay Adam the purchase price of $45,000.

On June 15, 1980, Baxter, in consideration of the sum of $50,000 paid to him by Cramer, executed and delivered a warranty deed purporting to transfer Wildacre to Cramer. Cramer made no search of the records to determine who appeared as owner of record. However, Cramer immediately recorded his deed to Wildacre.

On June 30, 1980, Baxter paid Adam the agreed upon purchase price of $45,000, and Adam executed and delivered to Baxter his warranty deed to Wildacre. Baxter had it recorded immediately.

On July 15, 1980, Baxter, in consideration of $40,000 paid to him by Dawson, executed and delivered to Dawson a warranty deed to Wildacre. Dawson made no search of the records and had no knowledge of any of the prior transactions concerning the tract. Furthermore, Dawson misplaced the deed and never had it recorded.

In the jurisdiction where Wildacre is situated, the recording statute provides that unrecorded deeds are void as to subsequent purchasers who (1) are innocent and (2) have paid a valuable consideration.

The jurisdiction has and maintains both an alphabetical grantor-grantee index and a tract index but there has never been a decision as to which, if either, should take precedence over the other.

1. What, if any, were the legal and equitable interests of Adam, Baxter and Cramer in Wildacre as of June 2, 1980, June 16, 1980, and July 1, 1980? Discuss.

2. In a contest between Cramer and Dawson as to the title to Wildacre, what arguments are each likely to assert and who should prevail? Discuss.

# QUESTION NO. 23

James, a wealthy stockbroker, stabbed Allen, his customer, after Allen had slapped James in the face during a violent argument over money at Allen's apartment. James, his clothes spotted with blood from Allen's wound, ran from the apartment screaming "Good Lord, what will the financial world think?" His departure and exclamation were witnessed by Sylvia, Allen's friend, who arrived at the front door of the apartment as James fled.

Upon entering Allen's apartment and discovering Allen wounded and unconscious, Sylvia called the police. When the police arrived at the apartment, Sylvia described to them the man she had seen flee the apartment.

Using the description provided by Sylvia, the police stopped James as he arrived home. James was placed under arrest and immediately taken to Allen's hospital room. Allen, who was on the critical list and not expected to live out the night, identified James as his assailant. Thereafter Allen showed surprising improvement. However, he died three weeks later from a virus contracted while in the hospital.

After the hospital visit, James was taken to police headquarters and placed in a lineup. At the demand of the police and over his objection, James repeated the words, "Good Lord, what will the financial world think?" At the lineup, Sylvia identified James both by sight and by voice as the person she had seen leaving the apartment. Later, over James' objection, a police officer took his clothing. Subsequent laboratory analysis matched Allen's blood type with the blood on James' clothing. James was charged with murder in the first degree.

James has moved to prevent the introduction into evidence at his trial of:

    a. Any testimony as to his identification by Allen at Allen's hospital room;

    b. Any testimony as to his visual identification by Sylvia at the lineup;

    c. Any testimony as to the identification of his voice by Sylvia at the lineup; and

    d. His clothing and the results of the laboratory analysis of the blood found thereon.

1. How should the court rule regarding the admissibility of the above items of testimony and evidence? Discuss.

2. Has James committed murder in the first degree in the death of Allen and, if not, has James committed any lesser included criminal homicide? Discuss.

# QUESTION NO. 24

Al, a professor of biology, was conducting an experiment in the basement of his home in an attempt to mate a docile variety of bee with a more aggressive variety of bee that had begun to move north toward the United States from South America. Al had a hive of both varieties of bees. One Saturday morning while Al was away, Debbie, a six year old girl who lived next door to Al, was standing in her driveway carelessly throwing rocks, one of which hit and broke a basement window of Al's house. Several bees of the aggressive variety escaped and stung Debbie, who immediately became severely ill and was rushed to the hospital. A consulting physician told Debbie's father, Dan, that he needed to test some bees of the type that had stung Debbie in order to treat her.

Dan immediately went to Al's house and, finding no one there, broke down the back door and entered the basement. He caught several bees in a tin can and, in the process of leaving with the bees, knocked over a jar of corrosive chemicals onto Al's antique rug. The chemicals severely damaged the rug.

Debbie subsequently recovered from the bee stings. The shock of the episode, however, released previously undetected latent psychotic tendencies and she has remained in a mental institution.

Al was thereafter prosecuted for not having obtained, as required by federal statute, a license from the Department of Health to conduct experiments with live specimens of animals or insects "not normally found in North America." Al pleaded guilty and paid a $500 fine.

1.  What are Debbie's rights against Al? Discuss.

2.  What are Al's rights against Dan? Discuss.

PRELIMINARY REPORT ON THE RELATIONSHIP BETWEEN
UNDERGRADUATE MAJOR AND BAR EXAMINATION SCORES


Prepared for

The Committee of Bar Examiners
of the State Bar of California


Prepared by

Stephen P. Klein
GANSK & ASSOCIATES
Los Angeles, California


June 2, 1982

PURPOSE

The study described in this report investigated the relationship between
undergraduate major and general bar examination scores as well as whether
this relationship was the same across sex and racial/ethnic groups.


SAMPLE AND PROCEDURES

All those applying to take July 1980 General Bar Examination (GBX) in
California were asked to complete and return a questionnaire prior to its
administration.  This questionnaire asked applicants to indicate which one
of the categories listed below was the best description of their
undergraduate major.  An applicant that returned the questionnaire but did
not indicate a major was placed in category 9.


        1  Economics, Business, Accounting
        2  Physical Science, Engineering, Mathematics, Biology
        3  Social Science (Anthropology, Psychology, Sociology)
        4  History, Government, Political Science
        5  English, Journalism, Classical Studies, Philosophy
        6  Fine Arts
        7  Education
        8  Other
       (9) No response

Questionnaires were returned by 7,112 (96 percent) of the 7,349 applicants
that took both the Multistate Bar Examination (MBE) and essay portions of
the July 1980 GBX.  Within the group of 7,112 applicants, 79 applicants
were not in one of the four racial/ethnic groups studied in this research.
These groups were:  Anglo, Asian (including Philipino and Pacific
Islander), Black, and Hispanic.  Sex and/or racial/ethnic group data were
not available for another 18 applicants.  The remaining 7,015 applicants
served as the sample for the analyses described in this report.


RESULTS

Table 1 shows the percentage of applicants in each racial/ethnic and sex
group that were in each category of undergraduate major as well as the
total number in each group.  These data indicate that males were more
likely than females to have majored in the fields included in categories 1
and 4.  The reverse was true for categories 3, 5, and 8.  About one third
of all applicants majored in category 4.

Differences among racial/ethnic groups in the relative proportion in each
category were generally much smaller than they were among sex groups.  The
largest difference among racial/ethnic groups was in category 4.  This
category accounted for 40 percent of the Hispanic applicants, but only 32
percent of the Asian applicants.  The differences among racial/ethnic
groups in category 4 were not explained by systematic differences in the
relative percentages of males and females within each racial/ethnic group.
The percentage of Anglos, Asians, Blacks, and Hispanics that were female
were: 30, 29, 38, and 24.  The corresponding percentages of females in each
racial/ethnic group that were in category 4 were: 26, 32, 29, and 32.

Table 1

PERCENTAGE IN EACH SEX AND RACIAL/ETHNIC GROUP IN EACH CATEGORY OF
UNDERGRADUATE MAJOR AND THE TOTAL NUMBER IN EACH GROUP AND CATEGORY

| | % in each undergraduate major category | | | | | | | | | % of Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
| Male | 20 | 9 | 11 | 37 | 10 | 1 | 1 | 6 | 4 | 70 | 4923 |
| Female | 7 | 4 | 21 | 27 | 16 | 4 | 3 | 12 | 6 | 30 | 2092 |
| Anglo | 16 | 8 | 14 | 33 | 12 | 2 | 2 | 8 | 5 | 84 | 5916 |
| Asian | 19 | 9 | 16 | 32 | 8 | 1 | 0 | 10 | 4 | 4 | 300 |
| Black | 15 | 7 | 20 | 34 | 9 | 1 | 3 | 7 | 5 | 6 | 400 |
| Hispanic | 12 | 4 | 19 | 40 | 8 | 1 | 2 | 10 | 3 | 6 | 399 |
| % of Total | 16 | 8 | 14 | 34 | 12 | 2 | 2 | 8 | 5 | 100 | -- |
| Total N | 1129 | 550 | 1004 | 2365 | 830 | 138 | 112 | 565 | 322 | -- | 7015 |

Analyses of variance conducted on MBE, essay, and total GBX scores
indicated that differences in average scores among racial/ethnic and sex
groups were statistically significant. The same was true for undergraduate
major category. However, the combination of all three variables accounted
for less than 10 percent of the variance in scores. In other words, most
of the differences in scores among applicants could not be explained by
differences in their undergraduate major, sex, or racial/ethnic group.

Previous research (Klein, 1980 and 1981) has shown that almost all of the
variance attributable to racial/ethnic and sex group could be explained by
differences among each group's average Law School Admission Test (LSAT)
scores and law school grades (LGPA).

Undergraduate major by itself accounted for only 1 percent of the variance
in MBE, essay, and total GBX scores. Moreover, there were no significant
two way or three way interactions among race, sex, and undergraduate major
on any of the dependent variables. This finding indicates that the general
differences between racial/ethnic and sex groups were reflected within each
category of undergraduate major. Similarly, the differences in average
score among categories were maintained across racial/ethnic and sex groups.
Any deviations from these trends were therefore most likely due to chance.

Table 2 shows the average essay, MBE, and GBX scores for each category of
undergraduate major. Standard deviations within categories were quite
similar to the standard deviations in the total sample (54.8 for essay,
45.7 for MBE, and 92.0 for total GBX). If an applicant had only three
essay answers scored as a result of the multiphased grading process, then
that applicant's essay score was multiplied by 3.0 in order to place it on
a comparable scale of measurement with essay grades assigned to applicants
that had all nine answers graded.

Table 2

AVERAGE GBX SCORES IN EACH CATEGORY OF UNDERGRADUATE MAJOR

|   | Category | Average Score Essay | MBE | Total |
|---|---|---|---|---|
| 1 | Economics, Business, Accounting | 617 | 430 | 1047 |
| 2 | Phys Science, Engineering, Mathematics, Biology | 615 | 434 | 1049 |
| 3 | Social Science | 617 | 423 | 1039 |
| 4 | History, Government, Political Science | 619 | 423 | 1041 |
| 5 | English, Journalism, Classical Studies, Philosophy | 629 | 433 | 1062 |
| 6 | Fine Arts | 616 | 418 | 1034 |
| 7 | Education | 600 | 408 | 1008 |
| 8 | Other | 616 | 422 | 1038 |
| 9 | No response | 612 | 416 | 1028 |
| 0 | Total Sample | 618 | 425 | 1043 |

Table 3 shows the percentage passing in each category.  Its also shows the difference in the percentage passing the MBE and essay in each category. For the purposes of this table, scores of 630, 420, and 1050 were needed for passing the essay, MBE, and total GBX.

Table 3

PERCENTAGE PASSING EACH GBX SECTION AND THE DIFFERENCE IN PERCENTAGE
PASSING THE MBE AND ESSAY IN EACH CATEGORY OF UNDERGRADUATE MAJOR

|   | Category | Essay | MBE | Total | MBE - Essay |
|---|---|---|---|---|---|
| 1 | Economics, Business, Accounting | 42 | 57 | 49 | 15 |
| 2 | Phys Sci, Engineer, Math, Biol | 42 | 62 | 49 | 20 |
| 3 | Social Science | 42 | 53 | 45 | 11 |
| 4 | History, Gov't, Political Sci | 43 | 52 | 46 | 9 |
| 5 | English, Journ, Class, Phil | 50 | 61 | 55 | 11 |
| 6 | Fine Arts | 43 | 49 | 44 | 6 |
| 7 | Education | 27 | 37 | 30 | 10 |
| 8 | Other | 40 | 50 | 42 | 10 |
| 9 | No response | 39 | 50 | 41 | 11 |
| 0 | Total Sample | 42 | 54 | 46 | 12 |

The data in Tables 2 and 3 indicate that in general, a group's relative standing on one portion of the GBX was a good indicator of its standing on the other portion. For instance, applicants in category 5 (English, Journalism, Classical Studies, and Philosophy) had the highest average essay score and were within 1 point of the highest average MBE score while applicants in category 7 (Education) had the lowest average scores on both measures (see Table 2).

The one major exception to this trend occurred with the applicants in category 2 (Physical Science, Engineering, Mathematics, and Biology). These applicants had the highest average MBE score but a below average essay score. This led to the unusually large difference between MBE and essay passing rates in this category (see Table 3).

Table 4 shows the average scores and the percent passing on the essay and MBE in category 2, category 5, and the total sample by sex group. These data indicate that the anomaly observed in category 2 was due mainly to male applicants performing less well on the essay than would have been expected on the basis of their MBE scores. For instance, 21 percent fewer males in category 2 passed the essay than passed the MBE compared to the 15 percent difference in passing rates on these two parts in the total sample.

The female passing rate on the essay in category 2 was 16 percent higher than the male rate as compared to the 9 percent difference that would have been expected on the basis of the difference between males and females on the essay in the total sample. Female applicants in category 2 and 5 also performed slightly better on the MBE than would have been expected on the basis of total sample data. For example, the female applicants in these two categories had average MBE scores that were only 2 points rather than the usual 4 points below the average score for males.

The total sample columns in Table 4 show that female applicants tended to have higher essay scores than males while the reverse was true on the MBE. Mean scores and passing rates were not always parallel because of random perturbations in score distributions. For instance, females in category 5 had a higher essay average but a lower percent passing the essay than females in category 2.

Table 4

AVERAGE SCORE AND PERCENTAGE PASSING BY SEX GROUP FOR
TWO CATEGORIES OF UNDERGRADUATE MAJOR AND THE TOTAL SAMPLE

| Variable | Sex group | Essay Cat 2 | Cat 5 | Total | MBE Cat 2 | Cat 5 | Total |
|---|---|---|---|---|---|---|---|
| Average score | Male | 613 | 624 | 614 | 434 | 434 | 426 |
| | Female | 630 | 635 | 626 | 432 | 432 | 422 |
| Percent passing | Male | 40 | 47 | 40 | 61 | 61 | 55 |
| | Female | 56 | 55 | 49 | 59 | 61 | 51 |

The number of males and females in category 2 were 460 and 90, respectively. The corresponding numbers in category 5 were 495 and 335.

DISCUSSION

The foregoing finding suggest that an applicant's undergraduate major in and of itself is unlikely to enhance or inhibit that applicant's score on either section of the examination. However, undergraduate major may interact with other variables in affecting the relationship between MBE and essay scores. For example, males in category 5 had a 7 percent higher pass rate on the essay than males in category 2 but there was no difference in their pass rate on the MBE. Although this might suggest that majoring in the fields included in category 5 helped essay performance, no such trend was found among female applicants in these two categories. This led to the highly statistically significant interaction between sex, undergraduate major, and type of bar score (essay versus MBE) being investigated.

The effect of undergraduate major on the relationship between bar scores and other variables may be of particular interest to law school admissions officers. Most law school selection systems ignore undergraduate major and use first year (essay) grades to develop the prediction system. Thus, they may be screening out a group of applicants who might do especially well on the MBE portion of the bar examination. Law school counselors also might use undergraduate major along with other measures in order to identify students who might need additional help in developing their writing skills.

Most of the differences in passing rates among categories are probably due to the general ability levels of the applicants in these categories. For instance, previous research has shown that the combination of law school admissions test (LSAT) scores and law school grade point average (LGPA) accounts for 50 percent of the variance in bar scores among applicants. In this study, undergraduate major by itself accounted for only 1 percent of the variance. It also is unlikely that the amount of variance accounted for would be significantly increased by adding undergraduate major to a prediction system that already included LSAT and LGPA (because major category is probably already highly correlated with LSAT and LGPA).


SUMMARY

This study investigated the relationship between undergraduate major and an applicant's sex and racial/ethnic group. The results indicated that among California applicants to the bar:

   o The choice of undergraduate major was related to an applicant's
     sex; males were more likely to have majored in business and hard
     science related fields whereas females were more likely to have
     majored in literary and social science fields.

   o Undergraduate major by itself accounted for about 1 percent of
     the variance in MBE, essay, and total GBX scores. There were no
     significant interactions among undergraduate major, sex, and
     racial/ethnic group in predicting any one of these three types of
     bar scores.

   o There was a significant interaction between undergraduate major,
     sex, and the type of bar score (essay versus MBE) being measured.
     This was due primarily to males who majored in the hard sciences
     scoring higher on the MBE than would be expected on the basis of
     their essay scores. This trend was not found for females.

SOURCES OF VARIATION IN PASSING RATES
ON CALIFORNIA BAR EXAMINATIONS

Stephen P. Klein, Ph.D.
July 25, 1983

The analyses presented in this report were conducted to investigate
possible sources of the generally declining passing rate on the California
Bar exam. The data presented in this report are an updated version of
those presented in a study of the 1976 to 1980 exams.

The first portion of the report summarizes the procedures used to determine
whether the variation in passing rate was due to changes in the exam's
difficulty (standard for passing) versus changes in the average ability
level of those taking it. The remaining sections discuss the results of
these analyses relative to other data about the applicant pool.

The statistics presented in the attached tables differ slightly from those
reported by the State Bar of California because the data in the tables are
based on just the applicants who sat for both the essay and MBE portions of
the exam.


PROCEDURES

The following procedures were used to construct a Difficulty Index (DI) for
each exam given between February 1976 and 1983:

1) Identify the sample of applicants who took both the essay and MBE
   portions of the exam. Run all analyses, including the computation
   of average scores, on this sample.

2) Convert California's MBE scores to the same units of measurement
   as used by National Conference of Bar Examiners for reporting MBE
   scale scores. Note that NCBE scale scores are adjusted for the
   difficulty of the MBE questions asked on one administration
   relative to those asked on other administrations. Thus, a scale
   score on one administration indicates the same performance level
   as that same score on another administration regardless of any
   differences between administrations in the average difficulty of
   their questions.

3) Compute an essay score for each applicant by obtaining his/her
   average score on an essay answer across all the answers graded for
   that applicant (including those read twice) and then multiply this
   score by 9 (the number of essay questions on the exam).

4) Convert the essay scores to a distribution having the same mean
   and standard deviation as the applicants' NCBE/MBE scale scores.
   This step converts essay raw scores to scale scores in order to
   adjust for any variations in the difficulty of the essay section
   across administrations. It does not change an applicant's
   relative standing on the on essay.

5) Compute each applicant's Total Adjusted Score as follows: Total
   Adjusted Score = (.4)(MBE Scale Score) + (.6)(Essay Scale Score)

6) Inspect the distribution of Total Adjusted Scores to determine the
score that would pass the same percentage of applicants as actually
passed, including those who passed by reappraisal. This score is
the exam's DI. The higher the DI, the more difficult the exam.

RESULTS

Tables 1 and 2 show that prior to 1981, the February exams tended to be
slightly easier to pass than the July exams even though February's passing
rate was much lower than July's rate. Since 1981, the February DI (142-
143) has been about the same as the July DI. Thus, the recent decline in
the percent passing the February exam is attributable mainly to a drop in
the average performance level of those taking it rather than to an increase
in standards. The July decline in passing rate is almost entirely due to a
decline in average performance level. The increased time limits on some of
the February and July 1982 essay questions apparently did not affect the
passing standards on these two exams.

Tables 3 and 4 show that the declines in passing percentage generally
parallel drops in the percent of first timers and ABA graduates taking the
examination. The average NCBE/MBE scale scores of February but not July
ABA graduates also has been declining. Average MBE scores and passing
rates of July ABA first timers have remained relatively stable.

Most applicants who failed the exam did so because of low essay scores or
low scores on both the essay and the MBE. Less than 4% of those taking the
exam failed the MBE but passed the essay (see Tables 5 and 6). The percent
passing the MBE was 22.4% higher than the percent passing the essay on the
July 1982 exam and 20% higher on the February 1983 exam. Thus, the passing
rate in California would have been much lower than what was obtained had
pass/fail status been based solely on the essay portion of the exam.

The decline in California's average February MBE scores since 1979 has not
been paralleled by a decline in average MBE scores in other states (see
Tables 7 and 8). For instance, the NonCalifornia February average has
remained at about 134 even though the California average slipped from its
1977-1979 average of 139 to a 136 in 1983.

DISCUSSION AND CONCLUSIONS

The decline in July's passing rate is not due to an increase in standards
whereas February's decline is due partly to a slight increase in standards.
As a result of this increase, the February standard is now comparable to
the July standard.

A large portion of the February decline and all of the July drop are highly
related to a decrease in the percentage of first timers and ABA graduates
taking the exam. The February but not the July decline appears to be
exacerbated by a drop in the average MBE scores of ABA graduates; even the
typically more able applicant is now performing less well in February.

Possible explanations for the declining passing rate include changes in:
law school admissions policies, testing practices, educational programs,
academic standards; applicant study habits or motivation; the effectiveness
of bar review courses; or a combination of these and other nonexam factors.

Table 1

DIFFICULTY INDEXES FOR FEBRUARY EXAMS

| Year | Number of applicants | Percent passing | Difficulty Index (DI) |
|------|------|------|------|
| 1976 | 3088 | 38 | 141 |
| 1977 | 3399 | 44 | 141 |
| 1979 | 4166 | 45 | 141 |
| 1980 | 3758 | 34 | 141 |
| 1981 | 3837 | 33 | 142 |
| 1982 | 4033 | 31 | 143 |
| 1983 | 4200 | 28 | 142 |

Table 2

DIFFICULTY INDEXES FOR JULY EXAMS

| Year | Number of applicants | Percent passing | Difficulty Index (DI) |
|------|------|------|------|
| 1976 | 6709 | 60 | 143 |
| 1977 | 7191 | 55 | 142 |
| 1978 | 6835 | 55 | 142 |
| 1979 | 7152 | 55 | 142 |
| 1980 | 7379 | 49 | 142 |
| 1981 | 7060 | 50 | 142 |
| 1982 | 7038 | 49 | 143 |

The higher the DI, the harder the exam was to pass.  Variation in essay grading standards is the primary source of any variation in DI's across administrations of the California Bar Exam.  The DI is not affected by possible variations in the difficulty of MBE or essay questions from one exam to the next.  The DI does not correspond to the number of MBE items an applicant needs to answer correctly in order to pass.

Table 3

SUMMARY STATISTICS FOR FEBRUARY TESTS

| | | All Applicants | | | | ABA Graduates | | |
|------|-----------------|-----------|------------------|-------------|-----|-----------------|------------------|-------------|
| Year | Total Number | % pass | % 1st timers | Mean MBE | DI | % of total | % 1st timers | Mean MBE |
| 1976 | 3088 | 38 | 38 | 137 | 141 | 49 | 16 | 144 |
| 1977 | 3399 | 44 | 35 | 139 | 141 | 43 | 14 | 146 |
| 1979 | 4166 | 45 | 32 | 139 | 141 | 43 | 13 | 146 |
| 1980 | 3758 | 34 | 36 | 136 | 141 | 42 | 14 | 145 |
| 1981 | 3837 | 33 | 34 | 138 | 142 | 41 | 13 | 146 |
| 1982 | 4033 | 31 | 32 | 137 | 143 | 40 | 11 | 143 |
| 1983 | 4200 | 28 | 30 | 136 | 142 | 39 | 10 | 140 |

Mean MBE = (Average California MBE score)/(3.0); percentages
are percentage of the total number of all applicants.


Table 4

SUMMARY STATISTICS FOR JULY TESTS

| | | All Applicants | | | | ABA Graduates | | |
|------|-----------------|-----------|------------------|-------------|-----|-----------------|------------------|-------------|
| Year | Total Number | % pass | % 1st timers | Mean MBE | DI | % of total | % 1st timers | Mean MBE |
| 1976 | 6709 | 60 | 77 | 145 | 143 | 64 | 54 | 152 |
| 1977 | 7191 | 55 | 77 | 143 | 142 | 61 | 52 | 150 |
| 1978 | 6835 | 55 | 80 | 145 | 142 | 62 | 55 | 151 |
| 1979 | 7152 | 55 | 74 | 144 | 142 | 62 | 53 | 150 |
| 1980 | 7379 | 49 | 69 | 141 | 142 | 62 | 50 | 148 |
| 1981 | 7080 | 50 | 68 | 142 | 142 | 55 | 45 | 149 |
| 1982 | 7038 | 49 | 66 | 142 | 143 | 55 | 44 | 149 |

Mean MBE = (Average California MBE score)/(3.0); percentages
are percentage of the total number of all applicants.

Table 5

PERCENTAGE OF APPLICANTS IN EACH PASS/FAIL
CATEGORY ON THE JULY 1982 EXAMINATION

Essay

|       |      | Fail | Pass | Total |
|-------|------|------|------|-------|
| M     | Fail | 38.1 | 3.5  | 41.6  |
| B     |      |      |      |       |
| E     | Pass | 25.9 | 32.5 | 58.4  |
|       | Total| 64.0 | 36.0 | 100.0 |

Table 6

PERCENTAGE OF APPLICANTS IN EACH PASS/FAIL
CATEGORY ON THE FEBRUARY 1983 EXAMINATION

Essay

|       |      | Fail | Pass | Total |
|-------|------|------|------|-------|
| M     | Fail | 55.5 | 3.5  | 60.0  |
| B     |      |      |      |       |
| E     | Pass | 24.5 | 16.5 | 40.0  |
|       | Total| 80.0 | 20.0 | 100.0 |

- 6 -

Table 7

NATIONAL AVERAGE MBE SCORE AND THE NUMBER OF
EXAMINEES TAKING THE MBE FROM 1975 TO 1983

| | Average MBE | | No. of Examinees | |
| Year | Feb | Jul | Feb | Jul |
|------|------|------|-------|-------|
| 1975 | 136.0 | 143.5 | 10,963 | 24,835 |
| 1976 | 134.5 | 142.4 | 12,610 | 28,381 |
| 1977 | 135.3 | 140.7 | 13,738 | 28,608 |
| 1978 | 135.5 | 141.4 | 13,715 | 29,171 |
| 1979 | 135.4 | 141.0 | 15,341 | 34,818 |
| 1980 | 134.3 | 140.6 | 16,948 | 36,368 |
| 1981 | 135.8 | 140.8 | 17,289 | 36,846 |
| 1982 | 134.8 | 139.7 | 18,150 | 36,995 |
| 1983 | 134.2 | | 17,964 | |

Table 8

CALIFORNIA AND NONCALIFORNIA AVERAGE MBE SCORES

| | February | | July | |
| Year | CA | NonCA | CA | NonCA |
|------|-----|-------|-----|-------|
| 1976 | 137 | 134 | 145 | 142 |
| 1977 | 139 | 134 | 143 | 140 |
| 1978 | 139 | 134 | 145 | 141 |
| 1979 | 139 | 134 | 144 | 140 |
| 1980 | 136 | 134 | 141 | 140 |
| 1981 | 138 | 134 | 142 | 141 |
| 1982 | 137 | 134 | 142 | 140 |
| 1983 | 136 | 134 | | |

PR-87-2

# MINORITY GROUP PERFORMANCE ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

December 3, 1987

## EXECUTIVE SUMMARY

There are large differences in passing rates among racial/ethnic groups
on the bar exam.  The passing rate of white first time takers is usually
about twice as high as the rate of black first timers.  Over 90 percent
of the whites would pass if the standard for passing was lowered to a
point that would result in 50 percent of the blacks passing.  The Asian
applicant pass rate is slightly below the white rate and the Latino rate
is between the Asian and black rates.

Over 50,000 applicants passed the California exam in the ten-year period
between 1977 and 1986.  Ten percent of these lawyers were members of a
minority group.  Minority group members make up about 14 percent of all
first timers.  Thus, there is about 4 percent difference between the
minority applicant share of the examinee population and their
representation in the group that is eventually licensed to practice.

During the past 10 years, the Committee of Bar Examiners has examined
several possible sources of the differences in passing rates among
racial/etnic groups.  This research has shown that bar exam scores are
closely related to an applicant's academic ability as indicated by that
applicant's law school grades and admission test scores.  In fact, the
combination of academic ability and law school attended can explain
virtually all of the differences in passing rates among groups.  For
instance, when used together, these factors can predict an applicant's
pass/fail status with 80 percent accuracy.

Adding race to this set of predictors does not improve accuracy by even
one percent.  And, racial/ethnic group, by itself, is only a very weak
predictor of whether an applicant will pass because a significant
percentage of minority applicants earn higher bar scores than many of
their white classmates.

- ii -

Research also has shown that:

o A larger percentage of minority than white applicants graduate
from the most selective schools in the state and a larger
percentage of minority than white applicants graduate from
American Bar Association (AB) approved schools.  Thus,
relatively low minority passing rates do not stem from minority
applicants being denied access to the better schools.

o Minority and white readers agree with each other on the
grades that should be assigned to essay answers written by
both minority and white applicants.  Thus, the reader's race
does not affect the score assigned.

o Substantially increasing the time applicants are given to
answer multiple choice and essay questions does not narrow
the differences in average scores among racial/ethnic groups.

o Differences among racial/ethnic groups are just as large on
the MBE (multiple choice) section as they are on the essay
and Performance Test sections of the exam.  The same result
was obtained with an experimental oral version of the exam.

o The differences among groups are essentially the same across
all the subject matter areas covered by the exam.

o Differences in performance level between white and minority
students are not due to some general skill in taking multiple
choice or essay tests.  This was demonstrated by a study that
showed that minority and white students earned equally low
scores on the bar exam when they took it during their first
few weeks of law school.

- iii -

o Rule changes governing the exam have not differentially
affected minority passing rates. These rule changes include:
(1) no longer allowing applicants some choice in which essay
questions they answer, (2) discontinuing the bifurcation rule
that allowed applicants to pass by passing one part of the
exam on one administration and another part on a subsequent
administration, and (3) converting the written scores to the
same score distribution as the applicants' MBE scores.

