AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| Students Against Racial Discrimination (SARD) | ) |
| *Plaintiff* | ) |
| v. | ) |
| The Regents of the University of California, et al. | ) |
| *Defendant* | ) |

Civil Action No.  8:25-cv-00192-JWH-JDE

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Dr. Zachary Bleemer
Louis A. Simpson International Building, Room 256, Industrial Relations Section, Princeton, NJ, 08544

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached to this subpoena.

| Place: Please e-mail responsive documents to: jonathan@mitchell.law | Date and Time: March 15, 2026, at 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  1/29/2026

CLERK OF COURT

_____     OR     _____
*Signature of Clerk or Deputy Clerk*                     Jonathan F. Mitchell
                                                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  SARD , who issues or requests this subpoena, are:

Jonathan F. Mitchell, 111 Congress Avenue, Suite 400, Austin, Texas, 78701; (512) 686-3940; jonathan@mitchell.law

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   8:25-cv-00192-JWH-JDE

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

## Documents to Be Produced by Dr. Roger Bolus

I.    **DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION**

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 1997, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message, and any electronic data or computer file.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or

last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms **"implement"** and **"implementation"** refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term **"information"** refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms **"person"** and **"persons"** mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term **"record"** means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)    handwriting;
  (B)    typewriting;
  (C)    printing;
  (D)    photostat;
  (E)    photograph;
  (F)    magnetic impulse;
  (G)    mechanical or electronic recording;
  (H)    digitized optical image; or
  (I)    another form of data compilation.

- The term **"record"** also includes any communication, including an e-mail or text-message communication.

- The term **"reproduction"** means an accurate and complete counterpart of an original document or record produced by:

  (A)    production from the same impression or the same matrix as the original;
  (B)    photograph, including an enlargement or miniature;
  (C)    mechanical or electronic re-recording;
  (D)    chemical reproduction;

(E)    digitized optical image; or

(F)    another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

- The term "**you**" means the State Bar of California.

## II.    DOCUMENTS OR TANGIBLE THINGS REQUESTED

**Request No. 1**: Produce the five databases on University of California undergraduate admissions compiled during your tenure at the University of California Office of the President in the 2010s, as described in your publication attached to this document, including all underlying or incorporated data, source files, and internal or external records used in compiling those databases.

**Request No. 2**: Produce all data, databases, or datasets in your possession, custody, or control that are identical or substantially similar to the databases described in Request No. 1, for the period covering undergraduate admissions to all University of California campuses from 1994 through approximately 2018.

**Request No. 3**: Produce all documents sufficient to identify the data fields, variable names, coding conventions, and metadata definitions used in the databases described in Requests Nos. 1 and 2.

**Request No. 4**: All communications, memoranda, or documents in your possession, custody, or control describing the compilation, maintenance, or methodology used by you or by the University of California in creating, updating, or storing the undergraduate admissions data described in Requests Nos. 1–3.

# Affirmative Action, Mismatch, and Economic Mobility after California's Proposition 209[*]

## Zachary Bleemer [†]

### June 2021

### Abstract

Proposition 209 banned race-based affirmative action at California public universities in 1998. Using a difference-in-difference research design and a newly-constructed longitudinal database linking all 1994-2002 University of California applicants to their educational experiences and wages, I show that ending affirmative action caused underrepresented minority (URM) freshman applicants to cascade into lower-quality colleges. The "Mismatch Hypothesis" implies that this cascade would provide net educational benefits to URM applicants, but their degree attainment declined overall and in STEM fields, especially among less academically qualified applicants. URM applicants' average wages in their 20s and 30s subsequently declined, driven by declines among Hispanic applicants. These declines are not explained by URM students' performance or persistence in STEM course sequences, which were unchanged after Prop 209. Ending affirmative action also deterred thousands of qualified URM students from applying to any UC campus. These findings provide causal evidence that banning affirmative action exacerbates socioeconomic inequities. Complementary regression discontinuity and institutional value-added analyses suggest that affirmative action's net educational and wage benefits for URM applicants exceed its net costs for on-the-margin white and Asian applicants.
*JEL Codes: I24, J24, J31, H75*

[*]Thanks especially to David Card, Rucker Johnson, and Jesse Rothstein, and also to Peter Arcidiacono, Esteban Aucejo, Henry Brady, Christina Brown, Jonathan Holmes, V. Joseph Hotz, Enrico Moretti, Jack Mountjoy, Martha Olney, Marianne Page, Nina Roussille, Emmanuel Saez, Zoë Steier, and Christopher Walters, as well as conference participants at the NBER Economic Mobility Study Group and the 2019 WEAI Annual Conference for helpful comments. Frankie Lin, Sakthi Ponnuswamy, Sowgandhi Rayapudi, and Akcan Balkir provided excellent research assistance, and thanks to Tongshan Chang and Chris Furgiuele for help in obtaining and understanding the data. Thanks as well to John Douglass, Margaret Heisel, and especially Charles Masten for help in understanding the 1990s policy setting. The author was employed by the University of California in a research capacity throughout the period in which this study was conducted, and acknowledges financial support from the National Academy of Education/Spencer Dissertation Fellowship, the Center for Studies in Higher Education, and the Stone Center on Wealth and Income Inequality. The conclusions of this research do not necessarily reflect the opinion or official position of the University of California, the California Employment Development Department, or the State of California. Any errors that remain are my own.

[†]759 Evans Hall – Department of Economics, UC Berkeley – Berkeley, CA 94720. E-mail: bleemer@berkeley.edu. Phone: (484) 678-6160. 14,600 words.

*"Those who deny that preferences are not [sic] being given or that the granting of such preferences is without negative consequences do a great disservice to the need for finding reasonable solutions. Equally so, those who believe that social and economic equality of opportunity can be achieved merely by the passage of ballot initiatives, however justified the need might be, are misguided. The "heavy-lifting" to achieve a society of genuine inclusion and equality of opportunity merely begins with the removal of race-based decision-making."*

~*UC Regent Ward Connerly, in introducing SP-1 and SP-2*

# 1   Introduction

Educational attainment, income, wealth, and economic mobility exhibit racial disparities in the United States. Access to selective universities is a key determinant of economic success and intergenerational mobility (Chetty et al., 2020a). As a result, many selective universities provide admissions advantages to applicants from disadvantaged racial and ethnic groups. Proponents of affirmative action argue that it offsets applicant qualification gaps that result from systemically unequal educational opportunities (Johnson, 2019). Detractors argue that affirmative action limits opportunity for Asian and white applicants and may have unintended consequences for targeted students. This study examines three questions at the basis of this disagreement. First, which students are targeted by affirmative action, and to what degree does affirmative action impact where those students go to college? Second, what are the short- and long-run effects of enrolling at a more-selective university because of affirmative action? Finally, how are the net benefits and costs of affirmative action distributed across Asian, Black, Hispanic, and white university applicants?

Prior scholarship has arrived at conflicting conclusions about the value of enrolling at a more-selective university because of access-oriented admissions policies like affirmative action. On the one hand, several recent studies have shown that applicants with test scores and grades at selective universities' minimum admissions thresholds are benefited by admission (e.g. Hoekstra, 2009; Zimmerman, 2014; Anelli, 2019). Studies of affirmative action, however, have uncovered mixed evidence on student outcomes (Arcidiacono and Lovenheim, 2016), with some finding support for the so-called "Mismatch Hypothesis": that the lower-testing applicants targeted by affirmative action would benefit from enrolling at **less**-selective universities, where they better "match" their peers' academic qualifications (Sowell, 1972).

This study combines longitudinal administrative data with a difference-in-difference research design to estimate the impact of affirmative action on students' college quality, course performance, choice of major, degree attainment, and wages over the subsequent 15 years. I construct a novel database of all 1994-2002 freshman applicants to the University of California (UC) system, which comprises all public research universities in the state, and individually link each applicant to nationwide university records and annual California wages. I then compare the outcomes of Black and Hispanic UC applicants with those of academically-comparable white and Asian applicants before after California's Proposition 209, which ended affirmative action at UC in 1998. I also link the applicant data to institutional value-added statistics to measure Prop 209's effect on applicants' university quality; to California high school records to examine Prop 209's effect on UC application-sending; and to five UC campuses' student transcripts to estimate Prop 209's impact on performance and persistence in demanding courses. Finally, I employ a regression discontinuity design to identify the value of being admitted to a selective public university for the on-the-margin white and Asian students likely to obtain greater university access after Prop 209.

I begin by documenting Prop 209's impact on admissions at UC's eight undergraduate campuses. Prop 209 curbed the large admissions advantages – some over 50 percentage points – provided by affirmative action to underrepresented minority (URM) UC applicants. As a result, UC's URM applicants cascaded into less-selective colleges and universities: those with a high "UC Academic Index" ($AI$, a weighted average of high school grades and test scores) tended to flow from more-selective UC campuses to less-selective campuses and private universities, while those with lower $AI$s mostly flowed to less-selective public colleges and universities. Overall, Prop 209 resulted in a net outflow of lower-income students from highly-selective public universities.

How did less-selective enrollment affect URM UC applicants? I estimate the average effect of Prop 209 using a difference-in-difference design estimated over the population of UC applicants. Each model estimates how URM applicant outcomes change after 1997 (the final year of affirmative action) relative to changes

among non-URM applicants, with the second difference absorbing ethnicity-neutral enrollment trends in the 1990s.[1] High school fixed effects and $AI$ covariates absorb spurious variation and observable selection bias into UC application. I also estimate effect heterogeneity by URM $AI$ quartile and by URM ethnicity.

Implementing this model, I show that Prop 209 led URM UC applicants to enroll at relatively lower-quality colleges and universities on average, measured both by traditional metrics like graduation rate and by institutional value-added. In contrast with the predictions of the Mismatch Hypothesis, URM UC applicants' average educational outcomes deteriorated after Prop 209: Bachelor's degree attainment declined by 4.3 percentage points among URM applicants in the bottom $AI$ quartile, and overall STEM and graduate degree attainment declined by 1.0 and 1.3 percentage points, respectively. Following these applicants into the labor market, I find that Prop 209 caused URM UC applicants to earn 5 percent lower average annual wages between ages 24 and 34, with larger proportional effects for lower-$AI$ applicants. The observed wage effects are driven by Hispanic applicants; despite parallel enrollment and degree attainment outcomes, I find no evidence of average wage deterioration among Black UC applicants after Prop 209.

These estimated effects are averaged across every URM UC applicant, many of whose enrollments were likely unchanged by the affirmative action ban. This implies that treatment effects for directly-impacted applicants were likely much larger. Given the magnitude of UC's applicant pool, these estimates imply that Prop 209 caused an aggregate decline in the number of URM Californians in their early 30s with 2014 wages over $100,000 by at least 3 percent. American Community Survey data confirm a 2010s pattern of relative wage deterioration among high-earning early-career URM Californians.

The primary threat to this baseline research design is the possibility of sample selection bias arising from differential selection into UC application after Prop 209. Estimating a difference-in-difference model of the proportion of California public high school students who applied to UC by ethnicity and $AI$ bin, I find that

---

[1]Non-URM applicants may not represent a traditional unimpacted comparison group, since some likely "crowded into" more-selective universities after Prop 209. I return to the question of non-URM applicant outcomes in Section 6, but the fact that non-URM applicants outnumber URM applicants by more than four-to-one in the applicant pool dilutes any "crowd-in" effects, implying that at least 80 percent of the observed differences are likely driven by changes in URM applicant outcomes.

UC annually received about 250 fewer Black and 900 fewer Hispanic applications after Prop 209, almost 80 percent of whom would likely have been admitted to at least one UC campus. While application deterrence could generate bias, I find that the baseline estimates are insensitive to a school-ethnicity-$AI$ control function (following Card and Rothstein, 2007) and other highly-detailed socioeconomic and academic covariates.

The baseline research design does not separately identify the impact of Prop 209 on non-URM applicants' outcomes. Instead, I exploit a large discontinuity non-URM admissions at UC Berkeley before Prop 209 to study the return to selective university access for on-the-margin non-URM applicants, many of whom may have been admitted if not for affirmative action. Employing a regression discontinuity design, I find that students just below Berkeley's admissions threshold nevertheless ended up with similar educational and labor market outcomes after enrolling at other universities, though the confidence intervals cannot rule out positive treatment effects. This suggests that the value of selective public university access for on-the-margin non-URM students was small.

Next, I turn to mechanisms explaining URM UC applicants' deteriorated educational outcomes after Prop 209. Several prior studies have suggested that URM students' STEM course performance and persistence would improve absent affirmative action, which likely would have led to the opposite of Prop 209's effect on STEM degree completion (Loury and Garman, 1993; Holzer and Neumark, 2000; Arcidiacono et al., 2016). However, while URM UC students earned lower grades and were less likely to persist along introductory STEM course sequences than their non-URM peers before Prop 209, these gaps are largely explained by students' prior academic opportunities and preparation, not their enrollment institution.[2] Prop 209 has no observable effect on students' STEM course performance and persistence, which do not appear to contribute to the effects of Prop 209 on students' educational and wage outcomes.

I conclude with a discussion of the efficiency of affirmative action. Two sets of evidence favor its alloca-tive efficiency, which in this case requires (to a first-order approximation) that the benefit of more-selective

---

[2]This study's examination of STEM course performance contributes to a literature interested in the production and composition of STEM graduates (e.g. Ehrenberg, 2010; Sjoquist and Winters, 2015; Denning and Turley, 2017). This study estimates how student outcomes in specific STEM courses change under different policy regimes.

university enrollment is greater for affirmative action's URM enrollees than for the non-URM students who would have enrolled in their place. First, the estimated return to UC Berkeley and UC Davis admission for on-the-margin non-URM students appears small, while URM applicants' estimated wage return to more-selective enrollment before Prop 209 is large.[3] Second, that latter return exceeds the average observed change in institutional value-added experienced by URM UC applicants, suggesting that the URM applicants impacted by Prop 209 had received above-average returns to more-selective university enrollment (as in Dale and Krueger, 2014; Bleemer, 2021). These evidence suggest that affirmative action both promotes socioeconomic mobility among URM youths and improves higher education's allocative efficiency.

