**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
Debo P. Adegbile (admitted *pro hac vice*)
debo.adegbile@wilmerhale.com
Michael S. Crafts (admitted *pro hac vice*)
michael.crafts@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-295-8800

Felicia H. Ellsworth (admitted *pro hac vice*)
felicia.ellsworth@wilmerhale.com
Sharon Kelleher Hogue (*pro hac vice* pending)
sharon.hogue@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: 617-526-6000

Christopher T. Casamassima (CA Bar No. 211280)
chris.casamassima@wilmerhale.com
Joshua A. Vittor (CA Bar No. 326221)
joshua.vittor@wilmerhale.com
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
Telephone: 213-443-5300

*Attorneys for UC Defendants*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STUDENTS AGAINST RACIAL DISCRIMINATION,<br><br>*Plaintiff*,<br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>*Defendants*. | Case No. 8:25-cv-00192-JWH-JDE<br><br>**DECLARATION OF HAN MI YOON-WU IN SUPPORT OF DEFENDANTS' CONTENTIONS IN DISPUTE REGARDING PLAINTIFF'S FIRST AND SECOND SETS OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS** |

I, Han Mi Yoon-Wu, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am Associate Vice Provost and Executive Director, Undergraduate Admissions at the University of California. As Associate Vice Provost and Executive Director, Undergraduate Admissions, I coordinate the systemwide efforts for admissions at UC's nine undergraduate campuses.

2. I submit this declaration in support of Defendant The Regents of the University of California's ("UC") contentions in the dispute regarding Plaintiff Students Against Racial Discrimination's ("SARD") first and second sets of requests for production of documents to UC.

3. I have knowledge of the facts set forth in this declaration. I am competent and willing to testify to the matters contained in this declaration.

**A. Admissions Data**

4. SARD seeks individual-level admissions data for all applicants to all UC undergraduate programs from the 1993 to 1994 admissions cycle to the present and from all UC law schools from the 2015 to 2016 admissions cycle to present.

5. The volume of requested data is enormous. SARD's requests encompass admissions data submitted to thirteen campuses—nine undergraduate campuses and four law school campuses—over more than thirty admissions cycles. Even using only recent undergraduate application volumes as a benchmark, UC received approximately 205,000 first-year applications for Fall 2026. Because applicants commonly apply to multiple UC campuses and each application is reviewed independently by the receiving campus, those Fall 2026 applicants, alone, generated nearly one million campus-specific undergraduate application records in a single admissions cycle. Extrapolated across the more than thirty admissions cycles covered by SARD's requests, the requests implicate tens of millions of application records across the nine UC undergraduate campuses (not including the law schools).

6. The requested data cannot be obtained through a simple export and UC would instead be required to create the datasets. Doing so for the extensive period covered by SARD's requests—more than three decades—would be particularly burdensome because of the significant volume of data sought. This is so because the requested data are not maintained in a single database but are instead stored across the thirteen campuses and the Office of the President. Moreover, the data are also not maintained in a single coherent format across the thirteen campuses and the Office of the President. Accordingly, UC personnel across the thirteen campuses and the Office of the President would have to identify admissions data across numerous and disparate systems that are, or previously have been, in place at each;

determine what information, if any, is available for particular admissions cycles; extract information from those systems; reconcile differences among data structures, definitions, and formats; and create entirely new datasets for purposes of this litigation.

7. Further, the challenges associated with creating coherent, comprehensive datasets responsive to SARD's request increase with each preceding year for which data are sought. UC, including the thirteen campuses and the Office of the President, has utilized numerous, unique admissions, student-information, and institutional-research data systems, which have been upgraded, replaced, consolidated, or retired over the more than thirty years covered by SARD's requests. For example, undergraduate admissions data maintained by the Office of the President have been stored in at least ***five*** data platforms over the past three decades alone, and the thirteen campuses have similarly each utilized numerous varying data storage systems over the extended time period covered by SARD's requests. As a result, admissions-related information has not been collected, stored, or defined in a uniform manner across admissions cycles, and determining what data exist for any particular admissions cycle would require extensive historical investigation regarding the systems used at the time and the structure and meaning of the data maintained within those systems. Any resulting analysis from data across the timespan requested by SARD therefore would almost certainly be unreliable because of intrinsic data quality issues due to the passage of time and changing systems.

8. Ensuring the accuracy and reliability of the admissions datasets created in response to SARD's requests would also require substantial effort and could not be guaranteed. Because the requested information spans thirteen campuses, more than thirty admissions cycles, and numerous historical systems, UC personnel could not assume that data extracted from those systems are directly comparable or

complete. Substantial review would be required to determine whether the resulting information is sufficiently reliable for production and whether additional quality-control measures are necessary to avoid producing inaccurate or confusing information. For example, UC undergraduate admissions data contain approximately 6,000 fields across numerous data systems, each of which must be reviewed and understood before the data can be responsibly produced in litigation.

9. Defining the data across more than three decades would require an immeasurable amount of time and effort. Data dictionaries are not available for early admissions cycles' data at the Office of the President, and, in the case of campuses, data dictionaries likely do not exist at all. Data sets have changed over time and current employees are likely unfamiliar with prior data collection efforts and would be unable to assess the quality of data collected in admissions cycles before their time. Given the variety of fields and systems used over the time period requested, UC would need to work with personnel who are no longer employed at the University to gain even a basic understanding of certain data fields. Moreover, UC would need to work with consultants or experts to analyze the data and ensure it is understandable for this litigation increasing both the costs to UC and the time that would be required for compliance.

