# EXHIBIT 7

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

WILMERHALE

March 13, 2026

**Felicia H. Ellsworth**

+1 617 526 6687 (t)
+1 617 526 5000 (f)
felicia.ellsworth@wilmerhale.com

**VIA EMAIL**

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940
(512) 686-3941
jonathan@mitchell.law

Re: **Response to Plaintiff's February 11 and 18 Correspondence Relating to RFPs**

Counsel:

I write in response to your February 11, 2026 letter and February 18, 2026 email, and to follow up on the parties' February 12, 2026 meet and confer regarding the Regents' Responses and Objections to Plaintiff's First and Second Sets of Requests for Production.[1]

Plaintiff's 46 RFPs seek documents and data far beyond any discovery to which Plaintiff is entitled under the federal rules and controlling precedent. This litigation is about whether the University of California ("UC") considers race when evaluating applications for admission to undergraduate campuses and law schools. It is not a vehicle to probe historical anecdotes untethered to UC's current practices or to Plaintiff's alleged harms. Nor is it an opportunity for Plaintiff to explore pet theories pushed by its "stakeholders" about the supposed dangers of considering race in admissions—something UC does not do. Yet Plaintiff seeks reams of documents and data that go back *decades* (and so have nothing to do with UC's current practices), that relate only to the academic or professional experiences of students *after* their admission (and so have nothing to do with admissions), or that are otherwise irrelevant to any party's claims or defenses and the relief Plaintiff seeks or disproportionate to the needs of the case.

Tellingly, neither your February 11 letter nor your February 18 email cites a single case to support your position that Plaintiff is entitled to the virtually uncabined and exceedingly burdensome discovery that it seeks. By doing so, you have failed to comply with the required procedure for raising discovery disputes. *See* C.D. Cal. L.R. 37-1 ("The moving party's letter must … provide any legal authority the moving party believes is dispositive of the dispute ….").
As detailed below, UC will provide only documents and data that are relevant and proportional to the needs of the case.

[1] Nothing in or about this letter, including the omission of any objection the UC previously made in response to Plaintiff's requests, shall be construed as a waiver of any such objection.

## I. Time Period

The majority of Plaintiff's RFPs seek information from time periods that are overbroad, not relevant to Plaintiff's claims, and disproportionately burdensome for UC.[2] Indeed, many seek information dating back several decades.[3]

These sweeping time periods are indefensible. They bear no relationship to Plaintiff's claims, the governing statutes of limitations, or the relief Plaintiff actually seeks. Plaintiff alleges that UC violates Title VI, 42 U.S.C. § 1981, and the Equal Protection clause because (in Plaintiff's view) UC's undergraduate and law school programs ***currently*** discriminate based on race.[4] Its claims are not premised on historical policies or practices. And its claims are subject to a two-year limitations period, which by itself suggests that Plaintiff's demand for decades of discovery is improper.[5]

Given its claims, it comes as no surprise that Plaintiff seeks principally forward-looking relief, including a declaratory judgment and injunction that would prevent UC from asking or allowing applicants to reveal their race,[6] and that the members on whom Plaintiff relies for standing include individuals who applied in the 2025-2026 admissions cycle and individuals who

---

[2] Plaintiff's first set of RFPs defined "Relevant Time Period" as January 1, 2020 through the present. UC objected to this definition and explained that, for purposes of its responses and objections, "Relevant Time Period" refers to January 1, 2022 through the date of the filing of this action. As a result, Plaintiff's statements in the February 18, 2026 email that UC has agreed to produce documents from the "'Relevant Time Period' (January 2020 onward)" for RFP Nos. 19, 22-23, 26, 28-31, 36, 38-39, and 42 are inaccurate. To the extent that UC has agreed (or agrees in this letter) to produce in response to requests, it has agreed (or agrees) to do so from January 1, 2022 through the date of the filing of this action.

[3] RFP Nos. 2, 7, 10, 16, and 38 seek data from before 2000 (RFP No. 2 seeks information from 1994 to 2018; RFP No. 7 from 1994 to the present; RFP No. 10 from the 1993-1994 admissions cycle to the present; RFP No. 16 from 1996 to the present; RFP No. 38 from 1998 to the present). RFP No. 20 seeks data from 2003 to the present, and RFP Nos. 15, 22-23, 30, 31, 32, 36, 37, 39 and 46 seek data from 2006 to the present. Finally, RFP No. 11 seeks data from the 2015-2016 admissions cycle to the present; RFP No. 45 from 2015 to the present; and RFP No. 3 from the 2018-2019 admissions cycle to the present.