The eventual passing rate (i.e., the percentage who pass after several
attempts) is much higher than the initial rate. Although this is true
for all groups, it is especially true for minority applicants. For
instance, about two-thirds of the minority applicants from ABA schools
eventually pass. However, there is no first attempt bar exam score that
distinguishes well between those who will and will not eventually pass.

An analysis of Law School Admission Test (LSAT) scores at ABA schools
suggests that most black and Latino applicants would not have been
accepted at their school were it not for special admissions programs.
In other words, their LSAT scores are almost always well below those of
their white classmates. And, the LSAT is a good predictor of law school
grades (and bar scores) for both white and minority students.

The minority applicants' lower average LSAT scores and thereby predicted
law school grades probably reflects an educational disadvantage that
accumulated over the 20+ years prior to admission. This disadvantage is
not eliminated during law school as evidence by the large difference in
average law school grades between white and minority students. However,
most minority applicants do eventually pass. Thus, they may simply need
more time to prepare for the exam than their white classmates. It also
appears that special admissions programs are effective in that they
bring into law schools many minority students who do not meet their
school's normal selection standards, but who nevertheless ultimately
become licensed to practice.

PR-87-2

MINORITY GROUP PERFORMANCE ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
Roger Bolus, Ph.D.

During the past 10 years, the Committee of Bar Examiners has examined several possible sources of the differences in passing rates among racial/ethnic groups on the California Bar Exam. This report summarizes the results of that research.

Part 1 of the report presents data on the size of the disparities in bar passing rates and scores among four groups: whites, Asians, Latinos, and blacks. Part 2 describes the results of studies that have sought to identify the sources of these differences. Part 3 shows how the disparities in bar scores among groups are associated with differences in their law school grades and admissions test scores. Part 4 contrasts a group's initial with its eventual passing rate. The last section summarizes these findings and discusses their implications. The reference section lists all the studies that report racial/ethnic data.

The following abbreviations are used throughout:

    ABA  = American Bar Association
    LSAT = Law School Admissions Test
    LGPA = Law school grade point average
    MBE  = Multistate Bar Examination (200 multiple choice questions)
    PT   = Performance Test of clinical legal skills

From 1977 to 1983, the California exam consisted of the MBE and from 9 to 15 essay questions. In July 1983, the exam was changed to its present structure of the MBE, six essay questions, and a two-problem PT. Six hours (1 day) is currently devoted to each of these three sections.

## DIFFERENCES AMONG GROUPS

In 1977, the Committee of Bar Examiners began collecting data on the racial/ethnic composition of the applicants to the bar. These data were gathered by means of a mailed questionnaire that applicants were asked to complete and return to the Committee before they took the exam. The questionnaire asked applicants to indicate the racial/ethnic group to which they belonged; and, they were given assurance that their answers would be used solely for research purposes.

Figure 1 shows the passing rate of July first time takers from California law schools that are accredited by the ABA. These data indicate relatively large and consistent differences among groups over time. Moreover, all groups show a general decline in passing rates since 1980.

Fluctuations in passing rates over time are most likely due to variations in the difficulty of the exam from one year to the next and to changes in the average ability level of the applicants taking the exam. In addition, on a given exam, there is often less than 200 California ABA first timers in any one minority group. Thus, some of the variation also may be due to chance.

The differences in passing rates among groups is mirrored in their total bar exam scores. Figure 2 presents data about the performance of all July 1984 first timers (i.e., regardless of the type of school from which they graduated). There are four arrays of data in this figure, one for each racial group. Each array has five vertical bars. Reading from left to right, these vertical bars correspond to the 10th, 25th, 50th (with an asterisk), 75th, and 90th percentile points in the distribution of scores. For instance, 50 percent of the blacks and 90 percent of the whites had total scores of 1160 or higher.

A score of 1260 or higher was required for passing the July 1984 exam. An inspection of Figure 2 reveals that minority applicants were not clustered just beneath the passing score. In fact, the passing score would have to be lowered by 100 points to produce a 50 percent passing

- 3 -

rate among blacks.  Such a decrease would result in about 90 percent of
the whites passing.  Because of the large differences in the number of
applicants in each racial group, lowering the passing score will result
in far more white than Latino or black applicants passing the exam.

Figure 2 also shows that several minority applicants earn much higher
bar exam scores than some white applicants.  For example, the top 10
percent of the blacks had higher scores than 50 percent of the whites.
And, the top 10 percent of the Asians did as well as the top 25 percent
of the whites.  Because of this overlap, racial/ethnic group is only a
weak predictor of total bar exam scores (e.g., these scores can be
predicted six times more accurately with LGPA than with applicant race).

## SOURCE OF DISPARITIES STUDIES

Several studies have examined whether the differences in passing rates
and average scores among racial/ethnic groups can be explained by a
variety of factors, such as the exam's time limits and content coverage.
This section summarizes the results of that research.

### Type of Law School

A study of the July 1977 exam revealed that minority group first timers
are more likely than white first timers to come from the more
prestigious law schools in the state.  For instance, 30 percent of the
whites, but less than 20 percent of the minority applicants graduated
from a non-ABA approved law school.  Of those who did graduate from an
ABA school, minority applicants were much more likely to come from the
most selective schools (as indicated by the average LSAT scores of their
graduates).  For instance, only 23 percent of the whites graduated from
the top five schools compared to 44 percent of the Asians, 38 percent of
the Latinos, and 48 percent of the blacks.

An analysis of the July 1984 data revealed the same pattern.  This
analysis classified the 33 schools with at least 18 applicants into
three groups on the basis of the average LSAT scores of their white

graduates who took the bar exam for the first time.  Figure 3 shows that over 50 percent of the minority applicants, but only 31 percent of the whites, graduated from the most selective schools.

There is an almost perfect relationship between a school's mean LSAT score and its bar exam passing rate.  The higher the average LSAT score, the higher the passing rate.  Thus, the relatively low passing rates of minority applicants does not stem from their being denied access to what are generally considered to be the better law schools and the ones that have the highest overall passing rates.


Test Taking Ability

It has been hypothesized that whites tend to do better on exams than nonwhites because they are just better at taking tests.  In other words, whites earn higher bar exam scores because they are supposedly better test takers rather than their actually attaining a greater mastery of the legal skills and knowledge that are tested.

This hypothesis was examined by administering the bar exam to novice law students at four ABA approved schools.  These students took various portions of the July 1985 exam within a few weeks of their starting law school.  And, their answers were graded along with those of all of the regular applicants (and in way that prevented the readers from knowing which answers were written by the novices).

This study indicated that: (1) white and nonwhite novices earned equally low scores on all three sections of the bar exam (MBE, PT, and Essay), (2) white novices tended to have higher LSAT scores than nonwhite novices, and (3) there was almost no correlation between LSAT and bar exam scores among novices, but a strong correlation between these measures among graduates.  Taken together, these findings suggest that some general skill in taking tests is not the source of differences between racial groups on the bar exam.  They also show that the LSAT predicts bar exam scores only after the applicant has had the benefit of a legal education.

Reader Characteristics

In the early 1970's, it was suggested that low minority passing rates stemmed in part from almost all of the essay readers being white. It was hypothesized that minority applicants were not receiving the grades they deserved because the way they answered a question was qualitatively different (not better or worse) than the way in which whites organized and explained the same information.

This hypothesis was tested by having white, black, and Latino lawyers grade the answers written by white, black, and Latino applicants to two essay questions on the July 1974 exam. The readers in this study only saw the question and the answer. They did not know the race of the person who wrote the answer or the grade assigned to it by the state bar's regular reader. The special readers also could use whatever grading criteria they felt were appropriate.

On both questions, there was no systematic relationship between an applicant's and a reader's race. In other words, white, black, and Latino readers rank ordered the quality of the answers in about the same way. White readers did not give the answers written by white applicants any higher grades than did the black or Latino readers. And, the readers who belonged to the same race agreed with each other regarding the relative quality of the answers to the same degree that they agreed with the readers who belonged to a different race.

These findings suggest that the score on an essay answer is not affected by whether the race of the reader who graded it is the same or different than the race of the applicant who wrote it. The Committee of Bar Examiners has nevertheless adopted the practice of insuring minority representation on the team of readers assigned to each essay question and PT problem.

- 6 -

Time Limits

Two experiments that were conducted in conjunction with the July 1980 examination show that differences in passing rates among groups do not stem from the exam's time limits.

In the Essay Time Limits Study, one group of applicants was given 55 minutes to answer a typical bar exam essay question and then 90 minutes to answer a different question. A second group was given the same sequence of time limits, but the opposite order of questions. Thus, both questions were answered under both time limits.

Applicants were assigned randomly to groups. All the answers to a question were merged into one batch so that readers did not know the time limit under which an answer was written. The answers were then graded in the normal manner; e.g., points were assigned in 5-point intervals on a 0 to 100-point scale. These procedures were replicated several times with different groups so that we could measure the effect of time limits on four separate questions.

Applicants who had 90 minutes to answer a question earned an average of four more points on that question than did those who had only 55 minutes to answer it. However, one third of the applicants received a higher score on the 55-minute than on the 90-minute question. Further analyses revealed that the amount an applicant benefited from the extra time was not related to race. In other words, minority applicants did not gain any more points on the average than did white applicants as a result of having an extra 35 minutes to answer. The size of the benefit derived from the extra time also was unrelated to an applicant's assessment of the adequacy of the essay test's time limits.

The same type of study was conducted with the MBE. Some applicants had 55 minutes whereas others had 90 minutes to answer the same set of 30 MBE items. And, the experiment was replicated with a second set of 30 items so that each applicant answered one set under the 55 minute time limit and another set under the 90 minute limit.

The results of the MBE Time Limits Study were consistent with those from the Essay Time Limits Study. There was a slight increase in average score as a result of the extra time (0.87 points per 30 items), some applicants scored higher under the shorter time limit than under the longer one, and there was no relationship between an applicant's race (or attitude regarding the adequacy of the MBE's time limits) and how much that applicant benefited from the extra time.

It is evident from these two studies that even a substantial increase in the time applicants are given to answer examination questions would not reduce the differences in scores and passing rates among racial groups.

<u>Test Format</u>

Minority applicants do about as well on one section of the exam (MBE, Essay, or PT) as they do on any other section. In other words, once differences in the overall difficulty and reliability of the sections are controlled, a minority group's average score on one section is about the same as it is on any other section.

Figure 4 illustrates this pattern by showing where the median July 1984 minority applicant falls in the distribution of white applicant scores. For instance, the average MBE score among Latino applicants is at the 25th percentile in the distribution of white applicant MBE scores.

Figure 4 also shows that the gap between white and minority applicants tends to be slightly greater on the MBE than on the other sections. Analyses of previous and subsequent exams show the same trend. This small, but consistent deviation is most likely due to the MBE's greater reliability (differences in average scores between groups automatically get smaller as the reliability of the test decreases...there would be no difference between groups if the scores were based solely on chance).

The Committee also explored what would happen to minority passing rates if the exam included oral and written problems that simulated closely the types of tasks lawyers are often required to perform or problems

that measured certain trial practice skills.  These studies found the
same general rank ordering of groups as in Figures 1 and 2.

The only exception to this trend is that on the oral tasks, blacks
earned about the same average score as Asians and Latinos (but still
well below the white average).  However, oral task scores were less
reliable (i.e., more subject to chance) than the written scores; and,
the more scores are affected by chance, the greater the likelihood that
different groups will receive the same average score.  Thus, the large
difference in passing rates between white and nonwhites would not be
reduced appreciably by adding reliably scored oral tasks to an exam that
already included the Essay and MBE.

It also is academic to consider the use of oral tasks on the California
bar exam because of costs and other considerations.  They compromise
test security, standardized administration procedures, and timely score
reporting.  In addition, they provide an opportunity for bias because
graders would observe an applicant's race, sex, age, and other
irrelevant characteristics.

Test Content

The differences among racial groups in total MBE score that are
illustrated in Figure 4 also are present in each of the six content
areas measured by this exam.  This trend is shown in Figure 5.  If
the questions in one content area tend to be relatively easier than in
another content area, then this difference is true for all groups.  No
one area is particularly difficult or easy for a given group.

Studies of the July 1974 and July 1980 MBE further indicated that none
of the questions on this test were especially difficult for one group.
If a question is relatively difficult for one group compared to its
average score, then it also is relatively difficult for another group
compared to its average.  And, within a given range of total MBE scores
(such as all applicants with scores between 135 and 145), there was no

difference among racial groups in their likelihood of answering a given question correctly.

Comparable analyses of essay questions yielded the same result. Thus, whatever is producing the disparities in passing rates between racial groups, its effect is felt equally across all the content areas that are tested.

Bar Exam Rules

The bar exam was changed in several ways during the past 10 years. We examined the possible effect of three of these changes on minority passing rates by comparing these rates before and after the changes were implemented. The three changes we investigated were: (1) elimination of optional questions, (2) introduction of the PT, and (3) adoption and later cancellation of the so called "bifurcation" rule.

Prior to the July 1980 exam, the Essay test consisted of three sections. Each section had five questions and an applicant was instructed to answer four of them. Thus, applicants could exercise some choice in which questions they chose to answer. As of the July 1980 exam, the Essay test was shortened to 9 questions and applicants were instructed to answer all of them. The time allocated to answer a question also was increased from 52 to 60 minutes.

Figure 1 shows that eliminating the optional questions had no adverse effect on performance. In fact, most groups performed better on the July 1980 exam than they did on any exam before or since even though this exam is the one on which the change presumably would have been felt the strongest. Figure 1 also shows there was no sudden or consistent decline in the passing rate corresponding to the introduction of the PT in July 1983. In most groups, the July 1983 passing rate was higher than it was a year later.

In April 1977, the Committee offered applicants two ways of passing the exam. One method involved achieving a combined MBE plus Essay score

- 10 -

that was above the pass/fail line for the total exam.  The other method
involved passing the Essay on one test date and the MBE on a different
administration.  Applicants could pass the exam by means of the latter
method beginning with the February 1978 exam.

For a variety of reasons, this so called "bifurcation" rule did not
produce a general increase in passing rates.  This situation and other
administrative considerations led to its discontinuation in July 1983.
However, applicants who passed only one part of the exams given between
February 1982 and February 1983 could still use the rule through July
1984.

Because repeaters are the only applicants whose pass/fail status could
be affected by the bifurcation rule, we examined their success rate on
the exams before this rule took effect (2/77 through 7/77), while it was
operative (2/78 through 7/84), and after it was fully rescinded (2/85
through 7/86).  Figure 6 shows that repeaters in all four racial groups
had a slightly _higher_ passing rate before the rule was implemented
than when it was in force.  Blacks were the only group whose passing
rate fell by more than one percentage point after the rule was
eliminated.

In short, neither the bifurcation rule nor the other changes discussed
above had any appreciable effect on the large differences in passing
rates between racial groups.  These differences were present before and
after the changes were made.


ACADEMIC ABILITY

Bar exam scores are closely related to an applicant's academic ability
as measured by that applicant's law school grades and admission scores.
And, differences in academic ability between racial groups can explain
essentially all of the differences in their average bar exam scores and
passing rates.

This pattern of results was demonstrated in a study of the July 1977 exam. That study found no systematic relationship between race and bar exam scores after an an applicant's law school grades, admission test scores, and law school were accounted for. This finding held for both the MBE and Essay sections of the exam as well as the total score.

Our analysis July 1984 data shows the same pattern of results. In this analysis, we compared how well various sets of variables, such as LGPA and LSAT, were able to predict an applicant's pass/fail status. We then examined whether adding applicant race to the prediction system improved out ability to forecast an applicant's bar scores. If it did, then it would suggest that race was influencing these scores.

For the purposes of this analysis, "passing" a section was defined as earning a score that was 70 percent of the maximum possible score on that section. We defined the effect of "school" as the degree to which the applicants at a school (as a group) tended to do better or worse on the exam than would be predicted on the basis of their average LSAT score. Graduates of the same school therefore received the same "score" on the school variable. And, in order to combine data across schools, we converted the LGPAs at a school to a score distribution that had the same mean and standard deviation as that school's LSAT scores.

Table 1 shows that applicant race had little or no impact on predictive accuracy once we controlled for LGPA, LSAT score, and school. This was true on each section and the exam as a whole. For instance, we predicted correctly the pass/fail status on the entire exam of 79.1 percent of the applicants on the basis their LGPAs alone. Adding LSAT to the prediction system increased accuracy by 0.4 percent and adding school increased it another 0.5 percent. Once these variables were accounted for, adding race did not increase predictive accuracy.

These results are consistent with those obtained in a comparison of white and Latino graduates from the University of New Mexico law school on that state's bar exam. LGPA's at this school were highly correlated with bar exam scores, and once there was a control for LGPA and LSAT,

- 12 -

including applicant race in the prediction equation increased the
accuracy of forecasting pass/fail status by less than 2 percent.

The close relationship between LGPA, race, and bar exam success rates
are illustrated in Figure 7.  This figure presents the data for two
highly respected ABA schools in California that had relatively large
numbers of minority group applicants taking the July 1984 exam.  The
data for each group are presented in the same form as was used in Figure
2; i.e., the left hand vertical bar corresponds to the 10th percentile
in the group, the next bar corresponds to the 25th percentile, etc.
The number in the box shows the percentage of applicants in the group
who passed the exam.

Two important findings are evident in this figure.  At both schools, the
grades of 75 percent of the black and Latino applicants place them in
the bottom quarter of their class; and, 50 percent of these applicants
are in the bottom 15 percent.  Secondly, the rank ordering of the groups
in terms of passing rate is generally consistent with their LGPAs.  This
latter finding is illustrated clearly in Table 2.  This table presents
data on all July first timers and shows that in each racial group, there
is a close association between academic ability and bar exam success
rate.  The higher the ability level, the higher the passing rate.


EVENTUAL SUCCESS RATE

Over 50,000 applicants passed the California exam in the ten-year period
between 1977 and 1986.  Table 3 shows that one in ten of these lawyers
is a member of a minority group.  This rate was obtained in every year
studied.  Minority group members make up about 14 percent of all first
timers.  Thus, there is about 4 percent difference between their share
of the examinee population and their representation in the population of
those licensed to practice.

Eventual passing rates (i.e., the percentage who pass after several
attempts) among minority applicants are much higher than their initial
rates.  Table 4 illustrates this finding with applicants who took the

- 13 -

exam for the first time in 1977, 1981, 1982, or 1984.  For instance, 39
percent of the Latinos passed on their first attempt and 29 percent
passed after one or more subsequent attempts.  Thus, Hispanics had an
eventual passing rate of 66 percent.

Another 8 percent of the Latinos failed on their first attempt and did
not repeat the exam.  However, their LGPAs and LSAT scores suggested
that the Latino eventual passing rate would have risen another 2 or 3
percent if this 8 percent had tried a few more times.  A similar
increase in eventual passing rates probably would be obtained in the
other minority groups if their nonrepeating initial fails had made more
than just one attempt to pass.

In recent years, about two-thirds of all the minority applicants from
ABA schools eventually pass the exam.  And, while there is a moderate
correlation between initial score and eventual pass/fail status, there
is no initial score that clearly differentiates between those who do
and do not eventually pass.


SUMMARY AND CONCLUSIONS

This report summarizes ten years of research on the performance of
Asians, blacks, Latinos, and whites on the California bar exam.  These
studies indicate there are very large and consistent differences among
these groups in both passing rates and bar exam scores.

These differences are similar to those observed among law schools.  For
instance, Figure 8 shows the passing rate at one ABA school is more
than double the rate at another ABA school.  These differences probably
stem from some schools attracting more able students than others.
Differences in passing rates among racial groups also appear to be due
to differences in the average academic ability levels of these groups.

However, several studies have examined whether there are other
empirically supported explanations for the observed disparities.  These
studies have found that the differences do not stem from the type of law

school attended.  In fact, minority applicants are more likely to have
graduated from the most prestigious law schools (as indicated by the
average LSAT scores of their graduates) than are white applicants.

Research also has shown that the differences in passing rates among
groups are not related to some general or abstract ability to take
tests; the racial composition of the readers who grade the answers; the
time limits imposed; the test formats used (multiple choice, essay, or
PT); the subject matter areas covered by the exam; whether applicants
are given some choice in which questions to answer; or whether they are
allowed to pass the exam in sections.

Differences in passing rates among groups do correspond closely with
differences in their law school grades and admission scores which in
turn are highly related to bar exam scores.  In other words, minority
applicants tend to have lower LGPAs and LSAT scores than their white
classmates.  For instance, at two California ABA law schools with large
minority enrollments, 75 percent of the black and Latino applicants had
grades that placed them in the bottom quarter of their class.

The differences in bar passage rates among groups disappear once we
control for LGPA, LSAT, and the general effect of the applicant's
school.  This finding was illustrated on the July 1984 exam where these
three variables predicted overall bar success rate with 80 percent
accuracy.  Adding race to the prediction system did not increase
accuracy by even one tenth of one percent.

Large differences in passing rates among racial groups are deceptive.
They hide the fact many minority applicants earn higher bar exam scores
than their white classmates, that over 5,000 minority applicants passed
the California exam in the last 10 years, and that one person in ten who
passes this exam is a racial/ethnic minority group member.  Moreover,
most minority applicants eventually pass the exam and two out of three
of the ABA minority first timers eventually pass.

These are important and encouraging statistics for those minority
applicants who do not pass on their first or second attempt.   We also

- 15 -

know that applicants who come close to passing but fail on their first
attempt are likely to succeed after one or more subsequent tries.

This situation has led some to suggest that the gap between minority and
white passing rates would be narrowed by simply lowering slightly the
score required for passing.  However, plots of score distributions show
that this strategy would not be effective because minority applicants
(and particularly blacks and Latinos) are not bunched just beneath the
pass/fail line whereas there is a large group of white applicants in
this zone.  And, there is no initial bar exam score that distinguishes
well between those who do and do not eventually pass.

A comparison of LSAT scores suggests that many if not most of the
successful black and Latino applicants would not have attended an ABA or
California accredited law school (let alone taken the bar exam) were it
not for special admissions programs.  In other words, their average LSAT
scores and undergraduate grades are well below those of their white
classmates.  The same pattern holds for their law school grades.

Given this situation, we should not expect a large percentage of
minority students to overcome an educational disadvantage in three years
of law school that accumulated over the 20+ years prior to law school.
Many minority applicants will simply need more time to prepare for the
exam than will white applicants.  However, a large number of minority
applicants do eventually pass.  Thus, special admissions programs are
bringing into law schools many minority students who do not meet normal
admissions standards, but who nevertheless do get licensed to practice.

REFERENCES

The reports listed below were prepared by the authors.  The Committee
of Bar Examiners and the authors also prepare summary reports on each
exam that contain data about the performance of racial groups.

An investigation of possible item and grader biases in a state bar
examination.  Paper presented at the meetings of the Western
Psychological Association, Los Angeles, California, April 9, 1976.

An analysis of possible sex and racial/ethnic biases in the July, 1976
California State Bar Examination (1978).

An analysis of the relationships between bar examination scores and an
applicant's law school, admissions test scores, grades, sex, and
racial/ethnic group (1979).  Summary reprinted in The Bar Examiner,
1980, 49, 14-18.

An analysis of possible variations in pass/fail standards on the
California Bar Examination (1981). (PR-81-1)

Testing research skills on the California Bar Examination (1981).
(PR-81-8)

The effect of time limits, item sequence, and question format on
applicant performance on the California Bar Examination (1981). (PR-81-7)

An analysis of the relationship between initial score and eventual
pass/fail status on the California Bar Examination (1982). (PR-81-9)

An evaluation of the Multistate Bar Examination.  National Conference of
Bar Examiners, Chicago (1982).

An analysis of the relationship between clinical legal skills and bar
examination results (1982). (PR-82-1)

An analysis of the relationship between trial practice skills and bar
examination results (1982). (PR-82-6)

An analysis of the Performance Test on the July 1983 California Bar
Examination (1984). (PR-84-2)

How the bifurcation rule affected the percent passing California's
General Bar Examination (1985). (PR-85-5)

The performance of novice law students and law school graduates on the
bar exam (1986). (PR-86-2)

A comparison of initial and eventual passing rates on the California Bar
Examination (1987) (PR-87-5).

List of Figures and Tables

Figure 1 - July first timer passing rates by race

Figure 2 - July 1984 score distributions by race

Figure 3 - Percent minority by level of school's mean white LSAT score

Figure 4 - Percentile of the median minority applicant in the
           distribution of white applicants

Figure 5 - Percentile of the median applicant by MBE content area

Figure 6 - Percent passing before, during, and after the bifurcation
           rule was in effect

Figure 7 - LGPA distributions and percent passing by race at two schools

Figure 8 - Schools consistency differ in passing rate


Table 1 - Accuracy in predicting July 1984 pass/fail status

Table 2 - Percent passing by quartile of academic ability

Table 3 - Racial/ethnic composition of passing applicants

Table 4 - Eventual passing rates by racial/ethnic group



JULY PASSING RATES FOR FIRST TIME TAKERS FROM CALIFORNIA ABA SCHOOLS



MINORITY FIRST TIMERS EARN MUCH LOWER
TOTAL SCORES THAN WHITE FIRST TIMERS



# MINORITY APPLICANTS ARE MORE LIKELY TO GRADUATE FROM THE MORE SELECTIVE SCHOOLS THAN WHITE APPLICANTS

Percent of first time takers in each group

| | White | Asian | Latino | Black |
|---|---|---|---|---|
| High | 30.6 | 56.4 | 50.0 | 60.4 |
| Medium | 52.0 | 30.2 | 34.5 | 25.3 |
| Low | 17.3 | 13.4 | 15.5 | 14.3 |

Percent of July 1984 first timers from schools with high, medium, and low average white LSAT scores



SIMILAR DIFFERENCES AMONG GROUPS ACROSS TEST TYPES



DIFFERENCES AMONG GROUPS ARE CONSISTENT ACROSS MBE SUBJECT MATTER AREAS





# LAW SCHOOL GRADES AND JULY 1984 FIRST TIMER PASSING RATES

## School A

White = 77%
Asian = 53%
Latino = 23%
Black = 19%

Percentile of Law School Grade Point Average

## School B

White = 78%
Asian = 44%
Latino = 29%
Black = 9%

Percentile of Law School Grade Point Average



LARGE DIFFERENCES IN PASSING RATES AMONG ABA SCHOOLS

# ADDING RACE DOES NOT IMPROVE THE PREDICTION OF PASS/FAIL STATES

| Predictors | Percent classified correctly | | | |
| --- | --- | --- | --- | --- |
| | MBE | Essay | PT | Total |
| LGPA | 74.9 | 75.5 | 69.5 | 79.1 |
| LGPA & LSAT | 75.8 | 75.5 | 70.0 | 79.5 |
| LGPA & LSAT & school | 75.9 | 76.5 | 71.1 | 80.0 |
| LGPA & LSAT & school & race | 75.9 | 76.8 | 71.6 | 80.0 |

# JULY 1984 FIRST TIMERS WITH SIMILAR LEVELS OF ACADEMIC ABILITY HAD SIMILAR PASSING RATES

| Relative standing on combined measure of academic ability | Percent Passing | | | |
| --- | --- | --- | --- | --- |
| | White | Asian | Latino | Black |
| Lowest 25% | 9 | 3 | 4 | 3 |
| Next 25% | 35 | 26 | 36 | 28 |
| Next 25% | 66 | 60 | 63 | * |
| Highest 25% | 92 | 89 | * | * |

Combined measure of academic ability = LGPA + LSAT

*Not enough applicants to obtain a reliable rate.

Table 3

RACIAL/ETHNIC COMPOSITION OF PASSING APPLICANTS

| Year | Number of applicants who passed | Percent from each group | | | | |
|------|------|------|------|------|------|------|
| | | White | Asian | Latino | Black | Other |
| 1977 | 5,341 | 91 | 2 | 3 | 2 | 1 |
| 1978 | 5,528 | 91 | 3 | 3 | 2 | 1 |
| 1979 | 6,210 | 90 | 3 | 3 | 3 | 1 |
| 1980 | 5,517 | 90 | 3 | 4 | 2 | 1 |
| 1981 | 5,112 | 90 | 3 | 3 | 3 | 1 |
| 1982 | 5,116 | 89 | 3 | 4 | 3 | 1 |
| 1983 | 5,105 | 89 | 4 | 4 | 2 | 1 |
| 1984 | 4,236 | 89 | 4 | 3 | 3 | 1 |
| 1985 | 4,997 | 89 | 4 | 4 | 2 | 1 |
| 1986 | 4,763 | 89 | 4 | 4 | 3 | 1 |
| Total | 51,928 | 89.7 | 3.2 | 3.5 | 2.5 | 1.1 |

## EVENTUAL PASSING RATES BY RACIAL/ETHNIC GROUP

| Group | White | Asian | Latino | Black |
|---|---|---|---|---|
| Passed on first try | 67 | 49 | 37 | 25 |
| Passed after >1 try | 17 | 24 | 29 | 23 |
| Eventual pass | 84 | 73 | 66 | 48 |
| Failed on only try | 5 | 9 | 8 | 13 |
| Failed after >1 try | 11 | 18 | 26 | 39 |
| Eventual fail | 16 | 27 | 34 | 52 |

Entries are the average percentages for four cohorts of July first time takers: 1977, 1981, 1982, and 1984.

TESTING RESEARCH SKILLS ON THE CALIFORNIA BAR EXAMINATION

A Report Submitted to the
Committee of Bar Examiners of the State Bar of California
and the National Conference of Bar Examiners

Prepared by

Stephen P. Klein
GANSK & ASSOCIATES

December 31, 1981

PREFACE

In 1979, the Committee of Bar Examiners (CBE) of the State Bar of California held a series of conferences with experts in legal education and testing. These meetings focused on identifying the kinds of skills that should and could be measured by a bar examination, especially those that were important in actual legal practice. It was apparent from these discussions that many of the skills and new assessment techniques that were considered warranted further investigation.