This study makes three main contributions. First, while previous studies have analyzed the intermediate effects of universities' affirmative action policies – sometimes coming to conflicting conclusions – they share common limitations. Several studies have exploited cross-state policy variation to estimate the educational impact of banning affirmative action, but out-of-state enrollment confounds identification of the policies' effects on impacted students (Backes, 2012; Hinrichs, 2012). Others estimate models of applicant and university behavior to predict how affirmative action **could** impact student enrollment and outcomes, but do not validate these predictions using actual policy variation (Arcidiacono, 2005; Arcidiacono et al., 2016; Kapor, 2020). A third set of studies have analyzed administrative university data from before and after Prop 209, but limits on available covariates and outcomes have challenged attempts to separately identify the effect of affirmative action from compositional changes among UC's applicants and students (Arcidiacono et al., 2014).[4] This study augments previous research by implementing a quasi-experimental research design spanning all U.S. universities that identifies the individual-level effects of affirmative action, and by analyzing new intermediate outcomes like university "value-added," STEM performance and persistence, and graduate degree completion.

Second, this study causally links university quality to wage outcomes in the context of affirmative action,

---

[3]Black et al. (2020) also provide evidence against large returns to more-selective university enrollment for the students who were "crowded out" of selective Texas universities by Texas Top Ten. However, Zimmerman (2019) shows that the largest returns to elite Chilean university enrollment accrue only to high-income students.

[4]Bagde et al. (2016) and Bertrand et al. (2010) show that Indian universities' caste-based affirmative action improves targeted students' grades and wage outcomes, respectively.

bridging the affirmative action literature with a literature identifying heterogeneity in the return to higher education (Dale and Krueger, 2002; Arcidiacono, 2004). Much of the affirmative action literature has focused on measuring mismatch (Arcidiacono and Lovenheim, 2016), but my findings are inconsistent with the Mismatch Hypothesis at the mean.[5] On the other hand, while most studies of heterogeneous university returns focus on a relatively high-testing local margin (e.g. Hoekstra, 2009; Anelli, 2019), I estimate average returns to university quality across all URM UC applicants after an affirmative action ban. I also present regression discontinuity evidence highlighting the importance of applicants' counterfactual enrollments and heterogeneity in estimating the return to selective university enrollment.

Finally, I provide direct evidence that affirmative action has first-order implications for intergenerational mobility and socioeconomic gaps by ethnicity. A growing literature examines the mechanisms explaining opportunity gaps for lower-income and URM youths and the efficacy of available policies to narrow those gaps (e.g. Jackson et al., 2016; Chetty et al., 2016). I find little evidence that affirmative action narrows the Black-white mobility gap, which has received particular attention (Dobbie and Fryer Jr, 2011; Billings et al., 2014; Chetty et al., 2020b; Derenoncourt and Montialoux, 2021), but find that it improved Black students' educational attainment and relatively increased (mostly lower-income) Hispanic youths' wages.

## 2   Background and Data

### 2.1   University of California Admissions in the 1990s

The University of California system is tasked by the 1960 Master Plan for Higher Education to educate roughly the top 12.5 percent of California public high school graduates. The system enrolled 137,000 undergraduates at eight campuses in 1999, with the campuses ranging in selectivity from the highly-selective Berkeley and Los Angeles (UCLA) campuses (which admitted 35 percent of applicants with an average SAT

---

[5]Two recent studies of affirmative action mismatch also analyze the University of California in the 1990s (Arcidiacono et al., 2014, 2016). Bleemer (2020) discusses the limitations of that previous research and the arguments of Sander and Taylor (2012) in the specific context of Prop 209 and reconciles their analysis with my baseline findings. Dillon and Smith (2020) and Barrow et al. (2020) find evidence of test- and income-based 'mismatch' at US undergraduate institutions and elite high schools, respectively.

score 1.5 $sd$ above mean) to the less-selective Santa Cruz and Riverside campuses (with an 85 percent admission rate and SAT scores 0.5 $sd$ above mean). Ranking campuses by their admissions rates in the period, I refer to the Berkeley, UCLA, and San Diego campuses as 'more selective', the Santa Barbara, Irvine, and Davis campuses as 'selective', and the Santa Cruz and Riverside campuses as 'less selective'. In 1999, California also had a 22-campus system of teaching-oriented universities – the California State University (CSU) system – and 114 two-year community colleges.

Affirmative action began at UC in 1964, the first year that the number of eligible applicants to UC Berkeley exceeded the number of available seats, and is now practiced by public universities in at least half of states (see Appendix A). The policy augmented UC's standard admissions protocol, which required that at least 50 percent of students be admitted solely based on their "Academic Index" ($AI$), a linear combination of high school GPA and SAT scores.[6] For example, archival documents from UC Berkeley (Figure A-3) show that it guaranteed admission to all applicants above an $AI$ threshold (e.g. 7,150), but set a lower threshold (6,500) for African-American, American Indian, Chicano, and Latino "underrepresented minority" (URM) applicants. Applications with $AI$s below their respective threshold were "read" by admissions personnel, giving them a variable likelihood of admission, while those with $AI$s below a second threshold (7,000 for non-URM applicants, below 6,000 for URM applicants) were mostly mechanically rejected.

Figure I summarizes the relative admissions likelihood of normal URM and non-URM applicants to each campus by $AI$ in two-year increments from 1994 to 2001.[7] At the most-selective Berkeley campus, for example, 1994-1995 URM applicants with $AI$s between 6,000 to 7,100 were 80 percentage points more likely to be admitted than same-$AI$ non-URM applicants. The admissions advantage declines to zero above $AI = 7,400$ because all such applicants were admitted. Seven of the eight UC campuses provided admissions advantages to URM applicants under affirmative action, with the advantage shifting to higher-$AI$ applicants

---

[6]In particular, $AI = min(HSGPA, 4) \times 1,000 + SATI + SATIIs$. The index included both SAT I components (math and verbal) and three SAT II scores: writing, math, and a third of the student's choosing. All SAT components were scored out of 800, so the maximum $AI$ was 8,000. Some campuses employed variants of this formula.

[7]'Normal' applicants exclude applicants without UC's minimum academic credentials and applicants to restricted programs like some engineering majors. Appendix B presents annual admissions likelihoods by $AI$ at each campus for 'normal' applicants.

over time as the campuses became more selective. UC Riverside admitted all 'normal' UC applicants. The figure's superscripts show the empirical integrals under each curve by the contemporaneous $AI$ distribution of each campus's URM applicants, estimating the excess number of annual URM admissions relative to simulated URM admissions under the non-URM $AI$ admissions rule. Many campuses admitted hundreds of URM applicants annually by affirmative action.

Increasing political controversy around affirmative action culminated in the mid-1990s, when the policy was prohibited first by the UC Regents in July 1995 and then by a voter referendum in November 1996. While the original Regents policy (SP-1) was rescinded in 2001, Prop 209 has prohibited UC and other public California institutions from "discriminat[ing] against, or grant[ing] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin" since the Fall 1998 admission cohort.[8] Figure I shows that most campuses continued providing large admissions advantages to URM applicants in 1996 and 1997 (though some programs were curtailed), but those advantages shrank considerably in 1998.[9]

Starting in 1998, UC implemented outreach programs to increase enrollment from majority-URM high schools, but those programs wound down after 2001 with little evidence of success (Atkinson and Pelfrey, 2004; UCOP, 2003). Instead, UC's primary policy response to the end of affirmative action was its Eligibility in the Local Context top percent policy, which did not begin until 2001 (Bleemer, 2021).

## 2.2    Data

This study analyzes the effects of Prop 209 using four primary data sources. The first, collected contemporaneously for administrative use by the UC Office of the President, covers all 1994-2002 California-resident freshman applicants to any University of California campus.[10] Each record contains an applicant's high

---

[8]Prop 209 also prohibited racial preferences in UC outreach and financial aid as well as affirmative action at the less-selective California State University system. Prop 209 banned racial preferences in state hiring (Marion, 2009) and graduate school admissions, though college-bound high school graduates shortly before and after 1998 all entered the labor market after 1998.

[9]Figures A-4 and A-5 show that some UC campuses saw relative declines in URM admissions and enrollment in 1996, particularly at UCLA and the less-selective UCs, but every UC campus saw sharp immediate declines in URM admission in 1998. The more selective UC campuses also saw sharp 1998 declines in URM enrollment.

[10]About one-third of UC students transfer from community colleges rather than enrolling as freshmen. Because affirmative action was likely less impactful for those applicants and because of limited data availability about those students' academic background

school, gender, ethnicity, parental education, parental occupations, and family income.[11]  Academic prepara-
tion measures include SAT and ACT standardized test scores by component, SAT II scores, high school grade
point averages, and the number of 12th-grade honors courses.[12]  Application, admission, and enrollment indi-
cators are available for each UC campus, as are degree attainment and major choice for UC enrollees.

The second dataset, an extract from the National Student Clearinghouse's (NSC) StudentTracker database,
contains enrollment and graduation records – covering nearly all U.S. two- and four-year colleges and universi-
ties – for all students in the UC application dataset, linked by full name and birth date.  Science, Technology,
Engineering, and Mathematics (STEM) majors are categorized by CIP code following the US Department of
Homeland Security (2016).[13]  I define Bachelor's (graduate) attainment as being within 6 (18) years of UC
application.  NSC data are available starting with the 1995 applicant cohort.  The data appendix (D) provides
additional details.

Third, I observe UC applicants' quarterly 2000-2017 wages from the California Employment Develop-
ment Department, linked by SSN.[14]  Wages are unavailable for workers not covered by California unemploy-
ment insurance, including out-of-state, federal, and self-employed workers.  Annual wages are measured as
the sum of quarterly wages, CPI-adjusted to 2018, and winsorized at the top and bottom one percent.  About
69 percent of UC applicants have positive covered wages in each of 6-16 years after UC application.

The fourth dataset includes comprehensive student transcripts – including course enrollments and grades
– for five UC campuses:  Berkeley, Davis, Santa Barbara, Santa Cruz, and Riverside.  The transcripts were

---

(prohibiting selection correction on observables), transfer applicants are not directly analyzed in the present study, though freshman
applicants may enroll at a community college and transfer to UC later.

[11]Parental education is observed as an index of maximum parental education for up to two parents, from 1 (no high school) to
7 (graduate degree).  Parental occupations are observed as one of 17 occupation codes each for two parents (or 289 total codes),
including codes like 'Clerical', 'Laborer', and 'Professional' as well as 'Homemaker', 'Retired', 'Other', or 'Deceased'.  Family
income is not reported by about 15 percent of applicants.

[12]Throughout the study period, each UC applicant was required to submit an SAT score and SAT II scores in writing, mathematics
(1 or 2), and a third field of their choosing.  Only 0.9 percent of applicants submitted ACT instead of SAT scores.

[13]See Tables A-1 and A-2 for the most common STEM and non-STEM majors in the data.  This definition generally aligns with
that used by Arcidiacono et al. (2016).  Not all NSC majors have CIP codes; I assign each major to its modal CIP code (in the full
observed NSC database) for categorization.

[14]Social security numbers on UC applications are not verified unless the student enrolls at a UC campus.  Among enrollees,
the verified social security number differs from that reported on their application in fewer than 0.25 percent of cases.  All statistics
estimated using EDD data were originally published as institutional research (Bleemer, 2019b).

obtained from campus Offices of the Registrar and are linked by name and birth date (Bleemer, 2018).

Additional educational administrative data come from several sources. Universities' admissions rate, average SAT scores, and six-year graduation rates from IPEDS are linked to NSC institutions.[15] Aggregated data from the California Department of Education provide the annual number of graduates from each public high school by gender and ethnicity. Finally, a comprehensive College Board SAT-taker database covering public California high school students is linked by name and birth date to the UC applicant pool.

## 2.3    University of California Descriptive Statistics

Table I provides descriptive statistics of UC applications, admissions, and enrollment for California-resident freshman applicants in three two-year cohorts: '94-95, who applied before Prop 209's passage; '96-97, who applied after the ban was approved but before its mandatory implementation; and '98-99, following the ban. The presented statistics indicate a university system steadily increasing in reputation and selectivity throughout the 1990s, with increases in non-URM applications of 25 percent overall and 42 percent at the more-selective campuses. Admissions rates consistently fell at all but the least-selective Riverside campus, but increasing yield rates – the percent of admitted students who enrolled – stemmed the decline in the proportion of applicants who enrolled at each campus. The average SAT scores of most campuses' applicants also rose steadily, as did the average scores of students admitted to each campus.

Almost 20 percent of UC applicants were URM in 1997, and URM applicants' average SAT scores rose through the period, potentially reflecting deterrence among lower-testing URM students. Table A-4 presents separate descriptive statistics by URM ethnicity, showing that about 20 percent of URM UC applicants were Black and nearly all of the rest Hispanic. Most campuses' URM admissions rates fell slightly in 1996 but then sharply declined in 1998, matched by a sharp rise in URM admits' test scores. See Appendix C for additional details on URM UC admissions after Prop 209.

---

[15] Average SAT scores are measured as the sum of the mean of universities' 25th and 75th Math and Verbal SAT percentiles. Admissions rates (and SAT scores) are fixed at 2006 (2000); graduation rates are contemporaneous. See https://nces.ed.gov/ipeds/.

URM enrollment rates fell precipitously at UC's more-selective campuses, slightly declined at the selective campuses, and slightly increased at the less-selective campuses. The next section examines the URM 'cascade' from more- to less-selective universities after Prop 209 in greater detail.