10. The requested data contain highly sensitive information regarding millions of non-party applicants and students, some of which is subject to state and federal student privacy laws. Before any production could occur, UC would need to undertake a substantial review to assess privacy obligations, determine what safeguards or anonymization measures may be necessary, and assess the re-identification risks associated with producing large-scale admissions datasets spanning multiple decades. In my estimation, ensuring data are secure enough to protect student privacy would take more than 10 times as many hours as preparing

non-student data for production. This is because the requested data include thousands of fields and, even after redacting or removing student names, student identification numbers, or other identifiable information, UC would have to expend significant time analyzing the data to minimize the risk of student identification by reverse-engineering the data.

11. The individuals who would be required to perform the work described would be admissions staff, institutional research professionals, information technology personnel, privacy professionals, registrars, and other employees responsible for administering admissions programs, maintaining student records, supporting student services, and operating essential University systems. Requiring those employees to devote substantial time to locating, reconstructing, validating, and preparing decades of historical admissions data would necessarily divert resources away from those ongoing responsibilities.

12. Further, creating secure, anonymized datasets would likely require UC to create entirely new computer programs to anonymize the data given that UC relied on a number of different systems—many of which are no longer in use—to create, maintain, and store the data over the extended period covered by SARD's requests.

13. Given the breadth of the request, UC would have to engage a data privacy expert to consult on and review the data anonymization measures, and hire additional personnel to assist with the effort of compiling and preparing the data for production. This presents its own burdens, including training contractors, conducting quality reviews, and significant personnel costs. It would not be possible to comply with current staffing levels, at least within the Office of the President.

14. UC is a public educational institution whose personnel are responsible for carrying out core public functions, including admitting students, maintaining educational records, administering financial aid and student-support programs,

complying with state and federal reporting obligations, and supporting instruction and research activities. The diversion of these personnel from their ordinary duties therefore affects not only UC's internal operations, but also the public educational mission UC is charged with serving.

15. Although it is not presently possible to calculate with precision the total number of hours and costs that would be incurred, my assessment is that compliance with SARD's requests for historical admissions data would require coordination across all thirteen campuses and the Office of the President; involvement of at least 10 individuals per campus or approximately 130 individuals total across all thirteen locations, including admissions staff, institutional research professionals, information technology personnel, privacy professionals, and records custodians; access to numerous current and historical systems, databases, and data repositories (including at least ***five*** for the Office of the President alone); reconstruction and validation of data relating to tens of millions of applications; review of approximately 6,000 fields; and hundreds, if not thousands, of staff hours.

**B. Student Outcomes Data**

16. SARD also seeks individual-level outcome data concerning every student who attended a UC undergraduate or law school campus, including graduation, employment, wage, bar-passage, and other outcome information.

17. With respect to post-admissions outcome data, it is my understanding that much of the requested data do not exist at all within UC. To the extent post-admissions outcome data exist, as with the other requested data, these data do not exist in a single, ready-to-produce format or a single database. Accordingly, compliance would require UC to determine whether and where such data exist and, to the extent such data exist, reconstruct the data from numerous systems and sources across thirteen different locations and the Office of the President.

18. UC maintains data regarding graduation rates but even that dataset alone contains more than 600 fields. For these data and any other post-admissions outcome data in UC's possession, UC would be required to conduct the same identification, review, and preparation process described above for any data, which would entail the same onerous process as the historical admissions datasets including extensive efforts to ensure data security and to protect student privacy.

19. Further, to the extent that any post-admissions outcome data are in UC's possession, much of those data would have been provided to UC by the California Employment Development Department, a third-party to this litigation, and would be subject to contractual restrictions on UC's ability to share the data. Accordingly, compliance would also require that UC identify and review the governing agreements, determine the scope of any restrictions on disclosure, evaluate whether notice or consent obligations apply, communicate with the affected third party, and, if necessary, seek authorization for production. Moreover, any data that were provided to UC by the California Employment Development Department would concern only UC students who are employed in the state of California, are not self-employed, and are not employed by the federal government, and thus would, at best, be incomplete and only partially responsive to SARD's requests.

20. Although it is not presently possible to calculate with precision the total number of hours and costs that would be incurred, my assessment is that compliance with SARD's requests for student outcomes data would require the involvement of 10 individuals per location or approximately 130 individuals total across all nine undergraduate and four law school campuses and the Office of the President, including numerous administrative offices and departments. The effort would consume hundreds of staff hours, exclusive of any additional effort required by third-party negotiations, privacy review, or production preparation.

**C. Researcher Datasets**

21. SARD seeks datasets associated with research conducted by Professor Zachary Bleemer in and around 2021. To my knowledge, these datasets were created in connection with the academic activities of Professor Bleemer. These data are not operational admissions records maintained in the ordinary course of UC's business.

22. UC does not maintain complete, comprehensive, or production-ready versions of the datasets underlying the Bleemer research. As with the other requested data, these data do not exist in a single, ready-to-produce format or a single database and identification, review, and preparation of any such data would entail the same process as the historical admissions datasets including extensive efforts to ensure data security and to protect student privacy.

23. Additionally, to the extent that the researcher relied on raw data that were, at some point, in UC's possession, UC does not know what specific portions of those data were ultimately used by Professor Bleemer or how those data were incorporated into the research dataset—including how those data may have been processed or analyzed by Professor Bleemer.

24. Moreover, the Bleemer datasets incorporate information obtained from third parties and therefore are subject to agreements with those third parties. The first dataset containing records for California-resident freshman applicants includes data obtained from the College Board and ACT Education Corp. The second dataset contains information obtained through the National Student Clearinghouse. The third dataset contains wage information obtained from the California Employment Development Department. Before producing any of these materials, UC would need to identify and review the governing agreements, determine the scope of any restrictions on disclosure, evaluate whether notice or consent obligations apply,

communicate with affected third parties, and, if necessary, seek authorization for production.

Dated: August 7, 2026

Respectfully submitted,

Han Mi Yoon-Wu