[4] Third Am. Compl. ¶¶ 57, 64, 71.

[5] *See Rahmatullah v. Charter Commc'ns, LLC*, 2021 WL 1593242 at *6 (C.D. Cal. Mar. 25, 2021) ("[S]ome of plaintiff's requests appear to request evidence from as far back as ten years... the court instructs the parties to keep in mind the applicable statutes of limitations for plaintiff's claims in negotiating a proper subject period. Plaintiff must be ready to justify any departures from such limitations periods."); *Mata v. Associated Builders & Contractors of S. California, Inc.*, 2006 WL 8434410 at *3 (C.D. Cal. Jan. 17, 2006) (finding time period for discovery requests appropriate where it conformed to the statute of limitations and was not overly burdensome or costly for defendants).

[6] Third Am. Compl. ¶ 77. Plaintiff's request for nominal damages, which is incidental to its Title VI claim, does not expand the scope of permissible discovery.

purportedly plan on applying in future cycles.[7] On Plaintiff's own allegations and theory of the case, documents and data from a decade ago—let alone three decades ago—have no relevance to this litigation and represent an extreme and unjustified overreach.

It is conceivable that some data from recent admissions cycles may be relevant to the litigation, which is why UC has offered to produce information dating back to 2022. But production of ten to thirty years' worth of university and student files cannot possibly be necessary to determine the legality of policies in place today, despite the history Plaintiff alleges in its complaint.[8] For example, in *Tumbling v. Merced Irr. Dist.*, 262 F.R.D. 509, 515 (E.D. Cal. 2009), the Court found the ten-year scope of his discovery request overbroad and limited discovery to two years before the date of the specific allegedly discriminatory acts, even though the plaintiff had alleged a decades-long "history of harassment, discrimination and retaliation."

Here, Plaintiff makes no allegations to justify such broad tranches of historical data. While its Third Amended Complaint vaguely claims that a "pattern" of racial discrimination has been in place at UC campuses since the early 2000s, its references to punctual historical events and statistics are not sufficient to make three decades' worth of information relevant, similar to the request in *Tumbling*. At no point has Plaintiff articulated how the existence of any historical UC policies or admissions results from 30 years ago would impact its ability to prove that its members have been discriminated against by UC in 2025 (and will continue to be discriminated against in the future).

Even if historical policies, practices, communications, and outcomes were relevant to this litigation, Plaintiff has not explained how this relevance outweighs the colossal burden production of these materials would impose on UC. Courts frequently limit the temporal scope of overly burdensome discovery requests, even when the information being sought is found to be relevant.[9] For example, in *Zissa v. Cnty. of Los Angeles*, 2019 WL 13074698 at *4 (C.D. Cal. Nov. 7, 2019), the Court explained that "[t]he fact that the general subject matter of the RFPs is relevant does not mean that requests themselves seek information that is proportional to the needs of the case and not otherwise objectionable." The Court ultimately found that the vast amount of documents requested (ten years' worth) posed a disproportionate burden on the defendant and denied a motion to compel production of documents in response to these requests. We expect the Court would do the same here.

---

[7] *Id*. ¶¶ 36, 39, 42, 45, 48, 51, 54.

[8] *See Saunders v. White*, 191 F. Supp. 2d 95, 130 (D.D.C. 2002) (data from 1962-1983 "do[] not indicate whether there was discrimination against black officers in the Army from 1983 until 1993, when the policy at issue in this case went into effect").

[9] *See, e.g.*, *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 448 (C.D. Cal. 1998) ("The relevance of these documents is minimal, and collecting them for the entire period of several decades … would be unduly burdensome, at least in light of the likely benefit of their production").

What is more, the UC programs at issue in this litigation include nine undergraduate campuses and four law schools; as a result, much of the documents and data requested exist in different formats, software programs, and databases across each individual undergraduate or law school campus's admissions office. Merely identifying, compiling, and producing data going back to 2022, as agreed to by UC, represents enough of a technical challenge. Producing several decades, and in some instances up to three decades' worth of data, would be unreasonably costly and burdensome and not proportionate to the needs of the litigation.