The National Conference of Bar Examiners (NCBE) concurred with this view and with their financial assistance, the CBE undertook the development and field testing of several new measures of lawyering skills (e.g., the ability to interview clients and the ability to represent them competently in legal proceedings). These tests were given in conjunction with the July 1980 administration of the California bar examination.

This report, which deals with the Research Test, is the first of a series of reports describing the results with the new measures. As its name implies, the Research Test assesses some of the skills that are required for carrying out legal research (such as the ability to determine whether existing case law can be used to support a client's case). One unique feature of this test is that examinees are given copies of the cases and statutes on which they are to base their answers; i.e., it is analogous to an open book examination.

Several other NCBE/CBE supported studies also were conducted in conjunction with the July 1980 administration of the California examination. These studies focused on a variety of issues associated with the current form of the examination, such as the degree to which scores on the multiple choice and essay portions of it are affected by the amount of time applicants are given to complete these sections. The results of these studies are presented in another report (Klein, 1981a).

SUMMARY

The July 1980 version of the California Bar Examination was divided into
two parts. One part, called the General Bar Examination (GBX), had two
sections; the Multistate Bar Examination (MBE) and the Essay Examination.
The MBE had 200 multiple choice questions and all the applicants partici-
pating in the research described in this report had MBE scores. The Essay
section had nine questions, however, because of California's multiphased
grading process, about 30 percent of the applicants had only three of their
essay answers graded.

The other part of the July 1980 examination was called the Special Session
(SS). The SS was optional; i.e., an applicant could choose not to take it
without jeopardizing his/her chances of passing the GBX. If an applicant
participated and did well in the SS, it could increase that applicant's
chances of passing. About 99 percent of the applicants who sat for the
complete GBX also took the SS.

Applicants were assigned randomly to one of the SS's four sections. Since
these sections were administered concurrently, a given applicant could take
only one of them. This report describes one of the SS's four sections,
namely the Research Test, and presents the results obtained with this test.

The Research Test was designed to measure an applicant's legal research
skills. Three forms of the test were developed, however, a given applicant
took only one of them. Each form had two parts, A and B. Part A required
the applicant to evaluate on a five point scale the degree to which each of
several cases supported various legal propositions that were relevant to a
client's case. Part B asked the applicant to use the information from Part
A and other materials, such as relevant and irrelevant statutes, in order
to prepare a memorandum about several facets of a client's case, such as
its strengths and weaknesses. Since applicants were given copies of all
the cases to be evaluated, the test emphasized analytic skills rather than
legal knowledge. Each applicant was given 195 minutes to complete the test.

Results indicated that the ratings the applicants made in Part A and the
scores that were assigned to the memoranda they wrote in Part B provided
reliable indices of their performance levels. The correlation between the
Part A and B scores was about the same as that obtained between two
questions on the Essay section of the GBX. The Part A scores correlated
slightly higher with the scores on the MBE than with scores on the Essay
portion of the GBX while the reverse was true for the Part B scores. Total
scores on the Research Test correlated with total GBX scores only slightly
less well than the MBE and Essay scores correlated with each other.

The Research Test did not widen or narrow the gap in performance levels
between racial groups that is present on the GBX. Similarly, repeater
status, type of law school from which the applicant graduated, and most
other background characteristics were just as highly correlated with
Research Test scores as they were with scores on the GBX. For example,
applicants who had worked as law clerks and received pay for doing legal
research prior to taking the Research Test tended to have higher scores on
this test (and on the GBX) than applicants who did not have this training.
These findings do not necessarily mean that such experience caused the
higher test scores in that the applicants who are selected for these jobs
also may be the ones with higher than average law school grades.

Questionnaire data indicated that applicants thought the Essay and MBE
portions of the GBX were better measures of their legal knowledge than was
the Research Test.  However, they thought the Research Test was a better
measure of their ability to perform as an attorney.  They also felt that
the case situations presented in the Research Test were far more realistic
than those used in either the Essay or MBE sections of the GBX.  The
applicants' chief complaint about the Research Test was that they did not
have enough time to complete it.  There was no relationship between an
applicant's assessment of the quality of the Research Test, MBE, or Essay
sections of the examination and that applicant's scores on these sections.

The pattern of relationships with scores on one form of the Research Test
was essentially the same as the pattern of relationships with scores on the
other two forms of the test.  These findings along with those described
above suggest that the Research Test measures important skills that are
similar but not identical to those measured by the MBE and Essay portions
of the GBX.  They also suggest that a revised version of the Research Test
could be a valuable addition to the GBX, especially if its development cost
could be reduced and spread across several jurisdictions.

# ACKNOWLEDGMENTS

The Committee of Bar Examiners of the State Bar of California provided the advice and cooperation that were necessary for carrying out the studies described in this report. Two members of this committee, Armando M. Menocal, III and Martin R. Glick, made especially important contributions in the design, implementation, analysis, and report preparation phases of this research. John O'Hara provided valuable advice and assistance throughout the project. He was also instrumental in making it a jointly supported effort of the Committee of Bar Examiners and the National Conference of Bar Examiners.

Professor Frederick M. Hart of the University of New Mexico School of Law and Professor Leo O'Brien of Hastings Law School were primarily responsible for developing the test materials used in this research.

The Committee's staff reviewed, pilot tested, edited, printed, and administered the test materials. This staff, along with the Committee's Board of Reappraisers, also selected, trained, and calibrated the cadre of lawyers who graded the essay portions of the tests. Kenneth D. McCloskey, the Committee's former Director of Testing, was in charge of and participated actively in all of these activities. The efficiency with which these tasks were completed, the quality of the data obtained, and the fact the research activities were carried out concurrently with testing and processing over 7,500 applicants on the regular bar examination testify to the skills, energies, and unstinting dedication that Ken provided. Ken was ably assisted in these activities by James B. Tippin, Jr., Suzanne M. Obermeier, and Philip Schoner. Phil also provided invaluable help in coordinating readers, data cleaning, and records management.

John Bianchini and Andrew York of the Educational Testing Service developed and implemented the computer systems that were used in assigning applicants to groups and in cleaning and linking diverse data files. Randy Onishi and Roger Bolus of GANSK & Associates also participated in the computer data cleaning and file management activities. Roger was further responsible for conducting the statistical analyses presented in this report.

Ralph Hoepfner of the System Development Corporation provided a thorough and extremely helpful technical review of a draft of this report. He also participated in the development of one of the test forms used in the study.

Finally, the project could not have been carried out without the excellent cooperation of the applicants who participated in it. Their tolerance and good nature in putting up with the many unique demands of the research at a time when they were under great emotional strain were most appreciated by all who were involved in this project.

CONTENTS

PREFACE ............................................................iii

SUMMARY ............................................................ v

ACKNOWLEDGMENTS ..................................................vii

Chapter
    1. INTRODUCTION................................................  1
        Background .............................................  1
        Purpose.................................................  2

    2. GENERAL PROCEDURES.........................................  3
        Overview ...............................................  3
        General Bar Examination.................................  3
        Special Session.........................................  5
        Background Characteristics..............................  6

    3. DESCRIPTION OF THE RESEARCH TEST .........................  8
        Overview................................................  8
        Development History.....................................  8
        Format and Instructions.................................  8
        Materials...............................................  9
        Time Limits.............................................  9
        Scoring.................................................  10

    4. PRELIMINARY ANALYSES......................................  11
        Comparability of Samples................................  11
        Item Analysis of Part A.................................  11
        Reader Consistency in Part B............................  12
        Reliability of Total Score..............................  15

    5. RESULTS...................................................  16
        Relationship Between Research and GBX Scores............  16
        Relationship of Research Test Scores to Other Measures..  16
        Attitudes Towards the Test..............................  18

    6. SUMMARY AND IMPLICATIONS OF FINDINGS......................  19

REFERENCES.........................................................  21

Appendix
    A. Excerpts from Notice to Applicants Regarding Special Session......  22
    B. Pre-examination Questionnaire...................................  23
    C. Post-examination Questionnaire.................................  25

Chapter 1

INTRODUCTION

BACKGROUND

The major goal of a bar examination is to identify those applicants to the bar who have the skills and knowledge that are necessary for practicing law. In a recent article in The Bar Examiner, O'Hara and Klein (1981) indicated that some of the skills that are frequently mentioned as being necessary are the abilities to:

o Analyze legal problems

o Collect and sort facts

o Marshall facts

o Understand and interpret opinions and regulations

o Write effectively

o Conduct legal research

Many of these skills are related to one another and some, such as the ability to analyze legal problems, are already measured well by the multiple choice and essay portions of most state bar examinations. However, current bar examinations do not measure some of the other important skills listed above, such as the ability to do legal research.

Critics of bar examinations also claim that the existing tests place too much emphasis on an applicant's ability to memorize legal principles and rules because in actual practice, an attorney often consults reference materials to obtain this information. Both the multiple choice and essay portions of the examination further require that the applicant deal with several different case situations in a relatively short period of time. This is an effective testing strategy because an applicant's score is not unduly influenced by knowledge (or lack of knowledge) about a particular legal principle. In other words, it allows for a wide sampling of case situations. However, one consequence of this strategy is that applicants are not tested on their ability to handle a substantial segment of a client's case.

The foregoing considerations led to the development of a test that would measure several important legal research skills. This test was designed to assess an applicant's ability to: assess the degree to which a wide array of case law and statutes supported a client's position, marshal the facts in support of that client's case, identify strengths and weaknesses in the case, and determine additional information that would be needed and the probable sources of that information. An important feature of this test was that it was not heavily dependent on specific legal knowledge. Thus, an applicant taking this test was provided with all of the case law to be analyzed, copies of statutes, etc.

PURPOSE

The analyses described in this report were conducted to answer the questions below:

- o  Are scores on the Research Test related to scores on the essay and multiple choice sections of the General Bar Examination?

- o  Are scores on the Research Test related to an applicant's legal training and experience?

- o  Are scores on the Research Test related to an applicant's attitudes about this test and/or the GBX?

- o  Is the difference in average performance level between Anglo and minority applicants on the Research Test larger or smaller than it is between these groups on the General Bar Examination?

- o  Do applicants think the Research Test is a realistic and good measure of their legal skills?

CHAPTER 1

GENERAL PROCEDURES

OVERVIEW

The July 1980 version of the California Bar Examination was divided into
two parts. One part, called the General Bar Examination (GBX), had two
sections; the Multistate Bar Examination (MBE) and the Essay examination.
Most of the applicants who took one section also took the other section.

The other part of the July 1980 examination was called the Special Session
(SS). The SS was optional; i.e., applicants could choose not to take it
without jeopardizing their chances of passing the GBX. However, if an
applicant participated and did well in the SS, it could increase that
applicant's chances of passing. About 99 percent of the applicants who sat
for the GBX also took the SS.

The SS had four sections that were administered concurrently. A given
applicant could, therefore, take only one of these sections. The focus of
this report is on the section involving the Research Test. Information
about the background characteristics of the applicants who took this test
was obtained from state bar records and questionnaires.


GENERAL BAR EXAMINATION

The July 1980 General Bar Examination (GBX) was administered over a three
day period. The first day and the afternoon of the second day were devoted
to the Essay. The MBE was given on the third day.


Multistate Bar Examination

The Multistate Bar Examination (MBE) is developed by the National
Conference of Bar Examiners and is published and scored by the Educational
Testing Service. About 45 states and the District of Columbia use the MBE
as part of their bar examinations.

The MBE consists of 200 multiple choice questions (or "items"). The six
areas covered by the MBE area are as follows: Constitutional Law,
Contracts, Criminal Law, Evidence, Real Property, and Torts. Some of the
questions relate to a common set of facts while other items stand by
themselves. Items are not grouped by area within the test.

The MBE is administered in two test sessions. Each session has 100 items
(drawn proportionately from the six areas). Applicants are given three
hours to complete each session and a break between sessions for lunch.

Each MBE item has four choices. An applicant's raw score is the number of
questions answered correctly; i.e., there is no correction for guessing.
The raw scores are converted to "scale scores" by the Educational Testing
Service so that an applicant's final score is not affected by possible
differences in overall test difficulty across administrations of the test.
California multiplies these scale scores by 3.0 so that the theoretical
maximum score on the MBE in California is 600 points.

Essay Examination

The Essay portion of the July 1980 GBX contained nine questions. These questions were developed by law professors teaching at non-California schools and by the California Committee of Bar Examiners and its staff. Some of the questions focused on only one subject matter area while others, called "cross-over questions," covered two areas.

The Essay section was divided into three test sessions of three hours each with three questions per session. Applicants were allowed to allocate the three hours in any way they wished across questions within a session.

The grading of the essay answers was done by a team of 12 lawyers per question (i.e., there were a total of 108 readers). These readers were trained to use the same criteria and standards in evaluating the answers to their question. The answers were graded in five point increments on a scale of 0 to 100 points. A score of 70 was assigned to an answer if the reader was in doubt as to whether the answer was a minimally adequate response to the question.

Pass/Fail Decisions

There are two ways an applicant can pass the GBX. Method 1 consists of receiving a combined Total score (i.e., MBE + Essay) of 1050 or greater. Method 2 involves receiving an MBE score of 420 or greater on one administration of the GBX and an Essay score of 630 or greater on another administration; i.e., in order to pass by the second method, an applicant must pass both sections of the examination. If an applicant fails the GBX because the applicant's score on one section was not high enough to compensate for a failing score on the other section, the applicant can retake the entire GBX (and thereby have the opportunity to pass under either method) without jeopardizing the passing status on the section passed previously.

Multiphased Grading

Research on California bar examinations (Klein, 1978 and 1980a) has indicated that final pass/fail decisions can be predicted with 99.5 percent accuracy without scoring all the essay answers written by many applicants. This finding and other considerations led the Committee of Bar Examiners to adopt a multiphased grading process. In Phase I of this process, 3 of an applicant's 9 essay answers are graded. The scores on these answers are combined with the applicant's MBE score to produce a Phase I score. This score is used to separate applicants into two groups, namely: pass and questionable. In subsequent phases, applicants in the latter category have their remaining 6 essay answers graded (and when necessary, regraded) in order to make accurate pass/fail decisions.

One consequence of the multiphased system is that total Essay scores were available for only 70 percent of the applicants taking this section. The group with complete data were not representative of the total applicant pool. Thus, for the purposes of this research, a total Essay score was created for all applicants by multiplying by 3.0 their total score over the three questions that they had graded in Phase I of the multiphased system. If an applicant did not have at least three essay questions graded, then no Essay score was created for that applicant.

-4-

Summary Statistical Data

Table 2.1 presents summary statistical data on the July 1980 GBX for the 7379 applicants who took both the MBE and Essay portions of this test.  The reliability of the MBE was computed by Dorans and Wright (1980).  The reliability of the Essay portion was computed by using the Spearman-Brown formula to step up the average inter-question correlation within sessions (r = .32).  It was not possible to compute the average correlation across all questions because the multiphased grading process resulted in some of the applicants who took the examination.  The reliability of the total GBX score was estimated using the procedures described by Gulliksen (1950) for a linear composite. There was a .68 correlation between the MBE and Essay sections.

Table 2.1

SUMMARY STATISTICAL DATA ON THE JULY 1980 GBX

| Statistic | MBE | Essay | Total |
|---|---|---|---|
| Average Score | 424.5 | 617.5 | 1042.0 |
| Standard Deviation | 46.0 | 54.4 | 92.2 |
| Reliability | .88 | .81 | .91 |

Some of the other characteristics of the applicant pool were: 49 percent passed the GBX, 69 percent took the GBX for the first time, and 62 percent were graduates of American Bar Association approved law schools.  Within this latter group, 81 percent took the GBX for the first time.  The passing rate among these ABA first timers was 73 percent.  These results are very consistent with those obtained with past administrations of the examination (Klein, 1981b).


SPECIAL SESSION (SS)

Prior to the administration of the examination, applicants were advised that there would be a Special Session (SS).  They were further advised that (1) their scores in the SS would not be counted if they passed the regular examination (i.e., based on the total of their Essay and MBE scores) and (2) their scores in the SS would be counted as one-sixth of their total grade if they failed the regular examination (see Appendix A).  Thus, participating in the SS could increase but not decrease their chances of passing.  Applicants also were informed that they had to take the MBE and Essay portions of the GBX in order to derive any benefit from taking the SS and that they would be assigned randomly to one of its four sections.  In other words, a given applicant was assigned to one of four concurrently administered sections.

The SS was administered on the morning of the second day of examination. Of the 7379 applicants who took the complete GBX, 98.5 percent elected to participate in the SS.

-5-

A stratified random sampling plan was used to assign applicants to sections. The stratification variables included race, type of law school from which an applicant graduated, and repeater status. The number of applicants assigned to a section was based on how many would be needed for statistical analyses of the data and the administration and scoring costs of each section. This report focuses on one of the four sections of the SS, namely, the Research Test. This test is described in Chapter 3.

BACKGROUND CHARACTERISTICS

Law School Type and Repeater Status

All persons applying to take California's bar examination are required to provide a transcript of their law school grades. These transcripts made it possible to determine the type of law school from which an applicant graduated; i.e., American Bar Association (ABA) approved, California Accredited (but not ABA approved), and Unaccredited. State bar records also were used to determine whether an applicant had taken and failed the GBX previously; i.e., whether or not the applicant was a repeater.

Sex and Racial/Ethnic (R/E) Group

All applicants taking the bar examination in California are requested to complete a form on which they indicate their sex and racial/ethnic (R/E) group affiliations. This information, which is used solely for research purposes, was provided by 99.6 percent of those taking the July 1980 examination. The distribution of sex and racial/ethnic groups on this examination was as follows: males (71%) and females (29%); Anglos (82%), Asians (4%), Blacks (6%), and Hispanics (6%). The Asian group is composed mainly of Chinese and Japanese Americans, but it also includes those with Philippino and Pacific Islander backgrounds. The Hispanic group is largely Mexican-American, although it contains small percentages of applicants with Central American, South American, and Puerto Rican backgrounds.

Questionnaire Data

Applicants were advised that in order to derive any benefit from their participation in the Special Session (i.e., in terms of passing the GBX), they had to complete and return the questionnaire that appears in Appendix B. This questionnaire requested information about certain potentially relevant background characteristics, such as the extent to which English was spoken in the home, and data about an applicant's legal training and experience.

All applicants who applied to take the July 1980 examination were mailed a copy of the questionnaire prior to the examination. Applicants who did not return the questionnaire by early July were sent another copy of it. They also were advised again that it had to be completed in order for them to derive any benefit from the Special Session and that they could turn it in at the examination site. Of the 7379 applicants taking the complete GBX (and thereby eligible to benefit from the Special Session), 96 percent returned questionnaires. And, almost all of those who completed both the full GBX and the Special Session returned questionnaires.

A questionnaire also was administered between the morning and afternoon
sessions on the third day of the examination.  This questionnaire inquired
about the applicants' preparation for the examination; assessment of the
adequacy of the time limits for the MBE, Essay, and Special Session; and
opinions about how well each of these sections measured their legal skills
and knowledge.  A copy of this questionnaire appears in Appendix C.  About
95 percent of the applicants who participated in the SS and took the
complete GBX turned in this questionnaire.

DESCRIPTION OF THE RESEARCH TEST

OVERVIEW

An applicant taking the Research Test section of the Special Session was
assigned randomly to one of the three forms of this test. Each form had
two parts, A and B. Part A required the applicant to evaluate the degree
to which various cases supported different legal propositions. Part B
asked the applicant to use the information from Part A and other materials
to prepare a memorandum about several facets of a client's case.

DEVELOPMENT HISTORY

The idea for the Research Test grew out of discussions among the members of
the Committee of Bar Examiners of the State Bar of California and several
consultants to the Committee. The first form of the test, which dealt with
a case involving medical malpractice, was developed and field tested in the
fall of 1979 by Professor Frederick Hart at the School of Law, University
of New Mexico. This field testing led to several revisions in the test's
format, instructions, length, and content.

The revised version of Form 1 served as the model for constructing Form 2.
This form, which dealt with a case involving consumer fraud, was developed
by Professor Leo O'Brien of Hastings Law School.

Form 2 and the revised version of Form 1 were pilot tested in May, 1980
with attorneys who had passed the California examination. These attorneys
had varying degrees of experience in conducting legal research. The
results of the May testing led the Committee of Bar Examiners and its staff
and consultants to make a few more revisions in both forms of the test.
Form 3 of the test, which was a slight variant of the first form, also was
constructed at the time these changes were made.

FORMAT AND INSTRUCTIONS

Each test form had two parts, designated as A and B. In Part A, the
applicant was given several cases and a set of propositions. Each
proposition, such as "An accused must be allowed to impeach prosecution
witnesses by means of juvenile adjudications," was discussed in at least
one of the cases. Applicants were instructed to evaluate the degree to
which a case supported a proposition using the following five point scale.

   1=Holding and express rationale contradict the proposition

   2=Holding OR express rationale (but not both) contradict the proposition

   3=Holding and express rationale are NEUTRAL with respect to the
     proposition

   4=Holding OR express rationale (but not both) support the proposition

   5=Holding and express rationale support the proposition

Part A was identical on Forms 1 and 3. It consisted of all possible
combinations of 5 cases and 9 propositions, i.e., a total of 45
case/proposition combinations.  Part A on Form 2 had 40 case/proposition
combinations.  However, since Form 2 dealt with a fact pattern involving
consumer fraud while Forms 1 and 3 were related to issues involving medical
malpractice, Form 2's cases and propositions were entirely different from
those used with Forms 1 and 3.

The instructions for Part B on all three forms placed the applicant in the
role of an associate in a law firm.  These instructions, which were in the
form of a memorandum from a senior partner in this firm, asked the
applicant to draft memoranda in response to questions about a particular
client's case.  Applicants were further instructed to base their memoranda
on the cases they analyzed in Part A, plus additional materials (including
factual information they were given about the client's case).

Part B of Form 1 asked for five separate memoranda in response to specific
questions.  Some of these questions appear below:

>    o What information available from the materials indicates that
       Dr. Brown may have been negligent?

>    o What additional factual information should our firm attempt to
       obtain in order to prove liability in negligence?  What are the
       likely sources of this information?

>    o Assuming that we are successful in establishing liability in
       negligence, what damages are recoverable?

Part B of Form 3 embedded all of Form 1's questions within a memorandum
from the senior partner to the applicant (this was the only difference in
the content and instructions of these two forms).

Part B of Form 2 was like Part B of Form 3 in that it contained several
questions embedded within a memorandum from the senior partner to the
applicant.

MATERIALS

An applicant taking any one of the Research Test's three forms received the
following materials for that form:  General Directions, Directions for Part
A, List of propositions for Part A, a booklet containing cases for Part A,
a form for recording answers to Part A, Directions for Part B, Additional
materials for Part B, and a booklet in which to write the memoranda for
Part B.

TIME LIMITS

Applicants were given all of their test materials at the beginning of the
session.  They were then told they had 195 minutes to complete the session.
They also were told they could allocate 195 minutes any way they wished
across parts, but that they should probably devote somewhat more than 75
minutes to Part B.

Part A

The test developers along with the staff and consultants of the Committee
of Bar Examiners developed a scoring key for each version of Part A.  This
key indicated the most appropriate rating for each case/proposition
combination.  A score was assigned to each rating using the values in Table
2.2 so that the closer the applicant's rating came to the keyed response,
the higher score the applicant received for that rating.  For example, if
an applicant rated a given case/combination as a 1 and the correct choice
was a 2, the applicant would receive 4 points for that case/proposition
combination.  A rating of 3 was rarely keyed correct.


Table 2.2

PART A ITEM SCORES FOR EACH COMBINATION
OF APPLICANT RATING AND KEYED RESPONSE

| Applicant's | Keyed Response | | | | |
| Rating | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1 | 5 | 4 | 3 | 2 | 1 |
| 2 | 4 | 5 | 4 | 3 | 2 |
| 3 | 3 | 4 | 5 | 4 | 3 |
| 4 | 2 | 3 | 4 | 5 | 4 |
| 5 | 1 | 2 | 3 | 4 | 5 |

The sum of the points earned on Part A was designated as the applicant's
raw score on this part.  The Part A raw scores on a form were converted
to a distribution having a mean of 50 and a standard deviation of 10.


Part B

The answers to each of the five questions in Part B, Form 1, were evaluated
on a 20 point scale.  The scores on each question were converted to a
distribution having a mean of 50 and a standard deviation of 10 (so that
each question would be weighted equally in determining an applicant's total
score on this part).  The five scale scores were summed for each applicant
to obtain a total score for Part B.  These total scores were converted to a
distribution having a mean of 50 and a standard deviation of 10.

The answers on Part B on Forms 2 and 3 were evaluated on a 100 point scale.
The Part B scores on each of these forms were then converted to a distri-
bution having a mean of 50 and a standard deviation of 10.


Total Score

An applicant's total score on the Research Test was the average of the
Part A and B scale scores.


-10-

Table 4.2

## SUMMARY OF PART A ITEM ANALYSIS RESULTS

| Statistic | Form 1 | Form 2 | Form 3 |
|---|---|---|---|
| Number of Items Scored | 42 | 40 | 42 |
| Average Item Score | 3.48 | 3.35 | 3.48 |
| Average Item Variance | .56 | .60 | .56 |
| Reliability (Alpha) | .87 | .87 | .89 |

The cases and propositions on Part A on Form 1 were
exactly the same as those on Form 3. Form 2 had an
entirely different set of cases and propositions.


## READER CONSISTENCY IN PART B

Form 1

Table 4.3 presents the average raw score assigned by a reader to all the
applicants graded by that reader on Form 1 as well as the average Part A
and Phase I GBX scores of the applicants evaluated by each reader.


Table 4.3

### AVERAGE SCORES OF APPLICANTS ASSIGNED TO EACH PART B READER ON FORM 1

| Question | Reader Number | Number of Applicants | Average Score | Standard Deviation | Average Score Part A | Phase I |
|---|---|---|---|---|---|---|
| 1 | 1 | 228 | 8.66 | 3.69 | 145.2 | 615.9 |
|   | 2 | 223 | 10.48 | 4.03 | 147.5 | 642.5 |
| 2 | 1 | 218 | 7.20 | 3.48 | 148.1 | 638.6 |
|   | 2 | 233 | 7.38 | 3.53 | 144.8 | 619.9 |
| 3 | 1 | 375 | 9.79 | 4.14 | 146.1 | 630.0 |
|   | 2 | 76 | 7.80 | 2.92 | 147.4 | 624.1 |
| 4 | 1 | 224 | 9.43 | 4.20 | 147.5 | 642.3 |
|   | 2 | 227 | 5.21 | 2.76 | 145.3 | 615.9 |
| 5 | 1 | 228 | 8.28 | 4.77 | 145.2 | 615.6 |
|   | 2 | 223 | 4.84 | 3.24 | 147.5 | 642.6 |

It is evident from the last column of Table 4.3 that applicants were not
assigned randomly to readers on each question. If random assignment had
occurred, there would not not have been a large difference in the average
Phase I scores between applicant groups on Questions 1, 2, 4, and 5. The
disproportionate allocation of applicants to readers on Question 3 was due
to administrative factors that were unrelated to the study.

-12-

Chapter 4
PRELIMINARY ANALYSES

COMPARABILITY OF SAMPLES

Because of the similarity between Forms 1 and 3, about 25 percent of the
applicants assigned to the Research Test section of the Special Session
were assigned to each of these forms.  The remaining applicants were
assigned to Form 2.  The assignment of applicants to forms was done
randomly and all test forms were given at each location at which the
General Bar Examination was administered.

Table 4.1 presents summary statistical data on the sample of applicants
that took each form.  An inspection of these data indicates that the
groups had extremely similar characteristics.

Table 4.1

SUMMARY DATA ON THE GROUP TAKING EACH FORM

| Statistic | Form 1 | Form 2 | Form 3 |
|---|---|---|---|
| Percent Anglo | 82 | 82 | 83 |
| Percent Male | 64 | 68 | 68 |
| Percent from ABA schools | 67 | 64 | 62 |
| Percent Repeaters | 29 | 31 | 31 |
| Average Age | 31 | 31 | 31 |
| Average MBE score | 423 | 424 | 424 |
| Average Essay score | 620 | 621 | 618 |
| Number of Applicants | 451 | 873 | 461 |

ITEM ANALYSIS OF PART A

A summary of the results of an analysis of the responses to each item
(case/proposition combination) in Part A is presented in Table 4.2.  The
persons who developed the scoring key for Part A of Forms 1 and 3 were not
able to achieve consensus on the ratings that should have been assigned to
3 of the 45 items in this part.  Thus, only 42 items on each form were
scored.

The data in Table 4.2 indicate that scores on Part A were very reliable.
An inspection of the data also revealed that the score on an item in Part A
correlated positively with the total score on the other items in this part
(about two thirds of these correlations were over .30).  This was true for
all three forms of the test.  These findings support the appropriateness of
the scoring key.

-11-

An analysis also was conducted of the degree to which the two readers
assigned to Form 1 agreed with each other in the scores that should be
assigned to 20 answers to each question that were graded independently by
both readers.  These answers were embedded in the regular set of answers
that were evaluated by each reader.  In other words, each reader evaluated
a set of 20 answers that were also evaluated by the other reader and these
answers were embedded in each reader's regular set.  The results of this
analysis are presented in Table 4.4.

Table 4.4

INDICES OF READER AGREEMENT ON FORM 1 - PART B

| Question Number | Reader Number | Average Score | Standard Deviation | Correlation Between Readers |
|---|---|---|---|---|
| 1 | 1 | 10.1 | 4.2 | .55 |
|   | 2 | 9.3 | 3.0 |  |
| 2 | 1 | 9.1 | 4.1 | .60 |
|   | 2 | 6.7 | 2.7 |  |
| 3 | 1 | 13.9 | 3.7 | .62 |
|   | 2 | 8.1 | 2.4 |  |
| 4 | 1 | 10.0 | 3.5 | .67 |
|   | 2 | 6.1 | 2.2 |  |
| 5 | 1 | 11.0 | 4.1 | .84 |
|   | 2 | 4.6 | 2.6 |  |

The correlations in the last column of Table 4.4 indicate that the two
readers agreed with each other fairly well in the relative standings of the
applicants (average r = .66).  This level of inter-reader agreement is
slightly better than that obtained on an essay question on the General Bar
Examination (see Klein, 1980b).