## 2.4   UC Applicants' University Enrollment

Figure II shows how URM UC applicants' decreased likelihood of UC admission after Prop 209 affected their UC enrollment. Enrollment shares are shown for the full $AI$ distribution of URM UC applicants for the two cohorts before and after Prop 209 and are smoothed across percentiles. Before Prop 209, about 30 percent of median-$AI$ URM applicants enrolled at the three more-selective UC campuses, while only about 3 percent of similar-$AI$ non-URM applicants did so. After Prop 209, this gap largely closed, and URM applicants across the entire $AI$ distribution became less likely to enroll at more-selective UC campuses. Higher-$AI$ URM applicants became more likely to enroll at the selective and less-selective campuses – likely as a result of their being rejected from the more-selective campuses – while lower-$AI$ URM applicants' selective UC enrollment declined. Meanwhile, the increasing selectivity of UC campuses also led to decreased enrollment likelihoods of all but the highest-$AI$ non-URM applicants.

Figure III broadly summarizes how Prop 209 reshaped UC applicants' enrollment across the public and private sectors of U.S. higher education. Each panel plots the percentage point difference in enrollment likelihood before and after Prop 209 for URM and non-URM UC applicants at each URM $AI$ percentile. URM applicants' relative likelihood of enrollment at Berkeley and UCLA declined across the $AI$ spectrum.[16] UC San Diego exhibits a pattern common to California's other public universities: URM enrollment increased relative to non-URM enrollment for higher-$AI$ applicants (70-95th percentiles) and decreased for those with somewhat-lower $AI$s (20-60th percentiles). The same pattern holds at lower $AI$ bands for the selective and less-selective UC campuses: e.g. URM applicants at the 25th $AI$ percentile became relatively

---

[16]Figure A-6 shows that the URM students who exited Berkeley and UCLA following Prop 209 also came from much lower-income households than those who replaced them, generating a net enrollment shift at UC's more-selective campuses from students in the bottom three income quartiles (fixed in '96-97) to students in the top quartile.

less likely to enroll at the selective UC campuses but more likely to enroll at the less-selective campuses. The teaching-oriented CSU system and California community colleges also absorbed some low-$AI$ URM applicants (relative to changes among non-URM applicants).[17] Some high-$AI$ URM applicants were absorbed by the highly-selective Ivy+ universities, and middle-$AI$ URM applicants became more likely to enroll at other private and out-of-state universities.

Overall, these patterns are consistent with a cascade of URM students from more- to less-selective institutions after Prop 209, with URM students from more-selective schools enrolling at less-selective universities where they replaced lower-$AI$ URM students now rejected absent affirmative action.[18] This cascade explains why URM enrollment only declines at the more-selective UC campuses (see Table A-6).

Prop 209's broad impact on where URM UC applicants' go to college highlights the importance of analyzing California student outcomes across all U.S. institutions, since restricting to students at a smaller set of universities (like the UC system) will generate sample selection bias. The following section describes this study's baseline research design, which exploits longitudinal records for all California-resident UC applicants – following students wherever they enroll – to credibly estimate the effects of affirmative action on student outcomes.

## 3  Empirical Methodology

I estimate the impact of Prop 209 on URM UC applicants by comparing the change in URM applicant outcomes after Prop 209 to the change in outcomes of non-URM students with similar prior academic opportunity and preparation. Treating non-URM applicants as a comparison group differences out shifts in UC campuses' reputation and selectivity that shaped all UC applicant outcomes. However, non-URM UC applicants are not a traditional 'control' group; Prop 209 likely increased some non-URM students' admissions likelihoods at

---

[17]The increase in community college enrollment and decrease in the number of students with no observed enrollment in NSC likely reflects community colleges' entry into NSC reporting; see Appendix D.

[18]Figure A-7 shows that this cascade pattern is not reflected in applicants' UC application portfolios, implying that the observed patterns result from admissions rather than application decisions.

some UC campuses so that those campuses could preserve their net enrollment despite the absence of affirmative action.[19] As a result, the estimates presented below identify the impact of Prop 209 on URM outcomes relative to its impact on non-URM outcomes. There are about four times as many non-URM UC applicants as URM applicants, so if UC campuses' net enrollment did not respond to Prop 209, every 1 percentage point average decrease in URM applicants' enrollment likelihood corresponds to almost a 0.25 percentage point average **increase** in non-URM applicants' enrollment likelihood.[20] If universities' treatment effects for on-the-margin URM and non-URM students are similar, this implies that as much as 20 percent of the estimates described below could be explained by improved outcomes among non-URM students. I return to this argument in Section 6, presenting evidence that the benefits of Prop 209 to non-URM students likely explain a smaller share of the presented estimates.

To implement the proposed research design, I estimate difference-in-difference models of the form:

$$Y_{iy} = \alpha_{h_i} + \delta_y + \beta_0 URM_i + \sum_{t=1994}^{2002} \mathbb{1}_{\{t=y\}} \beta_y URM_i + \gamma X_{iy} + \epsilon_{iy} \tag{1}$$

where $Y_{iy}$ is an outcome for California-resident freshman applicant $i$ after they applied to UC in year $y$. I present results from two model specifications, both estimated by OLS. First, I restrict the sample to 1994-2002 applicants and set $\beta_{1997}$ to 0, estimating the difference between URM and non-URM applicants' outcomes in the years before and after Prop 209. The $\beta_{1996}$ coefficient can be interpreted as a placebo test that observed post-1998 effects are driven by Prop 209, while the $\beta_{1994}$ and $\beta_{1995}$ coefficients could possibly reflect changes in applicant outcomes as a result of SP-1 and Prop 209's passage (which led some UC campuses to begin phasing out affirmative action in 1996). To estimate the effect of Prop 209 more concisely, I also estimate a specification further restricting the sample to 1996-1999 applicants and estimating a single $\beta_{\cdot 98-99}$ term,

---

[19]Figure III shows that there is no 'control' group of URM UC applicants; Prop 209 shifted URM UC applicants' college enrollment at every $AI$, even among the highest-$AI$ URM applicants. It also shows that the impacted non-URM students tend to have higher $AI$ than the URM students exiting those universities, suggesting that if the baseline results below reflected non-URM outcomes they would be driven by high-$AI$ applicants. In fact, most of the estimated effects are driven by low-$AI$ applicants.

[20]Figure A-2 shows that annual growth in net California university enrollment appears unchanged by Prop 209, nor did Prop 209 observably impact the overall weighted-average institutional quality of that enrollment, with gains among non-URM students offsetting declines among URM students.

averaging outcomes two years after 1998 relative to the two years prior. No UC campus implemented any other known changes in their admissions processes in this period.

Each model includes high school fixed effects $\alpha_{h_i}$, which absorb spurious cross-school application and outcome variation, and the components used to construct UC's Academic Index ($X_{iy}$), which absorb variation in applicants' observed academic preparation.[21] Standard errors are robust.

I also estimate three model variants to better understand Prop 209's effects on student outcomes. First, I separately estimate the model by '96-97 URM $AI$ quartile to observe heterogeneous treatment effects for students with different prior academic opportunities and preparation. Second, because some UC campuses began phasing out affirmative action in 1996, I replace the model's 1996-1997 pre-period with 1994-1995 and re-estimate post-1998 outcomes relative to those earlier years. Finally, I interact $\beta_0$ and $\beta_y$ with indicators for whether the student is Black or Hispanic (omitting Native American students because of sample size), identifying separate coefficients to estimate heterogeneity in Prop 209's impact by URM ethnicity.

It remains possible that the $\beta_y$ estimates reflect sample selection bias resulting from the impact of Prop 209 on the composition of UC applicants, since a non-random selection of URM applicants may have been discouraged from UC application by their decreased likelihood of admission. I quantify the degree of Prop 209's URM application deterrence and test the model's sensitivity to alternative specifications in Section 5.

## 4   The Impact of Affirmative Action on Student Outcomes

Figure IV visualizes the impact of Prop 209 on URM UC applicants with estimates of $\beta_y$ from Equation 1 for a sequence of enrollment, educational attainment, and labor market outcomes, all estimated relative to 1997. The subsections below discuss each of the measured outcomes in turn. Given that many URM applicants' undergraduate enrollment remained unchanged by Prop 209, the presented reduced-form coefficients

---

[21]That is, $X_{iy}$ includes Verbal and Math SAT scores, high school GPA, SAT II Writing score, SAT II Math score (and an indicator for submitting a Math 2 SAT II score), and a third SAT II score (along with indicators for which score was submitted). 15 percent of the sample is missing at least one test score (mostly the third SAT II); dummies are included for each missing value. I test models' sensitivity to covariate inclusion in Section 5.

likely underestimate impacted students' treatment effect of enrolling at less-selective universities after the affirmative action ban.

## 4.1  Institutional Quality

Prop 209 caused URM UC applicants to be 7.6 percentage points less likely to enroll at the more-selective UC campuses – particularly driven by the second and third URM $AI$ quartiles – and led to small corresponding enrollment increases across the spectrum of other public and private higher education institutions.[22] Prop 209 led to larger relative enrollment declines at the more-selective UC campuses for Black applicants, with the top $AI$ quartile of Black applicants facing a 15 percentage point enrollment decline (see Table A-8).

I summarize these changes in university enrollment quality by characterizing each institution in two ways: (1) using traditional measures of university quality like selectivity and graduation rate, and (2) using a set of novel "value-added" (VA) statistics, which estimate each institution's average treatment effects on their students' degree attainment and average wages between ages 30 and 34. I estimate the value-added statistics using fixed effect OLS regression over the 1995-1997 sample of UC applicants matched to their first enrollment institution, absorbing observable selection across institutions using either students' UC application and admission portfolios (following Mountjoy and Hickman (2020); "MH") or ethnicity indicators and fifth-order polynomials in SAT score and family income (following Chetty et al. (2020a); "CFSTY").[23] Appendix I provides methodological details and the estimated value-added statistics.

Table II presents difference-in-difference estimates of how Prop 209 impacted URM UC applicants' quality of enrollment institution. The first row shows that prior to Prop 209, URM students tended to enroll at higher-quality institutions – as measured by lower admissions rates, higher average SAT scores and gradu-

---

[22]See Table A-7. The empirical integral of URM students' changed enrollment at each UC campus by $AI$ between '95 and '98-99 – over the '98-99 distribution of URM UC applicants – provides a lower-bar estimate for the number of URM students who enter and exit each campus as a result of Prop 209. Table A-9 shows that at least 1,200 URM applicants exited UC campuses – with more than 800 exiting Berkeley and UCLA – and 800 entered UC campuses after Prop 209.

[23]I do not shrink the value-added statistics, and both sets of covariates likely fail to fully absorb selection bias across universities. Given students' positive selection across institutional value-added and that most URM students enroll at lower-VA institutions following Prop 209, both of these factors likely lead toward over-estimation of the VA decline following Prop 209.

ation rates, and higher estimated "value-added" – than academically-comparable non-URM UC applicants. The second row shows that Prop 209 caused URM UC applicants to enroll at less-selective universities with lower average SAT scores and graduation rates after 1998, with larger observed institutional declines among lower-$AI$ applicants. Those institutions are also estimated to have lower average "value-added": Prop 209 caused URM UC applicants to enroll at institutions that (on average) lead their students to lower likelihoods of Bachelor's degree attainment by 0.5-0.9 percentage points and whose graduates earn $400-$900 lower annual early-30s wages, with smaller value-added declines among high-$AI$ URM applicants. The first panel of Figure IV shows that the institutions where URM UC applicants enrolled remained relatively steady in terms of their "CFSTY" early-30s annual wage value-added between 1995 and 1997, but sharply and persistently declined by almost $1,000 after 1998. In summary, Prop 209 caused URM UC applicants to enroll at lower-quality colleges and universities.

## 4.2   Degree Attainment

Next I turn to Prop 209's effects on URM UC applicants' educational outcomes: whether they earned a Bachelor's degree, an undergraduate STEM degree, and/or a graduate degree.[24] Given that Prop 209 caused the average URM UC applicant to enroll at a lower-quality university more similar to their academically-comparable non-URM peers' institutions, the Mismatch Hypothesis entails that URM applicants' outcomes will improve after Prop 209. Figure IV presents estimates from Equation 1 for six-year BA attainment among bottom-$AI$-quartile applicants, unconditional STEM degree attainment, and graduate degree attainment, instead showing that all three abruptly and persistently decline in 1998 following Prop 209.

Table III provides additional details on the impact of Prop 209 on URM UC applicants' degree attainment. The first two columns show that URM UC applicants were already less likely to earn Bachelor's degrees than academically-comparable non-URM applicants before Prop 209, and if anything became even less likely to

---

[24]I define undergraduate degree attainment using the union of UC and NSC data to augment imperfect NSC records from UC Santa Cruz; see Appendix D. This may upwardly bias the resulting estimates, since URM students are less likely to enroll at UC campuses following Prop 209. Estimates for each separate data source are presented in Table A-12; estimates are somewhat more-negative in NSC data and less-negative in UC data among UC enrollees.

earn degrees after affirmative action was eliminated, with a 95-percent confidence interval of -1.69 to 0.27 percentage point change in average six-year degree attainment.[25] This effect is wholly driven by the bottom $AI$ quartile of URM applicants, whose enrollment was shown above to largely flow from the more-selective and selective UC campuses to less-selective public and private California universities.[26]

The third and fourth columns of Table III show that URM applicants may have become less likely to earn STEM degrees conditional on earning a college degree (95-percent c.i. -1.65 to 0.35 percentage points).[27] In combination with the decline in overall degree attainment, this provides strong evidence for Prop 209 causing a decline in **unconditional** STEM degree attainment by 1.0 percentage point (s.e. 0.4). Table A-13 presents major-specific estimates of changes in URM UC applicants' fields of study; the fields with largest increases after 1998 are biology (0.62 percentage points) and miscellaneous humanities fields (0.30), while those with the largest decreases are economics (-0.39), history (-0.32), and mathematics (-0.29), suggesting substantial heterogeneity between and within disciplines.