## II. Bleemer and Mare Databases

### A. Bleemer Databases (RFP Nos. 1-5)

RFP No. 1 seeks "the five databases on University of California undergraduate admissions compiled by Zachary Bleemer during his tenure at the UC Office of the President in the 2010s." The affixed study, which Dr. Bleemer authored while an intern at UC Office of the President, is a longitudinal study on a cohort of individuals who applied to UC from 1994 to 2002. None of these databases is relevant to Plaintiff's claims, and none of your correspondence sets forth any adequate justification for production of this data.

As an initial matter, Dr. Bleemer's research is irrelevant to Plaintiff's claims. The paper "combine[d] longitudinal administrative data with difference-in-difference research design to estimate the impact of affirmative action on students' college quality, course performance, choice of major, degree attainment, and wages over the subsequent 15 years."[10] Plaintiff may have an academic interest in the questions Dr. Bleemer addressed—the impact of Proposition 209 on applicants to UC nearly three decades ago. But this litigation is not about whether race-conscious admissions is beneficial or harmful to applicants, nor is it about whether race-conscious admissions are right or wrong. Rather, this litigation is about whether UC engages in race-conscious admissions at all. The subject of the study, and any related data or other documents, is therefore not relevant to any claims or defenses or proportionate to the needs of the case.

Reviewing the datasets one by one makes it even clearer that Plaintiff's request for production is improper. To start, none of the decades-old data Dr. Bleemer used in his study are relevant to Plaintiff's claims. The study used "four primary data sources" (not five, as Plaintiff requests).[11] The first dataset contains records for "all 1994-2002 California-resident freshman applicants to any University of California campus."[12] Admissions data from nearly three

---

[10] Zachary Bleemer, *Affirmative Action Mismatch, and Economic Mobility After California's Proposition 209*, at 2 (June 2021) (hereinafter, the "Bleemer Study").

[11] Bleemer Study, at 8.

[12] *Id*.

decades ago are of no relevance to Plaintiff's claims that UC is *presently* engaged in race-conscious admissions. *See supra* Section I. The data are from long before the admissions policies Plaintiff challenges went into effect. In correspondence regarding these discovery issues, Plaintiff contends that its request is proper because it alleges that UC "began introducing the use of illegal racial preferences in 2003 and 2006."[13] UC vigorously contests that allegation, but even that chronology cannot account for their purported need for admissions data from 1994 to 2002. Data from before the challenged admissions policies went into effect—and from long before UC's current admissions policies and practices took shape—simply have no bearing on whether UC's holistic admissions process introduced impermissible racial considerations, nor on whether UC presently discriminates based on race.[14]

The second and fourth datasets contain irrelevant student performance data. The second dataset contains an extract from a larger National Student Clearinghouse (NSC) database containing enrollment and graduation records for students in the first admissions dataset.[15] The fourth dataset similarly contains student transcripts for five UC campuses.[16] These requests are materially similar to RFP No. 13 and, for the same reasons, seek data that are wholly irrelevant to Plaintiff's claims. *See* Section IV, *infra*. Moreover, the student performance data underlying Dr. Bleemer's study are far older than the performance data sought by RFP No. 13 (seeking data for the Relevant Time Period from 2020 to present). The age of this data thus compounds their irrelevance and disproportionality.

The third dataset contains wage data from the California Employment Development Department from 2000-2017 about the UC applicants in the first dataset.[17] Plaintiff has not, and could not, identify a conceivable need for data on the wages later earned by individuals who applied to UC between 24 and 34 years ago (other than the purely academic interests of its stakeholders). If students' post-admissions academic performance is irrelevant to the question of whether applicants decades later were discriminated against, wage data of applicants (both admitted and denied)—years after they graduated from a UC, another college, or none at all—are not remotely relevant to this litigation.

In addition to the four primary datasets, Dr. Bleemer also used "[a]dditional educational administrative data" in his research.[18] This includes, for instance, administrative data on

---

[13] Email from J. Mitchell to F. Ellsworth (February 18, 2026) ("February 18, 2026 Email").

[14] *See Saunders*, 191 F. Supp. 2d 95 at 130 (D.D.C. 2002).

[15] Bleemer Study, at 9.

[16] Bleemer Study, at 9-10.

[17] *Id.* at 9. Datasets underlying Dr. Bleemer's study are subject to contractual obligations that may limit disclosure of the data to third parties.