The data in Tables 4.3 and 4.4 indicate that Reader #1 tended to assign
higher grades than Reader #2.  One explanation of these findings is that
the low level of agreement between readers in the score that should be
assigned to an answer (as distinct from the high level of agreement
regarding its relative quality) probably stemmed from the readers' being
more familiar with a 100 point scale than with the 20 point scale used with
each Part B question on Form 1.  They also could have differed in leniency.

The seriousness of the apparent differences in leniency across readers was
mitigated by the considerable counterbalancing of readers and applicants
across questions; e.g., if an applicant's answer to Question 1 was
evaluated by Reader #1, then that applicant's answer to Question 2 was
evaluated by Reader #2.  Similar counterbalancing occurred on Questions 4
and 5.

-13-

whether the counterbalancing described above was sufficient to offset the
problems created by the differences in the grading standards used by the
readers was investigated by scaling the scores assigned by a reader on a
question to the mean and standard deviation of the Phase I scores of the
applicants whose answers were graded by that reader.  The average of the
five scale scores constituted an applicant's "reader adjusted" Part B
score.  The pattern of results obtained with this score was essentially the
same as that obtained with the sum of the raw scores.  Thus, the results
obtained with this sum (rather than with the adjusted score) are presented
in the remainder of this report.


Forms 2 and 3

Forms 2 and 3 each had only one essay type question in Part B.  Because of
the relatively large number of applicants taking Form 2, there were three
readers assigned to grade the answers on this form.  Table 4.5 presents the
average raw score assigned by a reader to all the Part B answers graded by
that reader on a form as well as the average Part A and Phase I GBX scores
of the applicants evaluated by each reader.

The differences in the average Phase I scores across reader groups,
especially on Form 2, suggests that applicants were not assigned randomly
to readers on this Part.  However, unlike Form 1, there did not appear to
be significant differences in leniency between readers on Forms 2 and 3.


Table 4.5

AVERAGE SCORES OF APPLICANTS ASSIGNED TO EACH PART B READER ON FORMS 2 AND 3

| Form | Reader Number | Number of Applicants | Average Score | Standard Deviation | Average Score Part A | Phase I |
|------|--------|--------|--------|--------|--------|--------|
| 2    | 1      | 380    | 68.8   | 9.9    | 132.6  | 615.4  |
|      | 2      | 261    | 71.7   | 8.7    | 136.1  | 650.3  |
|      | 3      | 232    | 70.1   | 11.9   | 133.4  | 632.4  |
| 3    | 1      | 225    | 67.2   | 11.0   | 146.5  | 622.5  |
|      | 2      | 236    | 67.2   | 13.0   | 146.2  | 636.9  |

An analysis of inter-reader agreement was conducted by embedding a common
set of 20 answers in each reader's total set of answers.  The average
correlation between readers on Forms 2 and 3 on these answers was .75 and
.65, respectively.  There also was good agreement between readers in
average score and standard deviation.

While there is no direct way of determining whether the absolute (as
distinct from relative) quality of an applicant's performance on the
Research Test was comparable to that of the applicant's performance on the
GBX, it was observed that the average Part B scores on Forms 2 and 3 (67.2
and 69.7, respectively) were quite close to the average score (68.6) that
was assigned to a typical question on the Essay section of the GBX.  The
scoring system used with Part B of form 1 precluded making a comparison
between scores on this form and GBX scores.

There was no direct way of assessing the reliability of the total score on the Research Test because each applicant only took one form of this test. However, the reliability of the Part A scores could be estimated since each applicant evaluated several case/proposition combinations. This reliability tended to be about .87 (see Table 4.2).

The reliability of the total Part B score on Form 1 could be estimated from the five subscores on this form. This reliability was .62 (coefficient alpha). Table 4.6 contains a summary of the item analysis results used in obtaining this estimate. An inspection of these data indicates that the score on a question correlated fairly well with the sum of the scores on the other four questions (see "Item-Total Correlations" column). The one exception to this trend occurred with question #5. This question asked the applicant to discuss whether the client should ask for a jury trial. In fact, the reliability of the total score would have increased to .68 if this question was dropped. This finding and the high reliability of the scores on this question (see Table 4.4) suggest that it may be measuring a somewhat different ability than that measured by the other questions. For example, this question called for a discussion of trial <u>strategy</u> whereas the other questions focused more on analytic skills.

Table 4.6

ITEM ANALYSIS RESULTS ON PART B - FORM 1

| Question Number | Average Score | Standard Deviation | Item-Total Correlations |
|---|---|---|---|
| 1 | 9.56 | 3.96 | .40 |
| 2 | 7.29 | 3.50 | .33 |
| 3 | 9.46 | 4.03 | .50 |
| 4 | 7.31 | 4.12 | .52 |
| 5 | 6.58 | 4.43 | .15 |

These results along with those in Table 4.4 indicate that Part B can be scored with a reasonably high degree of reliability, especially when one considers that: (1) the reliability of three essay questions on the GBX, one test session, is only .59 (based on stepping up the average inter-item correlation of .32 within a session) and (2) the reliability of the Part B total score would have been substantially higher if the readers on this part had used the same scoring standards. In other words, if the average scores assigned by the two readers on each question were more similar, it would have increased the average correlation between questions which in turn would have increased the reliability of the total score on this part.

The reliability estimates for Part A and B (.87 and .62, respectively) were combined to estimate the reliability of the total score. The formula for estimating the reliability of a linear composite that is described by Gullicksen (1950) was used for this purpose. This formula indicated that the total score on the Research Test had a reliability of about .78. This is almost as high as the reliability of the entire Essay section of the GBX.

-15-

Chapter 5

RESULTS

## RELATIONSHIP BETWEEN RESEARCH AND GBX SCORES

Table 5.1 presents the correlation among the Part A (ratings of case/
proposition combinations), Part B (memoranda), and Total Research Test
scores as well as their correlations with the MBE and Essay portions of the
General Bar Examination (GBX).  The data with Form 3 were combined with
that of Form 1 for this table because Part A was the same on these two
forms and the correlations with their respective Part B scores were almost
identical on every measure examined.  The correlations for Forms 1+3 appear
above the main diagonal and for Form 2 below the main diagonal.

Table 5.1

CORRELATIONS AMONG RESEARCH TEST AND GBX SCORES

|        | RESEARCH SCORES | | | GBX SCORES | | |
|        | Part A | Part B | Total | MBE | Essay | Total |
|--------|--------|--------|-------|-----|-------|-------|
| Part A | -- | .35 | .82 | .48 | .39 | .47 |
| Part B | .33 | -- | .82 | .43 | .47 | .52 |
| Total | .81 | .81 | -- | .60 | .55 | .62 |
| MBE | .38 | .43 | .54 | -- | .69 | .91 |
| Essay | .32 | .50 | .53 | .69 | -- | .91 |
| GBX Total | .38 | .51 | .58 | .91 | .91 | -- |

The data in Table 5.1 indicate that there was a low positive correlation
between the Part A and B scores on each Form (.35 and .33 for Forms 1+3 and
2, respectively).  These correlations are about as strong as the
correlation between two essay questions on the GBX (average r = .32, see
Klein, 1981a).  The Part A scores on Forms 1 and 3 were more highly
correlated with MBE scores than they were with Essay scores while the
reverse was true for Part B scores.  There was a .60 average correlation
between the total scale score on the Research Test and the total GBX score.
This relationship is almost as strong as the one between GBX Essay and MBE
scores (r = .69).  The very high correlations between a part score and a
total score on the same test were, of course, a result of including the
part scores in the computation of the total scores.

## RELATIONSHIP OF RESEARCH TEST SCORES TO OTHER MEASURES

Table 5.2 presents the correlation of the Part A, Part B, and Total
Research Test scores with other measures.  For the purposes of comparison,
the last two columns of this table present the correlation between each
measure and scores on the MBE and Essay portions of the GBX for all the
applicants who took one of the three forms of the Research Test.

-16-

RELATIONSHIP OF RESEARCH TEST AND GBX SCORES TO OTHER MEASURES

| | RESEARCH TEST SCORES | | | | | | GBX SCORES | |
| | Part A | | Part B | | Total | | | |
| Measure | 1+3 | 2 | 1+3 | 2 | 1+3 | 2 | MBE | Essay |
|---|---|---|---|---|---|---|---|---|
| Age | -.35 | -.31 | -.28 | -.38 | -.38 | -.38 | -.29 | -.37 |
| Being Male | -.03 | .00 | -.18 | -.09 | -.10 | -.05 | .00 | -.14 |
| Being Anglo | .20 | .18 | .17 | .18 | .27 | .21 | .26 | .24 |
| Being Hispanic | -.07 | -.05 | -.06 | -.12 | -.09 | -.12 | -.13 | -.11 |
| Being Black | -.12 | -.18 | -.16 | -.14 | -.19 | -.14 | -.19 | -.18 |
| Graduate of a CA ABA Law School | .21 | .21 | .19 | .27 | .25 | .29 | .25 | .27 |
| Being a Repeater | -.23 | -.31 | -.33 | -.41 | -.40 | -.44 | -.45 | -.43 |
| Worked as a Law Clerk | .18 | .23 | .22 | .31 | .22 | .33 | .23 | .28 |
| Received pay for legal research | .20 | .25 | .26 | .33 | .28 | .34 | .26 | .28 |
| Hours of paid legal research | .16 | .23 | .23 | .24 | .22 | .27 | .20 | .21 |

The correlation coefficients in Table 5.2 indicate that Research Test scores correlate with other measures in the same direction and to about the same degree as GBX scores. For example, there was a -.42 correlation between being a repeater and total Research scores as well as between being a repeater and GBX scores. Similarly, there was a .28 correlation between being a graduate of a California ABA approved law school and Research Test scores and a .26 correlation between being an ABA graduate and GBX scores.

The Research Test did not significantly narrow the gap in average performance level between Anglo and minority groups (Klein, 1979). For example, the typical Anglo applicant had a GBX score at the 55th percentile and a Research Test score at the 54th percentile. The typical minority applicant had GBX and Research Test scores at the 28th and 30th percentiles, respectively. The 3 point difference in the size of these gaps was most likely due to the Research Test having a slightly lower reliability than the GBX.

Only three questionnaire items were consistently and statistically significantly correlated with Research Test scores; namely: worked as a law clerk, paid for doing legal research, and the number of hours of legal research for which the applicant was paid. However, these variables also were correlated with GBX scores. And, all the correlations among them could stem from some other variable. For example, the applicants who are paid to do legal research may be the ones who tend to have high law school grades. Thus, engaging in these activities may not have helped an applicant achieve higher GBX or Research Test scores than would otherwise be the case.

Rerunning all the correlations with the data from just first time takers
(so as to control in part for the amount of time applicants had for
engaging in various types of activities and training) did not appreciably
affect the relationships presented in Tables 5.1 and 5.2.


ATTITUDES TOWARDS THE TEST

The evaluation forms the applicants completed on the third day of the GBX
were analyzed to assess applicant attitudes towards the Research Test.
Table 5.3 contains the average score on each characteristic evaluated and
the percentage of applicants who rated each test as Good or Very Good on
each dimension.  It is evident from this table that the applicants judged
the Research Test to be a more realistic and a better measure of their
ability to perform as an attorney than either the Essay and MBE portions of
the GBX.  However, they rated the Essay and MBE as better indicators of
their legal knowledge.


Table 5.3

APPLICANT RATINGS OF TEST QUALITY

| Characteristic Evaluated | Test Evaluated | Average Score in Group that Took | | Percent Rating it Good or Very Good in Group that Took | |
|---|---|---|---|---|---|
| | | Form 1+3 | Form 2 | Form 1+3 | Form 2 |
| Legal | Research | 2.8 | 2.4 | 25 | 18 |
| Knowledge | Essay | 3.4 | 3.4 | 48 | 45 |
| | MBE | 3.1 | 3.1 | 38 | 38 |
| Ability to | Research | 3.0 | 2.5 | 35 | 28 |
| Perform as | Essay | 2.8 | 2.8 | 22 | 22 |
| an Attorney | MBE | 2.3 | 2.3 | 10 | 12 |
| Realism | Research | 3.9 | 3.7 | 76 | 73 |
| of Case | Essay | 3.0 | 3.1 | 33 | 38 |
| Situations | MBE | 2.7 | 2.8 | 23 | 26 |

The rating scale for the items was 1=very poor, 2=poor, 3=fair,
4= good, and 5=very good.


The most frequent complaint about the Research Test was that there was
not enough time to complete it.  For example, 84 percent of the applicants
made this complaint about the test while only 27 percent said the time
limits on the Essay and MBE portions of the examination were too short.

There was no systematic relationship between an applicant's evaluation of
the quality of the Research Test (including the appropriateness of its time
limits) and that applicant's score on any of the parts of this test.
Similarly, there was no systematic relationship between an applicant's
evaluation of the quality of the MBE and Essay sections of the GBX and
that applicant's scores on these sections.   All the correlations were
less than .08.

-18-

Chapter 6

SUMMARY AND IMPLICATIONS OF FINDINGS

The results presented in Chapters 4 and 5 indicate:

o An applicant's performance on Part A of the Research Test was
  quite reliable. This suggests that an appropriate scoring key
  can be developed for this type of measure and that an applicant's
  ability to evaluate the degree to which one case supports a given
  legal proposition is related to how well that applicant can
  evaluate other case/proposition combinations. It also suggests
  that an applicant's workload on the Research Test can be eased
  somewhat by reducing the number of case/proposition combinations
  the applicant has to evaluate.

o An applicant's performance on Part B of the Research Test can be
  scored at least as reliably as an answer written on the Essay
  section of the GBX. However, more effort will have to be devoted
  to reader calibration on Part B if scores are assigned using
  something other than the traditional 100 point scale.

o Like the MBE and Essay sections of the GBX, the two parts of the
  Research Test measure similar but not identical skills. Thus, it
  may not be appropriate to reduce scoring costs and testing time
  on the Research Test by replacing Part B with a machine scorable
  version of Part A. Similarly, it would not be appropriate to
  drop Part A, especially since it contributes substantially to the
  reliability of the Research Test's total score.

o Total scores on the Research Test correlated with total GBX
  scores only slightly less well than MBE and Essay scores
  correlated with each other. While this result may be due in part
  to the Research Test scores not being quite as reliable as the
  MBE and Essay scores, it also may stem from the Research Test
  measuring skills and knowledge that are similar but not identical
  to those that are now assessed by the GBX.

o The Research Test did not widen or narrow the gap in performance
  levels between racial groups that is present on the GBX.

o Repeater status, type of law school from which the applicant
  graduated, and most other background characteristics were just as
  highly correlated with Research Test scores as they were with
  scores on the GBX. For example, applicants who had worked as
  law clerks and received pay for doing legal research prior to
  taking the Research Test tended to have higher scores on this
  test (and on the GBX) than applicants who did not have this
  training. These findings do not necessarily mean that such
  experience caused the higher test scores in that the applicants
  who are selected for these jobs also may be the ones with higher
  than average law school grades.

o There was no relationship between an applicant's assessment of
  the quality of the Research Test, MBE, or Essay sections of the
  examination and that applicant's scores on these sections.

-19-

o Questionnaire data did indicate that applicants thought the Essay and MBE portions of the GBX were better measures of their legal knowledge than was the Research Test. However, they thought the Research Test was a better measure of their ability to perform as an attorney. They also felt that the case situations presented in the Research Test were far more realistic than those used in either the Essay or MBE sections of the GBX.

o The applicants' chief complaint about the Research Test was that they did not have enough time to complete it.

o The pattern of relationships with scores on one form of the Research Test was essentially the same as the pattern of relationships with scores on the other two forms of the test. This finding suggests that the general test plan used to construct these forms could be used to develop additional forms of the test that would have essentially the same characteristics as the forms used in this study.

o While there is no direct way of determining whether the absolute (as distinct from relative) quality of an applicant's performance on the Research Test was comparable to that applicant's performance on the GBX, it was observed that the average Part B scores on Forms 2 and 3 were almost the same as the average score that was assigned to a typical question on the Essay section of the GBX.

The foregoing results suggest that the Research Test measures important skills that are similar but not identical to those measured by the MBE and Essay portions of the GBX. In other words, it appears that the Research Test provides unique information about an applicant's legal abilities. And, there is consensus in the legal profession that these abilities are material to the practice of law. Thus, adding the Research Test to the GBX could increase the validity of the bar examination process.

One major obstacle to adding a Research Test to the bar examination is the cost of developing a new form of the test for each administration of the GBX. Unlike the typical essay question which is only a few paragraphs long, the Research Test requires the production and duplication of over 50 pages of case materials and other documents to be evaluated by each applicant. While it appears that an applicant's workload on the Research Test can and should be reduced, each new form of the test will still probably take longer (and cost more) to develop then the entire Essay section of the GBX. Thus, California may want to explore the feasibility of spreading out the test development costs by joining with other jurisdictions in the test construction process in much the same way that the MBE's development costs are shared by the jurisdictions that use the MBE.

Finally, it was not possible within the constraints of the July 1980 bar examination to have a given applicant take more than one form of the Research Test. Thus, there was no way of assessing directly the degree to which the scores on the test were affected by the unique nature of the case materials in each form. It is recommended, therefore, that this matter be investigated further so as to determine the reliability of the scores obtained. Such a study might be conducted in cooperation with two or three law schools.

REFERENCES

Dorans, N. and Wright, R.  Test Analysis: Multistate Bar Examination,
     Forms 3CEB2 and S-3CEB2.  Unpublished Statistical Report, SR-80-117.
     Princeton, N.J.: Educational Testing Service, October, 1980.

Gulliksen, Harold  Theory of Mental Tests.  New York: Wiley, 1950.

Klein, S. P.  Summary of studies conducted for the Committee of Bar
     Examiners and the statistical rationale underlying proposed changes.
     Unpublished report submitted to the Committee of Bar Examiners of
     the State Bar of California, August, 1978.

Klein, S. P.  An analysis of the relationships between bar examination
     scores and an applicant's law school, admissions test scores,
     grades, sex, and racial/ethnic group.  Paper presented at the
     American Bar Association meetings, Dallas, Texas; August 14, 1979.
     Reprinted in The Bar Examiner, 1980, 49, 14-18.

Klein, S. P.  A comparison of the effectiveness of a single versus
     multiphased grading system.  Unpublished report submitted to the
     Committee of Bar Examiners of the State Bar of California, May,
     1980a.

Klein, S. P.  Intra- and inter-reader agreement on the essay section of
     the California State Bar Examination.  Unpublished report submitted
     to the Committee of Bar Examiners of the State Bar of California,
     June, 1980b.

Klein, S. P.  The effect of time limits, item sequence, and question format
     on applicant performance on the California Bar Examination.
     Unpublished report submitted to the Committee of Bar Examiners of
     the State Bar of California and to the National Conference of Bar
     Examiners, October, 1981a.

Klein, S. P.  An analysis of possible variations in pass/fail standards on
     the California State Bar Examination.  Unpublished report submitted
     to the Committee of Bar Examiners of the State Bar of California,
     January, 1981b.

O'Hara, J. F. and Klein, S. P.  Is the bar examination an adequate measure
     of lawyer competence?  The Bar Examiner, 1981, 50, #3, 28-35.

APPENDIX A

EXCERPTS FROM NOTICE TO APPLICANTS REGARDING THE SPECIAL SESSION

In addition to the usual examination sessions, each applicant for the Fall 1980 Examination will be expected to participate in a one-half day Special Session to be administered either on Monday, July 28, 1980, or Tuesday, July 29, 1980.

The Special Session is designed to give applicants an opportunity to improve their scores by demonstrating their capabilities in other than the standard methods or procedures and to test alternative means of examining for the future.

To derive any benefit from the Special Session, applicants must complete and return designated questionnaires by specified deadlines and complete all other portions of the examination which they are taking.

There will be four types of problems given during the Special Session. Individual applicants will be assigned to the various types of problems by the Committee based on a statistical analysis of the composition of the entire examinee population. General descriptions of the four types of problems are:

Research Problem

Applicants will be given factual and legal information regarding a possible case for a client. They will then be asked to evaluate the extent to which certain legal materials given them support or are contrary to various legal propositions involved in the client's case. Applicants will also be asked to prepare a memorandum regarding various aspects of the client's case. Thus, this problem will be almost like an "open-book" test.

The scoring for the Special Session for the various groups of applicants will be scaled so that the Special Session would be equivalent to one session of a six-session examination. An applicant's score on the Special Session will then be utilized if and only if (a) the applicant did not pass the regular part of the examination based upon the usual scoring procedures and (b) the applicant's score on the Special Session is above passing. Thus, an applicant's performance on the Special Session can increase but cannot decrease the likelihood that the applicant will pass the examination. Since the score on the Special Session can count for one-sixth of an applicant's total grade, it can have a substantial beneficial impact for an applicant who scores well on it.

-22-

# THE COMMITTEE OF BAR EXAMINERS
### OF THE STATE BAR OF CALIFORNIA

555 FRANKLIN STREET
POST OFFICE BOX 7908
SAN FRANCISCO 94120
Telephone (415) 561-8300



FIFTH FLOOR
1250 WEST THIRD STREET
LOS ANGELES 90017
Telephone (213) 482-4040

APPLICATION - AUGUST 1980 ASSESSMENT CENTER AND QUESTIONNAIRE FOR ALL JULY, 1980 APPLICANTS

Your answers to the questions below will assist the Committee of Bar Examiners in its efforts to improve the bar examination. Your responses will be kept strictly confidential and used solely for statistical purposes. We are most appreciative of your cooperation.

LAST NAME _____     FIRST NAME _____     MID INITIAL _____

1. Birthdate [    /    /    ]
             Mo.  Day  Yr.

2. Which of the following jobs, if any, have you held for one or more months?  Check all that apply:

   [ ] Attorney                        [ ] Legal Investigator
   [ ] Court Reporter                  [ ] Legal Secretary
   [ ] Law Clerk                       [ ] Paralegal Assistant
   [ ] Law Enforcement Officer         [ ] Other Law Related Employment (specify.....................)

3. About what percentage of the time was English spoken in your home during your childhood?  Please put your answer in the box below.

   [    ] Percent of time English spoken.

4. Circle the box corresponding to the language other than English that was spoken most often.

   [1] Chinese        [3] Spanish              [5] None of these or no
   [2] Japanese       [4] Taglog/Phillipino        language besides English

5. Circle the box corresponding to the highest grade in school completed by your MOTHER or female guard-ian.  Leave blank if you do not know.

   [1] 1st to 5th      [4] High School Graduate
   [2] 6th to 8th      [5] College Graduates
   [3] 9th to 11th     [6] Graduate/Professional School Degree

6. Circle the box corresponding to the highest grade in school completed by your FATHER or male guardian. Leave blank if you do not know.

   [1] 1st to 5th      [4] High School Graduate
   [2] 6th to 8th      [5] College Graduate
   [3] 9th to 11th     [6] Graduate/Professional School Degree

PLEASE CONTINUE ON THE REVERSE SIDE

7.  Circle the box below that best describes your undergraduate major:

[1] Economics, Business, Accounting
[2] Physical Sciences, Engineering, Mathematics, Biology
[3] Social Sciences (Anthropology, Psychology, Sociology)
[4] History, Government, Political Science
[5] English, Journalism, Classical Studies, Philosophy
[6] Fine Arts, Theater Arts, Music
[7] Education
[8] Other (specify . . . . . . . . . . . . . . . . . . .)

8.  For each of the activities below, indicate the number of hours, if any, you have spent doing them for: SIMULATED cases, ACTUAL cases associated with supervised law school programs, and ACTUAL cases as part of paid and/or volunteer employment.  Insert the number 99 in a box if you spent 100 or more hours doing the activity.

|  | | ACTUAL CASES | |
|---|---|---|---|
|  | SIMULATED CASES | Supervised Law School Programs | Paid or Volunteer Employment |
| a.  Conduct legal research. | [   ] | [   ] | [   ] |
| b.  Prepare briefs, petitions, or motions. | [   ] | [   ] | [   ] |
| c.  Conduct direct examinations. | [   ] | [   ] | [   ] |
| d.  Conduct cross examinations. | [   ] | [   ] | [   ] |
| e.  Interview a client or a witness for a hearing. | [   ] | [   ] | [   ] |
| f.  Interview a client on general legal matters; e.g. landlord- tenant dispute. | [   ] | [   ] | [   ] |
| g.  Present an oral argument in a legal proceeding. | [   ] | [   ] | [   ] |

9.  In the box next to each choice below, indicate the number of courses, if any, you have taken in:

[ ] Evidence
[ ] Clinical or Trial Practice involving your participation in simulated or actual hearings
[ ] Trial Practice NOT involving your participation in simulated or actual hearings; i.e., lecture only.

10. If you have secured employment in California in a law related job commencing by September 15, please circle the box corresponding to how you will be employed.

[1] Attorney General's Office
[2] Public office, criminal prosecution (e.g., District Attorney)
[3] Public office, criminal defense (e.g.), Public Defender)
[4] Legal aid office (e.g., neighborhood legal assistance)
[5] Public interest law firm
[6] Law clerk for a judge
[7] Private law firm, criminal defense
[8] Private law firm, general practice
[9] Law department of a corporation
[0] Other (specify . . . . . . . . . . . . . . . . . . .)

11. Do you hereby apply to participate in the two day Assessment Center?  (Circle your answer below.)

(1)  No        (2)  Yes

If selected as a participant in the Assessment Center, I will be <u>available</u> to participate in the location circled below on any date between August 4 and August 24 (inclusive) <u>except for the dates circled below</u>.

| Circle one | Mon | Tue | Wed | Thu | Fri | Sat | Sun | |
|---|---|---|---|---|---|---|---|---|
| in (1) Los Angeles only | 4 | 5 | 6 | 7 | 8 | 9 | 10 | ___ |
| in (2) San Francisco only | 11 | 12 | 13 | 14 | 15 | 16 | 17 | ___ |
| in (3) Either Los Angeles or San Francisco. | 18 | 19 | 20 | 21 | 22 | 23 | 24 | ___ |

(Note:  The likelihood of being selected may be improved by increased availability.)

Date: _____, 1980        Signature: _____

APPENDIX C

POST EXAMINATION QUESTIONNAIRE


APPLICANTS MUST COMPLETE AND FILE THIS QUESTIONNAIRE BEFORE THE FINAL
SESSION OF THE GENERAL BAR EXAMINATION ON WEDNESDAY, JULY 30, 1980 IN
ORDER TO DERIVE ANY BENEFIT FROM THE SPECIAL SESSION OF THE JULY 1980
EXAMINATION OR TO PARTICIPATE IN THE AUGUST 1980 ASSESSMENT CENTER.

Your answers to the questions below will assist the Committee of Bar Examiners
in its efforts to improve the bar examination. Your responses will be kept
strictly confidential and used solely for statistical purposes. A completed
questionnaire is required of all applicants who participated in any one of the
special sessions and/or will be participating in the Assessment Center. We
are most appreciative of your cooperation in answering the questions below.

Application # [    ]    Center Number [    ]    Birthdate [  /  /  ]

1. Which of the following methods, if any, did you use to prepare for
   the examination?  Check all that apply:

   [ ] Commercial bar review course of at least 5 weeks duration
       which met 4 or more times per week; e.g., BAR or BRC.
   [ ] Commercial bar review course of less than 5 weeks duration.
   [ ] Intensified commercial writing course; e.g., Beverly Rubens.
   [ ] Law school sponsored or administered bar review course.

2. About how many hours per week were you engaged in paid employment during
   the last five weeks?  Please put your answer in the box below.

        [    ] Hours per week Employed

3. About how many hours per week did you spend studying for the examination
   during the last five weeks?  Please put your answer in the box below.

        [    ] Hours per week Studied

4. Circle the number corresponding to the special session you took:

        1 Videotape of Arbitration and Court Room cases
        2 Case of Barelas v. Brown (Research Task)
        3 Case of State v. Dolan (Research Task)
        4 60 multiple choice questions and script with questions
        5 Two essay questions and 20 multiple choice questions
        9 Did not participate in a special session

5. In your opinion, how good a measure of your LEGAL KNOWLEDGE was each
   part of the examination?  Please circle one number for each part.

|                        | Very Poor | Poor | Fair | Good | Very Good | Did Not Take |
|------------------------|-----------|------|------|------|-----------|--------------|
| a. Special Session     | 1         | 2    | 3    | 4    | 5         | 9            |
| b. Essay Examination   | 1         | 2    | 3    | 4    | 5         | 9            |
| c. Multistate (MBE)    | 1         | 2    | 3    | 4    | 5         | 9            |

-25-

6. In your opinion, how good a measure of your ABILITY TO PERFORM AS AN ATTORNEY was each part of the examination?  Please circle one number for each part.

|  | Very Poor | Poor | Fair | Good | Very Good | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

7. In your opinion, was the time allowed for each part the examination appropriate?  Please circle one number for each part.

|  | Less Than Enough | About Right | More Than Enough | Did Not Take |
|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 9 |

8. Please circle one number below for each part of the examination to indicate how much you agree or disagree with the statement: "The case situations were realistic."

|  | Strongly Disagree | Disagree | Neutral | Agree | Strongly Agree | Did Not Take |
|---|---|---|---|---|---|---|
| a. Special Session | 1 | 2 | 3 | 4 | 5 | 9 |
| b. Essay Examination | 1 | 2 | 3 | 4 | 5 | 9 |
| c. Multistate (MBE) | 1 | 2 | 3 | 4 | 5 | 9 |

9. In general, were the directions and questions in your special sessions clear or ambiguous?  Please circle one choice below.

   1-Clear    2-Mixed    3-Ambiguous    9-Did Not Take

10. What were your general reactions to the special session?  How could it be improved?  Should it be included in future examinations?

_____

_____

_____

_____

-26-

PR-01-01

# RELATIONSHIP OF SCORE RELIABILITY TO ESSAY TEST LENGTH, QUESTION LENGTH, AND SECTION WEIGHTING

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.