The last three columns of Table III show the relative impact of Prop 209 on URM students' likelihood of earning a graduate degree. Graduate degrees tend to offer large labor market returns (Altonji et al., 2016; Altonji and Zhong, 2021) and may represent an important benefit to more-selective university enrollment. URM applicants became 1.3 percentage points (s.e. 0.5) less likely to earn graduate degrees after Prop 209 relative to academically-comparable non-URM applicants, with particularly-large declines among lower-$AI$ applicants. Almost half of this decline can be explained by a decline in STEM-oriented masters and doctoral degrees, for which attainment declines 0.58 percentage points (s.e. 0.21). There is only weak evidence of a decline in law degree attainment, and no such evidence for medical degrees.

---

[25]These estimates contrast with Arcidiacono et al. (2014), whose Table 3 suggests that Prop 209 increased URM UC graduation rates. Bleemer (2020) shows that those findings reflect selection bias on unobserved applicant characteristics: replacing the highly-censored SAT score and high school GPA covariates available in their data with continuous measures of the same metrics fully attenuates the observed effect.

[26]Applicants' changed degree attainment is less than half of the change in the six-year graduation rates of the institutions where they enroll, a lower ratio than those estimated by Cohodes and Goodman (2014) and Bleemer (2021) in other contexts. This suggests that the degree attainment of students targeted by affirmative action was relatively less sensitive to enrollment change. The bottom $AI$ quartile had an estimated ratio closer to 1 (as in those other studies).

[27]This finding contrasts with a number of previous studies that show that increased university selectivity tends to decrease students' likelihood of earning STEM degrees along different margins (Arcidiacono et al., 2016; Mountjoy and Hickman, 2020; Bleemer, 2021). I further analyze Prop 209's effect on UC enrollees' performance and persistence in STEM courses in Section 7.

### 4.3    Employment and Wages

Finally, I turn to the effect of Prop 209 on URM UC applicants' labor market outcomes. Figure V shows estimates of $\beta_{98-99}$ annually estimated for each specified outcome six to sixteen years after UC application (when most applicants were age 34). The first panel shows that Prop 209 had no net effect on URM UC applicants' California labor market participation; 69 percent of applicants earned covered California wages annually before and after Prop 209.[28] Among wage-earning UC applicants, however, Prop 209 caused URM workers' wages to persistently decline by an average of \$1,800 (0.05 log points), or \$2,400 (0.04 log points) in their early 30s. As late as age 34, there is no evidence that the average wages of URM applicants impacted by Prop 209 recover to their earlier levels. Table A-14 shows that these wage declines are proportionally larger for lower-$AI$ URM applicants, who also faced the greatest educational deterioration.

The last two panels of Figure IV present the dynamics of URM UC applicants' wages in the years before and after Prop 209. Panel (e) shows estimated $\beta_y$ coefficients for the average of observed log wages 6-16 years after UC application. URM applicants' wages sharply decline between 1997 and 1998, reflecting the impact of Prop 209, but there is also evidence of a persistent relative trend of declining URM UC applicants' wages throughout the period. This trend is likely the result of ethnicity-specific wage dynamics in the California labor market, with URM workers' wage distribution potentially declining relative to the non-URM distribution as a result of rising inequality in the state (Juhn et al., 1991).

Following the insight of that study, I account for these wage dynamics by replacing applicants' wages with their percentile in the contemporaneous ACS wage distribution of same-ethnicity college-educated California workers born between 1974 and 1978, most of whom were already in college prior to Prop 209's 1998 implementation. Panel (f) shows that the resulting percentiles are unchanging in the periods either before or after Prop 209, successfully removing the time trend, with an approximately 1 percentage point decline observed

---

[28]Figure A-9 shows that California labor market participation is unchanged after Prop 209 for all four $AI$ quartiles of URM applicants. Prop 209 could have either increased or decreased URM applicants' likelihood of covered California employment: less-selective university enrollment likely decreases applicants' likelihood of seeking employment outside the state (since the credential is more geographically-specific), but increased out-of-state enrollment might have led to out-of-state employment.

between 1997 and 1998 caused by Prop 209. On average, a one percentile change in the 2001-2017 URM wage distributions corresponds to $1,940, closely matching the estimated decline in URM UC applicants' wages after Prop 209 shown in Table IV and suggesting that the baseline wage estimates reliably capture the effect of Prop 209.

I examine the wage estimates' sensitivity to alternative parallel trends assumptions using the method of Rambachan and Roth (2020), who provide robust confidence intervals for difference-in-difference statistics in the presence of bounded group-specific trends. Figure A-10 shows that the wage estimates presented in Panel (e) of Figure IV are sensitive to alternative assumptions, but that the wage percentile estimates in Panel (f) are robust to the assumption of annual differential trends of up to almost 0.15 percentiles per year. I also find that the pre-trend persists if the ACS wage distribution is fixed in a given year, implying that ethnicity-specific wage dynamics, not the form of the percentile transformation, explain the resulting parallel trends (Figure A-11).

Table IV summarizes the changes in URM UC applicants' wages following Prop 209, showing that academically-comparable URM and non-URM workers earned similar wages before Prop 209 but diverged afterwards. The second panel shows striking evidence of heterogeneity across URM students: while the wages of Hispanic students sharply declined following Prop 209 relative to academically-comparable non-URM applicants, there is little such evidence for Black applicants (though their smaller sample size results in larger standard errors).[29] This widens a previously-existing gap between the two groups, with Black applicants already earning lower average wages than academically-comparable Hispanic students (who also earn somewhat higher wages than academically-comparable non-URM applicants). Figure VI contextualizes this finding: while Black UC applicants faced similar or larger declines in university quality and educational outcomes than Hispanic UC applicants after Prop 209, and Hispanic UC applicants' wage outcomes deteriorated after 1998, there was no observable parallel decline among Black UC applicants. This suggests that while

---

[29]Estimating independent effects of Prop 209 on Black and Hispanic outcomes (e.g. dropping non-Black URM applicants to estimate the effect on Black applicants) does not change the presented results.

UC's affirmative action provided long-run wage returns to Hispanic students, its average labor market benefits to Black Californians may have been small, though this finding is tempered by Black applicants' wider confidence intervals and the unavailability of a Black-specific ACS wage distribution (due to small sample size).

While Prop 209 caused a small number of mostly-Black URM UC applicants to enroll at out-of-state Ivy+ institutions, the impact of their exit from California on the presented wage statistics can be narrowly bounded. Consider, for example, the number of years in which URM applicants earn at least $100,000 in the 6-16 years after UC application. Observationally, URM Ivy+ enrollees are about 15 percentage points less likely than other top-$A1$-quartile applicants to work in California annually, and almost one-third of URM Ivy+ enrollees who work in California earn over $100,000 between 6 and 16 years after UC application. Given the 0.5 (1.0) percentage point increase in Ivy+ enrollment among URM (Black) UC applicants after Prop 209, this implies an expected decline in the number of years earning over $100,000 of about 0.003 (0.005), small changes relative to the 0.08 fewer high-earning years among URM applicants and the 0.11 year gap between the estimated effects of Prop 209 on Black and Hispanic applicants reported in Table IV.

### 4.3.1    Contextualizing Prop 209's Labor Market Impact

While UC does not educate enough of the California workforce for its admissions policies to shift most moments of the state's aggregate wage distribution, the high wages earned by its graduates imply that its policies may meaningfully impact the composition of California's high-earning workers. About 56,000 URM students applied to UC between 1998 and 2002. Compared to a 1996-1997 baseline, the difference-in-difference estimates imply that Prop 209 caused each of those applicants to become about 1.3 percentage points less likely to earn at least $100,000 per year in California in 2014, 12 to 16 years after college application, though some of that decline may reflect secular ethnicity-specific wage dynamics in California.[30]  This implies a decline

---

[30]In 2014, $100,000 was approximately the 90th (95th) percentile of wages among California (U.S.) workers aged 30 to 34, though it was earned by more than 20 percent of UC applicants 14 years after application. For annual estimated URM wage threshold declines relative to each baseline, see Figure A-12.

in the number of high-earning URM Californians by over 700. American Community Survey estimates show that there were 27,000 URM Californians earning over $100,000 in 2014, implying that Prop 209 caused a decline in the number of such workers among UC applicants by about 3 percent.[31] Given that 30-to-34 URM workers made up 46 percent of the 2010 California workforce but only 14 percent of earners over $100,000, this implies that affirmative action had been meaningfully mitigating inequality until Prop 209.

Figure A-13 shows that the fraction of early- and mid-30s URM Californians earning wages above $100,000 indeed disproportionately declined in the years that those cohorts would have lost selective university access as a result of Prop 209.[32] For example, relative to a 2010 baseline, URM Californians between ages 33 and 37 became about 10 percent less likely to earn over $100,000 between 2012 (when they all would have enrolled at university before Prop 209) and 2017 (when they all would have enrolled after Prop 209). Members of several comparison groups – including slightly older URM Californians, similar-aged URM non-Californians, and similar-aged non-URM Californians – all became slightly **more** likely to earn over $100,000 over the period. This suggests that the baseline estimates' focus on UC applicants may yield an underestimate of the aggregate labor market effect of Prop 209 for high earners, with further declines likely coming from two groups: (1) URM non-UC applicants who could have become less likely to earn admission to the more-selective public CSU universities, which were also bound by Prop 209; and (2) URM high school graduates deterred from UC application by Prop 209. The next section quantifies the magnitude of this latter group.

## 5  Application Deterrence and Model Robustness

The primary potential threat to the difference-in-difference design is that Prop 209 may have deterred some URM students from sending an application to UC, which could have further contributed to income inequality but may also generate sample selection bias in the baseline estimates (Long, 2004; Dickson, 2006; Yagan,

---

[31]The estimated $130-$150 million decline in 2014 wages earned by URM Californians between ages 30 and 34 represents a 0.4-0.5 percent aggregate decline for that group. All ACS statistics calculated using data from IPUMS (Ruggles et al., 2018).

[32]For this ACS analysis, I define Californians as those **born** in the state, to identify those likely impacted by Prop 209 and abstract away from post-education cross-state mobility.

2016).[33] I quantify the magnitude of this potential bias by first estimating the number and character of 'missing' URM UC applications. I match the applicant data to the annual number of 1994-2001 "UC-eligible" graduates from each public California high school by gender and ethnicity – with UC eligibility indicating that they had satisfactorily completed accredited college-level coursework – and estimate models of the form:

$$\frac{A_{syea}}{UC_{sye}} = \sum_{e' \in \{A,B,H\}} \sum_{y' \in \{96,98,00\}} \beta_{e'y'a} \mathbb{1}_{e=e', y \in \{y', y'+1\}} + \zeta_{sea} + \eta_{sya} + \epsilon_{syea} \qquad (2)$$

where $A_{syea}$ is the number of UC-eligible UC applicants from school $s$ in years $\{y, y+1\}$ of ethnicity $e$ in $AI$ range $a$, and $UC_{sye}$ is the number of UC-eligible high school graduates in those years. $\zeta_{sea}$ and $\eta_{sya}$ are school-ethnicity and school-year fixed effects. Years are grouped into four pairs, from '94-95 to '00-01; ethnicities are grouped into Asian, Black, Hispanic, and white; and $AI$ bins are defined as 200-point bins from 4,000 to 8,000. I estimate Equation 2 by weighted least squares (weighting to the student level using $UC_{sye}$) separately for each $a$, and interpret $\beta_{e98a}$ as the average change in the proportion of UC-eligible $e$ high school graduates who applied to UC following Prop 209, implicitly assuming that the true distribution of $AI$ across school-year-ethnicity cohorts remains unchanged over time.[34]

Figure VII presents estimates of the Black and Hispanic $\beta_{e,'98-99,a}$ coefficients from Equation 2, scaled by the average total number of $e$ UC-eligible California high school graduates in the '98-99 cohorts. The figure also shows the proportion of those applicants who would have likely been admitted to some UC campus had they applied, where admission is predicted solely by $e$ and $AI$.[35] The figure shows that while some deterred Black and Hispanic high school graduates were unlikely to be admitted to any UC campus, there were also a

---

[33]Card and Krueger (2005) use SAT 'sends' (measured by College Board) as a proxy for university applications and present evidence that the decline in UC applications after 1998 was wholly driven by low-testing students unlikely to be qualified for UC admission. Appendix F replicates their finding using College Board data and shows that replacing SAT 'sends' with actual applications (observed by linking College Board and UC applicant records) reverses that conclusion.

[34]Table A-15 presents estimated coefficients for a specification of Equation 2 across all $AI$. It shows that URM application rates following Prop 209 declined by between 4 and 6 percent of all UC-eligible URM public high school graduates.