[18] *Id.* at 10.

universities' (including non-UCs) average SAT scores and graduation rates and data on high schools. None of the data is specific to any individual applicant to any UC. Most or all of this data is publicly available.[19] And it is "well established that discovery need not be required of documents of public record which are equally accessible to all parties."[20] While it is unclear if Plaintiff seeks this administrative data in addition to the four primary datasets, such administrative-level data about high schools and colleges across the nation have no bearing whatsoever on Plaintiff's claims.

To the extent any categories of data underlying the Bleemer study are relevant, it is undergraduate admissions data from the first dataset. Plaintiff has separately requested undergraduate admissions data, *see* RFP No. 10, and UC has agreed to produce admissions data subject to resolution of pending disputes over time period and scope and entry of an appropriate protective order. There is no need for a second, duplicative dispute over admissions data underlying the irrelevant Bleemer study—the mere existence of Dr. Bleemer's (irrelevant) study does not entitle Plaintiff to more admissions data than to which it would otherwise be entitled.

RFP Nos. 2-5 seek non-discoverable information for essentially the same reasons. RFP No. 2 seeks "identical or substantially similar" data—without any guidance on what that means—covering undergraduate admissions "from approximately 1994 through approximately 2018." "Substantially similar" data (though vague and undefined) are equally irrelevant as those data underlying the original study. Further, this request seeks data from an even older and longer time period.

RFP No. 3 seeks "the same categories of data outlined in the Bleemer datasets" for the 2018-2019 admissions cycle to present. As to the admissions data, this request is duplicative of RFP No. 10. As to the transcript data, this request is duplicative of RFP No. 13. As to the other two datasets, even assuming that UC possesses such data, they are irrelevant regardless of time period. Moreover, RFP No. 3 is internally inconsistent because Dr. Bleemer's datasets, used to conduct a longitudinal study, necessarily linked numerous datasets over many decades. A similar longitudinal study on recent UC applicants, while also irrelevant to Plaintiff's claims, is a logical impossibility because much of the relevant data do not yet exist.

RFP Nos. 4 and 5 seek explanatory documents and communications related to the datasets sought in Request No. 1. Because the underlying datasets are not relevant and not discoverable, neither are these incidental documents.

---

[19] *See, e.g.*, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), https://nces.ed.gov/ipeds/ (last accessed Mar. 13, 2026).

[20] *Baca v. John Muir Health*, No. 21-CV-04898-JSW, 2022 WL 16972489, at *4 (N.D. Cal. Nov. 16, 2022) (citing *Sec. & Exch., Comm'n v. Samuel H. Sloan & Co*., 369 F. Supp. 994, 995-96 (S.D.N.Y. 1973)).

B. Mare Databases (RFP Nos. 6-9)

Plaintiff's efforts to obtain data underlying two studies by Dr. Robert Mare is yet another attempt to obtain long-outdated admissions data that are neither relevant to any claims or defenses nor proportional to the needs of the case. Again, Plaintiff has separately requested undergraduate admissions data, *see* RFP No. 10, and UC has agreed to produce undergraduate admissions data, subject to a resolution of the parties' disputes over time period (*see supra* Section I) and scope (*see infra* Section III) and entry of an appropriate protective order. The mere existence of Dr. Mare's studies does not entitle Plaintiff to data from a broader time period than to which it would otherwise be entitled.

RFP No. 6 seeks data underlying two studies by Dr. Mare. The first study used admissions data—including "Readsheet data," holistic rankings, application reader characteristics, and "data on reader perceptions" based on rereads—for the Fall 2007 and Fall 2008 UCLA application cycles.[21] The second study "addresses the same issues with a similar approach" for application cycles from Fall 2007 through Fall 2011.[22] For the same reasons discussed above, *see supra* Section I, this attempt to obtain admissions data from nearly two decades ago is vastly disproportionate to the needs of the case.

Request Nos. 7-9 likewise seek irrelevant information. Request No. 7 seeks datasets that are identical or "substantially similar" (with no way for UC to know what that means) to the data Dr. Mare analyzed from the period 1994 to present. In essence, Request No. 7 seems to seek admissions data dating back to 1994. For the reasons described above and in Section I, *supra*, data from that period are not relevant and are disproportionate to the needs of the case.

Request Nos. 8 and 9 seek explanatory documents and communications related to the datasets sought in Request No. 6. Because the data sought in Request No. 6 are not relevant, neither are these incidental documents.