GANSK & ASSOCIATES

October 1, 2001

# RELATIONSHIP OF SCORE RELIABILITY TO ESSAY TEST LENGTH, QUESTION LENGTH, AND SECTION WEIGHTING

California's General Bar Examination (GBX) has two parts. One part is the Multistate Bar Exam (MBE). This one-day test consists of 200 multiple-choice items. The other part of the GBX consists of a two-day written exam that contains six 60-minute essay questions and two 180-minute performance test (PT) problems. The written section carries about twice as much weight as the MBE in determining a candidate's total score and thereby pass/fail status. Licensed attorneys who have been admitted to practice for at least four years in another state are eligible for licensure in California if they just take and pass the written section. This alternate route to licensure is called the "Attorneys" exam.

We investigated the effects on score reliability of reducing the written portion of the California exam to six 30-minute questions plus two 90-minute Multistate Performance Test (MPT) problems. This change would keep the number of questions the same, but eliminate one full day of testing. The major findings of our research (which included analyzing one to three recent July bar exams in 20 other jurisdictions) were as follows:

- When question length is held constant, longer tests (i.e., those with more questions) generally have higher reliabilities and correlations with the MBE than shorter ones.

- When the number of essay questions is held constant, longer questions (as indicated by the amount of testing time that is allocated to them) generally produce more reliable scores than shorter questions.

- Essay and total score reliability varies across states and within states across administrations even when the number of questions asked and the time allocated to answer them is held constant. Several factors may account for this variation.

- Total score reliability on the California exam is about .85 under the current policy of weighting the written section twice as much as the MBE.

- Reducing the written section to one day would *not* reduce its total score reliability *provided* the written and MBE sections are weighted equally.

- Giving the written section twice as much weight as the MBE with a shortened test would reduce total score reliability, but only slightly (from about .85 to .80).

- Changing the weights given to MBE and written sections from 65/35 to 50/50 will increase the passing rate for males (by about 1.7 percentage points) but decrease it for females (by about 1.2 points). Changing the weights assigned to these sections will not systematically increase or decrease the passing rate within a racial/ethnic group.

- Reducing the written section to one day would lower the score reliability of California's Attorneys exam. This is likely to be an important concern.

## Overview

The next portion of this report provides background information regarding score reliability and how it interacts with a jurisdiction's bar passage rate. Understanding the principles discussed in this section is necessary to fully appreciate what follows. We then describe the procedures in our study and the results we obtained as well as some important caveats and some possible concomitant effects of shortening the written test.

## Score Reliability

The bar exam assesses a candidate's knowledge, skills, and abilities in various areas of the law. It is obviously not feasible to ask all the questions that could be posed to candidates in these areas on every administration. Hence, any given version (or "form") of the exam (such as July 2000) contains only a *sample* of these questions. Score reliability indicates the degree to which the scores on this sample are likely to be *representative* of the scores these candidates would earn if they answered other sets of questions from the same pool of questions that could have been asked.

Score reliability also can be thought of as a measure the confidence that can be placed in the likelihood that the scores the candidates earned on the test that was given would correspond to their scores on an equivalent test that could have been given (such as the one slated for the next administration of the exam). Thus, score reliability refers to the *consistency* or *stability* of a candidate's score across different samples of questions that could be asked. Put another way, score reliability indicates how confident we can be in *generalizing* from the results with the particular sample of questions that were asked to the larger domain of all the relevant questions that could have been asked.

Several factors affect score reliability. For example, most candidates have only partial knowledge of a subject. Consequently, some candidates will be able to answer certain questions but not others while the reverse is true for other candidates. Similarly, some candidates may be "morning" people while others may function better later in the day. On essay tests, there also is the problem that different readers (or the same reader on different occasions) may assign different scores to the same answer.

All of these and many other extraneous factors can affect a candidate's score. Hence, a candidate's score has two components: (1) the systematic and consistent part (which is called "*true*" variance) and (2) the noise or chance part (which is called "*error*" variance). The true part is estimated from the degree to which a candidate's performance is consistent across different questions, such as the extent to which their scores on the even numbered MBE items corresponds to their scores on the odd numbered items. The *total* variance (i.e., the true + error variance) is a function of the standard deviation of the total scores (i.e., how much they spread out around the mean total score).

2

The *reliability coefficient* equals the true variance's share of the total variance; i.e., score reliability equals true variance divided by total variance. Reliability coefficients can therefore range from 0.00 to 1.00. A 0 coefficient indicates that we would have no confidence in the score being indicative of how a candidate would perform relative to others if we had asked a different sample of comparable questions. A 1.00 coefficient indicates that the relative standings of the candidates on one form of the test would be identical to their standings on another form of it.

## Score Reliability and Passing Rates

Almost all jurisdictions base their overall pass/fail decisions on a weighted combination of a candidate's essay and MBE scores. The reliability of this total score is a function of the reliabilities of the MBE and essay scores plus the correlation between these scores. The higher this correlation and the higher the reliabilities of the MBE and essay sections, the higher the reliability of the total scores. Thus, when state boards consider changing the structure of the essay portions of their bar exams, they will need to consider the effects of these changes on the correlation between MBE and essay scores as well as on the reliability of the essay section itself. Unfortunately, a change that lowers the score reliability of the essay section will also tend to lower its correlation with the MBE.

To illustrate, suppose a state's essay test consisted of six 60-minute questions. Our data suggest this will likely lead to an essay score reliability of about .71 and about a .62 correlation between essay and MBE scores. The MBE's score reliability is typically about .88. If the MBE and essay were weighted equally in computing a candidate's total score, then the reliability of these total scores would be about .87. It would slip slightly to about .83 if the essay carried twice as much weight as the MBE.

Now suppose this state shortened its essay test to six 30-minute questions; i.e., from a six-hour test to a three-hour test. Our data indicate this will lower the reliability of the essay section from .71 to about .54. It also will reduce the essay's correlation with the MBE to about .55. Taken together, these changes will lower the reliability of the total scores to about .81 if the sections are weighted equally and to .73 if the essay carries twice as much weight as the MBE. However, this loss in total score reliability could be offset somewhat by using the three hours that were taken away from the essay to add two Multistate Performance Test (MPT) problems to the exam.

Whether a change in the reliability of the total scores is policy relevant or not depends heavily on a state's passing rate. Specifically, the closer that rate is to 50%, the more important it is to have high total score reliability. Conversely, if almost everyone passes (or everyone fails), score reliability becomes much less critical because it is unlikely that using a different form of the test would result in changing the pass/fail status of many candidates.

Table 1 shows the relationship between score reliability, passing rate, and the likelihood of changing a candidate's pass/fail status as a result of simply administering a different form of the test. For example, if the reliability of the total scores is .90 and 80% of the applicants pass, then about 10% of them would have a different pass/fail status if they took another form of the test. In other words, some would go from passing to failing while others would move in the opposite direction. In contrast, if reliability slips to .80 and only 60% pass, then 20% of the candidates would have their pass/fail status affected by just taking a different form of the test. Hence, whether a small or even a fairly large reduction in score reliability matters depends heavily on a jurisdiction's passing rate. The closer that rate is to 50% for all takers, the more important score reliability becomes.

The overall passing rates on the February and July 2000 California GBX were 40% and 55%, respectively. The corresponding rates on the Attorneys exam were 54% and 55%. Because these rates are so close to 50%, score reliability is an especially important consideration for California.

**Table 1**
Percentage of Candidates Who Would Have a Different Pass/Fail Status if They Took a Different Form of the Test as a Function of Passing Rate and Total Score Reliability

| Percent Passing | Score Reliability | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | .00 | .10 | .20 | .30 | .40 | .50 | .60 | .70 | .80 | .90 |
| 90 | 19 | 17 | 16 | 16 | 15 | 14 | 12 | 11 | 9 | 6 |
| 80 | 32 | 30 | 28 | 26 | 24 | 22 | 20 | 17 | 14 | 10 |
| 70 | 42 | 39 | 37 | 34 | 32 | 29 | 25 | 22 | 18 | 13 |
| 60 | 48 | 45 | 42 | 38 | 35 | 32 | 28 | 24 | 20 | 14 |
| 50 | 50 | 47 | 44 | 40 | 37 | 33 | 29 | 25 | 21 | 15 |
| 40 | 48 | 45 | 42 | 38 | 35 | 32 | 28 | 24 | 20 | 14 |
| 30 | 42 | 39 | 37 | 34 | 32 | 29 | 25 | 22 | 18 | 13 |
| 20 | 32 | 30 | 28 | 26 | 24 | 22 | 20 | 17 | 14 | 10 |
| 10 | 19 | 17 | 16 | 16 | 15 | 14 | 12 | 11 | 9 | 6 |

## Research Methods

We examined recent July bar exam results from 21 jurisdictions. These jurisdictions ranged from having only 65 to nearly 8,000 July candidates. Together, these jurisdictions account for roughly 70% of all the bar exam takers annually. We restricted our study to states whose exams yielded scores on six or more independently graded essay questions. Almost all the states from which we requested scores were able to provide these data.

Data were analyzed for one to three exams for each of the participating jurisdictions. All told, we examined data for 42 exams that together contained over 400 questions. The results with state developed essay questions did not appear to differ systematically from those obtained with Multistate Essay Exam (MEE) questions. Thus, we did not distinguish between them in this report.

Where possible, we examined the reliability of each jurisdiction's full test. We also created as many completely separate six-question and nine-question essay subtests as the data would allow. For example, we formed two subtests per exam administration for the states that asked 12 essay questions, but only one six-question subtest (usually the first six questions) for states that asked 8 questions. When we were able to create more than one subtest for a state's exam, we computed statistics separately for each subtest and then used the average of their values for that administration. Thus, the unit of analysis is an administration of an exam.

## Effects of Test and Question Length

Table 2 shows the average of the score reliabilities for various combinations of test and question length. It is evident from this table that if the number of questions asked is held constant, then longer questions (i.e., those to which more testing time is allocated) provide more reliable scores than shorter questions. Similarly, if the time to answer is held constant, then the tests with more questions generally provide more reliable scores. Note also that asking 12 essay questions in six hours yields a score reliability that is roughly the same as asking 6 essay questions in six hours (.67 and .71, respectively). There did not appear to be a systematic relationship between the number of candidates in a jurisdiction and the size of its reliability coefficients.

**Table 2**
Mean Score Reliability for Different Combinations
of Test and Question Length

| Minutes per Question | Number of Essay Questions | | | |
|---|---|---|---|---|
| | 6 | 9 | 12 | >12 |
| 25-30 | .53 | .64 | .67 | .76 |
| 36-45 | .63 | .73 | | |
| 50-60 | .71 | | | |

Table 3 shows the correlation of MBE scores with tests of varying lengths. These data have the same general pattern as those in Table 2; i.e., increasing the number of questions and/or their length increases the correlation of their scores with MBE scores.

5

**Table 3**
Mean Correlation with the MBE for Different
Combinations of Test and Question Length

| Minutes per Question | Number of Essay Questions | | | |
|---|---|---|---|---|
| | 6 | 9 | 12 | >12 |
| 25-30 | .54 | .60 | .60 | .69 |
| 36-45 | .63 | .67 | | |
| 50-60 | .63 | | | |

## Other States' Experiences With the Proposed Structure

California's General Bar exam consists of the MBE, six 60-minute essay questions, and two 180-minute performance test problem. The score on a PT answer is nominally given twice as much weight as the score on an essay answer. The mean score reliability over the three July exams for its written (essay plus PT) section is .74. The mean correlation of this section with the MBE is .64. Total score reliability is .88 if the sections are weighted equally and .85 if the written section has twice as much weight as the MBE.

One of the other jurisdictions we studied ("State A") gave two 90-minute MPT problems and a dozen 30-minute essay questions. Analyses of its July 2000 data indicated that a written test composed of six 30-minute essay questions and two MPTs would have a written score reliability of .63. Such a test would have a .60 correlation with the MBE. These values would lead to a total score reliability of .85 if the sections are weighted equally and a .78 if the written section is weighted twice as much as the MBE.

Another jurisdiction ("State B") also gave two 90-minute MPTs and several essay questions. Averaging results over the last three July bar exams in this jurisdiction indicated that the combination of a three-hour essay test plus two 90-minute MPTs would have a written test score reliability of .65 and a correlation of .62 with the MBE. The reliability of this state's total scores would be .85 if the written and MBE sections were weighted equally and .80 if the written section had twice as much weight as the MBE.

A third jurisdiction ("State C") had exactly the same written test structure as California, but used half the testing time by giving six 30-minute essays and two 90-minute MPTs. By averaging data over the last two July exams (and giving each PT answer twice the nominal weight assigned to an essay answer) we found that State C's written section had a score reliability of .67 and a .61 correlation with the MBE. The reliability of the total scores was .86 when the sections were weighted equally and .81 when the written section was given twice as much weight as the MBE.

Table 4 contrasts the results in States A, B, and C with those in California. These data suggest that cutting the time California currently allocates to its written section in half would not affect total score reliability *provided* California gave the written and MBE sections equal weight. However, if California cut testing time in half and continued to give the written section twice as much weight as the MBE, then there would be slight (.05) drop in total score reliability (i.e., from about .85 to about .80).

**Table 4**
Estimated Total Score Reliability as a Function of Question Length
and the Weight Given to the Written Section Relative to the MBE

| State | Written Test Length | Written and MBE have equal weights | Written has twice the weight as the MBE |
|-------|---------------------|-----------------------------------|------------------------------------------|
| A | 6 Hours | .85 | .78 |
| B | 6 Hours | .85 | .80 |
| C | 6 Hours | .86 | .81 |
| California | 12 Hours | .88 | .85* |

\* California's current exam

## Concomitant Effects

It is conceivable that reducing the GBX's total score reliability from its present .85 to about .80 could have some very slight downstream consequences on other outcomes. Specifically, for reasons that go beyond the scope of this report, it will tend to slightly reduce the standard deviation of the total scores. This could, in turn, lead to a very small reduction in the February passing rate and a very slight increase in the July rate (because the passing score is above the mean in February but below the mean in July). Reducing total score reliability from .85 to .80 would very slightly reduce or have no effect on the differences in passing rates among gender and racial/ethnic groups.

As noted above, reducing the written section from a two-day test to a one-day test is likely to reduce the reliability of the written scores from about .74 to about .65. This may raise concerns about the stability of the pass/fail decisions on the Attorneys exam. Specifically, about 55% of the Attorney candidates pass this test. If score reliability is .74, then according to the data in Table 1, slightly more than one-out-of-five of the Attorney exam candidates would have their pass/fail status affected by simply taking another form of the test. If score reliability dropped to the expected .65 for a one-day written test, then about one-out-of-four candidates would experience a change in status just by taking another form of the test. In short, chance would play an even larger role in determining an Attorney candidate's pass/fail status.

There would be similar concerns in states that allow candidate's to "bank" their essay scores and/or require them to surpass a certain minimum score on each section of the exam. In short, written score reliability will be an issue when these scores are used by themselves to make pass/fail decisions (i.e., rather than in conjunction with MBE scores).

## Effect of Section Weighting

Changing the weight the MBE carries relative to the written section could have policy implications. To examine this issue, we recomputed every candidate's total scale score (prior to reread) on the last six July exams using a 50/50 written to MBE scale score weighting policy. We then contrasted the percent passing with these recomputed scores with the percent passing based on total scores (prior to reread) with the existing 65/35 weighting.

This analysis found that about 4.3% of the candidates who would pass under the current 65/35 weighting would fail if the weights were 50/50. Similarly, about 4.2% of those who would pass under a 50/50 weighting policy would fail under the current 65/35 policy. Thus, overall, about 8.5% of the candidates would have their pass/fail status affected by which set of weights was used, with about half of them going from a pass to a fail while the other half going in the opposite direction.

Which set of weights is used had almost no effect on the passing rates within racial/ethnic groups. For example, over the last six July exams, the passing rates prior to reread for Hispanics with the 65/35 rule and the 50/50 rule were 41.5% and 41.6%, respectively. The corresponding rates for African Americans were 27.9% and 27.8%. In short, weighting policy did not have much if any impact on a racial/ethnic group's passing rate.

The choice of weights did have a small effect on the passing rates within gender groups. Changing the weights from 65/35 to 50/50 would increase the passing rate for males by about 1.7 percentage points while decreasing it for females by about 1.2 points. These changes would occur because males generally earn higher scale scores on the MBE than on the written section while the reverse is true for females.

## Caveats

Several caveats should be kept in mind when considering the results presented above. First, the score reliability of an essay test depends on several factors, including the characteristics of those tested and those who grade their answers. Consequently, the reliability of essay scores varies across jurisdictions even when they ask the same questions, use the same time limits, and endorse the same grading standards as other jurisdictions. Thus, the experience in one jurisdiction may not coincide exactly with the experience in another.

Second, score reliability may be affected by the number of different subjects for which candidates had to prepare, the degree to which these subjects overlapped those on the MBE, what candidates were told and learned in their bar review courses, the diversity of the subjects covered by the questions that actually appeared on the test, the quality of the questions that were asked, and the procedures used in grading the answers to them.

Third, the number of questions asked may influence drafting, editing, and scoring practices. For example, a board that asks six questions may devote more time to writing and grading each of them than a board that asks 12 questions. Similarly, a state with relatively few candidates can devote more time to grading answers or even grading each answer twice. As a consequence, increasing test length from 6 to 12 questions may not increase score reliability as much as would otherwise be expected by standard statistical formulas.

Fourth, the analyses presented in this report are based solely on July exams. We did this in the interests of consistency because some of the states we wanted to include only give the test in July or had so few February takers as to render the results with their exams questionable. Our experience indicates that February exams tend to have slightly lower total score reliabilities than July exams.

Fifth, score reliability may vary across jurisdictions even when they ask the same questions and the same number of questions in the same amount of time and have ostensibly similar populations of candidates. For example, we found that score reliabilities ranged from .40 to .67 across the 22 exams for which we had data on one or more six-question essay tests with exactly 30 minutes per question. Thus, there was quite a lot of variation around the median value of .54 for an essay test of this length.

Sixth, our study focused on estimating how shortening the written section would affect score reliability. We did not examine whether shorter essay and PT questions would assess the same (or more or less appropriate) skills and abilities as longer ones.

Finally, some states, such as New York, consistently obtain a higher degree of score reliability per hour of essay testing time than other jurisdictions. And, score reliability may vary considerably within a state across administrations of its exam. It is not clear why such variation occurs (e.g., the standard deviation of MBE scores is generally quite comparable across states).

## Conclusions

The data in this report show that essay score reliability tends to increase as the number of questions asked increases. Increasing the amount of testing time per question (as a proxy for question length) also increases essay score reliability. Reducing test or question length will therefore tend to have the opposite effect. However, even a large reduction in question length is unlikely to have any practical effect on the reliability of total exam scores provided the MBE and written sections are weighted equally in the computation of those total scores. This outcome stems from the substantial correlation between MBE and written scores (and the MBE's high score reliability).

Nevertheless, there are some situations where a reduction in the written section's score reliability could be a serious concern. Specifically, this is likely to be a significant issue for any exam (including California's Attorneys exam) that bases pass/fail decisions on written test scores alone. This is an especially important concern when the passing rate is close to 50% (as it is on California's Attorneys exam).

Finally, how much weight is given to the written section relative to the MBE in computing a candidate's total scale score is likely to have some effect on the passing rates within gender groups. This will happen because males tend to earn higher MBE than written scores while the reverse is true for females.

## STATISTICAL NOTES

Table 1 was created by conducting a Monte Carlo simulation with 10,000 replications. It assumes that both tests have equal means and variances, and that their scores are distributed normally. Deviations from these assumptions would tend to lower agreement.

The table below shows the number of tests that were used to calculate the mean values that appear in Tables 2 and 3. A given exam was often used to calculate the mean for more than one cell in these tables. For example, analyses of the data from states that asked a dozen 30-minute questions were used to estimate the reliability for tests with 6, 9, and 12 questions.

Number of Tests Used to Calculate Score Reliability and Correlation with MBE

| Minutes per Question | Number of Essay Questions | | | |
|---|---|---|---|---|
| | 6 | 9 | 12 | >12 |
| 25-30 | 27 | 21 | 9 | 4 |
| 36-45 | 5 | 5* | | |
| 50-60 | 8 | | | |

* Three of the exams in this group contained 8 questions. The other two contained 10 questions apiece. However, the values in this cell were very similar across the five exams.

All the reliability coefficients in this report are unstandardized coefficient alphas. Calculations of total score reliability assumed that the MBE's reliability was .88 which is typical of that reported by ACT for July administrations.

The formula for estimating the reliability of the total scores of an equally weighted linear composite of MBE and essay (or written) scores is shown below where A = the reliability of the essay test, B = reliability of the MBE, and C = the correlation between them.

$$Rtt \text{ when weighted equally} = 1 - [(2 - A - B)/(2 + 2*C)]$$

The formula for estimating the reliability of the total scores of a differentially weighted linear composite of written and MBE scores is shown below where A, B, and C are the same as above, D = standard deviation of the essay, E = the square of this standard deviation, F = standard deviation of the MBE, and G = the square of this standard deviation.

$$Rtt \text{ when weights differ} = 1 - \{[(E + G) - (A*E) - (B*G)]/[(E + G) + 2(C*D*F)]\}$$

Sections are weighted by the relative sizes of their standard deviations. For example, for the analyses that gave the written section twice as much weight as the MBE, we set the written section's standard deviation at twice the size as the MBE's standard deviation.

RESEARCH ON THE CALIFORNIA BAR EXAMINATION

Stephen P. Klein, Ph.D.
September 9, 1987

This report summarizes the major findings of studies conducted on the California bar examination during the past 12 years. These studies investigated various characteristics of the exam (such as the adequacy of its time limits), essay grading practices, the stability of pass/fail standards, possible racial/ethnic and sex biases, and the relationship between traditional and non-traditional measures of lawyering skills.


A. ESSAY SECTION

1) The more questions an applicant answers, the more reliable the total essay score; i.e., the less likely the total essay score will be influenced by chance, such as an applicant's knowledge or ignorance of a particular facet of the law.

2) Total essay scores, by themselves, are not sufficiently reliable for making pass/fail decisions on individual applicants. This is true even if the essay section contains 12 questions.

3) Essay scores on different questions in the same content area usually correlate no more highly with each other than they do with scores on essay questions in other content areas. This finding suggests that differences in total essay scores among applicants are more a function of general legal knowledge and ability than they are of differences in the mastery of specific subjects.

4) Increasing the time applicants have to answer a question from 55 to 90 minutes usually resulted in only a slight improvement in score. It did not systematically change the relative standings of various groups. For instance, applicants who earned low scores under the shorter time limit did not benefit any more or less from the increased time than did other applicants.

5) Analytic (scorecard) grading is not as cost effective as holistic grading. The small increase in reliability gained through scorecard grading is more than offset by the subtantially longer time it takes readers to grade papers using this approach.

6) Applicants who type (versus handwrite) their answers earn about the same essay scores as would be expected on the basis of their MBE scores; i.e., typing does not tend to raise or lower essay scores. We do not know whether applicants would earn the essay same scores if they were required to change from their preferred response mode.

## B. PERFORMANCE TEST (PT)

1) PT answers are graded just as reliably as essay answers.  And, the score on a PT problem is about as reliable as the score on an essay question.

2) Two PT problems usually correlate about as highly with each other as each one does with a typical essay question.  This finding was considered in the decision to combine essay and PT scores into a single written score starting with the February 1987 exam.

3) Applicants who have been admitted to practice in other states generally score no higher or lower on the PT than would be expected on the basis of their scores on the other sections of the exam.  This finding holds up even after controlling for length of time in practice and for attorneys who take just the PT and essay as well as for those who take all three sections.

4) Applicants believe the PT is a more valid measure of their ability to practice law than is either the Essay or MBE.


## C. MULTISTATE BAR EXAMINATION (MBE)

1) There is a high correlation between MBE and essay scores.  If the percent passing both sections was the same, the MBE and essay would make the same pass/fail decision for about 70 to 80 percent of the applicants.  The rank ordering of law schools in terms of average MBE score is essentially identical to their rank ordering in terms of average essay score.

2) Similarity of content coverage does not appear to be the source of the close relationship between MBE and essay scores.  For instance, scores on the MBE Contracts subtest usually correlate no more highly with scores on an essay question in Contracts than they do with scores on an essay question in Evidence.  And, when an essay question is converted to a set of multiple choice questions, applicant scores on these items correlate more highly with MBE scores than they do with essay scores.

3) Differences in an applicant's grades among courses in law school do not necessarily coincide with differences in that applicant's scores on MBE subtests; e.g., doing especially well in contracts in law school relative to other subjects may or may not result in an elevated score on the MBE contracts section.  The same finding also holds for the essay section.

4) MBE scores are very reliable.  For example, an applicant's score on the first 100 questions provides a very accurate prediction of that applicant's score on the next 100 questions.  Thus, even though applicants are allowed to guess, their scores are not due to chance.

5) Lengthening the time applicants are given to answer a set of MBE
   questions tends to increase scores slightly for all groups.  For
   instance, all of the four most populous racial/ethnic groups who
   take the exam (Anglo, Asian, Black, and Hispanic) had about a 5
   percent increase in average MBE score after being given more than
   a 50 percent increase in time limits.


## D. REREADING AND REAPPRAISAL

1) The degree of agreement between readers in the scores they assign to
   the same essay answer is almost as high as when a single reader
   grades the same answer twice.

2) The average of two readers' grades on the same essay answer produces
   a more reliable score than does a single reading of that answer.

3) It is rare for two readers to assign substantially different grades
   to the same answer.  When large differences do occur, they are
   almost always a function of chance variation around the applicant's
   true score rather than one reader making a clear mistake in grading.

4) Consistently using the higher (or lower) of the two scores assigned
   to an answer results in lower test reliability than does using the
   average of the two scores.

5) The scores assigned to an answer on the second reading tend to be
   slightly lower than those assigned on the first reading.

6) The reread and reappraisal bands have been set at about the right
   place in that they include essentially all of the applicants whose
   pass/fail status might be affected by reread and reappraisal.

7) The degree of agreement between reappraisers is comparable to the
   degree of agreement between readers (when the reappraisers do not
   see the grades assigned by the readers).

8) The reappraisal process does not increase test reliabiltiy, but it
   does increase the percent passing the exam.  It also widens the gap
   in score between those who do and do not pass; i.e., as a result of
   reappraisal, only a handful of applicants fail by a few points.


## E. TOTAL SCORES AND PASS/FAIL STANDARDS

1) The Total bar exam score (after all readings) provides a
   sufficiently reliable index for making pass/fail decisions about
   individual applicants.

2) The score required for passing in California is similiar to that
   used by Oregon, but higher than the one used by most other states.
   For instance, California's passing rate for first timers would

- 4 -

increase substantially if it used New York's or Massachusetts' passing score.

3) There is a strong correlation between total bar exam scores and performance on legal problems that mirror closely several of the tasks that newly licensed attorneys would be expected to perform. And, the standard for passing these practice oriented problems was identical to the one used on the bar exam even though it was set without knowledge of the bar exam's standard.

4) In the past, the actual standard for passing in California was slightly lower in February than in July (as indicated by the MBE score that was required to produce the same passing rate as was actually observed on each exam). And, the standard for passing on both the February and July exams rose slightly during the last few years. These differences should disappear with the use of scaling.

5) First time takers are much more likely to pass than are repeaters. And, the higher the initial score, the greater the likelihood of eventually passing and doing so with just one or two more attempts. However, some repeaters eventually pass even though they had very low initial scores and/or made several previous attempts to pass.

6) Studies of first time takers on two recent exams reveal that about 70 percent of them eventually pass (i.e., after as many as five subsequent attempts). Almost 85 percent of all first time ABA takers eventually pass and about 63 percent of all minority ABA first timers eventually pass.

7) Most of the repeaters who eventually pass do so after their second or third attempt. The likelihood of passing after the third attempt is quite low.


## F. CHANGES IN BAR EXAM PROCEDURES AND RULES

During the past 15 years, several procedures and rules were changed in an effort to improve the exam. Some of these changes, such as the use of multiple readers for applicants near the pass/fail line and greater emphasis on reader calibration, have had their anticipated beneficial effects on overall exam quality.

Other procedures did not have their intended impacts and were later discontinued. This latter category includes: (1) the use of extra long essay time limits, (2) giving applicants some choice in which essay questions they answered, and (3) allowing repeaters to pass the exam in sections (the so called "bifurcation" rule). For example, the repeaters' passing rate dropped when this rule was introduced and rose after it could no longer influence their success rate.

In February 1987, scores on the essay and PT were combined into one total score and this score was then converted ("scaled") to the same score distribution as that used on the MBE. The standard for passing

was set at the average of the standards used on the previous 20 exams.
The February 1987 passing rate was the highest February rate in the last
10 years, thus "scaling" (and its associated pass/fail rules) did not
lower the passing rate.

## G. CORRELATES OF SUCCESS ON THE BAR EXAM

1) Law School Admission Test (LSAT) scores and law school grade point
   average (LGPA) are highly correlated with scores on all three parts
   of the bar exam (MBE, Essay, and PT).  However, even when used
   together, LSAT and LGPA provide less than a perfect prediction of
   an applicant's pass/fail status on the exam.

2) School type (ABA, California Accredited, or Unaccredited) is not
   correlated with success on the bar exam after factoring out each
   type's average LSAT score.  In other words, the generally higher bar
   exam passing rates of ABA schools is closely associated with these
   schools having students with relatively high LSAT scores.

3) The rank ordering of law schools in terms of the average LSAT
   scores of their <u>graduates</u> produces an almost perfect prediction of
   these schools' bar exam passing rates.  It also provides a very good
   prediction of their average scores on the various sections of the
   exam.  These findings may not apply to the many unaccredited schools
   that do not provide their graduates' LSAT scores.