[35]That is, the blue bar is the product of the black bar and the proportion of 1998-1999 URM UC applicants in bin $a$ who were admitted to at least one campus. See Figure A-1 for evidence that $e$ and $AI$ were highly predictive of applicants' admission at most UC campuses, even after 1998. Admit estimates implicitly assume that each UC applicant's admission is small relative to the size and composition of the applicant pool.

large number of applicants certain to be admitted to some campus – indeed, very likely to be admitted to UC's more-selective campuses – who were deterred from UC application after Prop 209.[36] The sum across the bars suggests that the number of Black and Hispanic UC applicants declined by 12-13 percent (about 1,200 per year), most of whom would have likely been admitted to some UC campus.[37]

Given this shift in the UC applicant pool, I test for the magnitude of sample selection bias in the baseline difference-in-difference estimates in the previous section by re-estimating the models with a series of additional covariates that could partially absorb remaining bias. First, I follow Card and Rothstein (2007) and construct a cross-school Heckit control function treating $p = \frac{A_{s_i yca}}{UC_{s_i ye}}$ as applicant $i$'s likelihood of applying to UC (Heckman, 1979). This control function formally requires the exclusion restriction that the within-school-ethnicity-cohort choice to apply to any UC campus is (conditionally) uncorrelated with student outcomes, and it absorbs cross-group selection into UC application. I also construct an alternative Heckit function defining $p$ by the leave-one-out percentage of UC-eligible high school graduates who applied to UC by an applicant's school, gender, and ethnicity. In addition to the inverse mills ratios of these $p$ statistics, I also collect a detailed set of applicant covariates excluded from the main specifications: gender, parental education, log family income, parental occupations, UC eligibility, high school GPA rank, and the number of enrolled 12th-grade honors courses.[38]

I conduct a Monte Carlo exercise randomly selecting sets of these additional covariates for model inclusion (following Card et al., 2018) to test the presented estimates' sensitivity to alternative covariate specifications. In particular, I re-estimate Equation 1 specifying $X_{iy}$ in the following ways: null (no covariates); including only the components of $AI$ (as in the baseline specification); and then adding between 1 and 9 additional sets

---

[36]Table A-9 links these application declines to the $AI$- and campus-specific enrollment changes presented in Figure III to show that application deterrence caused a decline in URM UC enrollment by about 450 students, half from Berkeley and UCLA. Combined with the estimated enrollment decline among UC applicants, this implies that Prop 209 caused an annual decline in URM UC enrollment of about 800 students in '98-99, or 14 percent. This closely matches the differently-calculated estimates of Bleemer (2019a).

[37]Figure A-14 presents additional specifications of Equation 2. It shows that URM students were particularly discouraged from applying to the Berkeley and UCLA campuses, and that UC-ineligible applicants were only slightly deterred by Prop 209. As a placebo test, it also shows that application rates among Asian students increased by less than 2 percent relative to white applications.

[38]Rank is determined using UC GPA among UC applicants in that school-year. Parental education indicates the applicants' parents' highest education level (with seven codes); parental occupation indicates the parents' occupation set (with $17^2$ codes). Covariates with missing values are included with missing value indicators.

of covariates, selecting those that lead to the largest and smallest estimates of $\beta_{\cdot 98-99}$. The resulting estimates are shown in Figure A-15 for six main outcomes.

While the $AI$ components are important covariates for several outcome measures, likely absorbing substantive changes in the composition of UC applicants around 1998, there is no further combination of these highly-detailed control functions and covariates that meaningfully changes any of the $\beta_{\cdot 98-99}$ estimates, with the exception of six-year degree attainment growing slightly more negative.[39] These results show that the baseline estimates are highly insensitive to alternative model specifications conditioning on applicants' academic, demographic, and socioeconomic status and cross-school application behavior, though they may reflect sample selection bias on unobservables like orthogonal dimensions of their high school leadership activities.

## 6    Impact of Prop 209 on Non-URM UC Applicants

Prop 209 did not measurably impact the overall weighted-average institutional value-added of enrollment at public or all California universities (see Figure A-2) or among UC applicants; the decline in enrollment quality among URM students was offset by an improvement among non-URM students. As discussed in Section 3 above, I interpret the baseline difference-in-difference estimates as the impact of Prop 209 on URM UC applicants, despite the fact that – assuming constant treatment effects – as much as 20 percent of each estimate may reflect changes among non-URM applicants caused to enroll at more-selective universities.[40] Two sets of additional evidence suggest that the per-applicant impact of Prop 209 is smaller for non-URM than URM applicants (as in Dale and Krueger, 2014; Bleemer, 2021), implying that non-URM outcomes explain less than 20 percent of each baseline estimate. First, single-difference estimates show that non-URM outcomes are generally smooth in the years before and after Prop 209, while URM educational and

---

[39]For example, high school fixed effects explain 8.8 (3.0) percent of variation in six-year degree attainment (conditional log wages); the addition of the AI covariates brings the $R^2$ to 12.9 (5.8) percent; and adding the full suite of additional covariates raises the $R^2$ to 15.3 (6.9) percent. These increasing $R^2$ values suggest that the covariates could have been expected to shift the estimated effect of Prop 209 if the estimates exhibited sample selection bias.

[40]Appendix E shows that relative to academically-comparable white applicants, Asian applicants enrolled at similar universities and had indistinguishable wage outcomes after Prop 209, suggesting proportional effects of affirmative action for both groups.

wage outcomes sharply and persistently decline in 1998 (see Figure A-16). While this provides suggestive evidence of relatively small returns to more-selective UC enrollment for "crowding-in" non-URM students, the absence of an unimpacted comparison group prohibits separate identification of Prop 209's effect on non-URM students and secular trends.

Second, I employ an alternative research design to directly estimate the admissions return to one UC campus – UC Berkeley, the most selective campus and the campus where URM applicants' relative admissions advantages were largest until Prop 209 – for the non-URM applicants who were on the Berkeley admissions margin in the years before Prop 209. These non-URM students were likely among those who would have most benefited from Prop 209, since many of them could have been admitted in the absence of Berkeley's affirmative action policy.

In 1996 and 1997 Berkeley guaranteed admission to applicants above an annually-determined $AI$ threshold.[41] Admissions officers then admitted some lower-$AI$ applicants based on other application characteristics. Figure IX(a) shows the admissions likelihood of '96-97 non-URM Berkeley applicants at every $AI$, adding 70 points to 1996 $AI$s to align the two years' thresholds (7,360 and 7,430); admission was near-guaranteed above the threshold and provided to only half of slightly below-threshold applicants. Because applicants near Berkeley's admissions threshold are quasi-randomly distribution on one or the other side of the threshold, differentiated by small test score or grade differences, I interpret outcome differences on either side of the threshold as resulting from the above-threshold non-URM applicants' greater access to UC Berkeley.

I estimate the effects of UC Berkeley admission for on-the-margin non-URM '96-97 applicants using local linear regression discontinuity models following Calonico et al. (2014). Each plot visualizes the 6,086 '96-97 non-URM Berkeley applicants within 400 $AI$ points of the threshold; regressions include a 1997 indicator covariate.[42] Figure IX(b) shows that the increased likelihood of Berkeley admission causes about

---

[41]See Figure A-3. Berkeley chose its annual threshold so that 50 percent of its admitted applicants had $AI$ above the threshold. As a result, the threshold could not be chosen until after Berkeley observed all applicants' $AI$s, prohibiting applicants from manipulating their $AI$ to exceed the threshold. Admissions around the threshold was noisier in '94-95; see Figure B-1.

[42]The distribution of applicants is smooth across the threshold, with the McCrary (2008) test yielding a $p$-value of 0.58. Sociodemographics are also smooth across the threshold: I predict annual log early-30s wages by gender-ethnicity indicators, log parental income, and parental education among '96-97 freshman UC-eligible UC applicants – omitting in-sample applicants within 400 $AI$ of

one-third of newly-admitted on-the-margin non-URM students to enroll. However, those students would have otherwise enrolled at similar-quality institutions on average; Panel (c) shows that the "CFSTY" wage value-added of applicants' enrollment institutions is unimpacted at the threshold. Most of the students would likely have otherwise enrolled at UCLA or UCSD (6.1 percentage points, s.e. 3.5) or out-of-state universities (8.0 percentage points, s.e. 3.4).

Panels (d) to (f) of Figure IX show that graduate school enrollment, early-30s wages, and the number of years spent by each applicant in their early 30s earning over $150,000 per year are smooth across the Berkeley admissions threshold.[43] While the estimated standard errors cannot reject moderate returns to UC Berkeley admission, the observed effects suggest that on-the-margin non-URM students have access to alternative similar-value universities, and switching enrollment to UC Berkeley provides little measurable long-run economic return.

Appendix J presents comparable estimates for UC Davis, the only other UC campus to set a binding $AI$ admissions threshold before Prop 209. It shows that on-the-margin non-URM applicants rejected from UC Davis enroll at lower-value-added universities but similarly face no observable change in their educational or wage outcomes, though there is some evidence of non-random selection into applying to Davis above its admissions threshold. Nevertheless, if these estimated returns to UC Berkeley and Davis are externally valid for the non-URM students who crowded into more-selective UC campuses following Prop 209, this suggests that Prop 209 provided minimal benefits to non-URM students.

# 7   STEM Course Performance and Persistence

Having documented Prop 209's high-level effects on impacted young URM Californians, I next turn to an investigation of educational mechanisms that could explain these effects. Several previous studies have hy-

---

the threshold – and find that crossing the threshold yields lower 'predicted' income by 0.00027 log points, with standard error 0.018.

[43]There is no estimated change in likelihood of California employment across the Berkeley access threshold; despite their increased likelihood of out-of-state university enrollment, applicants' number of early-30s years employed in California increases by 0.14 years (s.e. 0.17). $150,000 is a better indicator of unusually high wages for this strongly positively-selected sample than $100,000; in their early 30s, they earned the former (latter) in 1.7 (0.6) out of five years.

pothesized that students who attend more-selective universities as a result of affirmative action will earn lower grades and become less likely to persist in demanding courses, especially in STEM fields, than if they'd enrolled at a less-selective university with lower-testing peers Loury and Garman (1993); Arcidiacono et al. (2016). However, previous studies have focused on the impact of affirmative action on overall grade point averages and major choice instead of URM students' actual course performance and STEM course progression.[44] Complementing the finding that Prop 209 failed to increase URM UC applicants' likelihood of earning a STEM degree – indeed, it led to the opposite effect – I further test this "Science Mismatch Hypothesis" by estimating the impact of Prop 209 on URM UC enrollees' performance and persistence along introductory STEM course sequences. I test alternative formulations of this Hypothesis in Appendix G and arrive at similar conclusions.

Using five UC campuses' detailed course enrollment records, I match core introductory STEM course sequences across these campus (e.g., each campus's two-course introductory Physics sequence) and estimate models of students' performance and persistence along these sequences using an extension of the baseline difference-in-difference models estimated above:[45]

$$Y_{iysm} = \alpha_{h_i} + \delta_y + \beta_0 URM_i + \sum_{t=1994}^{2002} \mathbb{1}_{\{t=y\}} \beta_y URM_i + \gamma X_{iy} + \epsilon_{iysm} \tag{3}$$

for student $i$ from high school $h_i$ in cohort $y$ who takes course $s$ in term $m$. I define three outcomes of interest for each completed course: the student's SAT percentile relative to their peers; the student's grade (out of 4 grade points); and the student's persistence, defined as an indicator for whether they completed the subsequent course in the sequence (e.g. whether the student completed Chemistry 2 after completing

---

[44]Differences in overall GPAs are at least as likely to reflect differing grading standards across departments and between lower- and upper-division courses as they are to reflect student course performance (Arcidiacono et al., 2012; Bleemer and Mehta, 2020). Differences in major choice may reflect that students have different preferences across majors at more- or less-selective institutions in a manner unrelated to course performance.

[45]Introductory STEM courses include four courses in chemistry (two introductory, two organic), two in biology, two in physics, and three in computer science. Each of these courses generally requires the previous course as a prerequisite. When universities on the quarter system include three courses along a sequence, I include the first and third course. Course details are provided in Appendix H. Estimates are largely insensitive to omitting engineering students, who may face different STEM course incentives.

Chemistry 1). Persistence is not defined for the final course in each sequence, and repeated course grades are omitted. The model is stacked over $s$ and estimated across courses, weighted evenly across students. Covariates $X_{iy}$ include the components of $AI$ as above. Standard errors are two-way clustered by student and course.

This definition of persistence mirrors the concept employed in the STEM Mismatch Hypothesis. Because the regression is weighted evenly across individuals, persistence can be heuristically understood as ranging from 0 to 100 percent. A student whose only completed STEM course is Chemistry 1, without ever completing Chemistry 2, would have persistence of 0 percent. A student who takes Chemistry 1, 2, and 3 but not 4 would have persistence 66.6 percent, since they persisted after two courses but not the third. A student who takes only all 3 Computer Science courses would have persistence of 100 percent. The STEM Mismatch Hypothesis holds that URM students admitted by affirmative action have lower STEM persistence than they would have had at less-selective universities.

In the two years before Prop 209, URM UC enrollees earned lower average grades in introductory STEM courses by 0.42 GPA points and were less likely to persist along STEM course sequences by 11.2 percentage points (See Tables A-16 and A-17). These gaps are fully explained by URM enrollees' poorer prior academic opportunity and preparation; their performance and persistence was indistinguishable from those of academically-comparable non-URM students across the five UC campuses. Relative to academically-comparable non-URM UC students, however, '96-97 URM students were 7.3 percentiles lower in their classes' SAT distribution, largely reflecting their enrollment at relatively more-selective UC campuses. The first panel of Figure VIII shows that Prop 209 caused URM students to enroll in STEM courses in which their average SAT percentile was about 4 percentage points higher, closing the gap by more than half. However, this increase in class rank did not translate into any observable improvement in those students' likelihood of STEM persistence or course grades. URM enrollees STEM performance and persistence were unchanged when their class rank improved; the 95 percent confidence interval around the estimated change in STEM

28

persistence narrowly bounds 0, from -2.3 to 3.5 percentage points, small effects relative to the raw STEM persistence ethnicity gap of 11.2 percentage points before Prop 209. Figure A-17 shows that Prop 209 similarly impacted Black and Hispanic UC enrollees' STEM persistence and performance outcomes.

I also estimate a difference-in-difference model of UC enrollees' likelihood of completing any STEM major (following Equation 1). URM UC enrollees' STEM major choice is precisely unchanged relative to academically-comparable non-URM enrollees after Prop 209, with a 95 percent confidence interval rejecting increases above 1.5 percentage points; the overall decline in STEM attainment thus appears driven by students who exit these UC campuses following Prop 209. These findings suggest that selectivity differences between public research universities are at best a second-order determinant of URM students' relative persistence and performance in STEM courses; instead, they appear largely explained by compositional differences in prior academic opportunity and preparation. In turn, the absence of changed STEM performance and persistence after Prop 209 suggests that course performance or persistence are not primary explanations for the effect of Prop 209 on students' educational and wage outcomes.