## III. Admissions Data

A. Undergraduate and Law School Admissions Data (RFP Nos. 10-11)

RFP No. 10 seeks "[a]ll anonymized, individual-level data for applicants to all University of California undergraduate programs from the 1993-94 admissions cycle to the present" and

[21] Mare, R. D. 2012. *Holistic Review in Freshman Admissions at the University of California—Los Angeles*. Report Prepared for UCLA Committee on Undergraduate Admissions and Relations with Schools.

[22] Mare, R. D. 2014. *Holistic Review in Freshman Admissions at the University of California—Los Angeles: 2009-11 Update*. Report Prepared for UCLA Committee on Undergraduate Admissions and Relations with Schools.

RFP No. 11 seeks "[a]ll anonymized, individual-level data for applicants to all University of California law schools from the 2015-16 admissions cycle to present." As explained in detail *supra* Section I, Plaintiff's request for undergraduate data going back more than thirty years is absurd on its face. Even according to Plaintiff's own account, UC is not alleged to have used racial preferences in admissions until at least 2003.[23] Plaintiff's request for law school data going back more than a decade is just as arbitrary, as Plaintiff identifies nothing relevant about law school admissions data as far back as 2015. Plaintiff is entitled to discover only documents or data relevant to the case.[24]

UC is willing to produce undergraduate and law school admissions data from the 2022-2023 admission cycle to the commencement of this suit.[25] No admissions data from before 2022 bear on any aspect of Plaintiff's claims or UC's defenses. Starting with applicants who applied in the fall of 2022 ensures that requested data's relevance to the claims and defenses in this case justifies the burden of producing the data. "In making a decision regarding burdensomeness, a court must balance the burden on the interrogated party against the benefit to the discovering party of having the information."[26] The burden of producing irrelevant, pre-2022 data far outweighs the (nonexistent) benefit to Plaintiff of having that information.

RFP Nos. 10-11 seek at least a dozen different data points for every undergraduate and law school applicant, of which there have been ***more than one million*** in the past five years alone.[27] Those data were collected by thirteen different admissions offices, and many of the data remain not centrally stored. All of that data needs to be anonymized to protect applicants' privacy and structured to conform to Plaintiff's requests. Plaintiff cannot justify the burden it would impose on UC to collect, de-identify, and produce irrelevant data from the period prior to fall of 2022.

To be clear, these data and any related materials discussed below, in the form they will be produced, will be prepared for purposes of this litigation and are not kept in the ordinary course of business. By agreeing to produce such materials in response to RFP Nos. 10-11 and any related requests for production, UC does not waive the attorney work-product doctrine or any

---

[23] *See* Dkt. 66 ¶¶ 17-18; *see also* February 18, 2026 Email.

[24] Fed. R. Civ. P. 26(b); *see Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070-1071 (9th Cir. 2004).

[25] As UC offered in its original responses and objections, UC is willing to meet and confer regarding the data fields to be produced for individualized undergraduate applicant data and individualized law school applicant data.

[26] *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1032 (E.D. Cal. 2010); *see also Sadofsky v. Fiesta Prods., LLC*, 252 F.R.D. 143, 152 (E.D.N.Y. 2008) (denying motion to compel where documents requested "will primarily yield information …[that is] not relevant to the claims asserted by either party in the within action").

[27] *Undergraduate Admissions Summary*, Univ. of Cal., https://www.universityofcalifornia.edu/about-us/information-center/admissions-residency-and-ethnicity (updated Jan. 23, 2026).

related protection, and its production of these materials shall not be so construed. Furthermore, these materials, including the data, any data dictionaries, and any information about data fields, will be designated Highly Confidential - Attorneys' Eyes Only under the forthcoming Protective Order, and strict compliance with the terms of the Protective Order is expected.

B. Data Dictionaries, Codebooks, or Technical Documentation (RFP No. 24)

UC is willing to produce non-privileged documents responsive to RFP No. 24, subject to UC's general objection limiting the relevant time period to between January 1, 2022 and the commencement of this suit and subject to the parties' negotiations regarding the data fields to be produced. As noted above, any such materials produced in response to RFP No. 24 will be prepared for purposes of this litigation and are not kept in the ordinary course of business. By agreeing to produce such materials in response to RFP No. 24, UC does not waive the attorney work-product doctrine or any related protection, and its production of these materials shall not be so construed.

C. Data Custodians and Systems (RFP No. 25)

UC expects that its response to Interrogatory No. 3 will provide Plaintiff with the information they seek to obtain through RFP No. 25. If, after reviewing UC's response to Interrogatory No. 3, Plaintiff seeks additional information about UC's data custodians and systems, we suggest a meet and confer regarding that interrogatory response.