4) Scores on the first year law student's exam are highly correlated
   with bar exam scores.  An applicant who just passes the first year
   test is likely to fail the bar exam on the first attempt but pass
   on a subsequent attempt.  Thus, the passing score on this test
   appears to be set at about the right place in that it tends to
   pass those students who have a reasonable chance of eventually
   passing the bar exam.

5) Applicants whose LSAT scores are well below the average of their
   classmates' LSAT scores (such as those who enter law school via
   special admissions programs) do about as well in law school and
   on the bar exam as would be expected on the basis of their LSAT
   scores.  In other words, attending a school where most of the
   other students have substantially higher LGPAs and LSAT scores
   does not reduce or enhance an applicant's chances of passing the
   bar exam.

6) Applicants whose undergraduate major was English, Journalism, or
   Philosophy tended to earn slightly higher bar exam scores and
   especially essay scores than other applicants.  However,
   undergraduate major was only a very weak predictor of bar scores.
   The pattern of undergraduate majors was quite similar across all
   racial/ethnic groups; e.g., about one third of the applicants in
   each group majored in History, Government, or Political Science.

## H. ANALYSES BY SEX AND RACIAL/ETHNIC GROUP

1) After controlling for differences in overall difficulty across test sections, men tend to earn slightly higher MBE scores than essay or PT scores while the reverse is true for women. This trend even held for women who had an undergraduate major in the hard sciences.

2) In the past, women used to have higher average scores than men. However, this difference has been declining rapidly. This decline parallels the increasing percentage of applicants who are women.

3) Applicant sex does not predict bar exam scores after controlling on LGPA; i.e., overall, the exam does not tend to favor one group.

4) There are large differences in average scores among racial/ethnic groups. However, there also is considerable overlap of score distributions. Because of this overlap, racial/ethnic group is only a very weak predictor of an applicant's pass/fail status.

5) The small correlation between bar scores and racial/ethnic group disappears when there is control for the applicant's LGPA. In other words, the differences in passing rates among groups on the bar exam is comparable to the differences among them in law school grades. The bar exam neither widens or narrows this gap.

6) The foregoing findings hold for all three types of exam questions (MBE, essay, and PT). Thus, no section tends to favor a given group (after controlling for differences in reliability among sections).

7) None of the MBE, essay, or PT subtests tend to widen or narrow the differences in average score among groups. For instance, MBE Torts questions are not especially difficult for a given group relative to this group's performance on other MBE questions.

8) The grades assigned to an essay answer are not affected by whether the reader's racial/ethnic group is the same or different than that of the applicant who wrote the answer.

9) During each of the past 10 years, one person in 10 who passes the California bar exam belongs to a racial/ethnic minority group. About one applicant in seven who takes the exam for the first time is a member of a racial/ethnic minority group.

10) Minority applicants are more likely to come from the most selective law schools in the state (as reflected by their school's average LSAT score) than are Anglo applicants.

11) The eventual passing rates among minority group members is much higher than their initial rates. As a result, most minority applicants eventually pass the exam (although they are likely to require more attempts to do so than their Anglo classmates).

## I. NOVICE/GRADUATE STUDY

Sections of the July 1985 bar exam were given to students at four ABA
schools shortly after they began law school.  Their scores were then
compared with those of 1985 graduates from these same schools.  The
major findings of this study were:

1) The graduates scored substantially higher than the novices.  In
   fact, none of the novices passed any section.  And, the chances are
   essentially nil that any novice would even come close to passing the
   general bar exam.

2) LSAT scores were not related to the novices' bar scores, but were
   related to the graduates' bar scores.

3) Although there were large differences in average LSAT scores among
   racial/ethnic groups within the novice sample, there was no
   difference in their average bar exam scores.

4) The more reliable the bar exam test section, the greater the
   difference in average score between novices and graduates.

Taken together, these findings debunk various criticisms of the bar
exam.  They show that bar scores are not just a function of guessing,
chance, or being adept at taking certain types of tests.  Similarly,
scores on essays and PT problems are not primarily a function of general
writing or reasoning skills as distinct from the abilities developed in
law school.  And finally, although the PT provides applicants with all
of the law, case materials, and facts on which to base their answers,
applicants still need a legal education to do well on these problems.


## J. ASSESSMENT CENTER AND SPECIAL SESSION STUDIES

Several studies were conducted in conjunction with the July 1980 exam.
These studies examined how well the MBE and essay sections correlated
with more practice oriented measures of lawyering skills.  These
measures included tests of trial practice skills, legal research skills,
interviewing and counseling clients, examining witnesses, making opening
statements and closing arguments, preparing legal memos, etc.  Some of
these tasks were oral whereas others were written and/or observational.
The major findings of this research were that:

1) Applicants who had the abilities needed to do well on these tasks
   also tended to have the skills and knowledge that were required to
   do well on the bar exam.  This conclusion stems from the finding
   that scores on the special observational, oral, and written tasks
   correlated highly with regular bar exam scores (and to about the
   same degree as the MBE and essay correlated with each other).

2) Although an applicant's responses on an experimental tasks usually
   took longer to grade than a typical essay answer, the scores on
   these tasks were just as reliable as they were on an essay answer.

8

3) After controlling for differences in reliability among measures, scores on the practice oriented tests did not widen or narrow the the gap in average performance level among racial/ethnic groups

4) Most applicants thought the practice oriented tasks were a better indicator of their ability to function as an attorney than were either the MBE or the essay.

5) The pass/fail standards established by an independent panel for the practice oriented tasks coincided with the pass/fail standard for the bar exam even though the panel did not know the applicants' bar exam scores.

## REFERENCES

Two reports are prepared for each administration of the California bar exam: Summary Statistics (prepared by Philip Schoner) and Technical Report (by Stephen Klein).  The American College Testing Program (ACT) provides a report on each administration of the MBE (the Educational Testing Service prepared similar reports on the MBEs given prior to the July 1984 exam).

Except as noted otherwise, all the references below were prepared by Stephen Klein as reports for the Committee of Bar Examiners.

A. Essay Section

An analysis of grading practices on the California Bar Examination (1977).

Summary of studies conducted for the Committee of Bar Examiners and the statistical rationale underlying proposed changes (1978).

Comparison of an 8, 9, and 12 answer essay test in a multiphased pass/fail decision model (1978).

The effect of time limits, item sequence, and question format on applicant performance on the California Bar Examination (1981). (PR-81-7).

Essay grading: Fictions, facts, and forecasts.  The Bar Examiner, 1985, 54, 23-29.

Relationship between MBE and essay scores among applicants who did and did not type their answers (Memo of February 28, 1987).

B. PERFORMANCE TEST

An analysis of the Performance Test on the July 1983 California Bar
Examination (1984).

See also the Technical Report on each exam since July 1983.


C. MULTISTATE BAR EXAMINATION

Carlson, A. B. and C. Werts (1976).  Relationships among law school
predictors, law school performance, and bar examination results.
Princeton, NJ: Educational Testing Service.

The effect of time limits, item sequence, and question format on
applicant performance on the California Bar Examination (1981).

An evaluation of the Multistate Bar Examination.  National Conference of
Bar Examiners, Chicago (1982).

Summary of research on the Multistate Bar Examination. The Bar
Examiner, 1983, 52, 10-15.

See also the Technical Report on each exam and the reports prepared by
ACT and ETS on each administration of the MBE.


D. REREADING AND REAPPRAISAL

Intra- and inter-reader agreement on the essay section of the California
Bar Examination (1980).

A comparison of the effectiveness of a single versus multiphased grading
system (1980).

Large discrepancies between readers: Their source and policy
implications (1985).

Schoner, Philip G. and Alex Millar (1987).  The relationship between
tentative/calibration grades and general bar examination grades.

See also the Technical Report on each exam.


E. TOTAL SCORES

Summary of studies conducted for the Committee of Bar Examiners and the
statistical rationale underlying proposed changes (1978).

An analysis of possible variations in pass/fail standards on the
California Bar Examination (1981). (PR-81-1)

An analysis of the relationship between clinical skills and bar
examination results (1982).

An analysis of the relationship between initial score and eventual
pass/fail status on the California Bar Examination (1982). (PR-81-9)

Results of the July 1982 and July 1984 Tracking Studies (DR-87-5
in preparation).

See also the Summary Statistics and Technical Report on each exam.


F. CHANGES IN BAR EXAM PROCEDURES AND RULES

How the bifurcation rule affected the percent passing California's
General Bar Examination (1985). (PR-85-5)

Minority group performance on the California bar examination (in
preparation DR-87-2).

See also the Technical Reports on each exam.


G. CORRELATES OF SUCCESS ON THE BAR EXAM

An analysis of possible sex and racial/ethnic biases in the July, 1976
California State Bar Examination (1978).

An analysis of the relationships between bar examination scores and an
applicant's law school, admissions test scores, grades, sex, and
racial/ethnic group (1979).  Summary reprinted in The Bar Examiner,
1980, 49, 14-18.

Preliminary report on the relationship between undergraduate major and
bar examination scores (1982).

Minority group performance on the California bar examination (in
preparation DR-87-2).


H. ANALYSES BY SEX AND RACIAL/ETHNIC GROUP

An investigation of possible item and grader biases in a state bar
examination.  Paper presented at the meetings of the Western
Psychological Association, Los Angeles, California, April 9, 1976.

Summary of studies conducted for the Committee of Bar Examiners and the
statistical rationale underlying proposed changes (1978).

An analysis of the relationships between bar examination scores and an
applicant's law school, admissions test scores, grades, sex, and
racial/ethnic group (1979).  Summary reprinted in The Bar Examiner,
1980, 49, 14-18.

11

An analysis of the relationship between initial score and eventual pass/fail status on the California Bar Examination (1982).

Minority group performance on the California bar examination (in preparation DR-87-2).

See also the Summary Statistics and Technical Report on each exam.


I. NOVICE/GRADUATE STUDY

The performance of novice law students and law school graduates on the bar exam (1986).


J. ASSESSMENT CENTER AND SPECIAL SESSION STUDIES

Testing research skills on the California Bar Examination (1981).

An analysis of the relationship between clinical skills and bar examination results (1982).

An analysis of the relationship between trial practice skills and bar examination results (1982).

78- 1P

SUMMARY OF STUDIES CONDUCTED FOR
THE COMMITTEE OF BAR EXAMINERS
AND THE STATISTICAL RATIONALE
UNDERLYING PROPOSED CHANGES

Prepared by
Stephen P. Klein
August 25, 1978

78-1P

This report summarizes the results of a series of studies conducted on the State of California General Bar Examination. These studies have provided information regarding the statistical properties of the present examination process and the effects of certain modifications that might be made to improve this process. A summary of the changes that have been adopted and the rationale for them also are discussed.

BACKGROUND

The General Bar Examination has two sections. The Essay portion consists of three sets of five questions each. An applicant is instructed to select four questions per set to answer in the three-and-one-half hours allocated to each Essay test session. A given question involves several issues from one or more content areas, so that the Essay Test as a whole covers the major subject areas taught in law school. These questions are designed to assess an applicant's ability to analyze legal problems and are usually initially developed by non-California law professors. The questions are then revised and edited by the Committee of Bar Examiners, its staff, and the Board of Reappraisers. */

During the past few years, four to five readers (all of whom are attorneys who have passed the examination) are assigned to each essay question. This team, under the direction of a

_____

*/ The Board of Reappraisers is composed of nine attorneys who have had extensive experience as readers.

member of the Board of Reappraisers, researches the appropriate
ways of responding to the question, reviews an analysis of it
that was prepared by the professor who wrote it initially, and
reads a small sample of the answers that were written to it.  In
this way, the team develops mutually agreed upon scoring criteria
and standards.  The answers written by a group of 75 applicants
are then independently graded by all the members of the team in
order to assess the extent to which they are indeed calibrated to
one another.  Discrepancies in the interpretation of grading
procedures identified by this process are resolved via a conference
with the Committee of Bar Examiners, its staff, and the Board of
Reappraisers.  Once these steps are completed, all the answers to
the question are divided among the team members assigned to it,
although periodically certain answers are graded and discussed by
all the members of the team in order to help maintain interreader
consistency.

The second section of the examination consists of a six-hour
multiple choice test, called the Multistate Bar Examination
(MBE).  This test contains 200 questions that are divided among
six content areas:  Constitutional Law, Contracts, Criminal Law,
Evidence, Real Property, and Torts.  The MBE is developed by the
National Conference of Bar Examiners and is scored by the Educational
Testing Service of Princeton, New Jersey.

Each of the 12 essay questions answered by an applicant
is worth up to 100 points.  Scores on the MBE are weighted to
a maximum of 514 points so as to reflect the Committe of Bar

Examiner's policy that this section account for 30% of an applicant's total score (i.e., the maximum total score is 1714 points).

An applicant may pass the examination in one of two ways. The first method is by receiving a combined Essay and MBE score of 70% (1200 points) or higher. The second method is by passing each section of the examination separately with minimum scores of 840 and 360 for the Essay and MBE, respectively. In other words, an applicant may pass one portion on one administration of the examination and the other portion on a different administration. Since an applicant's passing status on one section cannot be reversed by subsequently failing that section, it is clearly in an applicant's best interests to take both portions each time he or she attempts to pass the examination as a whole. In that way, the applicant may be able to pass by either of the two methods.

In the past, if an applicant came close to passing but still failed the examination (or the Essay portion of it), that applicant's Essay answers were turned over to the Board of Reappraisers. The reappraisers assigned to a particular applicant reviewed all 12 of the applicant's answers as a set so as to make an overall pass/fail decision. This meant that an applicant's efforts were evaluated as a whole by readers who had extensive experience in grading bar examinations and who had also been intimately involved in the question development and scorer calibration processes.

COMPARISON OF MBE AND ESSAY TEST CHARACTERISTICS

Test Difficulty

    Using the criterion that 70% or higher of the total possible score on a test constitutes passing, then an applicant has about a 16% better chance of passing the MBE than the Essay.  In other words, about 16% more applicants pass the MBE than pass the Essay section of the examination.  And, this differential remains relatively constant across racial/ethnic groups.

Weighting

    Relative to the total possible points an applicant can earn on each section of the examination, MBE scores spread out somewhat more from the average MBE score than Essay scores spread out from their average.  The effect of this difference in the shapes of the two distributions of scores has been to let the MBE have about a 35%, rather than just a 30% influence on determining an applicant's performance level on the examination as a whole.  Since the two tests differ in difficulty, assigning more weight to the MBE than intended has resulted in a slightly higher passing rate than would have occurred if the 70:30 policy was strictly enforced.

Reliability

    The term "reliability" in the present context refers to the degree to which an applicant performed in a consistent manner

-4-

across the questions asked within each test. Two requirements have to be met in order for such consistency to occur. First, the general skills and knowledge that are needed to answer one question are also needed to answer the other questions on the test. And second, the applicant's performance on these questions is not influenced by chance events, such as being asked a question related to an esoteric aspect of the law with which the applicant was particularly familiar. In short, the more a score on a question is influenced by isolated skills, highly unique knowledge, scoring inconsistencies, and random factors (such as luck), the lower the reliability of a test containing such questions.

The MBE portion of the examination has a reliability that meets the generally accepted minimum standards for a test that is used in making important decisions about individuals. Although the Essay test by itself falls short of this criterion, the total examination score (i.e., MBE plus Essay) is consistently able to achieve the necessary level of reliability. Analyses of the past several examinations have further indicated that this standard would not be met if there was a reduction in the number of Essay questions answered per applicant unless other changes were made in the examination process, such as having more than one reader grade each answer.

Abilities Assessed

There is a strong positive correlation between an applicant's performance on the MBE and Essay sections of the test. In other

-5-

words, applicants who tend to do well on the MBE also do well on
the Essay and vice versa.  For example, one can predict with about
75% accuracy an applicant's pass/fail status on the Essay from
knowledge of that applicant's MBE score.  An even higher level
of predictive accuracy probably would be obtained if the Essay
scores were as reliable as the MBE.  It appears, therefore, that
the two tests are measuring very similar or at least highly
related skills and knowledge even though their formats (multiple
choice and essay) are quite different.

It is also evident that these skills and knowledge are
closely associated with the abilities required to perform well in
law school.  This conclusion is based on the strong relationship
between bar scores and law school grade point averages.  For
example, after adjusting law school grade point averages for
variations in the general ability levels of students attending
different schools, these averages are able to predict bar scores
about four times better than the combination of undergraduate
grades and law school admissions test scores are able to
predict first year grades in law school.  In other words, the
relative performance levels of students in law school corres-
pond closely with their performance on the bar examination,
especially when one takes into consideration the marked differences
in the overall caliber of the students attending different
schools.

-6-

## Equivalency of Examinations Across Administrations

The procedure used to equate scores on different administrations of the MBE involves embedding in each new form of the test several questions that have been used in previous forms. An analysis of how applicants taking the new form perform on these questions relative to how well applicants taking previous forms did on them is then used in scaling the total MBE scores. For instance, if the applicants taking a new form of the MBE do better on the scaling questions than applicants taking previous forms of the test, then it is assumed that those taking the new form are a more able group, and their scores on the new form are adjusted accordingly.

The foregoing procedures cannot be employed in assessing the equivalency of different administrations of the Essay test because none of its questions are ever used twice. However, the strong correlation between the Essay and MBE, as well as the equivalency of the MBE scores across administrations, permitted using this test to examine whether applicants earning similar MBE scores on different administrations were indeed exhibiting comparable levels of Essay performance. The results of this analysis indicated that about the same Essay score was assigned across test administrations for a given level of performance on the MBE. For example, applicants with MBE scores of 351 to 375 had average Essay scores of 820, 811, 818, 824, and 820 on

-7-

the six bar examinations administered between February 1975 and July 1977. It appears, therefore, that scoring standards have remained pretty much the same across different administrations of the test. This means that an applicant's chances of passing the examination are not appreciably influenced by taking it on any particular occasion.

The foregoing findings also indicate that the higher average scores and correspondingly higher passing rates on the July versus the February examinations are due to differences in the general level of ability of the applicants on these two testing dates rather than any variation in grading standards. This conclusion is supported further by the substantially larger percentage of applicants who take the examination for the first time during its July administration.

RESULTS OF RECENT RESEARCH ON BAR EXAMINATION PRACTICES

Differences in Passing Rates Between Groups

Various studies have been conducted on the bar examination to investigate whether the scores on it are related to an applicant's sex or racial/ethnic group. While some of these studies are still underway, the initial results are as follows:

1.  The magnitude of the difference in average performance levels between racial/ethnic groups remains relatively constant across the examination's essay questions.

-8-

The same is true for the multiple choice questions and subtests. Thus, certain questions or subject matter areas are not especially more or less difficult for a given group relative to the performance of other groups taking the test. These results indicate that individual questions or subtests do not differentially favor or discriminate against a particular group.

2. The magnitude of the difference in average Essay scores between groups does not change when applicants have their answers graded by readers whose racial/ethnic group is the same versus different than their own. Thus, the racial/ethnic group of the reader does not diminish or enhance a minority or majority group applicant's chances of passing the examination.

3. Controlling for potentially relevant attitudinal and background characteristics of the applicants, such as their socioeconomic status and whether they took an in-depth bar review course, does not change the between-group disparities in their respective passing rates. For instance, the passing rates for minority and majority applicants who feel that the examination is "not a fair test" of their legal skills and knowledge are essentially the same as the passing rates for all the members of their respective groups.

-9-

4.    Controlling for an applicant's performance in law
school as well as the overall caliber of the students
attending different schools substantially reduces
between-group differences in their passing rates.
This is especially true for those minority applicants
who have above-average law school grades.  In other
words, the overall differences in the passing rates
between groups appears to be primarily a function of
differences in their relative academic achievement
levels in law school.  And, the differences in passing
rates that still remain after this factor has been
controlled are due to some factor or set of factors
that is not applicable to all minority group applicants.

### Effect of Time Limits on the Essay Test

While no study has been done on the bar examination's time
limits per se, an experiment has been conducted with the same
type of question that is used on its Essay test.  This study
involved varying the time allowed to answer essay questions
that were administered as part of the First Year Law Students
Examination.  This test was chosen in part because it was felt
that the performance of those taking it would be especially
sensitive to any benefit that might be derived from an increased
time allocation.

The study's design varied the time limits by giving one
half of the examinees 65, rather than the regular 52 1/2 minutes

-10-

to answer one question and then giving the other one half of the applicants the additional 12 1/2 minutes to answer another question. The two sets of answers to each question were intermixed prior to scoring so that the graders did not know which ones had been written under the expanded time limit.

The results of this investigation indicated that, on the average, an examinee's score on a question improved only about one point with the additional time allocation. Moreover, the relative performance of the examinees across questions was unaffected by how much time they had to answer them. It appears, therefore, that increasing the Essay test's time limits would not appreciably affect the quality of the answers written or who was able to write a passing answer.

Essay Grading Process

It was noted above that the reliability of the Essay test has not been as high as the MBE even though far more applicant time and a great deal more of the bar's financial and personnel resources have been devoted to it. The Essay test also carries substantially more weight in determining an applicant's pass/fail status than does the MBE. This situation led to a series of studies that were designed to determine the cause of this discrepancy in reliability and the efficacy of alternative means of dealing with it.

-11-

<u>Scorer Reliability</u>.  The first of these studies involved an analysis of the extent to which readers agreed with themselves and with one another on the scores that should be assigned to a given answer.  Thirty answers to each of four essay questions appearing on the February 1977 examination were selected for this purpose.  These answers were then embedded into the total batch of answers that were graded by each reader during the normal scoring process; i.e., all four readers assigned to a given question graded the same set of thirty answers along with the several hundred other answers that each reader was separately responsible for scoring.  This insertion of the special set of thirty was done twice, once near the beginning of the six-week reading period and again near the end.

The results of this analysis indicated that a substantial portion of the variation in an applicant's scores across Essay questions was due to the grading process rather than to the uniqueness of the skills and knowledge required to answer different questions.  For example, two readers of the same answer usually only agreed with one another about 67% of the time as to whether that answer was or was not "passing" (i.e., deserving a score of 70 or higher).  The average intrareader agreement rate was slightly better (75%) but still low enough to indicate that systematic differences in grading standards or criteria between readers were not the only reasons for the disagreements between them in the scores they assigned.

-12-

The major implication of this finding was that it would be necessary to have the applicant answer several essay questions and/or have several independent readings per answer in order to balance out the effects of chance factors in the scoring process unless some means were found to increase the consistency with which the grades were assigned.

Scorecard Grading.  It was thought that one way of improving the reliability of the grading process would be to have the readers grade the answers in terms of how well they addressed each of the major issues within a question as well as other general features of the applicants' answers, such as the quality of the logical analysis and reasoning that was exhibited.  Each of the dimensions that was unique to a given question, as well as those that were common to all questions, was graded separately by an additional reader per question.

The analyses of the data obtained by this process indicated that this scorecard approach did not improve the reliability of the grading process enough to warrant the almost 100% increase in time it took to grade an answer with it.  Further, the regular and the scorecard procedures tended to result in the same rank ordering of applicants in terms of the quality of their performance.  In short, no new information about an applicant was obtained by means of employing scorecard grading, and it did not prove to be a cost effective means for increasing reader consistency.

<u>Analysis of Artifacts</u>.  The foregoing studies also provided an opportunity to examine whether Essay scores may have been influenced by certain systematic factors that were not associated with answer quality.  For instance, it was observed that there was no relationship between handwriting clarity and grades, although unedited typewritten answers received somewhat lower grades than handwritten versions of these same answers.  Whether an answer was graded toward the beginning, middle, or end of the six-week scoring process did not appear to affect the grades assigned.  It was noted, however, that longer answers tended to get somewhat higher grades than shorter ones.  While part of this relationship may stem from the more knowledgeable applicant writing more, this does not seem to be the whole story, in that answer length had absolutely no relationship to MBE scores even though the Essay and MBE scores were closely associated with one another.

<u>Reappraisal Process</u>

In the past, the reappraisal process involved having an applicant's answers (and the scores assigned to them by the initial readers) reviewed by two independent reappraisers if that applicant's total score fell between 1140 and 1199 points. If the two reappraisers agreed on what the pass/fail decision should be for an applicant, then that decision stood.  If they disagreed, the applicant's set of 12 answers was

-14-

evaluated by a third reappraiser so that a final decision could be made.

An analysis of this process indicated that reappraisers assigned somewhat higher total Essay scores than did the regular readers when the reappraisers were aware of the grades assigned by the initial readers. Despite this difference in the level of the overall grades assigned, the reappraisers and the regular readers agreed quite closely in how they assessed the relative performance of the applicants. For instance, better than 85% of the applicants with initial total scores between 1190 and 1199 passed the examination as a result of the reappraisal process, whereas if an applicant's score was below 1190, the applicant had less than an 8% chance of passing. Essentially no applicant during the past two years with an initial total score below 1170 has passed as a result of reappraisal.

## CONCLUSIONS

The results of the research studies presented in this report have indicated that California's State Bar Examination is achieving its objective of assessing applicant skills that are considered necessary (albeit not necessarily sufficient) for the practice of law. The examination scores correspond

closely to performance in law school, they are relatively free from possible contaminating influences, and they are sufficiently reliable for making pass/fail decisions about individual applicants. It is apparent, however, that the resources required to maintain these procedures, especially in light of the large number of applicants taking the examination, might be reallocated so as to improve the appropriateness with which the pass/fail decisions are made. For instance, it does not make a great deal of sense to have two reappraisers review the answers of applicants with total scores below 1170 when experience has shown that these applicants have essentially no chance of passing as a result of the reappraisal process. Further, the reappraisers just evaluate the applicants who came close to passing but failed. What about the applicants who came close to failing but passed? Isn't it just as likely that the initial readers inadvertantly passed as many applicants who should have failed as vice versa?

It is also apparent that changes might be made in the initial reading process so as to improve the reliability of the scores obtained and/or decrease the testing burden on the applicant. For instance, an eight-answer test in which each answer is independently evaluated by two readers has about the same reliability as a test in which there is only one reader for each of 12 answers. However, eight answers may not provide a sufficiently broad sample of legal issues to give an accurate and fair assessment of the applicant's skills and knowledge. Moreover, any change

-16-

in current practices must be weighed against their costs, impact on the speed of score reporting, logistical constraints, availability of skilled readers, test security, and related concerns.

The foregoing considerations and research results have led the Committee of Bar Examiners to divide the examination's scoring procedures into the following four phases:

1. Applicants will be divided into two groups, "Pass" and "Questionable," on the basis of their total score on the MBE and one of the three Essay test sessions. This will be done by assigning applicants randomly to sessions after the test has been administered so that all 15 reader teams may begin grading simultaneously.

   Previous research has indicated that which session is used for a particular applicant will not systematically affect his or her chances of passing in that the average scores across sessions rarely differ by more than a few points. An analysis of past examinations also has shown that a Phase I cutting score of 670 would have resulted in less than one half of one percent of the applicants unduly benefiting from the proposed procedures in the sense that they would have failed if all 12 of their answers had been graded. On the other hand, by using this cutting



| PHASE I | PHASE II | PHASE III | PHASE IV |
|---|---|---|---|
| Partial Reading | Complete Reading | Double Reading | Reappraisal |

Illustration of how the Pass, Fail, and Reappraisal Decisions Would Have Been Made if the Proposed Procedures had Been Used With the July, 1977 Examination.

-18-

score, over 35% of the applicants who take the examination are passed with just one reading of each of four answers.  This constitutes a savings of about 21,000 readings if 7,500 applicants take the examination (i.e., .35 x 8 x 7,500 = 21,000).

2.    In Phase II of the new procedure, all the applicants who were classified as "Questionables" have their remaining eight answers read.  Their total score (MBE plus Essay) is then used to place each of these applicants into one of three categories:  "Pass," "Still Questionable," and "Fail."  The cutting scores for the "Still Questionable" category, 1165 to 1217, represent 68 to 78% of the total possible range.  It also will be noted that the 1164 fail line is well below the score level from which applicants were likely to pass as a result of reappraisal.

3.    All the applicants who were classified as "Still Questionable" in Phase II would have their 12 answers reinserted into the regular reading process in Phase III. In other words, all the applicants in this group (about 23% of the total taking the test) would have their 12 answers read twice.  The average of these two independent sets of readings will then be combined with the MBE score to make a pass/fail or reappraisal decision for

each applicant.  While this process essentially offsets the savings gained in Phase II in terms of the number of answers that have to be read (i.e., .23 x 12 x 7,500 = 20,700), it does increase the reliability with which the pass/fail decision is made for those applicants whose status is most in doubt.  For instance, an analysis of the data collected on the February 1977 examination indicated that doubling the number of readers per answer would have had the same effect on the Essay Test's reliability as increasing the length of the Essay Test to 20 answers per applicant.

4.   Applicants who at the end of Phase III had scores between 1175 and 1199 will be placed in reappraisal. Also placed in reappraisal will be those applicants whose total score on the first reading was between 1200 and 1217 but who dropped below 1175 as a result of the second reading.  Each reappraised applicant will have his or her full set of answers and scores reviewed by one reappraiser, who will make the final pass/fail decision.  Thus, although this process substantially reduces the number of booklets that have to be evaluated by the Board of Reappraisers, it still focuses on those applicants whose passing status might be affected by reappraisal, as well as preserves the procedure of having an applicant's efforts reviewed as a whole.

The foregoing procedures differ from past practices primarily in terms of focusing reader resources at the pass/fail decision point rather than spreading them out evenly across all the applicants taking the examination. On the other hand, the new procedures are still designed to provide added protection against the chances of failing an applicant who should pass. Although it is unlikely that these procedures will result in any major change in the total proportion passing, they will increase the accuracy with which the pass/fail decisions are made. Moreover, the total number of answers reappraised will be somewhat less than in the past, which will hopefully expedite the score reporting process. This savings in reappraiser time will most likely be channeled into greater use of their skills and knowledge in the test development and scorer calibration aspects of the examination process.

Finally, the changes described above are based on two years of research and analysis of bar examination practices. And, they do not encompass all the ways in which the bar examinations's procedures have been modified. For instance, as a result of the findings on Essay test grading practices, the Committee of Bar Examiners has revised its reader calibration procedures so as to devote more effort to establishing and maintaining a high level of scorer reliability. Additional research also is being conducted on the relationships between test performance and an applicant's racial/ethnic group, sex, and law school grades.