## 8    Discussion: Affirmative Action and Efficiency

The evidence presented above have implications for both the equity and efficiency of affirmative action. While affirmative action may have second-order effects on students whose admission was unrelated to the policy, such as through peer effects (Sacerdote, 2011) and the effect of campus diversity (Carrell et al., 2009), to a first approximation the (Kaldor-Hicks allocative) efficiency of affirmative action can be measured by the net impact of Prop 209 on two groups of students: the URM students targeted by affirmative action and the non-URM students who would have been admitted otherwise. Since net enrollment at more- and less-selective universities appears roughly unaffected by Prop 209 (see Figure A-2), this net effect can instead be summarized by the average relative returns to more-selective university enrollment for these two groups of students.

The single-difference and regression discontinuity estimates presented in Section 6 suggest that the non-URM students whose enrollment was impacted by Prop 209 received minimal returns from those changes, in line with the hypothesis that the return to more-selective university enrollment was relatively larger for the URM students targeted by affirmative action than it was for the non-URM students who replaced them after Prop 209. Unfortunately, Berkeley's URM admissions policies did not generate a sharp change in admissions likelihood at any $AI$, prohibiting parallel analysis for that group of students (See Figure B-1).

That hypothesis is further supported by a comparison between the change in URM students' early-30s wages and the change in the wage value-added of their enrollment institutions. While Prop 209 led URM students to enroll at universities with lower early-30s wage value-added by as much as $1,000, those students' actual early-30s annual wages fell by more than $2,000 (see Tables II and IV). Assuming that the presented value-added statistics either approximate or relatively overestimate the average difference in treatment effects of enrolling at those universities, this suggests that the wage effect of more-selective university enrollment for the students impacted by affirmative action is significantly larger than universities' average treatment effect. While the local average wage treatment effect for "crowding-in" non-URM students remains unobserved, that effect is very likely to be lower than the above-average effects for the URM students who benefited from affirmative action. These evidence suggest that affirmative action improved the allocative efficiency of California higher education.

## 9    Conclusion

Proposition 209 banned race-based affirmative action at public California universities starting in 1998. In the years immediately after the ban, URM UC applicants' university enrollment sharply shifted away from UC's most-selective Berkeley and UCLA campuses, causing a cascade of students to enroll at lower-quality public institutions and some private universities. Contrary to the Mismatch Hypothesis, less-selective university enrollment did not lead UC's remaining URM students to earn higher grades in challenging courses, but it did

cause URM applicants to become less likely to earn STEM degrees and any graduate degrees, and undergraduate degree attainment declined among lower-testing URM applicants. These poorer educational outcomes in turn contributed to a 5 percent average annual decline in Hispanic – but not Black – applicants' early-career wages, exacerbating inequality by decreasing the number of early-career URM Californians earning over $100,000 by at least 3 percent. Prop 209 also discouraged thousands of additional academically-competitive URM students from sending applications to public research universities, likely leading to additional reductions in California's high-earning URM workforce.

Affirmative action decreases non-URM student enrollment for each net additional URM student that it causes to enroll. However, single-difference and regression discontinuity evidence suggest that those impacted non-URM students – whose more-selective university enrollment increased following Prop 209 – experienced relatively small long-run educational or wage effects after Prop 209. URM students, on the other hand, had received above-average wage returns to more-selective university enrollment under affirmative action, and thus faced disproportionate declines after Prop 209, suggesting that Prop 209 reduced both the equity and efficiency of California higher education. White and Asian students were proportionally impacted by Prop 209, with no evidence of disparate impacts for one or the other.

These findings differ from several existing analyses of the impacts of affirmative action, even those focusing on Prop 209, and highlight the importance of high-quality and detailed administrative data and a transparent research design to help to account for sample selection and omitted variable bias. They also contextualize the impact of university affirmative action policies relative to other policies aiming to close opportunity gaps for low-income and Black and Hispanic youths. Some limitations remain. The presented estimates are reduced-form, averaging over many URM students who were likely unimpacted by the Prop 209 policy change, which means that they likely underestimate the effect of Prop 209 on students whose enrollment was shifted by UC's policy change. They omit the impacts of Prop 209 on URM Californians dissuaded from UC application by Prop 209, who may have benefited from affirmative action at UC. The estimates also

omit labor market outcomes for (endogenously-selected) non-Californian and self-employed workers. Nevertheless, this study documents the meaningful potential of affirmative action policies to promote economic mobility in the U.S. – though perhaps not to close white-Black mobility gaps – and the equity and efficiency consequences of affirmative action's prohibition.

UNIVERSITY OF CALIFORNIA, BERKELEY

# References

**Altonji, Joseph G. and Ling Zhong**, "The Labor Market Return to Advanced Degrees," *Journal of Labor Economics*, 2021, *39* (2), 303–360.

**Altonji, Joseph, Peter Arcidiacono, and Arnaud Maurel**, "The Analysis of Field Choice in College and Graduate School: Determinants and Wage Effects," *Handbook of the Economics of Education*, 2016, *5*, 305–396.

**Anelli, Massimo**, "The Returns to Elite College Education: A Quasi-Experimental Analysis," *Journal of the European Economic Association*, 2019, *18* (6), 2824–2868.

**Antman, Francisca and Brian Duncan**, "Incentives to Identify: Racial Identity in the Age of Affirmative Action," *Review of Economics and Statistics*, 2015, *97* (3), 710–713.

**Antonovics, Kate and Richard Sander**, "Affirmative Action Bans and the "Chilling Effect"," *American Law and Economics Review*, 2013, *15* (1), 252—299.

**Arcidiacono, Peter**, "Ability Sorting and the Returns to College Major," *Journal of Econometrics*, 2004, *121* (1-2), 343–375.

— , "Affirmative Action in Higher Education: How Do Admission and Financial Aid Rules Affect Future Earnings?," *Econometrica*, 2005, *73* (5), 1477–1524.

— **and Michael Lovenheim**, "Affirmative Action and the Quality-Fit Trade-off," *Journal of Economic Literature*, 2016, *54* (1), 3–51.

— **, Esteban Aucejo, and Ken Spenner**, "What happens after enrollment? An analysis of the time path of racial differences in GPA and major choice," *IZA Journal of Labor Economics*, 2012, *1* (5).

— **, — , — , and V. Joseph Hotz**, "University Differences in the Graduation of Minorities in STEM Fields: Evidence from California," *American Economic Review*, 2016, *106* (3), 525–562.

— **, — , Patrick Coate, and V Joseph Hotz**, "Affirmative action and university fit: Evidence from Proposition 209," *IZA Journal of Labor Economics*, 2014, *3* (7).

— **, Josh Kinsler, and Tyler Ransom**, "Asian American Discrimination in Harvard Admissions," *Institute of Labor Economics Discussion Paper*, 2020, *13172*.

**Atkinson, Richard C. and Patricia A. Pelfrey**, "Rethinking Admissions: US Public Universities in the Post-Affirmative Action Age," *CSHE Research Paper Series*, 2004, *11* (4).

**Backes, Ben**, "Do affirmative action bans lower minority college enrollment and attainment? Evidence from statewide bans," *Journal of Human Resources*, 2012, *47* (2), 435–455.

**Bagde, Surendrakumar, Dennis Epple, and Lowell Taylor**, "Does Affirmative Action Work? Caste, Gender, College Quality, and Academic Success in India," *American Economic Review*, 2016, *106* (6), 1495–1521.

**Barrow, Lisa, Lauren Sartain, and Marisa de la Torre**, "Increasing Access to Selective High Schools through Place-Based Affirmative Action: Unintended Consequences," *AEJ: Applied Economics*, 2020, *12* (4), 135–163.

**Bertrand, Marianne, Rema Hanna, and Sendhil Mullainathan**, "Affirmative action in education: Evidence from engineering college admissions in India," *Journal of Public Economics*, 2010, *94* (1-2), 16–29.

**Billings, Stephen B, David J Deming, and Jonah Rockoff**, "School segregation, educational attainment, and crime: Evidence from the end of busing in Charlotte-Mecklenburg," *The Quarterly Journal of Economics*, 2014, *129* (1), 435–476.

**Black, Sandra, Jeffrey Denning, and Jesse Rothstein**, "Winners and Losers? The Effect of Gaining and Losing Access to Selective Colleges on Education and Labor Market Outcomes," *Manuscript*, 2020.

**Bleemer, Zachary**, "The UC ClioMetric History Project and Formatted Optical Character Recognition," *CSHE Research Paper Series*, 2018, *18* (3).

— , "Diversity in University Admissions: Affirmative Action, Percent Plans, and Holistic Review," *CSHE Research Paper Series*, 2019, *19* (6).

— , *The impact of Proposition 209 on under-represented UC applicants, and the magnitude of subsequent UC admission policies on URG enrollment*, Oakland, CA: UCOP Institutional Research and Academic Planning, 2019.

— , "Mismatch at the University of California before Proposition 209," *UC-CHP Policy Brief*, 2020, *2020.5.*

— , "Top Percent Policies and the Return to Postsecondary Selectivity," *CSHE Research Paper Series*, 2021, *21* (1).

— **and Aashish Mehta**, "College Major Restrictions and Student Stratification," *UC-CHP Policy Brief*, 2020, *2020.3.*

**Calonico, Sebastian, Matias Cattaneo, and Rocio Titiunik**, "Robust Nonparametric Confidence Intervals for Regression-Discontinuity Designs," *Econometrica*, 2014, *82* (6), 2295–2326.

**Card, David, Alessandra Fenizia, and David Silver**, "The Health Effects of Cesarean Delivery for Low-Risk First Births," *NBER Working Paper*, 2018, *24493.*

— **and Alan Krueger**, "Would the elimination of affirmative action affect highly qualified minority applicants? Evidence from California and Texas," *Industrial and Labor Relations Review*, 2005, *58*, 416—434.

— **and Jesse Rothstein**, "Racial Segregation and the Black-White Test Score Gap," *Journal of Public Economics*, 2007, *91* (11-12), 2158–2184.

**Carrell, Scott E., Richard L. Rullerton, and James E. West**, "Does Your Cohort Matter? Measuring Peer Effects in College Achievement," *Journal of Labor Economics*, 2009, *27* (3), 439–464.

**Chan, Jimmy and Erik Eyster**, "Does Banning Affirmative Action Lower College Student Quality?" *American Economic Review*, 2003, *93* (3), 858–872.

**Chetty, Raj, John Friedman, Emmanuel Saez, Nicholas Turner, and Danny Yagan**, "Income Segregation and Intergenerational Mobility Across Colleges in the United States," *The Quarterly Journal of Economics*, 2020, *135* (3), 1567–1633.

— **, Nathaniel Hendren, and Lawrence F Katz**, "The effects of exposure to better neighborhoods on children: New evidence from the Moving to Opportunity experiment," *American Economic Review*, 2016, *106* (4), 855–902.

— **, — , Maggie R. Jones, and Sonya R. Porter**, "Race and Economic Opportunity in the United States: an Intergenerational Perspective," *The Quarterly Journal of Economics*, 2020, *135* (2), 711–783.

**Cohodes, Sarah R. and Joshua S. Goodman**, "Merit Aid,

33

College Quality, and College Completion: Massachusetts' Adams Scholarship as an In-Kind Subsidy," *American Economic Journal: Applied Economics*, 2014, *6* (4), 251–285.

**Dale, Stacy and Alan Krueger**, "Estimating The Payoff Of Attending A More Selective College: An Application Of Selection On Observables And Unobservables," *The Quarterly Journal of Economics*, 2002, *107* (4), 1491–1527.

— **and** —, "Estimating the Effects of College Characteristics over the Career Using Administrative Earnings Data," *The Journal of Human Resources*, 2014, *49* (2), 323–358.

**Denning, Jeffrey and Patrick Turley**, "Was that SMART? Institutional Financial Incentives and Field of Study," *Journal of Human Resources*, 2017, *52* (1), 152–186.

**Derenoncourt, Ellora and Claire Montialoux**, "Minimum Wages and Racial Inequality," *The Quarterly Journal of Economics*, 2021, *136* (1), 169–228.

**Dickson, Lisa M.**, "Does ending affirmative action in college admissions lower the percent of minority students applying to college?," *Economics of Education Review*, 2006, *25* (1), 109–119.

**Dillon, Eleanor Wiske and Jeffrey Andrew Smith**, "The Consequences of Academic Match between Students and Colleges," *Journal of Human Resources*, 2020, *55* (3), 767–808.

**Dobbie, Will and Roland G Fryer Jr**, "Are high-quality schools enough to increase achievement among the poor? Evidence from the Harlem Children's Zone," *American Economic Journal: Applied Economics*, 2011, *3* (3), 158–87.

**Dynarski, Susan, Steven W. Hemelt, and Joshua M. Hyman**, "The Missing Manual: Using National Student Clearinghouse Data to Track Postsecondary Outcomes," *Educational Evaluation and Policy Analysis*, 2015, *37* (1S), 53S–79S.

**Ehrenberg, Ronald G.**, "Analyzing the factors that influence persistence rates in STEM field, majors: Introduction to the symposium," *Economics of Education Review*, 2010, *29* (6), 888–891.

**Fischer, Mary J and Douglas S Massey**, "The effects of affirmative action in higher education," *Social Science Research*, 2007, *36* (2), 531–549.

**Fryer, Roland G., Glenn C. Loury, and Tolga Yuret**, "An Economic Analysis of Color-Blind Affirmative Action," *The Journal of Law, Economics, and Organization*, 2008, *24* (2), 319–355.