D. Dataset Fields or Variables (RFP No. 27)

As explained in their Responses and Objections, UC is willing to meet and confer regarding Plaintiff's request for documents sufficient to show "all fields or variables included in any datasets produced in response to any of these Requests." The viability of any production in response to this Request will depend in part on the datasets to be produced to Plaintiff, and the parties presently do not agree on the datasets to be produced.

**IV. Student Performance and Preparation Documents and Data (RFP Nos. 13-14, 41, 43-46)**

RFP Nos. 13 and 14 seek sweeping, individual-level data reflecting post-admissions academic outcomes, including GPA, graduation timelines, transfer history, bar-passage attempts, and post-graduation employment, disaggregated by race or ethnicity, for undergraduate and law students across the UC system. RFP Nos. 41, 45, and 46 similarly seek documents, reports, studies, analyses, and underlying data concerning student "performance," "preparedness," and bar-passage outcomes, including historical and systemwide studies going back two decades.

And RFP Nos. 43 and 44 seek UC San Diego-specific documents relating to the Senate-Administration Working Group on Admissions report on student preparation.

This litigation concerns what UC considers when evaluating applications for *admission* to UC undergraduate programs and law schools. It does not concern what happens *after* an admissions decision is made. Post-admissions outcomes (including academic performance, graduation timelines, employment outcomes, or bar-passage results) do not inform whether race is considered during the admissions process and therefore have no bearing on the claims or defenses in this case. Plaintiff nonetheless contends—without explanation or support—that post-admissions student performance data are "assuredly relevant" to determining whether unlawful racial preferences were used in admissions.[28] That is incorrect.

A district court addressing materially similar discovery requests in an admissions case has squarely rejected that academic performance and preparation bear on the legality of admissions decisions. In *Students for Fair Admissions, Inc. v. University of North Carolina*, the court denied a motion to compel "data showing GPA's, graduation, and retention rates across racial and ethnic groups" and "any analysis of academic preparedness of UNC students by race or ethnicity."[29] The court explained that because the plaintiff's claim "challenges UNC's admissions process," "discovery must therefore be targeted to determine if the Applicant was treated unequally in the admissions process."[30] It reasoned that the Supreme Court in *Fisher* considered only admitted student demographics, not how students performed after enrollment, and therefore post-admissions performance was not relevant to evaluating the constitutionality of an admissions policy.[31] Because the school's admissions policies did not rely on post-admissions performance metrics, such data were not relevant to the plaintiff's claims.[32]

That reasoning applies with equal force here. Plaintiff does not identify any UC admissions policy that evaluates or justifies admissions decisions based on students' subsequent GPAs, graduation outcomes, or bar-passage results. Nor does Plaintiff offer any authority holding that such post-admissions outcomes are probative of discriminatory intent in admissions. Absent such a connection, the requested materials fall outside the scope of permissible discovery because they are not relevant.

Even if relevant, the burdens imposed by RFP Nos. 13-14, 41, and 43-46 also make them improper. The RFPs each seek decades of sensitive, individual-level data and internal analyses

---

[28] Letter from J. Mitchell to F. Ellsworth at 8 (February 11, 2026) ("February 11, 2026 Letter").

[29] 2017 WL 11684866, at *5 (M.D.N.C. Aug. 9, 2017).

[30] *Id.* (citing *Fisher v. University of Texas at Austin*, 136 S.Ct. 2198, 2210 (2016)).

[31] *Id.*

[32] *Id.*

across thirteen separate undergraduate campuses and law schools, each of which maintains its own student records and performance metrics in different systems. Responding to these requests would require campus-by-campus data collection, coordination, anonymization, and review, followed by extensive data aggregation and quality control at the systemwide level (all for categories of information that have no bearing on the admissions decisions at issue). That burden far outweighs any conceivable benefit to the resolution of the claims in this case.

Accordingly, UC maintains its objections to RFP Nos. 13-14, 41, and 43-46 and will not produce post-admissions student performance or preparedness data.