-21-

Other research studies, in progress and in the planning stages, are oriented toward gathering data regarding ways in which various aspects of the examination process might be improved, such as the nature and format of the questions asked. In short, the changes in grading procedures presented in this report are only a few of the outcomes of the Committee's directive for continued research and improvement of bar examination practices.

A-1

BASIC TEST STATISTICS *

| MEASURE | TEST STATISTIC | February 1976 | July 1976 | February 1977 | July 1977 |
|---------|----------------|---------------|-----------|---------------|-----------|
| Essay | Mean | 809.71 | 828.46 | 815.53 | 826.44 |
| | Standard Deviation | 58.35 | 68.79 | 58.96 | 62.12 |
| | Standard Error | 27.37 | 27.52 | 28.28 | 26.34 |
| | Reliability | .78 | .84 | .77 | .82 |
| | Percent Passing | 30.80 | 47.60 | 36.40 | 44.20 |
| MBE | Mean | 351.52 | 373.32 | 356.42 | 367.84 |
| | Standard Deviation | 36.93 | 40.59 | 35.99 | 38.65 |
| | Standard Error | 11.68 | 12.83 | 11.38 | 12.22 |
| | Reliability | .90 | .90 | .90 | .91 |
| | Percent Passing | 43.20 | 66.40 | 46.60 | 60.00 |
| Total Score | Mean | 1161.23 | 1201.78 | 1171.94 | 1194.27 |
| | Standard Deviation | 86.37 | 101.36 | 86.86 | 93.34 |
| | Standard Error | 29.92 | 30.41 | 30.09 | 29.52 |
| | Reliability | .88 | .91 | .88 | .90 |
| | Percent Passing | 37.70 | 54.30 | 38.20 | 49.50 |
| MBE/Essay Correlation | | .62 | .70 | .65 | .70 |
| Total Number of Applicants | | 3089 | 6710 | 3399 | 7191 |

* Passing scores on the Essay, MBE, and Total examination were
840, 360, and 1200, respectively. Reappraisal results were
not included in calculating percent passing.

The Essay test's reliability is based on the average interitem
correlation stepped-up to a 12 item test.

All test statistics are based on those applicants who answered
12 essay questions and who had an MBE score.

A-2

AVERAGE ESSAY SCORES FOR GIVEN LEVELS OF MBE SCORES

| MBE SCORE RANGE | Febr 1975 | July 1975 | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Average Score |
|---|---|---|---|---|---|---|---|
| Less than 351 | 777 | 766 | 777 | 767 | 780 | 777 | 774 |
| 351 to 375 | 820 | 811 | 818 | 819 | 824 | 820 | 819 |
| 376 to 395 | 838 | 836 | 838 | 842 | 842 | 847 | 841 |
| 396 to 415 | 861 | 863 | 857 | 867 | 866 | 869 | 864 |
| More than 415 | 900 | 888 | 889 | 892 | 894 | 893 | 893 |

A-3

NUMBER OF APPLICANTS REAPPRAISED AND PERCENT PASSING
RELATIVE TO INITIAL TOTAL SCORE: 1976 THROUGH 1977

| Initial Total Score Range | Percent Passing | | | | Number of Applicants |
|---|---|---|---|---|---|
| | Febr 1976 | July 1976 | Febr 1977 | July 1977 | |
| 1190-1199 | 86 | 88 | 85 | 89 | 821 |
| 1180-1189 | 32 | 43 | 34 | 42 | 860 |
| 1170-1179 | 5 | 10 | 5 | 6 | 823 |
| 1160-1169 | 0 | * | 0 | 0 | 814 |
| 1150-1159 | 0 | * | 0 | 0 | 812 |
| 1140-1149 | 0 | * | 0 | 0 | 795 |
| Number of Applicants | 914 | 1332 | 991 | 1688 | 4925 |
| Percent Passing | 19 | 27 | 20 | 23 | 23 |

\* In July of 1976, there was a problem in the typing room during
the first Essay test session in Los Angeles.  As a result, the
scores of certain applicants on this part of the examination
did not reflect accurately their true performance level.  This
situation led to a special reappraisal of the applicants
involved if they failed the examination which in turn led to
passing 11 applicants whose initial total score fell below 1170.
In July of 1977, one applicant with an initial total score
beteween 1165 and 1169 passed as a result of reappraisal.
In no other instance did an applicant with an initial total
score below 1170 pass as a result of reappraisal on these
four examinations.

A-4

AVERAGE TOTAL ESSAY SCORE BY TEST SESSION

| Essay<br>Test Session | Febr<br>1976 | July<br>1976 | Febr<br>1977 | July<br>1977 | Overall<br>Average |
|---|---|---|---|---|---|
| First | 264 | 275 | 271 | 274 | 271 |
| Second | 268 | 277 | 270 | 272 | 272 |
| Third | 277 | 277 | 274 | 280 | 277 |
| Average | 270 | 276 | 272 | 275 | 273 |

A-5

EFFECT OF VARIOUS PHASE I CUTTING SCORES ON PASS/FAIL DECISIONS

| Possible Cutting Score | % Passing At End of Phase I | | | | % Passing At End of Phase I Who Failed the Total Examination* | | | |
|---|---|---|---|---|---|---|---|---|
| | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Febr 1976 | July 1976 | Febr 1977 | July 1977 |
| 660 | 22.3 | 46.3 | 27.0 | 40.5 | 0.8 | 0.8 | 0.6 | 0.7 |
| 665 | 19.4 | 43.0 | 23.7 | 37.6 | 0.4 | 0.5 | 0.3 | 0.5 |
| 670 | 17.0 | 39.7 | 20.8 | 34.5 | 0.3 | 0.2 | 0.1 | 0.3 |

\* Based on final Pass/Fail decision; i.e., it includes reappraisal results.

A-6

NUMBER AND PERCENT OF APPLICANTS IN THE "STILL QUESTIONABLE"
CATEGORY AT THE END OF PHASE II OF THE PROPOSED PROCEDURES *

|  | Febr 1976 | July 1976 | Febr 1977 | July 1977 | Total |
|---|---|---|---|---|---|
| Number of Applicants in the Category | 767 | 1306 | 866 | 1521 | 4460 |
| Percent of all Applicants | 25 | 20 | 26 | 21 | 22 |

*   The "still questionable" category includes those applicants who
    had initial total scores between 1165 and 1217 after a single
    reading of all 12 of their Essay answers.

PR-03-04

# USING LAPTOPS TO ANSWER BAR EXAM QUESTIONS: WHO DOES IT AND DOES IT MATTER?

Stephen P. Klein, Ph.D. and Roger Bolus, Ph.D.
March 28, 2003

California's General Bar Exam (GBX) has two parts.  One part is the Multistate Bar Exam (MBE).  This is a 200-question multiple-choice test.  The other part is a written test that consists of six essay and two performance test (PT) questions. Candidates mark their MBE answers on a machine scored form.  They typically write their answers to the eight open-ended questions in blue books.  However, they also can elect to type them or prepare them on a laptop computer using a special software program that prevents them from having access to their hard drives.  The candidates using these response modes on the written (essay + PT) part of the exam are respectively referred to as writers, typists, and laptoppers. There were separate examination rooms for each group.  Typists and laptoppers brought their own machines to their respective test centers.

This report examines the characteristics of the candidates that used each response mode, the extent to which bar exam scores are related to response mode after holding certain demographic and other factors constant, and the effect of changing response modes.  We also examine whether most of the laptoppers are coming from those who would have otherwise written or typed their answers.

## Sample

Analyses were conducted with the candidates who took the July 2001, February 2002, and July 2002 exams.  Table 1 shows the number of candidates that used each response mode on each exam.  About two-thirds of the July candidates are first timers whereas about two-thirds of the February takers are repeaters.  Data were not analyzed for the candidates who received special accommodations or did not complete the exam.

Table 1
Number of Candidates Using Each Response Mode

| Response Mode | July 2001 | February 2002 | July 2002 |
|---|---|---|---|
| Write | 5989 | 2979 | 5192 |
| Laptop | 863 | 628 | 1731 |
| Type | 390 | 171 | 233 |
| Total | 7242 | 3313 | 7156 |

## Candidate Characteristics Related to Response Mode

The candidate characteristics studied were gender, racial/ethnic group, law school type, and repeater status. Table 2 shows the percentage of candidates using each mode on each exam as a function of these characteristics. These data (and those in Table 5) indicate that the laptop option is rapidly increasing in popularity. It also is evident that most of those electing to use a laptop are coming from those who would have otherwise write their answers. For example, between July 2001 and July 2002, there has been a ten percentage point decrease in the percent electing to write and a 12 percentage point increase in the percent using a laptop.

Table 2
Percentage of Candidates Using Each Mode on Each Exam

| Characteristic | Writers | | | Laptoppers | | | Typists | | |
|---|---|---|---|---|---|---|---|---|---|
| | 7/01 | 2/02 | 7/02 | 7/01 | 2/02 | 7/02 | 7/01 | 2/02 | 7/02 |
| **Gender** | | | | | | | | | |
| Female | 83 | 78 | 72 | 12 | 18 | 25 | 5 | 4 | 3 |
| Male | 83 | 79 | 73 | 12 | 16 | 24 | 6 | 5 | 4 |
| **Race & Ethnicity** | | | | | | | | | |
| Asian | 79 | 80 | 71 | 16 | 17 | 27 | 5 | 3 | 3 |
| Hispanic | 85 | 82 | 75 | 10 | 14 | 21 | 6 | 5 | 4 |
| Black | 91 | 86 | 83 | 5 | 9 | 13 | 4 | 4 | 4 |
| White | 82 | 76 | 71 | 12 | 19 | 26 | 5 | 6 | 3 |
| All Others | 83 | 83 | 78 | 11 | 15 | 19 | 6 | 3 | 3 |
| **Law School Type** | | | | | | | | | |
| ABA Approved | 82 | 77 | 69 | 14 | 20 | 29 | 4 | 3 | 2 |
| CA Accredited | 81 | 81 | 79 | 7 | 11 | 12 | 12 | 9 | 9 |
| CA Unaccredited | 88 | 85 | 81 | 4 | 6 | 10 | 8 | 9 | 8 |
| Others | 89 | 82 | 84 | 5 | 14 | 11 | 5 | 5 | 5 |
| **Repeater Status** | | | | | | | | | |
| First Timers | 82 | 76 | 69 | 14 | 21 | 28 | 5 | 4 | 3 |
| Repeaters | 85 | 80 | 80 | 8 | 15 | 15 | 7 | 5 | 4 |
| **Pass/Fail Status** | | | | | | | | | |
| Pass | 80 | 75 | 68 | 15 | 21 | 30 | 5 | 4 | 2 |
| Fail | 87 | 81 | 78 | 7 | 14 | 18 | 6 | 5 | 4 |
| **All Takers** | 83 | 79 | 73 | 12 | 17 | 24 | 5 | 5 | 3 |

Males and females had nearly identical rates of using each response mode. That was not true for other groups. Asians, first timers, and graduates of ABA law schools were more likely to use laptops than were other groups. On the July 2001 exam, graduates of California Accredited law schools were much more likely to type than use a laptop. That is no longer the case. The percent using a laptop has increased in all racial/ethnic groups.

## Relationship of Response Mode to Scores

A regression analysis was used to examine how response mode was related to total bar exam scale scores after controlling for the candidates' MBE scores, gender, racial/ethnic group, repeater status, and law school type. Table 3 shows the results of this analysis in terms of the increase (or decrease) in total scale score that was associated with using a laptop or typewriter relative to handwriting. For example, on the July 2001 exam, the average laptopper had a 16-point higher score than a *similarly situated* hand writer (i.e., in terms of MBE score, gender, and the other control variables noted above). However, that apparent advantage disappeared on the next two exams.[1] In contrast, the typists had lower than expected scores on all three exams. As benchmarks for these values, the last two rows show the effect of graduating from an ABA school and being a repeater.[2]

Table 3
Change in Total Scale Score as a Function of Various Factors

| Variable | July 2001 | February 2002 | July 2002 |
|----------|-----------|---------------|-----------|
| Using a Laptop | 16 | - 1 | 2 |
| Typing | -17 | -24 | -27 |
| Being an ABA Grad | 31 | 29 | 34 |
| Being a Repeater | -33 | -29 | -35 |

## Changing Response Mode

We investigated what happens when initially unsuccessful candidates elect to change response modes for their next exam. The sample for this analysis consisted of the 1887 applicants who failed the July 2001 exam and then sat for the February 2002 exam. About 12 percent of these applicants changed response modes between these two exams. Table 4 shows the results of this investigation.

---

[1] An analysis of July 2002 data in a neighboring state also found no relationship between response mode—handwriting versus laptop—and written scores after controlling on MBE score and gender.
[2] Standard deviations of total scale scores on the three exams were 136, 125, and 137, respectively.

Table 4
Percent Passing as a Function of July 2001 and February 2002 Response Modes for Those Applicants Who Took Both of These Exams

| July 2001 Mode | Feb 2002 Mode | Number of Takers | Number Passing | Percent Passing |
|---|---|---|---|---|
| Laptop | Laptop | 132 | 49 | 37 |
| Laptop | Type | 3 | 1 | 33 |
| Laptop | Write | 22 | 7 | 32 |
| Type | Laptop | 23 | 4 | 17 |
| Type | Type | 64 | 11 | 17 |
| Type | Write | 24 | 8 | 33 |
| Write | Laptop | 136 | 62 | 46 |
| Write | Type | 16 | 4 | 25 |
| Write | Write | 1467 | 397 | 27 |
| All switches to Laptop | | 159 | 66 | 42 |
| All switches to Typing | | 19 | 5 | 26 |
| All switches to Writing | | 46 | 15 | 33 |
| All repeaters | | 1887 | 543 | 29 |

The data in Table 4 show that as a group, those who switched from writing to using laptops had the most success on the February 2002 exam. Hence, unsuccessful applicants who wrote in the past might consider switching to a laptop if they felt comfortable with the required software and using a laptops. However, there were not enough candidates switching modes to reach any definitive conclusions about which one is generally best let alone would be best for a given applicant. That would have to be determined by having applicants take practice exams with each mode.

## Increasing Preference for Laptop Mode

Prior to the July 2000 exam, applicants could write their answers, type them, or (with permission) prepare them under special accommodations, such as receiving extra time. The laptop mode was piloted for the first time in California on the July 2000 exam. Since then, the number of laptoppers has increased steadily as has the percentage of applicants selecting this option.

4

Table 5 shows the percentage of applicants using each mode during the five years before laptops were offered and on each exam since then. The last row indicates the percentage of candidates that received special accommodations. The data in this table suggest that with the possible exception of the July 2000 exam, most of the laptoppers were applicants who would have written their answers were they not offered the laptop option. In absolute numbers, only a few laptoppers appear to have come from those who otherwise would have typed although this still represents about a 50 percent reduction in the number of typists.

Table 5
Percentage of All Applicants Using Each Mode on the Last 16 Exams*

| Response Mode | 2/1995 to 2/2000 | 7/2000 | 2/2001 | 7/2001 | 2/2002 | 7/2002 |
|---|---|---|---|---|---|---|
| Write | 87 | 87 | 82 | 79 | 74 | 70 |
| Type | 8 | 6 | 5 | 5 | 4 | 3 |
| Laptop | 0 | 2 | 7 | 11 | 16 | 23 |
| Special | 5 | 4 | 6 | 5 | 6 | 4 |

*Column totals may not sum to 100% due to rounding. Percentages include applicants who took just the Attorney's exam (i.e., the 6 essay questions and 2 PT problems). The pre-July 2002 data were provided by John Rodriguez.

## Summary and Conclusions

Analyses of the July 2001, February 2002, and July 2002 California bar exams found that the decision to use a given response mode was related to a candidate's racial/ethnic group, law school type, and repeater status. It was not related to gender. Specifically, men and women are equally likely to use a given mode, Asians and whites are more likely to use laptops than others, and graduates of ABA law schools are several times more likely to use laptops than are graduates of unaccredited schools. First timers also are more likely to use them than repeaters.

Most but not all of the difference in average bar exam scores between laptoppers and others appears to stem from differences in their legal knowledge and analysis skills as reflected by the relative sizes of their mean MBE scores. However, after adjusting for these differences and certain background characteristics (namely gender, law school type, racial/ethnic group, and repeater status), the July 2001 laptoppers still had a 16-point higher average total score than the writers and a 33-point higher average score than the typists.

5

Nevertheless, the laptoppers advantage over writers disappeared on the next two exams. It also was not found in an analysis of July 2002 bar exam scores in another jurisdiction. Thus, there does not now appear to be any advantage or disadvantage to using a laptop relative to writing. We do not know why the significant laptop effect evaporated after the July 2001 exam. It did not appear to be due to any systematic change in the demographic and other background characteristics of the applicants using each mode (see Table 2).

The typing effect did not disappear. On all three exams studied, the candidates who typed did not do as well as what would be expected on the basis of the case mix variables enumerated above. The negative typing effect is comparable to that of being a repeater. This effect cannot be attributed to handwriting clarity because the laptoppers and typists produce type printed answers (although the ones created on the laptop are much neater). In addition, answers from all three modes are intermixed in each batch of answers a reader grades. We could not determine the source of the typing effect from the available data. For example, it may be related to how typists allocate their testing time.

It is not clear what would happen if applicants were required to use a different response mode than the one they actually used. For instance, the typists may have done even worse if they had to write their answers and the writers may not have done as well as they did if they were required to use a laptop but lacked the necessary word processing skills and familiarity with laptops and the test-taking software.

Nevertheless, it is interesting to see what happens when applicants choose to change modes on their own. We investigated this matter by analyzing the data of the 1887 unsuccessful July 2001 applicants who took the February 2002 exam. This analysis found that the writers who switched to laptops had the most success on the February 2002 exam. However, only 12 percent of the repeaters changed modes. Thus, there were not enough of them to reach a definitive conclusion regarding the effects of a self-selected mode change.

Finally, the percentage of candidates who type is declining. It is now half of what it was before laptops were first offered. In contrast, the popularity of the laptop mode has doubled in just one year. This rapid increase in popularity could continue as more applicants use this mode to take their law school exams and become aware of its speed and ability to facilitate editing and revising text. The decreasing cost of laptops also may contribute to the popularity of this mode. In addition, a number of major states including New York and Illinois are also allowing applicants to use laptops.

6

RESEARCH ON THE CALIFORNIA BAR EXAMINATION:
A TEN YEAR RETROSPECTIVE


A report prepared for
The Committee of Bar Examiners
of the State Bar of California


Prepared by

Stephen P. Klein, Ph.D.
GANSK & ASSOCIATES


December 22, 1982

RESEARCH ON THE CALIFORNIA BAR EXAMINATION:
A TEN YEAR RETROSPECTIVE

This report summarizes the major findings of the studies conducted on
California's bar examination during the past 10 years.  These studies
investigated: various characteristics of the examination (such as the
appropriateness of its time limits), essay grading practices, the accuracy
of multiphased grading, the stability of pass/fail standards, correlates of
initial and eventual pass/fail status, possible racial/ethnic and sex
biases, and the relationship of traditional measures of legal skills and
knowledge to the ability to perform legal tasks.  A list of the studies
conducted is attached at the end of this report, and hereinafter the
studies are referred to by number as shown on the list, e.g. (4, 6).


CHARACTERISTICS OF THE BAR EXAMINATION

California's General Bar Examination (GBX) contains a one day multiple
choice section and a two day essay section.  The multiple choice section is
the Multistate Bar Examination (MBE).  The MBE consists of 200 items that
are drawn from 6 content areas.  The essay section currently contains 9
questions.    Applicants can pass the GBX by earning a combined total score
(i.e., MBE + essay) equivalent to 70% of the maximum possible total score
and/or by passing one section on one administration and the other section
on another administration.

Research on the GBX indicates: there is a strong correlation between essay
and MBE scores (e.g., applicants that pass one section are likely to pass
the other section whereas those who fail one section are likely to fail the
other section); about 16% more first timers pass the MBE as pass the essay;
even substantial increases in the time allowed to answer an MBE or essay
question does not change an applicant's relative standing any more than
would be expected by chance; and the sequence in which the questions are
asked does not affect an applicant's performance on these questions (4, 6,
11, 13).


ESSAY GRADING PRACTICES

Possible inconsistencies in grading an essay question were investigated by
having several readers independently score a common set of answers as well
having a reader grade the same set of answers on two or more occasions (2,
8, 11).  Results of this research indicate: readers agree with themselves
only slightly better than they agree with each other; using an analytic
(scorecard) grading system is not as cost effective as the traditional
(holistic) method; having applicants answer about 9 questions balances out
most of the inconsistencies that can be avoided by the use of multiple
questions; and using the average of two independent readings of an answer
also helps to balance out reader inconsistencies (but not as much as having
multiple questions).

The grading practices research and other studies (6, 9) show that the total
score on a 9 question essay test, by itself, is not reliable enough to make
pass/fail decisions about individual applicants if each answer is read only
once.  This would be so even if there was as many as 20 essay questions.
However, the current combination of 9 essay questions plus the MBE provides
a total score that is sufficiently reliable for making pass/fail decisions.

MULTIPHASED GRADING

The bar examination is used to make pass/fail decisions about individual
applicants rather than to determine by how much an applicant passed or
failed.  Research indicated these decisions could be made with greater
accuracy if reader resources were concentrated on those applicants whose
pass/fail status was most in doubt (2); and, such reallocation would not
introduce other errors (4, 5).  These findings led to a policy of passing
applicants if they had sufficiently high scores on a combination of the MBE
and 3 essay questions.  Pass/fail decisions on the remaining applicants are
made after reading all 9 of their essay answers at least once, and for
those near the pass/fail line, two or more times.

Tests of the multiphased grading system show that: it reduces the total
number of answers that have to be read; it increases the reliability of
pass/fail decisions; it increases the passing rate by about 0.5% (i.e.,
compared to the rate if all applicants had all of their answers read at
least once); and its accuracy is not affected by which 3 essay questions
are read in the first phase of the grading process (7, 11).


STABILITY OF PASS/FAIL STANDARDS

A different set of questions is asked each time the GBX is administered.
Thus, the percent passing a given administration could be affected by any
variation in the GBX's difficulty across administrations as well as by the
ability of the group taking that examination.

On the multiple choice portion of the GBX, raw scores (i.e., the number of
questions answered correctly) are converted to scale scores in order to
adjust for possible variations in average question difficulty across
administrations.  Empirical studies with the MBE have demonstrated the very
high degree of accuracy of the standard statistical procedures that are
used for this scaling (18).

It is not possible to adjust the essay scores in the same way the MBE
scores are adjusted.  Nevertheless, studies of past California examinations
indicate that essay scores have not been biased by possible variations in
question difficulty (and/or essay grading standards) across administrations
(4, 9, 11).  Thus, differences in percent passing from one examination to
another stem from differences in the applicants' legal skills and abilities
rather than from variations in test difficulty.


CORRELATES OF GBX SCORES

Applicants with English and science undergraduate majors have higher
average GBX scores than applicants who majored in the social sciences or
education (12).  The only exception to this trend is that male, but not
female, science majors score below average on the essay section.

GBX scores are highly correlated with law school admissions scores and law
school grades (1, 3, 6).  In fact, the correlation is about four times
stronger than it is between law school grades and the combination of
undergraduate grades and law school admissions scores.  The essay portion
of the GBX tends to be more highly correlated with law school grades than
with admissions scores while the opposite is true for the MBE.

The first year law student's examination (FYLSX) is a good predictor of an applicant's initial score and eventual pass/fail status on the GBX (10). Applicants who score at the pass/fail line on the FYLSX are likely to fail on their first attempt to pass the GBX. However, they have a slightly better than 50/50 chance of eventually passing the GBX.

In general, applicants from American Bar Association (ABA) approved law schools earn higher GBX scores than applicants from schools that are only accredited by California who in turn receive higher scores than applicants from unaccredited schools (6, 11, 13). However, there are numerous exceptions to these trends. In fact, from time to time, an unaccredited school will have a higher pass rate than an ABA approved school. And, there is less difference among school types in eventual passing rates than there is among them on any given examination (10).

Applicants of a given ability level (as indicated by their law school admissions scores) are more likely to pass the GBX if they graduated from an ABA school than if they graduated from some other type of law school. A few ABA schools have especially high passing rates relative to the ability level of their graduates (3, 6).

First time takers have a much higher passing rate than repeaters (6, 13). Repeaters who came close to passing on their first attempt are far more likely to eventually pass (and in fewer attempts) than are repeaters who score well below passing on their first try (10). However, there is no initial score that clearly distinguishes between the repeaters who will versus will not eventually pass. About 5% of the repeaters (or 1% of all applicants) pass the GBX as a result of the rule that permits passing the GBX by passing one section on one administration and the other section on another administration. However, far more than 5% of the repeaters fail because they try to pass solely on the basis of this bifurcation rule.

RACIAL/ETHNIC BIAS

The percentage of minority applicants that pass the GBX is well below the percentage of Anglo applicants that pass. This gap has occurred despite the fact that about 43% of all the minority applicants taking the GBX graduated from the 5 ABA schools with the highest average admissions scores (6). Only 23% of the Anglo applicants graduated from these 5 schools.

Three types of studies were conducted to determine whether the differences in passing rates among four racial/ethnic groups (Anglo, Asian, Black, and Hispanic) were attributable to certain characteristics of the examination or to differences in the average academic ability level of the groups. The three types of studies were: grader bias, item bias, and test bias.

The grader bias study (1) showed that an applicant's score on an essay answer was not affected by whether or not the reader of that answer was a member of the same racial/ethnic group as the applicant.

The item bias studies (1, 17) found that various types of multiple choice or essay questions were not especially difficult or easy for minority groups. In other words, the relative differences between groups were not affected by the type of question asked or the content area covered by a question.

The test bias studies (1, 3, 6) indicate that the differences in average
score between groups on both the essay and multiple choice portions of the
GBX are consistent with the differences in their law school admissions
scores and law school grades. Thus, the GBX does not widen or narrow the
gap in performance level between groups. The gap also would not change if
the GBX's time limits were substantially increased (11, 13) or if the GBX
were expanded to include oral and written clinical skills tests (14, 15).


SEX BIAS

Women generally have higher GBX scores then men. They also tend to have
higher law school admissions scores and grades. The sex bias studies (3,
6) show that after controlling for differences in law school admissions
scores and grades, women tend to do slightly better than men on the essay
portion of the GBX whereas men tend to do slightly better than women on the
multiple choice portion. However, these differences are not large enough
to appreciably affect the relative passing rates of the groups.


RELATIONSHIPS WITH PERFORMANCE TESTS OF LAWYERING SKILLS

Three performance tests were given in conjunction with the July 1980
administration of the GBX. One test assessed some of the skills that are
required for carrying out legal research, such as the ability to determine
whether and how decisions in the legal literature could be used to support
a client's case (14). Applicants taking the research test received copies
of the statutes, cases, and other relevant documents on which they were to
base their answers. Thus, it was similar to an open book examination.

The second performance test assessed certain trial practice skills (16).
In this test, applicants were given background materials about a case,
shown a brief segment of the legal proceedings via a videotape, and then
asked 1 to 3 questions about the segment, such as whether an objection that
was made should be granted. Applicants had 5 to 10 minutes to answer the
questions before the next segment in the proceedings appeared on the screen.

The third test was administered via an Assessment Center that was conducted
two weeks after the GBX (15). An applicant participated in the center for
two days. On one day, the applicant functioned as the attorney for the
plaintiff from the beginning to the end of a simulated case. On the other
day, the applicant served as defense counsel in a different case. Each
day, the applicant took several oral and written tasks. Specially trained
actors played the roles of clients and witnesses for the oral tasks.
Performance on an oral task was videotaped for later evaluation.

Analyses of the performance test data indicate they can be administered
under standardized conditions and scored reliably. Applicants report these
tests are better and more realistic measures of their legal skills than are
either the essay or MBE portions of the GBX. Applicants with some clinical
legal experience score higher on the performance tests then do applicants
without such experience. Research, Trial Practices, and Assessment Center
scores correlate about as well with GBX scores as MBE and essay scores
correlate with each other. Scores on the performance tests correlate
higher with each other than they do with GBX scores.

In summary, the performance tests measured a related group of skills; and, the skills in this group are similar to, but not exactly the same as, those measured by the GBX. Cost, test security, and other factors suggest that some of the machine scorable and essay portions of the performance tests, but not the oral portions, could be included in a bar examination.

REFERENCES

Reports prepared for the Committee of Bar Examiners:

1) An investigation of possible item and grader biases in a state bar examination. (1976)

2) An analysis of grading practices on the California Bar Examination. (1977)

3) An analysis of possible sex and racial/ethnic biases in the July 1976 California State Bar Examination. (1978)

4) Summary of studies conducted for the Committee of Bar Examiners and the statistical rationale underlying proposed changes. (1978)

5) Comparison of an 8, 9, and 12 answer essay test in a multiphased pass/fail decision model. (1978)

6) An analysis of the relationships between bar examination scores and an applicant's law school, admissions test scores, grades, sex, and racial/ethnic group. (1979)

7) A comparison of the effectiveness of a single versus multiphased grading system. (1980)

8) Intra- and inter-reader agreement on the essay section of the California State Bar Examination. (1980)

9) An analysis of possible variations in pass/fail standards on the California State Bar Examination. (1981)

10) The relationship between initial score and eventual pass/fail status on the California Bar Examination. (1982)

11) Analysis of the February 1982 bar examination. (1982)

12) The relationship between undergraduate major and bar examination scores. (1982)

Reports prepared for the Committee of Bar Examiners and the National Conference of Bar Examiners:

13) The effect of time limits, item sequence, and question format on applicant performance on the California Bar Examination. (1981)

14) Testing research skills on the California Bar Examination. (1981)

15) The relationship between clinical skills and bar examination results. (1982)

16) The relationship between trial practice skills and bar examination results. (1982)

Reports prepared for the National Conference of Bar Examiners involving California data:

17) An evaluation of the Multistate Bar Examination. (1982)

18) Technical Manual for the Multistate Bar Examination. (in preparation)

PR-86-2

THE PERFORMANCE OF NOVICE LAW STUDENTS AND
LAW SCHOOL GRADUATES ON THE BAR EXAM

Stephen P. Klein
GANSK & ASSOCIATES

June 17, 1986

# SUMMARY

California's bar examination has three sections: a two-problem
Performance Test (PT), a six-question Essay Test, and a 200-question
multiple choice test (called the Multistate Bar Examination or MBE).