**Griffith, Amanda**, "Persistence of women and minorities in STEM field majors: Is it the school that matters?," *Economics of Education Review*, 2010, *29* (6), 911–922.

**Heckman, James J.**, "Sample Selection Bias as a Specification Error," *Econometrica*, 1979, *47* (1), 153–161.

**Hinrichs, Peter**, "The Effects of Affirmative Action Bans on College Enrollment, Educational Attainment, and the Demographic Composition of Universities," *The Review of Economics and Statistics*, 2012, *94* (3), 712–722.

**Hoekstra, Mark**, "The Effect of Attending the Flagship State University on Earnings: A Discontinuity-Based Approach," *The Review of Economics and Statistics*, 2009, *91* (4), 717–724.

**Holzer, Harry and David Neumark**, "Assessing affirmative action," *Journal of Economic Literature*, 2000, *38* (3), 483–568.

**Jackson, C Kirabo, Rucker C Johnson, and Claudia Persico**, "The effects of school spending on educational and economic outcomes: Evidence from school finance reforms," *The Quarterly Journal of Economics*, 2016, *131* (1), 157–218.

**Johnson, Rucker**, *Children of the Dream: Why School Integration Works*, New York: Basic Books and Russell Sage Foundation Press, 2019.

**Juhn, Chinhui, Kevin M. Murphy, and Brooks Pierce**, "Accounting for the Slowdown in Black-White Wage Convergence," in Marvin H. Koster, ed., *Workers and Their Wages*, Washington, DC: AEI Press, 1991, pp. 107–143.

**Kapor, Adam**, "Distributional Effects of Race-Blind Affirmative Action," *Manuscript*, 2020.

**Long, Mark C.**, "College Applications and the Effect of Affirmative Action," *Journal of Econometrics*, 2004, *121* (1–2), 319–342.

**Loury, Linda Datcher and David Garman**, "Affirmative Action in Higher Education," *American Economic Review*, 1993, *83* (2), 99–103.

**Marion, Justin**, "How Costly Is Affirmative Action? Government Contracting and California's Proposition 209," *The Review of Economics and Statistics*, 2009, *91* (3), 503–522.

**McCrary, Justin**, "Manipulation of the running variable in the regression discontinuity design: A density test," *Journal of Econometrics*, 2008, *142*, 698–714.

**Mountjoy, Jack and Brent R. Hickman**, "The Returns to College(s): Estimating Value-Added and Match Effects in Higher Education," *Manuscript*, 2020.

**National Student Clearinghouse Research Center**, "Impact of Directory Information Blocks on StudentTracker Results," 2017.

**Niu, Sunny and Marta Tienda**, "Minority Student Academic Performance Under the Uniform Admission Law: Evidence From The University of Texas at Austin," *Educational Evaluation and Policy Analysis*, 2010, *32* (1), 44–69.

**Rambachan, Ashesh and Jonathan Roth**, "An Honest Approach to Parallel Trends," *Manuscript*, 2020.

**Rose, Heather**, "The Effects of Affirmative Action Programs: Evidence from the University of California at San Diego," *Educational Evaluation and Policy Analysis*, 2005, *27* (3), 263–289.

**Ruggles, Steven, Sarah Flood, Ronald Goeken, Josiah Grover, Erin Meyer, Jose Pacas, and Matthew Sobek**, *IPUMS USA: Version 8.0*, Minneapolis, MN: IPUMS, 2018.

**Sacerdote, Bruce**, "Peer Effects in Education: How Might They Work, How Big Are They and How Much Do We Know Thus Far?," *Handbook of the Economics of Education*, 2011, *3*, 249–277.

**Sander, Richard and Stuart Taylor**, *Mismatch: How Affirmative Action Hurts Students It's Intended to Help, and Why Universities Won't Admit It*, New York: Basic Books, 2012.

**Sjoquist, David L. and John V. Winters**, "State Merit Aid Programs and College Major: A Focus on STEM," *Journal of Labor Economics*, 2015, *33* (4), 973–1006.

**Sowell, Thomas**, *Black Education: Myths and Tragedies*, Philadelphia: David McKay, 1972.

**UCOP**, *Undergraduate Access to the University of California After the Elimination of Race-Conscious Policies*, Oakland, CA: University of California, 2003.

**US Department of Homeland Security**, "STEM Designated Degree Program List," 2016.

**Vars, Frederick and William Bowen**, "Scholastic Aptitude Test scores, race, and academic performance in selective colleges and universities," in C. Jencks and M. Phillips, eds., *The Black–White test score gap*, Washington, D.C.: Brookings Institution Press, 1998, pp. 457–479.

**Yagan, Danny**, "Supply vs. demand under an affirmative action ban: Estimates from UC law schools," *Journal of Public Economics*, 2016, *137*, 38–50.

**Zimmerman, Seth D.**, "The Returns to College Admission for Academically Marginal Students," *Journal of Labor Economics*, 2014, *32* (4), 711–754.

__ , "Elite Colleges and Upward Mobility to Top Jobs and Top Incomes," *American Economic Review*, 2019, *109* (1), 1–47.

Table I: Descriptive Statistics of 1990s UC Admissions by Ethnicity

| | Application | | | Admission | | | Enrollment | | |
|---|---|---|---|---|---|---|---|---|---|
| | '94-5 | '96-7 | '98-9 | '94-5 | '96-7 | '98-9 | '94-5 | '96-7 | '98-9 |
| **Panel A: Non-URM Applicants** | | | | | | | | | |
| Average Number or Percent of Applicants | | | | | | | | | |
| More Selective UCs | 15,659 | 18,941 | 22,262 | 48.2 | 43.2 | 37.7 | 15.2 | 13.4 | 13.2 |
| Selective UCs | 12,705 | 14,383 | 17,358 | 77.3 | 72.7 | 63.2 | 19.0 | 19.2 | 16.7 |
| Less Selective UCs | 7,251 | 7,827 | 10,098 | 83.7 | 85.5 | 84.5 | 15.7 | 18.4 | 17.5 |
| All UCs | 33,602 | 37,972 | 42,268 | 84.8 | 83.5 | 83.9 | 49.6 | 49.4 | 49.6 |
| Average SAT Score | | | | | | | | | |
| More Selective UCs | 1224 | 1227 | 1237 | 1320 | 1335 | 1339 | 1277 | 1294 | 1299 |
| Selective UCs | 1156 | 1160 | 1171 | 1193 | 1202 | 1222 | 1140 | 1156 | 1172 |
| Less Selective UCs | 1135 | 1134 | 1138 | 1157 | 1154 | 1158 | 1124 | 1121 | 1123 |
| All UCs | 1182 | 1187 | 1194 | 1207 | 1212 | 1216 | 1196 | 1208 | 1217 |
| **Panel B: URM Applicants** | | | | | | | | | |
| Average Number or Percent of Applicants | | | | | | | | | |
| More Selective UCs | 3,843 | 4,113 | 4,438 | 56.7 | 49.8 | 27.1 | 17.8 | 15.9 | 10.0 |
| Selective UCs | 2,889 | 2,970 | 3,356 | 78.2 | 74.5 | 57.2 | 19.0 | 16.5 | 15.6 |
| Less Selective UCs | 2,229 | 2,200 | 2,757 | 81.6 | 79.2 | 76.2 | 18.0 | 16.4 | 17.9 |
| All UCs | 9,478 | 9,498 | 9,922 | 81.3 | 79.4 | 73.4 | 47 | 44.3 | 39.6 |
| Average SAT Score | | | | | | | | | |
| More Selective UCs | 1054 | 1068 | 1083 | 1131 | 1158 | 1194 | 1102 | 1125 | 1149 |
| Selective UCs | 1017 | 1030 | 1045 | 1057 | 1074 | 1102 | 1018 | 1040 | 1068 |
| Less Selective UCs | 985 | 993 | 1006 | 1008 | 1019 | 1034 | 977 | 987 | 1004 |
| All UCs | 1025 | 1039 | 1048 | 1054 | 1071 | 1081 | 1052 | 1071 | 1077 |

Note: Count and mean average descriptive statistics of 1994-1999 California-resident freshman UC applicants who are or are not underrepresented minorities (URM). Statistics are averaged across campuses: Berkeley, UCLA, and San Diego are More Selective; Santa Barbara, Irvine, and Davis are Selective; and Santa Cruz and Riverside are Less Selective. URM includes Black, Hispanic, and Native American applicants. SAT score was on the 1600 scale. Percent admitted and percent enrolled are conditional on applying to that campus. Campus-specific statistics are presented in Table A-3. Descriptive statistics by ethnicity available in Tables A-4 (Black and Hispanic) and A-5 (white and Asian). Source: UC Corporate Student System.

Table II: Difference-in-Difference Estimates of URM UC Applicants' Post-1998 University Quality

| | First Four-Year Institution | | | First Institution Value-Added | | | |
| | Adm. Rate (%) | Avg. SAT | 6 Yr. BA Rate (%) | "MH" VA | | "CFSTY" VA | |
| | | | | BA (%) | Earn ($) | BA (%) | Earn ($) |
|---|---|---|---|---|---|---|---|
| **Panel A: Difference-in-Difference Coefficients** | | | | | | | |
| URM ($\beta_0$) | -7.3 | 37.1 | 3.5 | 2.0 | 1,896 | 2.8 | 2,862 |
| | (0.2) | (1.0) | (0.1) | (0.1) | (75) | (0.1) | (84) |
| URM × Prop 209 ($\beta_{\cdot 98-99}$) | 3.6 | -19.7 | -1.7 | -0.6 | -384 | -1.0 | -922 |
| | (0.2) | (1.3) | (0.2) | (0.2) | (93) | (0.2) | (105) |
| $\bar{Y}$ | 51.1 | 1,187.6 | 68.2 | | | | |
| Obs. | 173,958 | 171,565 | 169,945 | 177,365 | 173,878 | 176,092 | 173,591 |
| **Panel B: Estimates of URM × Prop 209 ($\beta_{\cdot 98-99}$) by AI Quartile** | | | | | | | |
| Bottom Quartile | 1.8 | -25.5 | -3.3 | -1.6 | -638 | -1.9 | -796 |
| | (0.6) | (3.7) | (0.6) | (0.4) | (214) | (0.5) | (246) |
| Second Quartile | 5.2 | -28.7 | -3.0 | -0.5 | -618 | -1.3 | -1,547 |
| | (0.5) | (3.0) | (0.5) | (0.4) | (197) | (0.4) | (237) |
| Third Quartile | 5.6 | -21.1 | -1.0 | 0.1 | -374 | -0.4 | -1,273 |
| | (0.5) | (2.7) | (0.4) | (0.3) | (182) | (0.3) | (218) |
| Top Quartile | 2.0 | -7.4 | -0.7 | -0.8 | -157 | -1.0 | -480 |
| | (0.4) | (2.4) | (0.3) | (0.3) | (224) | (0.3) | (233) |

Note: Estimates of $\beta_0$ and $\beta_{\cdot 98-99}$ from Equation 1, a difference-in-difference model of 1996-1999 URM UC freshman California-resident applicants' outcomes compared to non-URM outcomes after the 1998 end of UC's affirmative action program. Outcomes defined as characteristics of the first four-year university or the first two- or four-year institution at which the applicant enrolled within six years of high school graduation as measured in the NSC. Models include high school fixed effects and the components of UC's Academic Index (see footnote 21). Academic Index ($AI$) is defined in footnote 6; models by $AI$ quartile are estimated independently, with quartiles defined by the $AI$ distribution of 96-97 URM UC applicants. IPEDS data (first three columns) are linked to NSC by OPE ID; admission rate and average SAT score (which is averaged across the available 25th and 75th math and verbal score percentiles) are fixed by institution in 2001, the earliest observed year, while six-year graduation rate is contemporaneous. Robust standard errors in parentheses. Value-added (VA) measures are estimated by regressing six-year BA attainment or average conditional wages 12 to 16 years after UC application, when most applicants are in their early 30s, on college indicators, year FEs, and either ("MH") indicators for each applicant's set of UC campus applications and admissions (following Mountjoy and Hickman, 2020) or ("CFSTY") ethnicity indicators and quintics in SAT score and family income (following Chetty et al., 2020a), estimated over the 1995-1997 UC applicant pool. Source: UC Corporate Student System, National Student Clearinghouse, the California Employment Development Department, and the Integrated Postsecondary Education Data System (IPEDS).

Table III: Difference-in-Difference Estimates of URM UC Applicants' Post-1998 Educational Outcomes

| | Earn Bach. Deg. (%) | | Earn STEM Deg. (%) | | Earn Graduate Deg. (%) | | |
|---|---|---|---|---|---|---|---|
| | 4 Years | 6 Years | Uncondit. | Condit. | All | STEM | JD |
| **Panel A: Difference-in-Difference Coefficients** | | | | | | | |
| URM | -1.90 | -2.61 | 0.46 | 0.44 | 4.83 | 0.60 | 0.92 |
| | (0.41) | (0.40) | (0.31) | (0.41) | (0.42) | (0.17) | (0.19) |
| URM × Prop 209 | -0.85 | -0.71 | -0.98 | -0.65 | -1.31 | -0.58 | -0.21 |
| | (0.51) | (0.50) | (0.38) | (0.51) | (0.53) | (0.21) | (0.22) |
| $\bar{Y}$ | 47.8 | 74.6 | 22.2 | 27.1 | 36.0 | 5.4 | 4.9 |
| Obs. | 199,321 | 199,321 | 199,321 | 148,771 | 199,321 | 199,321 | 199,321 |
| **Panel B: Estimates of URM × Prop 209 ($\beta_{98-99}$) by $AI$ Quartile** | | | | | | | |
| Bottom Quartile | -2.09 | -4.25 | -1.23 | -1.42 | -2.77 | -0.86 | -0.08 |
| | (1.21) | (1.44) | (0.65) | (1.08) | (1.25) | (0.33) | (0.32) |
| Second Quartile | 0.55 | -0.52 | -1.05 | -0.44 | -1.11 | 0.34 | -0.65 |
| | (1.23) | (1.22) | (0.80) | (1.03) | (1.21) | (0.37) | (0.42) |
| Third Quartile | 0.98 | 1.22 | -0.76 | -0.82 | -1.26 | -0.53 | -0.68 |
| | (1.19) | (1.05) | (0.89) | (1.07) | (1.16) | (0.42) | (0.48) |
| Top Quartile | -0.71 | -0.03 | 0.81 | 0.14 | -0.14 | -0.32 | -0.24 |
| | (1.10) | (0.88) | (0.96) | (1.09) | (1.13) | (0.56) | (0.61) |

Note: Estimates of $\beta_0$ and $\beta_{98-99}$ from Equation 1, an OLS difference-in-difference model of 1996-1999 URM UC freshman California-resident applicants' educational outcomes compared to non-URM outcomes after the 1998 end of UC's affirmative action program. Outcomes defined as having earned a Bachelor's degree in five or six years, having earned a Bachelor's degree in a STEM field (unconditional or conditional on six-year degree attainment), or having ever earned a graduate degree (any, JD, or MD), all as measured in the union of UC administrative records and the NSC. Models include high school fixed effects and the components of UC's Academic Index (see footnote 21). Academic Index ($AI$) is defined in footnote 6; models by $AI$ quartile are estimated independently, with quartiles defined by the $AI$ distribution of 96-97 URM UC applicants. Robust standard errors in parentheses. Source: UC Corporate Student System and National Student Clearinghouse.