## V. Other

### A. Reports Showing Admissions and Enrollment by Race and Sex (RFP No. 12)

Much of the data Plaintiff requests in RFP No. 12 is publicly available,[33] and "it is 'well established that discovery need not be required of documents of public record which are equally accessible to all parties.'"[34] In any event, as noted above, UC will produce applicant data, including data on race, sex, admission decision, and enrollment status, for the time period from January 1, 2022 through the commencement of this suit. *See supra* Section III.A. To the extent this RFP seeks information for the period between January 1, 2022 and the commencement of this suit that is not already covered by RFP Nos. 10-11, please explain what that information is and why Plaintiff needs it.

### B. Reports Related to Probability of Admissions (RFP No. 40)

RFP No. 40 requests "[a]ll documents, reports, studies, or analyses that mention, pertain to, or relate to the probability of admission to UC undergraduate programs or law schools based on identifiable characteristics, including, but not limited to, GPA, test scores, athlete, sex or gender, race, ethnicity, geography, first-generation status, or any other identifiable characteristic considered in an admissions decision." Contrary to Plaintiff's assertion that there is "nothing vague or ambiguous about the word 'identifiable characteristics,'"[35] that phrase is exceedingly broad.

In your February 18 email, you suggest that this RFP would encompass an "internal report showing what the class would look like given different admissions criteria."[36] But that is

---

[33] *See Undergraduate Admissions Summary*, Univ. of Cal., https://www.universityofcalifornia.edu/about-us/information-center/admissions-residency-and-ethnicity (updated Jan. 23, 2026).

[34] *Baca*, 2022 WL 16972489, at *4.

[35] February 11, 2026 Letter at 16.

[36] February 18, 2026 Email.

not what this RFP asks for, which serves only to show how unworkable—and therefore improper—the request is. It is by no means clear that a report presenting a hypothetical class profile under alternative admissions criteria would constitute a report that "mention[s], pertain[s] to, or relate[s] to the probability of admission … based on identifiable characteristics." If you have specific categories of documents in mind, please revise this RFP to limit it to those categories of documents, and UC will consider that request.

C. No Workable Race-Neutral Alternatives (RFP No. 37)

UC objects to this RFP not out of "umbrage at the implication that UC campuses might have used non-race-neutral admissions"[37] but because the RFP seeks documents that are categorically irrelevant under the controlling legal framework. Plaintiff's claim that documents responsive to this RFP "will show whether UC complied with or defied the Supreme Court's ruling in *Grutter v. Bollinger*," respectfully, is nonsensical.[38] While "*Grutter* upheld as *permissible* certain race-based affirmative action programs" under federal law,[39] such programs have long been unlawful under Proposition 209, which "prohibits race- and gender-conscious programs the federal equal protection clause *permits* but does not *require*."[40] That means that UC could not and did not engage in a race-based affirmative action program, and thus did not determine that "no workable race-neutral alternatives would produce the educational benefits of racial diversity."

D. Certifications to Government and Communications to Third Parties (RFP Nos. 33 and 34)

The documents sought by these RFPs are not relevant. Your February 11 letter makes clear that the goal of these RFPs is to determine what UC has represented to the government or to third parties about the use of race in admissions,[41] but any such representations do not tend to show whether or not UC actually did use race in admissions. Only the latter question is at issue in this litigation.

---

[37] February 11, 2026 Letter at 15-16.

[38] *Id.* at 15.

[39] *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1136 (9th Cir. 2012).

[40] *Coral Constr., Inc. v. City & Cnty. of S.F.*, 235 P.3d 947, 957 (Cal. 2010).

[41] February 11, 2026 Letter at 14.

E. Complaints (RFP No. 35)

Contrary to your suggestion in your February 18 email,[42] UC did not say that they would withhold any documents responsive to this request. UC simply explained their position that "complaint" in this context is a vague and ambiguous term—and one that makes the request overbroad. Please narrow the request, including by explaining what you mean by "any complaint … that mention[s], pertain[s], or relate[s] to the use of race in [UC's] admission process." UC will then consider your reformulated request.

## VI. Withdrawn Requests

Thank you for confirming in your February 18 email that you have withdrawn the following requests: RFPs No. 17-18 (relating to California Public Records Act and FOIA requests); RFP No. 21 (relating to communications with "researchers or consultants") to the extent it encompasses individuals other than Robert Mare; RFP No. 32 (relating to comparisons between two or more applicants for admission); and RFP No. 39 (relating to policies for "classifying or describing the race of applicants for admission") to the extent it seeks documents predating the Relevant Time Period.

Best regards,

/s/ Felicia H. Ellsworth

Felicia H. Ellsworth

---

[42] February 18, 2026 Email.