The studies described in this report were undertaken to determine
whether the scores on these sections were mainly a function of knowledge
and skills that applicants already had prior to entering law school or
whether the scores were significantly affected by abilities developed
during the period they were in law school.

This issue was investigated by giving various parts of the exam to
students from four American Bar Association approved law schools who had
satisfied all of their school's admission requirements but had only just
begun their legal education (hereafter referred to as the "novices").
We then compared the scores earned by the 341 novices in this group to
the scores earned by 1,061 recent graduates from the same four schools.

The major findings of this research were as follows:

o Graduates earned substantially higher scores than the novices on
  every section of the exam.  For instance, the highest novice MBE
  score was 60 points (almost 2 standard deviations) below the
  lowest graduate score.

o The difference between graduates and novices was greater on the
  MBE and Essay than it was on the PT.  Two factors may have
  accounted for this trend: (1) PT scores, and particularly when
  based on only one problem, are less reliable than total MBE or
  Essay scores; and (2) the nature of the PT allows novices more
  opportunity to do well as a result of general academic ability.

o The chances that a novice would pass the bar exam are essentially
  nil.  The novices' average total score was more than 300 points
  (4 standard deviation units) below the passing score of 1260.

o There is absolutely no evidence that an examinee's MBE score is a
  function of chance or some generalized skill in taking multiple
  choice tests.  The novices' MBE subtest scores did not correlate
  with each other, and their MBE total scores did not correlate with
  their scores on the Law School Admissions Test (LSAT).  However,
  their LSAT scores tended to correlate with the Essay and PT
  scores.  Moreover, there was a high correlation between MBE and
  LSAT scores in the sample of graduates.

Taken together, these findings help to debunk the myth that bar exam
scores are mainly a function of chance or general test taking skills
rather than legal education.  Applicants to the bar who have relatively
high levels of academic ability usually earn higher bar exam scores than
other applicants.  However, they do this only after attending law school.

THE PERFORMANCE OF NOVICE LAW STUDENTS AND
LAW SCHOOL GRADUATES ON THE BAR EXAM*

BACKGROUND

California's bar examination has three sections: a two-problem
Performance Test (PT), a six-question Essay Test, and a 200-question
multiple choice test (called the Multistate Bar Examination or MBE).

Critics of the bar exam often contend that scores on these sections are
due mainly to extraneous factors rather than to legal knowledge and
skills.  For instance, they believe an applicant can earn a high MBE
score simply by chance or being adept at taking multiple choice tests.
Support for the latter possibility comes from the high correlation
between MBE and Law School Admissions Test (LSAT) scores among
applicants to the bar.

Similarly, some critics suggest that Essay and PT scores are primarily a
function of general writing and reasoning skills instead of the specific
abilities developed in law school.  The PT is especially subject to this
criticism because, like an open-book test, PT problems contain all the
laws, case materials, and facts on which applicants are expected to base
their answers.

PURPOSE

The studies described in this report were undertaken to determine
whether bar examination scores were mainly a function of knowledge and
skills that applicants already had prior to entering law school or
whether their bar scores were significantly affected by abilities
developed in law school.  In short, to what degree are PT, Essay, and
MBE scores sensitive to the effects of legal education?

This issue was investigated by giving various parts of the bar exam to
students who had satisfied all of their school's admission requirements
but had only just begun their legal education (hereafter referred to as
the "novices").  We then compared the scores earned by the novices to
those earned by graduates from the same schools.  If legal education
significantly affects bar scores, then: (1) the graduates would tend to
score higher than the novices and (2) none of the novices would pass.
In this context, "legal education" is defined broadly.  It includes not
only law school courses, but also summer work experience, bar review
courses, and other opportunities to develop legal skills and knowledge.

---

*The staff of the Committee of Bar Examiners, and especially Phil
Schoner and Jane Peterson Smith, assisted in conducting this research.
The study also could not have been done without the cooperation of the
four schools that participated.

PROCEDURES

Four American Bar Association approved law schools participated in the
study:  McGeorge, University of California at Los Angeles (UCLA),
UC-Hastings, and the University of Southern California (USC).

At the beginning of the fall 1985 term, the dean at each school sent a
notice to all first year law students (see Appendix A).  This notice
invited the students to participate in a research project sponsored by
the California Committee of Bar examiners.  The notice advised students
the test session would be held on Saturday, September 7.  It informed
them they would be asked to provide the researchers with their age, sex,
racial/ethnic group, and educational history.  They were further advised
that they would be asked to sign a form that permitted their school to
release their LSAT scores to the researchers.  And finally, they were
told that they would be paid $50.00 for participating and making a good
faith effort in the three hour test session, and that additional cash
prizes would be awarded to the participants who earned high scores.

The novices who came to their school's test site were assigned randomly
to five groups: A, B, C, D, or E.  These groups corresponded to the
following five parts of the July 1985 exam: PT Problem A, PT Problem B,
Essay Questions 1-3, Essay Questions 4-6, and the first 100 MBE items.

After completing the background questionnaire (see Appendix B), the
novices were given the same general directions as were used on the bar
exam.  For example, the novices in group E were told it was to their
advantage to to try to answer as many questions as they could.  All
groups were given three hours to answer their assigned questions.  This
is the same amount of time as that given regular bar exam applicants.

The answers written by the novices in Groups A - D were graded along
with those written by the over 7,600 regular July 1985 bar applicants.
And, there was no way a reader could determine whether a given answer
was written by a novice or a regular applicant.


SAMPLES

The procedures used to assign novices to groups worked well.  Table 1
shows that all five groups had about the same number of novices.  Table
2 indicates the groups also had similar mean LSAT scores and ages,
percentages of female and Anglo students, and the percentage saying they
had some previous legal training or experience (such as being a court
reporter, police officer, legal secretary, or paralegal).

The only exceptions to these trends were that the novices assigned to
Essay Questions 1-3 had a higher mean LSAT score than the other novices,
and the MBE group had a higher percentage of female and minority
students than the other groups.  None of these disparities were
significantly different than what would be expected to occur by chance.

Table 1

NUMBER OF NOVICES IN EACH COMBINATION OF SCHOOL AND GROUP,
AND THE PERCENTAGE OF ALL NOVICES IN EACH GROUP

| | Law School | | | | All Novices | |
|---|---|---|---|---|---|---|
| Group | Hastings | McGeorge | UCLA | USC | Number | Percent |
| PT-A | 20 | 17 | 14 | 15 | 66 | 19.4% |
| PT-B | 23 | 18 | 16 | 16 | 73 | 21.4% |
| Essay 1-3 | 22 | 18 | 14 | 15 | 69 | 20.2% |
| Essay 4-6 | 22 | 18 | 14 | 14 | 68 | 19.9% |
| MBE | 20 | 17 | 13 | 15 | 65 | 19.1% |
| Total | 107 | 88 | 71 | 75 | 341 | 100.0% |

Table 2

SUMMARY STATISTICS ON BACKGROUND CHARACTERISTICS FOR EACH GROUP
OF NOVICES AND FOR ALL FIRST TIMERS FROM THE SAME FOUR SCHOOLS

| Group | Mean LSAT | Mean Age | Percent Female | Percent Anglo | Percent Experienced |
|---|---|---|---|---|---|
| PT-A | 36.4 | 25.1 | 42 | 89 | 20 |
| PT-B | 36.8 | 25.5 | 37 | 84 | 21 |
| Essay 1-3 | 38.0 | 25.2 | 42 | 81 | 25 |
| Essay 4-6 | 36.9 | 26.2 | 34 | 84 | 19 |
| MBE | 36.1 | 25.6 | 48 | 71 | 20 |
| Novices | 36.9 | 25.1 | 40 | 82 | 21 |
| Graduates | 36.7 | * | 41 | 84 | * |

* Data on age and previous legal training and experience were not
  available for the 1,061 graduates.

The background characteristics of the novices paralleled closely the
characteristics of the 1,061 graduates from their schools who took the
California bar exam for the first time in July 1985 (hereafter referred
to as the "graduates"). Table 2 also shows that the mean LSAT score for
all novices was essentially the same as the mean LSAT score for the
graduates. However, both means were higher than the mean for all July
1985 first timers (34.66). Thus, if the novices' LSAT scores are
correlated with their bar exam scores, then their mean bar scores are
likely to overestimate the means that would have been obtained with a
random sample of all novice first-year law students.

The percentages of female and minority novices from the four schools
were very similar to the corresponding percentages for their graduates.
And, the two schools with the largest number of novices also had the
largest number of graduates.  These findings and the similarity of
novice and graduate LSAT scores permits making direct comparisons
between their bar exam results; i.e., there is no need for statistical
adjustments for case mix.


PT RESULTS

In PT Problem A, candidates were required to draft a letter counseling a
client.  In PT Problem B, they wrote a statement of legal theory and a
memo describing a plan for discovery.  Each PT answer was graded in
5-point intervals on a 0 to 100 point scale with a score of 70
considered as just passing.

The distribution of novice scores on PT problem A was essentially
identical to the distribution of their scores on problem B.  And, the
distribution of the graduates' scores on PT problem A was essentially
identical to the distribution of their scores on problem B.

However, as Figure 1 illustrates, the graduates tended to score
substantially higher than the novices.  In this and the subsequent
figures in this report, the top horizontal array of data is for
graduates and the bottom one is for novices.  In each array, there are
five vertical bars.  Reading from left to right, these vertical bars
correspond to the 10th, 25th, 50th (with an asterisk), 75th, and 90th
percentile points in the distribution of scores.  For instance, Figure 1
shows that only 10 percent of the graduates had scores of 60 or lower
whereas 50 percent of the novices had scores of 60 or lower.



Fig. 1:  The 10th, 25th, 50th, 75th, and 90th Percentile Points in
         the Distribution of Graduate and Novice PT Scores

Despite the 10 point difference in average PT score between novices and graduates, some of the novices scored higher than some of the graduates. In addition, on both problems A and B, 14 novices had passing scores. However, no novice received a PT score greater than 75 whereas more than 15 percent of the graduates had scores over 75. Moreover, because of the generally low correlation between problems, the amount of overlap between novices and graduates on one PT problem overestimates the overlap between them in total PT scores (this statistical trend is illustrated in the discussion of Essay results).

The novices' LSAT scores had low positive, but not statistically significant correlations with their scores on both problems A and B (r = .11 and .20, respectively). Prior legal training or experience was not correlated with problem A scores, but was positively correlated with problem B scores (r = .29).

ESSAY RESULTS

Each Essay answer was graded in 5-point intervals on a 0 to 100 point scale with a score of 70 considered as just passing. Not one novice received a passing score on any of their over 400 essay answers.

Figure 2 shows the distribution of novice and graduate scores on a typical question. These data indicate that the top 10 percent of the novices' scores does not even come close to the bottom 10 percent of the graduates' scores. A comparison of these data with Figure 1 shows there is far more overlap between novice and graduate PT scores than there is in their Essay scores.



Fig. 2:  The 10th, 25th, 50th, 75th, and 90th Percentile Points in the Distribution of Graduate and Novice Scores on a Typical Essay Question

Figure 3 shows the difference between novice and graduate essay scores
increased when the comparison is made between their respective mean
scores over three questions. For instance, 95 percent of the graduates
had a higher three-question mean essay score than the highest mean essay
score among the novices (60). These data indicate that the difference
between novices and graduates would be even greater if the comparison
was made between their respective average scores over all six questions.



Fig. 3:  The 10th, 25th, 50th, 75th, and 90th Percentile Points in
         the Distribution of Graduate and Novice Scores on the
         Average of Three Essay Questions

In both Group C and D, the novices' score on one essay question were not
highly correlated with their scores on the other two questions (mean
inter-question correlations were .12 and .10, respectively). However,
the corresponding correlations for graduates among questions 1-3 and 4-6
were only slightly higher (.16 and .22, respectively). These data
suggest that for both novices and graduates, factors other than general
writing ability or style are the major determiners of the score on a
given essay question.

Some of these factors appear to be related to the abilities measured by
the LSAT. Among novices, LSAT scores correlated .27 and .20 with the
average score on questions 1-3 and 4-6, respectively. The corresponding
correlations among graduates were not much higher (.34 and .30).

MBE RESULTS

The Multistate Bar Examination (MBE) contains 200 multiple choice
questions (or "items"). An examinee's raw score is the number of items
answered correctly, i.e., there is no correction for guessing. MBE raw
scores are converted to scale scores so that a given scale score
indicates the same level of proficiency regardless of the particular
administration of the exam on which it was earned. The July 1985
formula for converting total raw scores to California scale scores was:
California MBE Scale Score = 65.695 + 2.784 (MBE Total Raw Score)

The MBE's items cover six content areas: Evidence, Criminal Law, Constitutional Law, Torts, Contracts, and Real Property. The items are divided into a morning and afternoon session with 100 items per session. All six content areas are covered in each session; e.g., there are just as many Evidence items asked in the morning as there are in the afternoon. And, as a result of this balance, there is a very high correlation between morning and afternoon MBE raw scores.

These and other considerations led us to use only the items from the morning session for this study. However, in the national population of all July 1985 examinees, the AM session mean was 2.2 points higher than the PM session mean. Thus, a novice's California MBE scale score was estimated using the following equation:

Estimated MBE Scale = 65.695 + 2.784 [(2)(AM Raw Score) - 2.2]

Historically, a California MBE scale score of 420 or higher was considered passing. Almost 80 percent of the graduates had MBE scale scores over 420 whereas none of the novices came within 60 points of this score. The tremendous difference between novice and graduate MBE scores also is illustrated by the fact that 98 percent of the graduates had MBE scores higher than the highest novice MBE score (355). Figure 4 further illustrates the lack of overlap between the distribution of novice and graduate MBE scores.



Fig. 4:  The 10th, 25th, 50th, 75th, and 90th Percentile Points in the Distribution of Graduate and Novice MBE Scale Scores

The extremely large difference between the distributions of novice and graduate MBE scores also was exhibited in the subtest scores. For instance, the novices' mean score on an MBE subtest generally fell below the first percentile in the distribution of the graduates' scores. The only exception to this trend was on the Criminal Law subtest where the novices' mean score was at the ninth percentile in the distribution of graduates' scores.

If an examinee's MBE score is heavily dependent upon general skills in taking multiple choice tests, then the novices who scored relatively well on the LSAT (a multiple choice test) also should have done relatively well on the MBE. This did not happen. There was a very low and not statistically significant correlation between the novices' LSAT and MBE scores (r = .09) whereas there was a high correlation between LSAT and MBE scores among graduates from the same schools (r = .54).

Similarly, within the first 100 MBE items, the average correlation among subtests was .25 among graduates but only .06 in the sample of novices. The latter correlation also was much lower than the correlation between the novices' LSAT and average scores on three essay questions (r = .24). And, the novices' mean raw score on the first 100 items (42) was only 17 points higher than the mean that would have been obtained if they had just been guessing randomly. Taken together, these findings contradict the belief that MBE scores are affected greatly by some hypothesized skill in taking multiple choice tests.


## TOTAL SCORES

The total score on the California bar examination is the sum of the examinee's MBE scale score, six essay question scores, and three times the sum of the examinee's two PT scores. Applying this formula to the novices' mean scores on the various sections suggests that the typical novice would earn a total score of 952 (see Table 3).

A total exam score of 952 is substantially (four standard deviations) below the 1260 that is required for passing. Thus, it is exceedingly unlikely that any novice would pass the exam. The novices' estimated total mean score was almost 350 points below the graduates' mean total score (1291). No graduate had a total score below 1020.


## BACKGROUND CHARACTERISTICS

Table 4 shows that with the possible exception of LSAT scores, there was no consistent relationship between the novices' bar scores and their background characteristics. For instance, self reported previous legal training or experience was not correlated with novices' total MBE scores (or with any of their MBE subtest scores). Race, sex, and age also were not correlated with their bar scores. The novices' LSAT scores were not correlated with their previous legal experience, but their LSAT scores were negatively correlated (-.17) with age; i.e., younger novices tended to earn slightly higher LSAT scores than older novices.

Table 3

TOTAL AND PART SCORE MEANS AND STANDARD DEVIATIONS

| Section | Mean Score | | Standard Deviation | |
|---|---|---|---|---|
| | Novices | Graduates | Novices | Graduates |
| PT-A x 3 | 181.59 | 216.18 | 31.38 | 21.24 |
| PT-B x 3 | 181.65 | 213.03 | 22.02 | 20.64 |
| Essay 1-3 | 146.96 | 203.76 | 12.72 | 15.59 |
| Essay 4-6 | 148.03 | 208.03 | 11.73 | 16.46 |
| MBE Scale | 294.18 | 450.32 | 31.23 | 39.14 |
| Total | 952.41 | 1291.33 | * | 76.94 |

* The standard deviation of the novices total score
could not be estimated from the available data.  The
especially large standard deviation for novices on
PT-A was due to one novice receiving a score of 0.


Table 4

CORRELATION BETWEEN BACKGROUND CHARACTERISTICS AND BAR EXAMINATION
SCORES IN THE SAMPLES OF NOVICES AND GRADUATES

| Type of Bar Exam Score | LSAT Score | | Being Female | | Being Anglo | | Having Had Previous Experience |
|---|---|---|---|---|---|---|---|
| | Novcs | Grads | Novcs | Grads | Novcs | Grads | |
| PT-A | .11 | .16* | -.02 | .03 | .11 | .12* | -.14 |
| PT-B | .20 | .28* | -.20 | -.06 | .01 | .18* | .29* |
| Essay 1-3 | .27* | .34* | -.04 | .02 | -.03 | .18* | .09 |
| Essay 4-6 | .20 | .30* | -.11 | .00 | -.02 | .16* | .12 |
| MBE Scale | .09 | .44* | .13 | -.14* | -.08 | .29* | -.04 |

* Significantly different than zero at alpha = .05 (note that because
of the differences in sample sizes between novices and graduates,
the same correlation coefficient could be significant for graduates,
but not for the novices).  Data regarding self reported previous
legal training or experience were only available for novices.

CONCLUSIONS

All three sections of California's bar examination (PT, Essay, and MBE) are sensitive to the effects of legal education. In other words, on all three sections, the law school graduates scored higher than the novices. However, the difference between graduates and novices was greater on the MBE and Essay than on the PT.

MBE and Essay scores may have been more sensitive to the effects of legal education than PT scores because of differences in the reliabilities of these scores; i.e., MBE and Essay scores are more reliable than PT scores. The greater overlap between novices and graduates on the PT also could be due to the PT providing the applicant with all the data on which the answer is to be based.

It is highly unlikely that a novice could pass California's bar exam. None of the novices came close to receiving a passing score on the MBE or Essay sections. Although about 20 percent of the novices earned a passing score on one PT problem it is highly unlikely that a novice would earn a passing score on the sum of two PT problems. And, even if a novice did earn a passing grade on the entire PT, there is essentially no chance that this passing grade could offset the novice's almost assuredly low Essay and MBE scores.

There was no indication that written or multiple choice scores on the bar exam were significantly affected by general test taking skills as distinct from specific legal knowledge and abilities. For instance, there was almost no correlation between the novices' scores on one essay question and their scores on another essay question. And, there was essentially no correlation among their MBE subtest scores.

The low, but consistently positive correlations of LSAT scores with the novices' and the graduates' PT and Essay scores suggests that scores on these sections may be related to an examinee's general intellectual or academic ability.

In summary, this study helps to debunk the myth that bar exam scores are a function of chance or general test taking skills rather than legal education. Applicants to the bar who have relatively high levels of academic ability (as indicated by their LSAT scores) will generally earn higher bar exam scores than other applicants. However, they will do this only after attending law school. And, the probability is essentially nil that any novice would even come close to passing the entire exam.

# THE COMMITTEE OF BAR EXAMINERS

OF

## THE STATE BAR OF CALIFORNIA



555 FRANKLIN STREET
SAN FRANCISCO 94102
Telephone (415) 561-8303

MAILING ADDRESS:
POST OFFICE BOX 7908
SAN FRANCISCO 94120

1230 WEST THIRD STREET
LOS ANGELES 90017
Telephone (213) 482-8220

MEASUREMENT CENTER
SUITE 350
1660 SOUTH AMPHLETT BLVD.
SAN MATEO 94402

### GENERAL INFORMATION REGARDING SEPTEMBER 7 RESEARCH PROJECT

First-year law students are being recruited to participate in research sponsored by the California Committee of Bar Examiners. Five test instruments will be administered on Saturday, September 7, from 9:00 a.m. to 1:00 p.m. Participants will be compensated $50 for answering one 3-hour examination, making a "good faith effort" to score well, and completing a brief questionnaire. Additional cash prizes will be awarded to participants who earn high scores on the research examinations.

Participants will be asked to provide the following kinds of information about themselves: birthdate, sex, racial/ethnic group, undergraduate institution, undergraduate major, prior law-related experience. For purposes of payment, participants will provide their social security numbers and current addresses.

Each participant will be asked to sign a release permitting his or her law school to release LSAT scores and grade averages to the Committee. This information will be used solely for purposes of research and will not be known by anyone associated with the grading of the California bar examination.

No one who grades the California bar examination will have any way of knowing who participated in this study or what scores were earned. Eventually, the Committee may compare performance on this research examination with performance on an actual California bar, but no participant will be identified individually in any report involving any analysis of the data gathered on September 7.

jps/5 B0685

**APPENDIX A**

SEPTEMBER 7 RESEARCH PROJECT -- QUESTIONNAIRE

(1)   Name: _____
         last                              first

(2)   Address: _____
         street

         _____
         city                              ZIP

(3)   Law School: _____

(4)   Have you seen the July 1985 California bar examination or discussed
      its contents with anyone?   _____          _____
                                     yes                 no

      IF YES, YOU MUST TAKE RESEARCH TEST E.

(5)   Form of test you are taking: ____    ____    ____    ____    ____
                                     A       B       C       D       E

(6)   Social Security Number: _____

(7)   Sex: _____  _____   (8) Date of birth: _____
           1.male      2.female                         month   day   year

(9)   Ethnic group:

      _____  1.American Indian   _____  4.Indian sub-continent   _____  7.Black

      _____  2.Filipino          _____  5.Asian                  _____  8.White

      _____  3.Pacific Islander  _____  6.Hispanic

(10)  Undergraduate institution: _____

(11)  Undergraduate major: _____

(12)  Any previous legal training or experience (such as court reporter,
      police officer, legal secretary, paralegal)?  _____   _____
                                                       yes          no
      If yes, please describe: _____

      I authorize my law school to release information regarding my LSAT
      score and law school grades to the Committee of Bar Examiners for
      purposes of research.


                              _____
                              Signature


38/JPS

APPENDIX B

PR-88-5

# TEMPORAL TRENDS IN LSAT, MBE, AND ESSAY SCORES

Stephen P. Klein, Ph.D.

Roger Bolus, Ph.D.


GANSK & Associates

October 27, 1988

## TEMPORAL TRENDS IN LSAT, MBE, AND ESSAY SCORES

The research described in this report investigated whether an applicant with a given Law School Aptitude Test (LSAT) score was likely to earn a higher (or lower) Multistate Bar Examination (MBE) score on a recent administration of the MBE versus one given a few years ago. In short, are MBE scores drifting upwards (or downwards) over time relative to LSAT scores?

This research also examined whether Essay scores have changed over time and whether the relationship between Essay and MBE scores has changed. These issues were investigated to provide benchmarks for interpreting possible changes in the LSAT/MBE relationship.

If an upward drift in MBE scores is observed relative to LSAT, it could be due to improved legal education, increased effectiveness of bar review courses, a breach in the MBE's security, a change in the LSAT's psychometric properties, or some combination of these and other factors.

### SAMPLES

The samples for this research consisted of applicants who had a two-digit LSAT score and who also took the bar exam for the first time between July 1985 and February 1988 (i.e., a total of six exams). The February 1986 sample was curtailed because many of the first timers on this exam had a three-digit rather than a two-digit LSAT score.

### VARIABLES

The variables used in this research were LSAT score, MBE score, and average raw score on an essay question. The latter variable was the the mean of an applicant's six essay scores. A raw score of 70 is considered just passing by the essay graders. We also examined the average raw Performance Test (PT) score on each exam.

RESULTS

Table 1 shows that after controlling for exam date (February versus July), the mean score on all variables has generally increased slightly over time.  The three exceptions are: the 2/88 LSAT score which was very slightly lower than the 2/87 LSAT; the 7/87 Essay was slightly lower than the 7/86 Essay; and the highest PT score was on the 7/85 exam.

Table 1

SUMMARY STATISTICS BY EXAM

| Exam | Number of applicants | LSAT | MBE | Raw Essay | Raw PT |
|------|------|------|------|------|------|
| 2/86 | 708 | 30.6 | 138.7 | 65.5 | 66.2 |
| 2/87 | 1054 | 32.7 | 144.7 | 67.9 | 67.0 |
| 2/88 | 1148 | 32.4 | 146.8 | 68.3 | 68.4 |
| 7/85 | 4446 | 34.6 | 146.0 | 67.7 | 70.6 |
| 7/86 | 4362 | 35.2 | 148.1 | 68.8 | 69.1 |
| 7/87 | 4590 | 35.3 | 148.3 | 68.0 | 69.6 |

Table 2 shows the typical MBE score at various LSAT score levels.  For example, on the average, applicants with an LSAT of 35 earned an MBE of 147 on the July 1985 exam and a 144 on the February 1986 exam.

The data in Table 2, which are based on the linear regression equation between LSAT and MBE, suggest that there has been a very slight (albeit inconsistent) increase in MBE scores over time relative to LSAT.  For instance, the average of the 7/85 and 2/86 exams for applicants with an LSAT of 35 was about 146.  On the next two exams (7/86 and 2/87), their average rose to 148.  And, it went to 149 on the last two exams studied.

Table 2

AVERAGE MBE SCORES AT VARIOUS LSAT SCORE LEVELS

| Exam | 20 | 25 | 30 | 35 | 40 | 45 |
|------|-----|-----|-----|-----|-----|-----|
| 7/85 | 127 | 134 | 140 | 147 | 153 | 159 |
| 2/86 | 126 | 132 | 138 | 144 | 150 | 156 |
| 7/86 | 129 | 135 | 142 | 148 | 154 | 161 |
| 2/87 | 128 | 135 | 141 | 148 | 154 | 161 |
| 7/87 | 130 | 136 | 142 | 148 | 154 | 160 |
| 2/88 | 132 | 138 | 144 | 150 | 156 | 162 |

Table 3 shows that after holding LSAT constant, there has not been a gradual rise or fall over time in average Essay scores. For instance, an applicant with an LSAT of 35 would earn, on the average, a raw Essay question score of about 68 or 69 regardless of which test was taken.

Table 3

AVERAGE ESSAY SCORE AT VARIOUS LSAT SCORE LEVELS

| Exam | 20 | 25 | 30 | 35 | 40 | 45 |
|------|----|----|----|----|----|----|
| 7/85 | 63 | 65 | 66 | 68 | 69 | 71 |
| 2/86 | 63 | 64 | 65 | 67 | 68 | 69 |
| 7/86 | 64 | 65 | 67 | 69 | 70 | 72 |
| 2/87 | 64 | 65 | 67 | 69 | 70 | 72 |
| 7/87 | 62 | 64 | 66 | 68 | 70 | 72 |
| 2/88 | 65 | 66 | 68 | 69 | 71 | 72 |

Table 4 shows that the correlation between LSAT and MBE scores has remained virtually unchanged over time. The correlation between LSAT and Essay scores has varied slightly over time, but not in a consistent manner. For instance, it has not been steadily rising or falling nor is it always greater at one time of the year than at another. The same can be said about the MBE/Essay relationship. However, this relationship is always stronger than the other two relationships.

Table 4

CORRELATIONS AMONG MEASURES

| Exam | LSAT -MBE | LSAT- Essay | MBE- Essay |
|------|------|------|------|
| 7/85 | .55 | .37 | .59 |
| 2/86 | .55 | .37 | .60 |
| | | | |
| 7/86 | .55 | .38 | .63 |
| 2/87 | .56 | .41 | .67 |
| | | | |
| 7/87 | .53 | .43 | .65 |
| 2/88 | .55 | .40 | .65 |

DISCUSSION AND CONCLUSIONS

There has been a small increase in MBE scores during the past three years. However, most (but not all) of this increase can be accounted for by a corresponding increase in LSAT scores. Moreover, the inconsistencies in this MBE trend suggest that it could be due to chance. And, Essay and PT scores also have tended to increase during the same period that the MBE scores rose.

The strength of the relationship between LSAT scores and the MBE was virtually the same on the six exams studied ($r = .55$). And, although there has been some variation in the strength of the relationship between MBE and Essay scores over time, this variation is not related to when the test was given. For example, the relationship has not gotten

consistently weaker over time (such as would likely occur if the MBE's security was being gradually breached).

The stability of the Essay results across exams relative to LSAT scores suggests that the Committee's Board of Reappriasors continues to be very effective in maintaining consistent grading standards. An applicant with a given level of academic ability (as measured by LSAT) earns about the same Essay score regardless of when that applicant took the exam.

Taken together, the statistical evidence presented in this report suggests that nothing has happened recently to affect the bar exam scores of large numbers of applicants. Thus, the interpretation of an MBE or Essay score (in terms of the level of proficiency to which it refers) appears to be about the same today as it was three years ago. Nevertheless, the next few exams should be monitored to see if there is a continuation of the slight upward spiral in MBE scores relative to LSAT. If there is, then this matter should be revisited.