Table IV: Difference-in-Difference Estimates of URM UC Applicants' Post-1998 CA Wage Outcomes

| | Average 6-16 Years after UC App. | | | | Average 12-16 Years after UC App. | | | |
|---|---|---|---|---|---|---|---|---|
| | # Years Emp. | Total Wages ($) | Log Wages | # > $100K Wages | # Years Emp. | Total Wages | Log Wages ($) | # > $100 Wages |
| **Panel A: Difference-in-Difference Coefficients** | | | | | | | | |
| URM | 0.09 | -159 | 0.01 | -0.06 | 0.05 | -807 | -0.00 | -0.03 |
| | (0.04) | (359) | (0.01) | (0.02) | (0.02) | (531) | (0.01) | (0.01) |
| URM × Prop 209 | -0.00 | -1,822 | -0.05 | -0.08 | 0.00 | -2,382 | -0.04 | -0.07 |
| | (0.04) | (438) | (0.01) | (0.03) | (0.02) | (639) | (0.01) | (0.02) |
| $\bar{Y}$ | 7.55 | 60,888 | 10.69 | 1.48 | 3.30 | 79,064 | 10.89 | 1.01 |
| Obs. | 199,321 | 178,156 | 178,156 | 199,321 | 199,321 | 152,977 | 152,977 | 199,321 |
| **Panel B: Estimates with Separate Coefficients for Black and Hispanic Applicants** | | | | | | | | |
| Black | -0.60 | -2,004 | -0.08 | -0.16 | -0.27 | -1,903 | -0.09 | -0.09 |
| | (0.07) | (645) | (0.02) | (0.03) | (0.04) | (948) | (0.02) | (0.02) |
| Hispanic | 0.38 | 596 | 0.05 | -0.02 | 0.19 | -300 | 0.03 | -0.01 |
| | (0.04) | (403) | (0.01) | (0.02) | (0.02) | (595) | (0.01) | (0.02) |
| Black × Prop 209 | 0.03 | -479 | -0.03 | -0.01 | 0.02 | -581 | -0.03 | -0.02 |
| | (0.09) | (856) | (0.02) | (0.05) | (0.05) | (1,259) | (0.03) | (0.03) |
| Hispanic × Prop 209 | -0.04 | -2,300 | -0.05 | -0.12 | -0.01 | -3,000 | -0.05 | -0.09 |
| | (0.05) | (482) | (0.01) | (0.03) | (0.03) | (699) | (0.02) | (0.02) |
| $\bar{Y}$ | 7.56 | 60,939 | 10.69 | 1.48 | 3.30 | 79,136 | 10.89 | 1.01 |
| Obs. | 197,804 | 176,825 | 176,825 | 197,804 | 197,804 | 151,854 | 151,854 | 197,804 |

Note: Estimates of $\beta_0$ and $\beta_{98-99}$ from Equation 1, an OLS difference-in-difference model of 1996-1999 URM UC freshman California-resident applicants' wage outcomes compared to non-URM outcomes after the 1998 end of UC's affirmative action program. Panel B interacts the coefficients with Black and Hispanic indicators to separately estimate outcomes for each group; Native American applicants are omitted. Outcomes are defined as number of years of non-zero California wages, average wages and log wages across years with non-zero wages, and number of years with wages above $100,000, among the years 6-16 or 12-16 years after initial UC application. Outcomes measured in the California Employment Development Department database, which includes employment covered by California unemployment insurance. Models include high school fixed effects and the components of UC's Academic Index (see footnote 21). Academic Index ($AI$) is defined in footnote 6; models by $AI$ quartile are estimated independently, with quartiles defined by the $AI$ distribution of 96-97 URM UC applicants. The years 1996-1997 are omitted in Panel C because some universities preemptively curtailed their affirmative action programs in those years. Annual wages CPI-adjusted to 2018 and winsorized at top and bottom 1 percent. Robust standard errors in parentheses. Source: UC Corporate Student System and the California Employment Development Department.

Figure I: 'Normal' URM UC Applicants' Greater Likelihood of Admission by Campus, Year, and $AI$



Note: The difference between the percent of URM applicants and the percent of non-URM applicants admitted to each campus by academic index ($AI$), in each of four two-year periods (1994-2001), with darker lines corresponding to earlier periods. The two later periods are after the implementation of Prop 209 ended UC's affirmative action policies. The displayed statistics show the total annual number of additional URM students admitted to each campus in each period based on their higher likelihood of admission, calculated as the sum of the products between the increased admissions likelihood and the number of URM applicants by year and $AI$. The sample is restricted to freshman fall California-resident applicants who were "normal," in that they (a) were UC-eligible, which means that they satisfactorily completing the required high school coursework, and (b) selected intended majors that did not have special admissions restrictions (e.g. engineering at some campuses). UC Riverside admitted all such applicants. "URM" includes Black, Chicano, Latino, and Native American applicants. Source: UC Corporate Student System.

Figure II: UC Enrollment before and after Prop 209 by Ethnicity and *AI* Percentile



Note: The percent of all UC applicants who first enroll at each set of UC campuses before ('96-97 cohorts) and after ('98-99 cohorts) the end of affirmative action, by URM status and by percentile of academic index (*AI*) measured among 1996-1999 URM UC applicants. First enrollment measured in NSC up to six years after UC application. Statistics are smoothed with a triangular kernel with bandwidth 15. Source: UC Corporate Student System and National Student Clearinghouse.

Figure III: Changes in University Enrollment after Prop 209 by Ethnicity and *AI* Percentile



Note: Difference in percent of UC applicants who first enroll at each postsecondary institution(s) between 1998-1999 and 1996-1997, by URM status and by percentile of academic index (*AI*) measured among 1996-1999 URM UC applicants. First enrollment measured in NSC up to six years after UC application; university groups partition possible enrollments. Statistics are smoothed with a triangular kernel with bandwidth 15. "Ivy+" universities include the Ivy League, MIT, Stanford, and U. Chicago; private and non-CA universities exclude those institutions. Source: UC Corporate Student System and National Student Clearinghouse.

Figure IV: Annual Difference-in-Difference Estimates of URM UC Applicants' Outcomes after Prop 209



Note: OLS difference-in-difference coefficient estimates of Equation 1, the change in URM UC applicant outcomes relative to non-URM applicants, compared to the 1997 baseline. For details on outcomes (a) to (e), see notes to Tables II (with institutional value-added estimated following Chetty et al. (2020a)), III, and IV. Panel (f)'s outcome is defined as the average annual ethnicity-specific wage percentile between 6 and 16 years after UC application, omitting zero-wage years; percentiles are defined relative to the empirical distribution of wages earned in that year by same-ethnicity (URM, Asian, or White/Other) college-educated California ACS respondents born between 1974 and 1978, few of whom were directly impacted in university enrollment by Prop 209. Models include high school fixed effects, ethnicity indicators, and the components of UC's Academic Index (see footnote 21); 1994 NSC data are omitted. Panel (b) restricts the sample to the bottom $AI$ quartile as measured among '96-97 URM UC applicants. Annual wages CPI-adjusted to 2018 and winsorized at top and bottom 1 percent. Bars show robust 95-percent confidence intervals. Source: UC Corporate Student System, National Student Clearinghouse, California Employment Development Department, and the American Community Survey (Ruggles et al., 2018).

Figure V: Annual Difference-in-Difference Estimates of URM UC Applicants' Post-1998 Wage Outcomes



Note: Estimates of $\beta_{.98-99}$ from Equation 1, an OLS difference-in-difference model of 1996-1999 URM UC freshman California-resident applicants' employment outcomes compared to non-URM outcomes after Prop 209. Outcomes defined as non-zero California wages ("CA Employment") and California wages in dollars and log-dollars (omitting 0's) as measured in the California Employment Development Department database, which includes employment covered by California unemployment insurance. Coefficients in each year after UC application are estimated independently. Models include high school fixed effects and the components of UC's Academic Index (see footnote 21). Academic Index (*AI*) is defined in footnote 6. Annual wages CPI-adjusted to 2018 and winsorized at top and bottom 1 percent. Robust 95-percent confidence intervals shown. Figure A-8 presents separate estimates for Black and Hispanic applicants. Source: UC Corporate Student System and the California Employment Development Department.

Figure VI: Annual Difference-in-Difference Estimates of URM UC Applicant Outcomes by Ethnicity



Note: OLS difference-in-difference coefficient estimates of an extension of Equation 1 interacting $\beta_t$ with Black and Hispanic indicators, estimating the change in Black and Hispanic UC applicant outcomes relative to non-URM applicants compared to the 1997 baseline. For details on outcomes (a) to (e), see notes to Tables II, III, and IV; institutional value-added is estimated following Chetty et al. (2020a). Panel (f)'s outcome is defined as applicants' average annual ethnicity-specific wage percentile between 6 and 16 years after UC application, omitting zero-wage years; percentiles are defined relative to the empirical distribution of wages earned in that year by same-ethnicity (URM, Asian, or White/Other) college-educated California ACS respondents born between 1974 and 1978, few of whom were directly impacted in university enrollment by Prop 209. Models include high school fixed effects, ethnicity indicators, and the components of UC's Academic Index (see footnote 21); 1994 NSC data are omitted. Panel (b) restricts the sample to the bottom $AI$ quartile as measured among '96-97 URM UC applicants. Native American applicants are omitted. Bars show robust 95-percent confidence intervals. Source: UC Corporate Student System, National Student Clearinghouse, California Employment Development Department, and the American Community Survey (Ruggles et al., 2018).

Figure VII: Estimated Declines in Annual 1998-99 Applications and Admissions by Ethnicity



(a) Black                    (b) Hispanic

Note: Estimates of the change in the annual number of UC applicants (and admits) in 1998-1999 by ethnicity ($e$) and 200-point $AI$ bin, relative to 1994-1995. The height of each black bar is the product of $\beta_{e,98-99,a}$ (estimated in Equation 2) and $\sum_s UC_{s,98-99,e}$, the average number of UC-eligible California public high school graduates of ethnicity $e$ in 1998-1999. The height of each overlaying blue bar is the product of the black bar and the percent of 1998-1999 UC-eligible $e$ UC applicants in that $AI$ range admitted to at least one UC campus. The statistics in the bottom right sum the bars across all $AI$ and report the sums as a share of all $e$ UC applicants. 95-percent confidence intervals on the black bars from $\beta_{e,98-99,a}$ robust standard errors. Source: UC Corporate Student System and the California Department of Education.

Figure VIII: Difference-in-Difference Estimates of URM UC Enrollees' STEM Performance and Persistence



Note: Difference-in-difference WLS regression coefficient estimates of UCB, UCSB, UCD, UCSC, and UCR enrollees' introductory STEM course performance or persistence, differencing across URM status following Equation 3, relative to 1997. In Panels (a)-(c) each observation is a CA-resident freshman student-course pair in an introductory biology, chemistry, physics, or computer science course (see Appendix H) taken within 2.5 years of matriculation, stacking over courses and weighted evenly across observed students. SAT percentile is the fraction of other 1994-2002 freshman CA-resident peers who have lower SAT scores than the student; persistence indicates completing the subsequent course in the introductory STEM course sequence; and course grade is the grade points received in completed courses. In Panel (d) each observation is a student; the outcome indicates completing any UC STEM degree. Models include high school fixed effects, ethnicity indicators, and the components of UC's Academic Index (see footnote 21). UCSC is omitted from the GPA model because it did not mandate letter grades in the period. 95-percent confidence intervals are two-way clustered by student and course sequence level (e.g. second chemistry course). Source: UC Corporate Student System and UC-CHP Database (Bleemer, 2018).

Figure IX: Estimated Return to '96-97 UC Berkeley Enrollment for On-the-Margin Non-URM Applicants



Note: Regression discontinuity plots and estimates around the 1996-1997 UC Berkeley guaranteed admission $AI$ threshold among non-URM applicants, estimated by local linear regression following Calonico et al. (2014). See the notes to Tables II, III, and IV for a description of the outcome variables; "CFSTY" institutional value-added measured relative to CSU Long Beach. Reduced form coefficients from local linear regressions (conditional on year), with bias-corrected robust standard errors in parentheses. Running variable defined as $AI + (70 \times \mathbb{1}_{1997})$ to align thresholds over years. Source: UC Corporate Student System, National Student Clearinghouse, and the CA Employment Development Department.